IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN W. KEENER D/B/A JMJ FINANCIAL,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Jury Trial Demanded**<br>)<br>)<br>) No. _____<br>)<br>)<br>) |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission (the "SEC"), alleges as follows:

**I.     SUMMARY**

1.     From at least January 2015 through January 2018 ("the Relevant Period"), Justin W. Keener d/b/a JMJ Financial ("Keener" or the "Defendant") bought and sold billions of newly issued shares of microcap securities (*i.e.*, penny stocks)—and generated millions of dollars from those sales—but failed to comply with the mandatory dealer registration requirements of the Federal securities laws.

2.     Keener's admitted business model is to buy convertible notes—a type of security—from penny stock issuers, convert the notes into newly issued shares of stock, and sell those shares into the public market at a profit.  During the Relevant Period, Keener purchased or converted more than 100 such notes from more than 100 different microcap issuers.  Keener demanded and received highly favorable terms for these notes, including deep discounts on converted stock from

the prevailing market price. By engaging in a regular business of buying convertible notes and selling the resulting newly issued shares of microcap stock into the public market, Keener operated as an unregistered securities dealer and generated more than $21.5 million in profits.

3. By failing to comply with the dealer registration requirements of the Federal securities laws, Keener avoided certain regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

4. Through these activities, Keener violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") by acting as an unregistered securities dealer. [*See* 15 U.S.C. § 78o(a)(1)] The SEC requests, among other things, that this Court enjoin Keener from committing further violations of the Federal securities laws as alleged in this Complaint, and order him to pay disgorgement and a monetary penalty based upon these violations.

## II.   DEFENDANT

5. **Justin W. Keener**, age 45, resides in San Juan, Puerto Rico. During the Relevant Period, Keener was a resident of Miami Beach, Florida. Keener registered the name "JMJ Financial" as a fictitious name in Florida in 2008 and used it to conduct the business described herein from Miami Beach. Keener describes his business as a "sole proprietorship," although at one point he employed as many as twenty people. He has never been registered with the SEC in any capacity. The Financial Regulatory Authority ("FINRA") barred him from associating with any FINRA member in any capacity in 2012, after he became a part owner of a registered broker-dealer and refused to respond to a FINRA inquiry.

### III. JURISDICTION AND VENUE

6. This Court possesses jurisdiction over this matter pursuant to Exchange Act Sections 21(d), 21(e), and 27. [*See* 15 U.S.C. §§ 78u(d), 78u(e), and 78aa]  In connection with the transactions and acts alleged in this Complaint, Keener, directly or indirectly, made use of the means and instrumentalities of transportation and communication in interstate commerce and of the mails.

7. Venue lies in the Southern District of Florida pursuant to Exchange Act Section 27, 15 U.S.C. § 78aa, because Keener resided in and conducted business in this District during the Relevant Period.  Most of the transactions and acts constituting the violations alleged in this Complaint occurred in this District.  For instance, during the Relevant Period, Keener, while present in this District, either personally or through employees acting under his direction, solicited penny stock issuers to sell him convertible notes, negotiated purchase and sale terms for the notes, purchased the notes, converted the notes to penny stock, and placed orders to execute sales of the converted stock.  Although most of Keener's employees were located in California, he directed and supervised them from this District.

### IV. FACTS

**A. Keener Bought Convertible Notes From Penny Stock Issuers, Converted Them to Newly Issued Shares of Stock, and Sold the Shares in the Market as Part of His Regular Business.**

8. Keener operates a business through which he buys convertible notes, a form of short-term debt security, from penny stock issuers in need of cash.  After holding the notes for approximately six months, Keener converts them into newly issued shares of stock at a deep discount to the prevailing market price, which he negotiates in advance of the purchase, and sells that stock into the market to lock in a profit.  During the Relevant Period, Keener sold into the

public market more than 17.5 billion newly issued shares of penny stock from convertible notes that he purchased from more than 100 penny stock issuers. Keener's profits from this practice were approximately $21.5 million, the majority of which came from the spread between Keener's discounted acquisition cost for the stock and the prevailing market price.

9. Keener, personally or through his employees, negotiated the terms of the convertible notes that he purchased from penny stock issuers (as well as amendments to the original terms). Keener generally received very favorable terms from the issuers. He also signed the contracts by which he acquired the convertible notes.

10. During the Relevant Period, Keener held himself out to the public as being willing to buy convertible notes at a regular place of business, which was in Miami Beach, Florida. For example, Keener operated a website that advertised his business to issuers. Keener hired employees, who worked on commission, to solicit issuers who were willing to sell convertible notes to him. Keener and his employees also attended, and sometimes sponsored, conferences at which they solicited penny stock issuers in person. On several occasions, Keener made PowerPoint presentations at these conferences that included a notarized affidavit from his accountant stating that he had $20 million "committed" to purchase convertible notes from issuers.

11. Keener obtained nearly all of the stock that he sold in his business directly from the issuers, through note conversions, and not from purchases in the secondary market. The shares were newly issued, and the sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals. Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.

12. The newly issued stock that Keener received through the conversion process was restricted. SEC Rule 144 enables non-affiliates who acquire restricted stock directly from the issuer in a private transaction to resell it free of restriction into the market after observing a holding period, among other requirements. [*See* 17 C.F.R. § 210.144] Keener timed his conversions and sales in an effort to comply with the holding period under Rule 144. For that reason, Keener generally waited six months after purchasing a convertible note before he began to exercise his right to convert the note to stock, which he then resold in the market. Keener submitted the conversion notices to the issuers himself, or through employees acting at his direction (using mail, facsimile, and/or email facilities). Keener also personally, or through employees acting at his direction, arranged for the converted stock to be transferred to his brokerage accounts either electronically or via mailed certificates. As part of this process, Keener obtained attorney opinion letters to assure his brokerage firms that the converted stock was no longer restricted and could be resold to the public. Keener performed this work from his home and office in Miami Beach, Florida.

13. The convertible notes that Keener bought from the issuers entitled him to receive issuer stock at a substantial discount from the prevailing market price. Each note provided for a specified discount, which generally ranged between 35 and 50 percent less than the lowest closing price for the stock during the 10 to 25 trading days preceding the conversion request. Keener normally sold the stock himself, or through employees acting under his direction and supervision, as soon after conversion as the market would bear the sales. He did so to lock in his profits. Keener and his employees used the telephone and the Internet to place these sell orders. The majority of Keener's profits resulted from the discounted prices at which he acquired shares from

the issuers to sell into the market. This mechanism, which gave Keener a spread or markup on the stock that he sold, is a common attribute of a securities dealer.

14.     Keener's business practice was to convert notes in tranches, selling the resulting shares into the public market before converting a new tranche. He normally profited even when his tranched selling (or other factors) depressed the market price for a particular issuer's stock. This was because he could convert a new tranche at a discount to the diminished market price. This mechanism helped to protect his profits if the market price of a stock declined, as it often did.

15.     Keener's dealer business was very lucrative. The following are examples of transactions in which Keener purchased convertible notes from penny stock issuers, exercised his discounted conversion rights, and sold the resulting newly issued stock into the market for a significant profit:

    a.   Lithium Exploration Group, Inc. ("LEXG")

        i   On February 13, 2013, Keener purchased a convertible note from LEXG for $675,000 (with payments of $100,000 on that date; $50,000 on April 24, 2013; $50,000 on June 4, 2013; $50,000 on June 27, 2013; $75,000 on August 14, 2013; $100,000 on December 10, 2013; $50,000 on February 20, 2014; and $200,000 on April 16, 2014).

        ii   Pursuant to the terms of the note, Keener elected to convert $106,392 of the principal, interest, and "original issue discount" ("OID") that LEXG owed him into shares of LEXG's stock on 14 occasions between April 20, 2015 and May 10, 2016. In so doing, Keener received a total of 344,744,000 newly issued shares.

      iii      Pursuant to the favorable terms that Keener negotiated for himself, the conversion price for these shares was 50% less than the lowest closing price for the stock in the 20 trading days preceding each conversion. The terms that Keener negotiated allowed him to spend significantly less money to acquire the shares than he would have paid on the open market.

      iv      Keener sold the shares shortly after each conversion (between April 2015 and May 2016), generating profits of $154,168, most of which were attributable to the discounted acquisition prices that he negotiated.

  b.    ERHC Energy, Inc. ("ERHC")

      i      On April 16, 2014, Keener purchased a convertible note from ERHC for $250,000 (with payments of $100,000 on that date; $50,000 on September 4, 2014; $50,000 on October 22, 2014; and $50,000 on March 10, 2016). One of Keener's employees working on commission made the initial contact with ERHC.

      ii      Pursuant to the terms of the note, Keener elected to convert $186,666 of the principal, interest, and OID that ERHC owed him into shares of ERHC's stock on 22 occasions between January 2, 2015 and December 21, 2016. In so doing, Keener received a total of 438,698,078 newly issued shares.

      iii      Pursuant to the favorable terms that Keener negotiated for himself, the conversion price for these shares was 40% less than the lowest closing

7

        price for the stock in the 25 trading days preceding each conversion. The terms Keener negotiated allowed him to spend significantly less money to acquire the shares than he would have paid on the open market.

    iv    Keener sold the shares shortly after each conversion (between January 2015 and December 2016), generating profits of $271,129, most of which were attributable to the discounted acquisition prices that he negotiated.

c.    Accelera Innovations, Inc. ("ACNV")

    i    On September 2, 2015, Keener purchased a convertible note from ACNV for $75,000 (with payments of $50,000 on that date and $25,000 on March 10, 2016).

    ii    Pursuant to the terms of the note, Keener elected to convert $93,333 of the principal, interest, and OID that ACNV owed him into shares of ACNV's stock on fourteen occasions between March 2, 2016 and January 12, 2017.  In so doing, Keener received a total of 15,076,729 newly issued shares.

    iii    Pursuant to the favorable terms that Keener negotiated for himself, the conversion price for these shares was 40% less than the lowest closing prices for the stock in the 25 trading days preceding each conversion. The terms Keener negotiated allowed him to spend significantly less

money to acquire the shares than he would have paid on the open market.

  iv  Keener sold the shares shortly after each conversion (between March 2016 and March 2017), generating profits of $116,331, most of which were attributable to the discounted acquisition prices that he negotiated.

16. During the Relevant Period, Keener sold more than 17.5 billion shares of newly issued stock that he obtained from convertible notes for approximately $21.5 million in profits.

  **B.** **Keener Violated the Federal Securities Laws by Acting as an Unregistered Dealer.**

17. Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer. [15 U.S.C. § 78o(a)(1)]

18. Keener used means or instrumentalities of interstate commerce to buy and sell securities as part of his regular business. For example, Keener used the internet to solicit microcap issuers, transferred cash through bank wires, and used email and the telephone to negotiate and effectuate sales transactions. Keener engaged in much of the conduct described in this Complaint at his Miami Beach address in this District.

19. Between January 2015 and January 2018, Keener was not registered with the SEC as a dealer or associated with a dealer registered with the SEC.

20. Registration with the SEC requires the dealer to provide important information to the SEC about its business—some of which is made public—including but not limited to the

names of the direct and indirect owners and executive officers of the business, certain arrangements with other persons or entities, the identities of those who control the business, the states in which the dealer does business, past criminal or regulatory actions of the dealer or any affiliate that controls the business, and financial information including bankruptcy history. Further, registration requires the dealer to join a self-regulatory organization, such as FINRA or a national securities exchange, which assist the SEC in regulating the activities of registered dealers. Finally, registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

### C. Keener Sold Penny Stock.

21. Keener sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51–1. [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1]

22. Keener therefore participated in the offering of penny stock by acting as a securities dealer engaged in the selling of penny stocks.

### COUNT
### Violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
### (Against Keener)

23. The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1-22, inclusive, as if they were fully set forth herein.

24. By engaging in the conduct described above, Keener made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, or to induce or to attempt to induce the purchase or sale of, securities as part of a regular business while not

registered with the SEC as a dealer and when Keener was not associated with an entity registered with the SEC as a dealer.

25. By reason of the foregoing, Keener violated Exchange Act Section 15(a)(1). [*See* 15 U.S.C. § 78o(a)(1)]

26. A violation of Section 15(a)(1) does not require proof of scienter.

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court issue a Final Judgment:

### I.

### Violations

Finding that Keener violated the Federal securities laws and rules promulgated thereunder as alleged against him in this Complaint.

### II.

### Permanent Injunction

Permanently restraining and enjoining Keener and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive notice of the injunction by personal service or otherwise, from acting as an unregistered securities dealer in violation of Exchange Act Section 15(a)(1). [15 U.S.C. § 78o(a)(1)]

### III.

### Penny Stock Bar

Permanently restraining and enjoining Keener from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of

issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6).  [15 U.S.C. § 78u(d)(6)]

## IV.

## **Civil Penalties**

Ordering Keener to pay an appropriate civil penalty under Exchange Act Section 21(d)(3).  [15 U.S.C. § 78u(d)(3)]

## V.

## **Disgorgement**

Ordering Keener to disgorge, with prejudgment interest, all ill-gotten gains derived from the activities set forth in this Complaint.

## VI.

### Further Relief

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the Federal securities laws and for the protection of investors.

DATED:  March 24, 2020

Respectfully submitted,

By:

/s/
Joshua E. Braunstein (Special Bar No. A5502640)
Antony Richard Petrilla (Special Bar No. A5502641)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**Lead Attorney**
**Attorney To Be Noticed**

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**