**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:20-CV-21254-BLOOM**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | |
| **Plaintiff**, | |
| **v.** | **ORAL ARGUMENT REQUESTED** |
| **JUSTIN W. KEENER D/B/A JMJ FINANCIAL**, | |
| **Defendant**. | |

**DEFENDANT'S MOTION TO DISMISS,**
**WITH INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................. 2

II.   FACTUAL BACKGROUND............................................................................. 4

   A.   Mr. Keener Invested His Own Money in Microcap Companies ........................................ 4

   B.   Mr. Keener Received Convertible Notes, Did Not Provide Any Financial Services, and

        Himself Decided When and How Much Stock to Sell From the Notes.............................. 5

III.  LEGAL STANDARD ......................................................................................... 6

IV.   ARGUMENT ...................................................................................................... 7

   A.   There is Extensive Legal Guidance on the Definition of a Dealer ................................... 7

   B.   The SEC Fails to Allege Any Facts to Show Mr. Keener was a Dealer.......................... 11

   C.   The SEC's Allegations Instead Show Mr. Keener was a Trader, not a Dealer. .............. 15

   D.   The SEC Fails to State a Claim for Injunctive Relief ..................................................... 16

   E.   In the Alternative, the Complaint Should be Dismissed as a Due Process Violation....... 17

V.    CONCLUSION ................................................................................................ 19

VI.   REQUEST FOR HEARING............................................................................ 19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Prof'l Hunters Ass'n, Inc. v. F.A.A.*,
    177 F.3d 1030 (D.C. Cir. 1999) ...................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................5, 11, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................5

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ......................................................................4

*Chapel Investments, Inc. v. Cherubim Interests, Inc.*,
    177 F. Supp. 3d 981 (N.D. Tex. 2016) .....................................................7, 10, 13

*Gordon Wesley Sodorff, Jr.*,
    50 S.E.C. 1249, 1992 WL 224082 (Sept. 2, 1992) .............................................12

*Grayned v. City of Rockford*,
    408 US 104 (1972).......................................................................................15, 16

*McBoyle v. United States*,
    283 U.S. 25 (1931).............................................................................................16

*NYCERS v. SEC*,
    45 F.3d 7 (2d Cir. 1995).......................................................................................8

*Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*,
    150 F. Supp. 3d 1219 (D. Nev. 2015) ...............................................................10

*U.S. ex rel. Osheroff v. Humana Inc.*,
    776 F.3d 805 (11th Cir. 2015) ............................................................................4

*Schatzki v. Weiser Capital Management*,
    No. 10-CV-4685(RWS), 2016 WL 6662264 (S.D.N.Y. Nov. 9, 2016) ...................8

*SEC v. Federated Alliance Group*,
    No. 93-CV-0895E(F), 1996 WL 484036 (W.D.N.Y. Aug. 21, 1996)............6, 8, 13

*SEC v. Gentile*,
    939 F.3d 549 (3rd Cir. 2019) .............................................................................15

*SEC v. Globus Group, Inc.*,
　117 F. Supp.2d 1345 (S.D. Fla. 2000) ...................................................................15

*SEC v. Monarch Fund*,
　608 F.2d 938 (2d. Cir. 1979)...............................................................................15

*SEC v. Pentagon Capital Mgmt. PLC*,
　844 F. Supp. 2d 377 (S.D.N.Y. 2012)...................................................................17

*SEC v. River North Equity*,
　415 F. Supp. 3d 853 (N.D. Ill. 2019) .............................................................13, 15

*Skidmore v. Swift*,
　323 U.S. 134 (1944)...............................................................................................7

*SMF Holdings, Ltd. v. Banc of Am. Sec.*, LLC
　600 F.3d 1334 (11th Cir. 2010) .............................................................................8

*Thompson v. Relation Serve Media, Inc.*,
　610 F.3d 628 (11th Cir. 2010) ...............................................................................8

*United States of Am. v. Conigliaro*,
　No. CR 14-10363-RGS, --- F. Supp. 3d ---, 2019 WL 2410154 (D. Mass. June
　7, 2019) ...............................................................................................................16

*United States v. AMC Entm't, Inc.*,
　549 F.3d 760 (9th Cir. 2008) ...............................................................................16

*Upton v. SEC*,
　75 F.3d 92 (2d Cir. 1996)................................................................................16, 17

**Statutes**

15 U.S.C. § 78c(a)(5)(A) .............................................................................................6

15 U.S.C. § 78c(a)(5)(B)............................................................................................13

15 U.S.C. § 78o(a)(1)....................................................................................................6

15 U.S.C. § 78u(d) .....................................................................................................15

**Other Authorities**

17 C.F.R § 230.144 ....................................................................................................11

72 Fed. Reg. 36,822 (July 5, 2007)............................................................................11

Acqua Wellington North Am. Equities Fund, SEC No-Action Letter,
　WL 1230266 (Oct. 11, 2001)..................................................................................9

Burton Sec., SEC No-Action Letter,
  1977 WL 10680 (Dec. 5, 1977) .......................................................................14

Continental Grain Co., SEC No-Action Letter,
  1987 WL 108902 (Nov. 6, 1987) ........................................................................8

Davenport Mgmt. , Inc., SEC No-Action Letter,
  1993 WL 120436 (Apr. 13, 1993) .......................................................................9

Fairfield Trading Corp., SEC No-Action Letter,
  1988 WL 233618 (Jan. 10, 1988) ........................................................................8

Federal Rules of Civil Procedure Rule 12(b)(6) ........................................................1, 5

Guide to Broker-Dealer Registration .....................................................................7, 13

H.R.Rep. No. 1383, 73d. Cong. 2d Sess. (1934) .........................................................9

Louis Dreyfus Corp., SEC No-Action Letter,
  1987 WL 108160 (July 23, 1987) .......................................................................8

Nat'l Council of Sav. Instit.,
  SEC No-Action Letter, 1986 WL 67129 (July 27, 1986) .......................................14

SEC, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013) .......................................3

SEC Release No. 11742 (Oct. 5, 1975) ...................................................................8

SEC Release No. 34-46745 (Oct. 30, 2002), 67 Fed. Reg. 67495 (Nov. 5, 2002) .........................8

SEC Release No. 34-47364 (Feb. 13, 2003), 68 Fed. Reg. 8686 (Feb. 24, 2003) ..........................8

SEC Rule 144, 37 Fed. Reg. 596 (1972) ...........................................................2, 5, 11

United Savings Ass'n of Texas, SEC No-Action Letter,
  1987 WL 107923 (Apr. 2, 1987) .........................................................................8

United Trust Co. (Morris, Larson, King), SEC Denial of No-Action Request,
  1978 WL 13781(Sept. 6, 1978)..........................................................................12

Defendant, Justin W. Keener d/b/a JMJ Financial ("Mr. Keener"), by and through his undersigned counsel, hereby respectfully moves this Court to dismiss Plaintiff Securities and Exchange Commission's ("SEC's") Complaint (D.E. 1, filed March 24, 2020) ("Complaint"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the ground that the Complaint fails to state a claim upon which relief may be granted. The grounds for this Motion are set forth below in the incorporated Memorandum of Law.

## I.  INTRODUCTION

This case raises the question whether, as a matter of law, an individual who invests his own money in microcap companies, provides no financial services, and does not interact at all with the investing public, must register with the SEC as a securities dealer and be subject to the onerous requirements that come with it. The SEC answers this question in its Guide to Broker-Dealer Registration—which is published on its own website and is based on decades of no-action letters and court cases. The answer is no. Individuals who do not have the attributes of a dealer need not register with the SEC. As described below, the SEC does not allege that Justin Keener possessed a single one of the attributes the SEC has itself identified as characteristic of a dealer, and consequently, the Complaint must be dismissed.

The SEC has launched here a technical case—with no allegation of fraud whatsoever—claiming that Mr. Keener, a private investor, should have registered with the SEC as a securities dealer when he sold certain of his personal stock holdings into the market through registered third party broker-dealers. But the SEC's Complaint fails to state even a technical claim here. Instead, the SEC has contorted and stretched its own rules past the breaking point. Like the many persons who actively buy and sell securities for their own accounts—for instance, day

traders, hedge funds, and family investment offices—Mr. Keener's activity does not trigger SEC jurisdiction.

The law is clear.  Certain persons must register as securities dealers—namely, persons that advertise to the public that they buy and sell securities, market makers that quote buy and sell prices to the public, or those that offer related services such as extending credit to investors and giving investment advice.  But Mr. Keener is not one of them, and the SEC's barebones factual allegations do not demonstrate otherwise.  Instead, Mr. Keener is a *trader*—an individual who invests his own money and trades stock for his own benefit without providing any services to anyone else.  As the SEC itself acknowledges, Mr. Keener made all his own investment decisions, held the stock at issue for at least six months and in some cases several years, and had attorneys involved in each of his stock sales to confirm compliance with applicable securities laws (namely SEC Rule 144, 37 Fed. Reg. 596 (1972)).  Traders such as Mr. Keener are not dealers.  Instead, as set forth in the Securities Exchange Act of 1934, traders are exempt from the requirement to register as a securities dealer.  The distinction between a securities dealer and a securities trader is like the distinction between a restaurant and a grocery store—while they may both deal with similar products (*i.e.*, securities or food), they are two different entities subject to two different regulatory requirements.  And as the Complaint itself demonstrates, Mr. Keener complied with the regulatory requirements applicable to traders, *i.e.*, SEC Rule 144.

At its core, the complaint against Mr. Keener represents the SEC's calculated attempt to expand the settled definition of a dealer through enforcement actions rather than through the issuance of new guidance.  But the SEC's goal here runs up against the U.S. Constitution.  The SEC cannot punish individuals for conduct it never previously said was unlawful.  Yet that is exactly what the SEC seeks to do here, in contravention of Mr. Keener's due process rights,

which guarantee fair notice of the rules that will be imposed to punish him.  In a case involving no allegation of fraud and no allegation that a single investor was harmed, the SEC's attempt to impermissibly expand the scope of the law by way of an enforcement action against an individual—and indeed to pretend decades of its own guidance do not exist—must be dismissed.

Allowing this case to proceed would raise unjustified doubt as to whether traders like Mr. Keener, who provide much needed capital and liquidity to the marketplace, are required to undergo the expense and burden of registering with the SEC.  Despite the broad statutory language upon which the SEC relies, to date, no trader in Mr. Keener's position has been required to register with the SEC, because the SEC's own guidance on the distinction between a trader and a dealer supports that result.  For the reasons set forth below, if this Court entertains the SEC's case, it will contravene Mr. Keener's rights and potentially chill the entire private investment industry at a critical time when capital and liquidity are badly needed.

## II.     FACTUAL BACKGROUND

### A.     Mr. Keener Invested His Own Money in Microcap Companies

Mr. Keener is a 46-year-old individual investor who has, for more than a decade, invested his own money under the name JMJ Financial.  Compl. ¶ 5.  As alleged in the Complaint, Mr. Keener invested in certain microcap companies.  *Id.* ¶ 2.  Microcap companies are smaller companies, typically with "less than $250 or $300 million" in market capitalization, and may be "risky" investments because they tend to be new companies with "products and services that are still in development."[1]

---

[1] SEC, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013), avail. at https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html.

The SEC's Complaint identifies three examples of specific microcap companies in which Mr. Keener invested: (1) Lithium Exploration Group, Inc. (LEXG), a company that explores and develops natural resources in Western Canada;[2] (2) ERHC Energy, Inc. (ERHC), a company that explores oil and gas resources in Kenya, Chad, and other parts of Africa;[3] and (3) Accelera Innovations, Inc. (ACNV), a healthcare services company focused on using technology to improve healthcare quality and reduce its cost.[4]   *See* Compl. ¶ 15.

### B.   Mr. Keener Received Convertible Notes, Did Not Provide Any Financial Services, and Himself Decided When and How Much Stock to Sell From the Notes

Mr. Keener invested in these and other microcap companies in times when the companies were "in need of cash."  Compl. ¶ 8.  The investments took the form of "convertible notes,"[5] an investment instrument through which Mr. Keener invested a principal amount at a set interest

---

[2] Lithium Exploration Group, Inc., Annual Report (Form 10-K) (June 30, 2014), pp. 4, 23, avail. at https://www.sec.gov/Archives/edgar/data/1375576/000106299314005964/form10k.htm.

The Court may take judicial notice at the motion to dismiss stage "of relevant public documents required to be filed with the SEC, and actually filed."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-80 (11th Cir. 1999).

[3] ERHC Energy, Annual Report (Form 10-K) (Sept. 30, 2016), p. 2, avail. at https://www.sec.gov/Archives/edgar/data/799235/000114036117002243/form10k.htm.

[4] Accelera Innovations, Inc., Annual Report (Form 10-K) (Dec. 31, 2013), p. 3, avail. at https://www.sec.gov/Archives/edgar/data/1444144/000107997414000283/accelera10k12312013.htm.

[5] Convertible notes are a common investment instrument—press reports indicate more than $20 billion in convertible notes were issued in May 2020 alone.  Kate Duguid, Imani Moise, *Financing hunt during pandemic lifts May U.S. convertible debt issuance to record*, Reuters (June 2, 2020), avail. at https://www.reuters.com/article/us-health-coronavirus-converts-analysis/financing-hunt-during-pandemic-lifts-may-u-s-convertible-debt-issuance-to-record-idUSKBN2392F7?il=0. The Court may take judicial notice of news articles at the motion to dismiss stage.  *See, e.g.*, *U.S. ex rel. Osheroff v. Humana Inc.,* 776 F.3d 805, 811 (11th Cir. 2015).

rate, and could in some circumstances convert the investment into restricted shares of the company's stock.  *Id.*

When the circumstances permitted Mr. Keener to convert the investments into stock, Mr. Keener himself decided when and how much stock to sell, and he did not act at the direction of the companies.  *Id.*  There are no allegations that Mr. Keener provided any financial services to the companies or the investing public.  While Mr. Keener typically converted the notes into stock and subsequently sold many of the converted shares, Mr. Keener always held the notes for at least six months, and sometimes for much longer.  *Id.* ¶¶ 8, 15.  For instance, Mr. Keener invested in LEXG in February 2013 in exchange for a convertible note, but as alleged in the Complaint, he held that note for more than two years and did not convert that note or sell any LEXG stock until April 2015.  *Id.* ¶ 15.  Mr. Keener also invested in ERHC in April 2014 in exchange for a convertible note, and did not convert that note or sell any ERHC stock until nearly nine months later in January 2015.  *Id.*  These investments were lawfully profitable.  *Id.* The notes often provided that Mr. Keener could convert the investment into stock at a discount to the prevailing market price at the time of conversion, which, in the case of LEXG and ERHC as alleged in the Complaint, was many months or even years after the initial investment.  *Id.*  Each sale transaction included input from outside counsel—who confirmed that Mr. Keener could legally sell the shares at issue pursuant to SEC Rule 144—and was executed through a brokerage firm.  *Id.* ¶ 12.

## III.   LEGAL STANDARD

A complaint must be dismissed if it fails to state a cognizable claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  That is, a complaint must be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face'" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "Labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.

## IV.   ARGUMENT

The Complaint should be dismissed because it fails to state a claim for relief.  It fails to allege that Mr. Keener engaged in any of the activities characteristic of a dealer, as defined in judicial opinions, decades of no-action letters, and guidance published by the SEC.  Specifically, while firms that advertise to the public that they both buy and sell securities, offer related services to the public, or engage in the other dealer activities, may be obligated to register as a securities dealer with the SEC, the Complaint fails to allege Mr. Keener engaged in any of those activities.  Instead, the Complaint's own allegations demonstrate he was a *trader* rather than a dealer, and was thus exempt from the registration requirements.  And although the SEC would now have this Court ignore decades of its own guidance and no-action letters in favor of its present enforcement priorities, that is not the law.  The SEC may not contravene its prior guidance and seek to punish defendants for conduct it never previously explained was unlawful. This action should therefore be dismissed for the independent reason that it violates Mr. Keener's due process rights.

### A.      There is Extensive Legal Guidance on the Definition of a Dealer

Section 15(a) of the Exchange Act requires "dealers" to register with the SEC, and defines a dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise."  15 U.S.C. § 78o(a)(1); 15 U.S.C. §

78c(a)(5)(A).  If taken literally, this definition would cast too broad a net, encompassing anyone who buys and sells securities for a living, something the statute never was intended to do.  Thus, the SEC itself has never taken the Exchange Act's definition of the word "dealer" literally. Instead, the SEC has set forth detailed criteria relevant to defining a dealer as opposed to a trader, criteria which were developed over a series of no-action letters, adopted by courts, and published on the SEC's website.  *See, e.g.*, *SEC v. Federated Alliance Group*, No. 93-CV-0895E(F), 1996 WL 484036 at *5 (W.D.N.Y. Aug. 21, 1996) (adopting from SEC no-action letter nine factors to consider in determining whether an entity is a dealer); *Chapel Investments, Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981 (N.D. Tex. 2016) (citing several factors).

Since 2008, the SEC has posted these criteria to its website in the Guide to Broker-Dealer Registration ("Guide")—a guide that was prepared by the SEC in order "to summarize some of the significant provisions of the [Exchange] Act and its rules" and to provide "information about whether you need to register as a broker-dealer."[6]  The Guide, which summarizes the prior no-action letters and judicial authority, and is entitled to substantial deference,[7] lists the following activities as characteristics of a dealer as opposed to a trader:

1. Holding oneself out as "being willing to buy and sell a particular security on a continuous basis;"

2. Advertising that the person is "in the business of buying and selling securities;"

3. Doing "business with the public (either retail or institutional);"

4. Making a "market" in, or "quot[ing] prices for both purchases and sales of, one or more securities;"

---

[6] Guide, avail. at https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html (last accessed June 3, 2020).
[7] *Skidmore v. Swift*, 323 U.S. 134, 137-39 (1944) (agency interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" in particular based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements").

5.   Running "a matched book of repurchase agreements;"

6.   "[I]ssu[ing] or originat[ing] securities that [the person] also buys and sells;"

7.   Participating in "a selling group" or "otherwise underwrit[ing] securities;"

8.   Providing "services to investors," such as "handling money and securities, extending credit, or giving investment advice;" and

9.   Writing "derivatives contracts that are securities."

*Id.*

As noted, the SEC had discussed these factors previously in no-action letters—*i.e.*, letters in which the SEC set forth the reasons it declined to take action against firms for not having registered as a dealer.[8]  *See, e.g.,* Fairfield Trading Corp., SEC No-Action Letter, 1988 WL 233618 at *2 (Jan. 10, 1988) (declining enforcement action against company trading government securities when it, among other things, had "no customers" and did not "deal with the public"); Louis Dreyfus Corp., SEC No-Action Letter,  1987 WL 108160 at *2  (July 23, 1987) (same as to another government securities trading firm, when it had "no customers," did not provide quotes to purchasers of securities, and ultimate purchasers of securities did not know company's identity); Continental Grain Co., SEC No-Action Letter, 1987 WL 108902 at *5 (Nov. 6, 1987) (same); United Savings Ass'n of Texas, SEC No-Action Letter, 1987 WL 107923 at *1 (Apr. 2, 1987) (same outcome as to savings and loan firm that also engaged in securities transactions).[9]

---

[8] Courts treat SEC no-action letters as persuasive authority.  *See, e.g.*, *SMF Holdings, Ltd. v. Banc of Am. Sec.*, LLC, 600 F.3d 1334, 1339 (11th Cir. 2010) (citing SEC No-Action Letters to interpret terminology and understand the nature of the prime brokerage industry);  *Thompson v. Relation Serve Media, Inc.*, 610 F.3d 628 (11th Cir. 2010) (citing SEC No-Action Letter to support the conclusion that contract at issue is not "per se illegal" under federal law); *Schatzki v. Weiser Capital Management*, No. 10-CV-4685(RWS), 2016 WL 6662264, at *5 (S.D.N.Y. Nov. 9, 2016); *SEC v. Federated Alliance Group*, 1996 WL 484036 at *4 (W.D.N.Y. Aug. 21, 1996); *NYCERS v. SEC*, 45 F.3d 7, 13 (2d Cir. 1995).

[9] The SEC had also enumerated many of these factors elsewhere. *See, e.g.,* SEC Release No. 34-46745 (Oct. 30, 2002), 67 Fed. Reg. 67495 (Nov. 5, 2002); SEC Release No. 34-47364 (Feb. 13,

Some of the no-action letters also discussed the following criteria, beyond those included in the 2008 Guide, as characteristic of dealer activity:  "carrying a dealer inventory," using an "interdealer broker," lending securities to consumers, and guaranteeing contract performance or indemnifying the parties for any loss or liability from the failure of the transaction to be successfully consummated.  *See* Fairfield Trading Corp., SEC No-Action Letter, 1988 WL 233618 at *2 (Jan. 10, 1988) (dealer inventory, interdealer broker); Davenport Mgmt., Inc., SEC No-Action Letter, 1993 WL 120436, at *12 (Apr. 13, 1993) (securities lending); Acqua Wellington North Am. Equities Fund, SEC No-Action Letter, WL 1230266 at  *1 (Oct. 11, 2001) (declining enforcement action when firm, among other things, did not guarantee contract performance, and did not indemnify the parties).  In every one of these no-action letters, the SEC concluded the firms at issue did not qualify as dealers, and explained in detail its reasons for concluding as such.

Although the definition of dealer in the Exchange Act appears to broadly cover anyone in the business of buying and selling securities, it has never been interpreted that way.  Instead, the question whether individuals or firms constitute dealers as opposed to traders under the Exchange Act has always been addressed under the above dealer characteristics, which boil down to two overarching questions: (1) does the person advertise to the public that he is willing to buy and sell particular securities, carry a dealer inventory of securities in order to be able to do that, and quote prices for both purchases and sales; and (2) does the person offer services to the investing public, such as underwriting, lending, or originating securities, extending credit to investors, or giving investment advice.  These questions are key to fulfilling the purpose behind

---

2003), 68 Fed. Reg. 8686, 8689, n. 26 (Feb. 24, 2003); Release No. 34-40594, 63 Fed. Reg. 59362, 59370 n. 61 (Nov. 3, 1998); SEC Release No. 11742 (Oct. 5, 1975).

the dealer registration requirements and the securities laws in general—regulation of interactions with retail investors. *See, e.g.*, House Committee on Interstate and Foreign Commerce, H.R.Rep. No. 1383 at p. 2, 73d. Cong. 2d Sess. (1934) (describing key purpose of Exchange Act as regulating relationships with "the investing public").

**B.    The SEC Fails to Allege Any Facts to Show Mr. Keener was a Dealer**

The SEC fails to allege that Mr. Keener engaged in any of these dealer activities.  There is no allegation that Mr. Keener does business with the public or that he carries a dealer inventory of securities.  Nor does the SEC allege Mr. Keener ever used an inter-dealer broker, or that he quoted prices to the public for purchases and sales of securities.  Indeed, the SEC never alleges that Mr. Keener advertised to anyone that he was willing to sell any securities, let alone a particular security, as the prior authority requires.  While Mr. Keener maintained a website to provide information about himself and the types of investments he made to microcap issuers, and he and his employees attended conferences, Compl. ¶ 10, the SEC never alleges that Mr. Keener advertised that he *sold* securities or even quoted prices for the sale of securities.

Furthermore, the SEC never alleges that Mr. Keener provided any services to the companies or to the investing public.  It does not allege that Mr. Keener ever gave investment advice or extended credit to investors.  Nor does the SEC allege Mr. Keener lent or underwrote securities, or that he provided repurchase agreements.  And the SEC does not allege Mr. Keener guaranteed contract performance on any securities contracts or indemnified the parties for any loss or liability from the failure of the transaction to be successfully consummated.  The Complaint is silent as to all of these factors—and indeed never alleges that Mr. Keener acted in anyone's interests other than his own and concedes that he made all his own decisions regarding when and how much stock to sell.  *See* Sec. II.B. *supra*.  Accordingly, the Complaint must be

11

dismissed.  *See, e.g.*, *Chapel Investments, Inc.*, 177 F. Supp. 3d at 991 (finding firm was not a dealer when it did "not provide advice or services to other investors, but is instead acting in its own best interests as an investor"); *Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*, 150 F. Supp. 3d 1219, 1226 (D. Nev. 2015) ("dealer means buying and selling regularly in the service of others, rather than self-interestedly for one's own account") (internal citation and quotation omitted).  Given the SEC's own statements regarding the definition of a dealer as opposed to a trader, there is no basis upon which to conclude Mr. Keener violated the dealer registration requirements, let alone a "reasonable inference" of such a violation, as the law requires.  *Iqbal*, 556 U.S. at 678.  The SEC's 13-page, barebones complaint is nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" and must be dismissed.  *Id.*

At most, the SEC alleges that Mr. Keener is a dealer because he sold shares that were allegedly "newly issued" at the time of conversion.  Compl. ¶ 11.  But that is different from Mr. Keener "issuing or originating" the securities himself, and indeed, is irrelevant as a matter of law to the question of whether he qualified as a dealer.  It is the companies that issue and originate the securities, not Mr. Keener.  *See* Guide (explaining that "issuers" are the "entities issuing securities"—i.e., the companies themselves).  Moreover, as the SEC acknowledges, Mr. Keener confirmed with attorneys that his sales complied with SEC Rule 144, Compl. ¶ 12, which means attorneys confirmed Mr. Keener was "not [] engaged in a distribution" and was "not [an] underwriter."  17 C.F.R § 230.144; *see also* 72 Fed. Reg. 36,822, 36,825 (July 5, 2007) (SEC Rule 144 legislative history) ("holding securities for six months is a reasonable indication that an

investor has assumed the economic risk of investment in those securities" and thus did not "purchase[] the securities for distribution.").[10]

The SEC also alleges the fact that the convertible notes gave Mr. Keener the ability to convert the notes to stock at a discount to the trading price at the time of conversion is "a common attribute of a securities dealer."  Compl. ¶ 13.  However, the SEC has identified no law, rule or guidance indicating that this discount is a relevant characteristic, because no such law, rule, or guidance exists, and the SEC cannot now invent such a characteristic with retroactive effect.  Not to mention that this discount does not make sense as a characteristic of a dealer.  As alleged in the Complaint, Mr. Keener held the notes for many months or even years before converting, *id.* ¶ 15, and as such, a discount to the price at the time of conversion was no guarantee that Mr. Keener would even profit from the investment.[11]

Ultimately, the SEC alleges that Mr. Keener should have registered as a dealer because he sold a large number of shares and profited from his investments.  *See* Compl. ¶¶ 1, 2, 8, 13 – 16.  Both facts are irrelevant as a matter of law.  The volume of stock sales has no bearing on

---

[10] In fact, as the preliminary note to SEC Rule 144 indicates, compliance with SEC Rule 144 involves a conclusion that the person engaging in the transaction is a person "other than an issuer, underwriter, *or dealer*" under the Securities Act of 1933.  17 C.F.R. § 230.144 (emphasis added) ("A person satisfying the applicable conditions of the SEC Rule 144 safe harbor is deemed not to be engaged in a distribution of the securities and therefore not an underwriter of the securities for purposes of Section 2(a)(11).  Therefore, such a person is deemed not to be an underwriter when determining whether a sale is eligible for the Section 4(1) exemption for 'transactions by any person other than an issuer, underwriter, or dealer.'")

[11] To the extent the SEC argues otherwise based on the Commission's opinion in *Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082 (Sept. 2, 1992) that opinion is irrelevant.  Although that opinion took into account Mr. Sodorff's "markup over the price he paid" in determining Mr. Sodorff was a dealer, that markup was entirely different than the conversion discount in Mr. Keener's notes.  Mr. Sodorff never held the stock at issue there, but, instead, quickly sold the stock directly to the investing public at the company's request, and the "markup" was the fee he imposed for this service.  *Id.* at *5.  By contrast, Mr. Keener invested in convertible notes, held those notes for at least six months, and converted those notes at a time of his choosing.  Compl. ¶ 15.

whether Mr. Keener was a dealer.  The Guide never mentions volume, and moreover, the SEC has explicitly stated that this factor is irrelevant: "the ***level of a firm's activity*** with respect to . . . securities is ***not the measure of whether it is 'engaged in the business' of buying and selling*** . . . securities for its own account."  United Trust Co. (Morris, Larson, King), SEC Denial of No-Action Request,  1978 WL 13781 (Sept. 6, 1978) (emphasis added).  Nor is there any guidance or case law regarding any threshold volume that would be indicative of dealer activity.  Put simply, there is no basis for an investor to determine that any particular volume—whether in number of shares, transactions, or dollars at issue—results in crossing a threshold into dealer activity, and so volume cannot be a relevant criteria.

As for Mr. Keener's level of profit, the SEC fails to allege any facts regarding Mr. Keener's costs, ensuring the factual allegations are overstated.  More importantly, his level of profit is irrelevant—otherwise, the dealer definition would impermissibly expand to "embrace . . . every securities trader who makes money through buying and selling securities," an expansion that a court has rightfully rejected.  *SEC v. Federated Alliance Group*, No. 93–CV–0895E(F), 1996 WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996) (denying SEC's motion for summary judgment on claim that defendant was an unregistered dealer, and holding that considering large profits to be a relevant factor would excessively broaden the definition of dealer).[12]

---

[12] In the end, the SEC's failure to allege a single legally-relevant factor in claiming Mr. Keener was obligated to register as a dealer distinguishes his case from the SEC's other recent efforts to expand the definition of a dealer through enforcement.  *See, e.g.*, *SEC v. River North Equity*, 415 F. Supp. 3d 853 (N.D. Ill. 2019) (SEC alleged defendant extended credit in connection with securities transactions).

**C.** **The SEC's Allegations Instead Show Mr. Keener was a Trader, not a Dealer.**

In fact, the SEC's allegations demonstrate that Mr. Keener qualifies for an exception set forth in the Exchange Act to the dealer registration requirements. Specifically, the Exchange Act excludes "traders" from the dealer registration requirements and defines a trader as a "person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B). As another district court has explained: "[t]here is a broad exemption for investors and traders not engaged in the regular business of providing dealer services to others. . . . such as soliciting investor clients, handling investor client's money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." *Chapel Investments, Inc.*, 177 F. Supp. 3d at 990 (internal citations omitted).

The SEC has explained the trader exemption as follows: "***Individuals who buy and sell securities for themselves generally are considered traders and not dealers***." Guide (emphasis added). Moreover, a trader:

> does not handle other people's money or securities; he does not hold himself out as being willing to buy and sell securities for his own account on a continuous basis; and he does not furnish the services which are usually provided by dealers, such as quoting the market in one or more securities, rendering incidental investment advice, or extending or arranging for the extension of credit in connection with securities activities.

Nat'l Council of Sav. Instit., SEC No-Action Letter, 1986 WL 67129 at *1 (July 27, 1986); Burton Sec., SEC No-Action Letter, 1977 WL 10680 at *1 (Dec. 5, 1977) (same).

By the SEC's own allegations, Mr. Keener is not a dealer; he is clearly a trader. As set forth above, the SEC does not allege Mr. Keener handles other people's money or securities— instead, he only invests his own money. Compl. ¶ 10. Nor does the SEC allege that Mr. Keener ever held himself out as being willing to sell securities, on a continuous basis or otherwise, or

that he ever provided "the services which are usually provided by dealers," such as quoting prices, or providing credit or investment advice.  Nat'l Council of Sav. Instit., SEC No-Action Letter, 1986 WL 67129 at *2.  The Complaint does not raise a "reasonable inference" that Mr. Keener violated the law.  Instead, the only reasonable inference to be drawn from the Complaint's factual allegations—or lack thereof—is that Mr. Keener is a trader exempt from the dealer registration requirements.  Federal pleading standards require far more than "labels," "conclusions," and a "sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  The Complaint must be dismissed because it traffics only in labels and conclusions—it fails to allege a single relevant dealer characteristic as identified in the SEC's own guidance—and indeed fails to show even a "sheer possibility" that Mr. Keener acted unlawfully, let alone the "reasonable" and "plausible" inference that is required.  *Id.*

### D.       The SEC Fails to State a Claim for Injunctive Relief

The Complaint also fails to state a claim for prospective injunctive relief.  To obtain prospective injunctive relief, a claim must allege an ongoing violation.  *SEC v. Gentile*, 939 F.3d 549, 554 (3rd Cir. 2019).  Pursuant to 15 U.S.C. § 78u(d), the Commission has "general authority to seek injunctions against ongoing or threatened violations."  *Gentile*, 939 F.3d at 554. Injunctions such as penny stock bars and obey-the-law injunctions are proper *only* to prevent imminent harm, not to punish the defendant.  *Id*. at 556, 565; *see also SEC v. Globus Group, Inc.*, 117 F. Supp.2d 1345, 1346-47 (S.D. Fla. 2000).  The SEC has not alleged any ongoing violation.  To the contrary, the SEC alleges violations only "through January 2018," Compl. ¶ 1, and thus the SEC's request for prospective injunctive relief must be dismissed.  *See, e.g.*, *SEC v. Monarch Fund*, 608 F.2d 938, 943-44 (2d. Cir. 1979) (dismissing injunctive relief request when no indication of ongoing or potential future violations).

### E.       In the Alternative, the Complaint Should be Dismissed as a Due Process Violation

To the extent the SEC argues, as it has in other cases,[13] that the Court should disregard previous court decisions, the plethora of no-action letters, and the Guide as non-binding authority, the Complaint should be dismissed as a due process violation.  If Mr. Keener was not entitled to rely on this prior authority about which firms needed to be registered as dealers under Section 15(a), he had no fair notice that his conduct could be unlawful.

Fair notice that an act is illegal is a cornerstone of the American legal system.  As the U.S. Supreme Court wrote in *Grayned v. City of Rockford*, "because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 408 US 104, 108 (1972).  SEC actions are no exception.  *See, e.g.*, *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (dismissing SEC action on due process grounds when "there was substantial uncertainty in the Commission's interpretation" and defendant "was not on reasonable notice that [its] conduct might violate the rule").  Instead, SEC actions must be dismissed when they are based on rules or policies "that [were] not reasonably communicated to the public."  *Id.* (SEC must "advise the public that it believed the practice was questionable" before defendant can be penalized).[14]

---

[13] *See*, *SEC v. River North Equity*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019).

[14] *See also*, *Alaska Prof'l Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'") (quoting Oliver Wendell Holmes, Holdsworth's English Law, 25 Law Quarterly Rev. 414 (1909)), abrogated by *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015); *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) ("Due Process requires that the government provide citizens and other actors with sufficient notice as to what behavior complies with the law. Liberty depends on no less. . . ."); *United States of Am. v. Conigliaro*, No. CR 14-10363-RGS, --- F. Supp. 3d ---, 2019 WL 2410154 at *16 (D. Mass. June 7, 2019) (holding in regard to the regulatory authority of the U.S. Food and Drug Administration, "[I]t is

The SEC has never previously communicated that the conduct Mr. Keener engaged in—investing in companies in exchange for convertible notes that he, months or years later, converted into stock that he sold—could qualify him as a dealer subject to the registration requirements.  Indeed, the Complaint itself demonstrates that the very organizations responsible for dealer registration and regulations—the SEC and its partner organization Financial Regulatory Authority ("FINRA")—have been aware of Mr. Keener and JMJ Financial for almost a decade, Compl. ¶¶ 5, 20, yet the SEC never took any action until this lawsuit.  And to the contrary—the SEC's prior statements advised that individuals like Mr. Keener were traders exempt from the registration requirements.  In the absence of any rulemaking, the securities industry justifiably relied on the SEC's published statements in its Guide and no-action letters in interpreting the registration requirements.

For the SEC to now pursue an enforcement action based on an expansion of the definition of a dealer, with criteria nowhere set forth in prior authority, is a clear violation of Mr. Keener's due process, and for this alternate reason, the Complaint must be dismissed.  *See, e.g.*, *Upton v.*

---

reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed") (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).

Indeed, both current and former SEC Commissioners agree that when the SEC pursues enforcement actions that are not based on clearly communicated rules, a defendant's right to due process is violated.  Michael S. Piwowar, Commissioner, SEC, Remarks to the Securities Enforcement Forum 2014 (Oct. 14, 2014), avail. at https://www.sec.gov/news/speech/2014-spch101414msp ("Persons should be on notice as to what acts, or failures to act, constitute violations of the law and our regulations.  Persons should also be on notice as to the potential sanctions and liabilities that may be imposed as a result of those violations. . . . I oppose the use by the Commission of enforcement measures as an alternative to rulemaking . . . [In such circumstances] we fail in our duty to uphold due process."); Hester M. Peirce, Commissioner, SEC, Reasonableness Pants (May 8, 2019), avail. at https://www.sec.gov/news/speech/speech-peirce-050819 ("Our duty is to be clear with registrants about our interpretation of the fiduciary duty. . . . A regulator wearing its reasonableness pants tells the firms it regulates what their regulatory obligations are. . . . It is also respectful of the due process of the firms we regulate by giving them notice of what the SEC expects from them.").

*SEC*, 75 F.3d at 98 (vacating SEC order on due process grounds); *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 414-15 (S.D.N.Y. 2012) (dismissing SEC action when SEC had "not established that [the relevant] rules . . . were sufficiently clear as to permit liability"), *vacated in part on other grounds*, 725 F.3d 270 (2d Cir. 2013).  Otherwise, Mr. Keener will be penalized—and if the SEC has its way, to the tune of tens of millions of dollars—for conduct he had no way of knowing could be unlawful.  Such an outcome is all the more egregious here in the context of a Complaint that contains no allegations whatsoever of any harm to a single investor.

## V.    CONCLUSION

In sum, just as a grocery store does not become a restaurant simply by selling a lot of food, a trader does not become a dealer simply by selling a lot of stock.  To the extent government regulators wish to change the rules, the Constitution requires that they give prior notice.  For these reasons and all the others stated herein, Mr. Keener respectfully requests that the Court dismiss the Complaint.

## VI.    REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2) of the Local Rules of the U.S. District Court for the Southern District of Florida, Mr. Keener respectfully requests oral argument on this Motion if the Court is not prepared to grant the Motion based solely on the pleadings, on the basis that oral argument would be helpful to the Court's deliberative process in resolving the Motion, and submits that 30 minutes for each side would be sufficient.

Dated: June 22, 2020                          Respectfully submitted,

                                              **GREENBERG TRAURIG LLP**

                                              */s/ Benjamin G. Greenberg*

19

**Benjamin G. Greenberg**
Florida Bar No. 192732
greenbergb@gtlaw.com
333 SE 2nd Avenue Suite 4400
Miami, FL 33131
Telephone: (305) 579-0850
Facsimile: (305) 579-0717

**RASKIN & RASKIN, P.A.**

**Jane Serene Raskin**
Florida Bar No. 848689
201 Alhambra Circle Suite 1050
Coral Gables, Fl. 33134
Telephone: (305) 444-3400
jraskin@raskinlaw.com

*-and-*

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice pending*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served via ECF a true and correct copy of the

foregoing document to the following:

> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> 100 F Street NE
> Washington, DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov
>
> *Attorneys for Plaintiff*
> *Securities and Exchange Commission*

This, the 22nd day of June, 2020

<u>/s/ *Benjamin G. Greenberg*</u>