**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN W. KEENER D/B/A JMJ FINANCIAL, | ) | |
| | ) | No. 20-cv-21254 |
| Defendant. | ) | |
| | ) | Hon. Beth Bloom |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTS .................................................................................................................................. 2

STATUTORY SCHEME...................................................................................................... 4

   A.  Dealer Registration Under The Exchange Act.................................................. 4

   B.  What Is A Dealer?............................................................................................. 4

PLEADING STANDARD..................................................................................................... 6

ARGUMENT ........................................................................................................................ 7

   A.  The SEC's Complaint properly alleges that JMJ was an unregistered dealer. ................... 7

     i.  The unambiguous plain language controls. ................................................. 7

     ii.  The Eleventh Circuit applies the plain language of the dealer registration statute......... 9

   B.  Defendant's trader exception argument is both premature and erroneous. ...................... 13

   C.  The SEC has alleged sufficient facts to support an injunction. ......................... 16

   D.  JMJ's due process argument is meritless as it had ample notice it was a dealer. .............. 18

CONCLUSION..................................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**

*Aaron v. SEC*,
   446 U.S. 680 (1980) ........................................................................................................18

*American United Life Ins. Co. v. Martinez*,
   480 F.3d 1043 (11th Cir. 2007) .......................................................................................6

*In re Bayou Shores SNF, LLC*,
   828 F.3d 1297 (11th Cir. 2016) .................................................................................7, 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................................................6

*Eastside Church of Christ National Plan, Inc. v. National Plan, Inc.*,
   391 F.2d 357 (5th Cir. 1968) ..........................................................................4, 5, 10, 19

*Hecht v. Bowles*,
   321 U.S. 321 (1944) .......................................................................................................18

*In the Matter of Ironridge Global Partners, LLC*,
   Release No. 75272, 2015 WL 3862868 (June 23, 2015) .................................................19

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
   494 U.S. 827 (1990) .........................................................................................................7

*McMillian v. AMC Mortgage Servs., Inc.*,
   560 F. Supp. 2d 1210 (S.D. Ala. 2008) ............................................................................6

*Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) ...........................................................................................5

*Roth v. SEC*,
   22 F.3d 1108 (D.C. Cir. 1994) .....................................................................................4, 5

*SEC v. Big Apple Consulting USA, Inc.*,
   783 F.3d 786 (11th Cir. 2015) ................................................................................ *passim*

*SEC v. Blatt*,
    583 F.2d 1325 (5th Cir. 1978) .......................................................................................17

*SEC v. Buntrock*,
    No. 02 C 2180, 2004 WL 1179423 (N.D.Ill. May 25, 2004) ...........................................17

*SEC v. Calvo*,
    378 F.3d 1211 (11th Cir. 2004) ....................................................................................17

*SEC v. Commonwealth Chemical Securities Inc.*,
    574 F.2d 90 (2d Cir. 1978)............................................................................................18

*SEC v. C. Jones & Co.*,
    312 F. Supp. 2d 1375 (D.Colo. 2004)..............................................................................17

*SEC v. Federated Alliance Group*,
    No. 93–CV–0895E(F), 1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) ............................12

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011)............................................................................................16

*SEC v. Hopper*,
    No. Civ.A. H-04-1054, 2006 WL 778640 (S.D. Tex. Mar. 24 2006)...............................17

*SEC v. Melvin*,
    No. 1:12-CV-2984-CAP, 2013 WL 12062834 (N.D. Ga. June 26, 2013).........................17

*SEC v. Offill*,
    No. 3:07-CV-1643-D, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012*)*..........................10, 19

*SEC v. River North Equity LLC, et al.*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ...................................................................... *passim*

*In the Matter of Gordon Wesley Sodorff, Jr.*,
    Release No. 31134, 1992 WL 224082 (Sept. 2, 1992) .............................................5, 12, 19

*In the Matter of Southeast Banking Corp.*,
    69 F.3d 1539 (11th Cir. 1995) .........................................................................................6

*Ventrassist Pty. Ltd. v. Heartware, Inc.,*
    377 F. Supp. 2d 1278 (S.D. Fla. 2005) ...............................................................6

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ...........................................................................4

*Upton v. SEC,*
    75 F.3d 92 (2d Cir. 1996)..................................................................................19

*United States v. W. T. Grant Co.,*
    345 U.S. 629 (1953)...........................................................................................18

*U.S. v. Coscia,*
    866 F. 3d 782 (7th Cir. 2017) ...........................................................................19

**STATUTES AND RULES**

15 U.S.C. § 78o(a)(1)..........................................................................................1, 4

15 U.S.C. § 78c(a)(5)(A) ..................................................................................1, 4, 7

15 U.S.C. § 78c(a)(5)(B).....................................................................................1, 13

17 C.F.R. § 230.144 .............................................................................................13

**OTHER AUTHORITY**

Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings
    Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934,
    SEC Release No. 34-47364, 2003 WL 328058 (Feb. 13, 2003).......................................15

Registration Requirements for Foreign Broker-Dealers,
    Release No. 34-27017, 54 Fed. Reg. 30013 (July 18, 1989) ...............................................5

**INTRODUCTION**

The SEC's Complaint alleges in detail that Justin Keener, who does business as JMJ Financial ("JMJ" or "Keener"), has operated a regular business of buying and selling securities for its own account, and (2) JMJ did not register as a dealer with the SEC as required by the unambiguous plain language of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"). *See* 15 U.S.C. § 78o(a)(1).

JMJ has moved to dismiss the Complaint, contending that the SEC has failed to state a claim for relief, focusing largely on non-binding factors outside of the plain language of the statute, while ignoring binding precedent in this Circuit. JMJ claims that the Complaint does not plead a single fact to support the allegation that it operated as a dealer. That is simply untrue. The SEC alleges all of the facts required pursuant to the plain language of the Exchange Act, namely that JMJ: (1) held itself out to the public—through a website, conference sponsorships, and cold callers working on commission—as a business operating to purchase debt securities directly from penny stock companies (Compl. ¶ 10); (2) converted these securities into stock at a large discount to the prevailing market price (Compl. ¶¶ 1, 10-11, 15, 17); and (3) in the process, obtained billions of newly issued shares that it dumped on the market, reaping about $21.5 million in profits (Compl. ¶¶ 1-2, 15-16). Although JMJ effectively admits that it meets the statutory definition of "dealer," because it buys and sells securities for its own account, *see* 15 U.S.C. § 78c(a)(5)(A), it seeks to dismiss the Complaint on the grounds that it qualifies for the "trader exception," which exempts from the registration requirement those whose trading is not done as "part of a regular business." *See* 15 U.S.C. § 78c(a)(5)(B). While JMJ may disagree with the facts about its business in the Complaint, the Courts do not resolve factual disputes at the pleading stage.

Tellingly, and fatal to its motion, JMJ does not mention the controlling Eleventh Circuit

case finding, pursuant to the plain language of the statute,[1] that a public relations firm was a dealer because it was engaged in the business of, and profited from, selling millions of shares of stock that it obtained directly from the issuer at a substantial discount to the prevailing market price.  *See SEC v. Big Apple Consulting, USA, Inc*., 783 F.3d 786, 809-10 (11th Cir. 2015). While the securities dealer in *Big Apple* primarily operated a public relations business, here JMJ's only business is to buy debt securities directly from companies, convert them to stock at a discount to the market price, and sell the resulting stock in the market.  The SEC's Complaint clearly establishes that pursuant to the unambiguous plain language of the Exchange Act, JMJ is more of a dealer than was the public relations firm in *Big Apple*, and so its motion must fail.

JMJ ends it motion with two unpersuasive arguments about injunctive relief and due process.  It is premature to consider dismissing a claim for injunctive relief before liability has been determined.  Moreover, injunctive relief is proper because the SEC has alleged facts to establish that JMJ's illegal conduct is likely to continue.  Finally, JMJ's due process argument fails because the statute defining "dealer" is clear on its face, as the Eleventh Circuit found in *Big Apple*, providing JMJ ample notice that it operated as a dealer pursuant to the Exchange Act. Accordingly, the Court should deny JMJ's motion.

## FACTS

From at least January 2015 through January 2018, Defendant Keener, who does business as JMJ Financial ("JMJ"), bought and sold billions of newly issued shares of penny stock for his own account and realized substantial profits, but failed to comply with the mandatory dealer registration requirements of the Federal securities laws.  Compl. ¶¶ 1, 16.  JMJ's admitted

---

[1] The Eleventh Circuit applied the definition of dealer from the Securities Act of 1933 ("Securities Act"), but upheld the district court's use of the Exchange Act definition—the language at issue in this case—because the definitions are functionally identical.  *Big Apple*, 783 F.3d at 809, n.11.

business model is to buy convertible notes—a type of security—from penny stock issuers, convert the notes into newly issued shares of stock, and sell those shares into the public market at a profit.  *Id*.

JMJ held itself out to the public as being willing to buy convertible notes at a regular place of business in Miami Beach, Florida.  Compl. ¶ 10.  JMJ operated a website that advertised its business to issuers and hired employees working on commission to solicit issuers to sell it convertible notes.  *Id.*  Keener and his employees attended and sponsored conferences to solicit penny stock issuers in person.  *Id.*  On several occasions, Keener made PowerPoint presentations that included a notarized affidavit from his accountant stating that he had $20 million "committed" to purchase convertible notes from issuers.  *Id.*

JMJ obtained nearly all of the stock that it sold directly from the issuers, through note conversions, and not from purchases in the secondary market.  Compl. ¶ 11.  The shares were newly issued, and when JMJ sold them in the market, it significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  *Id.*  Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.  *Id.*

JMJ demanded and received deep conversion discounts from the prevailing market price in the convertible notes.  Compl. ¶¶ 1, 10-11, 15, 17.  The discounts generally ranged between 35 and 50 percent less than the lowest closing price for the stock during the 10 to 25 trading days preceding the conversion request.  Compl. ¶ 13.  The majority of JMJ's profits resulted from the discounted prices at which it acquired shares from the issuers to sell into the market.  *Id.*  This mechanism, which gave JMJ a spread or markup on the stock that it sold, is a common attribute of a securities dealer.  *Id.*

JMJ's business was prolific, substantial and lucrative.  During the period covered by the

Complaint, JMJ bought or converted notes from more than 100 penny stock issuers, sold about 17.5 billion newly issued shares of the issuers' stock into the public market, and generated about $21.5 million in profits, the vast majority of which came from the spread between the discounted price JMJ negotiated for the stock and the prevailing market price.  Comp. ¶¶ 2, 8, 13-16.

## STATUTORY SCHEME

### A.     Dealer Registration Under The Exchange Act

Dealers act as essential intermediaries between the investing public and the securities markets.  They are gatekeepers because, among other functions, they have the ability to sell or otherwise distribute vast quantities of newly issued stock to unsuspecting investors in the public market.  In light of their importance to the securities markets, persons who act as "dealers" must register with the SEC, unless they are specifically exempt from registration. *Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009); *see also* Exchange Act Section 15(a)(1), 15 U.S.C. § 78o(a)(1) (prohibiting a broker or dealer from using the mail or any other instrumentality of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless "registered in accordance with [Section 15(b) of the Exchange Act]").  This registration requirement "serves as the keystone of the entire system of broker-dealer regulation."  *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (cites and quotes omitted); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).

### B.     What Is A Dealer?

The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities … *for such person's own account*."  Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(5)(A) (emphasis added).  This language is clear.  The statutory definition was "drawn broadly by Congress to encompass a wide range of activities involving investors and securities

markets." *See* Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54 Fed. Reg. 30013, 30015 (July 18, 1989).  Having a broad definition of "dealer" advances the Exchange Act's investor-protection imperative because registration requirements ensure that "discipline may be exercised over those who may engage in the securities business [so that] necessary standards may be established with respect to training, experience, and records." *Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th Cir. 1982) (citation and quotation marks omitted); *see also Roth*, 22 F.3d at 1109 (D.C. Cir. 1994).

Courts and the SEC consider a totality of conduct to determine when a person or entity is "engaged in the securities business" and "buying and selling for his own account."  *See In the Matter of Gordon Wesley Sodorff, Jr.,* Release No. 31134, 1992 WL 224082, at *4-5 (Sept. 2, 1992).  "[T]he primary indicia . . . that a person has 'engaged in the business' . . . is that the level of participation in purchasing and selling securities involves more than a few isolated transactions."  *Id*. at *4.  There is substantial case law applying the dealer definition in this Circuit and elsewhere, as the SEC discusses in more detail below.  *See, e.g., Big Apple*, 783 F.3d at 809-10 (finding defendants were dealers where their "*entire* business model was predicated on the purchase and sale of securities" and where they bought "stocks at deep discounts" by contractual agreement and "then sold those stocks for profit.") (emphasis in original); *SEC v. River North Equity LLC, et al*., 415 F. Supp. 3d 853 (N.D. Ill. 2019) (denying motion to dismiss against stock seller that SEC alleged to have operated as an unregistered securities dealer where defendant sold billions of newly issued shares); *Eastside Church*, 391 F.2d at 361 (finding defendant was a dealer because it purchased and sold church bonds for its own account as part of its regular business).

## PLEADING STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In the Eleventh Circuit, courts view all facts alleged in the Complaint in the light most favorable to the non-moving party, in this case the SEC. *American United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). Courts also draw all reasonable inferences in the SEC's favor. *Ventrassist Pty. Ltd. v. Heartware, Inc.*, 377 F. Supp. 2d 1278, 1285 (S.D. Fla. 2005) ("the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merit of the plaintiff's case") (citing 5B Wright & Miller, *Federal Practice & Procedure: Civil 3d* § 1356 (3d ed.2004)). Moreover, to satisfy the liberal notice pleading standards of Rule 8(a), the SEC must do no more than set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *McMillian v. AMC Mortgage Servs., Inc.*, 560 F. Supp. 2d 1210, 1212 (S.D. Ala. 2008). "The proper test is whether the complaint 'contains either direct or inferential allegations respecting all material elements necessary to sustain a recovery under some viable legal theory.'" *Id.* at 1213 (citation omitted). The threshold for withstanding a motion to dismiss based on a claim of inadequate pleading is "exceedingly low." *In the Matter of Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995). The SEC's Complaint easily meets this standard as it adequately pleads all material elements necessary to allege that Defendant operated as an unregistered dealer in violation of the Exchange Act.

## ARGUMENT

**A.     The SEC's Complaint properly alleges that JMJ was an unregistered dealer.**

**i.     The unambiguous plain language controls.**

The dispositive question at the pleading stage is whether the SEC has alleged facts to demonstrate—pursuant to the plain language of the statute—that JMJ was "engaged in the business" of buying and selling securities without having registered with the SEC as a dealer.  15 U.S.C. § 78c(a)(5)(A).  In interpreting any statute, courts begin with the plain language of the statute itself.  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990).  "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1314 (11th Cir. 2016) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations removed)).  The Complaint describes in detail how over a three-year period JMJ (a fictitious name under which Keener did business) was a lucrative and prolific securities business, the very purpose of which was to buy convertible notes from penny stock issuers, convert them to shares, and sell those *newly issued* shares into the market.

From 2015 until 2018, JMJ—acting through Keener and as many as twenty people he employed—engaged in the business of buying and converting more than 100 convertible notes securities from more than 100 different penny stock issuers and sold approximately 17.5 billion shares of newly issued stock it derived from the notes during the three years at issue.  Compl. ¶¶ 2, 8, 16.  By engaging in this business, JMJ generated profits of approximately $21.5 million.  *Id.* ¶¶ 2, 8, 16.  These facts alone demonstrate, pursuant to the plain language of the statute, that JMJ's "*entire* business model was predicated on the purchase and sale of securities."  *See Big Apple*, 783 F.3d at 809.

7

Far from Keener's claim that he was merely a private investor who simply traded stocks (Mot. Dismiss at 2, 4), JMJ—including Keener and his employees—aggressively promoted its securities dealing business in various ways.  Comp. ¶ 10.  They included: holding JMJ "out to the public as being willing to buy convertible notes at a regular place of business"; operating a website that advertised [JMJ's] business to issuers"; "hir[ing] employees, who worked on commission, to solicit issuers who were willing to sell convertible notes" to JMJ; attending and *sponsoring* conferences at which Keener and his employees solicited penny stock issuers in person; and making "PowerPoint presentations at these conferences that included a notarized affidavit from [Keener's] accountant stating that he had $20 million 'committed' to purchase convertible notes from issuers."  *Id.*

The allegations relating to the volume of JMJ's purchases and sales of securities, its practice of buying securities directly from issuers, and its aggressive advertising, amply meet the pleading standard under the plain language of the statute for the Court to conclude that JMJ was "engaged in the business" of buying and selling securities for its own account and should have registered as a dealer.  As explained in detail below, *Big Apple*—Eleventh Circuit precedent that JMJ fails to cite even once in its motion to dismiss—compels this result.  *See id.* at 809-10 (finding under the plain meaning of "engage[d] … in the business" defendants were dealers where their "*entire* business model was predicated on purchase and sale of securities") (emphasis in original); *see also River North*, 415 F. Supp. 3d at 858 (finding it "more than plausible" that defendant met statutory dealer definition solely based on SEC allegations that defendant bought more than 10 billion shares of microcap stock from more than 62 issuers, quickly resold them to the investing public, and received $31 million in profit).

### ii. The Eleventh Circuit applies the plain language of the dealer registration statute.

In an attempt to avoid the clear language of the statute, JMJ claims that, "[a]lthough the definition of dealer in the Exchange Act appears to broadly cover anyone in the business of buying and selling securities, it has never been interpreted that way." Mot. Dismiss at 10. This is simply wrong. In fact, several courts have interpreted and applied the plain language of the dealer statute to the totality of securities business activities in each case to find that individuals and entities were subject to the registration requirement.

In *Big Apple*, the controlling Eleventh Circuit precedent, the Court upheld a decision granting summary judgment based on its analysis of the definition of "dealer" under the Securities Act and the Exchange Act.[2] 783 F.3d at 809-10. The defendant, a public relations consulting company, offered penny stock issuers a variety of services, including marketing, business planning, and e-commerce website development and maintenance. *Id*. at 790-91. The penny stock issuers paid the company for its services in cash and shares that the company purchased at deep discounts to the prevailing market price. *Id.* at 790.

The Eleventh Circuit reasoned that "the centerpiece to [the statutory definition of dealer] is the word 'business.'" *Id*. at 809. Applying the plain meaning of the word "business"—"[a] commercial enterprise carried on *for profit,* a particular occupation or employment habitually engaged in for *livelihood* or *gain*"—the Court found that where a company's business model is based entirely upon the purchase and sale of securities for profit or gain, that fact constitutes conclusive proof that the company is a dealer. *Id.* (emphasis in original) (quoting Black's Law

---

[2] As noted earlier, the Eleventh Circuit found that the definitions of dealer in the Securities Act and the Exchange Act were functionally identical. *Big Apple*, 783 F.3d at 809, n.11. This Court should reject any contention JMJ may make that slight differences in language between the Acts renders the legal analysis in *Big Apple* anything but dispositive here.

Dictionary 239 (10th ed. 2009)).   The court explained:

> While evidence of merely *some* profits from buying and selling securities
> may alone be inconclusive proof, the defendants' *entire* business model was
> predicated on the purchase and sale of securities.  [The defendants]
> depended on acquiring client stock to support operations and earn a profit . .
> . . As further evidence of their dealer status, [the defendants] purchased [an
> issuer's] stocks at deep discounts pursuant to its contractual agreement with
> [the issuer] and then sold those stocks for profit.

*Id.* (emphasis in original); *see also SEC v. Offill*, Case No. 3:07-CV-1643-D, 2012 WL 246061 at

*8-9 (N.D. Tex. Jan. 26, 2012) (granting summary judgment to the SEC and holding that the

defendant "bought and sold securities as part of his regular business, making him a dealer under

15 U.S.C. § 78c(a)(5)").

Applying the plain language of the Exchange Act and the plain meaning of the word

"business" as the Court did in *Big Apple*, JMJ and Keener are dealers because they publicly held

themselves out as—and operated—a business where they bought convertible notes (securities)

from penny stock issuers, converted them into stock at heavily discounted prices, and sold the

shares into the market at a profit.  *See Big Apple,* 783 F.3d at 809; Compl. ¶¶ 1-2, 10-11, 15-17.

Because the SEC's Complaint adequately pleads facts sufficient to allege that Defendant was a

dealer according to the plain language of the statute and Eleventh Circuit precedent, the Court

should deny JMJ's motion.

JMJ's motion also largely ignores other highly persuasive case law, including the recent

*River North* decision—which JMJ relegates to briefly discussing in a footnote.  *See* Mot. Dismiss

at 14 n. 12.  In *River North*, the court addressed and rejected similar contentions to those JMJ

advances in this case.  In denying Defendant's motion to dismiss, the court applied the plain

language of the statute and found that the SEC properly alleged that the defendant was a dealer

where it sold billions of shares of stock into the market.  415 F. Supp. 3d at 858.  The court

stated:

> [D]uring the relevant period River North bought and sold over 10 billion
> shares of stock from more than 62 microcap issuers, and then quickly resold
> them to the investing public, receiving some $31 million in profit.  From this,
> it is more than plausible that River North meets the *statutory* "dealer"
> definition.

.

*Id.* (emphasis added); *see also Eastside Church*, 391 F.2d at 361 (finding defendant was a dealer

because it purchased church bonds for its own account as part of its regular business and sold

some of them).  As in *Big Apple*, the court in *River North* gave substantial weight, to the fact that

the defendant bought the shares it sold directly from the issuer and at a large discount to the

prevailing market price—factors the SEC also alleges here.  *River North*, 415 F. Supp. 3d at 858-

59.  Both *Big Apple* and *River North* wholly undermine Defendant's conclusory claim that the

Complaint "fails to allege that Mr. Keener engaged in any of the activities characteristic of a

dealer, as defined in judicial opinions . . . ."  Mot. Dismiss at 7.

JMJ's decision not to acknowledge this significant and germane case law compounds

the errors in its legal arguments.  For instance, JMJ notes the SEC's allegation that "the ability

to convert the notes to stock at a discount to the trading price at the time of conversion is 'a

common attribute of a securities dealer.'"  Mot. Dismiss at 13.  In response, JMJ contends that

"the SEC has identified no law, rule or guidance indicating this discount is a relevant

characteristic, *because no such law, rule or guidance exists*, and the SEC cannot now invent

such a characteristic with retroactive effect."  *Id.* (emphasis added).  To the contrary, this

assertion ignores that the Eleventh Circuit in *Big Apple* found this precise characteristic to be

evidence that the defendant was a dealer.  *See Big Apple*, 783 F.3d at 810 ("As *further*

*evidence of their dealer status*, [defendants] purchased … stocks at deep discounts pursuant to

[their] contractual agreement with [the issuer] and then sold those stocks for profit.")

(emphasis added).

In *River North*, the court found allegations that the defendant received shares of stock at a discount to be "particularly significant" in holding that the complaint adequately pleaded the defendant was a dealer.  415 F. Supp. 3d at 859.  Indeed, in so holding, the court observed that the defendant "purchased stocks[3] at a discounted price directly from numerous issuers . . . (instead of purchasing stocks already in the marketplace, like a trader)."[4]  *Id.*  The court underscored that River North "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price."  *Id.* (citing *Sodorff*, 1992 WL 224082, at *5 ("Unlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid.")).  Contrary to JMJ's unsupported and conclusory assertions, the activities these courts found to be characteristic of dealer activity are indistinguishable from the SEC's allegations about JMJ.[5]  It is, therefore, simply wrong for JMJ to assert that, in citing JMJ's extensive

---

[3] It is a distinction without a difference that River North purchased stock and not convertible notes, because both are securities.  It is also significant that River North's stock was newly issued—just like JMJ's in this case—because it came from convertible notes that corporate insiders exercised.

[4] JMJ relies upon *SEC v. Federated Alliance Group*, No. 93–CV–0895E(F), 1996 WL 484036 at *5 (W.D.N.Y. Aug. 21, 1996) to assert that amassing large profits from selling securities is irrelevant to the dealer inquiry.  *See* Mot. Dismiss at 14.  This reliance is misplaced.  As a preliminary matter, the case is not binding on this Court, nor is it persuasive in light of binding Eleventh Circuit precedent.  The case is also inapplicable here.  The SEC's Complaint is not based solely on the premise that JMJ amassed large profits from selling securities.  Rather, consistent with the plain language of the statute, the SEC alleges that JMJ was engaged in the *business* of buying and selling securities for a profit—the hallmark of a dealer.  *See Big Apple*, 783 F.3d at 810.

[5] JMJ makes a cursory and unconvincing attempt to cast *Sodorff* as "irrelevant," because JMJ held the notes for six months and therefore ran a risk of loss.  *See* Mot. Dismiss at 13 n. 11.  The risk of loss is of no moment here because the Complaint alleges in detail how JMJ, as a business practice, negotiated deep discounts and engaged in tranched conversion and sales to protect its profits if the market price of a stock declined, as it often did.  Compl. ¶ 13, 14.

sales of discounted stock at a significant profit, the SEC is seeking to "now invent such a characteristic" of dealer activity.

**B.    Defendant's trader exception argument is both premature and erroneous.**

JMJ contends that the Complaint does not allege facts demonstrating that it operates as a dealer and that it instead qualifies for the "trader" exception to the dealer registration requirement.  Mot. Dismiss at 7-16.  JMJ's contentions fail because they rely on a disputed interpretation of the facts that the SEC alleges in its Complaint and a misapprehension of the plain meaning of the dealer registration statute.

To qualify for the "trader" exception, the trier of fact must conclude that even if JMJ engaged in the business of buying and selling securities (which it does not meaningfully deny), it did not do so as "part of a regular business."  *See* 15 U.S.C. § 78c(a)(5)(B).  On their face, the words "regular business" include anyone who has operated a company at a regular place of business that offers services to the public for a profit, as the SEC appropriately alleged with regard to JMJ.  *See* Compl. ¶¶ 1-2, 10-11, 15-17; *Big Apple*, 783 F.3d at 809 (defining "business" as "[a] commercial enterprise carried on *for profit,* a particular occupation or employment habitually engaged in for *livelihood* or *gain*") (emphasis in original) (quoting Black's Law Dictionary).[6]  The SEC's Complaint clearly alleges facts that are more than sufficient to meet the statutory language of the dealer statute and the plain meaning of the word "business."  JMJ's

---

[6] Defendant was not a trader under the statute merely because it held the securities for the time period set forth in SEC Rule 144, which applies to unregistered sales of securities under the Securities Act.  *See* Mot. Dismiss at 13 n.10; 17 C.F.R. § 230.144.  The Rule 144 procedure for selling stock has nothing to do with the registration of dealers under the Exchange Act.  Where, as here, the SEC has alleged that Defendant's conduct falls within the plain language of the dealer registration statute, it has met the pleading standards and Defendant's motion must be denied.

claim that it did not operate as a regular business, but rather as an individual trader, necessarily involves a dispute over the numerous facts alleged in the SEC's Complaint.  Such a dispute is premature at the motion to dismiss stage.

In challenging the adequacy of the SEC's allegations, and contending that it is a trader rather than a dealer, JMJ selectively relies upon a laundry list of factors it has culled primarily from decades-old "no-action letters" (letters SEC staff sent in response to specific inquiries indicating that staff would have declined to recommend enforcement action in *other* cases), and from other SEC guidance and judicial decisions.  *See* Mot. Dismiss, at 7-16.  These factors, however, are not binding on the Court and cannot be used to vary or change the unambiguous plain language of the statute.  *See In re Bayou Shores*, 828 F.3d at 1314 (quoting *Lamie v. U.S. Tr.*, 540 U.S. at 534 (when statute's language is plain, sole function of the courts—at least where disposition required by text is not absurd—is to enforce it according to its terms)); *River North*, 415 F. Supp. 3d at 858 (applying statutory dealer definition over non-binding factors).

 Apart from its failure to rely upon the plain language of the statute (or the controlling and persuasive case law that relies upon the plain language of the statute and wholly undermines its position), JMJ (1) challenges the Complaint only as to factors that it claims do not apply to it; and (2) is simply wrong in asserting that the SEC's Complaint does not allege its activities meet some of the factors in its preferred test.  First, JMJ's approach to cherry picking factors is unpersuasive because the Court's inquiry does not turn on whether Defendant's conduct meets every factor that it can cite.  *See* Mot. Dismiss, at 7-16.  In rejecting virtually the same contention JMJ makes here, the *River North* court refused to apply "a laundry list of factors set forth in various SEC no action letters and other guidance."  415 F. Supp. 3d at 858.  In doing so, the court emphasized that such factors do not control the dealer analysis and highlighted the

14

premature nature of Defendant's desired inquiry:

> River North contends that the SEC has not alleged that River North: extended credit; acted as an underwriter; held itself out publicly as willing to buy or sell securities from its own account on a continuing basis; or carried a dealer inventory of securities. *But as the Court stated, these factors (and any decisions construing them) are not controlling. They are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion.* And whether and which are met is necessarily a fact-based inquiry best reserved for summary judgment or trial.

*Id.* (emphasis added).  It is thus immaterial whether the SEC pled allegations to meet all of JMJ's preferred factors, and any factual disputes regarding its "business" should be addressed at a later stage of the proceedings.  *See* Mot. Dismiss at 7-11.

Second, as previously discussed, even if these factors were important to the Court's analysis at this stage of the proceedings—and they are not—JMJ is simply wrong to assert that the SEC "fails to allege that Mr. Keener engaged in any of the activities characteristic of a dealer, as defined in judicial opinions . . . ."  *See* Mot. Dismiss at 7.  As just one example, JMJ asserts, "At most, the SEC alleges that Mr. Keener is a dealer because he sold shares that were allegedly 'newly issued' at the time of conversion."  Mot. Dismiss at 12 (citing Compl. ¶ 11). JMJ then argues, "But that is different from Mr. Keener 'issuing or originating' the securities himself, and indeed, is irrelevant as a matter of law to the question of whether he qualified as a dealer." *Id.*  JMJ is again mistaken.

In guidance released in 2003, the SEC noted that, among other activities, dealers may "participate in the *sale* or distribution of new issues, such as by acting as an underwriter."[7] The Complaint expressly alleges that JMJ did this, stating:

> Keener obtained nearly all of the stock that he sold in his business directly from

---

[7] Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, SEC Release No. 34-47364 (Feb. 13, 2003), 2003 WL 328058, at *4 (emphasis added).

the issuers, through note conversions, and not from purchases in the secondary market.  The shares were *newly issued*, and the sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.

Compl. ¶ 11 (emphasis added).

This conduct is analogous to the activities of the defendant in *River North* where the court determined that it was "particularly significant that . . . like an underwriter, River North . . . purchased stocks at a discounted price directly from numerous issuers . . . instead of purchasing stocks already in the marketplace, like a trader."  *See* 415 F. Supp. 3d at 859 (citations and parentheticals omitted).  JMJ's attempts to parse the Complaint notwithstanding, there is no question that the stock JMJ sold resulted from its conversions of the notes Keener negotiated directly with the issuers; nor is there any question that JMJ's profits resulted from selling these newly issued shares in the market, as did River North.

 As discussed above, the SEC's allegations amply meet the pleading requirements of Federal Rule of Civil Procedure 8(a) when considered in light of the unambiguous plain language of the dealer registration statute.  Even though JMJ's contentions are, at best, premature, the SEC's allegations completely contradict any conclusion that JMJ was simply a trader.  The facts the SEC alleges demonstrate that Defendant was in the business of buying and selling securities for profit and eviscerate its hollow contention that it was merely acting as a trader.  Accordingly, the Court should deny JMJ's unsupported motion.

C.    **The SEC has alleged sufficient facts to support an injunction.**

JMJ argues that the SEC's claim for injunctive relief must be dismissed because the Complaint did not allege "any ongoing violation."  Mot. Dismiss at 16.  As an initial matter, Defendant's motion to dismiss remedies is premature before liability has been established.  *See, e.g., SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) *rev'd on other grounds*, 133 S.Ct. 1216

16

(2013) ("it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry."); *SEC v. Hopper*, No. Civ.A. H-04-1054, 2006 WL 778640, at * 16 (S.D.Tex. Mar. 24 2006) ("[C]ourt cannot conclude at this stage that it appears beyond a doubt that the SEC can prove no set of facts in support of its claims for relief"); *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423 at *3 (N.D.Ill. May 25, 2004) ("[T]o the extent that the defendants challenge the SEC's pleading of the disgorgement remedy, that challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violations"); *SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1382 (D.Colo. 2004) ("This issue [of whether the facts supported the SEC's request for injunctive relief] must await resolution until after the SEC has had the opportunity to present evidence supporting its claims"); *SEC v. Melvin*, No. 1:12-CV-2984-CAP, 2013 WL 12062834, at *6 (N.D. Ga. June 26, 2013) (reasoning that "[d]etermining whether to grant injunctive relief is fact-specific" and that "'it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation.'") (quoting *Gabelli*, 653 F.3d at 61).

In any event, the SEC has pled sufficient facts to warrant injunctive relief. "[T]he SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (citing *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1198, n.2 (11th Cir. 1999)); *see also SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978) ("The critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."). The Complaint alleges that JMJ engaged in a highly lucrative business of unregistered dealer activity over a period of years that at times employed as many as

17

20 people soliciting issuers to sell convertible notes to JMJ over the internet and at conferences. JMJ then converted the notes into stock at a discount to be immediately sold into the market, profiting from the spread, irrespective of the prevailing market price for the stock.  The SEC has plausibly alleged that JMJ engaged in activity that violated the federal securities laws, was lucrative, and is likely to continue if not enjoined.

While it is true that the SEC is authorized to seek injunctions against ongoing or threatened violations, it is also settled law that injunctive relief is proper when the defendant's conduct is no longer ongoing, so long as the SEC can establish the requisite likelihood of future violations occurring.  As Judge Friendly explained in *SEC v. Commonwealth Chemical Securities Inc.*, "[e]xcept for the case where the SEC steps in to prevent an ongoing violation," the phrase "about to" is best read as "to require a finding of a 'likelihood' or 'propensity' to engage in future violations."  574 F.2d 90, 99 (2d Cir. 1978).  "[T]he ultimate test is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violation in the future."  *Id.*; *accord Aaron v. SEC*, 446 U.S. 680, 701 (1980) (discussing *Commonwealth Chemical*).

*Commonwealth Chemical* is consistent with the long-held principle that "the cessation of violations, whether before or after the institution of a suit" is "no bar to the issuance of an injunction."  *Hecht v. Bowles*, 321 U.S. 321, 327 (1944); *accord United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct.").  Defendant's misconstruction of this Court's authority to consider the need to prevent future violations would upend these well-established principles.

**D.    JMJ's due process argument is meritless as it had ample notice it was a dealer.**

Finally, JMJ's due process challenge—that it lacked any notice that its activities required dealer registration—is meritless, particularly given that the plain language of the statute is clear

18

and put JMJ on notice that it was acting as a dealer and was required to register as such.  In addition, the Eleventh Circuit decided *Big Apple* at the beginning of the relevant period pled in the Complaint, applying the plain language of the statute.

JMJ's reliance on *Upton v. SEC,* 75 F.3d 92 (2d Cir. 1996), is misplaced.  In that case, which was on appeal following a full administrative hearing, "[i]t [was] undisputed that [respondent] complied with the literal terms of the [SEC] Rule at all times." *Id*. at 94. Nevertheless, the respondent was charged with and found liable, after an evidentiary hearing, for violating the rule based on a new interpretation that had never been communicated to the public, apart from one consent decree carrying "little, if any, precedential weight." *Id*. at 98.

This case is not analogous for several reasons.  First, we are at the pleading stage. Second, the SEC's allegations deal with the application of a federal statute, not an agency rule. Third, courts and the SEC have long applied the plain and unambiguous statutory language requiring dealers to register.  *See Big Apple,* 783 F.3d at 809-810; *Eastside Church*, 391 F.2d at 362; *Offill*, 2012 WL 246061, at \*8-9; *Sodorff*, 1992 WL 224082, at \*4; *In the Matter of Ironridge Global Partners, LLC*, Release. No. 75272, 2015 WL 3862868 (June 23, 2015) (instituting proceedings under Section 15(b) against unregistered dealer in connection with its serial underwriting activity, providing related investment advice, and receiving and selling billions of shares in connection with self-described financing services for domestic microcap issuers); *see also U.S. v. Coscia*, 866 F. 3d 782, 793 (7th Cir. 2017) (in denying due process challenge to "spoofing" statute, appellate court held that "Congress provided the necessary definition [of spoofing] and, in doing so, put the trading community on notice").  It is not surprising that the *River North* court rejected an *Upton* argument out of hand.  *See River North,* 866 F.3d at 859 (explaining "The definition at issue is broad.  The factors for the Court's

19

consideration are merely factors.  And the players in this case are not new to this field.").

Defendant had fair notice of the dealer registration laws as well as how courts and the SEC have applied them.  JMJ has not been denied due process.

## CONCLUSION

For the foregoing reasons, the SEC's Complaint sufficiently alleges a violation of the dealer registration requirements of the Exchange Act, a claim for injunctive relief, and Defendant was not deprived of its due process rights.  Thus, the SEC respectfully requests that the Court deny Defendant's motion to dismiss.

DATED:    July 6, 2020                          Respectfully submitted,

By:

                           /s/
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**Lead Attorney**
**Attorney to Be Noticed**

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, I filed Plaintiff Securities And Exchange Commission's Opposition To Defendant's Motion To Dismiss through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

_____/s/_____
Antony Richard Petrilla
**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**