# EXHIBIT 3

Investor Publications

# Guide to Broker-Dealer Registration

## Division of Trading and Markets[1]
## U.S. Securities and Exchange Commission
## April 2008

## Table of Contents

1. Introduction
2. Who Is Required to Register
   1. Who is a "Broker"
   2. Who is a "Dealer"
   3. What To Do If You Think You May be a Broker or a Dealer
   4. Brokers and Dealers Generally Must Register with the SEC
      1. "Associated Persons" of a Broker-Dealer
      2. Intrastate Broker-Dealers
      3. Broker-Dealers that Limit their Business to Excluded and Exempted Securities
      4. Broker-Dealers Must Register Before Selling Unregistered Securities - Including Private Placements (or Regulation D offerings)
      5. Issuer's Exemption
      6. Foreign Broker-Dealer Exemption
   5. Requirements Regarding Brokers and Dealers of Government and Municipal Securities, including Repurchase Agreements
   6. Special Rules That Apply to Banks and Other Financial Institutions
   7. Insurance Agency Networking
   8. Real Estate Securities and Real Estate Brokers/Agents
   9. Broker-Dealer Relationships with Affinity Groups
3. How to Register as a Broker-Dealer
   1. Form BD
   2. SRO Membership
   3. SIPC Membership
   4. State Requirements
   5. Associated Persons
   6. Successor Broker-Dealer Registration
   7. Withdrawal from Registration; Cancellation of Registration
4. Security Futures

5. Conduct Regulation of Broker-Dealers
    1. Antifraud Provisions
        1. Duty of Fair Dealing
        2. Suitability Requirements
        3. Duty of Best Execution
        4. Customer Confirmation Rule
        5. Disclosure of Credit Terms
        6. Restrictions on Short Sales (Regulation SHO)
        7. Trading During an Offering (Regulation M)
        8. Restrictions on Insider Trading
        9. Restrictions on Private Securities Transactions
    2. Analysts and Regulation AC
    3. Trading by Members of Exchanges, Brokers and Dealers
    4. Extending Credit on New Issues
    5. Regulation NMS
    6. Order Execution Obligations
    7. Regulation ATS: Broker-Dealer Trading Systems
    8. Penny Stock Rules
    9. Privacy of Consumer Financial Information (Regulation S-P)
    10. Investment Adviser Registration
6. Arbitration
7. Financial Responsibility of Broker-Dealers
    1. Net Capital Rule
    2. Use of Customer Balances
    3. Customer Protection
    4. Required Books, Records and Reports
    5. Risk Assessment Requirements
8. Other Requirements
    1. Examinations and Inspections
    2. Lost and Stolen Securities Program
    3. Fingerprinting Requirement
    4. Use of Electronic Media by Broker-Dealers
    5. Electronic Signatures
    6. Anti-Money Laundering Program
    7. Office of Foreign Assets Control
    8. Business Continuity Plans
9. Where to Get Further Information

# I. INTRODUCTION

The Securities Exchange Act of 1934 ("Exchange Act" or "Act") governs the way in which the nation's securities markets and its brokers and dealers operate. We have prepared this guide to summarize some of the significant provisions of the Act and its rules. You will find information about whether you need to register as a broker-dealer and how you can register, as well as the standards of conduct and the financial responsibility rules that broker-dealers must follow.

## CAUTION — MAKE SURE YOU FOLLOW ALL LAWS AND RULES

**Although this guide highlights certain provisions of the Act and our rules, it is not comprehensive. Brokers and dealers, and their associated persons, must comply with all applicable requirements, including those of the U.S. Securities and Exchange Commission ("SEC" or "Commission"), as well as the requirements of any self-regulatory organizations to which the brokers and dealers belong, and not just those summarized here.**

**The SEC staff stands ready to answer your questions and help you comply with our rules. After reading this guide, if you have questions, please feel free to contact the Office of Interpretation and Guidance at (202) 551-5777 (e-mail tradingandmarkets@sec.gov) or the Regional Office of the SEC in your area. You will find a list of useful phone numbers at the end of this guide, or on the SEC's website at www.sec.gov/contact.shtml.**

**You may wish to consult with a private lawyer who is familiar with the federal securities laws, to assure that you comply with all laws and regulations. The SEC staff cannot act as an individual's or broker-dealer's lawyer. While the staff attempts to provide guidance by telephone to individuals who are making inquiries, the guidance is informal and not binding. Formal guidance may be sought through a written inquiry that is consistent with the SEC's guidelines for no-action, interpretive, and exemptive requests.**

## II. WHO IS REQUIRED TO REGISTER

Most "brokers" and "dealers" must register with the SEC and join a "self-regulatory organization," or SRO. This section covers the factors that determine whether a person is a broker or dealer. It also describes the types of brokers and dealers that do not have to register with the SEC. Self-regulatory organizations are described in Part III, below.

*A note about banks:* The Exchange Act also contains special provisions relating to brokerage and dealing activities of banks. Please see Sections 3(a)(4)(B) and 3(a)(5)(C) and related provisions, and consult with counsel. Aspects of bank dealer activity are discussed in a publication issued by the SEC's Division of Trading and Markets, entitled "Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules," which is available on the SEC's website at: http://www.sec.gov/divisions/marketreg/bankdealerguide.htm. Bank brokerage activity is addressed in Regulation R, which was adopted jointly by the Commission and the Board of Governors of the Federal Reserve System. *See* Exchange Act Release No. 56501 (September 24, 2007) http://www.sec.gov/rules/final/2007/34-56501.pdf.

### A. Who is a "Broker"

Section 3(a)(4)(A) of the Act generally defines a "broker" broadly as

> any person engaged in the business of effecting transactions in securities for the account of others.

Sometimes you can easily determine if someone is a broker. For instance, a person who executes transactions for others on a securities exchange clearly is a broker. However, other situations are less clear. For example, each of the following individuals and businesses may need to register as a broker, depending on a number of factors:

- "finders," "business brokers," and other individuals or entities that engage in the following activities:

- Finding investors or customers for, making referrals to, or splitting commissions with registered broker-dealers, investment companies (or mutual funds, including hedge funds) or other securities intermediaries;

- Finding investment banking clients for registered broker-dealers;

- Finding investors for "issuers" (entities issuing securities), even in a "consultant" capacity;

- Engaging in, or finding investors for, venture capital or "angel" financings, including private placements;

- Finding buyers and sellers of businesses (i.e., activities relating to mergers and acquisitions where securities are involved);

- investment advisers and financial consultants;

- foreign broker-dealers that cannot rely on Rule 15a-6 under the Act (discussed below);

- persons that operate or control electronic or other platforms to trade securities;

- persons that market real-estate investment interests, such as tenancy-in-common interests, that are securities;

- persons that act as "placement agents" for private placements of securities;

- persons that market or effect transactions in insurance products that are securities, such as variable annuities, or other investment products that are securities;

- persons that effect securities transactions for the account of others for a fee, even when those other people are friends or family members;

- persons that provide support services to registered broker-dealers; and

- persons that act as "independent contractors," but are not "associated persons" of a broker-dealer (for information on "associated persons," see below).

In order to determine whether any of these individuals (or any other person or business) is a broker, we look at the activities that the person or business actually performs. You can find analyses of various activities in the decisions of federal courts and our own no-action and interpretive letters. Here are some of the questions that you should ask to determine whether you are acting as a broker:

- Do you participate in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction?

- Does your compensation for participation in the transaction depend upon, or is it related to, the outcome or size of the transaction or deal? Do you receive trailing commissions, such as 12b-1 fees? Do you receive any other transaction-related compensation?

- Are you otherwise engaged in the business of effecting or facilitating securities transactions?

- Do you handle the securities or funds of others in connection with securities transactions?

A "yes" answer to any of these questions indicates that you may need to register as a broker.

## B. Who is a "Dealer"

Unlike a broker, who acts as agent, a dealer acts as principal. Section 3(a)(5)(A) of the Act generally defines a "dealer" as:

> any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise.

The definition of "dealer" does not include a "trader," that is, a person who buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business. Individuals who buy and sell securities for themselves generally are considered traders and not dealers.

Sometimes you can easily tell if someone is a dealer. For example, a firm that advertises publicly that it makes a market in securities is obviously a dealer. Other situations can be less clear. For instance, each of the following individuals and businesses may need to register as a dealer, depending on a number of factors:

- a person who holds himself out as being willing to buy and sell a particular security on a continuous basis;
- a person who runs a matched book of repurchase agreements; or
- a person who issues or originates securities that he also buys and sells.

Here are some of the questions you should ask to determine whether you are acting as a dealer:

- Do you advertise or otherwise let others know that you are in the business of buying and selling securities?
- Do you do business with the public (either retail or institutional)?
- Do you make a market in, or quote prices for both purchases and sales of, one or more securities?
- Do you participate in a "selling group" or otherwise underwrite securities?
- Do you provide services to investors, such as handling money and securities, extending credit, or giving investment advice?
- Do you write derivatives contracts that are securities?

A "yes" answer to any of these questions indicates that you may need to register as a dealer.

## C. What To Do If You Think You May Be a Broker or a Dealer

If you are doing, or may do, any of the activities of a broker or dealer, you should find out whether you need to register. Information on the broker-dealer registration process is provided below. If you are not certain, you may want to review SEC interpretations, consult with private counsel, or ask for advice from the SEC's Division of Trading and Markets by calling (202) 551-5777 or by sending an e-mail to tradingandmarkets@sec.gov. (Please be sure to include your telephone number.)

**Note: If you will be acting as a "broker" or "dealer," you must not engage in securities business until you are properly registered. If you are already engaged in the business and are not yet registered, you should cease all activities until you are properly registered. For further information, please see Part II.D and Part III, below.**

## D. Brokers and Dealers Generally Must Register with the SEC

Section 15(a)(1) of the Act generally makes it unlawful for any broker or dealer to use the mails (or any other means of interstate commerce, such as the telephone, facsimiles, or the Internet) to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless that broker or dealer is registered with the Commission in accordance with Section 15(b) of the Act. There are a few exceptions to this general rule that we discuss below. In addition, we discuss the special registration requirements that apply to broker-dealers of government and municipal securities, including repurchase agreements, below.

### 1. "Associated Persons" of a Broker-Dealer

We call individuals who work for a registered broker-dealer "associated persons." This is the case whether such individuals are employees, independent contractors, or are otherwise working with a broker-dealer. These individuals may also be called "stock brokers" or "registered representatives." Although associated persons usually do not have to register separately with the SEC, they must be properly supervised by a currently registered broker-dealer. They may also have to register with the self-regulatory organizations of which their employer is a member — for example, the Financial Industry Regulatory Authority, Inc. ("FINRA") (f/k/a the National Association of Securities Dealers, Inc. ("NASD")) or a national securities exchange. To the extent that associated persons engage in securities activities outside of the supervision of their broker-dealer, they would have to register separately as broker-dealers. Part III, below, provides a discussion of how to register as a broker-dealer.

We do not differentiate between employees and other associated persons for securities law purposes. Broker-dealers must supervise the securities activities of their personnel regardless of whether they are considered "employees" or "independent contractors" as defined under state law. *See*, for example, *In the matter of William V. Giordano*, Securities Exchange Act Release No. 36742 (January 19, 1996).

The law also does not permit unregistered entities to receive commission income on behalf of a registered representative. **For example, associated persons cannot set up a separate entity to receive commission checks.** An unregistered entity that receives commission income in this situation must register as a broker-dealer. *See*, for example, *Wolff Juall Investments, LLC* (May 17, 2005). Under certain circumstances, unregistered entities may engage in payroll administration services involving broker-dealers. *See*, for example, letter re: *ADP TotalSource, Inc.* (December 4, 2007). In those circumstances, the broker-dealer employer generally hires and supervises all aspects of the employees' work and uses the payroll and benefits administrator merely as a means to centralize personnel services.

## 2. Intrastate Broker-Dealers

A broker-dealer that conducts all of its business in one state does not have to register with the SEC. (State registration is another matter. *See* Part III, below.) The exception provided for intrastate broker-dealer activity is very narrow. To qualify, all aspects of all transactions must be done within the borders of one state. This means that, without SEC registration, a broker-dealer cannot participate in any transaction executed on a national securities exchange.

A broker-dealer that otherwise meets the requirements of the intrastate broker-dealer exemption would not cease to qualify for the intrastate broker-dealer exemption solely because it has a website that may be viewed by out-of-state persons, so long as the broker-dealer takes measures reasonably designed to ensure that its business remains exclusively intrastate. These measures could include the use of disclaimers clearly indicating that the broker-dealer's business is exclusively intrastate and that the broker-dealer can only act for or with, and provide broker-dealer services to, a person in its state, as long as the broker-dealer does not provide broker-dealer services to persons that indicate they are, or that the broker-dealer has reason to believe are, not within the broker-dealer's state of residence.

These measures are not intended to be exclusive. A broker-dealer could adopt other measures reasonably designed to ensure that it does not provide broker-dealer services to persons that are not within the same state as the broker-dealer. However, an intermediary's business would not be "exclusively intrastate" if it sold securities or provided any other broker-dealer services to a person that indicates that it is, or that the broker-dealer has reason to believe is, not within the broker-dealer's state of residence.

For additional information regarding the use of the Internet by intrastate broker-dealers, see
https://www.sec.gov/rules/final/2016/33-10238.pdf.

*A word about municipal and government securities.* There is no intrastate exception from registration for municipal securities dealers or government securities brokers and dealers.

## 3. Broker-Dealers that Limit their Business to Excluded and Exempted Securities

A broker-dealer that transacts business *only* in commercial paper, bankers' acceptances, and commercial bills does not need to register with the SEC under Section 15(b) or any other section of the Act. On the other hand, persons transacting business only in certain "exempted securities," as defined in Section 3(a)(12) of the Act, do not have to register under Section 15(b), but may have to register under other provisions of the Act. For example, some broker-dealers of government securities, which are "exempted securities," must register as government securities brokers or dealers under Section 15C of the Act, as described in Part II.E, below.

## 4. Broker-Dealers Must Register Before Selling Unregistered Securities – Including Private Placements (or Regulation D offerings)

A security sold in a transaction that is exempt from registration under the Securities Act of 1933 (the "1933 Act") is not necessarily an "exempted security" under the Exchange Act. **For example, a person who sells securities that are exempt from registration under Regulation D of the 1933 Act must nevertheless register as a broker-dealer.** In other words, "placement agents" are not exempt from broker-dealer registration.

## 5. Issuer's "Exemption" and Associated Persons of Issuers *(Rule 3a4-1)*

Issuers generally are not "brokers" because they sell securities for their own accounts and not for the accounts of others. Moreover, issuers generally are not "dealers" because they do not buy and sell their securities for their own accounts as part of a regular business. Issuers whose activities go beyond selling their own securities, however, need to consider whether they would need to register as broker-dealers. This includes issuers that purchase their securities from investors, as well as issuers that effectively operate markets in their own securities or in securities whose features or terms can change or be altered. The so-called issuer's exemption does not apply to the personnel of a company who routinely engage in the business of effecting securities transactions for the company or related companies (such as general partners seeking investors in limited partnerships). The employees and other related persons of an issuer who assist in selling its securities may be "brokers," especially if they are paid for selling these securities and have few other duties.

Exchange Act Rule 3a4-1 provides that an associated person (or employee) of an issuer who participates in the sale of the issuer's securities would not have to register as a broker-dealer if that person, at the time of participation: (1) is not subject to a "statutory disqualification," as defined in Section 3(a)(39) of the Act; (2) is not compensated by payment of commissions or other remuneration based directly or indirectly on securities transactions; (3) *is not an associated person of a broker or dealer*; and (4) limits its sales activities as set forth in the rule.

Some issuers offer dividend reinvestment and stock purchase programs. Under certain conditions, an issuer may purchase and sell its own securities through a dividend reinvestment or stock purchase program without registering as a broker-dealer. These conditions, regarding solicitation, fees and expenses, and handling of participants' funds and securities, are explained in Securities Exchange Act Release No. 35041 (December 1, 1994), 59 FR 63393 ("1994 STA Letter"). Although Regulation M[2] replaced Rule 10b-6 and superseded the 1994 STA Letter, the staff positions taken in this letter regarding the application of Section 15(a) of the Exchange Act remain in effect. *See* 17 CFR 242.102(c) and Securities Exchange Act Release No. 38067 (December 20, 1996), 62 FR 520, 532 n.100 (January 3, 1997).

## 6. Foreign Broker-Dealer Exemption *(Rule 15a-6)*

The SEC generally uses a territorial approach in applying registration requirements to the international operations of broker-dealers. Under this approach, all broker-dealers physically operating within the United States that induce or attempt to induce securities transactions must register with the SEC, even if their activities are directed only to foreign investors outside of the United States. In addition, foreign broker-dealers that, from outside of the United States, induce or attempt to induce securities transactions by any person in the United States, or that use the means or instrumentalities of interstate commerce of the United States for this purpose, also must register. This includes the use of the internet to offer securities, solicit securities transactions, or advertise investment services to U.S. persons. *See* Securities Exchange Act Release No. 39779 (March 23, 1998)
http://www.sec.gov/rules/interp/33-7516.htm.

Foreign broker-dealers that limit their activities to those permitted under Rule 15a-6 of the Act, however, may be exempt from U.S. broker-dealer registration. Foreign broker-dealers that wish to rely on this exemption should review Securities Exchange Act Release No. 27017 (effective August 15, 1989), 54 FR 30013, to determine whether they meet the conditions of Rule 15a-6. *See also* letters re: *Securities Activities of U.S.-Affiliated Foreign Dealers* (April 9 and April 28, 1997). In addition, in April 2005, the Division of Market Regulation staff issued responses to frequently asked questions concerning Rule 15a-6 in relation to Regulation AC. *See* http://www.sec.gov/divisions/marketreg/mregacfaq0803.htm#partb. (Regulation AC is discussed in Part V.B, below.)

## E. Requirements Regarding Brokers and Dealers of Government and Municipal Securities, including Repurchase Agreements

Broker-dealers that limit their activity to government or municipal securities require specialized registration. Those that limit their activity to government securities do not have to register as "general-purpose" broker-dealers under Section 15(b) of the Act. General-purpose broker-dealers that conduct a government securities business, however, must note this activity on their Form BD. (Form BD is discussed below.) All firms that are brokers or dealers in government securities must comply with rules adopted by the Secretary of the Treasury, as well as SEC rules.

Firms that limit their securities business to buying and selling municipal securities for their own account (municipal securities dealers) must register as general-purpose broker-dealers. If, however, these entities are banks or meet the requirements of the intrastate exemption discussed in Part II.D.2. above, they must register as municipal securities dealers. Municipal securities brokers (other than banks) must register as general-purpose broker-dealers unless they qualify for the intrastate exception. *See* Part II.D.2 above.

Firms that run a matched book of repurchase agreements or other stock loans are considered dealers. Because a "book running dealer" holds itself out as willing to buy and sell securities, and is thus engaged in the business of buying and selling securities, it must register as a broker-dealer.

## F. Special Rules That Apply to Banks and Similar Financial Institutions

**Note:** Banks, thrifts, and other financial institutions should be aware that the Commission has adopted rules that may affect them. *See* Regulation R, Securities Exchange Act Release No. 34-56501 (Sept. 24, 2007), 72 FR 56514 (Oct. 3, 2007), www.sec.gov/rules/final/2007/34-56501.pdf and Securities Exchange Act Release No. 34-56502 (Sept. 24, 2007) 72 FR 56562 (Oct. 3, 2007), www.sec.gov/rules/final/2007/34-56502.pdf.

**Banks.** Prior to the enactment of the "Gramm-Leach-Bliley Act" ("GLBA") in 1999, U.S. banks were excepted from the definitions of "broker" and "dealer" under the Act. The GLBA amended the Exchange Act, and banks now have certain targeted exceptions and exemptions from broker-dealer registration. Currently, as a result of Commission rulemaking, banks are undergoing a phase-in period for compliance with the new law. Since October 1, 2003, banks that buy and sell securities must consider whether they are "dealers" under the federal securities laws. The Division of Trading and Markets has issued a special compliance guide for banks, entitled "Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules," which is available on the SEC's website at: http://www.sec.gov/divisions/marketreg/bankdealerguide.htm. Bank brokerage activity is addressed in Regulation R, which was adopted jointly by the Commission and the Board of Governors of the Federal Reserve System. *See* Exchange Act Release No. 56501 (September 24, 2007) (which can be found at http://www.sec.gov/rules/final/2007/34-56501.pdf).

*The bank exceptions and exemptions only apply to banks, and not to related entities.* It is important to note that exceptions applicable to banks under the Exchange Act, as amended by the GLBA, are **not** applicable to other entities, including bank subsidiaries and affiliates, that are not themselves banks. As such, subsidiaries and affiliates of banks that engage in broker-dealer activities are required to register as broker-dealers under the Act. Also, banks that act as municipal securities dealers or as government securities brokers or dealers continue to be required to register under the Act.

**Thrifts.** By statute, thrifts (savings associations) have the same status as banks, and may avail themselves of the same targeted exceptions and exemptions from broker-dealer registration as banks. (For further information, *See* the "Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules," noted above.) As with banks, it is important to note that exceptions and exemptions applicable to thrifts are **not** applicable to other entities, including subsidiaries and affiliates that are not thrifts. As such, subsidiaries and affiliates of thrifts that engage in broker-dealer activities are required to register as broker-dealers under the Act.

**Credit Unions and Financial Institution "Networking" Arrangements.** The exceptions and exemptions applicable to banks under the Exchange Act do not apply to other kinds of financial institutions, such as credit unions. The SEC staff, however, has permitted certain financial institutions, such as credit unions, to make

securities available to their customers without registering as broker-dealers. This is done through "networking" arrangements, where an affiliated or third-party broker-dealer provides brokerage services for the financial institution's customers, according to conditions stated in no-action letters and NASD Rule 2350.

Under a networking arrangement, financial institutions can share in the commissions generated by their referred customers, under certain conditions. The financial institution engaging in such networking must be in strict compliance with applicable law and Commission staff guidance. *See*, for example, letter re: *Chubb Securities Corporation* (November 24, 1993) and NASD Rule 2350 (applicable to broker-dealers that enter into networking arrangements with banks, thrifts, and credit unions).

## G. Insurance Agency Networking

The SEC staff has permitted insurance agencies to make insurance products that are also securities (such as variable annuities) available to their customers without registering as broker-dealers under certain conditions. This again is done through "networking" arrangements, where an affiliated or third-party broker-dealer provides brokerage services for the insurance agency's customers, according to conditions stated in no-action letters. These arrangements are designed to address the difficulties of dual state and federal laws applicable to the sale of these products. Through networking arrangements, insurance agencies can share in the commissions generated by their referred customers under certain conditions. Insurance agencies engaging in such networking must be in strict compliance with applicable law and Commission staff guidance. Insurance companies should consult the letter re: *First of America Brokerage Services, Inc.* (September 28, 1995). Those interested in structuring such an arrangement should contact private counsel or the SEC staff for further information.

Notably, insurance networking arrangements are limited to insurance products that are also securities. They do not encompass sales of mutual funds and other securities that do not present the same regulatory difficulties. *See* letter re: *Lincoln Financial Advisors Corp.* (February 20, 1998).

## H. Real Estate Securities and Real Estate Brokers/Agents

The offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security. When the real estate is offered in conjunction with certain services, however, it may constitute an investment contract, and thus, a security. *See generally*, Securities Act Release No. 5347 (Jan. 4, 1973) (providing guidelines as to the applicability of the federal securities laws to offers and sales of condominiums or units in a real estate development).

There is no general exception from the broker-dealer registration requirements for licensed real estate brokers or agents who engage in the business of effecting transactions in real estate securities. In the past, the Division staff has granted no-action relief from the registration requirements to licensed real estate personnel that engage in limited activities with respect to the sale of condominium units coupled with an offer or agreement to perform or arrange certain rental or other services for the purchaser. The relief provided in these letters is limited solely to their facts and should not be relied upon for activities relating to sales of other types of real estate securities, including tenants-in-common interests in real property. *See generally*, NASD Notice to Members 05-18, http://www.finra.org/sites/default/files/NoticeDocument/p013455.pdf (addressing tenants-in-common interests in real property).

## I. Broker-Dealer Relationships with Affinity Groups

Broker-dealers may enter into arrangements to offer services to members of certain non-profit groups, including civic organizations, charities, and educational institutions that rely upon private donations. These arrangements are subject to certain conditions to ensure that the organizations, or "affinity groups," do not develop a salesman's stake with respect to the sale of securities. *See*, for example, letter re: *Attkisson, Carter & Akers* (June 23, 1998).

# III. HOW TO REGISTER AS A BROKER-DEALER

**A broker-dealer may not begin business until:**

- **it has properly filed Form BD, and the SEC has granted its registration;**
- **it has become a member of an SRO;**
- **it has become a member of SIPC, the Securities Investor Protection Corporation;**
- **it complies with all applicable state requirements; and**
- **its "associated persons" have satisfied applicable qualification requirements.**

## A. Form BD

If a broker-dealer does not qualify for any of the exceptions or exemptions outlined in the sections above, it must register with the Commission under Section 15(b) of the Act. Broker-dealers register by filing an application on Form BD, which you may obtain from the SEC's webpage at http://www.sec.gov/about/forms/formbd.pdf or through the SEC's Publications Office at (202) 551-4040. You also use Form BD to:

- apply for membership in an SRO, such as FINRA or a registered national securities exchange;
- give notice that you conduct government securities activities; or
- apply for broker-dealer registration with each state in which you plan to do business.

Form BD asks questions about the background of the broker-dealer and its principals, controlling persons, and employees. The broker-dealer must meet the statutory requirements to engage in a business that involves high professional standards, and quite often includes the more rigorous responsibilities of a fiduciary.

To apply for registration, you must file one executed copy of Form BD through the Central Registration Depository ("CRD"), which is operated by FINRA. (The only exception is for banks registering as municipal securities dealers, which file Form MSD directly with the SEC and with their appropriate banking regulator.) Form BD contains additional filing instructions. The SEC does not charge a filing fee, but the SROs and the states may. Applicants that reside outside the U.S. must also appoint the SEC as agent for service of process using a standard form. Incomplete applications are not considered "filed" and will be returned to the applicant for completion and re-submission.

Within 45 days of filing a completed application, the SEC will either grant registration or begin proceedings to determine whether it should deny registration. An SEC registration may be granted with the condition that SRO membership must be obtained. The SROs have independent membership application procedures and are not required to act within 45 days of the filing of a completed application. In addition, state registrations may be required. A broker-dealer must comply with relevant state law as well as federal law and applicable SRO rules. Timeframes for registration with individual states may differ from the federal and SRO timeframes. As such, when deciding to register as a broker-dealer, it is important to plan for the time required for processing Federal, state, and SRO registration or membership applications.

*Duty to update Form BD.* A registered broker-dealer must keep its Form BD current. Thus, it must promptly update its Form BD by filing amendments whenever the information on file becomes inaccurate or incomplete for any reason.

***Prohibited Broker-Dealer Names.* Title 18, Section 709 of the United States Code makes it a criminal offense to use the words "National," "Federal," "United States," "Reserve," or "Deposit Insurance" in the name of a person or organization in the brokerage business, unless otherwise allowed by federal law. Further, a broker-dealer name that is otherwise materially misleading would become subject to scrutiny under Exchange Act Section 10(b), and Rule 10b-5 thereunder, the general antifraud rules, and any other applicable provisions.**

## B. SRO Membership (Section 15(b)(8) and Rule 15b9-1)

Before it begins doing business, a broker-dealer must become a member of an SRO. SROs assist the SEC in regulating the activities of broker-dealers. FINRA and the national securities exchanges are all SROs. If a broker-dealer restricts its transactions to the national securities exchanges of which it is a member and meets certain

other conditions, it may be required only to be a member of those exchanges. If a broker-dealer effects securities transactions other than on a national securities exchange of which it is a member, however, including any over-the-counter business, it must become a member of FINRA, unless it qualifies for the exemption in Rule 15b9-1. FINRA's webpage at www.finra.org provides detailed information on the FINRA membership process. You may also wish to consult the web pages of the individual exchanges for additional information.

Firms that engage in transactions in municipal securities must also comply with the rules of the Municipal Securities Rulemaking Board, or MSRB. The MSRB is an SRO that makes rules governing transactions in municipal securities, but, unlike other SROs, it does not enforce compliance with its rules. Compliance with MSRB rules is monitored and enforced by FINRA and the SEC (in the case of broker-dealers), and the Federal bank regulators and the SEC (in the case of banks). You may wish to consult the MSRB's website at www.msrb.org for additional information, or you can call the MSRB at (703) 797-6600.

## C. SIPC Membership

Every registered broker-dealer must be a member of the Securities Investor Protection Corporation, or SIPC, unless its principal business is conducted outside of the United States or consists exclusively of the sale or distribution of investment company shares, variable annuities, or insurance. Each SIPC member must pay an annual fee to SIPC. SIPC insures that its members' customers receive back their cash and securities in the event of a member's liquidation, up to $500,000 per customer for cash and securities. (Claims for cash are limited to $100,000.) For further information, contact SIPC, 805 15th St., NW, Suite 800, Washington, DC 20005. Telephone: (202) 371-8300, fax: (202) 371-6728, or visit SIPC's website at www.sipc.org.

## D. State Requirements

Every state has its own requirements for a person conducting business as a broker-dealer within that state. Each state's securities regulator can provide you with information about that state's requirements. You can obtain contact information for these regulators from the North American Securities Administrators Association, Inc. (NASAA), 750 First Street, NE, Suite 1140, Washington, DC 20002. Telephone: (202) 737-0900, or visit NASAA's website at www.nasaa.org.

## E. Associated Persons *(Section 3(a)(18); Rule 15b7-1)*

The Act defines an "associated person" of a broker-dealer as any partner, officer, director, branch manager, or employee of the broker-dealer, any person performing similar functions, or any person controlling, controlled by, or under common control with, the broker-dealer. A broker-dealer must file a Form U-4 with the applicable SRO for each associated person who will effect transactions in securities when that person is hired or otherwise becomes associated. Form U-4 is used to register individuals and to record these individuals' prior employment and disciplinary history.

An associated person who effects or is involved in effecting securities transactions also must meet qualification requirements. These include passing an SRO securities qualification examination. Many individuals take the comprehensive "Series 7" exam. If individuals engage only in activities involving sales of particular types of securities, such as municipal securities, direct participation programs (limited partnerships) or mutual funds, they may wish to take a specialized examination focused on that type of security, instead of the general securities examination. There is also a special exam for assistant representatives, whose activities are limited to accepting unsolicited customer orders for execution by the firm. Supervisory personnel, and those who engage in specialized activities such as options trading, must take additional exams that cover those areas. These examinations require the Series 7 exam as a prerequisite.

You can obtain copies of Form U-4, as well as information on securities qualification examinations, from an SRO. FINRA's website at www.finra.org contains detailed information and guidance for individuals who wish to obtain a series license through FINRA. Also note that individual states have their own licensing and registration requirements, so you should consult with the applicable state securities regulators for further information.

**Note: If you hold a series license, you must be properly associated with a registered broker-dealer to effect securities transactions. It is not sufficient merely to hold a series license when engaging in securities business. If you hold a series license and wish to start an independent securities business, or otherwise wish to effect securities transactions outside of an "associated person" relationship, you would first need to register as a broker-dealer.**

## F. Successor Broker-Dealer Registration *(Rules 15b1-3, 15Ba2-4, and 15Ca2-3)*

A successor broker-dealer assumes substantially all of the assets and liabilities, and continues the business, of a registered predecessor broker-dealer. A successor broker-dealer must file a new Form BD (or, in special instances, amend the predecessor broker-dealer's Form BD) within 30 days after such succession. The filing should indicate that the applicant is a successor. *See* Securities Exchange Act Release No. 31661 (December 28, 1992), 58 FR 7, which is available on the SEC's website at: http://www.sec.gov/rules/interp/1992/34-31661.pdf. *See* also, the instructions to Form BD.

## G. Withdrawal from Registration *(Rule 15b6-1)*; Cancellation of Registration

When a registered broker-dealer stops doing business, it must file a Form BDW (http://www.sec.gov/about/forms/formbdw.pdf) to withdraw its registration with the SEC and with the states and SROs of which it is a member. This form requires the broker-dealer to disclose the amount of any funds or securities it owes customers, and whether it is the subject of any proceedings, unsatisfied judgments, liens, or customer claims. These disclosures help to ensure that a broker-dealer's business is concluded in an orderly manner and that customers' funds and securities are protected. In most cases, a broker-dealer must also file a final FOCUS report. Form BDW may also be used by a broker-dealer to withdraw from membership with particular SROs, or to withdraw from registration with particular states, without withdrawing all of its registrations and memberships.

Form BDW is not considered "filed" unless it is deemed complete by the SEC and the SRO that reviews the filing. The SEC may also cancel a broker-dealer's registration if it finds that the firm is no longer in existence or has ceased doing business as a broker-dealer.

# IV. SECURITY FUTURES

Security futures, which are contracts of sale for future delivery of a single security or a narrow-based security index, are regulated as both securities by the SEC and as futures by the Commodity Futures Trading Commission ("CFTC"). As a result, firms that conduct business in security futures must be registered with both the SEC and the CFTC. Federal law permits firms already registered with either the SEC or the CFTC to register with the other agency, for the limited purpose of trading security futures, by filing a notice. Specifically, firms registered as general purpose broker-dealers under Section 15(b) of the Act may "notice" register with the CFTC. Likewise, futures commission merchants and introducing brokers registered with the CFTC may notice register with the SEC. (Section 15(b)(12) of the Act provides a limited exception to this notice registration requirement for certain natural persons who are members of security futures exchanges). However, futures commission merchants or introducing brokers that conduct a business in securities other than security futures must be registered as general-purpose broker-dealers. For more information on this topic, *See* Exchange Act Release No. 44730 (effective August 27, 2001), 66 FR 45138, and 66 FR 43080 (effective September 17, 2001).

# V. CONDUCT REGULATION OF BROKER-DEALERS

Broker-dealers, like other securities market participants, must comply with the general "antifraud" provisions of the federal securities laws. Broker-dealers must also comply with many requirements that are designed to maintain high industry standards. We discuss some of these provisions below.

## A. Antifraud Provisions *(Sections 9(a), 10(b), and 15(c)(1) and (2))*

The "antifraud" provisions prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, in connection with the purchase or sale of securities.[3] While these provisions are very broad, the Commission has adopted rules, issued interpretations, and brought enforcement actions that define some of the activities we consider manipulative, deceptive, fraudulent, or otherwise unlawful.[4] Broker-dealers must conduct their activities so as to avoid these kinds of practices.

### 1. Duty of Fair Dealing

Broker-dealers owe their customers a duty of fair dealing. This fundamental duty derives from the Act's antifraud provisions mentioned above. Under the so-called "shingle" theory, by virtue of engaging in the brokerage profession (e.g., hanging out the broker-dealer's business sign, or "shingle"), a broker-dealer represents to its customers that it will deal fairly with them, consistent with the standards of the profession. Based on this important representation, the SEC, through interpretive statements and enforcement actions, and the courts, through case law, have set forth over time certain duties for broker-dealers. These include the duties to execute orders promptly, disclose certain material information (i.e., information the customer would consider important as an investor), charge prices reasonably related to the prevailing market, and fully disclose any conflict of interest.

SRO rules also reflect the importance of fair dealing. For example, FINRA members must comply with NASD's Rules of Fair Practice. These rules generally require broker-dealers to observe high standards of commercial honor and just and equitable principles of trade in conducting their business. The exchanges and the MSRB have similar rules.

### 2. Suitability Requirements

Broker-dealers generally have an obligation to recommend only those specific investments or overall investment strategies that are suitable for their customers. The concept of suitability appears in specific SRO rules such as NASD Rule 2310 and has been interpreted as an obligation under the antifraud provisions of the federal securities laws. Under suitability requirements, a broker-dealer must have an "adequate and reasonable basis" for any recommendation that it makes. Reasonable basis suitability, or the reasonable basis test, relates to the particular security or strategy recommended. Therefore, the broker-dealer has an obligation to investigate and obtain adequate information about the security it is recommending.

A broker-dealer also has an obligation to determine customer-specific suitability. In particular, a broker-dealer must make recommendations based on a customer's financial situation, needs, and other security holdings. This requirement has been construed to impose a duty of inquiry on broker-dealers to obtain relevant information from customers relating to their financial situations and to keep such information current. SROs consider recommendations to be unsuitable when they are inconsistent with the customer's investment objectives.

### 3. Duty of Best Execution

The duty of best execution, which also stems from the Act's antifraud provisions, requires a broker-dealer to seek to obtain the most favorable terms available under the circumstances for its customer orders. This applies whether the broker-dealer is acting as agent or as principal.

The SRO rules also include a duty of best execution. For example, FINRA members must use "reasonable diligence" to determine the best market for a security and buy or sell the security in that market, so that the price to the customer is as favorable as possible under prevailing market conditions.

### 4. Customer Confirmation Rule (Rule 10b-10 and MSRB rule G-15)

A broker-dealer must provide its customers, at or before the completion of a transaction, with certain information, including:

- the date, time, identity, price, and number of shares involved;
- its capacity (agent or principal) and its compensation (for agency trades, compensation includes its commission and whether it receives payment for order flow;[5] and for principal trades, mark-up disclosure

may be required);

- the source and amount of any third party remuneration it has received or will receive;[6]
- other information, both general (such as, if the broker-dealer is not a SIPC member) and transaction-specific (such as the yield, in most transactions involving debt securities).

A broker-dealer may also be obligated under the antifraud provisions of the Act to disclose additional information to the customer at the time of his or her investment decision.

## 5. Disclosure of Credit Terms *(Rule 10b-16)*

Broker-dealers must notify customers purchasing securities on credit about the credit terms and the status of their accounts. A broker-dealer must establish procedures for disclosing this information before it extends credit to a customer for the purchase of securities. A broker-dealer must give the customer this information at the time the account is opened, and must also provide credit customers with account statements at least quarterly.

## 6. Restrictions on Short Sales *(Regulation SHO)*

A "short sale" is generally a sale of a security that the seller doesn't own or for which the seller delivers borrowed shares. Regulation SHO was adopted in 2004 to update short sale regulation in light of numerous market developments since short sale regulation was first adopted in 1938. Compliance with Regulation SHO began on January 3, 2005. Some of the goals of Regulation SHO include:

- Establishing uniform "locate" and "close-out" requirements in order to address problems associated with failures to deliver, including potentially abusive "naked" short selling.

  *Locate Requirement:* Regulation SHO requires a broker-dealer to have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due before effecting a short sale order in any equity security. This "locate" must be made and documented prior to effecting the short sale. Market makers engaged in bona fide market making are exempted from the "locate" requirement.

  *"Close-out" Requirement:* Regulation SHO imposes additional delivery requirements on broker-dealers for securities in which there are a relatively substantial number of extended delivery failures at a registered clearing agency ("threshold securities"). For instance, with limited exception, Regulation SHO requires brokers and dealers that are participants of a registered clearing agency to take action to "close-out" failure-to-deliver positions ("open fails") in threshold securities that have persisted for 13 consecutive settlement days. Closing out requires the broker or dealer to purchase securities of like kind and quantity. Until the position is closed out, the broker or dealer and any broker or dealer for which it clears transactions (for example, an introducing broker) may not effect further short sales in that threshold security without borrowing or entering into a bona fide agreement to borrow the security (known as the "pre-borrowing" requirement).

- Creating uniform order marking requirements for sales of all equity securities. This means that a broker-dealer must mark orders as "long" or "short."

For further information, please see the adopting release for Regulation SHO, as well as Frequently Asked Questions, Key Points, and other related materials at http://www.sec.gov/spotlight/shortsales.htm.

## 7. Trading During an Offering *(Regulation M)*

Regulation M is designed to protect the integrity of the securities trading market as an independent pricing mechanism by governing the activities of underwriters, issuers, selling security holders, and other participants in connection with a securities offering. These rules are aimed at preventing persons having an interest in an offering from influencing the market price for the offered security in order to facilitate a distribution. The adopting release for Regulation M is available at http://www.sec.gov/rules/final/34-38067.txt.

**Rule 101 of Regulation M** generally prohibits underwriters, broker-dealers and other distribution participants from bidding for, purchasing, or attempting to induce any person to bid for or purchase, any security which is the subject of a distribution until the applicable restricted period has ended. An offering's "restricted period" begins either one or five business days (depending on the trading volume value of the offered security and the public float value of the issuer) before the day of the offering's pricing and ends upon completion of the distribution.

Rule 101 contains various exceptions that are designed to permit an orderly distribution of securities and limit disruption in the market for the securities being distributed. For example, underwriters can continue to trade in actively-traded securities of larger issuers (securities with an average daily trading volume, or ADTV, value of $1 million or more and whose issuers have a public float value of at least $150 million). In addition, the following activities, among others, may be excepted from Rule 101, if they meet specified conditions:

- disseminating research reports;
- making unsolicited purchases;
- purchasing a group, or "basket" of 20 or more securities;
- exercising options, warrants, rights, and convertible securities;
- effecting transactions that total less than 2% of the security's ADTV; and
- effecting transactions in securities sold to "qualified institutional buyers."

**Rule 102 of Regulation M** prohibits issuers, selling security holders, and their affiliated purchasers from bidding for, purchasing, or attempting to induce any person to bid for or purchase, any security which is the subject of a distribution until after the applicable restricted period.

**Rule 103 of Regulation M** governs passive market making by broker-dealers participating in an offering of a Nasdaq security.

**Rule 104 of Regulation M** governs stabilization transactions, syndicate short covering activity, and penalty bids.

**Rule 105 of Regulation M** prevents manipulative short sales prior to pricing an offering by prohibiting the purchase of offering securities if a person sold short the security that is the subject of the offering during the Rule 105 restricted period. The rule contains exceptions for bona fide purchases, separate accounts, and investment companies.

For frequently asked questions about Regulation M, see Staff Legal Bulletin No. 9 at http://www.sec.gov/interps/legal/mrslb9.htm.

## 8. Restrictions on Insider Trading

The SEC and the courts interpret Section 10(b) and Rule 10b-5 under the Act to bar the use by any person of material non-public information in the purchase or sale of securities, whenever that use violates a duty of trust and confidence owed to a third party. Section 15(f) of the Act specifically requires broker-dealers to have and enforce written policies and procedures reasonably designed to prevent their employees from misusing material non-public information. Because employees in the investment banking operations of broker-dealers frequently have access to material non-public information, firms need to create procedures designed to limit the flow of this information so that their employees cannot use the information in the trading of securities. Broker-dealers can use these information barriers as a defense to a claim of insider trading. Such procedures typically include:

- training to make employees aware of these restrictions;
- employee trading restrictions;
- physical barriers;
- isolation of certain departments; and
- limitations on investment bank proprietary trading.[7]

### 9. Restrictions on Private Securities Transactions

NASD Rule 3040 provides that "no person associated with a member shall participate in any manner in a private securities transaction" except in accordance with the provisions of the rule. To the extent that any such transactions are permitted under the rule, prior to participating in any private securities transaction, the associated person must provide written notice to the member firm as described in the rule. If compensation is involved, the member firm must approve or disapprove the proposed transaction, record it in its books and records, and supervise the transaction as if it were executed on behalf of the member firm. Other conditions may also apply. In addition, private securities transactions of an associated person may be subject to an analysis under Exchange Act Section 10(b) and Rule 10b-5, as well as the broker-dealer supervisory provisions of Section 15(f) (described in Part V.A.8, above) and Section 15(b)(4)(E), and other relevant statutory or regulatory provisions.

## B. Analysts and Regulation AC

Regulation AC (or Regulation Analyst Certification) requires brokers, dealers, and persons associated with brokers or dealers that publish, distribute, or circulate research reports to include in those reports a certification that the views expressed in the report accurately reflect the analyst's personal views. The report must also disclose whether the analyst received compensation for the views expressed in the report. If the analyst has received related compensation, the broker, dealer, or associated person must disclose its amount, source, and purpose. Regulation AC applies to all brokers and dealers, as well as to those persons associated with a broker or dealer that fall within the definition of "covered person." Regulation AC also requires that broker-dealers keep records of analyst certifications relating to public appearances.

In addition to Commission rules, analyst conduct is governed by SRO rules, such as NASD Rule 2711 and NYSE Rule 472. The SRO rules impose restrictions on analyst compensation, personal trading activities, and involvement in investment banking activities. The SRO rules also include disclosure requirements for research reports and public appearances.

For further information, including investor guidance, SEC releases, and SRO rules, see http://www.sec.gov/divisions/marketreg/securitiesanalysts.htm. In addition, staff responses to frequently asked questions are available at http://www.sec.gov/divisions/marketreg/mregacfaq0803.htm.

## C. Trading by Members of Exchanges, Brokers and Dealers *(Section 11(a))*

Broker-dealers that are members of national securities exchanges are subject to additional regulations regarding transactions they effect on exchanges. For example, except under certain conditions, they generally cannot effect transactions on exchanges for their own accounts, the accounts of their associated persons, or accounts that they or their associated persons manage. Exceptions from this general rule include transactions by market makers, transactions routed through other members, and transactions that yield to other orders. Exchange members may wish to seek guidance from their exchange regarding these provisions.

## D. Extending Credit on New Issues; Disclosure of Capacity as Broker or Dealer *(Section 11(d))*

Section 11(d)(1) of the Act generally prohibits a broker-dealer that participates in the distribution of a new issue of securities from extending credit to customers in connection with the new issue during the distribution period and for 30 days thereafter. Sales by a broker-dealer of mutual fund shares and variable insurance product units are deemed to constitute participation in the distribution of a new issue. Therefore, purchase of mutual fund shares or variable product units using credit extended or arranged by the broker-dealer during the distribution period is a violation of Section 11(d)(1). However, Exchange Act Rule 11d1-2 permits a broker-dealer to extend credit to a customer on newly sold mutual fund shares and variable insurance product units after the customer has owned the shares or units for 30 days.

Section 11(d)(2) of the Act requires a broker-dealer to disclose in writing, at or before the completion of each transaction with a customer, whether the broker-dealer is acting in the capacity of broker or dealer with regard to

the transaction.

## E. Regulation NMS

Regulation NMS addresses four interrelated topics that are designed to modernize the regulatory structure of the U.S. equity markets: (1) order protection, (2) intermarket access, (3) sub-penny pricing, and (4) market data.

1. The "Order Protection Rule" requires trading centers to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the execution of trades at prices inferior to protected quotations displayed by other trading centers, subject to an applicable exception. To be protected, a quotation must be immediately and automatically accessible.

2. The "Access Rule" requires fair and non-discriminatory access to quotations, establishes a limit on access fees to harmonize the pricing of quotations across different trading centers, and requires each national securities exchange and national securities association to adopt, maintain, and enforce written rules that prohibit their members from engaging in a pattern or practice of displaying quotations that lock or cross automated quotations.

3. The "Sub-Penny Rule" prohibits market participants from accepting, ranking, or displaying orders, quotations, or indications of interest in a pricing increment smaller than a penny, except for orders, quotations, or indications of interest that are priced at less than $1.00 per share.

4. The "Market Data Rules" update the requirements for consolidating, distributing, and displaying market information. In addition, amendments to the joint industry plans for disseminating market information modify the formulas for allocating plan revenues among the self-regulatory organizations and broaden participation in plan governance.

Regulation NMS also updates and streamlines the existing Exchange Act rules governing the national market system previously adopted under Section 11A of the Exchange Act, and consolidates them into a single regulation.

For additional details regarding Regulation NMS, see http://www.sec.gov/rules/final/34-51808fr.pdf and http://www.sec.gov/spotlight/regnms.htm.

## F. Order Execution Obligations *(Rules 602-604 of Regulation NMS)*

Broker-dealers that are exchange specialists or Nasdaq market makers must comply with particular rules regarding publishing quotes and handling customer orders. These two types of broker-dealers have special functions in the securities markets, particularly because they trade for their own accounts while also handling orders for customers. These rules, which include the "Quote Rule" and the "Limit Order Display Rule," increase the information that is publicly available concerning the prices at which investors may buy and sell exchange-listed and Nasdaq National Market System securities.

The Quote Rule requires specialists and market makers to provide quotation information to their self-regulatory organization for dissemination to the public. The quote information that the specialist or market maker provides must reflect the best prices at which he is willing to trade (the lowest price the dealer will accept from a customer to sell the securities and the highest price the dealer will pay a customer to purchase the securities). A specialist or market maker may still trade at better prices in certain private trading systems, called electronic communications networks, or "ECNs," without publishing an improved quote. This is true only when the ECN itself publishes the improved prices and makes those prices available to the investing public. Thus, the Quote Rule ensures that the public has access to the best prices at which specialists and market makers are willing to trade even if those prices are in private trading systems.

Limit orders are orders to buy or sell securities at a specified price. The Limit Order Display Rule requires that specialists and market makers publicly display certain limit orders they receive from customers. If the limit order is for a price that is better than the specialist's or market maker's quote, the specialist or market maker must publicly display it. The rule benefits investors because the publication of trading interest at prices that improve specialists' and market makers' quotes present investors with improved pricing opportunities.

## G. Regulation ATS: Broker-Dealer Trading Systems

Regulation ATS (17 CFR 242.300 et seq.) provides a means for broker-dealers to operate automated trading platforms, to collect and execute orders in securities electronically, without registering as a national securities exchange under Section 6 of the Exchange Act or as an exempt exchange pursuant to Section 5 of the Act. For purposes of the regulation, an alternative trading system or ATS is any organization, association, person, group of persons, or system that constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as defined in Rule 3b-16 under the Exchange Act. *See* 17 CFR 242.300. Further, for purposes of the regulation, an ATS may not set rules governing the conduct of subscribers (other than with respect to the use of the particular trading system), or discipline subscribers other than by exclusion from trading. To the extent that an ATS or the sponsoring broker-dealer seeks to establish conduct or disciplinary rules, the entity may be required to register as a national securities exchange or obtain a Commission exemption from exchange registration based on limited trading volume.

In order to acquire the status of an ATS, a firm must first be registered as a broker-dealer, and it must file an initial operation report with respect to the trading system on Form ATS at least 20 days before commencing operation. The initial operation report must be accurate and kept current. The Commission does not issue approval orders for Form ATS filings; however, the Form ATS is not considered filed unless it complies with all applicable requirements under the Regulation. Regulation ATS contains provisions concerning the system's operations, including: fair access to the trading system; fees charged; the display of orders and the ability to execute orders; system capacity, integrity and security; record keeping and reporting; and procedures to ensure the confidential treatment of trading information.

An ATS must file with the Division of Trading and Markets quarterly reports regarding its operations on Form ATS-R. An ATS must also comply with any applicable SRO rules and with state laws relating to alternative trading systems and relating to the offer or sale of securities or the registration or regulation of persons or entities effecting securities transactions.

Finally, an ATS may not use in its name the word "exchange," or terms similar to the word "exchange," such as the term "stock market." *See* 17 CFR 242.301. For further information on the operation and regulation of alternative trading systems, see the adopting release for Regulation ATS at http://www.sec.gov/rules/final/34-40760.txt.

## H. Penny Stock Rules *(Rules 15g-2 through 15g-9, Schedule 15G)*

Most broker-dealers that effect transactions in "penny stocks" have certain enhanced suitability and disclosure obligations to their customers.[8] A penny stock is generally defined as any equity security other than a security that: (a) is an NMS stock (*See* Rule 600(b)(47)) listed on a "grandfathered" national securities exchange, (b) is an NMS stock listed on a national securities exchange or an automated quotation system sponsored by a registered national securities association (including Nasdaq) that satisfies certain minimum quantitative listing standards, (c) has a transaction price of five dollars or more, (d) is issued by a registered investment company or by the Options Clearing Corporation, (e) is a listed security futures product, or (f) is a security whose issuer has met certain net tangible assets or average revenues (*See* Rule 3a51-1). Penny stocks include the equity securities of private companies with no active trading market if they do not qualify for one of the exclusions from the definition of penny stock.

Before a broker-dealer that does not qualify for an exemption[9] may effect a solicited transaction in a penny stock for or with the account of a customer it must: (1) provide the customer with a risk disclosure document, as set forth in Schedule 15G, and receive a signed and dated acknowledgement of receipt of that document from the customer (*See* Rule 15g-2); (2) approve the customer's account for transactions in penny stocks, provide the customer with a suitability statement, and receive a signed a dated copy of that statement from the customer; and (3) receive the customer's written agreement to the transaction (*See* Rule 15g-9). The broker-dealer also must wait at least two business days after sending the customer the risk disclosure document and the suitability statement before

effecting the transaction. In addition, Exchange Act Rules 15g-3 through 15g-6 generally require a broker-dealer to give each penny stock customer:

- information on market quotations and, where appropriate, offer and bid prices;
- the aggregate amount of any compensation received by the broker-dealer in connection with such transaction;
- the aggregate amount of cash compensation that any associated person of the broker-dealer, who is a natural person and who has communicated with the customer concerning the transaction at or prior to the customer's transaction order, other than a person whose function is solely clerical or ministerial, has received or will receive from any source in connection with the transaction; and
- monthly account statements showing the market value of each penny stock held in the customer's account.

## I. Privacy of Consumer Financial Information *(Regulation S-P)*

Broker-dealers, including foreign broker-dealers registered with the Commission and unregistered broker-dealers in the United States, must comply with Regulation S-P, (*See* 17 CFR Part 248) even if their consumers are non-U.S. persons or if they conduct their activities through non-U.S. offices or branches.

Regulation S□P generally requires a broker-dealer to provide its customers with initial, annual and revised notices containing specified information about the broker-dealer's privacy policies and practices. These notices must be clear and conspicuous, and must accurately reflect the broker-dealer's policies and practices. *See* 17 CFR 248.4, 248.5, 248.6 and 248.8. Before disclosing nonpublic personal information about a consumer to a nonaffiliated third party, a broker-dealer must first give a consumer an opt-out notice and a reasonable opportunity to opt out of the disclosure. *See* 17 CFR 248.7 and 248.10. There are exceptions from these notice and opt-out requirements for disclosures to other financial institutions under joint marketing agreements and to certain service providers. *See* 17 CFR 248.13. There also are exceptions for disclosures made for purposes such as maintaining or servicing accounts, and disclosures made with the consent or at the direction of a consumer, or for purposes such as protecting against fraud, reporting to consumer reporting agencies, and providing information to law enforcement agencies. *See* 17 CFR 248.14 and 248.15.

Regulation S□P also imposes limits on the re-disclosure and re-use of information, and on sharing account number information with nonaffiliated third parties for use in telemarketing, direct mail marketing and email marketing. *See* 17 CFR 248.11 and 248.12. In addition, it includes a safeguards rule that requires a broker-dealer to adopt written policies and procedures for administrative, technical, and physical safeguards to protect customer records and information. *See* 17 CFR 248.30(a). Further, it includes a disposal rule that requires a broker-dealer (other than a broker-dealer registered by notice with the Commission to engage solely in transactions in securities futures) that maintains or possesses consumer report information for a business purpose to take reasonable measures to protect against unauthorized access to or use of the information in connection with its disposal. *See* 17 CFR 248.30(b).

Recently proposed amendments which would further strengthen the privacy protections under Regulation S-P are available at http://www.sec.gov/rules/proposed/2008/34-57427.pdf.

## J. Investment Adviser Registration

Broker-dealers offering certain types of accounts and services may also be subject to regulation under the Investment Advisers Act.[10] (An investment adviser is defined as a person who receives compensation for providing advice about securities as part of a regular business.) (*See* Section 202(a)(11) of the Investment Advisers Act.) In general, a broker-dealer whose performance of advisory services is "solely incidental" to the conduct of its business as a broker-dealer and that receives no "special compensation" is excepted from the definition of investment adviser. Thus, for example, a broker-dealer that provides advice and offers fee-based accounts (i.e., accounts that charge an asset-based or fixed fee rather than a commission, mark-up, or mark-down) must treat those accounts as advisory because an asset-based fee is considered "special compensation." Also, under a recently proposed rule, a broker-dealer would be required to treat (1) each account over which it exercises

investment discretion as an advisory account, unless the investment discretion is granted by a customer on a temporary or limited basis and (2) an account as advisory if the broker-dealer charges a separate fee for, or separately contracts to provide, advisory services. (*See* http://www.sec.gov/rules/proposed/2007/ia-2652.pdf.) Finally, under the same proposed rule, a broker-dealer that is registered under the Exchange Act and registered under the Investment Advisers Act would be an investment adviser solely with respect to those accounts for which it provides services that subject the broker-dealer to the Investment Advisers Act.

## VI. ARBITRATION

Pursuant to the rules of self-regulatory organizations, broker-dealers are required to arbitrate disputes with their customers, if the customer chooses to arbitrate. *See e.g.*, NASD Code of Arbitration Procedure for Customer Disputes, Rule 12200; American Stock Exchange, Rule 600; and Chicago Board of Options Exchange, Rule 18.1.

## VII. FINANCIAL RESPONSIBILITY OF BROKER-DEALERS

Broker-dealers must meet certain financial responsibility requirements, including:

- maintaining minimum amounts of liquid assets, or net capital;
- taking certain steps to safeguard the customer funds and securities; and
- making and preserving accurate books and records.

### A. Net Capital Rule *(Rule 15c3-1)*

The purpose of this rule is to require a broker-dealer to have at all times enough liquid assets to promptly satisfy the claims of customers if the broker-dealer goes out of business. Under this rule, broker-dealers must maintain minimum net capital levels based upon the type of securities activities they conduct and based on certain financial ratios. For example, broker-dealers that clear and carry customer accounts generally must maintain net capital equal to the greater of $250,000 or two percent of aggregate debit items. Broker-dealers that do not clear and carry customer accounts can operate with lower levels of net capital.

### B. Use of Customer Balances *(Rule 15c3-2)*

Broker-dealers that use customers' free credit balances in their business must establish procedures to provide specified information to those customers, including:
- the amount due to those customers;
- the fact that such funds are not segregated and may be used by the broker-dealer in its business; and
- the fact that such funds are payable on demand of the customer.

### C. Customer Protection Rule *(Rule 15c3-3)*

This rule protects customer funds and securities held by broker-dealers. Under the rule, a broker-dealer must have possession or control of all fully-paid or excess margin securities held for the account of customers, and determine daily that it is in compliance with this requirement. The broker-dealer must also make periodic computations to determine how much money it is holding that is either customer money or obtained from the use of customer securities. If this amount exceeds the amount that it is owed by customers or by other broker-dealers relating to customer transactions, the broker-dealer must deposit the excess into a special reserve bank account for the exclusive benefit of customers. This rule thus prevents a broker-dealer from using customer funds to finance its business.

### D. Required Books, Records, and Reports *(Rules 17a-3, 17a-4, 17a-5, 17a-11)*[11]

Broker-dealers must make and keep current books and records detailing, among other things, securities transactions, money balances, and securities positions. They also must keep records for required periods and furnish copies of those records to the SEC on request. These records include e-mail. Broker-dealers also must file

with the SEC periodic reports, including quarterly and annual financial statements. The annual statements generally must be certified by an independent public accountant. In addition, broker-dealers must notify the SEC and the appropriate SRO[12] regarding net capital, recordkeeping, and other operational problems, and in some cases file reports regarding those problems, within certain time periods. This gives us and the SROs early warning of these problems.

## E. Risk Assessment Requirements *(Rules 17h-1T and 17h-2T)*

Certain broker-dealers must maintain and preserve certain information regarding those affiliates, subsidiaries and holding companies whose business activities are reasonably likely to have a material impact on their own financial and operating condition (including the broker-dealer's net capital, liquidity, or ability to conduct or finance operations). Broker-dealers must also file a quarterly summary of this information. This information is designed to permit the SEC to assess the impact these entities may have on the broker-dealer.

# VIII. OTHER REQUIREMENTS

In addition to the provisions discussed above, broker-dealers must comply with other requirements. These include:

- submitting to Commission and SRO examinations;
- participating in the lost and stolen securities program;
- complying with the fingerprinting requirement;
- maintaining and reporting information regarding their affiliates;
- following certain guidelines when using electronic media to deliver information; and
- maintaining an anti-money laundering program.

## A. Examinations and Inspections *(Rules 15b2-2 and 17d-1)*

Broker-dealers are subject to examination by the SEC and the SROs. The appropriate SRO generally inspects newly-registered broker-dealers for compliance with applicable financial responsibility rules within six months of registration, and for compliance with all other regulatory requirements within twelve months of registration. A broker-dealer must permit the SEC to inspect its books and records at any reasonable time.

## B. Lost and Stolen Securities Program *(Rule 17f-1)*

In general, all broker-dealers must register in the lost and stolen securities program. The limited exceptions include broker-dealers that effect securities transactions exclusively on the floor of a national securities exchange solely for other exchange members and do not receive or hold customer securities, and broker-dealers whose business does not involve handling securities certificates. Broker-dealers must report losses, thefts, and instances of counterfeiting of securities certificates on Form X-17F-1A, and, in some cases, broker-dealers must make inquiries regarding securities certificates coming into their possession. Broker-dealers must file these reports and inquiries with the Securities Information Center (SIC), which operates the program for the SEC. A registration form can be obtained from Securities Information Center, P.O. Box 55151, Boston, MA 02205-5151. For registration and additional information, see the SIC's website at https://www.secic.com.

## C. Fingerprinting Requirement *(Rule 17f-2)*

Generally, every partner, officer, director, or employee of a broker-dealer must be fingerprinted and submit his or her fingerprints to the U.S. Attorney General. This requirement does not apply, however, to broker-dealers that sell only certain securities that are not ordinarily evidenced by certificates (such as mutual funds and variable annuities) or to persons who do not sell securities, have access to securities, money or original books and records, and do not supervise persons engaged in such activities. A broker-dealer claiming an exemption must comply with the notice requirements of Rule 17f-2. Broker-dealers may obtain fingerprint cards from their SRO and should submit completed fingerprint cards to the SRO for forwarding to the FBI on behalf of the Attorney General.

## D. Use of Electronic Media by Broker-Dealers

The Commission has issued two interpretive releases discussing the issues that broker-dealers should consider in using electronic media for delivering information to customers. These issues include the following:

- Will the customer have notice of and access to the communication?

- Will there be evidence of delivery?

- Did the broker-dealer take reasonable precautions to ensure the integrity, confidentiality, and security of any personal financial information?

*See* Securities Exchange Act Release No. 37182 (May 15, 1996), 61 FR 24644. *See also*, Securities Exchange Act Release No. 39779 (March 23, 1998), 63 FR 14806 (http://www.sec.gov/rules/interp/33-7516.htm).

## E. Electronic Signatures (E-SIGN)

Broker-dealers should also consider the impact, if any, that the Electronic Signatures in Global and National Commerce Act (commonly known as E-SIGN), Pub. L. No. 106-229, 114 Stat. 464 (2000) [15 U.S.C. §7001], has on their ability to deliver information to customers electronically.

## F. Anti-Money Laundering Program

Broker-dealers have broad obligations under the Bank Secrecy Act ("BSA")[13] to guard against money laundering and terrorist financing through their firms. The BSA, its implementing regulations, and Rule 17a-8 under the Exchange Act require broker-dealers to file reports or retain records relating to suspicious transactions, customer identity, large cash transactions, cross-border currency movement, foreign bank accounts and wire transfers, among other things.

The BSA, as amended by the USA PATRIOT Act, as well as SRO rules (e.g., NASD Rule 3011 and NYSE Rule 445), also requires all broker-dealers to have anti-money laundering compliance programs in place. Firms must develop and implement a written anti-money laundering compliance program, approved in writing by a member of senior management, which is reasonably designed to achieve and monitor the member's ongoing compliance with the requirements of the BSA and its implementing regulations. Under this obligation, firms must:

- establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of suspicious transactions;

- establish and implement policies, procedures, and internal controls reasonably designed to achieve compliance with the BSA and implementing regulations;

- provide for independent testing for compliance, to be conducted by member personnel or by a qualified outside party;

- designate and identify to the SROs an individual or individuals responsible for implementing and monitoring the day-to-day operations and internal controls of the program and provide prompt notification regarding any change in such designation(s); and

- provide ongoing training for appropriate personnel.

For a compilation of key anti-money laundering laws, rules and guidance applicable to broker-dealers, see Anti-Money Laundering Source Tool http://www.sec.gov/about/offices/ocie/amlsourcetool.htm; see also, FINRA Anti-Money Laundering Issue Center http://www.finra.org/RulesRegulation/IssueCenter/Anti-MoneyLaundering/index.htm. In addition, the Financial Crimes Enforcement Network ("FinCEN"), the division within the Department of the Treasury that administers the BSA, provides useful information for helping financial institutions, including broker-dealers, meet their BSA obligations. *See* FinCEN Web site http://fincen.gov/.

## G. Office of Foreign Assets Control

Broker-dealers have an obligation to comply with the sanctions programs administered by the Department of Treasury's Office of Foreign Assets Control (OFAC). OFAC administers and enforces economic and trade

sanctions based on US foreign policy and national security goals against targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction.[14] OFAC acts under Presidential wartime and national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under US jurisdiction.

OFAC's sanctions programs are separate and distinct from, and in addition to, the anti-money laundering requirements imposed under the BSA on broker-dealers.[15] Unlike the BSA, OFAC programs apply to all U.S. persons and are applicable across business lines. OFAC programs are also strict liability programs — there are no safe harbors and no de minimis standards, although having a comprehensive compliance program in place could act as a mitigating factor in any enforcement action. OFAC publishes regulations implementing each of its programs, which include trade restrictions and asset blockings against particular countries and parties tied to terrorism, narcotics trafficking, proliferation of weapons of mass destruction, as well as a number of programs targeting members of certain foreign jurisdictions. As part of its efforts to implement these programs, OFAC publishes a list of Specially Designated Nationals, which is frequently updated on an as-needed basis.[16] In general, OFAC regulations require you to do the following:

- block accounts and other property of specified countries, entities, and individuals;
- prohibit or reject unlicensed trade and financial transactions with specified countries, entities, and individuals; and
- report all blockings and rejections of prohibited transactions to OFAC within ten days of the occurrence and annually.[17]

OFAC has the authority to impose civil penalties of over $1,000,000 per count for violations of its sanctions programs. OFAC has stated that it will take into account the adequacy of your OFAC compliance program when it evaluates whether to impose a penalty if an OFAC violation occurs. To guard against engaging in OFAC prohibited transactions, you should generally follow a best practice of "screening against" the OFAC lists.[18] Consistent with this best practice, you should take care to screen all new accounts, existing accounts, customers and relationships against the OFAC lists, including any updates to the lists. This screening should include originators or recipients of wire and securities transfers.[19]

## H. Business Continuity Planning

The Commission, Federal Reserve Board, and Comptroller of the Currency published an interagency *White Paper* emphasizing the importance of core clearing and settlement organizations and establishing guidelines for their capacity and ability to restore operations within a short time of a wide-scale disruption.[20] Separately, the Commission also published a *Policy Statement* urging the organized securities markets to improve their business continuity arrangements,[21] and encouraging SRO-operated markets and electronic communications networks, or ECNs to establish plans to enable the restoration of trading no later than the business day following a wide-scale disruption.

In 2004, NASD and the NYSE adopted rules requiring every member to establish and maintain a business continuity plan, with elements as specified in the rules, and to provide the respective SROs with emergency contact information. *See* NASD Rule 3510 and NYSE Rule 446. *See also*, http://www.sec.gov/rules/sro/nasd/34-49537.pdf.

## IX. WHERE TO GET FURTHER INFORMATION

For general questions regarding broker-dealer registration and regulation:

Office of Interpretation and Guidance
Division of Trading and Markets
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

(202) 551-5777
e-mail: tradingandmarkets@sec.gov

For additional information about how to obtain official publications of SEC rules and regulations, and for on-line access to SEC rules:

Superintendent of Documents
Government Printing Office
Washington, DC 20402-9325

www.gpo.gov

For copies of SEC forms and recent SEC releases,

See www.sec.gov, or contact:

Publications Section
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 551-4040

Other useful addresses, telephone numbers, and websites:

SEC's website: www.sec.gov
The SEC's website contains contact numbers for SEC offices in Washington and for the SEC's regional offices:
http://www.sec.gov/contact/addresses.htm.

Financial Industry Regulatory Authority
9509 Key West Avenue
Rockville, MD 20850
(301) 590-6500 (call center)
(800) 289-9999 (to check on the registration status of a firm or individual)
www.finra.org

New York Stock Exchange, Inc.
20 Broad Street
New York, NY 10005
(212) 656-3000
www.nyse.com

North American Securities Administrators Association, Inc.
750 First Street, NE, Suite 1140
Washington, DC 20002
(202) 737-0900
www.nasaa.org

Municipal Securities Rulemaking Board
>1900 Duke Street, Suite 600
Alexandria, VA 22314
(703) 797-6600
www.msrb.org

Securities Investor Protection Corporation
805 15th Street, N.W. Suite 800
Washington, D.C. 20005-2215
(202)371-8300

www.sipc.org

e-mail: asksipc@sipc.org

**We wish to stress that we have published this guide as an introduction to the federal securities laws that apply to brokers and dealers. It only highlights and summarizes certain provisions, and does not relieve anyone from complying with all applicable regulatory requirements. You should not rely on this guide without referring to the actual statutes, rules, regulations, and interpretations.**

## Endnotes

[1] The Division of Trading and Markets was known as the Division of Market Regulation from August 7, 1972, until November 14, 2007.

[2] The treatment of dividend (or interest) reinvestment and stock purchase plans is addressed in Rule 102(c) of Regulation M. (*See* Part V.A.7.)

[3] Section 9(a) prohibits particular manipulative practices regarding securities registered on a national securities exchange. Section 10(b) is a broad "catch-all" provision that prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security. Sections 15(c)(1) and 15(c)(2) apply to the over-the-counter markets. Section 15(c)(1) prohibits broker-dealers from effecting transactions in, or inducing the purchase or sale of, any security by means of "any manipulative, deceptive or other fraudulent device," and Section 15(c)(2) prohibits a broker-dealer from making fictitious quotes.

[4] These include Rules 10b-1 through 10b-18, 15c1-1 through 15c1-9, 15c2-1 through 15c2-11, and Regulation M.

[5] In addition, Rule 11Ac1-3 requires broker-dealers to inform their customers, upon opening a new account and annually thereafter, of their policies regarding payment for order flow and for determining where to route a customer's order.

[6] The purpose of this disclosure is to inform the customer of the nature and extent of a broker-dealer's conflict of interest. Broker-dealers are neither required to disclose the precise amount of these payments nor any formula that would allow a customer to calculate this amount. Nevertheless, Rule 10b-10 is not a safe harbor from the anti-fraud provisions. Recent enforcement actions have indicated that failures to disclose the nature and extent of the conflict of interest may violate Section 17(a)(2) of the 1933 Act. See Edward D. Jones & Co., L.P., Securities Exchange Act Release No. 50910 (Dec. 22, 2004); Morgan Stanley DW, Inc., Securities Exchange Act Release No. 48789 (Nov. 17, 2003).

[7] SEC, Report by Division of Market Regulation, Broker-Dealer Policies and Procedures Designed to Segment the Flow and Prevent the Misuse of Material Non-Public Information, [1989-1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) 84,520 at p. 80, 620-25 (March, 1990).

[8] Rule 15g-1(a)(1) establishes a transaction exemption for brokers or dealers whose commission equivalents, mark-ups, and mark-downs from transactions in penny stocks during each of the immediately preceding three months and during eleven or more of the preceding twelve months, or during the immediately preceding six months, did not exceed five percent of its total commissions, commission equivalents, mark-ups, and mark-downs from transactions in securities during those months.

[9] Exemptions from the requirements of Exchange Act Rules 15g-2 through 15g-6 are provided for non-recommended transactions, broker-dealers doing a minimal business in penny stocks, trades with institutional investors, and private placements. See Rule 15g-1. Rule 15g-9(c) exempts certain transactions from the requirements of Rule 15g-9.

[10] *See* Certain Broker-Dealers Deemed Not To Be Investment Advisers, Exchange Act Release No. 51523 (April 12, 2005).

[11] Rules 17a-2, 17a-7, 17a-8, 17a-10 and 17a-13 contain additional recordkeeping and reporting requirements that apply to broker-dealers.

[12] When a broker-dealer is a member of more than one SRO, the SEC designates the SRO responsible for examining such broker-dealer for compliance with financial responsibility rules (the "designated examining authority").

[13] The Currency and Foreign Transactions Reporting Act of 1970 (commonly referred to as the "Bank Secrecy Act") is codified at 31 U.S.C. 5311, et seq. The regulations implementing the Bank Secrecy Act are located at 31 CFR Part 103.

[14] A list of countries subject to OFAC sanctions, as well as a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted counties (collectively called Specially Designated Nationals (SDNs)), is available on the OFAC website: www.treas.gov/ofac.

A summary of OFAC regulations as they apply to the securities industry can be found at the following link: www.treas.gov/offices/enforcement/ofac/regulations/t11facsc.pdf

*See also* Federal Financial Institutions Examination Council Bank Secrecy Act/Anti-Money Laundering Examination Manual ("FFIEC Manual"), at pages 137-145 (8/24/2007). The FFIEC Manual contains an entire section outlining best practices for OFAC Compliance, including risk matrices. Although that manual is written for the banking community, it provides information which may be useful to broker-dealers.

[15] *See also* FinCEN Interpretive Release No. 2004-02 "Unitary Filing of Suspicious Activity and Blocking Reports," 69 Fed. Reg. 76847 (Dec. 23, 2004).

[16] OFAC offers a RISS feed service as well as an email notice system which pushes out digital information about its programs, including updates to its SDN List. See www.treas.gov/ofac. These may be especially helpful to smaller firms whose OFAC compliance programs are more manual in nature.

[17] You will find forms for blocking and rejection reports on OFAC's website using the following links:

Voluntary blocking report:
www.treas.gov/offices/enforcement/ofac/legal/forms/e_blockreport1.pdf.

Annual blocking report:
www.treas.gov/offices/enforcement/ofac/legal/forms/td902250.pdf.

Voluntary rejection report:
www.treas.gov/offices/enforcement/ofac/legal/forms/e_recjectreport1.pdf

[18] The Financial Industry Regulatory Authority (FINRA) offers a tool that assists firms to search for names on OFAC lists: http://apps.finra.org/RulesRegulation/OFAC/1/Default.aspx.

[19] See also FFIEC Manual at 140 ("[t]he extent to which the bank includes account parties other than accountholders (e.g., beneficiaries, guarantors, principals, beneficial owners, nominee shareholders, directors, signatories, and powers of attorney) in the initial OFAC review during the account opening process, and during subsequent database reviews of existing accounts, will depend on the bank's risk profile and available technology.").

[20] Interagency Paper on Sound Practices to Strengthen the Resilience of the U.S. Financial Systems, Securities Exchange Act Release No. 47638 (April 7, 2003), 68 FR 17809 (April 11, 2003), http://www.sec.gov/news/studies/34-47638.htm.

[21] Policy Statement: Business Continuity Planning for Trading Markets, Securities Exchange Act Release No. 48545 (September 25, 2003), 68 FR 56656 (October 1, 2003), http://www.sec.gov/rules/policy/34-48545.htm.

*Modified: Dec. 12, 2016*