UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JUSTIN W. KEENER D/B/A JMJ FINANCIAL, )<br>)<br>Defendant. )<br>)<br>)<br>)<br>) | No. 20-cv-21254<br><br>Hon. Beth Bloom |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
OMNIBUS *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF
GEORGE OLDFIELD, JASON FLEMMONS, AND STEWART MAYHEW AND
INCORPORATED MEMORDANDUM OF LAW**

Plaintiff Securities and Exchange Commission respectfully moves the Court for an Order excluding from the jury trial the opinions and testimony of all three expert witnesses proffered by Defendant Justin W. Keener d/b/a JMJ Financial ("Defendant"): George Oldfield ("Dr. Oldfield"), Jason Flemmons ("Flemmons"), and Stewart Mayhew ("Dr. Mayhew"). The SEC also moves to exclude from the case entirely the opinions and testimony of Dr. Oldfield and one of the opinions offered by Flemmons. The opinions and testimony that the SEC seeks to exclude do not comply with the standards set forth in Rule 702 of the Federal Rules of Civil Procedure ("Rules") and case law including *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

**I.   INTRODUCTION**

The SEC's Complaint alleges that Defendant acted as an unregistered "dealer," in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), by buying hundreds of convertible notes, waiting for them to mature under SEC Rule 144,

converting them to stock at a discount to the prevailing market price, and selling the shares to investors in the public market.  *See* Dkt. #1, Complaint, ¶¶ 1-4 (hereinafter "Complaint").

Dr. Oldfield's opinions essentially address whether Defendant would be a "dealer" "in the field of market microstructure" and how Defendant's activities compare to those of market participants who have chosen not to register as dealers.  Those points are irrelevant to whether Defendant complied with the dealer registration statute.  They are no more than legal conclusions dressed as expert opinions.  Dr. Oldfield also failed to use a reliable methodology or to rely on sufficient facts and data to reach his opinions.  Therefore, his opinions and testimony should be excluded entirely.

Flemmons offers two opinions that relate solely to the remedy of disgorgement that the SEC seeks in this case.  Because remedies are for the Court—not the jury—to consider or decide, Flemmons opinions and testimony should be excluded from the jury trial.  Moreover, Flemmons's first opinion is based on a misleading strawman argument, and is not based upon sufficient facts or data or on a reliable methodology.  The Court should exclude Flemmons's first opinion and any related testimony entirely.

Finally, Dr. Mayhew addresses the question of whether counterparties to Defendant's sales of stock from convertible notes were harmed, which he contends relates to the issue of disgorgement.  That also is irrelevant to the issue of whether Defendant violated the law by failing to register as a dealer.  Therefore, his opinions and testimony should not be presented to the jury.

## II.      ARGUMENT AND MEMORANDUM OF LAW

### A.      Legal Standards For Expert Opinions

Federal Rule of Evidence 702 controls the admission of expert testimony.  It allows an

expert to give opinion testimony in a case, provided that "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702.  In this case, Defendant's proffered expert witnesses can only testify *if* they are qualified by "knowledge, skill, experience, training, or education" and:

> (1) [their] testimony is based upon sufficient facts or data; (2) [their] testimony is the product of reliable principles and methods; and (3) [they have] applied the principles and methods reliably to the facts of the case.

*Id.*  Rule 702 compels courts to perform a "gatekeeping" function—specifically, to determine whether the proffered expert testimony is reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 n. 7, 590–91 (1993).

The Eleventh Circuit has highlighted the importance of this gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert.  *See United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The burden of laying the proper foundation for the admission of expert opinion testimony rests with the party offering that testimony.  *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002).  The admissibility of the expert must be established by a preponderance of the evidence.  *Id.*

    **B.**    **The Court Should Exclude Dr. Oldfield's Opinions and Testimony Entirely**

On July 1, 2021, Defendant submitted the "Expert Report of George Oldfield, Ph.D." in this matter (hereinafter "Oldfield Report") (attached as Exhibit A hereto).  Dr. Oldfield expresses

three opinions in his report: (1) "Mr. Keener did not share the characteristics of a dealer as understood in the field of market microstructure" or based on Dr. Oldfield's "practical experience in financial markets" (Ex. A, at § VII heading and ¶ 42 (Oldfield Report)); (2) other market participants that are similar to Defendant "do not register as securities dealers" (*id*. at ¶ 48); and (3) "Mr. Keener would be an anomaly among registered dealers if he had registered." *Id*. at ¶ 70.

The Court should exclude the opinions and testimony of Dr. Oldfield because his opinions are irrelevant to issues in the case, he failed to employ a reliable methodology, and he failed to consider sufficient facts and data.

### 1. Dr. Oldfield's First Opinion Is Irrelevant and Not Based on a Reliable Methodology

#### a. Dr. Oldfield's Opinion About Dealers Under "Market Microstructure" or Financial Concepts Is Irrelevant

Dr. Oldfield's first opinion is that: "Defendant did not share the characteristics of a dealer as understood in the field of market microstructure" or based on Dr. Oldfield's "practical experience in financial markets." Ex. A, at § VII and ¶ 42 (Oldfield Report). This opinion is irrelevant because it will not "assist the trier of fact to understand or determine a *fact in issue*." *See Daubert*, 509 U.S. at 592 (emphasis added). Whether Defendant was a "dealer" will be determined based on the applicable *legal* definition in the Exchange Act. It does not matter what the world of market microstructure thinks of Defendant's status.

Dr. Oldfield has offered several definitions of the term "dealer"—including "an intermediary who is willing to act as a counterparty for the trades of his or her customers" and a "person who buys and sells stock trying to make a bid/ask spread by doing rapid transactions"— each of which is different from the definition in the Exchange Act—"any person engaged in

buying and selling securities … for such person's own account through a broker or otherwise." *Compare* Ex. A, at Fig. 4 (Oldfield Report) and Ex. F (Oldfield Dep. 107:9-17) *with* 15 U.S.C. § 78c(a)(5)(A). Whether Dr. Oldfield contends that Defendant does not meet "standard" definitions of dealer in the field of economics is wholly irrelevant to whether Defendant meets the legal definition of "dealer" under the Exchange Act. None of Dr. Oldfield's economic definitions of "dealer" could permissibly address the legal definition that governs the outcome here.

During his deposition, Dr. Oldfield testified that he had no opinion about whether Defendant was acting as a dealer under the securities laws. To that end, he asserted, "I'm not an expert on the legal definition of a dealer. I'm not opining upon the legal definition of a dealer. I'm—I'm opining on the way—the economic way—way that a dealer makes his money." Ex. F (Oldfield Dep. 110:23-111:2). Dr. Oldfield's first opinion should be excluded for this reason alone. He is expressly offering an expert opinion on a fact that is simply not at issue in this case. Whether Defendant's activities meet one or more definitions of "dealer" outside the only definition at issue in this case—the Exchange Act's definition—is irrelevant to any fact at issue here, and would only serve to confuse a jury.

Dr. Oldfield uses the veneer of academia and "practice" to usurp the jury's role and attempt an end-run around well-settled law that an expert witness may not testify about legal conclusions. *See U.S. v. Long,* 300 F. App'x 804, 814 (11th Cir. 2008) (citing *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness...may not testify to the legal implications of conduct; the court must be the jury's only source of law.")); *U.S. v. Milton,* 555 F.2d 1198, 1203 (5th Cir. 1977); *Johnson v. Bush,* No. 00-3542-CIV, 2002 WL 34355953, at *1 (S.D. Fla. Apr. 19, 2002) (testimony or opinion that is simply legal argument presented

through the guise of expert opinion is not permissible).

Despite claiming that he is not offering a legal opinion, Dr. Oldfield makes a thinly-veiled attempt to either supplant the Exchange Act's definition of "dealer" or to challenge it, neither of which is permissible for an expert witness. Indeed, Dr. Oldfield's attempt to both have a legal opinion and disclaim one simultaneously is best captured in the following exchange during his deposition:

> **Q.** So you're—you're drawing a legal conclusion about the—the facts alleged in the Complaint?
>
> **A.** No, I haven't made a legal decision at all. I've made a decision that if—if an investor is buying convertible notes from—from corporations and holding onto them and eventually converting them into common stock, that's an investment activity, that's not a dealer activity.

Ex. F (Oldfield Dep. 114:5-13). The Court should decline to permit Defendant's expert from having it both ways and identify this double-speak for what it is. This exchange underscores that the only thing Dr. Oldfield's opinion would accomplish would be to confuse the jury about what legal standard to apply in this matter and usurp the roles of the jury and the Court. *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely an inadmissible inference in our system of law.").

### b. Dr. Oldfield's First Opinion Is Not Based on a Reliable Methodology

Moreover, Dr. Oldfield's first opinion does not remotely qualify as the kind of "scientific, technical, or other specialized knowledge" that Rule 702 and *Daubert* require for an expert to provide opinion testimony. *Id.*, 509 U.S. at 592-93. At no point does he present any kind of scientific or other reliable methodology. He simply declares that dealers in his field and in his experience look and operate differently than Defendant. *See* Ex. F (Oldfield Dep. 10:23 – 11:1)

("And in my report, based upon my economic analysis, my experience, my statistical analysis, I don't believe Defendant was acting as a dealer from an economic standpoint.").

Even though he uses the term "statistical analysis," there is no part of this opinion that can be tested, as scientific conclusions generally may be. *See Daubert*, 509 U.S. at 593. There has been no peer review of his opinions, *see id.*, and no "[w]idespread acceptance," *see id.*, 509 U.S. at 594, because none of the economic literature he cites analyzed a dealer operating like Defendant (*i.e.*, one selling stock converted from notes). There is no "known or potential rate of error," *see id.*, associated with Dr. Oldfield's opinion, because it has no grounding in the scientific method. He merely proclaims, repeatedly, that Defendant is not a dealer. As Dr. Taveras, a Ph.D. economist, wrote in her rebuttal report for the SEC: "The Oldfield Report provides no relevant economic analysis in support of its opinion that Defendant's convertible note activity differs from dealer activity." Rebuttal Expert Report of Carmen A. Taveras, Ph.D., at ¶ 9.C (hereinafter "Taveras Report") (attached as Exhibit E hereto).

Instead of a scientific methodology, Dr. Oldfield instead offers verbal slights-of-hand. He admits that Defendant had "clients," but insists that these issuers were not his "customers." Ex. F (Oldfield Dep. 119:9-11) ("a customer is someone with whom you do an immediate transaction; a client is someone in whom you have a long-term economic interest"). He claims that Defendant engaged in "marketing"—with a website and other efforts—but not in "advertising," while providing no discernible guiding principle to distinguish between what the rest of world would consider to be synonyms. *See id.* at 47:3-6.

The Court should exclude Dr. Oldfield's first opinion entirely because it is either an irrelevant, untested observation or a poorly-disguised legal conclusion with no genuine economic methodology to support it.

### 2. Dr. Oldfield's Second Opinion Should Be Excluded Because It Is Irrelevant and Not Based on Sufficient Facts or Data

#### a. Dr. Oldfield Offers an Irrelevant Opinion About What Other Market Participants Do

Dr. Oldfield's second opinion is that other market participants—such as hedge funds, angel investors, high frequency traders, and family offices—"buy and sell securities, yet do not register as securities dealers with the SEC." Ex. A, at ¶ 48 (Oldfield Report). This opinion will do nothing to assist the trier of fact in determining any fact in this case, because it is irrelevant what other activities Dr. Oldfield's hand-picked market participants engaged in that are, as he admits, distinct from Defendant's activities.

For example, Dr. Oldfield testified in his deposition as follows:

> **Q.** So is it—is it your opinion that Mr. Keener is a lot like a hedge fund? You don't say it in the same terms that you do as to angel investors.
>
> **A.** No, I'm not saying that Mr. Keener is a lot like a hedge fund. What I'm saying is a hedge fund, and the hedge funds that we identified, buy and sell securities, but they're not registered as a dealer.

Ex. F (Oldfield Dep. 165:-16).

Apart from lacking any foundation for his opinion, there is simply no probative value in discussing whether some person or entity *other than Defendant* has failed to register as a securities dealer. *See Daubert*, 509 U.S. at 591 (stating that testimony must "fit" the facts of a case to satisfy Rule 702). Even if another person or entity has *exactly* the same business model as Defendant, the SEC is not required to charge them with operating as an unregistered dealer *before* it can charge Defendant. To make matters worse, and potentially further confuse the jury, some hedge funds and family offices *are* required to register with the SEC, in their case as

investment advisers.[1] The regulatory status of these other parties is a legal issue about which the field of economics has nothing useful to say.

### b. Dr. Oldfield's Second Opinion Is Not Based on a Reliable Methodology Or On Sufficient Facts and Data

Even if the subject matter of Dr. Oldfield's second opinion were relevant, his opinion should be excluded because it is not based on a reliable methodology or on sufficient facts and data. Dr. Oldfield asserts in his report that: "Defendant's investment activity is quite similar to that of an angel investor, with the principal difference being the stage of the company being financed." Ex. A, at ¶ 50 (Oldfield Report).

But during his deposition, Dr. Oldfield's exposed his utter lack of any basis for this conclusion. For instance, he conceded that: (1) he had only looked at a few of Defendant's transactions; (2) he did not know what proportion of Defendant's trading involved convertible notes; (3) he did not know how frequently Defendant engaged in transactions or on which days Defendant traded; (4) angel investors invest in private startup companies and Defendant invests in publicly traded companies; (5) Defendant had hundreds or thousands of transactions over a period of a few years, whereas angel investors only average 1-2 deals per year; and (6) angel investors tend to have a hands on role with their investment companies, whereas Dr. Oldfield could not identify a single issuer with which Defendant maintained a hands-on role or served in management. *See* Ex. F (Oldfield Dep. 150:5 – 157:21).

Dr. Oldfield applied no discernible methodology in arriving at his conclusion that

---

[1] *See* Ex. A, at ¶ 58 (Oldfield Report) ("Under the Dodd-Frank Act, most hedge funds are required to register with the SEC as investment advisers (but not broker-dealers), but small hedge fund managers with less than $150M [in regulatory assets under management] are exempt from SEC registration requirements as investment advisers."); 17 C.F.R. § 202(a)(11)(G) – 1(b)(3) (a family office is exempt from registration *only* if it "[d]oes not hold itself out to the public as an investment adviser").

Defendant's activities are like his hand-picked market participants who have chosen not to register as dealers. Dr. Oldfield's report includes several "figures" (*i.e.*, charts) in support of his comparisons of Defendant's activities to these other market participants. Ex. A, Figs. 5-9 (Oldfield Report). During his deposition, his explanations for how he selected the data points for his figures underscores that his opinion is bereft of any methodology. He apparently selected his comparison points based, not upon any economic principles, but rather upon whether he believed the SEC expressed an interest in them during the investigation that led to this lawsuit. For instance:

> **Q.** You mentioned that. . . the question whether they have a website or not in, I think, each one of the figures, the tables you have. [W]hat is the purpose of mentioning whether they have a website or not?
>
> **A.** Well, that seems to be an object of some great discussion in the transcript that I read. So, we looked at that.
>
> **Q.** Well, do you think it matters for—for any purpose in determining whether a person is acting as a dealer, an unregistered dealer?
>
> **A.** I have no opinion about unregistered dealers. I don't think it matters for purposes—for the purpose that we're talking about.
>
> **Q.** [S]o why did you include it in all of your charts?
>
> **A.** Because it seems to be important in the transcript that we read.
>
> **Q.** So you—you put that data point in your chart because you thought it was important to the SEC?
>
> **A.** Well, the SEC was asking lots of questions about it.
>
> **Q.** All right. So I guess the question is, when you—when you made those tables, did it matter to you what the content of the websites was?
>
> **A.** I didn't look at the content of the website. I just noted that they had a website.
>
> **Q.** So the only thing we can take away from all those tables, when you asked whether each one of these entities—angel investors, hedge funds,

> Defendant. . .the only point about that is whether they had a website or not; is that accurate?
>
> **A.** I believe so, yes.

Ex. F (Oldfield Dep. 82:4 – 83:13).

It did not matter to Dr. Oldfield whether the websites of his hand-picked market participants solicited issuers to sell them securities, as did Defendant's website. He never even looked at that issue. In fact, he had not even looked at Defendant's website when he wrote his report. *Id*. at 45:3-9. Dr. Oldfield's reasons for selecting other data points in his comparison charts are similarly without any foundation in economics principles. *See, e.g.*, *id*. at 161:20-25 ("So it was important to me in this economic analysis of drawing a parallel between Defendant and other types of unregistered investors to note that according to what the SEC was asking in their deposition of Defendant at some length, that he shared a characteristic with them, which was he attended conferences.").

Another colloquy during his deposition laid bare that the only "methodology" Dr. Oldfield used was focusing on what the SEC asked Defendant during his investigative testimony in 2019:

> **Q.** [Y]ou're using these figures to—to try and show that Mr. Keener is . . . similar to and comparable to these other kinds of investors. So what I'm trying to understand is what economic methodology you used to select these characteristics. Can you tell me?
>
> **A.** I select[ed] the characteristics that I thought would be determinative of whether he had a
> comparable activity according to what was concentrated on in the—in the deposition transcript.
>
> **Q.** So you—so you read Mr. Keener's investigative testimony . . . .transcript, correct?
>
> **A.** Yes.

> **Q.** And from that, you observed that you thought the questions were being asked about certain characteristics that seemed important?
>
> **A.** Yes.
>
> **Q.** And from that . . . you chose these characteristics to compare him to others?
>
> **A.** That was one criterion, yes.
>
> **Q.** Well, what was another criterion? All you said so far is the transcript. Go ahead.
>
> **A.** Whether or not they invested in convertible notes.
>
> **Q.** Oh, okay.

Ex. F (Oldfield Dep. 163:21-165-4).

Dr. Oldfield failed to employ a reliable methodology and failed to consider sufficient facts and data. It is a transparent attempt at providing the gloss of expert opinion to virtually random observations, and it has no place in this matter. Therefore, his opinion should be excluded. *See Cates v. Whirlpool Corp.*, No. 15-cv-5980, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) ("Ignoring relevant data is not a scientifically valid method."); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert testimony where the expert's "disregard of relevant data undermine[d] the reliability of [his] entire opinion"); *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436, 1450 (E.D. Wash. 1995) (rejecting expert who is "selective in his choice of supporting data, focusing only on those fragments of data which tend to lend credence to his theory").

> **3.** **Dr. Oldfield's Third Opinion Should Be Excluded Because It Is Not Based on a Reliable Methodology, Is Irrelevant and Is Not Based on Sufficient Facts or Data**

Dr. Oldfield's third opinion is that "Mr. Keener would be an anomaly among registered dealers if he had registered" because there are only two other dealers registered under the

singular description "[t]rading securities for own account." Ex. A, at ¶ 70 (Oldfield Report). Again, how other parties besides Defendant self-identify when they lawfully register as a broker-dealer is irrelevant to whether Defendant was acting as an unregistered dealer. And Dr. Oldfield does not even purport to use "economics" to justify this opinion. It is no more than glorified arithmetic, not the product of any sort of "scientific knowledge" or "methodology." *See Daubert*, 509 U.S. at 592-93.

Dr. Oldfield's third opinion also threatens to confuse the jury because it is inherently misleading and not reliable. The SEC has never claimed that Defendant should register as a dealer *solely* under the description of "[t]rading securities for own account." That description would not adequately capture Defendant's convertible notes business because he engages in other traditional dealer functions, such as in distributing newly issued stock to the public. At a minimum, Defendant—had he registered as a dealer—should also appropriately have used the description "[u]nderwriter or selling group participant (corporate securities other than mutual funds)" shown in Dr. Oldfield's chart in Figure 10. The definition of underwriter under the Exchange Act, in pertinent part, is "any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 78c(a)(20) (incorporating 15 U.S.C. § 80b-2(a)(20)).

Here again, Dr. Oldfield's opinions are irrelevant, and would at best serve only to confuse a jury, which could also be confronted with the definition of "underwriter" that exists in the federal securities laws, and which Dr. Oldfield himself was unable to apply. *See* Ex. F (Oldfield Dep. 212:11-15) ("I'm not sure whether [the definition of 'underwriter' in the Exchange Act] is or isn't relevant to the activities described here"). His own definition was "[u]nderwriters administer the issuance and distribution of securities; typically providing

financial and procedural advice, buying the issue and reselling it to the public." Ex. A, at Fig. 4 (Oldfield Report). On the face of these two definitions, it is clear that, not only are they different, but the operative definition in the Exchange Act is broader.

Even crediting Dr. Oldfield's assertion that his review somehow used a statistical methodology to arrive at this opinion, it is still without any probative value. As with his other opinions, whether some broker-dealer registrants self-described their activities in the narrow manner that Dr. Oldfield would characterize Defendant's activities—using inapposite definitions from the field of economics—has no probative value as to whether Defendant violated the statutory language at issue in *this* case. Accordingly, the Court should enter an order excluding Dr. Oldfield's third opinion entirely.

### C.   Flemmons's Opinions Should Be Excluded[2]

#### 1.   Flemmons's Opinions Should Be Excluded From the Jury Trial Because They Relate Solely to Remedies, Which Is an Issue Solely for the Court to Consider and Determine

Flemmons issued two reports (attached as Exhibits B and C hereto) each of which contain the same two opinions: (1) "The SEC's Disgorgement Claim Includes Net Proceeds That Are Unrelated to Stock Sales Arising from Convertible Notes," (Ex. B, at § IV.A (Flemmons First Report); Ex. C, at § IV.A (Flemmons Second Report)); and (2) "The SEC's Disgorgement Claim

---

[2] Flemmons issued two reports, the second of which was untimely. Defendant served the SEC with the "Expert Report of Jason S. Flemmons, CPA, CFE, CFF" on July 1, 2021 (hereinafter "Flemmons First Report"), the date expert reports were due in this case. The SEC timely served Dr. Taveras's rebuttal report on July 19, 2021, in which she described the serious flaws in Flemmons's methodology. *See generally* Ex. E (Taveras Report). Without providing prior notice to the SEC, Defendant served a "Final" report by Flemmons on Friday, July 30, 2021 (hereinafter "Flemmons Second Report"), after the close of business, despite the fact that Flemmons was scheduled to be deposed the very next business day, Monday, August 2. Flemmons's so-called "Final" Report did not mention Dr. Taveras's report, but substantially changed a key contention that she addressed—namely the (false) conclusion that Defendant's business suffered a loss during the Relevant Period in the SEC's Complaint.

Excludes Relevant Business Expenses." Ex. B, at § IV.B (Flemmons First Report); Ex. C, at § IV.B (Flemmons Second Report).

Both of Flemmons's opinions expressly relate to the disgorgement calculation in this case. Disgorgement, like all remedies, is for the Court to decide after liability is established. *Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 95–97, 98–100 (2d Cir. 1978) (Friendly, J.) (court decides amount of disgorgement); *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) (court and not jury decides remedies); *SEC v. Castaldo*, No. 08 Civ. 8397(JSR), 2009 WL 2591376 at *1 (S.D.N.Y. 2009) (equitable remedies are within the discretion of the court and not for jury determination). Therefore, there should be no opinions or testimony during the jury trial about how to calculate disgorgement.

If the jury finds Defendant liable for violating Section 15(a)(1) of the Exchange Act, the Court will rule upon remedies, and it might choose to consider or disregard Flemmons's opinions as appropriate (should the Court decline to exclude Flemmons's first opinion entirely as the SEC contends it should do below). Consequently, expert testimony about remedies (including but not limited to disgorgement) simply is not relevant during the jury trial. Such testimony would only waste time and confuse the jury. Flemmons's opinions and testimony thus should be excluded from the jury trial.

### 2. Flemmons's First Opinion Should Be Excluded Entirely Because It is Irrelevant, and Not Based on a Reliable Methodology or Any Expertise

Flemmons's first opinion, that "The SEC's Disgorgement Claim Includes Net Proceeds That Are Unrelated to Stock Sales Arising from Convertible Notes," is a misleading and unreliable strawman argument in which he creates a false narrative of what the SEC's disgorgement claim will be, which he then attacks. His opinion is pure sophistry and is not

based on a reliable methodology. Therefore, that opinion and testimony about it should be excluded from the case entirely.

The SEC has not yet specified the amount of disgorgement that it will seek in this case. That will occur during the remedies phase of the case after Defendant's liability is established. Nonetheless, Flemmons took a document *created by Defendant*, mischaracterized it as reflecting the "SEC's Disgorgement Claim," mischaracterized what conclusions the SEC might advance from the document, and then struck down this fictional position that he created.

Flemmons points to a spreadsheet that Defendant created and used internally, and Flemmons names it the "SEC's Disgorgement Calculation Support Spreadsheet" simply because the SEC identified it as one document that supports the allegations in the Complaint as to the Defendant's profits.[3] *See* Ex. C, at ¶ 3 (Flemmons's Second Report). Flemmons then, without basis, jumps to the conclusion that the SEC will be seeking as disgorgement all of the net income identified on that spreadsheet, even though the SEC has never said that is so. This opinion fails because there is not "an appropriate 'fit' with respect to the offered opinion and the facts of the case." *See McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("there is no fit where a large analytical leap must be made between the facts and the opinion"). Moreover, this reveals that Flemmons's opinion is not based on sufficient facts or data (*see* Fed. R. Evid. 702(b)) and that Flemmons did not employ a reliable methodology (*see id.* at 702(c) and (d)).

Next, Flemmons cites testimony from an employee of Defendant for the proposition that the spreadsheet "captures the consolidated stock proceeds and certain related costs for all of

---

[3] There is no doubt that Flemmons knew at all times that the spreadsheet was a document created by Defendant's personnel. *See* Ex. G (Flemmons Dep. 86:14-20) (stating that he "did understand" that Deposition Exhibit 1 was "a JMJ document" despite that his report referred to the document repeatedly as the "SEC's Disgorgement Calculation Support Spreadsheet").

Keener's investment activities, including those resulting from sales of converted stock from convertible notes and other sources unrelated to converted stock such as bridge loans, syndications, miscellaneous stock investments, open market trades, warrants, settlements, and others." Ex. C, at ¶ 23 (Flemmons Second Report). He then arrives at the following conclusion:

> Based on my review, the net proceeds information contained in the SEC's Disgorgement Calculation Support Spreadsheet does not represent the proceeds solely attributable to sales of converted stock during the Relevant Period.

*Id.* at ¶ 35.

The problem with this ostensible expert opinion is that it is merely stating the obvious or parroting what an employee of Defendant said, and thus is not the proper subject of an expert opinion. "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* (citation omitted); *see also Kleiman v. Wright*, No. 18-cv-80176-BLOOM/Reinhart, 2020 WL 6729362, at *25 (S.D. Fla. 2020).

Nor does Flemmons's other related conclusion meet the requirements for expert testimony. Flemmons states in his Report:

> Based on my analysis described above, the proceeds derived from sales of converted stock (which is net of the related cost of stock sold and losses on notes sold, and includes OID, interest, and fees relevant to conversions) for the Relevant Period is approximately $10.0 million, not $21.5 million as claimed by the SEC.

*See* Ex. C, at ¶ 36 (Flemmons Second Report).

Again, the SEC has never contended that the calculation Flemmons describes sums to $21.5 million. Moreover, the process Flemmons describes for arriving at his "$10.0 million"

-17-

figure does not lend itself to expert testimony. *See id.* at ¶¶ 30-34. All Flemmons did was to take determinations made by Defendant's employee about a narrow classification of proceeds and check some of those determinations against source documents. *Id.* He then did simple math to come up with the $10 million sum. There is no reason that an expert witness was needed to do this "basic" calculation. *Rossi v. Darden*, No. 16-21199-CIV-ALTONAGA/O'Sullivan, 2017 WL 2129429, *9 (S.D. Fla. May 17, 2017) (determining expert's "basic arithmetic exercise" was "not beyond the understanding of the average lay person" and "therefore does not assist the trier of fact through application of an expert's specialized knowledge or technique"); *Bowe v. Pub. Storage*, No. 1:14–cv–21559–UU, 2015 WL 11233065, *4 (S.D. Fla. May 7, 2015) (excluding expert's damages calculation based on "simple arithmetic, division and multiplication" because such calculations were "not beyond the understanding of the average lay person").

In short, Flemmons's first opinion is not based on sufficient facts or data, is not based on a reliable methodology, and is not the proper subject of expert testimony. It should be excluded entirely.

### D.   Dr. Mayhew's Opinion Should Be Excluded From Trial Because It Relates Solely to Remedies and Therefore Should Not Be Presented to the Jury

Defendant submitted the "Expert Report of Stewart Mayhew, Ph.D.," an economist, on July 1, 2021 (hereinafter "Mayhew Report") (attached as Exhibit D hereto). Dr. Mayhew's opinion and testimony relates solely to remedies. Dr. Mayhew advances only one opinion: "Defendant's Transactions Did Not Cause Harm to His Counterparties." *Id.* at § VI. He supports this opinion with several economic theories. He states that his assessment of "whether Defendant's failure to register as a dealer caused economic harm to the counterparties to Defendant's transactions. . . is relevant to the court's consideration of **whether disgorgement is an appropriate remedy**." *Id.* at ¶ 6 (emphasis added). He supports his opinion by arguing, among

other points, that the counterparties were likely to have been market makers, the prices of the stocks that Defendant sold already reflected any adverse impact from his convertible notes, the counterparties likely benefitted from his trading, and there is no "zero-sum game" that would cause counterparties to lose money while Defendant profited from trading. *Id*. at ¶ 38.

As with the Flemmons reports, the Mayhew Report is not relevant to any issue of liability that the jury would permissibly consider at trial. As such, the Court should exclude Mayhew's opinions and testimony from the jury trial.

### IV.  CONCLUSION

The reports of Defendant's expert witnesses and their proposed testimony do not meet any of the standards for admissibility under Rule 702 or *Daubert* and other caselaw. The Court should therefore exclude their testimony at trial.

Pursuant to Local Rule 7.1(a)(3), undersigned counsel hereby certifies that on August 12, 2021, they conferred with counsel for Defendants in a good faith effort to resolve the issues presented in this motion by agreement, but counsel were unable to reach an agreement.

DATE:   August 13, 2021                              Respectfully submitted,

By:

       /s/
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2021, I filed Plaintiff Securities and Exchange Commission's Omnibus *Daubert* Motion to Exclude the Testimony of George Oldfield, Jason Flemmons, and Stewart Mayhew and Incorporated Memordandum of Law through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

/s/
Joshua E. Braunstein

**ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**