EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JUSTIN W. KEENER D/B/A JMJ FINANCIAL,

Defendant.

Case No. 1:20-cv-21254-BB

EXPERT REPORT OF STEWART MAYHEW, PH.D.

JULY 1, 2021

# TABLE OF CONTENTS

I.      Qualifications ................................................................................................ 1

II.     Allegations .................................................................................................... 2

III.    Assignment ................................................................................................... 2

IV.     Background: Mr. Keener's Transactions ...................................................... 3

V.      Market-Adjusted Convertible Debt and Other Forms of Financing ................... 6

VI.     Mr. Keener's Transactions Did Not Cause Harm to His Counterparties ......................... 11

        A.      Mr. Keener's Counterparties Were Likely OTC Market Makers ........................ 13

        B.      One Common Approach to Identifying Economic Harm to a Buyer of a Security Is to Evaluate If Prices Are Artificially Inflated ................................................ 13

        C.      Information About Issuers' Convertible Notes Should Already Be Reflected in Their Trading Prices ........................................................................... 14

        D.      Counterparties to Mr. Keener's Transactions May Have Benefited from Purchasing at Discounted Prices ......................................................... 15

        E.      Counterparty Profits or Losses Depend on Stock Price Movements Subsequent to Their Purchases Rather than Whether Mr. Keener Profited ............................. 15

## I.    Qualifications

1.    I am a Vice President at Cornerstone Research, an economic and financial consulting firm, where I have been working since 2010. At Cornerstone Research, I have worked on many matters where I have conducted economic analysis of issues related to loss causation, damages, materiality, and various other economic issues that arise in the context of litigation, arbitration, and regulatory investigations. I have worked as a consultant on over 80 matters, many of which have involved analysis related to trading in securities and other financial instruments. I have testified as an expert on matters related to securities trading, including a matter related to compliance with Rule 144. I have not testified in deposition or trial during the past four years. Also, while at Cornerstone, I have worked on numerous research projects for stock exchanges, the Financial Industry Regulatory Authority ("FINRA"), the Securities and Exchange Commission ("SEC"), and various market participants, involving economic analysis of securities markets.

2.    Prior to joining Cornerstone Research, I worked at the SEC as Deputy Chief Economist (2008–2010), Assistant Chief Economist (2004–2008), and Visiting Academic Scholar (2002–2004). As Deputy Chief Economist, I directed and supervised economic analysis of proposed rules from the SEC's Divisions of Corporation Finance, Investment Management, and Trading and Markets. From 2004 to 2008, I led the group responsible for providing economic analysis and support for Trading and Markets, Investment Management, and the Office of Compliance Inspections and Examinations ("OCIE"). I have worked on examinations or enforcement matters related to market manipulation, insider trading, derivative security valuation, mutual fund market timing/late trading, option backdating, churning, front-running, best execution, and other areas. Over my entire tenure at the SEC, my responsibilities also included assisting OCIE and the Division of Enforcement on investigations and enforcement actions involving issues related to rule compliance, trading, and asset management, including economic analysis of harm to market participants, unjust enrichment, and disgorgement.

3.    Prior to joining the SEC, I was on the faculty of the Finance department at the Krannert School of Management, Purdue University (1996–1999) and the Department of Banking and Finance at the Terry College of Business, University of Georgia (2000–2004). I conducted

research on equity trading and option pricing, among other topics. My research has been published in prominent peer-reviewed academic journals, including the *Journal of Finance* and *Review of Financial Studies*. I also taught courses on investments, options and futures, and mathematical finance. I have also taught courses as an adjunct Lecturer at the Robert H. Smith School of Business at the University of Maryland (2012, 2018). I earned Bachelor of Science and Master of Science degrees in economics from Brigham Young University, and a Ph.D. in Business Administration with an emphasis in finance from the University of California, Berkeley. A copy of my curriculum vitae is attached as Appendix A of this report.

## II.      Allegations

4.      This matter involves trading in convertible notes by defendant Justin W. Keener ("Mr. Keener") between January 2015 and January 2018 ("the Relevant Period").[1] Specifically, the Complaint focuses on instances where Mr. Keener purchased convertible notes in private transactions from various small issuers ("Companies"), held the notes for six months or longer, converted the notes into shares of stock, and sold the shares in the public market.

5.      I understand that the SEC alleges that the nature of Mr. Keener's trading activity was such that Mr. Keener was required to register as a dealer, and that by failing to register, he violated Exchange Act section 15(a)(1).[2]

## III.      Assignment

6.      I have been retained in this matter by Buckley LLP, counsel for Mr. Keener. I have been asked to provide background information and analysis related to the structure of the convertible bond market and Mr. Keener's transactions, that might be useful to the court in assessing whether Mr. Keener's failure to register as a dealer caused economic harm to the counterparties

---

[1] *Securities Exchange Commission v. Justin W. Keener d/b/a JMJ Financial*, March 24, 2020 ("Complaint"), ¶1.
[2] Complaint ¶ 3, 4.

to Mr. Keener's transactions. I understand from counsel that this question is relevant to the court's consideration of whether disgorgement is an appropriate remedy.[3]

7.      I understand from counsel that one potential theory of harm the SEC may assert is that Mr. Keener's transactions resulted in harm to the counterparties who purchased the stock that Mr. Keener sold after converting the debt securities. I have been asked to evaluate the economic basis for that theory. For reasons discussed in Section VI, in my opinion there is no economic basis for concluding that Mr. Keener's transactions caused harm to these counterparties. I have also been asked to be prepared to evaluate and respond to other theories or methodologies the SEC might present after the filing of this report related to disgorgement or other remedies.

8.      Cornerstone Research is being compensated for my work in this matter at my usual billing rate, which is currently $875 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. Neither my compensation nor Cornerstone Research's compensation is dependent on the content of my opinions or the outcome of this matter.

9.      Appendix B contains a list of materials I have considered in reaching my opinions in this matter. The opinions expressed in this report are based on the information available to me as of the date of the report. I reserve the right to supplement my current opinions if additional information becomes available.

## IV.      Background: Mr. Keener's Transactions

10.      In this section I summarize my understanding of the transactions at issue in this matter, based on my review of the Complaint, discussions with counsel, and my review of documents related to twelve of Mr. Keener's transactions. I do not plan to offer expert testimony about the nature of these transactions, but include this information as background information I considered. To the extent that additional information becomes available to me regarding the nature of Mr. Keener's transactions that differs from what I summarize below, I would need to consider the extent to which it would affect my opinions.

---

[3] *Charles C. Liu, et al., Petitioners v. Securities and Exchange Commission*, No. 18-1501 591 U.S. (June 22, 2020) ("The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit.").

11.     I understand from the Complaint that the SEC alleges that during the relevant period, Mr. Keener "purchased or converted more than 100 … [convertible] notes from more than 100 different microcap issuers," and that these transactions allegedly "generated more than $21.5 million" in profits.[4]

12.     Based on my review of the Complaint and of some of Mr. Keener's transactions, I understand that the securities at issue in this matter were market-adjusted convertible promissory notes. This is a type of convertible debt security where the conversion price depends on the market price of the stock.

13.     These convertible promissory notes enabled the Companies to borrow money from Mr. Keener. I understand from counsel that Mr. Keener used the name "QuickLoans" to describe his lending program at issue in this case and that the accounting database maintained by Mr. Keener during the Relevant Period shows that Mr. Keener made fewer than 200 payments through the QuickLoans program between January 1, 2015 and January 1, 2018 for an average payment size of approximately $47,000. The range of payments was generally between $25,000 and $75,000 and the bulk of those payments occurred in 2015 and 2016.

14.     My understanding is that the Companies Mr. Keener invested in were publicly traded reporting companies. Furthermore, I understand that at the time of Mr. Keener's investments, the Companies' stock traded on OTC markets only—the Companies' stock was not listed on an exchange.

15.     Under the terms of the convertible promissory notes ("Notes"), the conversion price was discounted relative to the market price of the stock. The amount of the discount and the benchmark market price against which it is discounted are among the terms negotiated as part of the note.[5]  I understand that the conversion discounts for Mr. Keener's transactions generally ranged from 10% to 50%.[6]

---

[4] Complaint ¶ 2.

[5] For example, Mr. Keener's agreement with Accelera Innovations, Inc. states that Mr. Keener has the right to convert the number of shares equal to "the dollar conversion amount divided by the Conversion Price," which "is the lesser of $1.00 or 60% of the lowest trade price in the 25 trading days previous to the conversion." Convertible Promissory Note between Accelera Innovations, Inc. and JMJ Financial, JMJ-SEC-000099.

[6] Deposition of Justin Keener, June 6, 2019 ("Keener Deposition"), p. 61:13–17 ("It would be generally –…10 percent discount to 40 or 50 percent discount, that range.").

16.     Based on my review of 10-K filings by twelve of the Companies to which Mr. Keener lent money, Mr. Keener was not the only lender who provided financing to the Companies through convertible notes for eleven of these Companies. The 10-K filings I reviewed disclosed salient terms of the convertible notes sold to Mr. Keener and to other investors, including the amount borrowed and the conversion discount.[7]

17.     The Notes contained certain other features. For example, the Notes I reviewed contained a provision prohibiting Mr. Keener from short selling the shares of the Company. In addition, the Notes allowed the buyer (Mr. Keener) to convert the debt into stock at any time after the effective date unless the issuer paid the loan back in cash during the first 90 days, as it was allowed to do under the Notes.

18.     The Notes I reviewed were structured in a way that enabled the Company to borrow money from Mr. Keener incrementally over time, rather than in one lump sum.

19.     I understand that as a general matter, the convertible debt securities that Mr. Keener purchased were not "marketable" (could not be resold immediately to the public because they were not issued pursuant to a registration statement). Under the conditions of Rule 144, Mr. Keener could not resell the debt or stock obtained by converting them to the public for at least six months.[8] I understand that Mr. Keener generally held the convertible debt/or the stock for a combined period of at least six months (or 180 days) before selling the shares into the market. I am not aware that the SEC has alleged that any of Mr. Keener's transactions fell outside of the safe harbor of Rule 144. I also understand that when Mr. Keener sold stock after converting, he sold it in the public market in arms-length transactions conducted through a broker.

20.     The Notes I reviewed contained a provision prohibiting the buyer (Mr. Keener) from owning more than 4.99% of the Company's outstanding shares, to prevent Mr. Keener from becoming a 5% block shareholder.

---

[7] *See* 3DICON Corporation Form 10-K for the period ended December 31, 2012, pp. 22–24; 4Cable TV International, Inc. Form 10-K for the period ended December 31, 2014, p. 19; 5BARz International Inc. Form 10-K for the period ended December 31, 2013, pp. F-24–F-26; Advanced Medical Isotope Corporation Form 10-K for the period ended December  31, 2012, pp. F-20–F-22; Advaxis, Inc. Form 10-K for the period ended October 31, 2012, pp. 2–4; Amazonica, Corp. Form 10-K for the period ended April 30, 2015, pp. 16, 29–369; Daniels Corporate Advisory Company, Inc. Form 10-K for the period ended November 30, 2015, pp. F-15–F-16; Domark International, Inc. Form 10-K for the period ended May 31, 2014, pp. 26–27; ERHC Energy Form 10-K for the period ended September 30, 2014, pp. 39–41; IDS Industries, Inc. Form 10-K for the period ended August 31, 2012, 7, F-10–F-12; Lithium Exploration Group, Inc. Form 10-K for the period ended June 30, 2014, pp. 8–18.
[8] 17 CFR § 230.144.

21.     As an illustrative example, according to the documents relating to this transaction that I reviewed, the note enabled LEXG to borrow up to $1,100,000 from Mr. Keener. The initial funding was for $100,000, and the company subsequently borrowed another $575,000 in seven additional increments over the next fourteen months. The agreement outlined a "Principal Sum" of $1,100,000 with a 10% original issue discount, and a "Consideration" of $1,000,000.[9] The "Conversion Price" was "the lesser of $0.25 or 70% (seventy percent) of the lowest trade price in the 20 trading days previous to the conversion," indicating a 30% discount.[10] The Note also contained a one-time interest rate of 5% on the Principal Sum due on the maturity date.[11]

22.     Mr. Keener took risk in these transactions. Even though the Notes give the buyer the right to convert at a specified discount to the market price, if the Company goes out of business or declares bankruptcy before the notes are converted, the market price of the Company's stock may be so close to zero that even if Mr. Keener converted the note into stock, he would not be able to sell the shares into the market at a price that would enable him to recover his investment. I understand that this was not just a theoretical risk but a reality, and that Mr. Keener lost money on a substantial number of his convertible note investments. For example, Mr. Keener's 2015 tax filings show that he sold 64 notes on December 23, 2015 for a small fraction of the notional value, indicating that the notes had become nearly worthless. Mr. Keener claimed losses of approximately $2.4 million on these transactions.[12]

## V.     Market-Adjusted Convertible Debt and Other Forms of Financing

23.     As explained above, I have been asked to provide background information and analysis related to the structure of the convertible bond market that may aid the court in assessing whether Mr. Keener's failure to register as a dealer caused economic harm to the counterparties to Mr. Keener's transactions. Answering this question requires evaluating the alternative courses of action available to Mr. Keener and the issuers. This, in turn, requires an understanding of the ways firms can raise capital, and how the market-adjusted convertible debt securities at issue in

---

[9] Securities Purchase Agreement between Lithium Exploration Group, Inc. and JMJ Financial, February 13, 2013, JMJ-SEC-909-003124 at -230.
[10] Id.
[11] Id.
[12] Justin W. Keener Tax Form 8949 (2015) JMJ-LIT-007-000215–225.

this case compare to alternative forms of financing. This section provides background information on these topics.

24.    Firms raise capital primarily by either selling equity in the company, including common stock or preferred stock, or by borrowing money. Equity shares can be sold to the public or to private investors such as venture capital firms, private equity firms, or individual accredited investors. Firms can borrow money by issuing debt securities, either to the public or by a private placement, or through private loans, such as borrowing from a bank. In addition, firms can raise capital by issuing securities that are convertible into equity securities. Convertible debt is a type of borrowing that, under certain terms and conditions, later converts into equity securities.

25.    Each source of capital has its own costs, and the choice of what types of financing to use has important implications for the ability of the firm to finance its operations and to remain in business over time. The firm must have enough cash to fund its ongoing operations, and to make required payments on its outstanding debt obligations. It is up to the managers of the company to evaluate the cost of capital from each source, and to decide the most appropriate type of financing.

26.    The cost of borrowing for a company will depend critically on the extent to which the company is expected to have the ability to pay back the debt. To the extent there is risk that the company will not be able to pay back the debt, investors will not be willing to lend to the company unless the interest rate on the loan is high enough to compensate them adequately for the risk. If the risk of default is too high, lenders might not be willing to lend money to the company at any rate.

27.    Convertible debt is an important source of financing for some Companies. Since 2011, an average of approximately $46 billion of convertibles has been issued every year in the U.S. and, as of the end of 2020, the U.S. convertibles market neared $350 billion outstanding.[13] The large majority of the U.S. issuances are in the form of coupon-bearing convertible bonds, with a small fraction issued in the form of preferred equity, zero-coupon convertible bonds, and mandatory convertibles.[14] About three-quarters of the issued convertibles are also not rated by any credit

---

[13] Calamos Investments, "U.S. Convertible Market Snapshot," April 30, 2021, p.2
[14] John. P. Calamos, Sr., "Convertible Securities," Calamos Investments, 2020, p. 11.

rating agency or rated below investment-grade.[15] The U.S. also has an active secondary market for convertibles, with approximately $1.4 billion of convertible bonds traded on average every day.[16]

28.     For issuers that have publicly traded stock listed on an exchange, hedge funds are the main investors in convertible debt.[17] "Convertible arbitrage" is a well-known hedge fund strategy, whereby a hedge fund buys convertible debt and hedges the market risk, generally by short selling the stock or potentially by taking positions in exchange-listed options, and ultimately unwinding the position by converting the debt into stock. Convertible debt is typically issued at a discount relative to its fundamental theoretical price, in order to compensate investors for risks such as lower liquidity and valuation complexity.[18] The offering discount can vary significantly depending on the characteristics of the issue and of the issuer.[19] For example, academic studies have found that larger firms with low volatility stocks receive lower discounts.[20] Conversely, equity-like issuances (i.e., bonds whose price tends to be more sensitive to the issuer's stock price) or lower-rated issuances tend to carry higher discounts.[21] Furthermore, the discount can also be substantial and exceed 50%.[22]

29.     The ability of the hedge funds to minimize risk by short selling the stock is a critical component of the convertible arbitrage strategy. If the issuer experiences poor performance and the stock price declines, the convertible bonds become less valuable because the conversion option becomes less valuable, and the debt component of the bond has a higher default risk.

---

[15] Calamos Investments, "U.S. Convertible Market Snapshot," April 30, 2021, p.3

[16] SIFMA, "US Corporate Bonds: Issuance, Trading Volume, Outstanding," May 5, 2021, Tab 2.

[17] Stephen J. Brown, Bruce D. Grundy, Craig M. Lewis, and Patrick Verwijmeren, "Convertibles and Hedge Funds as Distributors of Equity Exposure," *Review of Financial Studies*, 2012, 25(10), p. 3085.

[18] *See*, for example, Stephen J. Brown, Bruce D. Grundy, Craig M. Lewis, and Patrick Verwijmeren, "Convertibles and Hedge Funds as Distributors of Equity Exposure," *Review of Financial Studies*, 2012, 25(10), p. 3093.

[19] Stephen J. Brown, Bruce D. Grundy, Craig M. Lewis, and Patrick Verwijmeren, "Convertibles and Hedge Funds as Distributors of Equity Exposure," *Review of Financial Studies*, 2012, 25(10), pp. 3093–3094; Brian J. Henderson and Heather Tookes, "Do Investment Banks' Relationships with Investors Impact Pricing? The Case of Convertible Bond Issues," *Management Science*, 2012, 58(12), pp. 2280–2282.

[20] Bruce D. Grundy and Patrick Verwijmeren, "The Buyers' Perspective on Security Design: Hedge Funds and Convertible Bond Call Provisions," *Journal of Financial Economics*, 2018, 127(1), p. 91; Brian J. Henderson and Heather Tookes, "Do Investment Banks' Relationships with Investors Impact Pricing? The Case of Convertible Bond Issues," *Management Science*, 2012, 58(12), p. 2280.

[21] Igor Loncarski, Jenke ter Horst, and Chris Veld, "The Rise and Demise of the Convertible Arbitrage Strategy," *Financial Analysts Journal*, 20, 65(5), 2009, p. 7; Brian J. Henderson and Heather Tookes, "Do Investment Banks' Relationships with Investors Impact Pricing? The Case of Convertible Bond Issues," *Management Science*, 2012, 58(12), p. 2282.

[22] Igor Loncarski, Jenke ter Horst, and Chris Veld, "The Rise and Demise of the Convertible Arbitrage Strategy," *Financial Analysts Journal*, 20, 65(5), 2009, p. 8; Brian J. Henderson and Heather Tookes, "Do Investment Banks' Relationships with Investors Impact Pricing? The Case of Convertible Bond Issues," *Management Science*, 2012, 58(12), p. 2277.

However, the hedge fund can offset this risk by short selling the stock, a position that makes money if the stock price declines. The ability of hedge funds to manage the company risk by short selling substantially reduces the risk of buying convertible bonds, making them more attractive, and enabling issuers to sell them at a more favorable price. Without the ability to hedge, investors would not be willing to pay as much for convertible bonds, (or for the same price would require a more favorable conversion price), and the cost of capital would increase for the issuers.

30.      For smaller companies that do not have stock listed on an exchange, especially those trading for very low prices such as a few pennies per share, hedging by short selling is likely not a viable alternative—even if shares of the stock are available to borrow, my understanding is that margin requirements for short positions can be prohibitively costly for penny stocks.[23] Moreover, unlisted stocks do not have listed options. Thus, the convertible arbitrage strategy, as implemented by hedge funds, may not be feasible. This makes it difficult for such companies to find buyers for traditional convertible debt.

31.      One market solution to this problem was that microcap issuers started issuing convertible debt that (potentially) can be converted into a fixed dollar amount of shares rather than a fixed number of shares. For this type of convertible debt, if the company performs poorly and the stock price declines, the owner of the convertible debt can convert into a greater number of shares, offsetting the effects of the lower share price. The SEC has called this a "market-adjustable security."[24] This is the type of security that Mr. Keener invested in.

32.      Market-adjusted convertibles and other similar instruments issued by small companies (e.g., startups), often carry a conversion discount to compensate investors for the heightened risk of non-payment. This feature allows investors to convert their bonds at a discounted price with respect to a reference price (e.g., the average stock price across a predetermined number of days prior to conversion). Academic research has documented a wide range of conversion discounts— for example, a study by Hillion and Vermaelen published in the Journal of Financial Economics

---

[23] FINRA 4210(c) "Maintenance Margin," states "The margin which must be maintained in all accounts of customers, except as set forth in paragraph (e), (f) or (g) and for cash accounts subject to other provisions of this Rule, shall be as follows… (2) $2.50 per share or 100 percent of the current market value, whichever amount is greater, of each stock 'short' in the account selling at less than $5.00 per share." This means that if a stock is trading at a market price of $0.01 per share, the margin required for maintaining a $10,000 short position in that stock would be $2.5 million.
[24] "Rule 144 Holding Period and Form 144 Filings (Proposed Rules)." Federal Register 86:11 (January 19, 2021) p. 5064.

in 2004 documented conversion discounts in the range of -5% (i.e., a *de facto* premium) to 50%.[25] Other sources I reviewed indicate there has continued to be a wide range of conversion discounts in recent years.[26]

33.     The market adjustment feature of this type of debt can reduce the level of risk borne by the investor in a way similar to how hedging by short selling can reduce the risk for a traditional convertible bond. However, this does not mean investing in market-adjusted convertible debt is a risk free or a low-risk investment strategy. The issuer may fail to pay the promised interest payments to the debtholders, resulting in a default and thus in a loss for the investor. At the extreme, the issuer can become insolvent and declare bankruptcy before the note is converted.[27] After conversion, the investor holds a position in the stock that may be large relative to the amount of liquidity in the market, and it may not be possible to sell the position quickly without substantial transaction costs.

34.     Market-adjusted convertible debt is used primarily by small issuers that have crucial needs for cash, and it is sometimes considered a "last resort" form of financing.[28] Even though the cost of capital is high, companies may choose this form of financing because it may be their only means of avoiding failure or bankruptcy. My review of some of the disclosures by the Companies at issue in this matter is consistent with this understanding.[29]

---

[25] Pierre Hillion and Theo Vermaelen, "Death Spiral Convertibles," *Journal of Financial Economics*, 2004, 71, p. 406.
[26] Susan Chaplinsky and Joseph Becker, "Convertible Notes: A Form of Early-Stage Financing," Darden Case No. UVA-F-1925, 2019, p. 12; WilmerHale, "2021 Venture Capital Report," April 26, 2021, p. 18. *See also,* Fenwick, "Convertible Debt Terms – Survey of Market Trends 2019/2020," September 23, 2020, p. 3.
[27] "As noted in Section IV above, Keener claimed tax losses of approximately $2.4M in 2015 upon selling 64 convertible notes."
[28] "Rule 144 Holding Period and Form 144 Filings (Proposed Rules)." Federal Register 86:11 (January 19, 2021) p. 5073 ("[M]arket-adjustable securities may constitute a ''last resort'' form of financing for issuers.").
[29] Accelera Innovations Form 10-K for the period ended December 31, 2015, pp. 13–14 ("Our ability to continue as a going concern is an issue raised as a result of recurring losses from operations and cash flow deficiencies since our inception. We continue to experience net losses. Our ability to continue as a going concern is subject to our ability to generate a profit and/or obtain necessary funding from outside sources, including obtaining additional funding from the sale of our securities, increasing sales or obtaining loans and grants from various financial institutions where possible. If we are unable to continue as a going concern, you may lose your entire investment… The Company will not be able to complete additional acquisitions and commercialize its technology without additional capital, if we do not raise substantial additional funds. The Company will require significant additional financing in order to meet the milestones and requirements of its Business Plan and avoid discontinuation of the License. Funding would be required for staffing, marketing, public relations and the necessary research precedent to expanding the scope of its offering. The Company intends to seek an aggregate of $35,000,000 in an offering through the sale of equity or convertible debt securities, the issuance of these securities could dilute existing shareholders."); 5BARz International Inc. Form 10-K for the period ended December 31, 2013, p. 30 ("The registrant has an accumulated deficit through December 31, 2013 totaling $5,171,925 and recurring losses and negative cash flows from operations. Because of these conditions, the registrant will require additional working capital to develop its business operations. The registrant's success will depend on its ability to raise money through debt and the sale of stock and the development and sale of product to meet its cash flow requirements. The ability to execute its strategic plan is contingent upon raising the necessary working capital to launch the global sales and marketing activities for the Company."); Daniels Corporate Advisory Company, Inc. Form 10-K for the period ended November 30, 2015, pp. 15–16 ("Our auditors issued a going concern opinion for the fiscal years ended November 30, 2015 and November 30, 2014 This means that there is substantial doubt that we can continue as an ongoing business without

35.     When non-listed companies issue convertible debt, it is often done as a private placement, and not sold to the public pursuant to a registration statement. The private investors who purchase the securities are restricted in their ability to resell the securities to the public.

36.     The fact that the securities are not "marketable" (cannot be resold to the public immediately) has important implications for the price investors are willing to pay for them. The academic literature documents that the lack of "marketability" can result in substantial discounts. Specifically, this literature has found discounts on average of approximately 7%, but they can exceed 50% in some situations.[30] In particular, existing literature has noted that the discount of private placements varies across different issues and issuer dimensions. For example, larger relative issue sizes are associated with larger discounts.[31]  Similarly,  issues by smaller, more volatile, and more risky companies tend to carry higher discounts.[32]

## VI.     Mr. Keener's Transactions Did Not Cause Harm to His Counterparties

37.     I understand that the SEC has stated that "to the extent that victims would need to be identified by name, they are the counter-parties to the sales of newly-issued stocks that [Mr. Keener] sold after making conversions of convertible notes."[33] Thus, I have been asked to evaluate the proposition that Mr. Keener's trading in convertible notes resulted in economic harm to the counterparties to whom he sold stock after converting.

38.     In my opinion, there is no economic basis for concluding that Mr. Keener's transactions caused harm to these counterparties. I conclude this for several reasons:

_____

additional financing and/or generating profits. If we cannot raise additional capital or generate sufficient revenues to operate profitably, we may have to suspend or cease operations. If that occurs, you will lose your investment… We may seek additional capital, including an offering of our equity securities, an offering of debt securities or obtaining financing through a bank or other entity."); Lithium Exploration Group, Inc. Form 10-K for the period ended June 30, 2014, p. 22 ("We had cash in the amount of $69,732 and working capital deficiency (current liabilities exceeding current assets) of $3,279,889 as of the year ended June 30, 2014. We currently do not generate much revenue from our operations. Any direct acquisition of a claim under lease or option is subject to our ability to obtain the financing necessary for us to fund and carry out exploration programs on potential properties. The requirements are substantial. Obtaining additional financing would be subject to a number of factors, including market prices for resources, investor acceptance of our properties and investor sentiment. These factors may negatively affect the timing, amount, terms or conditions of any additional financing available to us. The most likely source of future funds presently available to us is through the sale of equity capital and loans. Any sale of share capital will result in dilution to existing shareholders.").

[30] *See* Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," Journal of Corporation Law 27, no. 1 (Fall 2001), p. 114 and sources cited therein.

[31] *Id. See also*, Linda Chen, Edward A. Dyl, George J. Jiang, and Januj A. Juneja, "Risk, illiquidity or marketability: What matters for the discounts on private equity placements?" *Journal of Banking & Finance*, 2015, 57, pp. 44, 46.

[32] *Id.*

[33] SEC's Responses to Defendant's First Set of Interrogatories, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial*, January 22, 2021, p. 3.

a. First, as a preliminary observation, I would expect that many or most of the counterparties to Mr. Keener's stock sale transactions were registered broker dealers acting as Over the Counter (OTC) market makers.[34] These are sophisticated market participants in the business of providing liquidity in microcap stocks. They quote bid prices that are below the market's best estimate of the fundamental value of the stock, so they can earn the bid-ask spread and be compensated for the risks they take.

b. Second, the allegations do not comport with a theory that Mr. Keener sold the stock at prices that were artificially inflated as a result of his alleged violations. Thus, the standard approach used to assess harm in matters that involve the purchase or sale of securities does not apply.

c. Third, to the extent that the terms at which the Notes were issued and converted resulted in any adverse impact on the stock price, any such impact should have already been reflected in the stock price before Mr. Keener sold the shares, and would not be expected to cause a further negative impact after the stocks were purchased by the counterparties.

d. Fourth, to the extent Mr. Keener's selling stock into an illiquid market put downward pressure on the stock price, this impact would be temporary in nature and would have benefited, not harmed, the counterparties to his trades.

e. Fifth, the return on Mr. Keener's investment (whether positive or negative) was realized between the time he funded the Notes and the time he sold the converted stock, while the return on the counterparty's investment was realized over the interval beginning when the counterparty purchased from Mr. Keener. Because these are different time periods and, as mentioned above, there is no claim that the sale price was inflated, there is no "zero-sum game" situation implying that gains to Mr. Keener represent losses to his counterparty.

39.     I discuss each of these reasons in more detail below.

---

[34] SEC, "Over-the-Counter-Market," May 9, 2013, available at https://www.sec.gov/divisions/marketreg/mrotc.shtml.

### A.   Mr. Keener's Counterparties Were Likely OTC Market Makers

40.     As mentioned above in section IV, my understanding is that when Mr. Keener sold stock after converting, he sold it into the public market in arms-length transactions conducted through a broker. Because the Companies were not listed on an exchange, these transactions would have been executed through an OTC market maker. I have not been provided with evidence on the counterparties to Mr. Keener's trades. However, my understanding based on my experience is that the OTC equity market is predominantly a dealer-intermediated market, especially for microcap issuers. That is, it is a market where most trades involve a dealer (a "market maker") on at least one side of the trade, as opposed to one like the market for listed stocks where customer orders interact directly with other orders through a centralized order book.

41.     A broker seeking to sell a non-listed stock on behalf of a client would typically observe bid quotes from multiple market makers on a platform such as OTC Link (a quotation and messaging platform operated by OTC Markets Group) or on a quotation facility operated by FINRA. The broker would then contact one or more of these market makers and negotiate prices for trades on a bilateral basis.[35] It is also possible that Mr. Keener's broker may itself have been an OTC market maker, and could have "internalized" the order, buying the stock from Mr. Keener as counterparty. In either case, as a preliminary observation, it is likely that the counterparties for Mr. Keener's sales would have been OTC market makers.

### B.   One Common Approach to Identifying Economic Harm to a Buyer of a Security Is to Evaluate If Prices Are Artificially Inflated

42.     In assessing whether a party suffered economic harm as a result of participating in a securities transaction, the most common approach is to evaluate whether the transaction occurred at a price that was artificially inflated or depressed because of some violation or event. For example, this is the standard approach used to assess whether a trading party was harmed as a

---

[35] OTC Markets, "Trading," available at https://www.otcmarkets.com/learn/market-101/trading ("If the broker-dealer cannot, or chooses not to, execute the trade internally they will attempt to execute the trade with another broker-dealer. OTC Link® ATS provides trading and messaging capabilities, which facilitates the process of ascertaining whether the order is marketable. Marketable orders are orders where the price specified can immediately be executed in the market… Once a broker-dealer has a quote posted on OTC Link® ATS, they may receive a trade message via OTC Link® ATS from another broker-dealer; as the market changes, a broker-dealer with a standing quote may also initiate a trade message electronically. At that point the broker-dealer may accept, decline or counter (send a different price or size) the offer to trade. The broker-dealers then negotiate trade price/size, one of the main differences between a trading a security off-exchange and trading a listed security.").

result of material misstatements or omissions, or as a result of deliberate market manipulation. In such matters, a party may suffer economic harm if they *purchased* the stock at a price that was artificially *inflated* as a result of the conduct at issue, and the artificial inflation in the stock price dissipated while they were holding the stock. Alternatively, market participants could be harmed by the conduct at issue if they *sold* the stock at an artificially *depressed* price.[36]

43.      In this matter, to my knowledge there have been no allegations that the issuers, Mr. Keener, or anyone else made fraudulent misstatements or omissions about the issuers' stock, that Mr. Keener engaged in market manipulation when converting the notes or when selling the stock, or that Mr. Keener traded on the basis of positive material non-public information about the company. In the absence of such allegations I see no economic basis supporting a conclusion that the OTC market makers (or other investors) who purchased stock from Mr. Keener did so at an artificially high price.

### C.      Information About Issuers' Convertible Notes Should Already Be Reflected in Their Trading Prices

44.      Issuers are required to disclose information in their SEC filings about the securities they have issued, including convertible notes. I understand that the issuers Mr. Keener lent to were reporting companies and would have been required to disclose the Notes sold to Mr. Keener and other similar notes. I reviewed the disclosures filed by several of the companies who transacted with Mr. Keener and, in every instance, the Notes sold to Mr. Keener were disclosed.

45.      To the extent Mr. Keener's positions were large enough such that the financing costs associated with the issue (including any offering discount, interest rate, conversion discount, or other fees) were large enough to have a material effect on the stock price, I would generally expect this impact to occur as the market learned the information, to the extent that the stock traded in an efficient market. In particular, the stock price should account for the fact that the issuer has outstanding convertible bonds that can be converted at a discount.

---

[36] Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in *Litigation Services Handbook*, ed. Roman L. Weil, Daniel G. Lentz, David P. Hoffman (Hoboken:  John Wiley & Sons, Inc., 2002), pp. 11, 23; *See, SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).

### D.  Counterparties to Mr. Keener's Transactions May Have Benefited from Purchasing at Discounted Prices

46.     To the extent that Mr. Keener sold a large amount of stock into the market quickly, and there was not sufficient liquidity in the market to accommodate the selling pressure of his trades, it is possible that his sales might have put temporary downward pressure on the stock price. In this case, the counterparties to Mr. Keener's trades would have benefited from the opportunity to purchase the stock at a temporarily depressed price. It is well understood from the market microstructure literature that stock price movements contain two components, a permanent component and a temporary component.[37] The permanent component of stock price movements represents new information about the fundamental value of the stock becoming incorporated into the stock price, a process known as price discovery. The temporary component of stock prices represents short-term deviations around the fundamental value resulting from imbalances in order flow. Trading by a market participant can contribute to the permanent component when the market participant is an "informed" trader, or in other words has access to private information about the value of the stock that is not yet reflected in the stock price. Traders who do not have such information, but trade for reasons unrelated to private information (such as the need to liquidate a position to free up capital for other trades) are known as "uninformed traders," "noise traders" or "liquidity traders." When an uninformed trader wishes to sell more shares than are readily available in the market, it can have an impact on the stock price, but this only would be temporary.

### E.  Counterparty Profits or Losses Depend on Stock Price Movements Subsequent to Their Purchases Rather than Whether Mr. Keener Profited

47.     I understand from counsel that in *SEC v. Almagarby*, another matter in which the SEC alleges a convertible note investor failed to register as a securities dealer, the SEC has identified counterparties to Almagarby's sales of converted stock as potential victims. In that matter, I understand that the SEC has argued that if Mr. Almagarby (the convertible note investor) made profits, this implies that the counterparties to his trades must have been harmed:

---

[37] For a more thorough discussion of these topics, I refer the reader to Joel Hasbrouck, *Empirical Market Microstructure: The Institutions, Economics, and Econometrics of Securities Trading*, (New York, New York, 2007).

> "In any event, Defendants cannot claim they earned exorbitant outsized gains without
> their counterparties suffering concomitant losses as Defendants sold into a declining
> market that they helped create."[38]

48.     The logic of this argument is fundamentally flawed. The gains earned by Mr. Keener in a
profitable convertible note transaction, before expenses, are determined by the difference
between the price at which he purchased the stock in the conversion and the price at which he
sold the stock after converting it (as well as other components such as interest rate payments
received on the note). Once Mr. Keener has converted and sold the stock, his revenues on the
transaction are unaffected by whether the stock price subsequently increases or decreases.

49.     Conversely, the profits or losses to the counterparty to Mr. Keener's sales depend only on
what happens to the stock price after Mr. Keener sold the stock, and not on whether Mr. Keener
made a profit on the transaction.

50.     Consequently, there is no reason to conclude that if Mr. Keener made money on a
particular convertible note transaction that the counterparty to his sale lost money. If the stock
price remained constant or increased between when Mr. Keener lent the money and when he
converted, and increased further after Mr. Keener sold the stock, then both Mr. Keener and the
counterparty would have made gains.

51.     If the stock price declined after Mr. Keener sold the stock, the counterparty may or may
not have incurred losses, depending on the timing of when the stock price declined and how long
the counterparty held the stock before selling it. However, even if the counterparty did happen to
realize losses, such losses should not be attributed to Mr. Keener's actions, but to subsequent
negative developments affecting the stock price.

---

[38] SEC's Reply Memorandum in Support of its Motion for Remedies Against Defendants Ibrahim Almagarby and Microcap
Equity Group, LLC, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC,* November
13, 2020, p. 8.

Executed this 1st of July, 2021

_(signature)_

Stewart Mayhew, Ph.D.

**Appendix A**

# STEWART MAYHEW
### Vice President

**Cornerstone Research**
2001 K Street NW, North Tower, Suite 800
Washington, D.C.  20006
202.912.8960
smayhew@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1996 | **University of California, Berkeley** | Berkeley, California |
| | **Walter A. Haas School of Business** | |
| | *Ph.D., Finance* | |
| | | |
| | **Brigham Young University** | Provo, Utah |
| 1992 | *M.S., Applied Economics* | |
| 1991 | *B.S., Economics* | |

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| | **Cornerstone Research** | Washington, D.C. |
| 2015-Present | *Vice President* | |
| 2012-2015 | *Principal* | |
| 2010-2012 | *Senior Economist* | |

Provides economic and financial consulting services and analysis in connection with litigation and regulatory investigations involving financial markets. Specializes in securities class actions, trading in equity, option, futures, and fixed income markets, and economic analysis for securities regulation. Experience includes numerous 10(b)-5 and Section 11 cases and matters involving market manipulation, insider trading, short selling, best execution, dark pools, suitability, and risk disclosures. Has assisted respondents in enforcement actions involving the DOJ, SEC, FINRA, CFTC, FERC, and State Attorneys General. Experience with directing complex cases involving multiple experts.

| | | |
|---|---|---|
| | **University of Maryland, Robert H. Smith School of Business** | College Park, MD |
| 2012, 2018 | *Adjunct Faculty* | |

Taught MBA-level course in derivative securities.

| | | |
|---|---|---|
| | **U.S. Securities and Exchange Commission** | Washington, D.C. |
| 2008-2010 | *Deputy Chief Economist (Senior Officer)* | |
| 2004-2008 | *Assistant Chief Economist* | |
| 2002-2004 | *Visiting Academic Scholar* | |

Supervised teams of PhD financial economists. Provided economic analysis and support for SEC Divisions of Trading and Markets, Investment Management, Corporation Finance, and Enforcement, and the Office of Compliance Inspections and Examinations.

Worked on examinations and enforcement matters related to market manipulation, insider trading, derivative security valuation, mutual fund market timing/late trading, option backdating, churning, front-running, best execution, and other areas. Worked on rulemaking projects in areas including market structure, short selling, option trading, regulation of broker dealers, clearing and settlement, securities lending, credit rating agencies, investment advisors, hedge funds, mutual funds, exchange-traded funds, asset-backed securities, municipal bonds, option expensing, and proxy voting.

|            | **University of Georgia, Terry College of Business** | Athens, GA |
|------------|--|--|

2000-2004  *Assistant Professor*

Taught courses in Mathematical Finance (PhD), Advanced Speculative Markets (MBA), Financial Engineering (MBA), Derivative Securities (undergraduate), Investments (undergraduate)

**Purdue University, Krannert School of Management**          West Lafayette, IN

1996-1999  *Assistant Professor*

Taught Investments Seminar (PhD), Options and Futures (MBA), Investment Management (undergraduate). Helped organize interdisciplinary program in computational finance.

**Berkeley Options Database**          Berkeley, CA

1993-1996  *Database Manager*

**Financial Engineering Associates**          Berkeley, CA

1995-1996  *Financial Engineer*

Consultant for financial engineering problems and valuation of fixed-income derivatives.

## PUBLICATIONS

Equity Trading and the Allocation of Market Data Revenue, **Journal of Banking and Finance,** v62 (January 2016): 97-111. (with C. Caglio)

Ex-dividend Arbitrage in Option Markets, **Review of Financial Studies**, v23 n1 (January 2010): 271-303. (with J. Hao and A. Kalay)

Microstructural Biases in Empirical Tests of Option Pricing Models, **Review of Derivatives Research**, v12 n3 (October 2009): 169-191. (with P. Dennis)

Option Strategies, in "Financial Derivatives: Pricing and Risk Management," Robert Kolb and James Overdahl, eds. Wiley-Blackwell Publishers, 2009.

Stock Returns, Implied Volatility Innovations, and the Asymmetric Volatility Phenomenon **Journal of Financial and Quantitative Analysis**, v41 n2 (June 2006): 381-406. (with P. Dennis and C. Stivers)

Informed Trading in Stock and Option Markets, **Journal of Finance**, v59 n3 (June 2004): 1235-1259. (with S. Chakravarty and H. Gulen)

How Do Exchanges Select Stocks for Option Listing? **Journal of Finance**, v59 n1 (February 2004): 447-471. (with V. Mihov)

**PUBLICATIONS (continued)**

Stock Return Dynamics, Option Volume, and the Information Content of Implied Volatility **Journal of Futures Markets**, v23 n7 (July 2003): 615-646. (with C. Stivers)

Risk-Neutral Skewness: Evidence from Stock Options **Journal of Financial and Quantitative Analysis** v37 n3 (September 2002): 471-493. (with P. Dennis)

Competition, Market Structure and Bid-Ask Spreads in Stock Option Markets, **Journal of Finance** v57 n2 (April 2002): 931-958. [Reprinted in *Financial Markets*, Jeff Madura, editor, SAGE Library in Business and Mangagement, Sage publications, 2004.]

The Dynamics of International Stock Index Returns, **Research in Banking and Finance** v1 (2000): 219-230. (with H. Gulen)

Stock Index Futures Trading and Volatility in International Equity Markets. **Journal of Futures Markets** v20 n7 (August 2000): 661-685. (with Huseyin Gulen)

The Allocation of Informed Trading Across Related Markets: An Analysis of the Impact of Changes in Equity-Option Margin Requirements **Journal of Finance** v50 n5 (December 1995): 1635-1653. (with A. Sarin and K. Shastri)

Implied Volatility, **Financial Analysts Journal**, v51 n4, (July/Aug 1995): 8-20.

The Political Economy of Early Federal Reclamation in the West, in "The Political Economy of the American West," Anderson and Hill, eds., Rowman and Littlefield, 1994. (with B. D. Gardner)

**WORKING PAPERS**

The Information Content of NYSE Equity Prices and Closing Imbalances
(with D. T. McCormick and C. Spatt)

Short Sale Constraints, Overvaluation, and the Introduction of Options (with V. Mihov)

Market Fragmentation Metrics (with L. Harris)

**PRESENTATIONS**

"Market microstructure: An overview"
  U.S. Senate Committee on Banking, Housing, and Urban Affairs Staff, 2010
"Economics of central clearing and exchange trading of security-based swaps"
  SEC Division of Trading and Markets training seminar, 2010
"Black Scholes option pricing" and "Valuation of retail structured products"
  SEC Enforcement Division, Structured and New Product Unit training seminar, 2010
"Regulation and risk management of new products," "Index linked notes," and 3 other presentations
  APEC Financial Regulators Training Initiative, Shanghai, 2010
"Economics of securitization and the 2008 financial crisis," SEC Graduate program, 2010

**Appendix A**
**STEWART MAYHEW**
**Vice President**

---

**PRESENTATIONS (continued)**

"Market Microstructure for Emerging Markets" and "Market Manipulation"
    SEC International Institute for Securities Market Development, 2008
"Securities market regulation in a world of derivative securities"
    SEC International Enforcement Institute, 2006
"Conflicts of interest for market intermediaries"
    Council of Securities Regulators of the Americas (COSRA), 2006
    SEC International Institute for Securities Market Development, 2006
"Market surveillance: theory, design, and execution," "Market Manipulation," and other presentations
    SEC Market Oversight/Enforcement training program, Quito, 2006
    SEC Market Oversight/Enforcement training program, Mumbai, 2005

Research papers presented on program at 25 conferences between 1996 and 2010 including:
- American Finance Association (4 papers)
- Western Finance Association (3 papers)
- European Finance Association (3 papers)
- Financial Management Association (3 papers)
- NBER Microstructure Conference
- Vanderbilt Financial Markets Conference
- Cornell/Queens Conference on Derivative Securities
- Q Group Conference
- Chicago Board of Trade Research Symposium

Research presented at 47 seminars at universities and other research organizations

**Appendix B**

# Documents Considered List
## for the Expert Report of Stewart Mayhew, Ph.D

**Academic Articles and Books**

Brian J. Henderson and Heather Tookes, "Do Investment Banks' Relationships with Investors Impact Pricing? The Case of Convertible Bond Issues," *Management Science* , 2012, 58(12), pp. 1793–1814.

Bruce D. Grundy and Patrick Verwijmeren, "The Buyers' Perspective on Security Design: Hedge Funds and Convertible Bond Call Provisions," *Journal of Financial Economics* , 2018, 127(1), pp. 77–93.

Igor Loncarski, Jenke ter Horst, and Chris Veld, "The Rise and Demise of the Convertible Arbitrage Strategy," *Financial Analysts Journal* , 20, 65(5), 2009, pp. 1–16.

Joel Hasbrouck, *Empirical Market Microstructure: The Institutions, Economics, and Econometrics of Securities Trading* , (New York, New York, 2007).

Linda Chen, Edward A. Dyl, George J. Jiang, and Januj A. Juneja, "Risk, illiquidity or marketability: What matters for the discounts on private equity placements?," *Journal of Banking & Finance* , 2015, 57, pp. 41–50.

Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law* , 27(1) (Fall 2001), pp. 89–116.

Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of Expert Analysis," in *Litigation Services Handbook* , ed. Roman L. Weil, Daniel G. Lentz, David P. Hoffman (Hoboken:  John Wiley & Sons, Inc., 2002), pp. 1–25.

Pierre Hillion and Theo Vermaelen, "Death Spiral Convertibles," *Journal of Financial Economics* , 2004, 71, pp. 381–415.

Stephen J. Brown, Bruce D. Grundy, Craig M. Lewis, and Patrick Verwijmeren, "Convertibles and Hedge Funds as Distributors of Equity Exposure," *Review of Financial Studies* , 2012, 25(10), pp. 3077–3112.

Susan Chaplinsky and Joseph Becker, "Convertible Notes: A Form of Early-Stage Financing," Darden Case No. UVA-F-1925, 2019, pp. 1–15.

**Depositions**

Deposition of Justin Keener, June 6, 2019.

**Industry Reports**

Calamos Investments, "U.S. Convertible Market Snapshot," April 30, 2021.

Fenwick, "Convertible Debt Terms – Survey of Market Trends 2019/2020," September 23, 2020.

John. P. Calamos, Sr., "Convertible Securities," Calamos Investments, 2020.

SIFMA, "US Corporate Bonds: Issuance, Trading Volume, Outstanding," May 5, 2021.

WilmerHale, "2021 Venture Capital Report," April 26, 2021.

**Pleadings, Legal Documents, and Court Rulings**

"17 CFR § 230.144," *Code of Federal Regulation* .

*Charles C. Liu, et al., Petitioners v. Securities and Exchange Commission* , No. 18-1501 591 U.S. (June 22, 2020).

Complaint, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC* , November 17, 2017.

Complaint, *Securities Exchange Commission v. Justin W. Keener d/b/a JMJ Financial* , March 24, 2020.

Declaration of Joseph Darragh in Support of SEC's Motion for Remedies Against Defendants Ibrahim Almagarby and Microcap Equity Group, LLC, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC* , November 12, 2020.

Defendant's Motion to Dismiss, with Incorporated Memorandum of Law, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , June 22, 2020.

**Appendix B**

# Documents Considered List
## for the Expert Report of Stewart Mayhew, Ph.D

Defendant's Reply in Support of Motion to Dismiss, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , July 13, 2020.

Defendant's Response and Objections to Plaintiff's First Set of Requests for Admission, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , April 19, 2020.

Export Report of Robert W. Lowry in Response to Report by Defendants' Expert Witness, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC* , November 11, 2019.

FINRA, "4210. Maintenance Margin," available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/4210.

On Petitions for Review of an Order of the Securities Exchange Commission, *Christopher H. Zacharias v. Securities and Exchange Commission* , June 23, 2009.

Order Denying Motion to Dismiss, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , August 14, 2020.

Plaintiff Securities and Exchange Commission's Opposition to Defendant's Motion to Dismiss, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , July 6, 2020.

"Rule 144 Holding Period and Form 144 Filings (Proposed Rules)." Federal Register 86:11 (January 19, 2021) pp. 5063–5086.

*SEC v. Texas Gulf Sulphur Co.* , 401 F.2d 833 (2d Cir. 1968).

SEC's Reply Memorandum in Support of its Motion for Remedies Against Defendants Ibrahim Almagarby and Microcap Equity Group, LLC, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC* , November 13, 2020.

SEC's Responses to Defendant's First Set of Interrogatories, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , January 22, 2021.

SEC's Motion for Remedies Against Defendants Ibrahim Almagarby and Microcap Equity Group, LLC, and Supporting Memorandum of Law, LLC, *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group, LLC* , October 15, 2020.

Small Public Company Coalition, Comments on the Proposed Amendment to Rule 144, March 22, 2021.

Wells Submission on Behalf of Justin W. Keener D/B/A JMJ Financial, *Securities and Exchange Commission v. Justin W. Keener D/B/A JMJ Financial* , November 11, 2019.

## Produced Documents

Convertible Promissory Note between Accelera Innovations, Inc. and JMJ Financial, JMJ-SEC-000099.

Convertible Promissory Note between 3D Icon Corp. and JMJ Financial, JMJ-SEC-000001.

Convertible Promissory Note between 4Cable TV International, Inc. and JMJ Financial, JMJ-SEC-000058.

Convertible Promissory Note between 5Barz International, Inc. and JMJ Financial, JMJ-SEC-000074.

Convertible Promissory Note between Advanced Medical Isotope Corporation and JMJ Financial, JMJ-SEC-000112.

Convertible Promissory Note between Advaxis, Inc. and JMJ Financial, JMJ-SEC-000200.

Convertible Promissory Note between Amazonica Corp. and JMJ Financial, JMJ-SEC-000278.

Convertible Promissory Note between Daniels Corporate Advisory Company, Inc. and JMJ Financial, JMJ-SEC-000307.

Convertible Promissory Note between Domark International, Inc. and JMJ Financial, JMJ-SEC-000383.

Convertible Promissory Note between IDS Industries, Inc. and JMJ Financial, JMJ-SEC-000258.

Justin W. Keener Tax Form 8949 (2015), JMJ-LIT-007-000215.

Transaction Data and Documents for the Convertible Promissory Note Between Accelera Innovations, Inc. and JMJ Financial, JMJ-SEC-000027.

Transaction Data and Documents for the Convertible Promissory Note Between ERHC Energy Inc. and JMJ Financial, JMJ-SEC-001578.

**Appendix B**

# Documents Considered List
## for the Expert Report of Stewart Mayhew, Ph.D

Transaction Data and Documents for the Convertible Promissory Note Between Lithium Exploration Group, Inc. and JMJ Financial, JMJ-SEC-003124.

**Publicly Available**

OTC Markets, "Trading," available at https://www.otcmarkets.com/learn/market-101/trading.
SEC, "Over-the-Counter-Market," May 9, 2013, available at
https://www.sec.gov/divisions/marketreg/mrotc.shtml.

**SEC Filings**

3DICON Corporation Form 10-K for the period ended December 31, 2012.
4Cable TV International, Inc. Form 10-K for the period ended December 31, 2014.
5BARz International Inc. Form 10-K for the period ended December 31, 2013.
Accelera Innovations Form 10-K for the period ended December 31, 2015.
Advanced Medical Isotope Corporation Form 10-K for the period ended December  31, 2012.
Advaxis, Inc. Form 10-K for the period ended October 31, 2012.
Advaxis, Inc. Form 10-K/A for the period ended October 31, 2012.
Amazonica, Corp. Form 10-K for the period ended April 30, 2013.
Amazonica, Corp. Form 10-K for the period ended April 30, 2015.
Daniels Corporate Advisory Company, Inc. Form 10-K for the period ended November 30, 2015.
Domark International, Inc. Form 10-K for the period ended May 31, 2014.
ERHC Energy Form 10-K for the period ended September 30, 2014.
IDS Industries, Inc. Form 10-K for the period ended August 31, 2012.
Lithium Exploration Group Form 10-K for the period ended June 30, 2017, Exhibit 10.1 "Securities Purchase Agreement between Lithium Exploration Group, Inc. and JMJ Financial, February 13, 2013."
Lithium Exploration Group, Inc. Form 10-K for the period ended June 30, 2014.

\* In addition to the documents on this list, I considered all documents cited in my report to form my opinion.