IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) |
| Plaintiff, | ) |
| v. | ) |
| JUSTIN W. KEENER D/B/A JMJ Financial, | ) No. 20-cv-21254 |
| Defendant. | ) Hon. Beth Bloom |

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS

#### A.  Defendant & JMJ Financial

1. Justin W. Keener was a resident of Miami, Florida from 2006 to 2018.  Ex. 1 (Keener Tr. 25:18-20).  Keener holds a bachelor's degree in finance from North Carolina State University.  *Id*. at 16:9-11.

2. Keener has never registered with the SEC as a securities dealer.  *See* Dkt. #30, Defendant's Answer and Affirmative Defenses to the Securities and Exchange Commission's Complaint, ¶ 5 (hereinafter "Answer").

3. Keener was associated with a registered broker-dealer leading up to his disbarment by the Financial Regulatory Authority ("FINRA") in 2012.  *See* Ex. 1 (Keener Tr. 18:3-4 ("I was, in fact, disbarred from FINRA.")); Ex. 7, at 4589-91 (FINRA order suspending and then barring Keener from associating with any broker-dealer that is a member of FINRA).  FINRA barred Keener from associating with any broker-dealer that is a member of FINRA because he failed to cooperate with a FINRA investigation.  Ex. 7, at 4593.

4. Keener does business under the "fictitious name" JMJ Financial ("JMJ"), which he registered in Florida in 2008.  Answer, ¶ 5; Ex. 2 (one-page "fictitious name" application).

5. Keener has had offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico between January 2015 through January 2018. Ex. 1 (Keener Tr. 30:21 – 31:6). JMJ's San Diego office had 7,400 square feet and accommodated 15 to 20 "individual offices" and cubicles. Ex. 3 (Weisman Tr. 30:16 – 31:1).

6. Between January 2015 and January 2018, JMJ had as many as 25 employees at one time (Ex. 22 (Keener Dep. 47:13-18); Answer, ¶ 5) who each had employment contracts (Ex. 1 (Keener Tr. 54:10-12)), including the following: James Abbott (note finder), Dawn AuCoin (accountant), Peter Capernaros (loan servicing), John Casiano (note finder), Patrick Conniry (trader), Nhan Do (trader), Shawn Ellis (note finder), David Halfen (note finder), Jason Hightower (note finder), Liz Jankowski (marketing), Brandi Linn (Keener's assistant), Fran Martino (general counsel), Chris Mayo (note finder), Conrad Nagel (Chief Financial Officer), Eilon Natan (note finder), Maria Posadas (accounting), and Sandy Weisman (executive vice president). *See* Ex. 1 (Keener Tr. 43:10-14, 44:8-11, 45:16-22, 50:6-16, 52:3-4, 124:16-21, 174:9-12, 200:13-16); Ex. 4 (Nagel Tr. 15:17-25, 19:14-15, 22:25 – 23:5, 24:10-14, 35:14-17); Ex. 3 (Weisman Tr. 15:4-8, 79:16-21, 81:6-12); Ex. 5, at JMJ-SEC-010-5653 (Hightower identified 500 issuers for JMJ to contact). JMJ also employed two independent contractors for information technology services: Summer Piper and Alex Egg. Ex. 1 (Keener Tr. 52:12-16).

7. According to Keener's tax records, JMJ had employee payroll of $1,997,248 in 2014, $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017. *See* Ex. 6, at JMJ-SEC-022-64, 71, 77, 87 (Keener's tax returns for 2014-17); Ex. 1 (Keener Tr. 88:25 – 90:9).

### B. Keener's Convertible Note Business

8. JMJ purchased securities known as convertible notes (hereinafter "the Convertible

2

Notes") from penny stock issuers during the period July 2010 through April 2018.[1] *See* Ex. 11, at ¶ 17 (Taveras Declaration),

9. Keener "negotiated the terms of the convertible notes and signed contracts to memorialize the investments he made into [the] issuers." Answer, ¶ 9.

10. The Convertible Notes were contracts in which the issuer of the note promised to pay JMJ (the holder of the note) a designated sum of principal and potentially interest within a designated time frame (or be subject to financial penalties). *See, e.g.,* Ex. 12, at JMJ-SEC-010-6878 (convertible note issued by Bioenergy Plus, Inc. to JMJ).

11. JMJ's QuickLoan program generally sought to purchase Convertible Notes priced between $50,000 and $500,000. *See* Ex. 9, at 12 (JMJ website). JMJ's marketing of this program emphasized a streamlined approval process with reduced paperwork and quick funding for companies that needed cash for working capital, to make payroll and to "keep the lights on." *See* Ex. 1 (Keener Tr. 69:16 – 70:20, 208:10-15). JMJ bought hundreds of Convertible Notes as part of the QuickLoan program. *See id.* at 71:20-24 (Keener estimated that "100 to 200 issuers" sold JMJ convertible notes as part of the QuickLoan program); Ex. 24, at 13 ("Quick Loan History … Over 225 QuickLoan recipients with hundreds of follow-on transactions").

12. JMJ also sought to purchase larger notes that Keener called "bridge loans" that frequently had an equity conversion feature essentially the same as a Convertible Note. *See* Ex. 1 (Keener Tr. 80:25 – 81:12, 98:8-12, 111:15-23); Ex. 3 (Weisman Tr. 34:14-19).

13. As their name suggests, the Convertible Notes granted JMJ the option to demand that

---

[1] The SEC's Complaint pleaded that the Relevant Period was January 2015 through January 2018, Complaint, ¶ 1, but Keener signed a one-year tolling agreement on March 27, 2019. *See* Ex. 8 (tolling agreement between the SEC and Keener). That agreement specified that the parties would not count the period of March 7, 2019 through March 6, 2020 in any calculation of a statute of limitations in this matter. *Id*. at ¶ 1.

sums owed under the notes be paid in the form of the issuer's stock (hereinafter known as "converting the note"). The vast majority of issuers allowed Keener to convert the notes to stock rather than repay them in cash. *See* Ex. 4 (Nagel Tr. 102:22 – 103:3 (estimating only one out of every five issuers repaid notes without an equity conversion event occurring)).

14. The Convertible Notes allowed JMJ to convert the notes into stock at a typical discount of 30% to 40% against the lowest closing price of the stock during a specified number of trading days before each conversion (also known as the "look back period"). *See* Ex. 1 (Keener Tr. 61:25 – 62:2); Ex. 3 (Weisman Tr. 37:1-13); Ex. 4 (Nagel

15. Tr. 109:13-14 ("And that's why we made money on conversions, because generally speaking, there was that discount.")).

16. This discount meant that the conversion price fluctuated with the issuer's stock price. *See* Ex. 4 (Nagel Tr. 109:2-7 (describing how conversion price depended upon stock price during "lookback" period).

17. JMJ kept track of when notes were eligible to be converted and normally only converted a portion of the note to ensure that its stock holdings in that issuer did not exceed 4.99% at any point in time, which otherwise would have required making a public filing disclosing Keener's beneficial ownership of the issuer. *Id.* at 110:22-111:7; *see* Ex. 12, at JMJ-SEC-010-6878 (convertible note promissory note of Alliance Bioenergy Plus, Inc. limited JMJ to acquiring no more than 4.99% of the issuer's stock at one time from the note).

18. Once stock from a note was eligible to be sold, JMJ converted the note into stock and sold it into the market. *See* Ex. 4 (Nagel Tr. 52:19-25 (Keener converted notes six months after buying them).

19. At that point, existing shareholders typically experienced price declines in the stock. Ex.

4 (Nagel Tr. 111:14-18 (general trend after JMJ started selling stock from the Convertible Notes was for the stock price to drop)).  JMJ could make profits selling into a declining market because it acquired its shares at a substantial discount to the prevailing market price.  Ex. 13 (Mayhew Dep. 67:19 – 68:3 ("Q. … So Mr. Keener can sell into a declining market and still make profitable trades, would you agree?  A. Yes.")).

20.  When JMJ evaluated issuers for its QuickLoan program, among the criteria Keener considered was the liquidity of an issuer's existing stock, the volume at which it traded in the market, and the amount of other outstanding convertible debt.  *See* Ex. 14, at JMJ-SEC-017-3301 (Natan email describing JMJ criteria for QuickLoan Program); Ex. 15 (convertible note amount was generally equal to 10% of total dollar volume of issuer's stock traded over prior 60 days).

21.  Although each Convertible Note designated an amount of principal on its face, JMJ's practice was to pay the issuer a smaller amount at the note's inception and then pay additional amounts in the future.  Ex. 16, at 26 (describing the QuickLoan program as having "Automatic Follow-On Payments [from JMJ] Built In [to ensure] Only <u>one</u> closing … The typical QuickLoan will receive the closing payment [and] typically several more payments through the life of the transaction … Some have 10+ payments, so it keeps on paying the company") (emphasis in original).  This approach allowed JMJ to add to its position in an issuer's convertible notes without having to negotiate and close on new contract language each time.  *See id.*; Ex. 9, at 7 (JMJ's website).

22.  Some issuers sold JMJ warrants (convertible into common stock) at the same time that they sold JMJ convertible notes.  *See* Ex. 4 (Nagel Tr. 71:3-11); Ex. 17 (Natan Tr. 38:6-8 ("a warrant is just another term that's added to a [convertible note] transaction.")).  No issuer sold JMJ warrants without a convertible note.  Ex. 4 (Nagel Tr. 71:3-11).

23. To support, conduct, and develop its convertible notes business, JMJ "developed proprietary software" at a cost of more than $3 million. Ex. 3 (Weisman Tr. 24:23); Ex. 17 (Natan Tr. 61:23 – 62:15); Ex. 24, at 13 ("Over $3M in custom technology").

24. Customer management software, called "the mainframe," tracked "existing portfolio companies" and "potential companies and our interactions and relationships as we went through a relationship-building process." Ex. 3 (Weisman Tr. 25:22 – 26:17).

25. JMJ also had an accounting database to track the performance of JMJ's convertible notes. *See* Ex. 4 (Nagel Tr. 19:16 – 22:21); Ex. 3 (Weisman Tr. 25:20-21). The accounting database was "highly accurate." Ex. 4 (Nagel Tr. 67:8-9).

26. JMJ experienced substantial competition from other companies that sought to purchase convertible notes from issuers. *See* Ex. 3 (Weisman Tr. 90:8-18 ("the marketplace became saturated with lenders doing similar types of loans")); Ex. 17 (Natan Tr. 33:22 – 34:8 (JMJ's convertible note business is part of a "competitive industry")). JMJ was nevertheless quite successful with, as Keener stated in a presentation in 2016, "over 50% market share." *See* Ex. 24, at 27 (JMJ "Broker and Finder Seminar" PowerPoint presentation).

### C. Keener's Volume of Business

27. Between July 2010 and April 2018, JMJ entered into at least 272 convertible notes with 201 different issuers.[2] Ex. 11 (Taveras Decl. at ¶¶ 17-18).

28. To purchase the notes, as well as warrant agreements bundled with the notes, JMJ made payments totaling approximately $52 million. *Id.* at ¶ 18.

29. JMJ converted these notes and warrants on 2,414 occasions during the period and

---

[2] JMJ purchased other convertible notes during the period, but they are not included in this description because JMJ did not sell stock from those issuers during the relevant period for purposes of disgorgement (March 24, 2014 through January 31, 2018).

received more than 38 billion shares of newly issued stock directly from the issuers. *Id.*

30. JMJ sold those shares into the market through more than 16,000 transactions during the period for gross proceeds of over $93 million. *Id.*

31. During the period March 24, 2014 through January 31, 2018, JMJ sold a subset of the 38 billion shares of stock (which was approximately 33 billion shares) for net proceeds of approximately $34 million. *Id.* at ¶¶ 11, 12.

32. Sixty-two percent (62%) of these net proceeds were from selling stock converted from notes; 17% were from selling stock converted from warrants bundled with notes; 14% were from selling stock received from issuers settling the outstanding note balances without using the conversion mechanism; 6% were from selling stock from "bonuses" associated with notes; and 0.1% from penalties on the convertible note issuers. *Id.* at ¶ 14. Less than one percent of these net proceeds were from stock purchased in the open market. *Id.*

33. JMJ had net income of approximately $33 million after accounting for proceeds from original issue discounts, interest, and penalties (of $6.3 million) as well as write-offs and other losses (of $7.2 million). *Id.* at Taveras Ex. 1.

34. Keener stated that "50 to 100 percent would be a reasonable … estimate" of JMJ's profit margin on convertible notes (*i.e.*, the ratio of JMJ's profit from a convertible note to its acquisition cost). *See* Ex. 1 (Keener Tr. 246:14-20).

35. Keener testified in June 2019 that he had "essentially no interest" in the convertible note business going forward and "I have no interest in reentering that business whatsoever again." *Id.* at 56:18-23, 57:12-13.

36. In June and July 2020, JMJ sold the stock of Blink Charging Co. f/k/a Car Charging Group Inc. ("BLNK") that JMJ obtained from a Convertible Note that it purchased in October

7

2016. *See* Ex. 19, at 1-13 ("BlueSheet" transaction records showing sales of BLNK stock by Keener and JMJ Financial); Ex. 20 (BLNK convertible note issued to JMJ Financial signed by Keener on October 13, 2016); Ex. 18 (warrant purchase agreement between BLNK and JMJ Financial dated October 13, 2016). JMJ's total proceeds from these sales exceeded $13.76 million. Ex. 19, at 13.

37. Keener and his employees solicited issuers and conducted securities transactions using the means and instruments of communication in interstate commerce and of the mails. *See, e.g.*, Answer, ¶ 13 (Keener "admits that he used the telephone or internet to liquidate shares"); Ex. 9 (JMJ website soliciting issuers); Ex. 26, at 1-3 (JMJ Twitter account soliciting issuers); Ex. 23, at 1-10 (JMJ press releases issued on its website); Ex. 33, at 1-2 ("Campaign Report" analyzing distribution of JMJ newsletter by email); Ex. 34, at JMJ-SEC-016-11520 (Keener email to issuer); Ex. 35, at JMJ-SEC-105-25820 ("all phone calls must be made" to qualify for bonuses).

### D. The Stock JMJ Sold from Convertible Notes Was Newly Issued

38. Issuers satisfied JMJ's conversion demands by directing their transfer agents to issue new stock, i.e., stock that had not previously traded in the market. *See* Ex. 1 (Keener Tr. 120:15 – 121:8). Keener knew that stock converted from notes was not publicly traded until he "introduce[d] it to the market." *Id*.

39. It was JMJ's practice when purchasing a convertible note to have the issuer execute a letter to its transfer agent reserving a certain amount of new shares that later could be issued to JMJ upon conversion of the note.[3] *See* Ex. 12, at JMJ-SEC-010-6881 - 83 (transfer agent letter for Alliance Bioenergy Plus, Inc. dated April 22, 2016). Many of these letters stated that the

---

[3] A transfer agent is the institutional market participant hired by issuers to record, track, and effectuate corporate issuances of new stock to purchasers.

transfer agent should reserve "such number of shares that has a market value equal to at least five times" the outstanding balance on the note. *Id.*

40. JMJ monitored the trading of the issuers' stock to determine when to increase the reservation of shares (*i.e.*, if the price drops, JMJ may need more shares when it converts the note). *See* Ex. 36, at JMJ-SEC-014-11523 - 26 ("T[ransfer] A[gent] Reset Report" tracks when to request additional shares to be reserved at the issuers' transfer agents).

### E. Keener Held Himself Out to the Public As Being Willing to Buy Convertible Notes at a Regular Place of Business

41. JMJ employed a marketing manager named Liz Jankowski. *See* Ex. 1 (Keener Tr. 159:24 – 160:10); Ex. 17 (Natan Tr. 73:11-13).

42. Internal JMJ marketing documents show that JMJ employed a comprehensive marketing strategy to solicit issuers to sell JMJ convertible notes, including: operating a website (JMJfn.com); attending and sponsoring industry conferences to reach issuers; sponsoring JMJ's own conferences; using email campaigns to solicit issuers; developing a "firm brochure"; and issuing press releases about JMJ to the internet. *See* Ex. 21, at JMJ-SEC-007-2625 - 2627 (JMJ "Marketing Initiatives for 2016"); Ex. 22 (Keener Dep. 71:7-9); Ex. 23 (JMJ press releases).

43. The SEC downloaded JMJ's website on April 16, 2019. Ex. 10, ¶ 4 (Castillo Declaration regarding capture of JMJfn.com); Ex. 9, at 1-18 (JMJ website capture); *see also* Answer, ¶ 10 ("Defendant further admits to operating a website for JMJ Financial").

44. The website advertised JMJ's QuickLoan program in which JMJ purchased convertible notes priced between $50,000 and $250,000 from publicly-traded issuers. *See* Ex. 9, at 7. The website advertised JMJ's interest in offering bridge loans and engaging in "convertible debentures" and "registered equity financings" with publicly-traded companies. *Id.* at 4 (website page on bridge loans). The website stated that "JMJ has placed over $60 million in the last five

9

years, closing transaction with over 70 public companies in 2015 alone." *Id.*

45. The website included press releases that Keener and one of his employees drafted that were intended to establish JMJ's credibility with convertible note issuers. Ex. 1 (Keener Tr. 113:16 – 114:14); *see* Ex. 23 (JMJ press releases); Ex. 3 (Weisman Tr. 105:1-14).

46. JMJ maintained a Twitter account (@JMJ Financial) that advertised JMJ's willingness to purchase convertible notes. *See* Ex. 27, ¶ 3 (Castillo Declaration regarding capture of Twitter posts for @JMJ Financial); Ex. 26, at 1-3 (JMJ's Twitter posts as of Nov. 9, 2020).

47. JMJ hired employees to solicit potential issuer clients to sell JMJ convertible notes. *See* Ex. 1 (Keener Tr. 166:6-22, 169:3-19 (Keener drafted scripts for employees soliciting issuers to use)); Ex. 36, at JMJ-SEC-014-11491 - 98 (sample scripts); Ex. 17 (Natan Tr. 13:11 – 14:9).

48. These employees included James Abbott, John Casiano, Shawn Ellis, David Halfen, Chris Mayo, and Eilon Natan. *See, e.g.,* Ex. 17 (Natan Tr. 13:7-10).

49. JMJ paid them commissions and bonuses tied to the number and size of convertible notes they obtained for JMJ. *See, e.g.,* Ex. 35, at JMJ-SEC-015-25820 (email describing 2014 Bonus Structure for JMJ employees); Ex. 28, at JMJ-SEC-010-5680, 5682-83 ("2016 Comp Plan" setting forth bonus requirements); Ex. 25, at 1-2 (Natan received commissions of $114,500 in 2016 and $68,252 in 2017)); *see also* Ex. 1 (Keener Tr. 183:3-12 (describing bonus structure for note finder employees)).

50. A piece of "lead generation software" known internally at JMJ as "the screener" helped its employees "screen public filings … to identify potential borrowers." Ex. 3 (Weisman Tr. 25:10-14). The screener had the capability to track every company in the SEC's EDGAR database "and then [JMJ] could decide if it made sense to contact those companies to see if they had any capital needs." *Id.* at 27:23 – 28:13. JMJ contacted hundreds of those companies. *Id.* at

28:14-23.

51. Keener sponsored, and he and his employees attended, microcap industry conferences (Answer, ¶ 9) at which they solicited issuers to sell JMJ convertible notes. *See, e.g.,* Ex. 3 (Weisman Tr. 93:12 – 94:24). For example, in 2016, Keener and his employees had the following conference schedule:

| Date | Name | Location | Sponsor? | Sponsorship Cost | JMJ Attendees |
|---|---|---|---|---|---|
| 1/11/2016 | SeeThruEquity - Microcap Healthcare Investor Conference | Fairmont, San Francisco, CA | Yes | $4,000 - Gold Sponsor | Jankowski, Natan, and Weisman |
| 1/11-13/2016 | Biotech Showcase 2016 | Parc 55, San Francisco, CA | No | N/A | Jankowski, Natan, and Weisman |
| 2/8-9/2016 | Bio CEO & Investor Conference | Waldorf Astoria, New York | No | N/A | Keener, Jankowski, Natan, and Weisman |
| 2/10-11/2016 | Nat'l Investment Banking Association | Margaritaville Beach Resort, Hollywood, FL | Yes | Unknown | Ellis, Halfen, Linn, Natan, and Weisman |
| 2/22/2016 | Innovations 2016 - SeeThruEquity & Brewer Group | Ritz-Carlton, Miami Beach, Florida | Yes | Fee Waived | Halfen, Jankowski, Natan, and Weisman |
| 3/13-16/2016 | Roth Conference | Ritz-Carlton, Dana Point | Yes | $10,500 - Silver Sponsor | Caparneros, Ellis, Jankowski, Natan, and Weisman |
| 5/3-5/2016 | Growth Capital Expo | Caesars Palace, Las Vegas | Yes | $7,500 - Gold Sponsor | Ellis, Jankowski, Natan, and Weisman |
| 6/1-2/2016 | Marcum Microcap Conference | New York | Yes | $13,500 - Gold Sponsor | Not Known |
| 6/7-9/2016 | LD Micro | Los Angeles | No | N/A | Not Known |

*See* Ex. 29 (one-page 2016 conference schedule as of June 15, 2016).

52. Keener has served as a speaker at industry conferences. *See* Ex. 1 (Keener Tr. 128:2-4).

53. JMJ touted conference sponsorships on Twitter by posting pictures of its booths and otherwise advertising its interest in convertible notes. *See* Ex. 26, at 1-3 (JMJ's Twitter posts).

11

54. JMJ issued at least eight press releases to publicize conference sponsorships. *See* Ex. 23 (press releases). The press releases made statements such as:

    a. "[JMJ] commits $20 Million in unsecured investment to emerging public companies in 2015." *Id.*, at JMJ-SEC-007-002759.

    b. "Keener and JMJ Financial have committed $20,000,000 to unsecured investments in 2016." *Id.*, at JMJ-SEC-007-000137.

    c. "JMJ Financial's primary investment vehicle, the QuickLoan, allows small publicly-traded companies the ability to access up to $500,000 utilizing a simple two-page promissory note." *Id.*, at JMJ-SEC-007-000179.

    d. "With a portfolio of over 200 companies and many years of operating experience, JMJ Financial is one of the most active, stable and reliable investors focused on the smallcap segment." *Id.*, at JMJ-SEC-007-002755.

55. JMJ referred to non-employees who helped to identify issuers willing to sell convertible notes as "brokers and finders," and it used the term "partners" for service providers, such as law firms or accounting firms, that steered issuers to JMJ. *See* Ex. 1 (Keener Tr. 138:9-15, 139:4-25); Ex. 4 (Nagel Tr. 79:14-20); Ex. 3 (Weisman Tr. 101:14-25).

56. JMJ hosted a dinner at Nobu Restaurant in Las Vegas for 24 "brokers and finders" on April 13, 2015. Ex. 30, at JMJ-SEC-015-2383 (guest list for Nobu dinner); *see also* Ex. 1 (Keener Tr. 156:7-17 (Keener remembered buying securities such as a convertible note with the assistance of at least one attendee at the Nobu dinner)).

57. JMJ paid commissions to brokers and finders who helped it find convertible notes to purchase. *See* Ex. 4 (Nagel Tr. 85:16 – 86:17, 87:18 – 88:10 (JMJ paid a portion of the convertible note purchase price to brokers and finders)).

58. JMJ held a "Partner Seminar" on August 14, 2015 at the Wynn Hotel in Las Vegas. *See* Ex. 16, at 1 (PowerPoint presentation titled "Partner Seminar August 14, 2015").

59. JMJ held a "Broker and Finder Seminar" (also called the "JMJ Financial Small Cap

Summit") on April 8, 2016 at the Wynn Hotel where JMJ covered all expenses for attendees, including the cost of accommodations and airfare for participants. *See* Ex. 24, at 1 (PowerPoint presentation titled "Broker and Finder Seminar April 8, 2016"); Ex. 4 (Nagel Tr. 79:1-9); Ex. 23, at JMJ-SEC-007-98 (press release: "Justin Keener and JMJ Financial Host Small Cap Dealmaker Summit in Las Vegas").

60. At both events, Keener made a presentation to the participants urging them to send JMJ referrals of issuers that were looking to sell convertible notes. *See* Ex. 16; Ex. 24. Keener's presentations included a notarized affidavit of JMJ's CFO (Conrad Nagel) stating that JMJ had "in excess of $20,000,000 in liquid cash and cash equivalents that is immediately available for investment into small cap emerging companies." Ex. 16, at 20, 23 ("Committed to invest additional $20M this year."); Ex. 24, at 31 (same).

61. JMJ posted information on Twitter about the Las Vegas seminars that it held. *See* Ex. 26, at 2 (JMJ's Twitter posts).

62. A JMJ press release about the April 8, 2016 event quoted Keener as follows:

> "The individuals we invited to Vegas have been responsible for arranging billions of dollars of investment in hundreds of small and micro-cap companies," said Justin Keener[,] Founder and Portfolio Manager of JMJ Financial. "The JMJ Financial Small Cap Summit is unique in the industry, using an invitation-only, all expenses paid format to bring key dealmakers together to share and brainstorm. Underwriting the entire cost of this annual event, travel and lodging underscores our commitment to providing unsecured investment capital to small cap issuers."

Ex. 23, at JMJ-SEC-007-98.

63. Keener took business deductions of $103,399, $101,701 and $67,407 on his 2014, 2015, and 2016 federal tax returns for the costs of sponsoring and sending JMJ employees to industry conferences as well as sponsoring JMJ-branded conferences. *See* Ex. 6, at JMJ-SEC-022-64, 71, 77 (tax returns); Ex. 4 (Nagel Tr. 82:22 – 83:9 (the federal tax return line items for "Conference

and Summits – fees" covered all costs of attending and sponsoring both industry and JMJ conferences)).

64. JMJ sent emails to potential issuer clients soliciting them to sell JMJ convertible notes. *See, e.g.,* Ex. 31, at JMJ-SEC-015-23789 (Keener solicitation email to issuer).

65. JMJ distributed via email an "e-Newsletter" (which it also promoted on Twitter) to issuers to solicit them to sell JMJ convertible notes. *See, e.g.,* Ex. 32, at JMJ-SEC-012-5822 - 24 (JMJ April 2016 Newsletter); *see also* Ex. 1 (Keener Tr. 162:22). JMJ employee Peter Capernaros used software to track which issuers opened the e-Newsletter emails. Ex. 33, at 1-2. JMJ touted the e-Newsletter on Twitter. *See* Ex. 26, at 1 (JMJ's Twitter posts).

66. JMJ sent potential issuer clients gifts, such as jelly beans and mugs branded with "JMJ Financial." Ex. 22 (Keener Dep. 64:1-6).

### F. Services JMJ Provided to Issuers

67. JMJ directly paid auditors who were working to audit the financial statements for certain issuers that had sold convertible notes to JMJ. Ex. 1 (Keener Tr. 190:21 – 191:3); Ex. 4 (Nagel Tr. 89:13-14); *see also* Ex. 34, at JMJ-SEC-016-11520 (email exchange regarding JMJ paying for audit expenses of an issuer)); Ex. 17 (Natan Tr. 87:15-17 ("In some cases … a portion of the proceeds [of a convertible note] would go directly to the accounting firms to make sure that they do their work.")).

68. JMJ directly paid attorneys working on such issuers' periodic filings. *See* Ex. 1 (Keener Tr. 191:2-3); Ex. 4 (Nagel Tr. 89:13-14); Ex. 17 (Natan Tr. 87:2-25).

69. JMJ provided custom financing options to issuers, described on its website as a "bridge loan": "As each situation is unique, we'll tailor the structure, timeline and details of your bridge loan to your specific needs. As we invest the personal capital of our portfolio manager, with no

14

investors or underwriters, we can be uniquely creative and responsive." *See* Ex. 9, at 4 (website page on bridge loans).

70. JMJ provided "Debt Consolidation/Refinance" consulting services to issuers on how to structure convertible notes and other financial instruments where the issuer has sold convertible notes to multiple holders. *Id*. at 6.

### G. Keener Never Sought or Received Advice of Counsel About Whether to Register as a Dealer

71. Keener testified at his deposition that he never sought advice of counsel about whether to register as a securities dealer:

> **Q.** Other than – I don't want you to talk about your current counsel. Other than with them – other than with them, you've never sought advice as to whether you needed to register as a dealer, is that right?
> **A.** That's right.

Ex. 22 (Keener Dep. 246:18-23).

72. Keener testified at his deposition that he never received advice of counsel about whether to register as a securities dealer:

> **Q.** … Do you have a letter or advice from an attorney that says you don't have to register as a dealer other than in a Rule 144 letter?
> **A.** That specifically states that, no.

*Id*. at 237:8-11.

### H. Keener Never Contacted the SEC to Seek Guidance About His Dealer Liability

73. Keener never contacted the SEC to seek guidance about Section 15(a)(1) of the Securities Exchange Act of 1934. Ex. 22 (Keener Dep. 254:23 – 255:5).