**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JUSTIN W. KEENER D/B/A JMJ Financial,** | ) | |
| | ) | **No. 20-cv-21254** |
| **Defendant.** | ) | |
| | ) | **Hon. Beth Bloom** |
| | ) | |
| _____ | ) | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

1

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

UNDISPUTED FACTS .......................................................................................................3

    A.    Defendant's Business .................................................................................3

    B.    Defendant Was Not Registered as a Dealer or Associated with A Registered Dealer .............................................................................................................3

    C.    Defendant's Regular Business Relies Upon the Purchase of Convertible Notes, Converting the Notes to Shares of Stock, and the Sale of Newly Issued Shares of Company Stock Into the Public Market .............................................................4

    D,    Defendant Held Himself Out to the Public as Being in the Business of Buying and Selling Securities ........................................................................................5

    E.    The Volume and Profit From Defendant's Convertible Notes Business Was Substantial .................................................................................................8

    F,    The Stock Defendant Distributed to the Public From Convertible Notes Was Newly Issued and Came Directly From Defendant's Issuer Clients .....................9

    G.    The SEC Did Not Make Any Representations to Defendant About Section 15(a)(1) ......................................................................................................10

    H.    Defendant Used Interstate Commerce to Execute Securities Transactions in his Convertible Notes Business .........................................................................10

ARGUMENT .....................................................................................................................10

    A.    Governing Law ..........................................................................................10

        1.    Summary Judgment Standard .............................................................10

        2.    The Exchange Act and Case Law Make Clear What a Dealer Is and Require that Dealers Register with the SEC ..................................................11

B.     The Undisputed Facts Show That Defendant Was a Dealer in Securities, Was Not Registered, and Thus Violated Section 15(a)(1) .........................................15

    1.     Defendant's Regular Business Was to Acquire and Sell Securities for Profit ...15

    2.     Defendant's Profit Came From Purchasing Deeply Discounted Stock Directly From Issuers and Promptly Reselling It. ..........................................................18

    3.     Defendant Was Not Registered, and He Engaged in Securities Transactions in Interstate Commerce .........................................................................................19

C.     The SEC Guide Does Not Excuse Defendant From the Registration Requirements of the Exchange Act ...................................................................19

D.     Defendant's Third, Fourth Fifth, and Sixth Affirmative Defenses Fail as a Matter of Law, and Summary Judgment Should Be Entered Against Defendant on Them ...........................................................................................................21

    1.     Defendant's Due Process or Fair Notice Defense (Third Affirmative Defense) Is Invalid as a Matter of Law ...........................................................................21

       a.     Defendant's Challenge to the Language of the Dealer Registration Statute Fails.................................................................................................22

       b.     The SEC Is Not Required to Interpret the Statutes It Enforces ...............24

    2.     Defendant's Estoppel Defense (Fourth Affirmative Defense) Is Insufficient as a Matter of Law ........................................................................................25

    3.     Defendant's Statute of Limitations Defense (Fifth Affirmative Defense) Is Invalid.................................................................................................................27

    4.     Defendant's Advice of Counsel Defense (Sixth Affirmative Defense) Fails as a Matter of Fact and Law ..........................................................................28

D.     Defendant's Remaining Affirmative Defenses Cannot Overcome the SEC's Claim Under Section 15(a)(1) of the Exchange Act ............................................29

CONCLUSION...................................................................................................................30

## __TABLE OF AUTHORITIES__

**CASES**

*Abbes v. Embraer Servs., Inc.,*
    195 F. App'x 898 (11th Cir. 2006)..................................................................................11

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .............................................................................................. 10, 11

*In re Bayou Shores SNF, LLC,*
    828 F.3d 1297 (11th Cir. 2016)............................................................................... 11, 20

*Bonner v. City of Prichard,*
    661 F.2d 1206 (11th Cir. 1981)..................................................................................14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .............................................................................................. 10, 11

*City of South Miami v. DeSanti*s,
    408 F. Supp. 3d 1266 (S.D. Fla. 2019).................................................................... 22, 23

*Corporate Relations Group,*
    No. 6:99CV1222ORL28KRS, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003) .............14

*Eastside Church of Christ v. National Plan, Inc.,*
    391 F.2d 357 (5th Cir. 1968)................................................................................. 13, 24

*Flava Works, Inc. v. City of Miami,*
    609 F.3d 1233 (11th Cir. 2010)..................................................................................11

*FTC v. Wyndham Worldwide Corp.*
    799 F.3d 236 (3d Cir. 2015)............................................................................ 23, 24, 25

*Gargiulo v. G.M. Sales, Inc.,*
    131 F.3d 995 (11th Cir. 1997)....................................................................................11

*Gordon Wesley Sodorff, Jr.*,
    50 S.E.C. 1249, 1992 WL 224082 (Sep. 2, 1992)........................................ 14, 17, 24, 26

*Graham v. SEC,*
    222 F.3d 994 (D.C. Cir. 2000) ....................................................................27

*Heckler v. Community Health Servs., Inc.,*
    467 U.S. 51 (1984) .......................................................................................26

*Hoxworth, et al. v. Blinder, et al.,*
    74 F.3d 205 (10th Cir. 1996) ........................................................................4

*IBC Funds, LLC,*
    Exchange Act Rel. No. 77195, 2016 WL 683557 (Feb. 19, 2016) ...........24, 26

*Ironridge Global Partners, LLC,*
    Exchange Act Rel. No. 81443, 2017 WL 3588037 (Aug. 21, 2017) .........24, 26

*Kaiser Aluminum & Chem. Corp. v. Bonjorno,*
    494 U.S. 827 (1990) ...............................................................................11, 20

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) ..................................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .....................................................................................11

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) ...............................................................................22, 23

*Rojas–Reyes v. I.N.S.,*
    235 F.3d 115 (2d Cir. 2000) .........................................................................26

*Roth v. SEC,*
    22 F.3d 1108 (D.C. Cir. 1994) .....................................................................12

*SEC v. Almagarby,*
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) ................... 13, 14, 16, 17, 18, 20, 24

*SEC v. Badian,*

No. 06 Civ. 2621(LTS)(JLC), 2010 WL 1028256 (S.D.N.Y. Mar. 11, 2010) ................26

*SEC v. Big Apple Consulting USA, Inc.,*
783 F.3d 786 (11th Cir. 2015)..................................... 13, 15, 16, 18, 19, 20 24

*SEC v. Blavin,*
557 F.Supp. 1304 (E.D. Mich. 1983) ............................................................26

*SEC v. Calmes,*
No. 09-80524-CIV, 2010 WL 11505260 (S.D. Fla. Nov. 19, 2010)...............................28

*SEC v. Chenery Corp.,*
332 U.S. 194 (1947) ...............................................................................25

*SEC v. Culpepper,*
270 F.2d 241 (2nd Cir. 1959).......................................................................26

*SEC v. Fierro, et al.,*
No. 20-2104 (MAS) (DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020) .......................14

*SEC v. Huff,*
758 F. Supp. 2d 1288 (S.D. Fla. 2010) ...........................................................29

*SEC v. Keener,*
1:20-cv-21254-BLOOM/Louis, 2020 WL 4736205,
(S.D. Fla. Aug. 14, 2020)........................................... 13, 17, 19, 20, 21, 23, 24

*SEC v. Martino,*
255 F.Supp.2d 268 (S.D.N.Y. 2003) ...............................................................14

*SEC v. Merchant Capital,*
311 Fed. Appx. 250 (11th Cir. 2009) ...........................................................15

*SEC v. Morgan, Lewis, and Bockius,*
209 F.2d 44 (3rd Cir. 1953) .......................................................................26

*SEC v. Novus Tech., LLC,*
No. 3:07-CV-235-TC, 2010 WL 4180550 (D. Utah Oct. 20, 2010)...............................14

*SEC v. Offill,*

No. 3:07-CV-1643-D, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012) .................. 17, 24, 26

*SEC v. PV Enterprises*,
No. 16-20542-Civ-Scola, 2016 WL 8808697 (S.D. Fla. Jun. 28, 2016) .........................29

*SEC v. Ridenour*,
913 F.2d 515 (8th Cir. 1990)........................................................................ 18, 24, 26

*SEC v. River North*,
415 F. Supp. 3d 853 (N.D. Ill. 2019)...................................................................... 14, 18

*SEC v. Rivlin*,
No. 99–1455, 1999 WL 1455758 (D.D.C. Dec.20, 1999)..............................................26

*SEC v. United Monetary Servs. Inc.*,
No. 83-3540-CIV-Paine, 1990 WL 91812 (S.D. Fla. May 18, 1990) ............................14

*United States v. House*,
684 F.3d 1173 (11th Cir. 2012)................................................................................22, 25

*United States v. Parker*,
839 F.2d 1473 (11th Cir. 1988).....................................................................................29

**STATUTES**

15 U.S.C § 78c(a)(51) ....................................................................................................4

15 U.S.C. § 78o .............................................................................................................2

15 U.S.C. § 78o(a)(1) ........................................................................................... 2, 12, 19

15 U.S.C. § 78c(a)(5)(A) ......................................................................................2, 12, 20

15 U.S.C. § 78c(a)(5)(B) ..........................................................................................2, 12

15 U.S.C. § 78u(d)(8)(A)(ii) .......................................................................................27

15 U.S.C. § 78u(d)(8)(B).............................................................................................28

15 U.S.C. § 78z............................................................................................................26

28 U.S.C. § 2462 ............................................................................................................27

**RULES**

17 C.F.R. § 240.3a51-1.2 ...............................................................................................4

**OTHER AUTHORITY**

*Guide to Broker-Dealer Registration*, U.S. Securities and Exchange Commission, Division of
    Trading and Markets*,* April 2008, https://www.sec.gov/reportspubs/investor-
    publications/divisionsmarketregbdguidehtm.htm ............................................. 19, 20, 21

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1, plaintiff, United States Securities and Exchange Commission (the "Commission" or "SEC"), respectfully requests that the Court enter summary judgment in favor of the SEC and against defendant Justin W. Keener d/b/a JMJ Financial ("Defendant") on (1) the SEC's claim that Defendant operated as an unregistered dealer in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), and (2) Defendant's Third through Sixth affirmative defenses.[1]

## INTRODUCTION

Those who buy and sell securities as part of a "regular business" must register with the Commission as securities dealers or associate with a registered dealer.  There is strict liability for failing to do so.  The undisputed facts establish that Defendant did not register as a dealer, or properly associate with a registered dealer, even though he operated a business that bought securities in the form of convertible notes from penny stock companies, converted those notes into shares of stock at a substantial discount to the prevailing market price, and sold those newly issued shares into the market for net income of at least $33 million since March 2014.  Toward that end, it is undisputed that Defendant: (1) maintained three offices and employed as many as 25 individuals and contractors to operate the business; (2) advertised the business through a website, Twitter, direct solicitations, and industry conferences; and (3) paid commissions to in-house and third-party "finders" to solicit microcap companies to sell Defendant convertible notes.  Defendant purchased convertible notes from more than 200 penny stock companies, converted them on more than 2400 occasions to discounted stock, and sold over 33 *billion* of

---

[1] The SEC has filed herewith its Statement of Material Facts ("SMF").

1

these shares into the public market.

The complaint charges Defendant with acting as an unregistered securities dealer in violation of Section 15(a)(1) of the Exchange Act.  *See* 15 U.S.C. § 78o.  This case is ripe for summary judgment because there are no genuine issues of material fact, and the Court should find as a matter of law that Defendant's business of buying and selling securities rendered him a "dealer" within the plain language of Section 3(a)(5)(A) of the Exchange Act.  *See* 15 U.S.C. § 78c(a)(5)(A).  "[A]ny person engaged in the business of buying and selling securities. . . for such person's own account through a broker or otherwise" "as a part of a regular business" must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  15 U.S.C. §§ 78c(a)(5)(A) & (B), 78o(a)(1).  Under this clear and unambiguous statutory language, as well as controlling case law in the Eleventh Circuit interpreting it, the undisputed facts show that Defendant bought and sold securities for his own account through a large-scale and lucrative regular business and thus was a dealer.

Defendant has asserted a number of affirmative defenses that all fail as a matter of law, or relate only to the form of  relief to be granted, which is an issue to be decided only after liability is established.  Defendant's Third Affirmative Defense—a purported due process violation because allegedly he did not have "fair notice" that his conduct would be unlawful—fails as a matter of law because the statute is clear and its meaning well established by Eleventh Circuit law.  Defendant's Fourth Affirmative Defense of "estoppel" fails as a matter of law because estoppel is not a legally cognizable defense against the SEC's claim.  Defendant's Fifth Affirmative Defense, advice of counsel, fails because the undisputed facts show that Defendant never sought or obtained advice from counsel regarding his potential liability as an unregistered dealer.  In any event, advice of counsel is

not a legally cognizable defense to a strict liability claim such as a failure to register under Exchange Act Section 15(a).  Defendant's Sixth Affirmative Defense, statute of limitations, fails because he signed a tolling agreement that extended the statute of limitations, and the complaint was filed well within the allowable period.

Defendant's Seventh through Tenth affirmative defenses are not relevant to liability because they relate solely to remedies, such as injunctive relief, disgorgement, penalties and a penny stock bar.  If Defendant is found liable, the Court will address remedies at a later date.

## UNDISPUTED FACTS

### A.     Defendant's Business

Defendant was a resident of Miami, Florida from 2006 to 2018.  SMF 1.  During the time period of the Complaint, Defendant conducted business under the name "JMJ Financial," a "fictitious name" that he registered for his business in Florida in 2008.  SMF 4.  Defendant has maintained offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico.  SMF 5. The San Diego office, for example, had 7,400 square feet and accommodated 15 to 20 "individual offices" and cubicles.  *Id.*  Defendant has employed as many as 25 individuals at one time who each had employment contracts.  SMF 6.  Defendant's tax returns reported that Defendant paid employee compensation of $1,997,248 in 2014, $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017.  SMF 7.

### B.     Defendant Was Not Registered as a Dealer or Associated with A Registered Dealer

At no time has Defendant ever registered with the SEC as a dealer.  SMF 2.  He was associated with a registered broker-dealer before being barred by the Financial Regulatory Authority ("FINRA") in 2012.  SMF 3.  FINRA barred Defendant from associating with any

broker-dealer that is a member of FINRA because he failed to cooperate with a FINRA

investigation. *Id.*

**C.     Defendant's Regular Business Relies Upon the Purchase of Convertible Notes, Converting the Notes to Shares of Stock, and the Sale of Newly Issued Shares of Company Stock Into the Public Market**

Defendant's business model relied upon purchasing securities known as convertible notes

(sometimes bundled with warrants) on negotiated terms from penny stock companies (issuers),[2]

converting those notes into stock (or otherwise receiving repayment in stock), and selling the

newly issued stock into the public market.  SMF 8, 9, 13, 17.  Using his business name "JMJ

Financial," Defendant aggressively advertised to penny stock issuers that they could raise capital

by selling him convertible notes.  SMF 40-65.  More than 99% of Defendant's net proceeds came

from selling newly issued stock from convertible notes and bundled warrant agreements and not

from selling stock that he bought in the open market.  SMF 31.  The negotiated terms of the

convertible notes allowed Defendant to convert the notes into newly issued stock at a typical

discount of 30% to 40% below the lowest closing price of the stock during a specified number of

trading days before each conversion.  SMF 14.  The discount to the market price allowed

Defendant to realize significant profits from his convertible notes business.  *Id.*  Defendant

converted notes as soon as the resulting stock was eligible for sale, which was typically 6 months

after he bought them.  SMF 17.

Although each Convertible Note designated an amount of principal on its face,

---

[2] Penny stocks, also known as "microcaps," are not listed on a national securities exchange, trade over the counter ("OTC") at prices below $5, and are typically issued by companies with little to no revenue or assets. 15 U.S.C § 78c(a)(51); 17 C.F.R. § 240.3a51-1.2. "'Penny stocks' are low-priced, high risk equity securities.  The securities are frequently traded outside well-established trading markets."  *Hoxworth, et al. v. Blinder, et al.*, 74 F.3d 205, n.1 (10th Cir. 1996).

Defendant's practice was to pay the issuer a smaller amount at the note's inception and then pay additional amounts in the future. SMF 20. This approach allowed Defendant to add to his position in an issuer's convertible notes without having to negotiate and close on new contract language each time. *Id.*

To support, conduct, and develop his convertible notes business, Defendant developed proprietary software at a cost of more than $3 million. SMF 22. A specific piece of software called "the mainframe" managed the business's penny stock issuer customers. SMF 23. As one of Defendant's employee explained, the mainframe performed customer management functions, including tracking "existing portfolio companies" and "potential companies and our interactions and relationships as we went through a relationship-building process." *Id.* Defendant also had a highly accurate accounting database that organized and tracked the performance of his convertible notes. SMF 24.

## D. Defendant Held Itself Out to the Public as Being in the Business of Buying and Selling Securities

Defendant actively marketed his business in a variety of ways to both existing and new potential penny stock issuer clients to solicit them to sell him convertible notes. SMF 40-65. This marketing strategy included: operating a website describing his business operation (www.JMJfn.com) [SMF 43-44]; maintaining a Twitter account (@JMJ Financial) that advertised Defendant's convertible notes business [SMF 45]; using email campaigns to solicit issuers [SMF 63]; developing a "firm brochure" describing the convertible notes business [SMF 41]; issuing press releases about Defendant on his website and through wire services [SMF 53, 61]; attending and sponsoring industry conferences to reach issuers [SMF 50-51]; sponsoring Defendant's own conferences, for which Defendant paid all of the attendees expenses [SMF 57-58]; and providing "JMJ Financial" branded promotional items to potential issuer clients. SMF

65.  Defendant had personnel dedicated to marketing his convertible notes business, and he paid

finders' fees to third parties who brought him new issuer clients.  SMF 46-48, 56.

Defendant's website advertised his QuickLoan and Bridge Loan programs, the platforms

through which the business purchased convertible notes from publicly-traded issuers.  SMF 43.

The website advertised Defendant's business as one that is engaged in "convertible debentures"

and "registered equity financings" with publicly-traded companies.  *Id.*  The website also stated

that "Defendant has placed over $60 million in the last five years, closing transactions with over

70 public companies in 2015 alone."  *Id.*  The website included press releases that advertised

Defendant's convertible notes business and were also intended to reach existing and potential

convertible note issuers.  SMF 44.

Defendant sent emails and an "e-Newsletter" to existing and potential issuer clients

soliciting them to sell convertible notes to JMJ.  SMF 64.  Defendant used his Twitter account to

promote the "e-Newsletter."  *Id.*

Defendant hired at least six employees to solicit issuer clients directly to sell convertible

notes to JMJ.  SMF 46-47.  Defendant paid these employees commissions and bonuses based

upon the number and size of the convertible notes that they purchased for JMJ.  SMF 48.

Software known internally as "the screener" helped these employees screen public filings to

identify potential borrowers.  SMF 49.  The screener had the capability to track every publicly-

traded company in the SEC's EDGAR database and Defendant's employees contacted hundreds

of these issuers.  *Id.*

Defendant sponsored, and personally attended along with his employees, microcap

industry conferences at which they solicited issuer clients to sell Defendant convertible notes.

SMF 50.  For example, in 2016, Defendant sponsored six different conferences focused on the

convertible notes business. *Id.* Defendant also served as a speaker at industry conferences about his business. SMF 51. Defendant promoted conference sponsorships on Twitter by posting pictures of his booths and otherwise advertising his interest in convertible notes and offered JMJ-branded promotional items at his conference booths. SMF 52.

Defendant also used outside individuals and entities to help identify and refer potential issuer clients to the business. SMF 54. Defendant referred to the individuals as "brokers and finders," and he used the term "partners" for service providers, such as law firms or accounting firms, that steered issuer clients to JMJ. *Id.* Defendant paid commissions to these brokers and finders who helped refer issuer clients to his convertible notes business. SMF 56. On April 13, 2015, Defendant hosted a dinner at Nobu Restaurant in Las Vegas for 24 brokers and finders. SMF 55.

Defendant held a "Partner Seminar" on August 14, 2015 at the Wynn Hotel in Las Vegas. SMF 57. Defendant held a "Broker and Finder Seminar" on April 8, 2016 also at the Wynn Hotel where Defendant covered all expenses of the invited attendees, including the cost of their accommodations and airfare. SMF 58, 61. At both events, Defendant made a presentation to the participants urging them to refer issuers to Defendant that were looking to raise capital by selling convertible notes. SMF 59. Defendant's presentations included a notarized affidavit of his CFO (Conrad Nagel) stating that Defendant had "in excess of $20,000,000 in liquid cash and cash equivalents that is immediately available for investment into small cap emerging companies." *Id.* JMJ posted information and pictures on Twitter about the Las Vegas seminars that he held. SMF 60. Defendant similarly advertised in press releases that he "committed $20 million" to "unsecured investments" in microcap companies in both 2015 and 2016. SMF 53.a & b.

Defendant took business-related deductions of $103,399, $101,701 and $67,407 on his

2014, 2015, and 2016 federal tax returns for the costs of sponsoring and sending employees to these industry conferences as well as sponsoring JMJ-branded conferences.  SMF 62.

E.    **The Volume and Profit From Defendant's Convertible Note Business Was Substantial**

Between July 2010 and April 2018, Defendant bought more than 272 convertible notes with 201 different issuers.[3]  SMF 26.  To purchase the notes, and related warrants, Defendant made payments to the issuers totaling approximately $52 million.  SMF 27.  Defendant converted these notes on 2,414 occasions and received more than 38 billion shares of newly issued stock directly from the issuers.  SMF 28.  He sold those shares into the market through more than 16,000 transactions for gross proceeds of approximately $93.5 million.  SMF 29.

During the period March 24, 2014 through January 31, 2018, Defendant's net proceeds from selling approximately 33 billion shares of stock converted from notes, and warrant agreements bundled with the notes, totaled approximately $34 million.  SMF 30.  Sixty-two percent (62%) of these net proceeds were from selling stock converted from notes; 17% were from selling stock converted from warrants bundled with notes; 14% were from selling stock received from issuers as payment for outstanding note balances where the parties did not employ the conversion mechanism of the notes (also known as "settlements"); and 6% were from selling stock from "bonuses" associated with notes.  SMF 31.  Less than one percent of these net proceeds were from stock purchased in the open market.  *Id*.  The vast majority of Defendant's net proceeds derived originally from or were tied to his acquisition of convertible notes.

Defendant had net income of approximately $33 million during this period after

---

[3] Defendant purchased other convertible notes during the period, but they are not included in this description because Defendant did not sell stock from those issuers during the period March 24, 2014 through January 31, 2018.

accounting for proceeds from original issue discounts, interest, and penalties as well as write-offs and other losses.[4] SMF 32.

Defendant stated that "50 to 100 percent would be a reasonable … estimate" of Defendant's profit margin on convertible notes (*i.e.*, the ratio of Defendant's profit from a convertible note to his acquisition cost).  SMF 33.  Despite testifying in 2019 that he had "essentially no interest" in the convertible note business going forward [SMF 34], Defendant continues to engage in the business of buying and selling securities.  SMF 35.  As recently as June and July 2020, Defendant sold the stock of Blink Charging Co. that Defendant obtained from a Convertible Note that he purchased in October 2017.  *Id*.  Defendant's total proceeds from these sales exceeded $13.76 million.  *Id*.

## F.    The Stock That Defendant Distributed to the Public From Convertible Notes Was Newly Issued and Came Directly From Defendant's Issuer Clients

When Defendant exercised his right to convert the notes to stock, each penny stock company directly issued Defendant new stock that had not previously traded in the market.  SMF 37.  Defendant knew that the stock was not publicly traded until he "introduce[d] it to the market."  *Id*.  Defendant rarely bought stock in the open market.  SMF 31.

Issuers generally use transfer agents to record, track, and effectuate each corporate issuance of new stock.  SMF 38 n.3.  Defendant's practice when purchasing a convertible note was to have the issuer execute a letter to his transfer agent reserving a certain amount of authorized, but unissued, shares that could be issued to Defendant upon conversion of the note.  SMF 38.  These letters typically stated that the transfer agent should reserve "such number of

---

[4] In *Liu v. SEC,* 140 S. Ct. 1936, 1940, 1942 (2020), the Supreme Court found that "legitimate" business expenses should be deducted from profits to determine the disgorgement amount.  Should the Court find Defendant liable, the SEC will deduct Defendant's legitimate business expenses from any request for disgorgement during the remedies phase of this case.

shares that has a market value equal to at least five times the outstanding Note balance." *Id.*

These practices enabled Defendant, during the period March 24, 2014 and January 31, 2018, to sell approximately 33 billion shares of newly issued stock to the public.

**G.    The SEC Did Not Make Any Representations to Defendant About Section 15(a)(1) of the Exchange Act**

Defendant never contacted the SEC to inquire whether he needed to register as a dealer under Exchange Act Section 15(a)(1), and the SEC never made any representations to him about that statute.  SMF 72.

**H.    Defendant Used the Means and Instruments of Transportation and Communication in Interstate Commerce and of the Mails**

In connection with the Defendant's convertible notes business, he and his employees regularly used the means and instruments of transportation and communication in interstate commerce and of the mails.  This included soliciting issuers through a website, Twitter, email campaigns, and interstate telephone calls as well as conducting securities transactions, including selling stock into the public market, over the telephone and via the internet.  SMF 36.

## ARGUMENT

**A.    Governing Law**

**1.    Summary Judgment Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court should enter summary judgment where, as here, the movant demonstrates that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must be material and genuine.  *Anderson*,

477 U.S. at 248.  On a motion for summary judgment, the evidence and the factual inferences arising from the evidence are construed in the light most favorable to the non-moving party. *Flava Works, Inc. v. City of Miami*, 609 F.3d 1233, 1236 (11th Cir. 2010).

The party opposing the motion for summary judgment, however, may not simply rest upon mere allegations or denials of the pleadings and factual statements made in support of the motion.  *Celotex*, 477 U.S. at 322-323; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F.App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## 2.   The Exchange Act and Case Law Make Clear What a Dealer Is and Require that Dealers Register with the SEC

In interpreting any statute, courts begin with the plain language of the statute itself.  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990).  "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1314 (11th Cir. 2016) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations omitted)).

Section 15(a)(1) of the Exchange Act makes it unlawful for anyone who is a dealer to use the mails or interstate commerce to engage in or attempt to induce the purchase or sale

of securities unless the dealer is registered with the SEC.[5]  15 U.S.C. § 78o(a)(1).  Those

who buy and sell securities for their own account as part of a regular business must register

with the SEC as securities dealers.  15 U.S.C. §§ 78c(a)(5)(A) & (B).  This provision is an

essential part of securities regulation.  *See Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994)

("The broker-dealer registration requirement serves as the 'keystone of the entire system of

broker-dealer regulation.'") (citation omitted).

Section 3(a)(5)(A) of the Exchange Act defines "dealer" as "any person engaged in

the business of buying and selling securities . . . for such person's own account through a

broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).  Section 3(a)(5)(B) provides an exception for

persons "not engaged in the business of dealing."  15 U.S.C. § 78c(a)(5)(B).  That section

provides that persons are not dealers if they buy and sell for their own account, but only if

they do so "*not as a part of a regular business*."[6]  *Id.* (emphasis added).

---

[5] Section 15(a)(1) provides:

It shall be unlawful for any broker or dealer which is either a person other than a
natural person or a natural person not associated with a broker or dealer which is a
person other than a natural person (other than such a broker or dealer whose
business is exclusively intrastate and who does not make use of any facility of a
national securities exchange) to make use of the mails or any means or
instrumentality of interstate commerce to effect any transactions in, or to induce
or attempt to induce the purchase or sale of, any security (other than an exempted
security or commercial paper, bankers' acceptances, or commercial bills) unless
such broker or dealer is registered in accordance with subsection (b) of this
section.

[6] Section 3(a)(5)(B) provides:

*Exception for Person Not Engage In the Business of Dealing.*  The term "dealer" does not
include a person that buys or sells securities (not including security-based swaps, other
than security-based swaps with or for persons that are not eligible contract participants)
for such person's own account, either individually or in a fiduciary capacity, but not as a
part of a regular business.

12

The relevant statutes are unambiguous, and case law has applied them to describe what constitutes operating a business of being a dealer.  The Eleventh Circuit has held that being in the "business" of a dealer means operating "[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*."  *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) (emphasis in original).[7]

In *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1279 (S.D. Fla. 2020), the district court granted summary judgment on a Section 15(a)(1) claim for failure to register where the defendant operated a business of buying aged corporate debt from creditors, negotiating with the corporate debtors to obtain repayment in the form of deeply discounted stock, and selling the newly issued stock into the public market.  The court stated, "the centerpiece to [the definition of dealer] is the word 'business,'" and found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer."  *Id.* at 1272.

Other cases hold the frequency and regularity of buying and selling securities demonstrates that one is engaged in the securities business as a dealer.  *See Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) (defendant was a dealer because

---

[7] Although *Big Apple*, 783 F.3d at 809, was construing the definition of "dealer" for purposes of registration of securities under Section 5 of the Securities Act of 1933 [15 U.S.C. § 77e] ("Securities Act"), as this Court has already found, the Eleventh Circuit's analysis in *Big Apple* is applicable to this case, which involves registration of dealers under Section 15(a)(1) of the Exchange Act.  *See SEC v. Keener*, 1:20-cv-21254-BLOOM/Louis, 2020 WL 4736205, at *5 n.2 (S.D. Fla. Aug. 14, 2020) (Dkt. #29 at 8) (rejecting Defendant's contention that *Big Apple* does not apply).  Indeed, the definitions of "dealer" under the Securities Act [Section 2(a)(12), 15 U.S.C. § 77b(a)(12)] and under the Exchange Act [Section 3(a)(5)(A), 15 U.S.C. § 78c(a)(5)(A)] both focus on whether the person is "in the business" of transacting in securities.  As this Court noted, the Eleventh Circuit in *Big Apple* found that "the definition of dealers in 15 U.S.C. § 77b(a)(12) and 15 U.S.C. § 78c(a)(5)(A) are very similar," and therefore can be analyzed in the same way.  *Id.* (quoting 783 F.3d at 809 n.11).

it purchased many church bonds for its own account as a part of a regular business and sold some of them);[8] *SEC v. River North*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (courts construing the term dealer generally require a "certain regularity of participation in securities transactions"); *accord SEC v. Fierro, et al.*, No. 20-2104 (MAS) (DEA), 2020 WL 7481773, at *4 (Dec. 18, 2020).

Second, courts have relied on a defendant's practice of making a profit not from buying stock in the market and selling only after market prices increased (like a trader), but rather from buying newly issued stock directly from the issuer and then reselling it at a marked-up price, as underwriters do. *See, e.g., River North*, 415 F. Supp. 3d at 858-59 (finding it "particularly significant" that…like an underwriter, River North purchased stocks at a discounted price directly from numerous issuers…(instead of purchasing stocks already in the marketplace, like a trader)" and "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price") (citing *Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sep. 2, 1992) ("Unlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid.")); *Almagarby*, 479 F. Supp. 3d at 1272 ("It is undisputed that Defendants purchased securities from Issuers at deep discounts and sold them back on the market for profit"). Section 15(a)(1) does not require a showing of scienter to establish a violation[9] because

---

[8] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[9] *See Corporate Relations Group*, No. 6:99CV1222ORL28KRS, 2003 WL 25570113, at *17 (M.D. Fla. Mar. 28, 2003); *SEC v. United Monetary Servs. Inc.*, No. 83-3540-CIV-Paine, 1990 WL 91812, at *8 (S.D. Fla. May 18, 1990); *accord SEC v. Novus Tech., LLC*, No. 3:07-CV-235-TC, 2010 WL 4180550, at *12 (D. Utah Oct. 20, 2010); *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003).

it imposes strict liability. *SEC v. Merchant Capital*, 311 Fed. Appx. 250, 252 (11th Cir. 2009). The SEC need only show that a defendant *functioned* as a "dealer" as the term is defined in the Exchange Act, regardless of the person's intent, to establish a violation.

**B.      The Undisputed Facts Show That Defendant Was a Dealer in Securities, Was Not Registered, and Thus Violated Section 15(a)(1)**

**1.      Defendant's Regular Business Was to Acquire and Sell Securities for Profit**

The undisputed facts establish that Defendant engaged in "[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*." *Big Apple*, 783 F.3d at 809. It is undisputed that Defendant maintained a large office in San Diego, California and, with his other offices, including one in this district, had as many as 25 employees and contractors. SMF 5-6. Defendant paid these individuals collectively $1,997,248 in 2014, $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017. SMF 7. Defendant employed in-house accountants and attorneys to support his convertible notes business. SMF 6. His business created, operated, and maintained a proprietary computer system, which cost $3 million, that was designed to find convertible notes for sale, manage the process of buying and selling them, and account for them after he converted them into common stock and sold them into the public market. SMF 22-24.

As many business enterprises do, Defendant advertised, promoted, and continued to develop his business. He did so through various means that were all designed to solicit issuer clients to sell him convertible notes. For instance, Defendant operated a website and a Twitter account through which he advertised his convertible notes business. SMF 43-45. He also published and distributed press releases advertising his business, as well as a JMJ-branded newsletter that advertised that he was operating a commercial enterprise engaged in the purchase of convertible notes. SMF 53, 61.

15

Further, Defendant hired employees to find and solicit issuers to sell him convertible notes and paid them success-based compensation, including commissions and bonuses tied to the number and size of convertible notes they obtained for JMJ.  SMF 46-48.  Defendant sponsored, and he and his employees attended, third-party conferences at which they solicited issuers in person.  SMF 50.  Defendant also sponsored his own conferences for "brokers and finders" or "partners" who helped him identify issuers willing to sell him convertible notes.  SMF 57-58; *see Almagarby*, 479 F. Supp. 3d at 1272 (clear indication that defendants were operating as dealers where they "went so far as employing finders" to solicit issuers to sell convertible notes to enhance their pecuniary gain).[10]  At these conferences, Defendant personally made PowerPoint presentations in which he represented that he had $20 million "committed" to purchasing convertible notes from penny stock issuers.  SMF 59.

These undisputed facts demonstrate that Defendant engaged in the business of buying and selling securities for his own account and that this was part of his regular business.  In *Big Apple*, 783 F.3d at 809-810, the Eleventh Circuit held that "where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer."  This case is even stronger.  In *Big Apple*, the defendant on a day-to-day basis "provided investor relations and public relations services to microcap companies."  *Big Apple,* 783 F.3d at 790.  The Eleventh Circuit found the public relations firm in *Big Appl*e to be a dealer because it received payment in the form of discounted stock directly from the issuer, which it then sold in the public market.  *Id*. at 809-10.  By contrast, Defendant's entire business

_____

[10] Defendant provided additional services to issuers as part of its convertible note business.  He consulted with them on debt consolidation where the issuer had sold convertible notes to multiple holders.  SMF 69.  Defendant also advanced funds to issuers by directly paying lawyers and auditors working on issuers' SEC filings to ensure that they were current.  SMF 66-67.

model and his day-to-day operations focused almost entirely upon finding issuer clients that were offering securities (convertible notes) to buy, buying the notes, converting them to stock, and then selling the newly issued stock in the public market. *See* SMF 8-17; *see also SEC v. Offill*, Case No. 3:07-CV-1643-D, 2012 WL 246061, at *8-9 (N.D. Tex. Jan. 26, 2012) (granting summary judgment on a Section 15(a)(1) claim for failure to register and holding that the defendant "bought and sold securities as part of his regular business, making him a dealer under 15 U.S.C. § 78c(a)(5)").

Moreover, the "sheer volume" of Defendant's convertible notes business, as well as the significant profits that it generated, further establish that he is a dealer. *See Almagarby*, 479 F. Supp. 3d at 1272. Defendant sold approximately 33 billion shares of stock from convertible notes and warrant agreements bundled with the notes during the period of March 24, 2014 through January 31, 2018. SMF 30. These sales resulted in approximately $34 million in net proceeds and approximately $33 million in net income. SMF 30, 32. In June and July 2020, while this matter was pending, Defendant continued his commercial enterprise by selling approximately $13.76 million worth of stock from a convertible note. SMF 35. While Defendant might quibble over the amount of the profits, he does not dispute that he was in business to—and in fact did—make a profit from buying convertible notes and selling stock from them.

As this Court noted in denying Defendant's motion to dismiss, Defendant's "level of participation in purchasing and selling securities involve[d] more than a few isolated transactions." *SEC v. Keener,* 1:20-cv-21254-BLOOM/Louis, 2020 WL 4736205, at *4 (S.D. Fla. Aug. 14, 2020) (Dkt. #29 at 8) (internal quotation marks omitted) (quoting *Sodorff, Jr.*, 1992 WL 224082, at *4-5). The court in *Almagarby* found defendants were engaged in even less

securities trading but were still dealers.  479 F. Supp. 3d at 1272 (finding that "the sheer volume of the number of deals and the large sums of profit Defendants generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that Defendants were engaged in the 'business' of buying and selling securities") (citing *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (defendant "was a dealer because his 'high level of activity ... made him more than an active investor'")).

### 2.    Defendant's Profits Came From Purchasing Deeply Discounted Stock Directly From Issuers and Promptly Reselling It

The second aspect of Defendant's business that demonstrates he was a dealer is that his profits came, not from buying stock in the open market and reselling when prices increased, but rather from purchasing deeply discounted stock directly from his issuer clients and then promptly reselling in the marketplace.  He generally made his profit from the difference between the discounted conversion price and the prevailing stock price upon conversion and sale.  SMF 14. This is similar to the business of the defendants that the courts found to be dealers in *Big Apple*, 783 F.3d at 809-10, and *Almagarby*, 479 F. Supp. 3d at 1272.  *See also River North*, 415 F. Supp. 3d at 858-59 (denying motion to dismiss and finding it "particularly significant that … like an underwriter, River North: (1) purchased stocks at a discounted price directly from numerous issuers … (instead of purchasing stocks already in the marketplace, like a trader) and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price").[11]

---

[11] Note that, unlike Defendant, Almagarby did not have a place of business outside of his home and did not have any employees, yet the Court still concluded that he was a dealer based largely upon the "sheer volume" of his business, including the profits he earned from selling newly issued shares into the public market.  *See Almagarby*, 479 F. Supp. 3d at 1268.

**3.      Defendant Was Not Registered, and He Engaged in Securities Transactions in Interstate Commerce**

It is undisputed that Defendant has never registered with the SEC as a dealer.  SMF 2.

Nor was Defendant associated with entities that were registered with the SEC as dealers because

he had been barred by FINRA in 2012.  SMF 3.  Where, as here, the undisputed facts show that,

under the plain language of the Exchange Act, Defendant was a dealer who conducted his

securities transactions in interstate commerce[12] but was not registered, summary judgment

should be entered against him for violating Section 15(a)(1) of the Exchange Act.

**C.      The SEC Guide Does Not Excuse Defendant From the Registration Requirements of the Exchange Act**

Earlier in this case, Defendant cited long-standing dealer guidance provided by the SEC's

Division of Trading and Markets in an effort to escape liability for his dealer activities.

Specifically, Defendant relied upon the *Guide to Broker-Dealer Registration*[13] ("SEC Guide"),

to support his claim that he was not a dealer.  *See, e.g., Keener*, 2020 WL 4736205, at *3

("Defendant contends that he is a trader, and not a dealer, based on various factors mentioned in

the SEC's Guide to Broker-Dealer Registration.").  Defendant's arguments are unavailing for

two principal reasons.

First, the definition of a dealer is explicit and clearly set forth in the Exchange Act and in

case law such as *Big Apple.*  In interpreting any statute, courts begin with the plain language of

---

[12] Exchange Act Section 15(a)(1) [15 U.S.C. 78o(a)(1)] requires that the transactions "make use of the mails or any means or instrumentality of interstate commerce."  Here, it is not disputed that Defendant and its employees used the telephone and the internet to solicit and purchase the convertible notes, convert them to shares, and sell the shares into the public market. SMF 36.

[13] *See Guide to Broker-Dealer Registration*, U.S. Securities and Exchange Commission, Division of Trading and Markets, April 2008, https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html (last visited August 13, 2020).

the statute itself. *Kaiser*, 494 U.S. at 835; *In re Bayou Shores,* 828 F.3d at 1314.

The SEC Guide merely walks through the statutory dealer framework involving broker and dealer registration in an effort to aid those who may be required to register. But it does not supplant the plain language of the Exchange Act or the Eleventh Circuit's holding in *Big Apple*. In fact, the SEC Guide specifically warns readers in bold-face type "**CAUTION – MAKE SURE YOU FOLLOW ALL LAWS AND RULES,**" advises them that the SEC cannot act as the reader's attorney, and states that the reader may wish to consult an attorney with respect to whether they are required to register as dealers. SEC Guide, at 3.

The SEC Guide lists factors that "are merely examples of activity or actions that might render one a dealer." *Almagarby*, 479 F. Supp. 3d at 1273 (noting that there is nothing to indicate that such factors "are an exclusive or exhaustive checklist that creates a burden of proof for the SEC)." *Id.* As this Court stated in denying Defendant's motion to dismiss, those questions or factors "are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion" and "while factors are relevant for assessing and ultimately concluding whether a party is a dealer, they do not supplant the statute's plain language, especially at this stage." *Keener*, 2020 WL 4736205, at *4. Although the Court made that statement at the pleadings stage of the case, there are no facts in the record that compel a different result now.

In short, the plain language of the statute and the controlling precedent in the Eleventh Circuit that construes that language govern the determination of whether Defendant was acting as a dealer. *See* 15 U.S.C. §§ 78c(a)(5)(A) & 79o(a)(1); *Big Apple*, 783 F.3d at 809-810. Under those authorities, as a matter of law, Defendant is a dealer who was required to register with the SEC.

Second, even if the Court were to consider the activities listed in the SEC Guide, as it did in rejecting Defendant's motion to dismiss, they leave no genuine dispute that Defendant is a dealer. The SEC Guide identifies activities that could require a participant to register as a dealer, SEC Guide, at 5, and Defendant unquestionably engaged in some of them. As the Court held: Defendant "allegedly operated a website advertising his business to issuers, he hired employees to solicit issuers who were willing to sell convertible notes to him, he sponsored conferences in which he and his employees solicited penny stock issuers in person, and he made PowerPoint presentations at conferences representing that he had $20 million 'committed' to purchase convertible notes from issuers." *Keener*, 2020 WL 4736205, at *4. Nothing has changed since the Court wrote those words, except that it now has undisputed facts before it with greater detail about how Defendant held himself out to the public as being in the business of buying and selling securities. SMF 40-65.

In short, even applying the factors set forth in guidance on the SEC's website, there is no dispute that Defendant engaged in the business of buying and selling securities—convertible notes and stock—and was required to register with the SEC.

**D.     Defendant's Third, Fourth, Fifth and Sixth Affirmative Defenses Fail as a Matter of Law, and Summary Judgment Should Be Entered Against Defendant on Them**

  **1.     Defendant's Due Process or Fair Notice Defense (Third Affirmative Defense) Is Invalid as a Matter of Law**

Defendant's Third Affirmative Defense is that the SEC's claim is "barred by due process, in whole or in part, where Defendant had no fair notice that his conduct could be unlawful." Dkt. #30, Affirmative Defense 3. Specifically, Defendant claims that despite the broad language of the dealer registration statute, "no trader in Mr. Defendant's position has ever been required to register with the SEC" and "the SEC has never interpreted the dealer registration statute to

encompass the type of conduct at issue in this case."  Dkt. #14 at 4; Dkt. #47 at 2.  Defendant

also seems to claim that the SEC failed to provide clear guidance on the meaning of the federal

statute requiring dealers to register with the SEC.  Dkt. #14 at 7, 12, and 14.  These arguments all

fail, as a matter of law, and therefore the Court should enter summary judgment against

Defendant on his Third Affirmative Defense.[14]

### a.   Defendant's Challenge to the Language of the Dealer Registration Statute Fails

Defendant claims that he was denied "fair notice" and had no way to know that his

conduct was illegal or that he was required to register as a dealer pursuant to Section 15(a)(1) of

the Exchange Act.  A "fair notice" claim necessarily challenges the language of a statute on the

basis of vagueness.  *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).  "To

sustain such a challenge, the movant 'must prove that the enactment is vague "not in the sense

that it requires a person to conform his conduct to an imprecise but comprehensible normative

standard, but rather in the sense that no standard of conduct is specified at all.  Such a provision

simply has *no* core.""  *City of South Miami v. DeSanti*s, 408 F. Supp. 3d 1266, 1303 (S.D. Fla.

2019) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494

n.7 (1982)) (emphasis in original).

If Defendant now contends that Exchange Act Section 15(a)(1) or the definition of dealer

in Section 3(a)(5) are unconstitutionally vague—an argument that he declined to make in his

---

[14] A Constitutional Due Process or fair notice challenge to a statute is a legal question to be decided by the Court, not a jury.  *United States v. House*, 684 F.3d 1173, 1207 (11th Cir. 2012) ("[T]he issue of whether a [law] is void for vagueness is a question of law for the court to determine," which means that "defendants [are] not entitled to a 'fair warning' instruction to the jury") (citing *United States v. Paradies*, 98 F.3d 1266, 1284 (11th Cir. 1996).  Defendant's challenges to the dealer registration statute are not issues of fact for the jury to consider, but are questions of law that the Court may decide pursuant to a motion for summary judgment.

motion to dismiss, as the Court specifically noted—that argument fails.  *Keener*, 2020 WL 4736205, at *5. "The Supreme Court has explained that a statute is void for vagueness (1) if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute,' and (2) if 'it encourages arbitrary and erratic arrests and convictions.'" *City of South Miami*, 408 F. Supp. 3d 1266, 1303 (quoting *Papachristou,* 405 U.S. at 162).

The language of Exchange Act Section 15(a)(1)—the dealer registration statute—and Section 3(a)(5)(A)—the definition of the term dealer—are clear and unambiguous, and Defendant can point to no case holding otherwise.  The operative terms in those sections— "buying and selling securities," "business," and "own account"—are common, everyday terms that clearly give a "person of ordinary intelligence" fair notice that they may be a dealer and required to register with the SEC.  Certainly, based upon these clear terms, Defendant has not and cannot establish that the statute itself fails to provide fair notice or contains "no standard of conduct or rule at all."  *See City of South Miami*, 408 F. Supp. 3d at 1303; *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015).  With respect to statutory language, "we can never expect mathematical certainty from our language," but "when the words of a challenged statute are marked by flexibility and reasonable breadth, rather than meticulous specificity, the Supreme Court has upheld the challenged law."  *City of South Miami*, 408 F. Supp. 3d at 1303 (internal quotation marks omitted) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

Defendant can make no showing that the dealer registration statute itself is vague, ambiguous, or lacks clarity.  In addressing Defendant's due process and "fair notice" claim at the motion to dismiss stage—that he had no way to know his conduct was unlawful—this Court noted that Defendant failed to consider "the express language of the statute, decisions from this

circuit applying the definition of dealer, and the SEC Guide itself which sets forth instances in which a party can be deemed a dealer." *Keener,* 2020 WL 4736205, at *5.  Section 15(a)(1) of the Exchange Act has been law for decades and the SEC has applied it throughout that time in this Circuit and others.[15]  Other courts within this Circuit have interpreted and applied the plain, unambiguous term "dealer" to which Defendant claims he lacked fair notice.  *See Big Apple*, 783 F.3d at 809-10; *Almagarby*, 479 F. Supp. 3d at 1272.

###### b.  The SEC Is Not Required to Interpret the Statutes It Enforces

Defendant has alleged that the SEC failed to provide adequate guidance to the market (Dkt. #47 at 1-2) with respect to the dealer registration statute, suggesting that the SEC has a duty to interpret the statutes it enforces.  This claim too should fail.  When challenging an agency's enforcement action on due process grounds with respect to a federal statute, Defendant must establish that the language of the statute itself did not provide fair notice.  "The relevant question is not whether [defendant] had fair notice of the [agency's] interpretation of the statute, but whether [the defendant] had fair notice of what the statute itself requires." *Wyndham*, 799 F.3d at 253-54.  "As a necessary consequence, [defendant] is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute." *Id.*, 799 F.3d at 255. Here, Defendant "was not entitled to know with ascertainable certainty the [SEC's] interpretation of what practices required" registration pursuant to Section 15(a)(1) of the Exchange Act, but rather he was entitled to know only what the plain language of the statute required. *Id.*  "The

---

[15] *See Eastside Church*, 391 F.3d at 362; *Ridenour*, 913 F.2d 515; *Offill*, 2012 WL 246061*; Sodorff*, 1992 WL 224082; *see also Ironridge Global Partners, LLC*, Exchange Act Rel. No. 81443, 2017 WL 3588037 (Aug. 21, 2017) (settled action for failure to register pursuant to Section 15(a)(1) where buying and selling billions of shares in connection with financing services for microcap issuers); and *IBC Funds, LLC*, Exchange Act Rel. No. 77195, 2016 WL 683557 ( Feb. 19, 2016) (settled action for violating Section 15(a)(1) by operating as a dealer and failing to register).

court not the agency is the ultimate arbiter of the statute's meaning." *Id*. at 251; *see also House*, 684 F.3d at 1207.  Hence, the Court should reject any argument that the SEC was required to or failed to provide guidance with respect to the dealer registration statute.

Relatedly, an agency is not required to interpret every provision of a statute through rulemaking before pursuing litigation.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947) ("the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency").  Here, where the terms of the statute are clear and the courts have applied the plain wording of the statute, Defendant's claim that the agency was required to do more before bringing this action must fail.

## 2. Defendant's Estoppel Defense (Fourth Affirmative Defense) Is Insufficient as a Matter of Law

Defendant's Fourth Affirmative Defense states, "[t]he Complaint is estopped, in whole or in part, from asserting claims inconsistent with the SEC's own published guidance and no-action letters."  Dkt. #30, Affirmative Defense 4.  In a discovery motion filed in this case, Defendant also argued that the SEC's claim against him violates his due process rights because "no trader in Mr. Defendant's position has ever been required to register with the SEC" and "the SEC has never interpreted the dealer registration statute to encompass the type of conduct at issue in this case."  Dkt. #47 at 2.  In effect, Defendant argues that the SEC is estopped from enforcing the law against him.

Defendant's argument is unavailing for several reasons.  First, for many years, the SEC has interpreted the dealer registration statute to encompass individuals and entities that, as a business, purchase large amounts of newly issued securities (sometimes at a discount) directly

from the issuer and then subsequently sell the shares into the public market.[16]

Second, even if the SEC had not previously proceeded in such a manner, it is not estopped from charging Defendant for his violations.[17] "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs., Inc.,* 467 U.S. 51, 60 (1984).  Indeed, the affirmative defenses of estoppel and waiver should only be applied against the government "in the most serious of circumstances" "upon a showing of affirmative misconduct by the government." *Rojas–Reyes v. I.N.S.,* 235 F.3d 115, 126 (2d Cir. 2000) (internal quotation marks omitted).  Defendant has not even attempted to make such a showing here.

Moreover, at least two circuits and a number of district courts have found that estoppel cannot be raised at all in SEC enforcement actions, stating that "the Commission may not waive the requirements of an act of Congress nor may the doctrine of estoppel be invoked against the Commission." *SEC v. Culpepper,* 270 F.2d 241, 248 (2nd Cir. 1959) (internal quotation marks omitted); *SEC v. Morgan, Lewis, and Bockius*, 209 F.2d 44, 49 (3rd Cir. 1953); *SEC v. Badian*, 2010 WL 1028256 at *2-3 (S.D.N.Y. 2010) (discovery denied as to affirmative estoppel defense against the SEC).[18]

---

[16] *See Ridenour*, 913 F.2d 515; *Offill*, 2012 WL 246061; *Sodorff*, 1992 WL 224082; *see also Ironridge Global Partners,* 2017 WL 3588037; and *IBC Funds, LLC,*  2016 WL 683557.

[17] *See also* Section 26 of the Exchange Act [15 U.S.C. § 78z] ("No action or failure to act by the Commission….shall be construed to mean that the particular authority has in any way passed upon the merits of or given approval to any security or any transaction….").

[18] *See also SEC v. Rivlin,* No. 99–1455, 1999 WL 1455758, at *5 (D.D.C. Dec.20, 1999) (citing *Culpepper* and granting SEC motion to strike defenses based on estoppel and waiver); *SEC v. Keating,* 1992 WL 207918, at *3 (C.D. Cal. 1992); *SEC v. Blavin,* 557 F. Supp. 1304, 1310 (E.D. Mich. 1983) ("[t]here is no estoppel against the SEC in enforcement actions.  The Government cannot be estopped from bringing an action in the public interest simply because of alleged misconduct by one or more of its agents.") (citations omitted), *aff'd,* 760 F.2d 706 (6th Cir.1985).

Third, even if the Court were to entertain such waiver and estoppel arguments, the undisputed facts demonstrate that they are without merit as a matter of law. "Even in circumstances where the doctrine of estoppel is applicable, the following elements, at least, must be established: that there was a 'definite' representation to the party claiming estoppel; that the latter 'relied on its adversary's conduct in such a manner as to change his position for the worse'; and that the reliance was 'reasonable.'" *Graham v. SEC*, 222 F.3d 994, 1008 (D.C. Cir. 2000) (citing *Community Health Servs.,* 467 U.S. at 59). Here, it is undisputed that the SEC never made any representations to Defendant regarding the dealer registration statute or that he relied upon any such representations. *See id*. (where no representations or opinions were issued to defendant, "SEC's failure to prosecute at an earlier stage [did] not estop the agency from proceeding once it finally accumulated sufficient evidence to do so"); SMF 72.

For all of the foregoing reasons, summary judgment should be entered against Defendant on his Fourth Affirmative Defense.

### 3. Defendant's Statute of Limitations Defense (Fifth Affirmative Defense) Is Invalid

Defendant's Fifth Affirmative Defense alleges that "[t]he Complaint is barred, in whole or in part, by the applicable statute of limitations." Dkt. #30, Affirmative Defense 5. The undisputed facts establish that this defense is baseless because the SEC's claim is timely. Different statutes of limitation ("SOLs") apply to the various remedies sought by the SEC. For penalties, 28 U.S.C. § 2462 sets a five-year SOL. For disgorgement in non-scienter claims such as that involved in the present case, the SOL also is five years, as set forth in Section 21(d)(8)(A)(ii) of the Exchange Act [15 U.S.C. § 78u(d)(8)(A)(ii)], as amended by Section 6501(a) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283

("NDAA"), effective January 1, 2021.[19]  The NDAA also amended the Exchange Act to provide a ten-year SOL for equitable remedies including injunctions and penny stock bars.  15 U.S.C. § 78u(d)(8)(B).

It is undisputed that Defendant entered into a one-year tolling agreement on March 27, 2019.  SMF 8 n.1.  That agreement specified that the parties would not count the period of March 7, 2019 through March 6, 2020 in any calculation of a SOL in this matter.  *Id.*  Removing that one year period from the SOL that would normally apply to the SEC's Complaint, which was filed on March 24, 2020, means that the SEC can seek disgorgement and a penalty for any conduct that occurred on or after March 24, 2014 and may seek an injunction and a penny stock bar for any conduct that occurred on or after March 24, 2009.  Accordingly, the SEC's claim (and all relief it seeks) is timely.  Summary judgment should be entered against Defendant on his Fifth Affirmative Defense.

### 4.  Defendant's Advice of Counsel Defense (Sixth Affirmative Defense) Fails as a Matter of Fact and Law

Defendant's Sixth Affirmative Defense states, "[t]he Complaint is barred, in whole or in part, where Defendant acted on the advice of counsel."  Dkt. #30, Affirmative Defense 6.  In his deposition, Defendant admitted that he had never sought or received advice from an attorney regarding his potential liability for operating as an unregistered dealer.  SMF 70-71.

But even if he had sought or received advice of counsel, the SEC's Section 15(a)(1) claim imposes strict liability and does not require any proof of scienter or intent to commit the violation.  *See supra* at 15.  In cases involving other violations for failure to register under the

---

[19] Section 6501(b) of the NDAA provides that "[t]he amendments made by subsection (a) shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act."  Therefore, the SOLs established by the NDAA apply to pending cases such as the present case.

securities laws, courts have held that advice of or reliance on counsel defenses are insufficient to avoid liability. *See SEC v. PV Enterprises*, No. 16-20542-Civ-Scola, 2016 WL 8808697, at *4 (S.D. Fla. Jun. 28, 2016) (in case involving failure to register securities under Section 5 of the Securities Act, "neither a good faith belief that the offers or sales in question were legal, nor reliance on the advice of counsel, provides a complete defense") (quoting *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999)). Even if Defendant had actually sought and received advice of counsel (which he did not), and could meet the factors to establish the defense,[20] that would only be relevant (if at all) to remedies, such as the amount of penalties to be imposed. *SEC v. Calmes*, No. 09-80524-CIV, 2010 WL 11505260, at *5 (S.D. Fla. Nov. 19, 2010). Therefore, summary judgment should be entered against Defendant on his Sixth Affirmative Defense.

## E.     Defendant's Remaining Affirmative Defenses Cannot Overcome the SEC's Claim Under Section 15(a)(1) of the Exchange Act[21]

Defendant's Seventh, Eighth, Ninth, and Tenth Affirmative Defenses are irrelevant to liability and, at most, relate solely to whether the SEC is entitled to various forms of relief

---

[20] "To succeed with a defense of good faith reliance on the advice of counsel, the defendant must show that 1) he fully disclosed all relevant facts to his counsel and 2) he relied in good faith on his counsel's advice." *United States v. Parker*, 839 F.2d 1473, 1482 n.6 (11th Cir. 1988); *SEC v. Huff*, 758 F.Supp.2d 1288, 1348-49 (S.D. Fla. 2010) (collecting cases). Obviously, Defendant can make neither showing because he did not consult an attorney about his potential dealer liability.

[21] Defendant's First Affirmative Defense merely purports to incorporate "defenses contained in his prior motions." This shotgun defense—which lacks sufficient particularity—fails because, as shown above, the purported defenses raised by Defendant are invalid or otherwise fail as a matter of law. Defendant's Second Affirmative Defense asserts that the Complaint fails to state a claim upon which relief can be granted. But in denying Defendant's motion to dismiss, the Court already ruled that Defendant is wrong on that score, and the SEC has shown above that the undisputed facts establish that the SEC is entitled to judgment as a matter of law on its claim.

including injunctive relief (Seventh Affirmative Defense), disgorgement (Eighth), a penny-stock bar (Ninth) and penalties (Tenth).  None of those constitutes a defense to liability, and therefore, these affirmative defenses cannot defeat the SEC's motion for summary judgment.

## CONCLUSION

There is no genuine issue of material fact that Defendant was a unregistered dealer and, therefore, violated Section 15(a)(1) of the Exchange Act.  Accordingly, the SEC respectfully requests that the Court grant summary judgment in its favor and against Defendant. [22] The SEC also respectfully requests that the Court grant summary judgment in its favor and against Defendant on his Third, Fourth, Fifth and Sixth Affirmative Defenses.

---

[22] If the Court grants the SEC's motion for summary judgment, the SEC will respectfully request that the Court set a briefing schedule to decide the appropriate remedies.

DATE:   August 13, 2021                    Respectfully submitted,

By:

_____/s/_____
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2021, I filed Plaintiff Securities And Exchange Commission's Motion for Summary Judgement and Incorporated Memorandum of Law through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

_____/s/_____
 Joshua E. Braunstein

**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**