UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

v.

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

                          Defendant.

CASE NO. 1:20-CV-21254-
BLOOM/LOUIS

ORAL ARGUMENT REQUESTED

**DEFENDANT JUSTIN W. KEENER'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.    Introduction .................................................................................................................. 1

II.   Facual Background ...................................................................................................... 4

    A.   Mr. Keener's Investments Generally ................................................................. 4

    B.   Mr. Keener's Investments in Convertible Notes ............................................. 4

    C.   The Marketplace of Investors and Registered Dealers .................................. 6

    D.   Mr. Keener Did not Offer Dealer Services ..................................................... 7

III.  Legal Standard ............................................................................................................. 8

IV.   Argument ..................................................................................................................... 8

    A.   Mr. Keener is Not a Securities Dealer Under the Exchange Act ...................... 8

       1.   The Definition of a Dealer ........................................................................ 8

       2.   Mr. Keener Does Not Meet the Definition of a Dealer ............................. 14

       3.   The SEC's Arguments to the Contrary Fail ............................................... 17

          a)   The Factors are Controlling .............................................................. 17

          b)   The Volume of Transactions is Not Relevant .................................... 19

          c)   Marketing Efforts Directed to Issuers Are Not Relevant ................. 20

          d)   The Features of Mr. Keener's Convertible Notes Are Not Relevant ........... 21

          e)   The Shares Newly Issued to Mr. Keener Upon Conversion Do Not Make Him an Underwriter ................................................................. 22

    B.   Due Process Bars the SEC's Claim ................................................................. 23

    C.   The SEC Cannot Obtain Disgorgement .......................................................... 25

    D.   The SEC Cannot Obtain Injunctive Relief ..................................................... 29

V.    Conclusion ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
   446 U.S. 680 (1980) ................................................................................................................30

*Abbott v. Abbott*,
   560 U.S. 1 (2010) ...................................................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................................................8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................................8

*CFTC v. Sidoti*,
   178 F.3d 1132 (11th Cir. 1999) ..............................................................................................27

*CFTC v. Southern Tr. Metals, Inc.*,
   894 F.3d 1313 (11th Cir. 2018) ..............................................................................................27

*Chapel Invs., Inc. v. Cherubim Ints., Inc.*,
   177 F. Supp. 3d 981 (N.D. Tex. 2016) ......................................................................10, 13, 15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984) ................................................................................................................10

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ................................................................................................................25

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1926) ................................................................................................................24

*Diebold Inc. v. Marshall*,
   585 F.2d 1327 (6th Cir. 1978) ...........................................................................................17, 25

*Donander Co. v. C.I.R.*,
   29 B.T.A. 312 (U.S. Bd. Tax Appeals, Nov. 8, 1933) ..............................................................9

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ................................................................................................................24

*Ford Motor Co. v. FTC*,
   673 F.2d 1008 (9th Cir. 1981) ................................................................................................23

*In re Haning,*
    252 B.R. 799 (M.D. Fla. 2000) ...........................................................................................14

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) ..........................................................................................*passim*

*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157 (2004).................................................................................................9

*PHH Corp. v. CFPB,*
    839 F.3d 1 (D.C. Cir. 2016) ...................................................................................25

*Pub. Employees' Ret. Sys. Of Miss. v. Merrill Lynch & Co.,*
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...................................................................10

*Quantum Cap., LLC v. Banco De Los Trabajadores,*
    Case No.: 1:14-cv-23193-UU, 2016 WL 10536988 (S.D. Fla. Sept. 8, 2016) ...................10

*Scott v. Harris,*
    550 U.S. 372 (2007)...............................................................................................17

*SEC v. Almagarby,*
    479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020).......................................................19

*SEC v. Bevil,*
    2020 WL 7048263 (D. Nev. Nov. 30, 2020) ........................................................27

*SEC v. Big Apple Consulting USA, Inc,*
    783 F.3d 786 (11th Cir. 2015) .........................................................................18, 19

*SEC v. Big Apple Consulting USA, Inc.,*
    No. 6:09–cv–1963–Orl–28GJK, 2011 WL 3753581 (M.D. Fla. Aug. 25, 2011) ...................18, 19

*SEC v. Federated All. Grp.,*
    No. 93-CV-0895E(F),1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) .........................13, 18

*SEC v. Feng,*
    935 F.3d 721 (9th Cir. 2019)..................................................................................13

*SEC v. Gane,*
    2005 WL 90154 (S.D. Fla. Jan. 4, 2005)...............................................................27

*SEC v. Gentile,*
    939 F.3d 549 (3rd Cir. 2019) .................................................................................29

*SEC v. Janus Spectrum LLC,*
    811 Fed. Appx. 432 (9th Cir. 2020).......................................................................27

*SEC v. Jones,*
    476 F. Supp. 2d 374 (S.D.N.Y. 2007)................................................................ 26, 28

*SEC v. Kramer,*
    778 F. Supp. 2d 1320 (M.D. Fla. 2011)..............................................................13

*SEC v. Mapp,*
    240 F. Supp. 3d. 569 (E.D. Tex. 2017) ...............................................................10

*SEC v. Mizrahi,*
    2020 WL 6114913 (C.D. Cal. Oct. 5, 2020) ......................................................28

*SEC v. Nat'l Presto Indus., Inc.,*
    486 F.3d 305 (7th Cir. 2007).............................................................................10

*SEC v. Perez,*
    2011 WL 5597331 (S.D. Fla. Nov. 17, 2011) ....................................................30

*SEC v. Pros Int'l, Inc.,*
    994 F.2d 767 (10th Cir. 1993) ...........................................................................30

*SEC v. Wyly,*
    56 F. Supp. 3d 260 (S.D.N.Y. 2014)..................................................................28

*Stokeling v. U.S.,*
    139 S. Ct. 544 (2019)..........................................................................................9

*Trinity Broad of Fla., Inc. v. FCC,*
    211 F.3d 618 (D.C. Cir 2000) ...........................................................................24

*Upton v. SEC,*
    75 F.3d 92 (2d Cir. 1996) ..................................................................................25

*Vaughn v. C.I.R.,*
    85 F.2d 497 (2d Cir. 1936) ..................................................................................9

**Statutes**

15 U.S.C. § 78c(a)(5)(A) .........................................................................................8

15 U.S.C. § 78c(a)(5)(B) .........................................................................................9

Securities Exchange Act of 1934 ...................................................................*passim*

**Other Authorities**

17 C.F.R. § 230.144................................................................................................22

Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges,* § 43-a (Supp. 1933) ...............9

Cont'l Grain Co., SEC No-Action Letter, 1987 WL 108902, at *1, 4 (Nov. 6, 1987) ..........................12

*In re David B. Havanich, Jr., et al.*
    SEC Release No. 935, 2016 WL 25746, at *11 (Jan. 4, 2016) ............................................29

Fairfield Trading Corp., SEC No-Action Letter, 1988 WL 233618, at *2 (Jan. 10, 1988).........................................................................................................................12

Fed. R. Civ. P. 56(a).........................................................................................................8

FINRA, Rule 2040.............................................................................................................16

H.R. Rep. No. 1383, 73d. Cong. 2d Sess. (1934) .............................................................10

Louis Dreyfus Corp., SEC No-Action Letter, 1987 WL 108160, at *2 (July 23, 1987) .......................12

Market Regulation, *Concerning Hedge Fund Activities in the U.S. Financial Markets* ...................12

Mary Jo White, "Enhancing Our Equity Market Structure," (June 5, 2014),
    https://www.sec.gov/news/speech/2014-spch060514mjw..............................................20, 21

Nat'l Council of Sav. Instit., SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986)...............................................................................................................................14

Nat'l Counil of Sav. Instit., SEC No-Action Letter, 1986 WL 67129, at *2 (June 26, 1986)...............................................................................................................................11

Proposed Rule, SEC Release No. 34-46745, 2002 WL 31428622, at *6 (Oct. 30, 2002).................................................................................................................................12, 13

Rule 144 Holding Period and Form 144 Filings, SEC Release No. 33-10911, 2020
    WL 7701214 (Dec. 22, 2020)...........................................................................................23

SEC Release No. 33-7390, 1997 WL 70606, at *3 (Feb. 28, 1997) ...................................22, 23

SEC Release No. 34-11742, 1975 WL 163406, at *3 (Oct. 15, 1975) ..............................11, 20

SEC Release No. 34-27017, n. 17, 54 Fed. Reg. 30013, 30015 (July 18, 1989) .................14

SEC Release No. 34-40594, 63 Fed. Reg. 59362, 59370 n. 61 (Nov. 3, 1998) .................11

SEC Release No. 34-47364, 68 Fed. Reg. 8686, 8689, n. 26 (Feb. 24, 2003) ..................11

SEC Release No. 34-63452, 75 Fed. Reg. 80,174 (Dec. 21, 2010) No. 34-63452.................11

SEC Release No. 34-73954, 2014 WL 7407470, at *3 (Dec. 30, 2014) ............................11

SEC Release No. No. 34-27017 54 Fed. Reg. 30013, 30014 (July 11, 1989) .....................12

*SEC Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker* (1936) ................................................................................................................9

I.      INTRODUCTION

Mr. Keener is an investor.  He has invested in a wide variety of investments over the past 20 years, from real estate and private companies, to stocks, bonds, mutual funds, Treasury bills, private placements, term loans, and bridge loans.  The SEC has based this enforcement action on one type of investment Mr. Keener made over a limited two-year period—convertible notes.  These notes were loans that Mr. Keener made to companies that companies sometimes repaid in cash, and that other times Mr. Keener converted into equity investments.  These investments were risky, and in fact Mr. Keener lost millions of dollars on them.  The SEC claims Mr. Keener should have registered as a securities dealer under Section 15(a) of the Securities Exchange Act of 1934 because he invested in these convertible notes and converted them into equity investments.  But that position is wrong because it contradicts the statutory language; it contradicts the formal interpretation of the dealer registration requirements adopted and published by the Commission; and it contradicts 80 years of judicial precedent and industry practice.

The Exchange Act states that the only persons who need to register as securities dealers are those that are "engaged in the business of buying and selling securities."  From the time the Exchange Act was enacted, being "engaged in the business" of buying and selling securities has meant something very particular.  Persons "engaged in the business" means those firms that act as market makers, simultaneously quoting buy and sell prices to customers, and otherwise serving customers who seek to trade.  Persons "engaged in the business" does not include anyone and everyone who makes a living through buying and selling securities.  Instead, the Exchange Act contains a trader exception that specifically excludes persons who trade for themselves and do not provide any services to the market or have customers.  This is because the purpose of the Exchange Act's broker-dealer registration requirements was *not* to limit the activity of individual traders, but

instead to protect trading customers of market makers from any unscrupulous behavior by such entities.

That is why the SEC, in formal rulemaking declarations, has for decades instructed that dealers are characterized by particular factors, chief among them whether the firm handles other people's money or securities and furnishes services to investors such as quoting a market or providing investment advice.  And that is why many courts have applied these factors in determining whether a firm is "engaged in the business" of buying and selling securities.  The SEC has explained these factors in a plethora of rulemaking releases, has applied the factors in many no-action letters, and has restated the factors in the Guide to Broker-Dealer Registration which is published on the SEC's website to this day.  When individual members of the public have asked the SEC specific questions about what firms constitute dealers, the SEC has repeatedly directed these individuals to consider the factors and stated that courts consider these factors when determining whether registration is required.  These factors constitute the law that must be applied in this case.

Mr. Keener does not meet a single one of those factors:

- He has no customers.

- He has never provided a single service to any customer.

- He has never sold a single share directly to any member of the investing public.

- He does not earn any compensation in the form of fees or commissions from customers.  Instead, he takes substantial risk and hopes to earn capital gains.

The SEC's own published statements leave little room for doubt that people with no customers like Mr. Keener are not securities dealers: "*Individuals who buy and sell securities for themselves generally are considered traders and not dealers.*"  Guide to Broker-Dealer Registration, https://tinyurl.com/88xycezk ("Guide").  That is exactly why no currently registered dealers solely trade for their own account— instead, all currently registered dealers provide services to the investing public.

Thousands of investors like Mr. Keener, including family offices, hedge funds, angel investors, and high frequency trading firms, are not registered as securities dealers. Mr. Keener looks very similar to unregistered family offices—private wealth management firms that manage the investments of a single high-net-worth family. Based on public data, it is clear that many of these unregistered firms invest in convertible notes—in particular angel investors, wealthy individuals who frequently invest in early stage companies through convertible notes. The market for convertible notes is worth $350 billion. The Court should reject Plaintiff's basic premise—one it has never asserted before in any rulemaking or other guidance—that convertible notes are unique and that all investors in this $350 billion convertible notes market must now register as securities dealers.

The real nail in the coffin on the SEC's case is the fact that since 1972, the SEC has encouraged and facilitated the sale of restricted securities such as the exact convertible note investments at issue here, as a way to lower the barriers for companies in raising capital. That is, the SEC has urged companies and investors to enter into convertible notes for decades, and never warned that such notes could turn an investor into a securities dealer. However, the SEC now argues those exact convertible notes are nefarious and warrant punishing a convertible note investor who did not register as a securities dealer to the tune of millions of dollars and serious injunctive relief. Such hypocrisy violates fundamental notions of fair dealing and due process.

This is particularly so when the SEC has not identified a single person that was harmed by any one of Mr. Keener's convertible note investments, or a single fact that would have been different had Mr. Keener registered as a securities dealer. For this independent reason, the SEC is not entitled to the astounding $21.5 million in disgorgement it seeks. Last year, the U.S. Supreme Court held that the SEC can only obtain disgorgement of net profits and must return those profits to victims. *Liu v. SEC*, 140 S. Ct. 1936, 1945 (2020). But there are no victims here. Mr. Keener sold his stock through third party broker-dealers. There is no allegation that any other investor

purchased stock that Mr. Keener sold at an artificially inflated price, or that any investor even lost money after purchasing stock from Mr. Keener.  Nor are there any net profits.  Mr. Keener lost millions of dollars on the convertible note investments the SEC takes issue with.  Without any allegation that anyone has been harmed, let alone proof of harm, or any net profits, *Liu* forbids disgorgement.

## II.   FACUAL BACKGROUND

### A.   <u>Mr. Keener's Investments Generally</u>

Mr. Keener is an individual who has made a wide variety of investments—from stocks and bonds to real estate and private companies.[1]  SOF ¶ 7. He began investing his own money when he was 30 years old.  *Id.* ¶ 2.  His investments have ranged from thousands of dollars to millions of dollars depending on the investment opportunity presented.  *Id.* ¶¶ 7, 13.  With each investment opportunity, Mr. Keener analyzed the potential investment, conducted due diligence to identify risks, and decided whether to invest his own money in the opportunity.  *Id.* ¶¶ 8-10.  During the Relevant Period,[2] he maintained a website to gain credibility with companies as an investor, and also had employees to assist him in identifying and analyzing investment opportunities, and in executing and monitoring investments.  *Id.* ¶¶ 10, 55, 87.

### B.   <u>Mr. Keener's Investments in Convertible Notes</u>

Many of Mr. Keener's investments have been in the microcap space, which includes smaller companies, many of which may be struggling to raise financing to develop a new product or service. *Id.* ¶¶ 19, 27.  For a limited period of approximately two years, Mr. Keener invested in convertible notes in the microcap space (the investments at issue in this case).  *Id.* ¶¶ 11, 56.  The terms of the

---

[1] All facts cited herein refer to Defendant's Statement of Material Facts in Supp. of Mot. for Summ. J. ("SOF") filed contemporaneously herewith.
[2] The Relevant Period specified in the Complaint is January 2015 to January 2018.  Compl. ECF No. 1 ¶ 1.

notes varied, and were negotiated between Mr. Keener and executives of the companies. *Id.* ¶ 24. Generally speaking, the notes functioned as follows. Mr. Keener made a loan to a company of approximately $25,000 to $100,000. *Id.* ¶ 13. The notes refer to Mr. Keener as a "Lender" or an "Investor." *Id.* ¶ 23. The company had the option to repay the loan in cash in whole or in part within three months of the date of Mr. Keener's loan. *Id.* ¶ 12. If the company had not already repaid the loan in cash, Mr. Keener could seek to convert the outstanding balance of the loan into stock. *Id.* ¶¶ 16, 35-38. After the legally required waiting period, he could also seek to have that stock deposited into his personal brokerage account, and to have his brokerage firm try to sell that stock. *Id.* ¶¶ 39, 51.

Mr. Keener never sought to sell stock received from a conversion without waiting at least six months from the initial convertible note investment. *Id.* ¶ 28. He often waited longer than six months—in some cases, several years. *Id.* Because Mr. Keener held these investments for so long, these investments were risky. *Id.* ¶ 30. The companies could go into bankruptcy during that time, or their share price could decline precipitously. *Id.* In 2015 alone, Mr. Keener recognized investment losses on sixteen separate notes. *Id.* To give Mr. Keener some protection against downside risk, the companies allowed Mr. Keener to convert the outstanding loan balance into shares at an adjustable discount linked to the trading price of the stock around the time of conversion. *Id.* ¶ 17.

In those instances when the companies were viable and Mr. Keener could seek to convert the outstanding loan balance into stock, Mr. Keener and his assistants had to go through a lengthy process before any such conversions could take place. *Id.* ¶¶ 34-38. The companies were obligated to disclose the terms of Mr. Keener's convertible note investments in public securities filings, and to set aside shares to cover Mr. Keener's conversions. *Id.* ¶¶ 26, 38. But Mr. Keener would still have to provide extensive compliance-related documentation to the issuer's transfer agent and to his

brokerage firm before those third parties—all of whom were registered with, regulated by, and regularly inspected by the SEC—would agree to execute his conversion and sale requests. *Id.* ¶¶ 37-38, 40-47. The paperwork always included letters from attorneys confirming that Mr. Keener had held the investment for at least six months, and that the conversion request complied with SEC Rule 144. *Id.* ¶ 48. In many cases, the paperwork also included letters from attorneys confirming that Mr. Keener was not acting as an "underwriter," was not engaging in a "distribution" of securities, and indeed was "not engaged in the business of dealing." *Id.* ¶ 49.

Once the shares were deposited into Mr. Keener's brokerage accounts, his brokerage firm would seek to sell the shares on Mr. Keener's behalf. *Id.* ¶ 52. His brokerage firms were required to disclose Mr. Keener's transactions to FINRA (the Financial Industry Regulatory Authority) in the ordinary course. *Id.* ¶ 53.

Some of Mr. Keener's convertible note investments were successful, but many were not. *Id.* ¶ 30. Even for those companies where he was able to convert and sell stock after a lengthy holding period, he incurred many business expenses, including compensation to assistants to analyze, monitor, and execute these investments, as well as attorney and brokerage fees. *Id.* ¶¶ 55, 59, 65.

**C.    The Marketplace of Investors and Registered Dealers**

There are hundreds of thousands, if not millions, of other persons and firms who seek to make a living through buying and selling securities. *Id.* ¶ 91. But there are only 3,434 registered securities dealers. *Id.* ¶ 100.

Which entities fit the former category but not the latter? There are single family offices: private wealth management companies that serve high-net-worth families and pursue a variety of investment opportunities including buying and selling stocks. *Id.* ¶ 92. There are hedge funds: investment vehicles for wealthy individuals that trade in a variety of financial instruments and that employ complex strategies to manage risk and amplify returns. *Id.* ¶ 93. There are also angel

6

investors: wealthy individuals who invest in early stage companies, when risks of failure are relatively high, and who hope to recoup that investment when companies go public. *Id.* ¶ 94. There are high-frequency traders that buy and sell a tremendous volume of shares each day, and who are responsible for up to 50% of trading volume on any given day. *Id.* ¶ 95. All of these entities are examples of the wide variety of persons and firms involved in buying and selling securities that are not registered dealers. *Id.* ¶¶ 91-95.

By contrast, the entities that are registered securities dealers all fit a narrow profile. They act as market makers and/or they solicit customers from the investing public. *Id.* ¶¶ 67, 96-100. Specifically, all registered broker-dealers must identify which of 26 preset lines of business they engage in. *Id.* ¶ 96-97. Based on an expert analysis of this dealer registration data, it is clear that all registered broker-dealers identify or describe their activities as involving customer-facing activities and activities involving the investing public. *Id.* ¶¶ 96-100.

### D. <u>Mr. Keener Did not Offer Dealer Services</u>

In order to understand how Mr. Keener fits into this landscape of other investors and registered dealers, it is useful to know what Mr. Keener did not do. He has never solicited any customers from the investing public. *Id.* ¶¶ 69, 80-81, 86-89. He did not work with retail or institutional investors. *Id.* ¶¶ 80-81. He never quoted prices or provided any services to investors or anyone else. *Id.* ¶¶ 74-75, 77. All of his sales were executed directly through registered broker-dealers. *Id.* ¶ 70. He never gave anyone investment advice. *Id.* ¶ 79. He did not issue, originate, or underwrite securities. *Id.* ¶¶ 82-83. He never advertised his willingness to buy and sell any particular security or his willingness to sell any particular securities at all. *Id.* ¶¶ 86-89. Instead, all he did is identify investment opportunities and invest his own money as he saw fit. *Id.* ¶¶ 7-10.

## III.    LEGAL STANDARD

Summary judgment must be granted where the record shows there "is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There is no genuine factual issue when no reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The Court should enter judgment as a matter of law when the non-moving party fails to offer sufficient proof of an "essential element" of that party's case and "on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317-18 (1986).

## IV.    ARGUMENT

The Court should grant summary judgment to Mr. Keener because there is no genuine dispute as to any material fact.  As this Court already ruled, persons do not become dealers simply because they make a living from buying and selling securities.  Instead, as the SEC has stated for decades, persons become dealers only when they meet a number of factors under a totality of the circumstances analysis.  Those factors focus on whether a firm provides services to the investing public.  Individuals who invest in securities for their own account without providing any services to the investing public are not dealers.  The Court should grant summary judgment to Mr. Keener because there is no material dispute that Mr. Keener does not provide any services to the investing public.

### A.    Mr. Keener is Not a Securities Dealer Under the Exchange Act

#### 1.    The Definition of a Dealer

Exchange Act Section 3(a)(5) defines a "dealer" as a person "engaged in the business of buying and selling securities . . . for such person's own account." 15 U.S.C. § 78c(a)(5)(A).  The definition contains an important exception.  Specifically, traders are excluded from the dealer definition.  Traders buy or sell securities for their own account, but "not as part of a regular

8

business"—that is, they are not "engaged in the business" of dealing.  15 U.S.C. § 78c(a)(5)(B); *see also* Guide.

What does it mean to be "engaged in the business" of dealing?  This phrase is not defined in the statute.  However, in 1934, the business of dealing was well understood by courts, scholars, and the SEC itself to mean the business of providing financial services to customers and facilitating customer trading, and not a person who invests his own money based on his own investment decisions.

- **Contemporaneous SEC statement**: In the 1930s, the SEC reported that the "characteristic" activity of a dealer is that "[t]he dealer sells securities to his customer."  Ex. A (*SEC Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at xiv (1936)).

- **Contemporaneous cases**: 1930s-era cases analyzing a similar dealer definition under the tax laws state that a person who "carries on an investment business for [his] own profit . . . *is not* a dealer in securities . . . regardless of the number of purchases and sales."  *Donander Co. v. C.I.R.*, 29 B.T.A. 312, 314-15 (U.S. Bd. Tax Appeals, Nov. 8, 1933) (emphasis added). Instead, "[t]he term [dealer] rather has application to a merchant who holds himself out to sell to customers."  *Id.*; *see also Vaughn v. C.I.R.*, 85 F.2d 497, 499 (2d Cir. 1936) (dealer purchases stocks "as a supply for customers," not for "speculation").

- **Contemporaneous treatise:** A leading 1933 treatise describes a person "engag[ed] in the business" of dealing as someone who "sells to his customers."  Ex. B (Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges*, § 43-a, p.32 (Supp. 1933)).

Courts must presume that Congress intended for the specific meaning of phrases that existed at the time of enactment to apply.  *See, e.g., Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 166, 169 (2004) (Congress is presumed to legislate against existing "background of law, scholarship, and history"); *Stokeling v. U.S.*, 139 S. Ct. 544, 551 (2019) (terms should be read consistent with the legal sources they are "transplanted from").  Indeed, it is clear that the Exchange Act dealer definition reflected this contemporaneous understanding of dealers as persons who sell securities to the investing public, because the purpose of the Exchange Act and the broker-dealer registration requirements was specifically to protect investing customers, and thus regulate those

9

firms who had customers.  *See, e.g.*, H.R. Rep. No. 1383 at p 2, 73d. Cong. 2d Sess. (1934) (describing key purpose of Exchange Act as regulating relationships with "the investing public").

Case law and SEC guidance has reinforced this dealer definition for decades.  *See, e.g.*, *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016) ("There is a broad exemption [in the Exchange Act] for investors and traders not engaged in the regular business of providing dealer services to others.").  Specifically, because the phrase "engaged in the business" of dealing was not defined in the statute, courts and the SEC developed a long list of factors that must be analyzed to determine whether a person qualifies.  *See, e.g.*, *Quantum Cap., LLC v. Banco De Los Trabajadores*, Case No.: 1:14-cv-23193-UU, 2016 WL 10536988, at *6 (S.D. Fla. Sept. 8, 2016) ("Because the Exchange Act [does not define] 'engaging in the business,' an array of factors determines whether a person qualifies as a broker or dealer under the Exchange Act."); *SEC v. Mapp*, 240 F. Supp. 3d 569, 591-92 (E.D. Tex. 2017) ("The Court must look to case law . . . as the Exchange Act does not directly define what is required to 'engage in the business.'") (citations omitted).

Dating back to at least 1975, the SEC has codified a factors-based understanding of the dealer definition in a plethora of Commission Releases, no-action letters, and other published guidance that constitute the controlling law that now applies to determining whether a person is a securities dealer.  *See, e.g.*, Order ECF No. 29, at 8 (ruling on motion to dismiss finding that the "factors are relevant for assessing and ultimately concluding whether a party is a dealer"); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 866 (1984) (courts defer to official agency interpretation of statute it administers); *SEC v. Nat'l Presto Indus., Inc.*, 486 F.3d 305, 315 (7th Cir. 2007) (finding Commission's published factors for identifying investment companies controlling); *Pub. Employees' Ret. Sys. Of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 481-82 (S.D.N.Y. 2010) (same as to Commission release regarding underwriter definition).

Over the past 40 years, the SEC has dozens of times articulated between 3 and 10 factors

that must be considered in assessing dealer status.  The factors that repeatedly arise in these

formulations are the following:  (1) soliciting, providing services to, and interacting with investors;

(2) creating a market in particular securities by standing ready to buy and sell those securities on a

continuous basis; and (3) carrying a dealer inventory to respond to customer demand.  *See, e.g.*, SEC

Release No. 34-11742, 1975 WL 163406, at *3 (Oct. 15, 1975) (listing 4 factors); SEC Release No.

34-40594, 63 Fed. Reg. 59362, 59370 n. 61 (Nov. 3, 1998) (listing 8 factors); SEC Release No. 34-

47364, 68 Fed. Reg. 8686, 8689, n. 26 (Feb. 24, 2003) (listing 8 factors); SEC Release No. 34-63452,

75 Fed. Reg. 80,174 (Dec. 21, 2010) (listing 6 factors).[3]  The SEC has specifically directed the public

to apply these factors.  *See, e.g.*, SEC Release No. 34-73954, 2014 WL 7407470, at *3 (Dec. 30, 2014)

("Persons may [] rely on . . . published guidance issued by the SEC or its staff in the form of

releases, no action letters or interpretation" in determining broker-dealer status under Section

15(a).).

The reason for establishing these factors in the first place was to make clear—as the SEC

stated back in 1975—that "it was not the intent of Congress that every [firm] engaged in" the

activity of buying and selling securities "solely for its own account . . . even though such purchases

and sales are made with some frequency" register as a dealer.  Adoption of Rule 15Ba2-1, SEC

Release No. 34-11742, 1975 WL 163406, at *3 (Oct. 15, 1975).  Instead, a firm that buys and sells

securities "solely for its own investment account" and "does not carry on a public securities

---

[3] For example, here is one formulation of the factors from the SEC: "A trader does not [1] handle other people's money or securities; [2] he does not hold himself out as being willing to buy and sell securities for his own account on a continuous basis; and [3] he does not furnish the services which are usually provided by dealers, such as quoting the market in one or more securities[,] rendering incidental investment advice, or extending or arranging for the extension of credit in connection with securities activities."  Nat'l Council of Sav. Instit., SEC No-Action Letter, 1986 WL 67129, at *2 (June 26, 1986).

business" is a trader, not a dealer.  Test. of Richard R. Lindsey, Director, SEC Division of Market

Regulation, *Concerning Hedge Fund Activities in the U.S. Financial Markets*, Before the H. Comm. on

Banking and Fin. Servs., 105th Cong., at n.2 (Oct. 1, 1998).  At bottom, dealers are service

providers—they function as "intermediar[ies] between customers and the securities markets."  SEC

Release No. 34-27017, 54 Fed. Reg. 30013, 30014 (July 11, 1989).

 The SEC has repeatedly reassured market participants through no-action letters that it would

not take action against unregistered firms when those firms did not meet this factors-based analysis,

including when the firms had "no customers" and did "not stand ready to purchase or sell securities

in general."  *See* Cont'l Grain Co., SEC No-Action Letter, 1987 WL 108902, at *1, 4 (Nov. 6, 1987)

(declining to take action after applying 10 factors); *see also* Fairfield Trading Corp., SEC No-Action

Letter, 1988 WL 233618, at *2 (Jan. 10, 1988) (same); Louis Dreyfus Corp., SEC No-Action

Letter,  1987 WL 108160, at *2  (July 23, 1987) (same).

 In 2002, the SEC proposed and subsequently adopted rules providing banks with

exemptions from dealer registration requirements.  In the Release in which the SEC published its

proposed rules, the SEC again summarized the dealer/trader distinction as focused on whether the

person has customers and provides services to those customers:

> As developed over the years, the dealer/trader distinction recognizes that **dealers** normally
> have a regular clientele, hold themselves out as buying or selling securities at a regular place
> of business, have a regular turnover of business (or participate in the distribution of new
> issues), and **generally transact a substantial portion of their business with investors** (or,
> in the case of dealers who are market makers, principally trade with other professionals).  In
> contrast, **traders** have a less regular volume, **do not handle others' money or securities,
> do not make a market, and do not furnish dealer-type services such as rendering
> investment advice, extending or arranging for credit, or lending securities**.

Proposed Rule, SEC Release No. 34-46745, 2002 WL 31428622, at *6 (Oct. 30, 2002) (emphasis

added).

 Since 2008, the SEC has published on its website a Guide to Broker-Dealer Registration,

which summarizes and restates the factors from the prior SEC releases.  SEC Opp. to Mot. to

Compel ECF No. 48-1. The factors restated in the Guide, all of which focus on services to the investing public, are the following:

- Persons that "do business with the public";

- Persons who "quote prices" for both the purchase and sale of securities, or provide "services to investors" such as "handling money and securities, extending credit, or giving investment advice";

- Persons who advertise that they are "willing to buy and sell a particular security on a continuous basis" or that they are in the "business of buying and selling securities";

- Persons who issue, originate, or underwrite securities, run a "matched book of repurchase agreements," or "write derivatives contracts."

*Id.*

To summarize, in at least each of the following years, the SEC has directed the public to conduct a factors-based analysis of the dealer definition:



Courts have routinely applied this factors-based analysis in determining whether a person is a broker or dealer under the Exchange Act. *See, e.g.*, *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) ("[A]n array of factors determines whether a person qualifies as a broker or dealer under Section 15(a)."); *SEC v. Federated All. Grp.*, No. 93-CV-0895E(F),1996 WL 484036, at *4-5 (W.D.N.Y. Aug. 21, 1996) (applying 9 factors and denying SEC's motion for summary judgment); *Chapel Invs., Inc.*, 177 F. Supp. 3d at 990-91  (finding person was not a dealer after applying 4 factors). This is a totality of the circumstances analysis, and "all of the relevant facts and circumstances" must be considered.   Proposed Rule, SEC Release No. 34-46745, 2002 WL 31428622, at *5 (Oct. 30, 2002); *see also SEC v. Feng*, 935 F.3d 721, 731-32 (9th Cir. 2019) (collecting cases for applying

13

"totality-of-the-circumstances approach" for analyzing broker definition).   No one factor controls. *In re Haning*, 252 B.R. 799, 808 (M.D. Fla. 2000) ("As with any totality of the circumstances test, no one factor will dispose of the issues of this Case.").

These factors are consistent with the historical understanding that dealers have customers and are financial intermediaries and market makers—persons who inject liquidity into trading markets because they stand ready to buy or sell securities as their customers desire.  *See* p. 9, *supra*. Dealers are not persons who only buy and sell securities based on their own investment decisions.

**Investors/Traders**: The SEC's statements have also been clear about who is excluded from the dealer definition and is instead an investor or trader.  Since 2008, the SEC's own website has stated: "**Individuals who buy and sell securities for themselves generally are considered traders** and not dealers."  Guide § II.B.  (emphasis added).  This point was not pulled out of thin air: instead, the SEC has been saying the same thing for decades.  *See, e.g.*, Nat'l Council of Sav. Instit., SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986) ("[T]he staff has consistently taken the position that a person who buys and sells securities for his own account . . . is generally not considered to be 'engaged in the business' of buying and selling securities and consequently, is not deemed to be a 'dealer.'"); SEC Release No. 34-27017, n.17, 54 Fed. Reg. 30013, 30015 (July 18, 1989) ("[The dealer definition] has been interpreted to exclude various activities not within the intent of the definition, such as buying and selling for investment.").

2.   <u>Mr. Keener Does Not Meet the Definition of a Dealer</u>

Mr. Keener is not a securities dealer under this authority because he does not meet any of the factors.

- He does not do business with the public or with any investors.  SOF ¶¶ 69, 80-81.

- He does not quote prices for the purchase and sale of securities.  *Id.* ¶ 75.  He does not provide any services to investors.  *Id.* ¶ 77.  He did not give anyone investment advice.  *Id.* ¶

14

79.  He does not lend securities or extend or arrange for credit to investors.  *Id.* ¶ 78.  He does not even handle any money other than his own.  *Id.* ¶ 8.

- He does not stand ready or willing to buy and sell any particular security on a continuous basis or advertise that he is in the business of buying and selling securities.  *Id.* ¶¶ 72, 75, 80, 86, 88-89.

- He does not issue, originate, or underwrite securities.  *Id.* ¶¶ 82-83.  He does not run any book of repurchase agreements or write derivatives contract.  *Id.* ¶ 84-85.

Instead, during the Relevant Period, he identified potential opportunities to invest his own money, and conducted due diligence on each investment.  *Id.* ¶¶ 7, 9-10.  If he decided to pursue an investment in a company, he negotiated the terms with the company directly.  *Id.* ¶ 24.  The convertible note investments at issue in this case were loans to companies that were sometimes repaid in cash and were sometimes converted into equity investments.  *Id.* ¶¶ 12, 16.  If the loan was not repaid in cash, Mr. Keener never sold any converted stock without waiting at least six months from the date of the investment.  *Id.* ¶ 28.  During that lengthy holding period, some of the companies Mr. Keener invested in failed.  *Id.* ¶ 30.  In those cases, Mr. Keener lost his entire investment.  *Id.*  For those companies that were still viable after six months, Mr. Keener would potentially look to convert those notes into equity, a process that involved providing extensive documentation to the transfer agent holding the company's shares, and to the brokerage and clearing firms holding Mr. Keener's securities accounts.  *Id.* ¶¶ 34, 38, 45.  Once the shares were deposited into his account, Mr. Keener's brokerage firm would seek to sell the shares on Mr. Keener's behalf.  *Id.* ¶ 52.  Mr. Keener thus acted as an investor; he provided no dealer services to anyone.  *See, e.g., Chapel Invs., Inc.*, 177 F. Supp. 3d at 990 (finding firm was not a dealer when it "does not provide advice or services to other investors, but is instead acting in its own best interests as an investor").

The conclusion that Mr. Keener's activity did not meet the dealer factors is supported by dozens of legal opinions that Mr. Keener obtained from attorneys before converting and selling the

stock at issue that confirm he was not acting as a securities dealer or an underwriter, and that he had complied with SEC Rule 144.  SOF ¶¶ 48-49; *cf.* FINRA, Rule 2040 (2015) (authorizing reliance on "legal opinion [obtained] from independent, reputable U.S. licensed counsel knowledgeable in the area" for determining broker activity under Section 15(a)).  Notably, some of these opinions were issued by Laura Anthony, a prominent securities attorney based in South Florida.  SOF ¶ 49.  Based on a review of his transactions, she concluded that Mr. Keener was not a securities dealer and did not engage in the business of dealing.  *Id.* (finding that JMJ Financial "is not engaged in the business of . . . dealing," "has not acted as a dealer," did not purchase shares to "engage in a 'distribution,'" and "should not be deemed an underwriter.").  Two other attorneys drew identical conclusions in the course of reviewing many of Mr. Keener's transactions.  *Id.* (attorneys finding that JMJ Financial "is not a dealer" and did not acquire the shares "with a view to distribution," and that "after a review of case law, the commentators, and Rule 144 . . . JMJ Financial is not an 'underwriter'").

This conclusion that Mr. Keener's activity did not meet the dealer factors is also supported by the conduct of participants in the financial industry.  There are no persons currently registered as securities dealers who are similar to Mr. Keener.  *Id.* ¶¶ 96-101.  Registered dealers are required to identify which of 26 specific lines of business they engage in.  *Id.* ¶ 96.  All but one involve interacting with customer trading orders.  *Id.* ¶¶ 97-98 (lines of business include "making inter-dealer markets" and "retailing corporate equity securities over-the-counter").  The one remaining line of business is "trading securities for own account."  *Id.* ¶ 98.  This is the only one of the 26 lines of business that Mr. Keener engaged in.  *Id.* ¶ 99.  An analysis of the registration data for the more than 3,400 firms that are currently registered dealers reveals that only two of those firms (or 0.06%) had checked only this one line of business.  *Id.* ¶ 100.  Moreover, a review of those two firms demonstrated that both engage in soliciting and providing services to customers.  *Id.*  Consequently, there are no persons or firms in the entire country registered as dealers who like Mr. Keener only

engage in trading securities for their own account, without providing any services to customers. Indeed, the SEC has not identified a single registered dealer similar to Mr. Keener.  SOF ¶ 101.

On the flipside, there are thousands of firms and investors like Mr. Keener who buy and sell securities for a living, including hedge funds, family offices, high-frequency traders, and angel investors, and those entities have not registered as dealers.  *Id.* ¶ 91.  Many of these entities are similar to Mr. Keener in that they invest in convertible notes.  *Id.* ¶ 94.  These entities are also similar to Mr. Keener in that they do not have customers among the investing public.  *Id.* ¶¶ 92-94.  The conclusion that must follow is that the SEC's current interpretation of the dealer registration requirements for purposes of litigation is wrong, not that an entire industry is mistaken.  *See, e.g.*, *Diebold Inc. v. Marshall*, 585 F.2d 1327, 1334-36 (6th Cir. 1978) (rejecting agency request that court "embrace the untenable assumption that [an entire] industry has been habitually disregarding a known legal requirement").

Based on this record—when Mr. Keener does not meet any of the factors, he never provided any dealer services to anyone, he made all of his own investment decisions, attorneys advised him his transactions complied with securities laws, and his activity matches that of an entire industry of unregistered traders—no reasonable jury could conclude he was a dealer.  *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment must be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party").

### 3.    The SEC's Arguments to the Contrary Fail

The SEC now argues for a misleading interpretation of the Exchange Act stripped of 80 years of context, interpretation, and practice, to essentially limit the trader exclusion to persons who buy and sell securities as a hobby, and not to make a living.  As described above, that is not, and has never been, the law.

### a)    *The Factors are Controlling*

First, the SEC asks the Court to ignore the factors as "non-binding" (likely because it knows Mr. Keener is not a dealer under the factors). As demonstrated above and as this Court has already ruled, the "factors are relevant for assessing and ultimately concluding whether a party is a dealer." Order ECF No. 29 at 8; *see also Federated All. Grp.*, 1996 WL 484036, at *5 (applying factors and denying SEC summary judgment because SEC put forth "an excessively broad definition of a dealer" and one that "would embrace . . . every securities trader who makes money through buying and selling of securities"). Moreover, the SEC's standard response to dealer registration inquiries was *not* to ignore the factors; instead, the SEC directed persons to conduct a "fact-specific assessment that involves consideration of a number of factors (which have been developed through SEC staff no action letters and case law)." SOF ¶ 68. The SEC's standard response also stated that courts consider the factors when determining whether someone is a dealer. *Id.* And yet, the SEC's enforcement attorneys are now telling this Court to ignore those factors. The SEC cannot have it both ways.

The SEC argues the Court should ignore the factors because one decision from the Eleventh Circuit in *SEC v. Big Apple Consulting USA, Inc.* purportedly concerning dealer registration does not discuss the factors. 783 F.3d 786 (11th Cir. 2015). The SEC is wrong—*Big Apple* neither applies nor compels any conclusion that the Court should ignore the factors in assessing the dealer registration requirements under Section 15(a) of the Exchange Act. In the Eleventh Circuit's own words, here is why:

> As a preliminary matter, the defendants contest only the district court's finding that they had acted as underwriters and dealers with respect to the registration requirements of Section 5 of the Securities Act. Therefore, **any claims raised by [defendants] as to their § 15(a) violations of the Exchange Act for failing to register with the SEC are deemed abandoned**.

*Id.* at 806 (emphasis added, and internal quotations and citations omitted). The Court added as an aside that based on what it could "discern[] from the defendants' briefs," it appeared appropriate to

analyze the Exchange Act Section 15(a) claims the same way as the Securities Act Section 5 claims, as based on whether the firm made most of its money through buying and selling securities. *Id.* at 806, 809.  But that is dicta, and was based on a radically incomplete record in which two of the defendants appeared pro se.[4]  Significantly, the Court said nothing to suggest that the dealer factors must be ignored.  In fact, the district court did apply those factors (and the Eleventh Circuit never suggested that the district court erred in doing so).  *SEC v. Big Apple Consulting USA, Inc.*, No. 6:09–cv–1963–Orl–28GJK, 2011 WL 3753581, at *9-10 (M.D. Fla. Aug. 25, 2011) (applying the guidelines "the SEC has promulgated . . . to help determine whether someone is acting as a dealer or not").  Moreover, it is black letter law that the dealer definitions in the Securities Act and Exchange Act must be interpreted differently when only the Exchange Act contains a trader exception.  *Abbott v. Abbott*, 560 U.S. 1, 33 (2010) ("In interpreting statutory text, we ordinarily presume that the use of different words is purposeful and evinces an intention to convey a different meaning.").

b)      *The Volume of Transactions is Not Relevant*

To the extent the SEC suggests that *Big Apple* can be read to hold that a dealer under the Exchange Act is someone who earns most of their income from selling stock, that is wrong.  The same is true for *SEC v. Almagarby*, a factually distinguishable case which followed *Big Apple* and focused exclusively on the defendant's volume of trading activity.  479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020).  The conclusory statements in both cases about the relevance of the volume of trading activity contradict case law and decades of rulemaking and other guidance from the SEC applying a

---

[4] *Big Apple* also presented a deeply different set of facts.  The defendant in *Big Apple* was an investor relations firm that—in total contrast to Mr. Keener—interacted directly with the investing public and received stock as compensation for the investor relation services it offered.  Mr. Keener never interacted with the investing public or received any compensation for any services.  *Big Apple* also facilitated an outright fraud perpetrated by an issuer.  Specifically, defendant touted the stock of and processed trades for its client Cyber Key, after Cyber Key announced it had secured a multi-million dollar contract with DHS, when Big Apple should have known the contract was obviously fabricated.  The fraud continued for 15 months, with the defendants issuing many press releases making false claims about the fabricated DHS contract.  *Id.* at 790-93.

19

complex, factors-based analysis, and would bring within their scope the entire financial industry with tens of thousands of participants who are not registered.

The SEC has never said that having a high percentage of your income derived from buying and selling securities is dispositive or even relevant to assessing whether a person is a securities dealer. In fact, for decades, the SEC has said the exact opposite: "[T]he nature of a bank's activities, rather than the volume of transactions or similar criteria, are of greater relevance in determining when a bank is a . . . securities dealer." SEC Release No. 11742, 1975 WL 163406, at *4 (Oct. 15, 1975). Former SEC Chair Mary Jo White echoed this position in a 2014 speech—namely, she agreed that certain firms that exclusively traded securities and had extremely high levels of trading activity are not dealers. She admitted that high frequency trading firms—which by definition trade substantial volumes every day and indeed represent "well over a majority of [all] trading volume"— did not fit within the dealer definition. Mary Jo White, "Enhancing Our Equity Market Structure," (June 5, 2014), https://www.sec.gov/news/speech/2014-spch060514mjw (announcing that SEC staff were being asked to prepare a rule to bring high frequency traders within the dealer definition, but no such rule was ever prepared). And in our case specifically, the SEC has admitted that there are no "dollar or volume thresholds for determining whether a person is a dealer." SOF ¶ 90. In such circumstances, the volume of Mr. Keener's convertible note investments cannot be relevant.

c)    *Marketing Efforts Directed to Issuers Are Not Relevant*

Advertising directed at soliciting customers from the investing public could be indicative of dealer activity. But it is undisputed that Mr. Keener never engaged in such advertising—he never advertised his willingness to buy securities from, or sell securities to, the investing public. *Id.* ¶¶ 80, 86-89. Instead, all he did was maintain a website describing some of his investments to demonstrate *to companies* (not to the investing public) that he was a serious investor. *Id.* ¶ 87. For a few years, he and his assistants also attended conferences as way to network and meet companies that may be in

20

need of funding. *Id.* ¶ 86. These facts are immaterial to the dealer analysis: there are many investors who maintain websites and attend conferences, but do not register as dealers—including angel investors, high frequency traders, and family offices. *Id.* ¶¶ 92-95.

The reason for this is clear. The advertising that matters for the dealer analysis is advertising to the public that you stand ready to buy and sell their securities to meet market demand. And Mr. Keener has never advertised himself as someone seeking to buy or sell securities from the investing public. *Id.* ¶¶ 80, 87-89. Any other interpretation of the relevance of advertising—in particular an interpretation that expands to communications aimed at *companies* and not the investing public—is nonsensically overbroad and does nothing to further the purpose of the dealer registration requirements or the securities laws generally, which is to protect investors. *See* p. 9, *supra.*

d)   *The Features of Mr. Keener's Convertible Notes Are Not Relevant*

Nor are there any unique features of Mr. Keener's convertible notes that are relevant to the dealer analysis. Convertible notes are a common method for companies to raise money, with approximately $350 billion currently invested in convertible notes in the United States. SOF ¶ 18.

The fact that many of the convertible notes Mr. Keener invested in had a market-adjustable discount feature is irrelevant. Convertible notes frequently contain market-adjustable or other discount features. *Id.* The notes Mr. Keener invested in were risky because of the length of time he held the notes—at least six months and in some cases up to two or three years. *Id.* ¶ 28. The share price of many of the companies Mr. Keener invested in declined precipitously and several even went bankrupt during that time. *Id.* ¶ 30. Thus, to protect his investment, Mr. Keener's notes often allowed him to convert the outstanding note balance to stock at a discount to the market price at the time of conversion. *Id.* ¶ 17. For the same reason, a conversion discount is a common feature in longer-term investments held by many investors who are not registered dealers—including hedge funds and angel investors. *Id.* ¶¶ 18, 94. Indeed, the SEC previously recognized that companies

21

"typically must offer restricted shares" such as those in convertible notes at a "20-50%" discount in order to attract investors.  Revision of Holding Period Requirements in Rules 144 and 145, SEC Release No. 33-7390, 1997 WL 70606, at *3 (Feb. 28, 1997).

No prior SEC guidance states that the existence of this discount could be relevant to the dealer analysis.  From an economic standpoint, dealers often seek to profit from a "bid-ask spread"—that is, by quoting to customers buy prices (the "bid") that are lower than sell prices (the "ask").  SOF ¶ 67.  But that "spread" bears no resemblance at all to the discount in Mr. Keener's notes and is made through extremely rapid or even simultaneous activity on the buy and sell side.  *Id.*  Indeed, the SEC admits that Mr. Keener never quoted a market to customers or engaged in the kind of rapid trading activity characteristic of the bid-ask spread.  *Id.* ¶ 74.

        e)     *The Shares Newly Issued to Mr. Keener Upon Conversion Do Not Make Him an Underwriter*

To the extent the SEC claims the convertible notes Mr. Keener invested in were indicative of dealer activity because the shares resulting from conversions were new to the market, the SEC is wrong.  Convertible notes are, by definition, a way for new stock to come into the market.  *Id.* ¶ 18.  There is no SEC guidance or case law that suggests all convertible notes are thus indicative of dealer activity, or that the shares being newly issued is even relevant to the dealer analysis.  At most, the SEC's Guide to Broker Dealer Registration directs consideration of whether a person is acting as an "underwriter" engaging in a distribution of shares.  Guide §II.B.  However, Mr. Keener obtained dozens of letters from counsel confirming that he *was not acting as an underwriter*, and was not engaging in a distribution of shares.  SOF ¶¶ 48-49.  And the SEC does not dispute that those attorney opinion letters were accurate.  *Id.*

In fact, since 1972, the SEC has specifically encouraged convertible note investments.  At that time, the SEC adopted Rule 144, which specifies that persons who comply with the elements in that Rule will not be deemed "underwriters," and may freely sell stock obtained from conversions.

17 C.F.R. § 230.144.  Moreover, the SEC twice shortened the required holding period (from two years to one year in 1997, and then from one year to six months in 2008).  The purpose of shortening the holding period was to make it even easier for companies to raise capital through mechanisms like convertible notes.  Revision of Holding Period Requirements in Rules 144 and 145, SEC Release No. 33-7390, 1997 WL 70606, at *5 (Feb. 20, 1997) (purpose is to "increase the liquidity of privately sold securities and decrease the cost of capital for all issuers without compromising investor protection").  Mr. Keener thus invested in convertible notes in reliance on the SEC's rulemaking, and sold converted stock only after confirming with attorneys that the transactions complied the rules.  SOF ¶¶ 48-49.  To now say that this exact convertible note activity, which was allowed and even encouraged under Rule 144, is actually unlawful under another part of the securities laws is a bait and switch no court should sanction.

A few months ago, on December 22, 2020, the SEC proposed to modify Rule 144 to lengthen the holding period—specifically, to begin the holding period at the time of the conversion rather than at the time of the initial investment.  Rule 144 Holding Period and Form 144 Filings, SEC Release No. 33-10911, 2020 WL 7701214 (Dec. 22, 2020).  However, in seeking to change the holding period, the SEC conceded that Rule 144 as currently written supports convertible note investments.  *Id.*  The SEC has apparently now changed course and seeks to curtail convertible note investments; but the proper way to change course is to modify Rule 144, not to pursue an enforcement action against an investor for engaging in an activity that was at the time encouraged by Rule 144.  *See, e.g.*, *Ford Motor Co. v. FTC*, 673 F.2d 1008 (9th Cir. 1981) (dismissing enforcement action when it sought to address same conduct targeted in pending rulemaking).

### B.   Due Process Bars the SEC's Claim

Even if the Court concludes there is a material dispute of fact on liability, Mr. Keener is still entitled to summary judgment because the SEC's 15(a) claim is barred by due process.  "A

fundamental principle in our legal system is that laws which regulate persons or entities must give

fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239,

253 (2012). The SEC essentially claims that by virtue of the plain language of the Exchange Act, Mr.

Keener had clear notice that investing in convertible notes with a market adjustable discount feature

obviously crossed the line from a trader not engaged in a "regular business," to a dealer "engaged in

the business." That is absurd.

The SEC already conceded decades ago that "engaged in the business" was not clear, when it

directed the public to assess many different factors to determine whether activity fell within the

scope of the statutory language. And the SEC conceded the same again and again when it

repeatedly changed the number of factors, the order of the factors, and the wording of the factors

themselves. *See* pp. 10-13, *supra*. The SEC's own website to this day states that whether certain facts

and circumstances meet the dealer definition is "less clear." Guide § II.B. If the SEC itself has

disagreed as to what the statute requires, that is a clear sign of a due process violation. *Connally v.*

*Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (due process violation when "men of common intelligence

must necessarily guess at its meaning and differ as to its application"); *Trinity Broad of Fla., Inc. v.*

*FCC*, 211 F.3d 618, 632 (D.C. Cir 2000) ("[W]here the [defendant's] interpretation is reasonable, and

where the agency itself struggles to provide a definitive reading of the regulatory requirements, a

regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may

not be punished.") (internal citations omitted).

Moreover, to the extent the SEC claims Mr. Keener had fair notice under the prior SEC

factors guidance itself that convertible note investments with a market-adjustable discount feature

qualified as dealer activity, that is wrong. No SEC dealer guidance mentions convertible notes or

market-adjustable discounts. Instead, the SEC has taken a litigation position that *contradicts* the prior

guidance that "individuals who buy and sell securities for themselves generally are considered traders

24

and not dealers." Guide § II.B.  Due process forbids agencies from changing their interpretations of the law in an enforcement action.  *See PHH Corp. v. CFPB*, 839 F.3d 1, 47 (D.C. Cir. 2016), *restated on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) (agency cannot impose new liability "for past actions which were taken in good-faith reliance on agency pronouncements"); *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (finding lack of fair notice when there was a "substantial change in [an agency] enforcement policy that was not reasonably communicated to the public").

Finally, Mr. Keener's conduct was consistent with industry practice, which further underscores that the SEC's current litigation position constitutes a due process violation.  *Diebold, Inc.*, 585 F.2d at 1334-36 (due process violation when agency interpretation conflicted with "common [industry] understanding and commercial practice").  Mr. Keener differs from all registered dealers because he provides no services to customers.  SOF ¶¶ 96-101.  On the flipside, many non-registered investors and traders engaged in the exact same convertible note investments as Mr. Keener.  *Id.* ¶¶ 18, 94.  In fact, the SEC's complaint in *Almagarby*, another recent lawsuit in which the SEC alleged a convertible note investor should have registered as a dealer, triggered considerable confusion in the financial industry.  After the *Almagarby* complaint was filed, a clearing firm contacted the SEC for an explanation of the change its position on the dealer definition evidenced in that lawsuit.  *Id.* ¶ 46.  The SEC refused to provide any explanation.  *Id.*  "While it may be possible for an entire industry to be in violation of the [law] for a long time without the [agency] noticing, the more plausible hypothesis is that the [agency] did not think the industry's practice was unlawful" in the first place.  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012) (internal quotations omitted).

C.    **The SEC Cannot Obtain Disgorgement**

Not only has the SEC failed to show liability; the SEC has also failed to show it is entitled to the disgorgement relief it requested.  Specifically, the SEC's request for disgorgement must be struck

because it fails as a matter of law for three independent reasons:  (1) there are no victims of Mr. Keener's investments; (2) there is no causal connection between the alleged registration violation and any ill-gotten gains; and (3) Mr. Keener lost money on the transactions at issue.   When the SEC fails to put forth evidence that it is entitled to disgorgement, the SEC's disgorgement request must be dismissed.  *SEC v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (dismissing SEC's disgorgement claim at summary judgment when SEC "provided no evidence" to support the claim).

**No Victims**: Last year, the U.S. Supreme Court ruled that disgorgement must be "awarded for victims," *i.e.*, to "wronged investors." *Liu*, 140 S. Ct. at 1940, 1948.  This is because the Exchange Act only authorizes disgorgement to the extent "appropriate or necessary for the benefit of investors." *Id.* at 1947.  The SEC cannot obtain disgorgement here because there are no wronged investors.  Mr. Keener's transactions did not cause anyone harm.

The convertible notes Mr. Keener invested in were freely negotiated with companies who were in need of financing—and likely had no alternate source of financing.  SOF ¶ 27.  Issuers disclosed the notes upon execution, and thus the notes were factored into the issuer stock prices.  *Id.* ¶ 26.  Mr. Keener's sales of converted stock were conducted through registered broker-dealers where he had opened securities brokerage accounts (for instance, BMA Securities, J.H. Darbie & Co., and Key West Investments, LLC).  *Id.* ¶¶ 40, 70.  The brokerage firms reported details about Mr. Keener's transactions to FINRA in real time.  *Id.* ¶ 53.  Those brokerage firms negotiated their own prices for subsequent sales, whether to market makers or to downstream investors.  *Id.* ¶ 54.

The SEC has not identified any theory or evidence as to how anyone in this chain of events was harmed.  The only allegation the SEC has raised to date is that the "counterparties" to Mr. Keener's sales were "victims."  But it has never identified *how* any "counterparties" were allegedly victimized, or even *who the counterparties are*.  In fact, Mr. Keener's counterparties were registered broker-dealers and market makers who negotiated their own prices.  *Id.* ¶¶ 54, 70-71.  There is no

suggestion that these counterparties—who were sophisticated market professionals—purchased at an artificially inflated price, or even that any particular counterparty actually lost money on stock acquired from Mr. Keener.  In such circumstances, *Liu* plainly bars disgorgement.  *See, e.g., SEC v. Bevil*, 2020 WL 7048263, at *4-5 (D. Nev. Nov. 30, 2020) (denying SEC disgorgement request when no showing that proceeds would be for the benefit of victims); *SEC v. Janus Spectrum LLC*, 811 Fed. Appx. 432 (9th Cir. 2020) (remanding disgorgement award for same reason).

**No Causal Connection:**  Nor is disgorgement an available remedy where, as here, there is no causal connection between the alleged violation and any ill-gotten profits.  *See SEC v. Gane*, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005) ("Since disgorgement primarily serves to prevent unjust enrichment, the Court may exercise its equitable power *only over property causally related to the wrongdoing.*") (citing *SEC v. First City Fin. Corp. Ltd.*, 890 F.2d 1215, 1230 (D.D.C. 1989)).  The complaint alleges a failure to perform an administrative act.  The SEC cannot identify any causal connection between the omission of this administrative act and any ill-gotten profits.

Indeed, the Eleventh Circuit has held that disgorgement is inappropriate for a registration violation because there is no causal connection to any "ill-gotten profits":

> [T]he district court may not disgorge profits obtained without the aid of any wrongdoing. . . . The CFTC merely alleged Sidoti failed to register as a principal of Trinity.  Sidoti's failure to register, by itself, is not causally related to Trinity's ill-gotten profits.  **Indeed, the CFTC has not cited and we are not aware of any case in which a court has disgorged profits from a defendant whom it finds liable solely for failure to register as a principal.**  A district court may not disgorge profits, unless there is record evidence the defendant is liable (either directly or indirectly) for fraud.

*CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999) (emphasis added); *see also CFTC v. Southern Tr. Metals, Inc.*, 894 F.3d 1313, 1331 (11th Cir. 2018) (vacating restitution award because there was "no showing that the registration violations caused the losses").  The SEC has alleged only a registration violation, without fraud.  Nor has the SEC identified a single aspect of Mr. Keener's convertible note transactions that would have been different had Mr. Keener registered.  There is no evidence or

even any allegation that Mr. Keener's conduct resulted in any market distortion, price impact, or profit tied to the failure to register.  Without any causal connection between the alleged violation and harm or ill-gotten profits, the SEC's disgorgement claim fails as a matter of law for this second independent reason.  *See, e.g.*, *SEC v. Wyly*, 56 F. Supp. 3d 260, 269 (S.D.N.Y. 2014) (denying disgorgement request when there was "no evidence here that the defendants' unlawful conduct . . . resulted in any market distortion, price impact, or profit tied to the violation").

**No Net Profits**:  A third reason the SEC cannot obtain disgorgement is because the SEC has not demonstrated that Mr. Keener generated any net profits.  The Supreme Court ruled in *Liu* that disgorgement must be limited to net profits, and cannot extend to gross profits:  "Courts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into account." *Liu*, 140 S. Ct. at 1945-46 ("legitimate expenses" must be deducted).  Disgorgement is an equitable remedy not meant to punish the defendant, but to remedy victims' losses.  *Id.* at 1946; *see also SEC v. Mizrahi*, 2020 WL 6114913, at *1 (C.D. Cal. Oct. 5, 2020) (extracting gross profits unfairly punishes defendant).

The SEC has not demonstrated that Mr. Keener generated any net profits.  The SEC requested disgorgement, and alleged Mr. Keener "generated more than $21.5 million in profits."  ECF 1 ¶ 2.  However, the SEC later admitted that this number was overbroad because it (1) included revenue beyond that generated from the sale of converted stock; and (2) did not account for Mr. Keener's business expenses.  SOF ¶¶ 33, 60.  Yet, the SEC never amended its complaint or identified any alternate disgorgement number, and in particular never identified one that accounted for Mr. Keener's business expenses as directed by *Liu*.  Thus, the SEC failed to prove an essential element of its disgorgement demand—that Mr. Keener generated net profits—and thus it is not entitled to disgorgement as a matter of law.  *Jones*, 476 F. Supp. 2d at 386.

28

In fact, Mr. Keener generated only $10 million in proceeds from the sale of stock resulting from note conversions but incurred more than $12 million in business expenses during that time. SOF ¶¶ 58, 59, 61.  The expenses included, for example, employee salaries, broker and attorney charges, and office rent.  *Id.* ¶ 59.  Mr. Keener explained the reason for the losses on his convertible notes investments as follows:

> [I]t just turned out to be not a good way to make money. . . . [W]ith investing in convertible notes, it's a pain.  Had to have employees to help administer them.  You deal with defaults, companies that stop making the filings, there's companies that won't pay you.  And it became very burdensome and was not worth my continuing to move forward in those type of investments. . . .
>
> [I]t's a very difficult investment to administer.  I believe because the borrower has little incentive to honor the investment, the contract.  It's not like a mortgage where the person who borrows the mortgage has the incentive of I don't want to lose my home, so I'm going to honor our agreement, I'm going to pay.   Most of these – these were unsecured. . . . So the borrower had little interest in honoring a contract. . . even if you [] sue them, they still don't care. . . . So it just became a hassle . . . I have no interest in reentering that business whatsoever again.

*Id.* ¶ 65.  The SEC thus has no justification for its disgorgement demand, and under *Liu*, is not entitled to any disgorgement at all.

### D.      The SEC Cannot Obtain Injunctive Relief

Finally, the SEC is not entitled to injunctive relief.  "If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied."  *SEC v. Gentile*, 939 F.3d 549, 562 (3rd Cir. 2019) (injunction is only to "prevent harm" and not for punitive reasons).  Here, not only is there no risk of future harm, there was never any harm resulting from any of Mr. Keener's investments to begin with.  *See* Sec. IV.C, *supra*.  The SEC has not identified a single person— theoretical or actual—that was harmed in any way by any of Mr. Keener's investments.  Nor has the SEC identified specific transactions that would have been different had Mr. Keener registered as a dealer.  This is exactly why "[n]o Commission opinion in a litigated administrative proceeding has

imposed a bar on a respondent solely for operating as an unregistered broker-dealer." *In re David B. Havanich, Jr., et al.*, Release No. 935, 2016 WL 25746, at *11 (Jan. 4, 2016)

An injunction is a "drastic remedy and not a mild prophylactic" and it "should not be obtained against one acting in good faith." *Aaron v. SEC*, 446 U.S. 680, 703 (1980) (Burger, J., concurring). The SEC admitted that Mr. Keener did not act with scienter—he had no knowledge that any of his conduct violated any laws. ECF No. 45 at 2 ("SEC does not allege scienter"). Instead, attorneys vetted each of Mr. Keener's transactions and confirmed they complied with applicable securities laws. SOF ¶¶ 46, 48-50. The SEC now seeks to impose strict liability on Mr. Keener for a registration violation when an entire industry agreed with Mr. Keener's interpretation, and not the SEC's current litigation position. Moreover, Mr. Keener stopped investing in new convertible notes in microcap companies four years ago because of the unprofitable nature of those notes. *Id.* ¶¶ 55-65. Thus, there is no likelihood that the violations the SEC alleges in this case will ever be repeated. In such circumstances, the SEC's request for injunctive relief fails as a matter of law. *See, e.g.*, *SEC v. Pros Int'l, Inc.*, 994 F.2d 767 (10th Cir. 1993) (affirming denial of injunction when defendant did not act with scienter); *SEC v. Perez*, 2011 WL 5597331 (S.D. Fla. Nov. 17, 2011) (denying injunction when no likelihood of future violations).

## V.    CONCLUSION

One year of discovery has demonstrated that the SEC has no more facts than it started with. Mr. Keener is not a dealer. His convertible note investments did not turn him into a dealer. If they did, thousands of other persons and firms would be in violation of the law. Moreover, after one year of discovery, the SEC has not identified a single person that has been harmed by Mr. Keener's investments; to the contrary, the companies he invested in benefited. His investments were disclosed to the public by companies and his transactions were disclosed to FINRA by the registered broker-dealers that sold his stock. The SEC's case must be dismissed.

30

Dated: August 13, 2021

Respectfully submitted,

**GREENBERG TRAURIG LLP**

/s/ *Benjamin G. Greenberg*
**Benjamin G. Greenberg**
Florida Bar No. 192732
333 SE 2nd Avenue Suite 4400
Miami, FL 33131
Telephone: (305) 579-0850
Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

31

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing

Defendant's Motion for Summary Judgment to the following:

> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> 100 F Street NE
> Washington, DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov
>
> *Attorneys for Plaintiff*
> *Securities and Exchange Commission*

This, the 13th day of August, 2021

/s/ *Benjamin G. Greenberg*
Benjamin G. Greenberg