**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:20-CV-21254-BLOOM/LOUIS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **ORAL ARGUMENT REQUESTED** |
| **JUSTIN W. KEENER D/B/A JMJ FINANCIAL,** | |
| **Defendant.** | |

**<u>DEFENDANT'S OPPOSITION TO PLAINTIFF'S OMNIBUS *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF GEORGE OLDFIELD, JASON FLEMMONS, AND STEWART MAYHEW</u>**

<u>**TABLE OF CONTENTS**</u>

I.   INTRODUCTION .................................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................................2

III. LEGAL STANDARDS ......................................................................................................4

IV. ARGUMENT ......................................................................................................................5

    A.   Dr. Oldfield's First Opinion Should Be Admitted..................................................5

    B.   Dr. Oldfield's Second Opinion Should Be Admitted..............................................8

    C.   Dr. Oldfield's Third Opinion Should Be Admitted..............................................12

    D.   Mr. Flemmons's Opinions Should Be Admitted...................................................14

    E.   The SEC Concedes Dr. Mayhew's Opinion Is Admissible. ..................................17

V.   CONCLUSION ..................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012).................................................................................................................10

*City of Tuscaloosa v. Harcros Chemicals, Inc.,*
   158 F.3d 548 (11th Cir. 1998) ...............................................................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993)...........................................................................................................5, 16

*Diebold v. Marshall,*
   585 F.2d 1327 (6th Cir. 1978) .................................................................................................9

*Easterwood v. Carnival Corp.,*
   No. 19-cv-22932-BLOOM/Louis, 2020 WL 6880369 (S.D. Fla. Nov. 23, 2020) ...........5

*FTC v. Qualcomm Inc.,*
   Case No. 17-CV-00220-LHK, 2018 WL 6460573 (N.D. Cal. Dec. 10, 2018).......... 10, 11

*Garfield v. NDC Health Corp.,*
   466 F.3d 1255 (11th Cir. 2006) .............................................................................................10

*Highland Capital Mgmt. v. Schneider,*
   551 F. Supp. 2d 173 (S.D.N.Y. 2008)....................................................................................9

*Horrillo v. Cook Inc.,*
   No. 08–60931–CIV, 2014 WL 2708349 (S.D. Fla. June 6, 2014)....................................10

*Johnson v. Carnival Corp.,*
   Case No. 19-cv-23167-BLOOM/Louis, 2021 WL 1341527 (S.D. Fla. Apr. 9,
   2021)........................................................................................................................................13

*Maiz v. Virani,*
   253 F.3d 641 (11th Cir. 2001) ..........................................................................................5, 7

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.,*
   CASE NOS. 18-CV-63130-RUIZ/STRAUSS, 19-CV-61881, 2020 WL 1666763
   (S.D. Fla. Apr. 3, 2020)................................................................................................... 13, 14

*SEC v. Hall,*
   Case No. 15-CV-23489-Altonaga/O'Sullivan, 2017 WL 3635109 (S.D. Fla. Jan.
   4, 2017) ...............................................................................................................................9, 11

*SEC v. Kovzan*,
    No. 11–2017–JWL, 2012 WL 4819011 (D. Kan. Oct. 10, 2012)....................................9, 10

*SEC v. Spartan Secs. Grp., Ltd.*,
    No. 8:19-cv-448-T-33CPT, 2020 WL 7024884 (M.D. Fla. Nov. 30, 2020) .............................. 6, 7, 9

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991).......................................................................................6, 13

**Statutes**

Securities Exchange Act of 1934 Section 15(a) .............................................................................2

**Other Authorities**

Fed. R. Evid. 702 .................................................................................................... 4, 7, 16

Fed. R. Evid. 702 advisory committee's note to 2000 amendment...................................................7

Guide to Broker-Dealer Registration, https://www.sec.gov/reportspubs/investor-
    publications/divisionsmarketregbdguidehtm.html ...................................................................5

Joel Hasbrouck, *Empirical Market Microstructure: The Institutions, Economics, and
    Econometrics of Securities Trading*, Oxford University Press (2007) ...........................................7

Larry Harris, *Trading and Exchanges*, Oxford University Press (2003)..........................................7

Mark Garman, *Market Microstructure*, Journal of Financial Economics 3 (1976) ......................7

Maureen O'Hara, *Market Microstructure Theory*, Blackwell Publishing (1997) ............................7

Richard Brealey, Stewart Myers, & Franklin Allen, *Principles of Corporate Finance* (10th
    ed. 2011) ....................................................................................................................7

Uniform Application for Broker-Dealer Registration,
    https://www.sec.gov/about/forms/formbd.pdf ..........................................................................6

William L. Silber, *Marketmaker Behavior in an Auction Market: An Analysis of Scalpers in
    Futures Markets*, 39 The Journal of Finance, no. 4 (1984) ......................................................7

## I.      INTRODUCTION

The SEC through its *Daubert* Motion ("Mot.") seeks to litigate this case without any inconvenient facts.  It wants to hide from the jury that there are a plethora of other firms and persons who, like Mr. Keener, make a living from buying and selling securities but are not required by the SEC to register as securities dealers.  It also does not want the jury to know that of the 3,400 firms and persons that are currently registered broker-dealers, none of them are similar to Mr. Keener—not one of them solely invests its own money and does not serve customers.  Nor does the SEC want anyone to explain the technical financial and economic terms in this case to the jury, for instance what a convertible note is or what it means to be a market maker or to use a bid-ask spread.

This is the testimony that Mr. Keener seeks to introduce through Dr. George Oldfield.  Dr. Oldfield is an expert with decades of experience as a practitioner in the securities industry, including extensive experience managing securities and convertible bond trading at a broker-dealer.  He also has more than 20 years' experience as a finance professor teaching graduate courses in trading, market making, and investing activities.  And he also served as an Economic Fellow at the SEC, where he advised on many issues, including how market makers work.  Dr. Oldfield's testimony is relevant to the core issues in the case, including how dealers operate in the real world, and whether Mr. Keener could have been on notice of any requirement that he register as a securities dealer.  His testimony will be helpful to the jury.

In addition, the SEC apparently seeks to prevent Mr. Keener from being able to contest the SEC's own affirmative assertions about the revenue, profits, and income Mr. Keener purportedly generated through sales of converted stock. Specifically, Mr. Keener's expert Jason Flemmons, a former Deputy Chief Accountant at the SEC, analyzed the SEC's income claims.  He assessed Mr. Keener's summary revenue and income data and tested it against hundreds of underlying transaction and expense records.  Following this detailed analysis, Mr. Flemmons concluded that the SEC's

allegations were flawed because the SEC's numbers included revenue generated from sources other than the sale of converted stock and because they failed to account for Mr. Keener's business expenses. The SEC has put Mr. Keener's income at issue, and it should not be permitted to prevent Mr. Keener from defending against its allegations.

None of the SEC's arguments to the contrary have any merit and are based largely on a pin-sized view of relevance that is unsupported by any case law. The SEC's other tactic is to ask that the Court adopt a heightened standard that expert testimony be "scientific" in nature to be admissible. But of course, the Federal Rules require no such thing, and specifically allow for expert testimony that is based not on a "scientific method" but on knowledge, skill, training and education. The SEC's Motion must be denied.

## II.      FACTUAL BACKGROUND

The SEC filed a single-count complaint against Mr. Keener on March 24, 2020, alleging that Mr. Keener's investments in convertible notes, coupled with his converting some of those notes into shares of stock and selling the shares of stock in the stock market, required him to register as a securities dealer under Section 15(a) of the Securities Exchange Act of 1934. Compl. ECF No. 1, at 10-11. Mr. Keener's contends that the Exchange Act's definition of a dealer cannot be interpreted as broadly as the SEC seeks to do in this case. Mr. Keener based his defense on statutory language, legislative history, judicial interpretations, industry practice, as well as the SEC's own formal rulemaking interpretations, published guidance, no-action letters, and public statements. These sources establish that Mr. Keener is not a dealer but is instead an investor that fits the trader exception to the dealer definition, and that this interpretation is supported by the fact that there are thousands of unregistered investors that buy and sell securities for a living.

To this end, and pursuant to the Court's amended discovery order (ECF No. 41) Mr. Keener disclosed three experts and served their respective reports on July 1, 2021. Mr. Keener offered

reports from three well-qualified and seasoned experts: Dr. George Oldfield, Dr. Stewart Mayhew, and Mr. Jason Flemmons.  The SEC, on the other hand, did not disclose any expert witnesses by the July 1 deadline.

Mr. Keener's three expert reports concern key defenses in this case.  Dr. Oldfield, Principal Emeritus at the Brattle Group, has fifty years of experience in the securities industry as an academic, practitioner, and regulator, including a position as an Economic Research Fellow at the SEC, a Managing Director at PaineWebber Capital Markets, and an Economist at the Federal Reserve Banks of New York and Philadelphia.  *See* Ex. 1 (7.1.21 Oldfield Report) ¶¶ 1-7 & App'x A.  Based on his extensive knowledge and expertise in the field, Dr. Oldfield's report addresses numerous matters beyond the knowledge of a lay jury. He explains the nature of convertible securities and the role of different participants in the financial markets.  *See id.* § VII.  He offers an opinion regarding how Mr. Keener's investments in convertible securities compared to the activities of other market participants, as understood in the relevant academic literature and in practice.  *See id.*  He also analyzes and summarizes the activities of different types of firms involved in buying and selling securities that are not registered dealers, as well as those that are.  *See id.* §§ VIII-IX.  In preparing his report, Dr. Oldfield reviewed pleadings and discovery materials, public data regarding dealers and other financial firms, as well textbooks and peer-reviewed academic research in the field of market microstructure.  *See id.* at App'x B.  The SEC did not offer an affirmative expert regarding such matters.  *See id.* ¶¶ 43-44.

Mr. Flemmons, Senior Managing Director of Forensics at Ankura Consulting Group, has twenty-five years of experience in forensic accounting and auditing, as a consultant and a regulator. Ex. 2 (7.1.21 Flemmons Report) ¶¶ 5-10.  Mr. Flemmons is a Certified Public Accountant and is Certified in Financial Forensics by the AICPA.  *Id.* ¶ 5.  He also served as the Deputy Chief Accountant of the SEC's Division of Enforcement.  *Id.* ¶ 6.  His report assessed Mr. Keener's

3

proceeds and business expenses, to address the SEC's allegations that Mr. Keener earned $20 million or more in profit from his sales of converted stock. *Id.* ¶ 19 (referring to SEC Complaint). In response to discovery requests seeking the basis for that figure, the SEC pointed to one document—a spreadsheet prepared by one of Mr. Keener's assistants. Ex. 3 (4.8.21 Pl.'s Resps. to Def.'s Second Set of Reqs. for Admis.) at 8.   Applying his accounting expertise, Mr. Flemmons reviewed that spreadsheet, as well as hundreds of transaction and expense records, and concluded that the spreadsheet (1) included net proceeds unrelated to sales of converted stock; and (2) excluded Mr. Keener's business expenses. Ex. 2 § II.[1]  The SEC did not offer an affirmative expert or any other information during discovery regarding its profits allegations.

Dr. Mayhew, Vice President at Cornerstone Research, has twenty-five years of experience as an academic, regulator, and consultant in economic and finance matters. Ex. 5 (7.1.21 Mayhew Report) ¶¶ 1-3. Dr. Mayhew is also an SEC veteran and has consulted on numerous matters regarding securities and various financial instruments. He was retained to address the assertion by the SEC in discovery that Mr. Keener's transactions caused harm to the "counterparties" to his stock sales. *Id.* ¶¶ 6-7. In his analysis, Dr. Mayhew also provides important background on convertible note transactions and the nature and composition of over-the-counter (OTC) markets. Again, the SEC did not offer an affirmative expert of its own on these topics.

## III.   LEGAL STANDARDS

The Eleventh Circuit has held that expert testimony is admissible under Federal Rule of Evidence 702 if it meets three criteria: (i) the expert is qualified to testify competently regarding the matters he intends to address; (ii) the methodology by which the expert reaches his conclusions is

---

[1] Mr. Flemmons submitted a modified report on July 30, 2021, which merely reflected the completion of validation testing of the business expenses and proceeds that Mr. Flemmons had not been able to complete by the initial deadline, as well as other light edits. The two opinions that Mr. Flemmons offered did not change between the initial report dated July 1, 2021 and the final report submitted on July 30, 2021. Ex. 4 (7.30.21 Final Flemmons Report).

sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (iii) the testimony

assists the trier of fact, through the application of scientific, technical, or specialized expertise, to

understand the evidence or to determine a fact in issue. *See, e.g., Maiz v. Virani*, 253 F.3d 641, 665

(11th Cir. 2001); *Easterwood v. Carnival Corp.*, No. 19-cv-22932-BLOOM/Louis, 2020 WL 6880369, at

*1 (S.D. Fla. Nov. 23, 2020) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

"The inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579, 594 (1993). "Many factors will bear on the inquiry, and [there is no] definitive

checklist or test." *Id.* at 593.

## IV.   ARGUMENT

### A.   Dr. Oldfield's First Opinion Should Be Admitted.

This case involves many concepts and terms that are beyond the understanding of a

layperson, including microcap companies and convertible note investments. It also involves the

characteristics of a dealer, which by the SEC's own admission includes a number of concepts and

terms that are based on economic and financial activities and have no standard legal definitions. For

instance:

- The Complaint alleges Mr. Keener made "a spread or markup on the stock that he sold, [which] is a common attribute of a securities dealer." Compl. ECF No. 1, ¶ 13. A "spread" is not a legal term.

- The SEC's Guide to Broker-Dealer Registration refers to many economic terms including "a matched book of repurchase agreements," a "selling group," and "mak[ing] a market." Guide to Broker-Dealer Registration, https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html, § II.B.

- FINRA (the Financial Industry Regulatory Authority) which regulates broker-dealers, lists a number of economic activities that are characteristic of broker-dealers, including "Exchange member engaged in floor activities" and "retailing corporate

equity securities over-the-counter." *See* Uniform Application for Broker-Dealer Registration, https://www.sec.gov/about/forms/formbd.pdf.

These are exactly the types of terms Dr. Oldfield elucidates and applies to the facts of the case. For instance, he explains what a convertible note is and why companies might enter into convertible note agreements. *See* Ex. 1 § V. He also explains a number of concepts relevant to understanding dealer characteristics from the field of market microstructure, including "bid and ask" prices, "market makers," "repurchase agreements," and "Over-the-Counter markets," and he then applies those terms to Mr. Keener's activities. *See id.* § VII. This is exactly the type of information that will be helpful to simplify complex and unfamiliar terms for the jury. *See, e.g., SEC v. Spartan Secs. Grp., Ltd.*, No. 8:19-cv-448-T-33CPT, 2020 WL 7024884, at *3 (M.D. Fla. Nov. 30, 2020) (admitting expert testimony to explain the microcap securities industry, because such testimony would be "helpful" for the jury); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.").

The SEC's argument to the contrary is inconsistent and meritless. The SEC first criticizes Dr. Oldfield for *not* offering an opinion as to the ultimate question whether Mr. Keener "was acting as a dealer under the securities laws" but then turns around and complains that he testifies to "legal conclusions." Mot. at 5. Dr. Oldfield's opinion concerns neither the securities laws nor legal conclusions. Instead, he explains complex economic and finance concepts, including various dealer characteristics, and applies them to Mr. Keener's activities. *See* Ex. 1 § VII. Such an opinion is an accepted topic for expert testimony. *See, e.g., Spartan*, 2020 WL 7024884, at *7 (admitting expert testimony regarding terms, customs, standards, and practices of microcap industry and application to the facts of the case, over objection that the testimony constituted legal conclusions).

Dr. Oldfield's application of market microstructure concepts to the facts of this case is also based on a reliable methodology. His opinion is based on five decades of experience in financial

markets and the securities industry as an academic, regulator, and practitioner, as well as on highly regarded textbooks and peer-reviewed research published in top academic journals.[2]  *See* Ex. 1 at App'x B; *see also* Ex. 6 (7.29.21 Oldfield Tr.) at 14:12-22, 75:20-23 ("I based my report on the economic analysis of dealership, on the economic analysis of investing" and on "widely accepted" and reliable academic sources).  Opinions grounded in academic research and experience as a practitioner are routinely considered reliable and admissible.  *See Maiz*, 253 F.3d at 666 ("[T]here is no question that an expert may still properly base his testimony on professional study or personal experience.").

At most, the SEC claims Dr. Oldfield's opinion is not reliable because it is not a "scientific" opinion and is not based on a "scientific methodology."  Mot. at 6-7.  The SEC is wrong—as a matter of law, an expert analysis need not be based on a scientific method, and instead can be based on academic research and practical experience.  *See, e.g.*, Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Some types of expert testimony will not rely on anything like a scientific method. . . . Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."); *Spartan*, 2020 WL 7024884, at *4 (admitting

---

[2] For instance, Dr. Oldfield relied on the following sources: Richard Brealey, Stewart Myers, & Franklin Allen, *Principles of Corporate Finance* (10th ed. 2011); Mark Garman, *Market Microstructure*, Journal of Financial Economics 3 (1976); Larry Harris, *Trading and Exchanges*, Oxford University Press (2003); Joel Hasbrouck, *Empirical Market Microstructure: The Institutions, Economics, and Econometrics of Securities Trading*, Oxford University Press (2007); Maureen O'Hara, *Market Microstructure Theory*, Blackwell Publishing (1997); William L. Silber, *Marketmaker Behavior in an Auction Market: An Analysis of Scalpers in Futures Markets*, 39 The Journal of Finance, no. 4 (1984).

expert testimony based on specialized knowledge regarding the securities industry, over objections that testimony was not complex or technical).

Finally, the SEC claims Dr. Oldfield's analysis is not "reliable" because none of the economic literature he cites "analyzed a dealer . . . selling stock converted from notes." Mot. at 6-7. But that is exactly Dr. Oldfield's point. No academic literature concerning financial markets treats convertible notes as having any unique relevance to the dealer analysis. Not to mention, Dr. Oldfield did provide extensive background information about convertible notes and the benefits they offer to companies and investors alike. *See* Ex. 1 § V.

### B.  Dr. Oldfield's Second Opinion Should Be Admitted.

Dr. Oldfield in his second opinion summarizes different market participants involved in buying and selling securities, including convertible notes, and compares and contrasts their activity with Mr. Keener's. *See* Ex. 1 ¶¶ 48-69. For instance:

- **Angel Investors:** Dr. Oldfield examines angel investors, who are wealthy individuals who invest their own money in early-stage companies that are seeking to develop a product and generate revenue. *Id.* ¶ 50. Because of the risky nature of the investments, when there is no guarantee that a company will succeed, angel investments frequently take the form of convertible notes with conversion discounts. *Id.* ¶¶ 50-52. Mr. Oldfield explains that there are angel investors similar to Mr. Keener who are not registered dealers. *Id.* ¶¶ 54-55.

- **Hedge Funds:** Dr. Oldfield also examines hedge funds, which are private investment vehicles for wealthy individuals, and that employ complex trading strategies to maximize returns. *Id.* ¶ 56. He explains that there are many hedge funds similar to Mr. Keener, including those with substantial assets, that are not registered as dealers. *Id.* ¶¶ 58-59.

- **High-Frequency Traders:** Dr. Oldfield also examines high-frequency traders, which place rapid and high-volume orders into the market. *Id.* ¶ 61. Such traders may be responsible for up to 50% of all trading volume in the United States. *Id.* Dr. Oldfield explains that there are such high-frequency traders that share some characteristics with Mr. Keener and are not registered as dealers. *Id.* ¶¶ 63-65.

- **Single Family Offices:** Dr. Oldfield also examines single family offices, which are private wealth management companies that serve high-net-worth families and invest in a wide variety of instruments. *Id.* ¶ 66. Dr. Oldfield explains that there are single

family offices that are similar to Mr. Keener and are not registered as dealers.  *Id.* ¶ 68.

Dr. Oldfield's analysis shows that there are many market participants who make a living from buying and selling securities, who share characteristics with Mr. Keener, yet are not registered as securities dealers.  It cannot reasonably be disputed that such industry context and analysis is relevant to Mr. Keener's contention that he was not a dealer and did not have fair notice of the dealer definition that the SEC promotes in this case.  *See, e.g.*, *SEC v. Hall*, Case No. 15-CV-23489-Altonaga/O'Sullivan, 2017 WL 3635109, at *3 (S.D. Fla. Jan. 4, 2017) (noting that courts often find "testimony regarding the security industry's standards" relevant in securities cases); *Highland Capital Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008) (allowing expert testimony on customs and practices in the securities industry); *SEC v. Kovzan*, No. 11–2017–JWL, 2012 WL 4819011, at *5 (D. Kan. Oct. 10, 2012) (industry practice in a securities case is relevant to a fair notice defense). When an entire industry agrees with Mr. Keener's position, and disagrees with the SEC's current litigation position, that is clear evidence that the SEC's position is mistaken.  *See, e.g.*, *Diebold v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978) (industry practice with regard to government's current litigation or enforcement posture is relevant to fair notice).  Nor can it reasonably be disputed that such industry context is outside "the common knowledge of lay people" and is thus an appropriate topic for expert analysis.  *See, e.g.*, *Spartan*, 2020 WL 7024884, at *7 (admitting expert analysis regarding transfer agent industry standards because it explained aspects of the industry "not in the common knowledge of lay people.").[3]

The SEC claims Dr. Oldfield's analysis is irrelevant because it was "not required to charge" other market participants with "operating as an unregistered dealer" before suing Mr. Keener.  Mot.

---

[3] Industry practice is also highly relevant to the SEC's requested relief—particularly its request for injunctive relief.  As this Court has recognized, the propriety of injunctive relief requires an assessment of Mr. Keener's scienter.  Order ECF No. 29, at 11.  And Mr. Keener can demonstrate that he lacked scienter by demonstrating that his conduct was consistent with industry custom and

at 8.  Even if that is true, Mr. Keener is of course entitled to point to the SEC's "very lengthy period of conspicuous inaction" against any defendant who looked remotely similar to Mr. Keener. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157-58 (2012).  Indeed, such evidence proves Mr. Keener's fair notice defense, because while it may be "possible for an entire industry to be in violation of the [law] for a very long time without the [SEC] noticing" the "more plausible hypothesis is that the [SEC] did not think the industry's practice was unlawful."  *Id.* (internal quotations omitted).  And Dr. Oldfield's opinion is directly relevant to proving the financial industry's understanding and practice with regards to the dealer definition.

Dr. Oldfield's analysis of other market participants in the financial industry is based on his decades of experience as a practitioner in the industry, an analysis of public information about market participants, and a review of relevant academic literature.  This is precisely the indicia of reliability courts look at when determining that expert testimony is admissible.  *See Horrillo v. Cook Inc.*, No. 08–60931–CIV, 2014 WL 2708349, at *4 (S.D. Fla. June 6, 2014) (finding testimony reliable where expert's opinions were supported by peer-reviewed literature and the expert's expertise and experience).  In addition to his own experience and academic research, Dr. Oldfield reviewed representative discovery materials, including transaction records related to Mr. Keener's investments in convertible notes, in order to compare Mr. Keener's activities to those of other market participants.  *See* Ex. 1 § VI.  His selection of materials was appropriately tailored to the allegations in the SEC's Complaint.  *See, e.g., FTC v. Qualcomm Inc.*, Case No. 17-CV-00220-LHK, 2018 WL

---

practice.  *See, e.g., Kovzan*, 2012 WL 4819011, at *5 (defendant can show lack of scienter by showing he did not depart from industry standards); *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264 (11th Cir. 2006) (explaining that scienter requires a showing of recklessness; an extreme departure from standards of ordinary care).

6460573, at *3 (N.D. Cal. Dec. 10, 2018) (finding review of representative documents was appropriate).

The SEC claims Dr. Oldfield's opinion should be excluded because he focused on the transactions identified in the SEC's Complaint and did not expand to a detailed review of all of Mr. Keener's transactions. Mot. at 9 (taking issue with Dr. Oldfield's review of "a few of" Mr. Keener's investments). The SEC's criticism rings particularly hollow when its entire Motion for Summary Judgment does not discuss even one specific transaction in any detail, let alone perform the detailed review it claims Dr. Oldfield should have conducted. Regardless, the SEC does not identify any material fact from the remainder of Mr. Keener's transactions that would have altered Dr. Oldfield's conclusions. *Hall*, 2017 WL 3635109, at *4 (number of documents reviewed is irrelevant to admissibility of opinion, and expert need not review immaterial documents).

Moreover, the SEC seeks to distinguish Mr. Keener from the other market participants that Dr. Oldfield addressed. For instance, the SEC argues Mr. Keener is different from angel investors, and that the marketing materials used by angel investors, hedge funds, and other financial industry participants may be different from those used by Mr. Keener. *See* Mot. at 9-10. But those are arguments for the jury, not for the Court in a *Daubert* motion. *See Hall*, 2017 WL 3635109, at *4 (criticisms of the "factual underpinnings" of an expert opinion "go to the weight and credibility of his testimony, not to its admissibility.") (quoting *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015)); *Qualcomm Inc.*, 2018 WL 6460573, at *3 (criticisms that expert formed opinions based on incomplete data is a topic for cross-examination). The same is true for the SEC's claim that Dr. Oldfield "hand-picked" examples of other market participants to compare to Mr. Keener. Mot. at 10. Dr. Oldfield identified market participants that shared characteristics the SEC has focused on in this case—namely, the fact that Mr. Keener had a website, had employees, and attended conferences. *See* Compl. ECF No. 1, ¶¶ 5 (alleging that Mr. Keener once employed "as

11

many as twenty people") and 10 (noting that Mr. Keener "operated a website," "hired employees," and "attended, and sometimes sponsored, conferences").  Indeed, these are the very facts on which the SEC's entire Motion for Summary Judgment is premised.  *See* Pl.'s Mot. for Summ. J. ECF No. 68, at 5-8; Pl.'s Statement of Material Facts ECF No. 67, ¶¶ 43-49, 50-52, 55-57, 60, 65.  The SEC's claim that these facts are crucial for the Court to consider, but were improper for Dr. Oldfield to consider in evaluating comparable market participants makes no sense and should be rejected.[4]

### C.  Dr. Oldfield's Third Opinion Should Be Admitted.

Dr. Oldfield in his third opinion analyzed extensive data concerning registered dealers and compared Mr. Keener's investing activity to the activities of these registered dealers.  *See* Ex. 1 ¶¶ 70-76.  Specifically, Dr. Oldfield analyzed and summarized the forms (titled Form BD) that firms must complete in order to register as securities dealers.  The Form BD lists 26 types of economic activity registrants use to describe their business.  *See id.* ¶ 72.  Dr. Oldfield's analysis of the Form BDs completed by the more than 3,400 registered broker-dealers demonstrates that all of them engage in customer-facing activities with the investing public, and none of them are similar to Mr. Keener in solely trading for their own account.  *See id.* ¶¶ 72-76.  Dr. Oldfield's analysis of registered dealers establishes Mr. Keener's key claim in this case—that the extraordinarily overbroad interpretation of the dealer definition that the SEC is promoting in this case has no connection to reality.

The SEC has no serious argument that the activities engaged in by the thousands of registered broker-dealers are irrelevant to this case.  Instead, the SEC claims Dr. Oldfield's analysis should be excluded because it could "confuse the jury."  But the SEC's explanation of how the jury

---

[4] Nor do the SEC's cases support its claims, because the SEC has not identified any relevant data that Dr. Oldfield overlooked that would have altered his opinion.  *See* Mot. at 12 (citing cases all focused on experts who had ignored "relevant data": *Cates v. Whirlpool Corp.*, No. 15-cv-5980, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005); *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436, 1450 (E.D. Wash. 1995).)

might be so "confused" is less than clear, and appears to hinge on Dr. Oldfield's statement that he was not applying the legal "definition of 'underwriter'" in his analysis of the Form BD data.  Mot. at 13.  Regardless, the SEC is free to clear up any confusion it perceives through cross-examination or presentation of additional evidence.  *See, e.g.*, *Johnson v. Carnival Corp.*, Case No. 19-cv-23167-BLOOM/Louis, 2021 WL 1341527, at *3 (S.D. Fla. Apr. 9, 2021) (expert witness preclusion for potential jury confusion under Rule 403 is an "extraordinary remedy" and proper cure for weaknesses in expert testimony is through cross-examination).

Dr. Oldfield's analysis of the dealer registration data is reliable and is based on a statistical analysis as well as his decades of experience in the financial industry.  First, Dr. Oldfield explained the Form BD itself, which uses many technical and economic terms that are not defined in the form, including "Exchange member engaged in exchange commission business other than floor activities," "Broker or dealer making inter-dealer markets in corporate securities over-the-counter," "Solicitor of time deposits in a financial institution," and "Real estate syndicator."  Ex. 1 ¶ 72.  Such explanations are a proper topic for expert testimony.  *See, e.g.*, *Bilzerian*, 926 F.2d at 1294 (admitting expert testimony on "unfamiliar terms and concepts" in securities case).

Dr. Oldfield then explained that, of the 26 lines of business on the form, the only activity Mr. Keener engaged in was "trading securities for own account."  Ex. 1 ¶ 72.  Next, Dr. Oldfield analyzed and summarized data contained in more than 3,400 separate registration forms, focusing in particular on the firms that identify "trading securities for own account" among their business activities.  *Id.* ¶¶ 73, 75.  Based on this analysis, he concluded that Mr. Keener would have been an anomaly among registered dealers because ***there are no registered dealers that, like Mr. Keener, only trade for their own account and have no customers.***  *Id.* ¶¶ 75, 76.  Such an analysis of voluminous data is appropriate for expert analysis.  *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, CASE NOS. 18-CV-63130-RUIZ/STRAUSS, 19-CV-61881, 2020 WL 1666763, at *15 (S.D.

Fla. Apr. 3, 2020) ("[E]xpert testimony that 'synthesizes or summarizes data in a manner that streamlines the presentation of that data' is admissible.") (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016)).

The SEC argues Dr. Oldfield's analysis is not reliable because it is purportedly simple "arithmetic" rather than the product of "scientific knowledge" or "methodology." Mot. at 12-13. But it is not mere "arithmetic"—it is a distillation of thousands of pieces of complex data. This is a proper topic for expert testimony. *See Ohio State Troopers*, 2020 WL 1666763, at *15. Moreover, the SEC identifies no flaws in Dr. Oldfield's analysis that would make it unreliable. And as a matter of law, expert testimony does not need to be "scientific" in order to be reliable. *See* Sec. IV.A.ii., *supra*.

### D.  Mr. Flemmons's Opinions Should Be Admitted.

#### i.  Mr. Flemmons's Opinions Relate to More Than Remedies.

Mr. Flemmons's opinions also relate to a core issue in this case—which sales of converted stock are alleged to have required Mr. Keener to register as a dealer, and whether and how much Mr. Keener profited from those sales. Ex. 2 at 5 (summarizing opinions). Accordingly, his opinions are highly relevant and admissible at any jury trial concerning liability, and not just remedies as the SEC contends. Mot. at 14-15. The SEC's pleadings are replete with allegations—indeed, with conflicting and contradictory allegations—about Mr. Keener's revenue, income, and profit purportedly generated through the sale of converted stock. For instance, the Complaint alleges Mr. Keener generated $21.5 million in "profits." Compl. ECF No. 1, at 2, 4, 9. In its Initial Disclosures, the SEC estimated Mr. Keener's allegedly obtained "ill-gotten gains" of $20 million. Ex. 7 (7.20.20 Pl.'s Initial Discl.) at 3. The SEC's Motion for Summary Judgment is premised on its claim that Mr. Keener generated more than $33 million in "net income." Pl. Mot. for Summ. J. ECF No. 68, at 8. This $33 million figure is based on a declaration by an SEC employee, Carmen Taveras, that was attached to the SEC's Motion for Summary Judgment. Decl. of Carmen A. Taveras ECF No. 67-11,

14

¶ 4.  The SEC has put these numbers at issue in any jury trial on liability.  If these numbers were not at issue, it would not have attached the Taveras declaration to its Motion for Summary Judgment.  Thus, Mr. Keener is entitled to rebut the SEC's numbers through Mr. Flemmons's detailed expert analysis of Mr. Keener's proceeds and expenses.  Ex. 2 § IV.

Not only are the "net income" numbers at issue, but more importantly, the SEC has not even identified what transactions are at issue.  The SEC's Complaint alleges Mr. Keener is a dealer because he invested in convertible notes, "converted them into newly issued shares" and "sold the shares in the market."  Compl. ECF No. 1, at 3 (capitalization altered).  The SEC's discovery responses similarly state the sales at issue are "the sales of newly-issued stocks that Defendant sold after making conversions of convertible notes."  Ex. 8 (1.22.21 Pl.'s Resps. to Def.'s First Set of Interrogs.) at 2-3.  Yet it apparently now seeks to address all of Mr. Keener's stock sales regardless of whether the stock was obtained through a note conversion.  *See, e.g.*, Decl. of Carmen A. Taveras ECF No. 67-11, ¶ 12.  Mr. Flemmons is the only witness who has tested summary transaction data against source documents to analyze whether revenue was generated through the sale of converted stock, as opposed to revenues generated through some other means.  Ex. 2 ¶¶ 32-33; Ex. 4 ¶¶ 32-34.  Consequently, his testimony is relevant and necessary to identifying the transactions that are properly at issue in the case.

### ii.  Mr. Flemmons's First Opinion is Relevant, Reliable, and Will Help the Trier of Fact.

Mr. Flemmons based his analysis on the SEC's allegations in this case.  Specifically, the SEC alleged Mr. Keener generated more than $20 million in "profits" from the sale of converted stock and identified one spreadsheet prepared by Mr. Keener's assistant as the sole source of support for that "profits" number.  Compl. ECF No. 1, at 2, 4, 9; Ex. 3 at 8.  Thus, Mr. Flemmons analyzed the data in the spreadsheet, including by testing underlying source documents to verify various data

points, and concluded that the SEC's allegations were demonstrably false because the "profits" numbers included revenue generated from sources other than converted stock, and also failed to account for relevant business expenses.  Ex. 2 ¶¶ 34-35, 45-46.

The SEC now feigns a lack of understanding as to why Mr. Flemmons began his analysis from this spreadsheet, going so far as to claim that Mr. Flemmons created a "fictional position" about the SEC's allegations.  Mot. at 16.  One need only look at the SEC's discovery responses in this case to know that is false.  Ex. 3 at 8 (SEC citing this spreadsheet, Bates numbered JMJ-SEC-008-000380, when asked how it arrived at the figure in the complaint).

The SEC then claims that Mr. Flemmons's forensic accounting opinion is not an expert analysis and instead employs "simple math" and "stat[es] the obvious."  Mot. at 17-18.  The SEC's claim makes no sense.  Forensic accounting is a core area for expert testimony: it is precisely the sort of "technical and specialized expertise" contemplated by Rule 702 and *Daubert*. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563-64 n.17 (11th Cir. 1998).  Consistent with his experience, expertise, and training in forensic accounting, Mr. Flemmons examined summary data and, applying his accounting training and expertise, tested it against hundreds of source documents and business records. Ex. 2 ¶¶ 32-33, 39-42, Exhibit 2, Exhibit 5.  Mr. Flemmons analyzed the original transaction documents to assess whether "the classification of the proceeds as related [to] either a convertible note or other investment activity was accurate," which requires additional expertise far beyond simple math. *Id.* ¶ 33.  It is telling that the SEC proffered a summary witness to calculate Mr. Keener's net profits who holds a Ph.D. in economics from the Massachusetts Institute of Technology—hardly a lay witness.  Decl. of Carmen A. Taveras ECF No. 67-11.

Mr. Flemmons's analysis consists of "calculating, compiling, and explaining the costs borne and profits enjoyed by the defendants" which is beyond the capabilities of a layperson and will help the trier of fact in this case. *Harcros Chemicals*, 158 F.3d at 563-64 n.17.  For this reason, the SEC's

16

cases are inapposite and deal with limited records or data, not forensic accounting that involved testing of hundreds of source documents.  *See* Mot. at 18 (citing *Bowe v. Public Storage*, No. 1:14–cv–21559–UU, 2015 WL 11233065 (S.D. Fla. May 7, 2015) (expert who looked at limited sources); and *Rossi v. Darden*, No. 16-21199-CIV-ALTONAGA/O'Sullivan, 2017 WL 2129429 (S.D. Fla. May 17, 2017) (expert who had not reviewed all the relevant data).)

### E.  The SEC Concedes Dr. Mayhew's Opinion Is Admissible.

Mr. Keener seeks to introduce Dr. Mayhew's report and testimony not on issues relating to liability, but solely on issues relating to remedies, should the SEC prevail on its theories of liability. Accordingly, there is nothing for the Court to decide as to Dr. Mayhew because the SEC does not dispute that Dr. Mayhew's report and testimony are relevant and admissible when it comes to determining any remedies.  *See* Mot. at 18.

## V.  CONCLUSION

The testimony of Dr. Oldfield and Mr. Flemmons is both relevant and admissible.  Both speak to core issues in this case.  Dr. Oldfield will simplify complex economic and financial concepts regarding convertible notes and the microcap industry for the jury.  And he will speak to the industry practice around the dealer/trader distinction.  Mr. Flemmons will address Mr. Keener's profits and the specific transactions in the case, which the SEC has put directly at issue through its allegations.  The SEC's arguments to exclude both witnesses at bottom go to the weight that the jury should give to their testimony, and do not speak to the admissibility of their testimony.  The SEC's *Daubert* Motion should be denied.

Dated: August 27, 2021                    Respectfully submitted,

                                          **GREENBERG TRAURIG LLP**

                                          /s/ *Benjamin G. Greenberg*

                                          **Benjamin G. Greenberg**
                                          Florida Bar No. 192732
                                          greenbergb@gtlaw.com
                                          333 SE 2nd Avenue Suite 4400
                                          Miami, FL 33131
                                          Telephone: (305) 579-0850
                                          Facsimile: (305) 579-0717

                                          *-and-*

                                          **BUCKLEY LLP**

                                          **Christopher F. Regan (*pro hac vice*)**
                                          **Veena Viswanatha (*pro hac vice*)**
                                          **Adam Miller (*pro hac vice*)**
                                          2001 M Street NW, Suite 500
                                          Washington, DC 20036
                                          Telephone: (202) 349-8000
                                          Facsimile: (202) 349-8080
                                          cregan@buckleyfirm.com
                                          vviswanatha@buckleyfirm.com
                                          amiller@buckleyfirm.com

                                          *Counsel for Defendant Justin W. Keener*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing Defendant's Opposition To Plaintiff's Omnibus *Daubert* Motion To Exclude The Testimony Of George Oldfield, Jason Flemmons, And Stewart Mayhew to the following:

Joshua E. Braunstein (Special Bar No. A5502640)
Antony Richard Petrilla (Special Bar No. A5502641)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*

This, the 27th day of August, 2021

*/s/ Benjamin G. Greenberg*

19