## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JUSTIN W. KEENER D/B/A JMJ FINANCIAL,** ) | |
| ) | **No. 20-cv-21254** |
| **Defendant.** ) | |
| ) | **Hon. Beth Bloom** |
| ) | |
| ) | |
| ) | |
| _____ ) | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE REBUTTAL EXPERT REPORT OF DR. CARMEN TAVERAS**

## **<u>TABLE OF CONTENTS</u>**

BACKGROUND…………………………………………………………………..…1

LEGAL STANDARD...........................................................................................……...2

ARGUMENT ....................................................................................……...4

I.     Dr. Taveras is an Eminently Qualified Economist ........................................……...4

II.    Defendant's Experts Should Not be Permitted to Testify..................................……...5

III.   If Defendant's Experts are Permitted to Testify, Then Dr. Taveras' Expert
Rebuttal Testimony is Appropriate in Scope, Reliable, and Will Assist the Jury ....……...7

    A.  Dr. Taveras' Rebuttal Testimony is Appropriate Under Rule 26(a)....................……...8

        1.  Dr. Taveras' Rebuttal to Mr. Flemmons' Report..................................……...8

        2.  Dr. Taveras' Rebuttal to Dr. Mayhew's Report..................................…...10

        3.  Dr. Taveras' Opinions Contradict and Rebut the Same Subject
Matter as Defendants' Experts...................................................……...12

    B.  Dr. Taveras' Rebuttal Testimony is Reliable and Helpful .....................................……15

        1.  Dr. Taveras' Expert Rebuttal to Dr. Oldfield is Reliable and Helpful ..............……15

        2.  Dr. Taveras' Expert Rebuttal to Dr. Mayhew is Reliable and Helpful..............……17

        3.  Dr. Taveras' Expert Rebuttal to Mr. Flemmons is Reliable and Helpful .....……18

    CONCLUSION.....................................................................................……20

## **TABLE OF AUTHORITIES**

**CASES**

*Adacel, Inc. v. Adsync Tech., Inc.*,
    2020 WL 4588415 (M.D. Fla. July 9, 2020) ...........................................……13

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) .............................................…..3, 5

*Coquina Invs. v. Rothstein*,
    2011 WL 4949191 (S.D. Fla. Oct. 18, 2011).................................……19

*Cosmo v. Carnival Corp.*,
    2017 WL 4785639 (S.D. Fla. Oct. 16, 2017).................................……18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...........................................................*ibid.*

*Fuller v. SunTrust Banks, Inc.*,
    2019 WL 5448206 (N.D. Ga. Oct. 3, 2019) ..............................13, 14

*In re Trasylol Prods. Liab. Litig.*,
    2010 WL 4065436 (S.D. Fla. Aug. 6, 2010).................................……14

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)........................................................……..2

*Liu v. SEC*, 140 S.Ct. 1936 (2020)……………………………………………..11

*Long v. Murray County School District*,
    2012 WL 13071603 (N.D. Ga. Apr. 18, 2012) .............................……18

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) .............................................3, 19

*Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*,
    845 F. Supp. 2d 1241 (M.D. Fla. 2012)....................................…...14

*Northrup v. Werner Enterprise, Inc.*,
    2015 WL 4756947 (M.D. Fla. Aug. 11, 2015) ............................……13

*OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*,
    549 F.3d 1344 (11th Cir. 2008) ............................................……14

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC,*
    2011 WL 2295269 (S.D. Fla. June 8, 2011) ...................................................19

*Perez v. Wells Fargo N.A.,*
    774 F.3d 1329 (11th Cir. 2014) ...........................................……..14

*Plantation Pipe Line Co. v. Associated Elec. & Gas Ins. Servs. Ltd.,*
    2011 WL 13143562 (N.D. Ga. Nov. 10, 2011) ............................……13

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,*
    326 F.3d 1333 (11th Cir. 2003)……………………………………………..3, 4, 5, 16

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
    944 F.2d 597 (9th Cir. 1991) ...........................................……13

*Rink v. Cheminova, Inc.,*
    400 F.3d 1286 (11th Cir. 2005) ...........................................……16

*SEC v. Sabrdaran,*
    252 F. Supp. 3d 866 (N.D. Cal. 2016) .....................................……..5

*United States v. Abreu,*
    406 F.3d 1304 (11th Cir. 2005) ...........................................……..4

*United States v. Frazier,*
    387 F.3d 1244 (11th Cir. 2004) ...........................................3, 13

*United States v. Hansen,*
    262 F.3d 1217 (11th Cir. 2001) ...........................................……..3

*Wreal, LLC v. Amazon.Com, Inc.,*
    2016 WL 8793317 (S.D. Fla. Jan. 7, 2016) ...............................……19

## STATUTES & RULES

15 U.S.C. § 78o(a)(1)...........................................................2, 15

Fed. R. Civ. P. 26(a)…………………………………………………………8, 12, 13

Fed. R. Evid. 702 .............................................................2-4, 7

Fed. R. Evid. 1006 .......................................................……..7

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in opposition to Defendant's Motion to Exclude Rebuttal Expert Report of Dr. Carmen Taveras [ECF No. 66] ("Def. Mem."). Defendant argues that portions of Dr. Taveras' report should be excluded as outside the scope of appropriate rebuttal, and that Dr. Taveras' report should be excluded in full because it is purportedly "unreliable and/or will not be helpful to the jury." Def. Mem. at 2. Contrary to Defendant's assertion, it is ***Defendant's*** experts—not Dr. Taveras—who fail to meet the Eleventh Circuit's three-pronged test for admissibility under *Daubert*. *See* Plaintiff Securities and Exchange Commission's Omnibus *Daubert* Motion to Exclude the Testimony of George Oldfield, Jason Flemmons, and Stewart Mayhew and Incorporated Memorandum of Law [ECF No. 65] ("SEC *Daubert* Mtn."). But if this Court permits Defendant's experts to testify, then (i) Dr. Taveras is an eminently qualified economist; (ii) Dr. Taveras' rebuttal testimony is narrowly tailored to respond directly to the opinions articulated by each of Defendant's experts; and (iii) Dr. Taveras' testimony is reliable and helpful. This Court should deny Defendant's motion.

## BACKGROUND

Defendant Justin W. Keener, d/b/a JMJ Financial ("Defendant") engaged in the business of repeatedly purchasing convertible notes from small "microcap" issuers, converting the notes into stock at significant discounts from prevailing market prices, and selling the resulting newly issued shares into the public market for a significant profit. Complaint ¶¶ 1-4 [ECF No. 1]. Defendant sold more than ***38 billion shares of stock*** purchased from more than ***200 different issuers*** into the public market. *See* Plaintiff's Statement of Material Facts ¶¶ 27, 29 [ECF No. 67]. Defendant's net proceeds from sales between March 24, 2014 and January 31, 2018 totaled approximately ***$34 million***. *Id.* ¶ 31. The SEC alleges that, by engaging in this business,

Defendant acted as an unregistered dealer in violation of Section 15(a)(1) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

There is *one* issue in the SEC's case in chief, and that is whether Defendant acted as an

unregistered dealer.  To prevail on this claim, the SEC must prove by a preponderance of the

evidence that:  Defendant (i) made use of the mails or other means or instrumentalities of

interstate commerce; (ii) to effect transactions in, or to induce or to attempt to induce the

purchase or sale of, securities; (iii) as part of a regular business; (iv) while not registered with the

SEC as a dealer; and (v) when Defendant was not associated with an entity registered with the

SEC as a dealer.  Complaint ¶ 24; 15 U.S.C. § 78o(a)(1).  This issue can, and should, be resolved

in the SEC's favor on summary judgment.  *See* Plaintiff Securities and Exchange Commission's

Motion for Summary Judgment and Incorporated Memorandum of Law [ECF No. 68] (seeking

judgment in favor of the SEC and against Defendant on Count I of the Complaint, and on the

Defendant's Third, Fourth, Fifth, and Sixth Affirmative Defenses).

If this case survives summary judgment, however, and this Court permits—in whole or

part—the testimony of Defendant's experts to reach the jury, then the question for this Court is

whether Dr. Taveras' rebuttal testimony will assist the jury in understanding the evidence and

reaching a judgment.  The answer to that question is, indisputably, "yes."

## LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, as

explained and refined by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Federal Rule of

Evidence 702 permits qualified experts to proffer their expert opinions where: (i) the expert's

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

2

evidence or decide a fact in issue; (ii) the testimony is based on sufficient facts or data; (iii) the

testimony is the product of reliable principles and methods; and (iv) the witness has applied the

principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  The proponent of the

expert opinion bears the burden of laying a proper foundation for its admission, which must be

shown by a preponderance of the evidence.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300,

1306 (11th Cir. 1999).

The trial court thus functions as a gatekeeper and engages in a three-part inquiry to

determine whether: (i) the expert is qualified to testify competently regarding the matters she

intends to address; (ii) the methodology by which the expert reaches her conclusions is

sufficiently reliable; and (iii) the testimony will assist the trier of fact, through the application of

scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in

issue.  *See, e.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (citing *Daubert*,

509 U.S. at 592).  The Eleventh Circuit has referred to these requirements as the "qualifications,"

"reliability," and "helpfulness" prongs and, although there is inevitably some overlap, they

remain distinct concepts that must be individually analyzed.  *United States v. Frazier*, 387 F.3d

1244, 1260 (11th Cir. 2004).

In considering the admissibility of expert testimony, "it is not the role of the district court

to make ultimate conclusions as to the persuasiveness of the proffered evidence."  *Quiet Tech.

DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz v. Virani*, 253

F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper role under *Daubert* 'is not

intended to supplant the adversary system or the role of the jury.'") (quoting *Allison*, 184 F.3d at

1311)).  The Court should "consider any additional factors that may advance its Rule

702 analysis."  *Quiet Tech.*, 326 F.3d at 1341.  Indeed, "[t]he inquiry envisioned by Rule 702 is

3

. . . a flexible one." *Daubert*, 509 U.S. at 594. "Many factors will bear on the inquiry," and no "definitive checklist or test" exists. *Id.* at 593.

## ARGUMENT

### I.      Dr. Taveras is an Eminently Qualified Economist

Defendant does not challenge Dr. Taveras' qualifications or experience, nor could he. Under the qualifications prong, "a witness qualifie[s] as an expert by knowledge, skill, experience, training, or education." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005) (citing Fed. R. Evid. 702). Dr. Taveras meets and exceeds the standard of a qualified economist.

Dr. Taveras has more than 15 years' academic and professional experience in economics and financial markets, including seven years with the SEC as a Financial Economist in the SEC's Division of Economic and Risk Analysis, where she is currently an Assistant Director. Ex. 1, Rebuttal Expert Report of Carmen A. Taveras, Ph.D. ¶¶ 1-3 (July 19, 2021); *id.* at 29-31 (*Curriculum Vitae* of Carmen A. Taveras, Ph.D.). In this role, Dr. Taveras provides financial, economic, and statistical analyses to assist the SEC in the investigation and litigation of potential securities law violations. Ex. 1 ¶ 1. Since joining the SEC in 2014, Dr. Taveras has worked on approximately 80 enforcement matters. *Id.* Before joining the SEC, Dr. Taveras worked at Securities Litigation and Consulting Group ("SLCG"), a consulting firm specializing in financial economics matters. *Id.* ¶ 2. At SLCG, Dr. Taveras conducted economic analysis of issues related to securities class actions, brokerage industry disputes, and regulatory investigations. In addition, while at SLCG, Dr. Taveras prepared reports in consulting engagements for securities regulators and industry groups. *Id.*

Dr. Taveras has a Ph.D. in economics from the Massachusetts Institute of Technology, where she taught graduate and undergraduate courses in economics. *Id.* ¶ 3. Dr. Taveras

obtained a Postgraduate Diploma in Macroeconomics from the Pontificia Universidad Católica in Chile, and a B.A. in Economics from the Pontificia Universidad Católica Madre y Maestra in the Dominican Republic. *Id.*

Dr. Taveras has served as an expert witness on several occasions, including testifying at trial. *Id.* at 30-31. Dr. Taveras' testimony and opinions have been accepted by all the courts and finders of fact to which they have been offered, and her opinions and testimony have never been rejected or criticized by a court. In one matter, *SEC v. Sabrdaran*, Case No. 252 F. Supp. 3d 866 (N.D. Cal. 2016), the federal trial court adopted Dr. Taveras' opinions **virtually verbatim**. This Court should conclude that Dr. Taveras is qualified as an expert in the field of economics and well suited to testify as a rebuttal expert in this matter. *See, e.g.*, *Quiet Tech.*, 326 F.3d at 1341-42 ("[A]n expert's overwhelming qualifications may bear on the reliability of his proffered testimony.").

## II.     Defendant's Experts Should Not be Permitted to Testify

The SEC has filed a *Daubert* motion to exclude the testimony of Defendant's experts. *See* SEC *Daubert* Mtn. [ECF No. 65]. As detailed in that motion (incorporated by reference herein), this Court should exercise its gatekeeper function to preclude each of Defendant's three experts from testifying in this case. *Id.*; *see also Allison,* 184 F.3d at 1311-12 ("The judge's role is to keep **unreliable** and **irrelevant** information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value.") (emphasis added).

*First*, this Court should exclude the opinions and testimony of Dr. Oldfield, because his opinions are irrelevant to the question whether Defendant was an unregistered dealer. SEC *Daubert* Mtn. § II.B [ECF No. 65]. Most importantly, Dr. Oldfield **admits** that he did not

consider whether Defendant operated as a dealer under the federal securities laws, but instead applied his own inapposite standard in order to opine that Defendant would not be considered a "dealer" in the field of market microstructure. *Id.* § II.B.1.  In essence, Dr. Oldfield would ask the jury to ignore the binding precedent in this Circuit, and instead suggest that the jury should find Defendant not liable based on Dr. Oldfield's different, inapplicable, standard. *Id.* Moreover, even if Dr. Oldfield's opinions were relevant—which they are not—this Court nevertheless should exclude his report and testimony under *Daubert*, because Dr. Oldfield failed to use a reliable methodology, and did not rely on sufficient facts and data to reach his opinions. *Id.* § II.B.  Accordingly, nothing that Dr. Oldfield opines will assist the jury in determining whether Defendant complied with the Exchange Act's dealer registration statute—the sole question at issue in this case.

*Second,* this Court should grant the SEC's motion to exclude the testimony of Defendant's experts, Mr. Flemmons and Dr. Mayhew, because these experts' opinions relate solely to the remedy of disgorgement,[1] which is an issue for the Court—not the jury—to decide. *Id.* §§ II.C-D; *see also* Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant's Motion *in Limine* to Exclude Any Evidence Regarding Alleged Victims, Counterparties, or Harm at § I [filed concurrently herewith] ("SEC MIL Opp'n") (jury

---

[1] *See* Expert Report of Jason S. Flemmons ¶ 3 (July 1, 2021) [ECF No. 65-2] ("Flemmons Report") ("I was retained to analyze the SEC's **Disgorgement** Calculation Support Spreadsheet and to offer opinions as to whether it accurately reflects 1) the net proceeds of JMJ's sales of stocks attributable to convertible notes and 2) the expenses incurred by JMJ in running its business.") (emphasis added); Final Expert Report of Jason S. Flemmons ¶ 3 (July 30, 2021) [ECF No. 65-3] ("Flemmons Revised Report") (same); Expert Report of Stewart Mayhew, Ph.D. ¶ 6 (July 1, 2021) [ECF No. 65-4] ("Mayhew Report") ("I have been asked to provide background . . . that might be useful to the court in assessing whether Mr. Keener's failure to register as a dealer caused economic harm to the counterparties to Mr. Keener's transactions.  I understand from counsel that this question is relevant to the court's consideration of whether **disgorgement** is an appropriate remedy.") (emphasis added).

decides issue of liability; Court determines remedies, including disgorgement).  Because

disgorgement is neither an element of the SEC's claim, nor part of the SEC's case in chief, Mr.

Flemmons and Dr. Mayhew are incapable of rendering any opinion that will "help the ***trier of***

***fact*** to understand the evidence or to ***determine a fact in issue***."  Fed. R. Evid. 702(a) (emphasis

added).[2]

      The SEC submits Dr. Taveras' rebuttal expert testimony solely in response to the

proposed testimony of Defendant's experts, should this Court permit them to testify at trial.

Accordingly, if this Court grants the SEC's affirmative *Daubert* motion, then Defendant's

motion concerning Dr. Taveras will be moot.[3]

## III.   If Defendant's Experts are Permitted to Testify, Then Dr. Taveras' Expert Rebuttal Testimony is Appropriate in Scope, Reliable, and Will Assist the Jury

      If Defendant's experts are permitted to testify over the SEC's objection, then this Court

should permit Dr. Taveras' rebuttal testimony, because it is appropriate in scope, reliable, and

helpful to the jury.  Defendant does not challenge Dr. Taveras' qualifications.  Nor has

Defendant established any methodological errors—let alone such serious errors as to render Dr.

Taveras' opinions unreliable or likely to confuse or mislead the jury.  Rather, Defendant is

simply trying to exclude Dr. Taveras' testimony, so that Defendant's experts can present their

---

[2] Mr. Flemmons' opinions should also be excluded on the independent ground that he failed to apply sufficient facts or data or rely on a reliable methodology.  *See* SEC *Daubert* Mtn. § II.C.2 [ECF No. 65].

[3] The SEC may call Dr. Taveras as a summary witness under Federal Rule of Evidence 1006.  *See* SEC Rule 26(a) Supplemental Disclosures [ECF No. 69-15] ("[Dr. Taveras] [m]ay be called as a summary witness regarding voluminous records relating to some or all of the following:  Defendant's securities transactions, tax records, and expense records.").  On August 13, 2021, Dr. Taveras filed a summary witness declaration in support of the SEC's motion for summary judgment.  *See* Declaration of Carmen A. Taveras, Ph.D., in Support of Plaintiff's Motion for Summary Judgment [ECF No. 67-11] (summarizing certain information produced by Defendant relating to his convertible note transactions).  Defendant has not challenged Dr. Taveras' testimony as a summary witness.

unsupported and unreliable opinions to the jury without opposition.  This Court should not permit Defendant to run roughshod over the Rules of Evidence and Procedure.

**A.    Dr. Taveras' Rebuttal Testimony is Appropriate Under Rule 26(a)**

Defendant argues—with respect to Dr. Taveras' opinions concerning Mr. Flemmons and Dr. Mayhew (but not Dr. Oldfield)—that Dr. Taveras' rebuttal report should be stricken, because it purportedly is "a disguised effort by the SEC" to introduce new evidence or respond to opinions Defendant's experts do not offer.  Def. Mem. at 2-4; *id.* at 8, 10, 12-14.  Defendant is incorrect.  Dr. Taveras directly challenges the opinions of Mr. Flemmons and Dr. Mayhew, and therefore does not exceed the proper scope of expert rebuttal under Federal Rule of Civil Procedure 26(a).  This Court should deny Defendant's motion.

**1.    Dr. Taveras' Rebuttal to Mr. Flemmons' Report**

Mr. Flemmons offers two opinions concerning Defendant's proceeds and expenses, which he states are relevant to the SEC's disgorgement claim.  Mr. Flemmons first argues that, "the SEC's disgorgement claim includes net proceeds that are unrelated to stock sales arising from convertible notes."  Flemmons Report §§ II.A, IV.A [ECF No. 65-2]; Flemmons Revised Report §§ II.A, IV.A [ECF No. 65-3].  Mr. Flemmons next argues that, "the SEC's disgorgement claim excludes relevant business expenses."  Flemmons Report §§ II.B, IV.B [ECF No. 65-2]; Flemmons Revised Report §§ II.B, IV.B [ECF No. 65-3].

In rebuttal, Dr. Taveras identifies fatal flaws with each of Mr. Flemmons' two opinions. With respect to Mr. Flemmons' first opinion, Dr. Taveras observes that Mr. Flemmons "relies on a classification of sale proceeds provided by ***Defendant***," and opines that Mr. Flemmons improperly excludes "trading activity related to stock sales derived from warrants and note settlements on the assumption that they are distinct from the activity relating to convertible

notes." Ex. 1 ¶ 12 (emphasis added) (internal quotation marks and alterations omitted).  Dr.

Taveras disagrees with Mr. Flemmons' classification of net income, observing that:

> Whether Defendant received shares to pay down note balances or
> received shares or cash from settlements or penalties for
> prepayment or unpaid notes, all of those inflows are ***income***
> resulting from convertible note activity.  Similarly, shares received
> through warrants tied to convertible notes are just like shares
> received through conversions: both are newly issued shares
> intended to compensate the Defendant. . . . Mr. Flemmons
> ***excluded*** warrant activity from convertible note activity in his
> calculations, contrary to testimony of Defendant's CFO that
> warrants were packaged with the convertible notes and that
> Defendant would not have obtained the warrants in the absence of
> the convertible notes.

*Id*. ¶ 18 (emphasis added).  Dr. Taveras concludes that—using his unduly narrow and erroneous

approach—Mr. Flemmons "finds that Defendant's net income from convertible notes is

approximately $10 million, or 48% of his total net income from stock sales from January 2015 to

January 2018."  *Id.* ¶ 12.

     With respect to Mr. Flemmons' second opinion, Dr. Taveras opines that "[t]he main flaw

in [Mr. Flemmons'] analysis is that while the Flemmons Report focuses on Defendant's

convertible note activity on the net income side, it includes ***all*** of Defendant's business expenses

on the expense side, netting 48% of the Defendant's net income against 100% of his total

business expenses."  *Id.* ¶ 13 (emphasis added).  To correct Mr. Flemmons' error, Dr. Taveras

offers two alternative approaches:

> The first approach . . . is to pro-rate the expenses based on the
> portion of the Defendant's business related to convertible note
> activity, as defined by Mr. Flemmons, which was 48%.  I first
> remove from the business expense category $2,250,000 in bad debt
> associated with the ACAR note, which Mr. Flemmons claims is
> not a convertible note.  To estimate the portion from convertible
> notes I multiply the expenses by the portion of his net income from
> convertible notes, as identified by Mr. Flemmons.  On that basis, ***I
> assign 48% of them, or $5.7 million, to his convertible note
> activity.***

*Id.* ¶ 16 (emphasis added) & Exhibit 1, Column C.

> The second approach . . . was to re-calculate the portion of proceeds attributable to convertible notes. . . .  Because this approach suggests that ***nearly all of the net income was related to convertible notes***, [Taveras] did not adjust or apportion the expenses. ***This approach results in a net profit of $6.4 million*** (i.e., $20.4 million in net income from notes minus $13.9 million in business expenses).

*Id.* ¶ 19 (emphasis added) & Exhibit 1, Column D.

Each of Dr. Taveras' alternative corrections to Mr. Flemmons' errors results in ***positive*** net profits from Defendant's convertible note activity, in contrast to Mr. Flemmons' flawed $4 million net loss number.  *Id.* ¶ 20.[4]  In offering her corrections to Mr. Flemmons' errors, Dr. Taveras ***expressly states*** that she is not offering an opinion on the appropriate amount of an as-yet-to-be-awarded disgorgement amount in this case.  *Id.* ¶ 21.

## 2.    Dr. Taveras' Rebuttal to Dr. Mayhew's Report

Dr. Taveras' report similarly responds to errors in Dr. Mayhew's report, which offers an opinion on "whether Mr. Keener's failure to register as a dealer caused economic harm to the counterparties" that Dr. Mayhew asserts "is relevant to the court's consideration of whether disgorgement is an appropriate remedy."  Mayhew Report ¶ 6 [ECF No. 65-4].[5]  Dr. Taveras

---

[4]  Mr. Flemmons' initial report, filed on July 1, 2021, offset Defendant's reported net income of $10 million from convertible notes by $14 million in purported business expenses, arriving at the incorrect $4 million net loss number.  Flemmons Report ¶ 45 [ECF No. 65-2].  After Dr. Taveras pointed out Mr. Flemmons' error in her July 19, 2021 report and during her July 27, 2021 deposition, Mr. Flemmons filed his revised report, which makes no mention of Defendant's purported $4 million loss.  *See* Flemmons Revised Report [ECF No. 65-3].  Mr. Flemmons' abrupt about-face upon receiving Dr. Taveras' rebuttal report and testimony makes clear that Dr. Taveras' report concerns the "same subject matter" as Mr. Flemmons' report.

[5]  The SEC disputes Defendant's contention that—to obtain an award of disgorgement in this case—the SEC is required to identify the alleged "victims" of Defendant's wrongdoing or to quantify the economic harm to counterparties.  *See* SEC MIL Opp'n § III.B [filed concurrently herewith].  The U.S. Supreme Court's decision in *Liu v. SEC*, 140 S.Ct. 1936 (2020), does not

first responds to Dr. Mayhew's opinion that Defendant's transactions did not cause harm to counterparties, detailing myriad ways that the investors on the other side of Defendant's transactions had limited information concerning Defendant's unlawful unregistered dealer activities.  Ex. 1 ¶¶ 22-24.  Dr. Taveras notes, "the market *could not have known* with certainty how many shares Defendant received, when he received them (and thus when he was likely to sell them), whether the company issued new convertible notes, and whether it paid Defendant's note back in cash or defaulted on the note by failing to deliver the newly issued shares to Defendant."  *Id.* ¶ 25 (emphasis added).  Dr. Taveras further observes, "although some information on the convertible notes may have been available, the public information regarding the timing and size of conversions and sales was limited."  *Id.* ¶ 27.

Dr. Taveras next responds to Dr. Mayhew's opinions concerning the purported price impact of Defendant's unregistered dealer activity.  *Id.* ¶ 28.  After observing that, "[t]he Mayhew report did not provide any empirical evidence to support" its price impact claims, Dr. Taveras undertakes the missing empirical analysis, providing analytical evidence that *contradicts* Dr. Mayhew's speculative opinions.  *Id.*

*First*, Dr. Taveras presents a "price analysis around and after Defendant's activities arising from convertible notes."  *Id.* ¶ 29 & Exhibit 3.

*Second*, Dr. Taveras analyzes "stock price changes for all issuers" during distinct periods of time.  *Id.* ¶ 30 & Exhibit 4.  Dr. Taveras notes that "[i]f Dr. Mayhew's prediction were correct,

---

require an analysis of the feasibility of distributing disgorged amounts to injured parties for a disgorgement award to issue, much less that any such analysis occur *before* any finding of liability or the Court's determination whether to award disgorgement at all.  Accordingly, Dr. Taveras' opinions concerning the impact on counterparties and retail investors stemming from Defendant's violations of the securities laws are offered purely in rebuttal to Defendant's flawed and premature expert reports.

one would observe that prices are about as likely to increase as they are to decrease" in the period in between Defendant's first and last sales. *Id.* ¶ 32. But Dr. Taveras' empirical analysis shows that, contrary to Dr. Mayhew's prediction, "half the issuers . . . experienced a stock price decline of *92% or worse* from the date prior to Defendant's first sale to the date of his last sale. This finding indicates that prices did ***not*** reflect the full impact of Defendant's convertible note activity prior to Defendant's sales." *Id.* ¶ 33 (emphasis added). Based on additional analyses for the period after Defendant's sales, Dr. Taveras critiques and refutes Dr. Mayhew's assertion that the price impact from Defendant's unlawful activities "would be only temporary." *Id.* ¶¶ 34-40 & Exhibits 3 and 4.

*Finally,* Dr. Taveras responds to Dr. Mayhew's opinions concerning "counterparties" and whether Defendant's unlawful unregistered dealer activity caused "economic harm to the counterparties to whom [Defendant] sold stock after converting." *Id.* ¶ 41 (quoting Mayhew Report ¶ 37). In rebuttal to Dr. Mayhew's opinion, Dr. Taveras opines that "[t]he individuals who bought and held the shares sold by Defendant would have been harmed by subsequent price declines," and notes that these individuals were "likely to have been retail investors" according to peer-reviewed literature. *Id.* ¶ 42.

### 3. Dr. Taveras' Opinions Contradict and Rebut the Same Subject Matter as Defendant's Experts

Under Rule 26(a), rebuttal expert reports are permissible "solely to contradict or rebut evidence on the ***same subject matter***" as the initial expert report. Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). Although neither the Federal Rules of Civil Procedure, nor the Eleventh Circuit, has defined or explained the term "same subject matter," other courts have construed it broadly. *See Fuller v. SunTrust Banks, Inc.*, Civ. A. No. 1:11-CV-784-ODE, 2019 WL 5448206, at *22 (N.D. Ga. Oct. 3, 2019); *Northrup v. Werner Enterprise, Inc.*, No. 8:14-cv-1627-T-27JSS,

2015 WL 4756947, at *3 (M.D. Fla. Aug. 11, 2015) (collecting cases). The Eleventh Circuit has held that "the purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party." *Frazier*, 387 F.3d at 1269. This Court therefore has broad discretion in deciding what constitutes proper rebuttal evidence, including a proper rebuttal expert report. *See, e.g., id.* (decision to permit rebuttal testimony resides in sound discretion of the trial judge); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 601 (9th Cir. 1991) ("The district court . . . has broad discretion in admitting expert testimony and its decision will be sustained unless it is 'manifestly erroneous.'").

Here, Dr. Taveras' rebuttal opinions concern the ***same subject matter***—the remedy of disgorgement—as Mr. Flemmons' and Dr. Mayhew's reports. *See Adacel, Inc. v. Adsync Tech., Inc.*, Case No. 6:18-cv-1176-Orl-78EJK, 2020 WL 4588415, at *3 (M.D. Fla. July 9, 2020) (rebuttal is not limited to the exact terms discussed and addressed by the initial expert) (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)); *Plantation Pipe Line Co. v. Associated Elec. & Gas Ins. Servs. Ltd.*, No. 1:09-CV-1260-SCJ, 2011 WL 13143562, at *2 (N.D. Ga. Nov. 10, 2011) ("While a rebuttal expert report must address the ***same subject matter*** as the report it contradicts, limiting its analysis only to those methods proposed by the first expert would impose an additional restriction on parties that is not included in the Rules.") (emphasis added) (cleaned up). Dr. Taveras' opinions are narrowly tailored to "explain, repel, counteract, or disprove" the opinions advanced by Mr. Flemmons and Dr. Mayhew concerning disgorgement, and therefore constitute appropriate rebuttal opinions.

Contrary to Defendant's assertion, neither the SEC nor Dr. Taveras has advanced a "brand-new theory of who was harmed and how." Def. Mem. at 11. Mr. Flemmons and Dr. Mayhew offered opinions in their reports concerning disgorgement. In rebuttal, Dr. Taveras

13

establishes that Mr. Flemmons' and Dr. Mayhew's methodologies and resultant disgorgement are deeply flawed.  Defendant's histrionics aside, the SEC is ***not*** trying to "confiscate an individual's property" without disclosure.  *Id.* at 12; *see generally* SEC MIL Opp'n [filed concurrently herewith].  The SEC is ***not*** advancing an affirmative disgorgement theory through Dr. Taveras' rebuttal report.  *See* Ex. 1 ¶ 21 (expressly disclaiming any assertion that Dr. Taveras is offering an opinion on the appropriate amount of an as-yet-to-be-awarded disgorgement amount).  Dr. Taveras' rebuttal testimony is permissible, because it directly addresses assertions raised by Defendant's experts.  *See In re Trasylol Prods. Liab. Litig.*, No. 09-01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010); *Fuller*, 2019 WL 5448206, at *22 (declining to exclude rebuttal report as outside the scope of initial report where rebuttal report attacked assumptions made within initial expert's report).[6]

### B.      Dr. Taveras' Rebuttal Testimony is Reliable and Helpful

Defendant also makes an ineffectual effort to exclude Dr. Taveras' rebuttal opinions as "neither reliable nor helpful."  Def. Mem. at 8.  Again, Dr. Taveras' testimony is offered solely in rebuttal to Defendant's flawed expert reports, which should be excluded.  *See* Section II, *supra;* SEC *Daubert* Mtn. [ECF No. 65].  But, to the extent this Court permits any of

---

[6] Even if this Court were to determine that portions of Dr. Taveras' rebuttal report present new analyses, any "late" disclosure is both substantially justified and harmless.  Dr. Taveras submitted her rebuttal report on July 19, 2021, 18 days after the submission of Defendant's expert reports, and 11 days before Defendant served Mr. Flemmons' revised report. Defendant had Dr. Taveras' report for more than a week before her deposition on July 27, 2021, and Defendant was not deprived of his ability to effectively cross-examine Dr. Taveras.  *See Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1251-52 (M.D. Fla. 2012).  Nor did Dr. Taveras' rebuttal report change the scope of the SEC's unregistered dealer claim, or otherwise "greatly affect the orderly handling of th[e] case."  *Id.* at 1252.  Courts in the Eleventh Circuit "have a strong preference for deciding cases on the merits."  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1332 (11th Cir. 2014); *OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1364 (11th Cir. 2008) (finding plaintiff violated Rule 26 but the violation was harmless).

Defendant's experts to testify, Dr. Taveras should be allowed to offer her response to that testimony, to assist the jury in understanding the infirmities of Defendant's expert opinions.

> **1.     Dr. Taveras' Expert Rebuttal to Dr. Oldfield is Reliable and Helpful**

Defendant claims that, "Dr. Taveras' 'opinion' concerning Dr. Oldfield's report consists of two paragraphs that do not actually address any of its substance." Def. Mem. at 9. But it is ***Dr. Oldfield***, not ***Dr. Taveras***, who fails to meet *Daubert*'s threshold for reliable and helpful testimony. This Court should deny Defendant's motion.

In his report, Dr. Oldfield offers a series of opinions concerning Defendant's dealer activity that are wholly divorced from the applicable legal standard under the Exchange Act. Dr. Oldfield's opinions are highly likely to confuse the jury. SEC *Daubert* Mtn. § II.B [ECF No. 65]. It is this Court—not Dr. Oldfield—who should instruct the jury as to the applicable legal standard. And, it is this Court—not Dr. Oldfield—who should instruct the jury of the elements of an unregistered dealer charge under Section 15(a) of the Exchange Act. Dr. Oldfield offers nothing more than anecdotal and colloquial experience, outside the context of the securities laws, about the meaning of "dealer." *Id.* But such anecdotes and colloquialisms are irrelevant to the question the fact-finder must decide—whether the SEC has shown by a preponderance of the evidence that Defendant bought convertible notes and sold stock as part of a regular course of business while not registered with the SEC as a dealer. 15 U.S.C. § 78o(a)(1); *see also* Complaint ¶ 24. Accordingly, Dr. Oldfield is more likely to confuse than assist the jury, and his opinions should be excluded.

Should this Court permit Dr. Oldfield to testify, however, there is no question that Dr. Taveras' rebuttal testimony is reliable and helpful. In determining the reliability of an expert opinion, the Court considers: (i) whether the expert's theory can be and has been tested; (ii)

whether the theory has been subjected to peer review and publication; (iii) the known or potential rate of error of the particular scientific technique; and (iv) whether the technique is generally accepted in the scientific community.  *See Quiet Tech.*, 326 F.3d at 1341.  The *Daubert* inquiry does not require consideration of whether the expert's testimony is correct, but only whether the testimony is reliable and should be considered by the jury.  *See, e.g., Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292-93 (11th Cir. 2005).

Here, based on her expertise as an economist—including seven years in the SEC's Division of Economic Risk Analysis, stellar academic credentials in the field of economics, and numerous teaching, professional, and testifying engagements—Dr. Taveras opines, in her rebuttal report, that Dr. Oldfield does ***not*** provide any relevant economic analysis in support of his opinion that Defendant's convertible note activity differs from dealer activity.  The purpose of Dr. Taveras' rebuttal expert testimony is to educate the lay members of the jury (should Dr. Oldfield be permitted to testify, which he should not) that none of the carefully worded opinions Dr. Oldfield offers is an ***economic*** opinion.  Because a lay jury might be confused by the veneer of legitimacy in which Dr. Oldfield casts his opinions, Dr. Taveras merely points out, based on her own economic expertise, that Dr. Oldfield offers no relevant economic support for the opinions he articulates.

16

## 2.    Dr. Taveras' Expert Rebuttal to Dr. Mayhew is Reliable and Helpful

With respect to Dr. Mayhew, Defendant argues that there is a "second fatal flaw" in Dr. Taveras' opinion, because the methodology that Dr. Taveras used to attempt to attribute stock price declines to Mr. Keener's activities is unreliable.  Def. Mem. at 12.  This argument fails.

As discussed above, Dr. Mayhew opines—without conducting any empirical analysis whatsoever—that it is unlikely that Defendant's unregistered dealer activity caused stock price declines.  *See* Section III.A.2, *supra*; SEC *Daubert* Mtn. § II.D [ECF No. 65].  In rebuttal, Dr. Taveras corrects Dr. Mayhew's failure to conduct an empirical analysis, and presents her own economic analyses of the price impacts of Defendant's unlawful activities, showing that Dr. Mayhew is wrong about the price impact of Defendant's unregistered dealer activity, that this impact was not temporary, and that the price impact likely would have been borne by retail investors.  Ex. 1 ¶¶ 28-42.[7]  Dr. Taveras openly acknowledges that the ***correlation*** between Defendant's unlawful dealer activity and stock price drops does not necessarily mean that Defendant's unlawful dealer activity ***caused*** investor harm.  *See* Ex. 2, Deposition Tr. of Carmen A. Taveras, Ph.D. at 160 (July 27, 2021) ("Causality is not something I show in my report.  What

---

[7] Defendant states, without support, that the price drops associated with Defendant's sales "could be explained by many factors . . . such as the fact that companies who are forced to offer convertible notes in the first place . . . are generally far from financially healthy . . . ."  Def. Mem. at 12.  On examination, Defendant's guesswork falls flat.  Dr. Mayhew admits that "I would generally expect this impact [on the stock price] to occur as the market learned the information, to the extent that the stock traded in an efficient market."  Mayhew Report ¶ 45 [ECF No. 65-4].  If the public announcement of Defendant's convertible note purchases resulted in price drops due to the issuers being "far from financially healthy" (as Defendant speculates), then those price drops would be observed in the period between the date on which Defendant purchased the notes and the date of Defendant's first conversion.  Dr. Taveras finds a median price drop of 64% in that time period.  *See* Ex. 1 ¶ 30 & Exhibit 4.  But Dr. Taveras observes an ***additional*** price drop between Defendant's first and last sales, well ***after*** the public announcement of Defendant's convertible note purchases.  *Id.* ¶¶ 30-33 & Exhibit 4.  Defendant fails to provide ***any*** alternative reason—other than Defendant's sales—for that price drop.

I show is that there is an association between his sales and prices declining.").  Notably, the correlation between Defendant's sales and declining prices observed in the data contradicts Dr. Mayhew's opinion that "any adverse impact on the stock price . . . should have already been reflected in the stock price before Mr. Keener sold the shares."  Mayhew Report ¶ 38.c [ECF No. 65-4].

Thus—in contrast to Dr. Mayhew, who merely offers speculative commentary divorced from economic or scientific grounding—Dr. Taveras conducts robust economic analyses and is transparent with the Court and the jury that these analyses do not necessarily imply causation, but instead establish that Defendant's unlawful sales and stock price drops are correlated with one another.  Courts can, and do, admit expert testimony with regard to correlations between wrongdoing and harm, permitting the jury to weigh such evidence, even in the absence of causation.  *See Long v. Murray County School District*, Civ. A. No. 4:10-CV-00015-HLM, 2012 WL 13071603, at *20 (N.D. Ga. Apr. 18, 2012) (finding expert arguments about correlation versus causation "go to the credibility of [expert's] testimony, rather than its admissibility"); *Cosmo v. Carnival Corp.*, No. 16-22933-Civ, 2017 WL 4785639, at *2 (S.D. Fla. Oct. 16, 2017) (collecting cases).

### 3.    Dr. Taveras' Expert Rebuttal to Mr. Flemmons is Reliable and Helpful

In a throwaway argument at the conclusion of his brief, Defendant argues that Dr. Taveras' rebuttal to Mr. Flemmons' report is "also inadmissible because it offers argument on a legal issue for the court to decide—which sales are relevant based on the allegations of the Complaint."  Def. Mem. at 14.  Defendant is incorrect.

Dr. Taveras' offers no legal opinions, and Defendant's "saying it, does not make it so." As discussed above, based on her economic expertise and seven years in the SEC's Division of

18

Economic Risk Analysis, Dr. Taveras opines that Mr. Flemmons' Report is methodologically flawed and therefore unreliable.  Specifically, Dr. Taveras observes that Mr. Flemmons nets all expenses, even those he deemed unrelated to convertible notes, from his calculation of Defendant's net proceeds from convertible notes.  Ex. 1 ¶¶ 13-16.  More generally, Mr. Flemmons incorrectly assumes that **100 percent** of Defendant's expenses resulted from the sale of convertible notes after concluding that just **48 percent** of Defendant's net income was from convertible notes.  *Id.* ¶ 13.  Dr. Taveras' opinion that it is inappropriate to match 100 percent of expenses against just 48 percent of trading activity is an **economic** opinion (and common sense), **not** a legal opinion.  Dr. Taveras then offers two alternative methodologies that correct Defendant's error, which show that Defendant generated net profits from convertible note activity ranging from $4.3 million to $6.4 million, rather than the $4 million net loss Mr. Flemmons calculated.  *Id.* ¶¶ 16-21.

If Mr. Flemmons is permitted to testify, then there can be no question that Dr. Taveras' opinions—which identify Mr. Flemmons' methodological errors and correct for those errors— will assist the trier of fact to understand the evidence and determine the relevant facts at issue. *Maiz*, 253 F.3d at 666-67; *see also Wreal, LLC v. Amazon.Com, Inc.*, Case No. 14-21385-Civ- Lenard/Goodman, 2016 WL 8793317, at *4 (S.D. Fla. Jan. 7, 2016); *Coquina Invs. v. Rothstein,* No. 10-60786-Civ., 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts."); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC,* No. 09-61490-Civ., 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) (authorizing testimony from a rebuttal expert who "merely provides other factors that [the plaintiff's expert] should have considered in his report, based on her economics expertise," and explaining that

19

"[h]ighlighting such factors will be helpful for the jury to weigh the evidence presented at trial.").

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the SEC's affirmative *Daubert* motion and incorporated herein by reference, Defendant's experts should be excluded and Defendant's *Daubert* motion denied as moot.  To the extent Defendant's experts are permitted to testify, in whole or part, then this Court should deny Defendant's motion to exclude the testimony of Dr. Taveras.

DATED:    August 27, 2021                    Respectfully submitted,

By:

        /s/ Joshua E. Braunstein
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**Lead Attorney**
**Attorney to Be Noticed**

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2021, I caused the Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant's Motion to Exclude Rebuttal Expert Report of Dr. Carmen Taveras to be served on all counsel of record in this case through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

/s/ Joshua E. Braunstein
Joshua E. Braunstein
**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

21