# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:20-CV-21254-BLOOM/LOUIS

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

Defendant.

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANT JUSTIN W. KEENER'S OPPOSITION TO PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION'S OMNIBUS MOTION IN LIMINE**

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ................................................................................................................. 1

II.    LEGAL STANDARDS ........................................................................................................ 1

III.    MATTERS THE SEC SEEKS TO EXCLUDE FROM TRIAL ......................................... 2

    A.    Mr. Keener's Fair Notice Defense ........................................................................... 2

    B.    Communications from the SEC's Office of Interpretation and Guidance .............. 4

    C.    The SEC's Potential Remedies ................................................................................ 8

    D.    Advice, Involvement or Presence of Counsel ........................................................ 10

    E.    Hardships Pertaining to This Litigation or Related Investigations ......................... 11

    F.    Rule 144 Compliance ............................................................................................. 12

IV.    CONCLUSION .................................................................................................................. 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)......................................................................................................................3

*Ctr. Hill Courts Condo. Ass'n v. Rockhill Ins. Co.*,
   No. 19-cv-80111-BLOOM/Reinhart, 2020 WL 496065 (S.D. Fla. Jan. 30, 2020) ........................1

*Diebold Inc. v. Marshall*,
   585 F.2d 1327 (6th Cir. 1978) ....................................................................................................5, 7

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012)......................................................................................................................2

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ....................................................................................................5

*SEC v. Almagarby*,
   479 F. Supp. 3d 1266 (S.D. Fla. 2020) ......................................................................................6

*SEC v. Berrettini*,
   No. 10-cv-1614, 2015 WL 4247776 (N.D. Ill. Jul. 14, 2015)......................................................11

*SEC v. Kovzan*,
   No. 11–2017–JWL, 2012 WL 4819011 (D. Kan. Oct. 10, 2012)..............................................4, 7

*SEC v. Moran*,
   95 Civ. 4472 (BN), 1995 WL 785953 (S.D.N.Y. Oct. 31, 1995) ..............................................11

*SEC v. Nutmeg Grp., LLC*,
   No. 09-cv-1775, 2017 WL 3269389 (N.D. Ill. Aug. 1, 2017) ....................................................12

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953).....................................................................................................................13

*SEC v. Ripple Labs, Inc.*,
   No. 20 Civ. 10832 (AT) (SN), 2021 WL 1814771 (S.D.N.Y. May. 6, 2021) ............................4

*SEC v. Spencer Pharm., Inc.*,
   58 F. Supp. 3d 165 (D. Mass. 2014) ..........................................................................................12

*SEC v. Ustian*,
   No. 16 C 3885, 2020 U.S. Dist. LEXIS 14092 (N.D. Ill. Jan 26, 2020)....................................11

*Stonebrae, L.P. v. Toll Bros., Inc.,*
   No. C-08-0221 EMC, 2009 WL 1082067 (N.D. Cal. Apr. 22, 2009) ................................8

*Summit Petroleum Corp. v. EPA,*
   690 F.3d 733 (6th Cir. 2012) ...............................................................................................7

*U.S. v. Grant,*
   256 F.3d 1146 (11th Cir. 2001) ...........................................................................................2

*U.S. v. Harra,*
   985 F.3d 196 (3rd Cir. 2021) ...............................................................................................3

*U.S. v. Weed,*
   873 F.3d 68 (1st Cir. 2017) ................................................................................................13

*Upton v. SEC,*
   75 F.3d 92 (2d Cir. 1996) ................................................................................................3, 5

**Statutes**

15 U.S.C. § 77(b)(a)(11) ...........................................................................................................13

15 U.S.C. § 77(d)(a)(1) .............................................................................................................13

15 U.S.C. § 77e .........................................................................................................................13

Securities Exchange Act of 1934 ........................................................................................*passim*

**Other Authorities**

17 C.F.R. § 230.144 ..............................................................................................................*passim*

Federal Rule of Evidence 403 ....................................................................................................1

Guide to Broker Dealer Registration, https://www.sec.gov/reportspubs/investor-
   publications/divisionsmarketregbdguidehtm.html .............................................................5

Revision of Holding Period Requirements in Rules 144 and 145, 17 C.F.R. pt. 230
   (Feb. 20, 1997) Release No. 33-7390 ................................................................................13

Revisions to Rules 144 and 145, 17 CFR Parts 230 and 239 (Dec. 6, 2007) Release
   No. 33-8869 ........................................................................................................................14

Rule 144 Holding Period and Form 144 Filings, 17 C.F.R. pts. 230, 232, 239, 249
   (Dec. 22, 2020) Release No. 33-10911...............................................................................14

Defendant Justin W. Keener respectfully files this opposition to the SEC's "Omnibus Motion in Limine and Incorporated Memorandum of Law," filed on August 13, 2021 (the "Motion" or "Mot.").

## I.   INTRODUCTION

The SEC's Omnibus Motion in Limine contains a barrage of requests that Mr. Keener be precluded from referencing various facts or circumstances at the trial of this case.  In some cases, Mr. Keener does not dispute the SEC's request, at least as drafted—although the SEC's motion is just vague enough to suspect that it will later try to expand the scope of the prohibition.  In other cases, the SEC's requests are unfair and unjustified, part of its consistent effort to stack the deck against Mr. Keener at every opportunity and hide from the jury relevant facts at the core of Mr. Keener's defense.  The SEC organized its motion into six distinct sections, and Mr. Keener will follow that structure in this response.

## II.   LEGAL STANDARDS

This Court has previously explained the standards governing a pretrial motion in limine: "In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds.  The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground.  Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context."  *Ctr. Hill Courts Condo. Ass'n v. Rockhill Ins. Co.*, No. 19-cv-80111-BLOOM/Reinhart, 2020 WL 496065, at *3 (S.D. Fla. Jan. 30, 2020) (citations and quotation marks omitted).

Under Federal Rule of Evidence 403, relevant evidence can only be excluded "if its probative value is substantially outweighed" by the danger of … unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

As the Eleventh Circuit has held, such an exclusion "is an extraordinary remedy, whose major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *U.S. v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001) (citation and alteration omitted).  There is a "strong presumption in favor of admissibility."  *Id.*

## III.    MATTERS THE SEC SEEKS TO EXCLUDE FROM TRIAL

### A.    Mr. Keener's Fair Notice Defense

The SEC's first request pertains to Mr. Keener's affirmative defense of lack of fair notice and due process.  This defense asserts that the SEC has unfairly and without warning departed in this case from the way it has interpreted and applied the dealer registration provision of the Securities Exchange Act of 1934 ("Exchange Act") for decades in a way that would now sweep in millions of unregistered investors into the definition of a "dealer."  The SEC contends that there "should be no mention to the jury of the subject matter of those affirmative defenses or any evidence or allegations pertaining to them because they are purely legal issues to be decided by the Court and not the jury."  Mot. at 3.  The SEC is wrong—Mr. Keener's fair notice defense must be presented to the jury.

Mr. Keener's fair notice defense is based on straightforward concepts.  The Supreme Court has made clear that a "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  The requirement that regulations be clear is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).  Thus, "[r]egulated parties should know what is required of them so they may act accordingly."  *Id.*  "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for

the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012).

These fundamental principles mean that the SEC cannot penalize someone based on "a substantial change in its enforcement policy that was not reasonably communicated to the public." *Upton v. SEC,* 75 F.3d 92, 98 (2d Cir. 1996). Yet that is exactly what the SEC seeks to do to Mr. Keener. There is no dispute that, for decades, the SEC advised market participants that whether someone is a "dealer" is a fact-intensive inquiry requiring consideration of up to a dozen factors— none of which describe Mr. Keener's conduct. So the SEC now says that those factors are irrelevant—suddenly replaced with an overbroad reading of the Exchange Act and new factors never before announced, such as the fact that Mr. Keener employed assistants to manage his affairs, that he used social media to promote himself, and that he negotiated for conversion discounts. None of these factors have ever appeared in any of the SEC's dealer-related guidance over the years.

Mr. Keener contends that, by changing its position without warning, the SEC deprived him of fair notice of what the law requires. This is a quintessential jury question, as it requires a determination of whether a person in Mr. Keener's position did or did not have fair notice of what the law requires. *See, e.g.*, *U.S. v. Harra,* 985 F.3d 196, 215-16 (3rd Cir. 2021) (finding that whether an individual had fair warning of government interpretation of regulation was a question for the jury).[1] And as set forth below, answering this question requires a fact-intensive inquiry into how other

---

[1] The SEC argues that a fair notice claim cannot go to the jury because it can only concern a challenge to "the language of a statute on the basis of vagueness." Mot. at 3. This is illogical and plainly incorrect. A vague statute is one way, but certainly not the only way, in which a person can be deprived of fair notice of what the law requires. For instance, the Supreme Court did not consider vagueness when it rejected an agency's new interpretation of its regulations as applied to conduct that took place before the new interpretation was announced based on "the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." *Christopher*, 567 U.S. at 156 (cleaned up); *see also Upton,* 75 F.3d at 98 (holding, without any consideration of vagueness, that "we cannot defer to the [SEC's] interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation.").

market participants in the financial industry understood the dealer definition, the basis of that understanding, and how Mr. Keener's activities compared to those of other market participants. *See* Sec. III.B, *infra*. Therefore, there is no basis to preclude evidence or argument regarding fair notice.[2]

### B.   Communications from the SEC's Office of Interpretation and Guidance

The SEC's second request is to exclude communications between its Office of Interpretation and Guidance ("OIG") and members of the public. Mot. at 5. The SEC observes that Mr. Keener seeks to utilize those communications in support of his fair notice defense, described in detail above, but contends that they are "not probative." *Id.* The SEC is wrong. These communications are direct evidence of Mr. Keener's contention that the SEC's current litigation posture is inconsistent with its longstanding (and still extant) guidance to market participants regarding the central issue in this case—who must register as a securities dealer. Thus, the communications directly support Mr. Keener's fair notice defense.

In determining whether an individual has received adequate fair notice, multiple courts— including this one—have determined that evidence demonstrating industry understanding or custom with regard to regulatory requirements is relevant. *See* Order, ECF No. 45 at 3 ("I find the [OIG communications] sought [are] relevant; the request is intuitive with respect to Defendant's due process argument."); *SEC v. Kovzan*, No. 11–2017–JWL, 2012 WL 4819011, at *14 (D. Kan. Oct. 10, 2012) (non-public SEC communications with third parties relevant to a defendant's fair notice defense); *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2021 WL 1814771, at *1 (S.D.N.Y. May. 6, 2021) (same).

In addition to industry understanding and custom, courts have also found inconsistent agency interpretation, enforcement, or explanation relevant to an individual's fair notice argument.

---

[2] Mr. Keener is not pursuing an affirmative defense based on estoppel and therefore does not object to precluding evidence or argument on that point.

*See, e.g.*, *Upton*, 75 F.3d at 98 ("The Commission may not sanction [Defendant] pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public."); *Diebold Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978) (finding no fair notice when purported requirement was rarely fulfilled or enforced in the industry). And a defendant may also prove his fair notice defense by highlighting confusion and inconsistent interpretations within an agency as to the rules at issue. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995) (finding no fair notice when agency regulations were internally inconsistent, the agency had difficulty clarifying which section of the regulations should apply to the defendant's activity, and conflicting interpretations of the regulatory requirements came from different agency regional offices).

In support of his fair notice defense, Mr. Keener will rely on, among other things, the OIG communications. These documents are highly relevant to Mr. Keener's fair notice defense because they demonstrate both (i) industry understanding regarding dealer registration requirements and (ii) the inconsistency between the SEC's current litigation posture and how it has explained dealer registration requirements to market participants for years. Specifically, these communications tend to reflect inquiries from members of the public to OIG as to whether they must register with the SEC as a broker-dealer in order to engage in certain activities or businesses. *See e.g.*, Exs. 1-4 (SEC-JMJ-OIG-51, -53, -62, -68) (market participants explaining their business model and asking the SEC whether such activities require broker-dealer registration).

The SEC routinely responded by directing the questioner to the SEC's publicly available Guide to Broker Dealer Registration (the "Guide") (*avail. at* https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html). *See e.g.*, Exs. 5-6 (SEC-JMJ-OIG-02; SEC-JMJ-OIG-65). In many instances, the SEC described dealer status as a "fact-specific assessment that involves consideration of a number of factors (which have been developed through SEC staff no action letters and case law)" and further explained that the

relevant factors could be found in the Guide.  *See e.g.,* Exs. 7-10 (SEC-JMJ-OIG-48; SEC-JMJ-OIG-54; SEC-JMJ-OIG-63; SEC-JMJ-OIG-277) ("This Guide to Broker-Dealer Registration provides some basic information regarding . . . the activities/factors the staff and the courts consider when determining whether a person fits that definition.").

In at least one instance, a market participant contacted the SEC asking for clarification of the seeming inconsistencies between the SEC's position set forth in *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020), and the factor-based analysis set forth in the Guide.  Specifically, an attorney for a clearing firm repeatedly contacted the SEC to determine whether—in the wake of the filing of the complaint in *Almagarby*—the acquisition, conversion, and sale of third-party debt required registration as a dealer.  *See* Ex. 11 (SEC-JMJ-OIG-20).  The questioner stated it was "aware that the definition of dealer excludes routine trading transactions for one's own account as well as other potentially relevant carve outs.  Here we are simply trying to gain our regulators posture." *Id.* But the SEC repeatedly stonewalled the individual's request for regulatory clarity on the SEC's posture, ultimately stating only that "we cannot comment on Enforcement Actions other than to provide information already made public by the Commission."  *See* Ex. 12 (SEC-JMJ-OIG-31).

Such communications perfectly exemplify the kind of agency inconsistency and market confusion that supports Mr. Keener's fair notice defense.  Although in this litigation the SEC espouses the novel theory that only its strained interpretation of the Exchange Act and brand-new factors are determinative of an individual's status as a dealer, the communications that the SEC seeks to exclude refute this notion.  Of the 580 OIG communication-related documents produced by the SEC, at least 166 explain that dealer status is a "fact-specific assessment that involves consideration of a number of factors" that are set forth in its Guide.  *See, e.g.*, Ex. 10.  Many of those communications even post-date the SEC's Complaint in this case.  Accordingly, they are relevant to Mr. Keener's fair notice defense.

The SEC's assertions to the contrary are unavailing.  The SEC argues in the first instance that the OIG communications are "expressly informal communications" that "cannot supplant or change the law applicable to [Mr. Keener]'s conduct."  Mot. at 5.  But Mr. Keener is not making that argument.  Rather, Mr. Keener will introduce these communications to demonstrate that the SEC created the industry understanding about the factors relevant to determining if a person qualifies as a dealer, and that the SEC's current position in this litigation directly conflicts with the industry understanding it helped create.  *Cf. Diebold*, 585 F.2d at 1336 (prior enforcement practices relevant to fair notice defense).  The fact that these communications are "informal" does not make them irrelevant; indeed, courts have looked to informal agency guidance in determining whether a reasonable person could have anticipated punishment for his conduct.  *See, e.g.*, *Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 748-49 (6th Cir. 2012) (refusing an agency's preferred interpretation in part because of agency guidance memoranda reflecting a different interpretation).  The SEC is not free to misstate or change the law merely by labeling its statements "informal."  And to be clear— the SEC's current litigation position is effectively that these OIG communications misstate the law and that the factors set forth in the Guide are not relevant.

Nor is it material that Mr. Keener was not a party to these communications.  Mot. at 5.  General industry understanding of permissible or impermissible conduct as communicated by a regulator to market participants, as well as conflicting statements by the regulator, are relevant in assessing whether an individual received adequate fair notice.  *See Kovzan*, 2012 WL 4819011, at *5.  That is true even when the evidence of such industry understanding is located in non-public communications with third parties.  *See id.*  Mr. Keener's position is simple:  through this litigation, the SEC is imposing a broader definition of "dealer" under the Exchange Act than it ever has before to encompass individuals like Mr. Keener who solely invest their own money and provide no

7

services to the investing public.  The OIG communications are direct evidence of this contention, even if Mr. Keener was not privy to these communications at the time they were drafted.

At bottom, Mr. Keener's fair notice defense requires a number of factual determinations, such as whether the evidence shows that the SEC changed its position, and if so, whether that change in position deprived Mr. Keener of fair notice of what the law required.  These are factual questions that must be resolved by the jury.  *See Stonebrae, L.P. v. Toll Bros., Inc.*, No. C-08-0221 EMC, 2009 WL 1082067, at *6-7 (N.D. Cal. Apr. 22, 2009) (finding a genuine dispute of material fact as to whether letter provided adequate fair notice). Therefore, there is no basis to prohibit evidence or argument regarding the OIG communications.

## C.   The SEC's Potential Remedies

The SEC's third request is to "preclude Defendant from offering any evidence or making any argument about any potential remedies—including disgorgement, penalties, and the entry of an injunction or a penny stock bar—the Court may impose if the jury finds Defendant liable."  Mot. at 9.  Mr. Keener has no objection to the SEC's request as phrased, so long as it is limited to proceedings determining liability.[3]

However, Mr. Keener strongly objects to the SEC's obvious attempts to avoid any scrutiny of its case on remedies.  Throughout discovery, the SEC has steadfastly refused to answer any questions that it deemed relevant to remedies.  *See, e.g.*, Ex. 13 (4.8.21 Pl.'s Resps. to Def.'s Second

---

[3] The SEC prefaces its request by asserting that "[b]ecause two of Defendant's three expert reports deal exclusively with the equitable remedy of disgorgement, the SEC anticipates that Defendant will seek to introduce to the jury evidence pertaining to the SEC's potential claim for disgorgement."  Mot. at 9.  This assertion is incorrect—the reports submitted by Dr. Oldfield and Mr. Flemmons are relevant to issues of liability, as explained in Mr. Keener's opposition to the SEC's motion to exclude expert testimony.  For present purposes, however, the SEC's assertion is simply irrelevant because the SEC is not seeking to exclude the testimony of the experts in this Motion.

Set of Reqs. for Admis.) at 8; Ex. 14 (1.22.21 Pl's Resps. to Def.'s First Set of Interrogs.) at 2-3; Ex.
15 (7.16.21 Pl.'s Resps. to Def.'s Fourth Set of Interrogs.) at 2-3.

Even more egregious are the games that the SEC has played with its rebuttal expert witness.
On March 10, 2021, the SEC designated an in-house economist, Dr. Carmen Taveras, as a
"summary witness," and later it also designated her as a rebuttal expert to respond to Mr. Keener's
experts. *See* Ex. 23 (7.19.21 Pl.'s Suppl. Discl.), at 1-2. Months after this disclosure, the SEC made
Dr. Taveras available for a deposition on July 27, 2021. Even though the discovery period was
nearly over, Dr. Taveras testified clearly that she had done no work in her capacity as a summary
witness, nor had she (or anyone else at the SEC) attempted to make any calculations showing how
much money Mr. Keener should have to disgorge, assuming liability. Ex. 16 (Taveras Tr.) at 47:3-6;
54:5-8; 254:18-255:5.

Two weeks later, however, Dr. Taveras submitted a detailed declaration in support of the
SEC's motion for summary judgment. The declaration purports to, among other things, calculate
Mr. Keener's "net proceeds from stock sales, a summary of net proceeds based upon the type of
instrument from which JMJ obtained the stock, and net income." Taveras Decl. (Ex. 11 to Pl.'s
Statement of Material Facts ECF No. 67-11), ¶ 12. It is quite obvious that the SEC instructed Dr.
Taveras to wait to undertake the work leading to her declaration until after her deposition, so that
she could not be questioned about it. For this reason, and as described in more detail in Mr.
Keener's Motion in Limine, all of Dr. Taveras's testimony as a fact summary witness should be
excluded. *See* Def.'s Mot. in Lim. ECF No. 69 at 6-7.

If Dr. Taveras's summary testimony is not excluded, Mr. Keener must have an opportunity
to take adequate discovery. The SEC declared in its motion for summary judgment that "[i]f the
Court grants the SEC's Motion for Summary Judgment, the SEC will respectfully request that the
Court *set a briefing schedule to decide the appropriate remedies*." Pl.'s Mot. for Summ. J. ECF No. 68, at 30

n.22 (emphasis added).  By seeking to determine remedies through a "briefing schedule," the SEC is again attempting to avoid the scrutiny of the normal discovery process.  The SEC's desire to do so is understandable, because Dr. Taveras's calculations are seriously flawed in numerous respects.  For instance, it purports to opine on Mr. Keener's "net income," but ignores all the business expenses that Mr. Keener incurred.  Taveras Decl., ¶ 4.  It also purports to differentiate proceeds based upon "the type of instrument from which" Mr. Keener obtained the stock, but the spreadsheet she relied on *does not contain* the information needed to make that differentiation.  *Id.* ¶¶ 6-7 (stating that she relied on one file called "the Database"); Ex. 17 (Aucoin Tr.) at 84:8-16, 93:22-94:3, 189:18-191:13 (describing that the information needed to distinguish sales of converted stock from other sales is not "in any one place" and that documents relating to each transaction would need to be consulted).

At any rate, the SEC's effort to shield Dr. Taveras's opinions from scrutiny is unfair and contrary to fundamental notions of due process.  Mr. Keener must be given an opportunity to test the SEC's evidence on remedies through the normal discovery process, including by having an opportunity to cross-examine Dr. Taveras about her calculations and presenting his own accounting or economic experts to rebut her conclusions.

### D.   Advice, Involvement or Presence of Counsel

The SEC's fourth request is that Mr. Keener "not be permitted to refer to any advice, involvement, or presence of counsel *with regard to whether he was acting as an unregistered dealer*."  Mot. at 10 (emphasis added).  As phrased, Mr. Keener does not object to this request—he does not contend that he received advice from counsel "with regard to whether he was acting as an unregistered dealer."

To be clear, however, Mr. Keener understands that the SEC's fourth request here does not concern Rule 144, or any related attorney opinion letters, because those issues are addressed in a separate section of the SEC's motion.  *See infra* III.F.  Further, Mr. Keener understands the SEC's

request would not prohibit mention of his routine interactions with attorneys on other subjects, so long as there is no suggestion that those attorneys advised him "with regard to whether he was acting as an unregistered dealer." Mot. at 10. For instance, testimony about his employee Francois Martino, an attorney who was involved in drafting documents related to many of the convertible note investments at issue, would be necessary and appropriate to enable Mr. Keener to explain his investments, and will not suggest to the jury that Mr. Keener is relying on the advice of counsel as a defense to the SEC's claim. *See, e.g., SEC v. Ustian,* No. 16 C 3885, 2020 U.S. Dist. LEXIS 14092, at *33-36 (N.D. Ill. Jan 26, 2020) (allowing evidence related to non-privileged attorney interactions where defendant declined to assert an advice of counsel defense).

### E.   Hardships Pertaining to This Litigation or Related Investigations

The SEC's fifth request is to preclude testimony or argument about "personal hardships that the Defendant allegedly may have suffered or might suffer in the future as a result of this litigation, the outcome of the litigation, or the investigations that preceded or are related to the litigation." Mot. at 11. As phrased, Mr. Keener does not object to this request.

However, the SEC confuses matters later in its argument by appearing to change the scope of what it asks the Court to preclude. At the tail end of its argument, the motion states that "[r]eferences to Defendant's purported hardships of any sort, whether personal, emotional, financial, or career-related, and whether past, present or future, are irrelevant to any issues in this case." *Id.* at 13. If this is the SEC's request—to exclude "hardships" beyond those experienced "as a result of this litigation"—then it must be rejected. Such a request is incomprehensibly broad and vague and unsupported by any case law. The cases the SEC cites only concern evidence about litigation-related hardships. *See, e.g., SEC v. Moran,* 95 Civ. 4472 (BN), 1995 WL 785953, at *1 (S.D.N.Y. Oct. 31, 1995) (concerning hardships "suffered as a result of" the litigation); *SEC v. Berrettini*, No. 10-cv-1614, 2015 WL 4247776, at *2 (N.D. Ill. Jul. 14, 2015) (concerning "adverse impact that the SEC's

investigation or lawsuit may have had on" defendants personally); *SEC v. Spencer Pharm., Inc.*, 58 F. Supp. 3d 165, 166 (D. Mass. 2014) (same).

Also, to be clear, Mr. Keener intends to introduce evidence relating to his business losses and expenses, which the SEC has put at issue by making allegations about his net income from the sales of converted stock. *See, e.g.* Pl's Mot. for Summ. J. ECF No. 68, at 1, 8, and 17 (referring repeatedly to Mr. Keener's alleged profits). Such evidence is not within the scope of the SEC's motion because it is not hardship evidence at all, nor did such losses or expenses arise "as a result of" the SEC's investigation or this lawsuit.[4]

### F.     Rule 144 Compliance

The SEC's final request is to "preclude any mention of Rule 144 and exclude any attorney opinion letters related to it." Mot. at 15 (citing 17 C.F.R. § 230.144). This request should be rejected first and foremost because the SEC itself has put Rule 144 at issue. The SEC's Complaint and pleadings are filled with references to Rule 144. For instance, the SEC alleges Mr. Keener "timed his conversions and sales in an effort to comply with the holding period under Rule 144." Compl. ECF No. 1, ¶ 12. Another of the SEC's recent pleadings asserts that Mr. Keener "wait[ed] for [convertible notes] to mature under SEC Rule 144." Pl's *Daubert* Mot. ECF No. 65 at 1. Not to mention that the SEC argues that one of the reasons that Mr. Keener is a dealer is based on the allegation that he quickly sold newly issued stock into the market like an underwriter. *See, e.g.*, Pl's Mot. for Summ. J. ECF No. 68, at 9-10 (alleging Mr. Keener "distributed" "newly issued" stock to the public); Pl's *Daubert* Mot. ECF No. 65, at 13 (claiming that Mr. Keener is an underwriter because he "distribut[ed] newly issued stock to the public" and that the jury in this case will be "confronted

---

[4] For this reason, the SEC's citation to *SEC v. Nutmeg Grp., LLC*, No. 09-cv-1775, 2017 WL 3269389 (N.D. Ill. Aug. 1, 2017) is not on point. *See* Mot. at 12. Evidence regarding defendant's finances was excluded in that case only because the SEC had not put the defendant's financial condition at issue. *Nutmeg Grp.*, 2017 WL 3269389, at *7-8.

with the definition of 'underwriter' that exists in the federal securities laws").  But the law that applies to this allegation is Rule 144: if an investor complies with Rule 144, that specifically demonstrates that the investor is *not* an underwriter.  The SEC, having made Rule 144 part of its own case, cannot seek to preclude Mr. Keener from "any mention" of that Rule.  The jury must be given the full explanation of the significance of this Rule and Mr. Keener's efforts to comply with it, not just the portions that the SEC seeks to use.

Under the Securities Act of 1933, anyone seeking to sell a security must first register that security unless an exemption applies.  *See* 15 U.S.C. § 77e.  The purpose of this registration is to "promot[e] full disclosure" of information concerning the security.  *See, e.g.*, *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  However, Section 4(a)(1) of the Securities Act exempts certain transactions from this registration requirement.  Specifically, it exempts "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77(d)(a)(1).  An "underwriter" is defined in the Securities Act broadly as anyone who has "purchased [stock] from an issuer" with "a view to . . . the distribution" of the stock.  15 U.S.C. § 77(b)(a)(11).  "Recognizing the breadth and complexity of this definition" the SEC promulgated Rule 144 "to provide greater certainty and security to issuers and investors by creating a safe harbor for the Section 4(a)(1) exemption," and to clearly define circumstances in which an investor is not an underwriter.  *U.S. v. Weed*, 873 F.3d 68, 71 (1st Cir. 2017) (citations and quotation marks omitted).

The Rule 144 safe harbor conditions include, among other criteria, that the investor have held the securities for a certain length of time. 17 C.F.R. § 230.144.  When Rule 144 was originally enacted in 1972, the required holding period was two years.  However, the SEC twice shortened the holding period (from two years to one year, and then from one year to six months), in order to encourage investors to use this exemption and make it easier for companies to raise capital.  *See* Revision of Holding Period Requirements in Rules 144 and 145, Release No. 33-7390, 17 C.F.R. pt.

230 (Feb. 20, 1997).  Specifically, the holding period was reduced in order to "increase the liquidity of privately sold securities and decrease the cost of capital for all issuers without compromising investor protection."  Revisions to Rules 144 and 145, Release No. 33-8869, 17 CFR Parts 230 and 239 (Dec. 6, 2007).  Through Rule 144, the SEC thus encouraged the exact convertible note investments at issue in this case, by allowing investors to sell converted stock without requiring that the stock be registered, as long as the investors met the safe harbor conditions demonstrating that they were not underwriters.[5]

Mr. Keener accepted the SEC's invitation to invest in these unregistered securities through Rule 144 and used the safe harbor to avoid being deemed an underwriter.  Attorneys reviewed all of his stock conversions and provided opinion letters in all cases where he met the Rule 144 safe harbor conditions.  Those letters confirmed that he was "deemed not to be engaged in a distribution," 17 C.F.R. § 230.144, was not an underwriter, and could sell the shares free of restriction.  *See, e.g.*, Ex. 18 at JMJ-SEC-005-008314 (concluding, after a "review of the documents presented to us by the Issuer and JMJ Financial and such other corporate documents we have deemed necessary," that the "shares may be issued free of any restrictions, and may be sold free of restriction in the manner provided by Rule 144"); Ex. 19 at JMJ-SEC-004-009090 (concluding, following a review of documents, that "the above listed shares meet the criteria under Rule 144, and that all of the shares listed above may be transferred").

---

[5] When Rule 144 was adopted in 1972, the SEC specifically permitted holders of convertible notes to start the holding period from the time of the original investment.  A few months ago, on December 22, 2020, the SEC proposed to modify Rule 144 to require convertible note holders to restart the holding period at the date of conversion—thus admitting that current Rule 144 supports convertible note investments in a way it now seeks to curtail through this proposed rulemaking. Rule 144 Holding Period and Form 144 Filings, Release No. 33-10911, 17 C.F.R. pts. 230, 232, 239, 249 (Dec. 22, 2020).

Mr. Keener provided these Rule 144 attorney letters to each transfer agent before the transfer agent would release an issuer's shares to Mr. Keener. *See, e.g.*, Ex. 20. And Mr. Keener also provided the attorney letters to his brokerage and clearing firms before those firms would accept a deposit of those shares and seek to sell them on his behalf. *See, e.g.*, Ex. 21. These transactions would not have existed without Rule 144 and the opinion letters confirming Mr. Keener's compliance with that safe harbor, and thus they cannot be understood without that evidence.

The SEC does not and cannot dispute these basic facts. Instead, it argues that because Rule 144 concerns the registration of securities under the Securities Act, rather than the registration of dealers under the Exchange Act, compliance with Rule 144 cannot be relevant. *See* Mot. at 13-14. That is wrong. As noted above, the SEC has put Mr. Keener's compliance with Rule 144 directly at issue. Specifically, the SEC has alleged repeatedly that Mr. Keener was a dealer because he engaged in a "distribution" of "newly issued" stock. *See, e.g.*, Pl's Mot. for Summ. J. ECF No. 68, at 1, 4, 8, 9, 10, 13, 14, 17, 25; *see also* Pl's Daubert Mot. ECF No. 65, at 13 (claiming that Mr. Keener was an underwriter because he "distributes[ed] newly issued stock to the public"). However, as set forth above, this question of whether he engaged in a "distribution" cannot even be analyzed without reference to the Rule 144 safe harbor.

Mr. Keener must be allowed to rebut the SEC's allegations through evidence that he complied with Rule 144. None of the third-party transfer agents, clearing firms, or brokerage firms would have processed his conversion and sale requests without attorney opinion letters confirming his compliance with Rule 144. The SEC has not disputed that Mr. Keener complied with Rule 144 and has not disputed the accuracy of a single opinion letter in this case. *See* Ex. 22 at Resp. to No. 12. The SEC cannot have it both ways: it cannot allege Mr. Keener was a dealer because he acted like an underwriter engaged in a "distribution," but then exclude the evidence that he did no such thing.

## IV. **CONCLUSION**

For the foregoing reasons, Mr. Keener respectfully requests that the Court deny the SEC's

motion in limine as stated herein.

Dated: August 27, 2021          Respectfully submitted,

**GREENBERG TRAURIG LLP**

/s/ *Benjamin G. Greenberg*
**Benjamin G. Greenberg**
Florida Bar No. 192732
333 SE 2nd Avenue Suite 4400
Miami, FL 33131
Telephone: (305) 579-0850
Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com
*Counsel for Defendant Justin W. Keener*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing

Defendant's Opposition to Plaintiff's Omnibus Motion In Limine And Incorporated Memorandum

of Law, to the following:

> Benjamin G. Greenberg (Florida Bar No. 192732
> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> GREENBERG TRAURIG LLP
> 333 SE 2nd Avenue Suite 4400
> Miami, FL 33131
> Telephone: (305) 579-0850
> Facsimile: (305) 579-0717
> greenbergb@gtlaw.com
>
>
> *Counsel for Defendant Justin W Keener.*

This, the 27th day of August 2021

/s/ *Benjamin G. Greenberg*
Benjamin G. Greenberg

17