# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JUSTIN W. KEENER D/B/A JMJ FINANCIAL, | ) ) | No. 20-cv-21254 |
| Defendant. | ) ) ) | Hon. Beth Bloom |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

CORRECTIONS TO DEFENDANT'S FACTS ...........................................................................3

SUMMARY JUDGMENT STANDARD ......................................................................................5

ARGUMENT ................................................................................................................................6

      A.     The Undisputed Facts Establish That Defendant Operated As An Unregistered
           Dealer ...............................................................................................................6

           1.    The Plain Language Of The Statute And Eleventh Circuit Precedent Control.....6

           2.    Defendant Cannot Rewrite The Statute To Fit His Needs ...................................8

           3.    Although The Factors Contained In The SEC's Guide May Be Instructive,
               They Do Not Supplant The Law ....................................................................10

           4.    Defendant's Business Activities Meet His Own Four Factor Test.....................14

            5.    Defendant's Remaining Contentions Regarding His Status As A Dealer Lack
               Merit...............................................................................................................16

      B.     Defendant's Due Process/Fair Notice Argument Fails As A Matter Of Law........20

      C.     Defendant's Disgorgement Arguments Are Both Premature And Without
           Merit.................................................................................................................24

      D.     Defendant's Challenge to Injunctive Relief Is Premature And Meritless.............26

CONCLUSION.............................................................................................................................27

## **TABLE OF AUTHORITIES**

**CASES**

*Bonner v. City of Prichard,*
   661 F.2d 1206 (11th Cir. 1981) ....................................................................7

*Brice v. Haynes Invest., LLC*,
   Case No. 18-cv-01200-WHO, Case No. 19-cv-01481-WHO, 2021 WL 2936733 (N.D.
   Cal. July 13, 2021) ...................................................................................25

*CBS Inc. v. PrimeTime 24 Joint Venture,*
   245 F.3d 1217 (11th Cir. 2001) .............................................................9, 11

*Chapel Invs., Inc. v. Cherubim Ints., Inc.*,
   177 F. Supp. 3d 981 (N.D. Tex. 2016) ......................................................14

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
   467 U.S. 837 (1984) ..................................................................................12

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ..................................................................................23

*City of South Miami v. DeSanti*s,
   408 F. Supp. 3d 1266 (S.D. Fla. 2019) ....................................................21

*Clark v. Coats & Clark, Inc.,*
   929 F.2d 604 (11th Cir. 1991) ....................................................................5

*Eastside Church of Christ v. National Plan, Inc.*,
   391 F.2d 357 (5th Cir. 1968) ..............................................6, 7, 11, 12, 13, 22

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ..................................................................................23

*FTC v. Wyndham Worldwide Corp.*
   799 F.3d 236 (3d Cir. 2015) ................................................................. 9, 22

*Gordon Wesley Sodorff, Jr.,*
   50 S.E.C. 1249, 1992 WL 224082 (Sep. 2, 1992) ..........................16, 17, 18, 19

*Heckler v. Community Health Servs., Inc.,*
  467 U.S. 51 (1984)..................................................................................................23

*Hickson Corp. v. N. Crossarm Co.,*
  357 F.3d 1256 (11th Cir. 2004) ............................................................................5

*Kaiser Aluminum & Chem. Corp. v. Bonjorno,*
  494 U.S. 827 (1990)................................................................................................6

*Liu v. SEC,*
  140 S. Ct. 1936 (2020)..........................................................................................24

*PHH Corp. v. CFPB,*
  839 F.3d 1 (D.C. Cir. 2016)..................................................................................23

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.,*
  714 F. Supp. 2d 475 (S.D.N.Y. 2010)..................................................................12

*Rojas–Reyes v. I.N.S.,*
  235 F.3d 115 (2d Cir. 2000)..................................................................................23

*SEC v. Almagarby,*
  479 F. Supp. 3d 1266 (S.D. Fla. 2020) ....................................................*Passim*

*SEC v. Big Apple Consulting USA, Inc.,*
  783 F.3d 786 (11th Cir. 2015) ..................................................................*Passim*

*SEC v. Blackburn,*
  Case No. 15-2451, 2020 WL 10787527 (E.D. La. Nov. 3, 2020) ......................25

*SEC v. Calvo,*
  378 F.3d 1211 (11th Cir. 2004) ............................................................................27

*SEC v. Federated All. Grp.,*
  No. 93-CV-0895E(F), 1996 WL 484036 (W.D.N.Y. Aug. 21, 1996)..............14

*SEC v. Ginsburg,*
  No. 99-8694-CV-RYSKAMP, 2002 WL 1835810 (S.D. Fla. July 8, 2002)...................25

*SEC v. Kramer*,
    778 F.Supp.2d 1320 (M.D.Fla. 2011) ...........................................................................14

*SEC v. Nat'l Presto Indus., Inc.*,
    486 F.3d 305 (7th Cir. 2007) .......................................................................................12

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990) ..................................................................................17, 19

*SEC v. River North*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) .................................................................16, 17, 19

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996)............................................................................................23

*Vaughn v. C.I.R.*,
    85 F.2d 497 (2d Cir. 1936)............................................................................................9

## STATUTES

15 U.S.C § 78c(a)(5)...................................................................................................1, 6

15 U.S.C § 78c(a)(5)(A) ...............................................................................................12

15 U.S.C § 78c(a)(10).....................................................................................................14

15 U.S.C. § 78o(a)(1)...................................................................................................1, 6

15 U.S.C. § 78z..............................................................................................................23

## OTHER AUTHORITY

*Cont'l Grain Co.*,
    SEC No-Action Letter, 1987 WL 108902, (Nov. 6, 1987)................................................10

Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings
Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934,
    SEC Release No. 34-47364, 2003 WL 328058 (Feb. 13, 2003) ......................................19

*Fairfield Trading Corp.*,
  SEC No-Action Letter, 1988 WL 233618 (Jan. 10, 1988) ................................................10

*Louis Dreyfus Corp.*,
  SEC No-Action Letter, 1987 WL 108160 (July 23, 1987) ................................................11

*Nat'l Council of Sav. Instit.*,
  SEC No-Action Letter, 1986 WL 67129 (June 26, 1986) ................................................10

*SEC v. Almagarby,* Case No. 17-62255-CIV-COOKE/HUNT, slip op (S.D. Fla. Aug. 16, 2021)
  [DE 138]................................................................................................................................25

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1, plaintiff, United States Securities and Exchange Commission (the "Commission" or "SEC"), respectfully submits this opposition to the motion for summary judgment submitted by Defendant Justin W. Keener d/b/a JMJ Financial ("Defendant").

## INTRODUCTION

The Court should deny Defendant's motion for summary judgment ("Def. MSJ") for several reasons, foremost because in its own motion for summary judgment the SEC has proven its case against him as a matter of law.  *See* DE 68.

First, there is no genuine issue of material fact that Defendant is an unregistered dealer, and not a "trader," under the plain and unambiguous language of Sections 3(a)(5)(A) and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78c(a)(5)(A) and 78o(a)(1) ("dealer registration statute" or "statute") and controlling Eleventh Circuit Law. Second, even if, as Defendant urges, the SEC's Guide to Broker-Dealer Registration ("Guide")[1] *were* the "controlling law" on dealer registration—and it is not—Defendant's securities business would still unquestionably meet various factors that the Guide provides for determining if particular operations meet the statutory definition of the term "dealer."  Third, Defendant's Due Process fair notice argument (hereinafter "Due Process") fails because the dealer registration statute is clear and unambiguous, the Eleventh Circuit has clearly interpreted the statute, and the Guide squarely instructs readers that they are required to follow the law.  Finally, Defendant has conceded that the SEC's requests for disgorgement and an injunction are premature and should

---

[1] *See* Plaintiff's Opposition Statement of Material Facts (hereinafter "OSMF"), at ¶ 106 ("The Division of Trading and Markets has put staff guidance on SEC.gov titled Guide to Broker-Dealer Registration.").

not be decided until after liability is determined, and his legal arguments challenging these forms of equitable relief are otherwise without merit.

The SEC's motion for summary judgment demonstrates that, from at least 2010 Defendant was engaged in a commercial enterprise in which he purchased hundreds of convertible notes, converted those notes into billions of shares of newly issued securities, sold those shares into the public market, and made millions of dollars in profits—making him a dealer, as a matter of law, under the plain language of the dealer registration statute and Eleventh Circuit law.  Further, the SEC's MSJ *also* unquestionably demonstrates—consistent with factors in the Guide—that, among other things, Defendant: (1) advertised through various means to the public and his issuer clients that he was in the securities business, and stood ready, willing and able to buy millions of dollars in convertible notes in 2015 and 2016; (2) had numerous issuer clients with whom he conducted thousands of transactions; and (3) bought securities with a view toward distributing them.  Thus, even applying Defendant's cherry-picked factors from the Guide, he was operating as an unregistered "dealer" in violation of the dealer registration statute. Defendant cannot avoid the ramifications of the unambiguous language of the statute and Eleventh Circuit law by adding his preferred language to the dealer registration requirements that do not appear in the statute or in the controlling precedent.

Defendant's allegation that the SEC's claim violates Due Process because he lacked fair notice that his conduct was illegal is meritless.  As this Court observed in denying his motion to dismiss in August 2020, Defendant failed then to contend that any language in the dealer registration statute is ambiguous.  More than a year later, he *still fails to contend that the dealer registration statute is ambiguous*.  Instead, Defendant has cobbled together selected phrases from SEC Guidance, which he uses to: (1) falsely assert that the SEC has changed its views on the

Exchange Act's definition, and (2) unpersuasively contend that the SEC is confused about what the dealer registration statute prohibits. These claims fail to articulate, let alone meet, the standard for establishing a Due Process defense.

Defendant had clear notice that his conduct was illegal based upon the plain language of the statute, the Eleventh Circuit's decision in *SEC v. Big Apple Consulting USA, Inc.* 783 F.3d 786 (11th Cir. 2015), *and* the Guide. Moreover, as the undisputed facts show, and this Court also found, Defendant is not a novice investor—he has a long history operating in the securities industry. As it did at the pleading stage, the Court should reject Defendant's Due Process defense.

Defendant's disgorgement and injunctive relief arguments are premature and wrong. As he has now conceded, both disgorgement and injunctive relief are equitable remedies, which the Court determines *after* liability. *See* DE 87 at 8 (Def. Opposition to SEC Omnibus MIL). Thus, the Court should address them after liability has been determined.

The Court should deny Defendant's MSJ because it is fails to establish that the SEC cannot meet the elements of its claim. Rather, the undisputed facts demonstrate that Defendant was in the business of buying convertible notes, converting those notes to shares, and selling those shares into the public market. Those facts establish, as a matter of law, that Defendant was operating as an unregistered dealer in violation of the dealer registration statute and the Eleventh Circuit law interpreting it.

## CORRECTIONS TO DEFENDANT'S FACTS

In the statement of material facts in support of MSJ, Defendant mischaracterizes some of the well-established facts. The SEC here corrects only *some* of Defendant's factual statements and provides support for those corrections.

In his MSJ Defendant asserts that: "For a limited period of approximately two years, Mr. Keener invested in convertible notes in the microcap space (the investments at issue in this case)." Def. MSJ at 4.  This is untrue.  Defendant started purchasing convertible notes as early as 2009, when he obtained a note from a company called mPhase Technologies.  OSMF at ¶ 11. On December 22, 2014, Defendant entered into a contract to sell 44 non-performing convertible notes to River North Equity.  *Id*.  In the contract, Defendant represented that: "JMJ Financial . . . is an active manager of investments in convertible notes with over 220 convertible notes in its portfolio."  *Id*.  Defendant purchased those notes between December 18, 2009 (mPhase Technologies) and May 22, 2014 (Bill the Butcher).  *Id*.  The total balance owed on those notes at the time of sale exceeded $5.4 million.  *Id*.

Defendant also asserts that he "has no customers."  Def. MSJ at 2.  In fact, Defendant's customers—or "clients," as he called them—were the issuers who sold him convertible notes. Defendant's expert witness Dr. Oldfield admitted that the issuers were his "clients," notwithstanding his unpersuasive attempt to distinguish Defendant's "clients" from customers. *See* OSMF at ¶ 103 (Oldfield stated: "a client is someone in whom you have a long-term economic interest, whereas a customer is someone you do an immediate transaction with"). Defendant's own accounting database used the field "client_id" to refer to the microcap issuers. *Id*. at ¶ 102.

Defendant also asserts that: "Generally speaking, the notes functioned as follows.  Mr. Keener made a loan to a company of approximately $25,000 to $100,000." Def. MSJ at 5.  This statement fails to account for the many convertible notes with prices that exceeded $100,000.  In her summary declaration, Dr. Taveras calculated that Defendant spent approximately

$51,919,658 purchasing 272 convertible notes between July 2010 and April 2018.  DE 67-11 at ¶ 17 and Ex. 4, page 12 of 20.  Applying simple division, the average price per note was $190,881.

In his MSJ, Defendant asserts that he "has never sold a single share directly to any member of the investing public."  Def. MSJ at 2.  But as Defendant's own expert, Dr. Mayhew, explained, virtually all trades in the OTC market occur with a market maker on both sides of the transaction.  DE 72-26 at 135:10 – 136:5.  Private party transactions in which retail customers trade directly with each other (for example, by exchanging physical stock certificates) are rare. *Id*. at 136:6 - 137:15.  Thus, there would have been few occasions in which Defendant ever would have sold shares directly to any member of the investing public.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing the Court that there is no genuine dispute as to any material fact that should be decided at trial.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  Where, as here, the nonmoving party has the burden of proof at trial, the moving party may carry its burden at summary judgment *either* by presenting evidence negating an essential element of the nonmoving party's claim, *or* by pointing to specific portions of the record that demonstrate that the nonmoving party cannot meet its burden of proof at trial. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–608 (11th Cir. 1991) (discussing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)). Defendant has not met the standard for either option. Pursuant to the plain language of the dealer registration statute, Defendant's motion must fail as the undisputed facts demonstrate that he was, as a matter of law, operating as an unregistered dealer.

## ARGUMENT

**A.  The Undisputed Facts Establish That Defendant Operated As An Unregistered Dealer**

**1.  The Plain Language Of The Statute And Eleventh Circuit Precedent Control**

Defendant's MSJ fails, among other reasons, for ignoring that statutory interpretation begins with the plain language itself.  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990).  The unambiguous, plain language of the Exchange Act states that "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise" is a dealer who must register with the Commission pursuant to Section 15(a)(1).  *See* 15 U.S.C. §§ 78c(a)(5) and 78o(a)(1).  The Eleventh Circuit has interpreted "engaged in the business" to mean, operating "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain." *Big Apple*, 783 F.3d at 790, 809.  The undisputed facts show that for more than a decade Defendant has, as part of a "commercial enterprise carried on for profit," bought securities in the form of convertible notes, converted them to stock, and then sold billions of shares of that stock into the public market from his own accounts using brokerage firms.  DE 67 at ¶¶ 8, 9, 13, 17.

Defendant has long operated a sophisticated business enterprise with as many as 25 employees, millions of dollars in databases and software, and an advertising strategy worthy of a large corporation.  *Id*. at ¶¶ 6, 23, 41-66.  Defendant's convertible notes business was prolific and profitable (contrary to his false assertions that he lost money), and as the SEC's MSJ amply demonstrates, DE 68, he unmistakably meets the plain language of the definition of "dealer" in the Exchange Act as well under the analysis in *Big Apple* and *Eastside Church.  See Big Apple*, 783 F.3d at 809 (applying the plain language of the statute, defendant that provided investor and

public relations services to penny stock companies was a dealer where as part of its regular

business it received and sold discounted shares of stock as payment); *Eastside Church of Christ*

*v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) (finding defendant was a dealer because

it purchased many church bonds and sold some of them for its own account as a part of a regular

business);[2] *see also See SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1268 (S.D. Fla. 2020) (Court

granted summary judgment in favor of SEC where defendant obtained aged debt of penny stock

companies, received shares of their stock at deep discounts to satisfy the debt, and sold the shares

into the public market as a commercial, for-profit enterprise).

Indeed, in its MSJ, the SEC detailed the volume of Defendant's business and the profits

he garnered from his unlawful unregistered dealer activity.  *See* DE 68 at 8-9 (SEC MSJ); DE 67

at ¶¶ 27-37 (SEC's Statement of Material Facts ("SMF")); *see also* DE 67-11 at ¶ 3 (Declaration

of Carmen A. Taveras, Ph.D., in Support of Plaintiff's Motion for Summary Judgment)

("Taveras Decl.") (summarizing convertible note transactions).  The undisputed facts

demonstrate that:

- Between July 2010 and April 2018, Defendant bought more than *272 convertible notes* from *201 different issuers*.

- Defendant paid these issuers approximately *$52 million* for these notes and related warrants.

- Defendant converted these notes on *2,414 occasions* and received more than *38 billion shares* of newly issued stock directly from the issuers.

- He sold those shares into the market through more than *16,000 transactions* for *gross proceeds of approximately $93.5 million*.

---

[2] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

- During the period March 24, 2014 through January 31, 2018, Defendant's **net proceeds** from selling approximately 33 billion shares of stock converted from notes and warrant agreements bundled with the notes totaled approximately **$34 million**.

DE 68 at 8-9 (emphasis added); DE 67 at ¶¶ 34-35; DE 67-11 at ¶ 3.

Thus, as a matter of law, Defendant was in the "business" of buying and selling securities for his own account. For the reasons stated in the SEC's motion for summary judgment, the Court should grant summary judgment against Defendant and deny the instant motion. *See* DE 68 at 10-30.

### 2. Defendant Cannot Rewrite The Statute To Fit His Needs

Ignoring the unambiguous, plain language of the statute and the binding precedent in this Circuit, Defendant attempts to rewrite the statutory definition of the term "dealer," and in particular, the words "engaged in the business." Def. MSJ at 8-9. Defendant relies upon three non-binding sources from the 1930s—an SEC report, a Second Circuit tax case, and a stockbroker text—and he claims that the words of the statute must be interpreted based upon selective portions of those materials. *Id*. Applying his personalized construction, Defendant claims that dealers must be "in the business of providing financial services to customers" and are o*nly* those who "sell securities to the investing public." *Id*. He is wrong.

First, there is no statute, rule, regulation, or binding precedent that includes Defendant's new definition of the term "dealer" or otherwise restricts the Exchange Act's definition to his terms. The plain language neither limits "dealers" to only those who provide *financial services* to clients, nor to those who only *sell* securities to the investing public. The plain language does not even include the term "financial services," and specifically includes those who "buy" as well as "sell" securities as a business. As discussed above, the Eleventh Circuit has interpreted "engaged in the business" to mean, "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain." *Big Apple*, 783 F.3d at

809.  Courts in this District have applied *Big Apple* to sellers of stock obtained directly from the issuer as part of a regular business.  *See Almagarby*, 479 F. Supp. 3d at 1272.

Second, "[t]he court not the agency is the ultimate arbiter of the statute's meaning."  *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251 (3d Cir. 2015) (citing *Skidmore v. Swift & Co*. 323 U.S. 134, 140 (1944).  SEC reports, guidance, scholarly articles, and treatises, while instructive, are not binding on this Court and cannot change the plain language of the statute or the Eleventh Circuit's interpretation of it.   "[W]here the meaning of a statute is discernible in light of canons of construction, [courts] should not resort to legislative history or other extrinsic evidence." *CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1225 (11th Cir. 2001).

Finally, the three 1930s sources upon which Defendant relies do not assist him.  The SEC report he attaches as an exhibit to his MJS does not address the definition of "dealer" in the Exchange Act, but instead notes the results of a feasibility study on segregating the functions of brokers and dealers.  Nonetheless, specific language in the report *precisely describes Defendant's business*, in describing what dealers do, stating in part, "The *dealer* … *buys securities from his customer with a view to disposing of them elsewhere.*"  Def. MSJ at 9 & Ex. A at 4 (emphasis added).  Defendant bought securities from his issuer clients with a view to converting the notes into new issues of stock and selling those into the public market.  Next, Defendant's reliance on a Second Circuit tax case is similarly unavailing, as it did not address the definition of "dealer" in the Exchange Act, but instead examined whether the defendant was a "dealer" for purposes of determining net income in 1929 pursuant to the applicable tax regulation.  *Vaughn v. C.I.R.*, 85 F.2d 497, 499 (2d Cir. 1936).  Finally, Defendant's reliance upon a 1933 textbook is equally inapposite, as it was published *before the Exchange Act was*

*enacted*, and did not address the definition of "dealer" at issue here.  Def. MSJ at 9 & Ex. B at 1, 4.

### 3.   Although The Factors Contained In The SEC's Guide May Be Instructive, They Do Not Supplant The Law

In his MSJ, Defendant does not meaningfully confront the statutory language or the seminal cases relating to dealer registration.  Instead, he spends the bulk of his arguments on the proposition that various forms of SEC guidance—including the informational Guide on the SEC's website—and not the statutory language and case law should control the Court's analysis.  Def. MSJ at 10.  This argument fails.

Specifically, Defendant asserts that, "the SEC has codified a factors-based understanding of the dealer definition in a plethora of Commission Releases, no-action letters, and other published guidance *that constitute the controlling law that now applies to determining whether a person is a securities dealer*."  *Id.* at 10-15 (emphasis added).  After chronicling some of these sources, Defendant focuses on the Guide, which he asserts "summarizes and restates the factors from the prior SEC releases," all of which "focus on services to the investing public."  *Id.* at 12-13.[3]  In doing so, Defendant wholly ignores this Court's prior finding that SEC guidance is not

---

[3]  In fashioning his factor based test, Defendant relies upon an array of SEC "no-action" letters from the late 1980s, none of which support his position.  Defendant asserts that the "SEC has repeatedly reassured market participants through no-action letters that it would not take action against unregistered firms when those firms did not meet this factors-based analysis, including when the firms had 'no customers' and did 'not stand ready to purchase or sell securities in general.'" Def. MSJ at 11, n.3-12.  Notwithstanding that no-action letters do not have the force of law, these particular no-action letters fail to support his claims as they focus on factors that, as discussed, show that Defendant operated as a dealer.  As amply demonstrated in the SEC's MSJ, Defendant: (1) has customers, (2) holds himself out as providing services and quoting a market for securities; and (3) stands ready to purchase or sell securities in general.  *See Nat'l Council of Sav. Instit., SEC No-Action Letter,* 1986 WL 67129 at *2 (June 26, 1986) (focus on handling other people's securities, holding oneself out as willing to buy and sell securities, and willing to provide a service); *Cont'l Grain Co.*, SEC No-Action Letter, 1987 WL 108902, at *1, 4 (Nov. 6, 1987) (declining to take action after applying 10 factors); *see also Fairfield*

binding and cannot supplant the plain language of the statute or the Eleventh Circuit's

interpretation of it.  DE 29 at 8; *PrimeTime 24 Joint Venture,* 245 F.3d at 1225 (under cannons of

construction, courts should not resort to extrinsic evidence); *see also SEC v. Almagarby,* 479 F.

Supp. 3d at 1273 ("SEC no-action letters are not binding pieces of legislation . . . . They are not

rulings of the [SEC] or its staff on questions of law or fact and are not dispositive of the legal

issues raised as to the applicability of the federal securities laws to a given transaction.")

(internal quotation marks and citation omitted).

     In accordance with this well-established principle, the Guide makes clear that it is only to

be used as an interpretive aid.  It specifically warns readers in bold-face type "**CAUTION –**

**MAKE SURE YOU FOLLOW ALL LAWS AND RULES,**" it advises them that the SEC

cannot act as the reader's attorney, and it states that the reader may wish to consult an attorney

with respect to whether they are required to register as dealers.  OSMF, Exhibit 5, at page 3 of

31.

     Defendant acknowledges this Court's decision denying his motion to dismiss for the

limited proposition that the factors in the SEC guidance are "*relevant* for assessing and

ultimately concluding whether a party is a dealer."  *Id*. at 8 (emphasis added).  However, he

simply ignores the significant distinction between "relevant" and "controlling" authorities.

Nothing this Court has held or stated could reasonably be interpreted to mean that it believes that

SEC guidance supersedes or supplants the plain language of the dealer registration statute or the

decisions in *Big Apple* and *Eastside Church*.  To the contrary, the rest of the sentence in this

Court's opinion from which Defendant draws the quoted language reads: "[T]hey [the factors] ***do***

---

*Trading Corp*., SEC No-Action Letter, 1988 WL 233618, at *2 (Jan. 10, 1988) (same); *Louis Dreyfus Corp*., SEC No-Action Letter, 1987 WL 108160, at *2 (July 23, 1987) (same).

***not supplant the statute's plain language***, especially at this [the pleadings] stage." *See* DE 29 at 8 (emphasis added).

Defendant's citation to *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843-44 (1984), is not remotely on point because it discusses deference to agency "regulations" only if the underlying statute contains a "gap left, implicitly or explicitly, by Congress." *See* Def. MSJ at 10.  Congress left no gaps here, but specifically defined the term "dealer" as someone in the business of buying and selling securities for his own account. *See* 15 U.S.C. § 78c(a)(5)(A).  In addition, there is no SEC rule or regulation defining the term dealer.  The Guide or the guidance on the Commission's website surely does not qualify as a regulation or gap filling measure in any event, as it was not subject to the rulemaking process under the Administrative Procedures Act.  An agency exercises its authority to fill gaps in a statutory scheme by promulgating regulations.  But despite Defendant's confusing arguments, the SEC's charges are based upon the plain language of a federal statute and not any SEC rule or regulation.[4]

There is no question that Defendant's attempt to elevate SEC guidance to controlling law is part of his effort to avoid the plain language of the statute and the holdings in *Big Apple* and *Eastside Church*.  If the investor relations firm in *Big Apple* is a dealer because it received payment for services in the form of discounted stock (which it then sold in the market), then obviously a securities professional like Defendant, whose "***entire business model was predicated on the purchase and sale of securities,***" is also a dealer. *See Big Apple,* 783 F.3d at 809-810

---

[4] Defendant also cites several decisions from courts outside the Eleventh Circuit that have nothing to do with dealer registration and are not persuasive authority in any respect. *See SEC v. Nat'l Presto Indus., Inc.*, 486 F.3d 305, 315 (7th Cir. 2007); *Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 481-82 (S.D.N.Y. 2010).

(emphasis added).  One would come to the same conclusion comparing Defendant to the buyer and seller of church bonds in *Eastside Church,* 391 F.2d at 362.

Recognizing the devastating impact on his arguments, Defendant attempts to distinguish the holding in *Big Apple* as mere *dicta* and on the grounds that the investor relations firm there interacted with the investing public and was also involved in a fraud.  Def. MSJ at 19, n. 4.  The Court's holding that the investor relations firm was operating as dealer was not *dicta*; rather the Court upheld the lower court's decision on a motion for summary judgment based on the definition of the term "dealer."  *See Big Apple*, 783 F.3d at 809.  Further, Defendant does not, and cannot, explain how his own website, Twitter account, and sales employees—all of which Defendant used to market services to issuers—were meaningfully different from the contact that the investor relations firm in *Big Apple* had with the public, or how Defendant's purchase of convertible notes was not a service to issuers (*i.e.*, providing liquidity and extending credit) in exchange for notes he typically converted into shares of penny stock.

Defendant's attempt to distinguish *Big Apple* because the case also involved fraud charges is similarly unavailing because the Eleventh Circuit did not consider any form of fraud in concluding that the defendant was a dealer.  He also argues that *Big Apple* does not stand for the proposition that "a dealer … is someone who earns most of their income from selling stock."  Def. MSJ at 19.  And that is true.  But *Big Apple actually* holds that someone who operates a "commercial enterprise" where their "entire business model was predicated on the purchase and sale of securities" bought from the issuer at "deep discounts" is a dealer.  *Id*., 783 F.3d at 809-10.  Defendant meets each of those criteria.

Notably, Defendant only briefly addresses the *Almagarby* case by observing that it is "factually distinguishable" and that it "followed *Big Apple* and focused exclusively on

defendant's volume of trading activity." Def. MSJ at 19. But Defendant's casual dismissal of that recent case misses the Court's finding that *Almagarby's* entire business model was based upon exchanging issuer debt for discounted stock received directly from the issuers and, like Defendant, selling the newly issued shares into the public market. *See Almagarby*, 479 F. Supp. 3d at 1272.

### 4. Defendant's Business Activities Meet His Own Four Factor Test

Defendant insists that four factors that he selects from the Guide constitute the legally binding test to determine whether someone is a "dealer." According to Defendant, dealers are persons who: (1) do business with the public; (2) quote prices for the purchase and sale of securities or provide services to investors; (3) advertise that they are willing to buy and sell a particular security on a continuous basis; and (4) issue, originate, or underwrite securities. Def. MSJ at 12-13. After contending that these factors are themselves controlling law as to the sole issue in this case (and they are not), Defendant then asserts that he meets none of the factors and, therefore, is not a dealer.[5]

---

[5] Defendant cites to three cases to support his proposition that these four factors are central to determining whether he was a dealer. Def. MSJ at 13. None of these cases support Defendant's assertions. First, Defendant misquotes *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011), a case that identifies factors that courts have adopted to determine if someone is a *broker; not a dealer*, as he modifies the quote to suggest. Second, the Court in *SEC v. Federated All. Grp.*, No. 93-CV-0895E(F), 1996 WL 484036, at *4-5 (W.D.N.Y. Aug. 21, 1996), applied nine factors to determine whether the defendant was a *government* securities dealer, pursuant to Section 20(a) of the Securities Act, a different statute and section than at issue here. Finally, *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990-91 (N.D. Tex. 2016) is wholly inapposite at it applies to whether a defendant may freely sell shares into the market pursuant to "a court-approved Section 3(a)(10) exchange." *See* 15 U.S.C. § 77c(a)(10) (Securities Act Section 3(a)(10), which exempts securities from registration if received in settlement of legal disputes after a fairness hearing). In making that finding the Court noted, "Under both the Securities Act and the Exchange Act, only a person engaged in the business of dealing may be considered a dealer." *Id*. at 990 (citing *Big Apple*, 783 F.3d at 809 (investor relations company whose livelihood was based on reselling shares received from its clients as compensation for services provided in exchange for stock was a dealer)).

Even if these factors *were* the controlling law, a cursory review of the record demonstrates that Defendant meets all four factors.  *See* Def. MSJ at 14-15.  This is fatal to Defendant's self-analysis since, as this Court observed in its order denying Defendant's motion to dismiss, "Indeed, the SEC Guide provides that a 'yes' answer to any one of the referenced factors 'indicates that you may need to register as a dealer.' Under that same reasoning, a 'no' answer to one or even all of the factors does not foreclose the possibility that someone is a 'dealer.'"  DE 29 at 7.

First, Defendant claims that he "does not do business with the public or any investors." Def. MSJ at 14.  Yet he plainly solicits issuers—which are certainly part of the public—to sell him convertible notes; he does so through public means, including a website, Twitter, press releases, attending and sponsoring conferences, and employing commission-driven employees and paid third-party finders.  DE 67 at ¶¶ 44-49, 51-62.  In addition, once he converts the notes to shares, he sells those shares into the public market.

Second, Defendant also asserts that he "does not quote prices for the purchase and sale of securities." Def. MSJ at 14.  But this is exactly what he does when he negotiates with issuers to buy convertible notes or when he sells notes to other convertible note holders (as he did with one specific issuer, River North).  *See* OSMF at ¶ 11.

Third, Defendant further contends that he "does not stand ready or willing to buy and sell any particular security on a continuous basis or advertise that he is in the business of buying and selling securities."  Def. MSJ at 15.  Defendant cannot dispute his extensive pubic advertising and active soliciting, through which he holds himself out as being ready and willing to purchase convertible notes (*e.g.* "QuickLoans").  Indeed, there is no other way to characterize his announcement, in press releases distributed over the internet and through speeches at

conferences, that he had $20 million "committed" to investing in microcap companies, which for Defendant meant buying convertible notes. *See* DE 67 at ¶¶ 54.a & b, 60. These public announcements clearly express his willingness to purchase a "particular security" (convertible notes) and to sell a "particular security" (the stock derived from them).

Fourth, Defendant also asserts that he "does not issue, originate, or underwrite securities." Def. MSJ at 15. The undisputed facts demonstrate this contention is false. Defendant purchases convertible notes, converts them to new shares of stock, and sells those shares into the public market. There can be little doubt that this practice constitutes the creation or origination of securities and the issuance of those securities into the market similar to an underwriter. *See, e.g., SEC v. River North*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (finding it "particularly significant" that…like an underwriter, River North purchased stocks at a discounted price directly from numerous issuers…(instead of purchasing stocks already in the marketplace, like a trader)" and "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price") (citing *Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sep. 2, 1992) ("Unlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid.")).

### 5. Defendant's Remaining Contentions Regarding His Status As A Dealer Lack Merit

In further support of his claim that the four factors contained in the SEC Guide are controlling law upon which the Court must rely, Defendant makes a series of additional arguments targeting the specific and most persuasive facts demonstrating that he is a dealer pursuant to the plain language of the dealer registration statute and Eleventh Circuit law. None of Defendant's kitchen-sink arguments aid him. Def. MSJ at 17-18. Defendant contends that the

following facts are not relevant to the dealer analysis: (1) the volume of his transactions, *id.* at 19-20; (2) his marketing efforts directed at issuers, *id.* at 20-21; (3) the features of his convertible notes, *id.* at 21-22; and (4) the newly issued shares that result from his conversions of notes. *Id.* at 22-23.

First, Defendant's contention that the volume of his transactions is irrelevant to the dealer analysis is wrong. Def. MSJ at 19-20. The number of securities transactions executed and the profits generated are key indicators of whether someone is in the business of buying and selling securities. Where, as here, "a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." *See Almagarby* 479 F. Supp. 3d at 1272 (finding that "the sheer volume of the number of deals and the large sums of profit Defendants generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that Defendants were engaged in the 'business' of buying and selling securities") (citing *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (defendant "was a dealer because his 'high level of activity ... made him more than an active investor'")). Moreover, volume tends to establish the "regularity of participation in securities transactions" and as the Commission noted 29 years ago in an adjudicated proceeding (not in guidance), a dealer will have "more than a few isolated transactions." *See* DE 29 at 8 (quoting *Gordon Wesley Sodorff, Jr.,* 1992 WL 224082, at *4-5; *River North,* 415 F. Supp. 3d at 858 (courts construing the term dealer generally require a "certain regularity of participation in securities transactions").

Second, Defendant is also wrong to contend that any advertising or solicitation he directed at microcap issuers is somehow not relevant to the analysis of whether he is a dealer. Def. MSJ at 20-21. While conceding that "[a]dvertising directed at soliciting customers from the

investing public could be indicative of dealer activity," he claims that his advertising and solicitations aimed at issuers from whom he offered to buy convertible notes is somehow not relevant to the analysis. *Id.* at 20. He offers no support for this conclusion—just his own observation that to conclude otherwise would be "nonsensically overbroad." *See id.*

Of course, Defendant ignores the obvious fact that advertising and soliciting issuers demonstrates that he was in the business of buying convertible notes. *Almagarby*, 479 F. Supp. 3d at 1272 (clear indication that defendants were operating as dealers where they "went so far as employing finders" to solicit issuers to sell convertible notes to enhance their pecuniary gain). Further, this Court has already held that it was indicative of dealer activity where he "operated a website advertising his business to *issuers*," "hired employees to solicit *issuers* who were willing to sell convertible notes to him," "sponsored conferences in which he and his employees solicited penny stock *issuers* in person," and "made PowerPoint presentations at conferences representing that he had $20 million 'committed' to purchase convertible notes from *issuers*." DE 29 at 9 (emphasis added). All that has changed since the Court wrote those words is that these facts are now undisputed.

Third, Defendant baldly claims that it is irrelevant to the dealer analysis that his notes are convertible into the issuer's stock at a considerable discount to the prevailing market price. Def. MSJ at 21-22. Defendant is mistaken. He again cites not a scintilla of legal authority for his position, while asserting that "[n]o prior SEC guidance states that the existence of this discount could be relevant to the dealer analysis." *See id.* at 22. Whether this is technically true, it is hardly determinative where a slew of cases have found the discounted shares feature to be significant. For instance, *Sodorff* is *not* SEC guidance; it is instead a decision on the appeal of a proceeding adjudicated by FINRA (then known as NASD). *Id.*, 1992 WL 224082, at *1. There,

the Commission specifically held *in 1992* that discounts were highly relevant to the dealer analysis. *Id.*, 1992 WL 224082, at *5. This is, of course, in addition to the governing case law, such as *Big Apple*, which highlighted the importance of receiving steeply discounted stock to the dealer analysis.[6] *See Big Apple*, 73 F.3d at 810.

Finally, Defendant is also misguided when he claims that selling newly issued shares into the public market is not indicative of dealer activity and that doing so did not make him an underwriter. Def. MSJ at 22-23. He admits that "[c]onvertible notes are, by definition, a way for new stock to come into the market." *See id.* at 22. Then he asserts that "[t]here is no SEC guidance or case law that suggests all convertible notes are thus indicative of dealer activity, or that the shares being newly issued is even relevant to the dealer analysis." *Id.* Defendant is wrong, both SEC guidance and case law indicate that selling newly issued shares into the market is indicative of "dealer" activity. *See Ridenour*, 913 F.2d 515; *Sodorff*, 1992 WL 224082. In making these arguments, Defendant ignores the SEC's statement in 2003 that a person who "participate[s] in the *sale or distribution of new issues*, such as by acting as an underwriter," may be a dealer. *See* Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, SEC Release No. 34-47364, 2003 WL 328058, at *4 (Feb. 13, 2003) (emphasis added).

---

[6] *See also Almagarby*, 479 F. Supp. 3d at 1279 (granting summary judgment where defendant operated a business of buying aged corporate debt from creditors, ***negotiating with the corporate debtors to obtain repayment in the form of deeply discounted stock***, and selling the newly issued stock into the public market) (emphasis added); *River North*, 415 F. Supp. 3d at 858-59 (finding it "particularly significant" that…like an underwriter, River North purchased stocks at a discounted price directly from numerous issuers…(instead of purchasing stocks already in the marketplace, like a trader)" and "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price") (citation omitted).

Defendant further contends that he was not an underwriter because allegedly he complied with Rule 144 of the Securities Act of 1933 ("Securities Act") and he misleadingly points to attorney opinion letters stating that "he *was not acting as an underwriter*."  *See* Def. MSJ at 15-16; 22-23.  Defendant's alleged compliance with Rule 144 does not exempt him from the requirement to register as a dealer pursuant to Section 15(a)(1) of the Exchange Act.  Rule 144 is a safe harbor that applies to the resale of unregistered *securities* under the Securities Act; it is not a safe harbor from registering as a *dealer* pursuant to the Exchange Act.  Section 4(a)(1) of the Securities Act allows individuals, who possess unregistered securities *and are not underwriters*, to sell those securities without registering them with the Commission.  However, if resellers comply with Rule 144, they may sell the securities without being deemed underwriters under Section 4(a)(1).  But complying with Rule 144 does not allow a reseller to ignore the dealer registration statute.

In summary, Defendant cannot escape dealer liability with his carefully cultivated and misleading legal analysis, his bald allegations that SEC guidance somehow supersedes the plain language of the Exchange Act, or by claiming that—despite applicable case law—any evidence that the SEC uses to establish that he was in the business of buying and selling securities is irrelevant.  Defendant is a dealer and not a trader because he buys and sells securities for his own account as part of a regular business.  As demonstrated above, even applying Defendant's hand-picked factors from the SEC Guide underscores, rather than undermines, that conclusion.

### B.  Defendant's Due Process Argument Fails As A Matter Of Law

Defendant's Due Process arguments are without merit because: (1) he fails to even contend—a requirement for establishing a constitutional statutory challenge—that the dealer

registration statute itself is vague, ambiguous, or lacks clarity;[7] and (2) his Due Process argument

is based on the obvious fictions that the SEC believes the law is unclear and has "taken a

litigation position that *contradicts*" SEC guidance.[8]  Def. MSJ at 24-25.

This Court correctly observed in August 2020 that Defendant had "failed to point to any

particular aspect of the Exchange Act that is ambiguous." DE 29 at 11.  More than a year later,

he still does not directly or meaningfully contend that the Exchange Act's definition of "dealer"

is ambiguous.  This failure is fatal to his alleged defense because "[t]o sustain such a challenge,

the movant [must not only allege, but] 'must prove that the enactment is vague.'" *City of South*

*Miami v. DeSanti*s, 408 F. Supp. 3d 1266, 1303 (S.D. Fla. 2019) (quoting *Village of Hoffman*

*Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.7 (1982)) (emphasis in original).

Defendant, rather than accept that this case does not involve the SEC's interpretation of a

regulation, but is about the application of the plain language of the relevant statute, continues to

focus on the Guide, and simply ignores that the law in the Eleventh Circuit is clear.[9]  *See Big*

---

[7] To the extent that Defendant contends he has articulated a statutory Due Process claim, he is incorrect.  Defendant merely claims in conclusory fashion, "The SEC already conceded decades ago that 'engaged in the business' was not clear" and that the SEC's supposed confusion "is a clear sign of a due process violation."  Def. MSJ at 24.  This, of course, is not an allegation, much less an argument, that the statute itself lacks clarity.  Defendant is undoubtedly aware that this argument is facially untenable, since *Big Apple* definitively interpreted that very language and applied a plain meaning analysis that utterly forecloses any such argument.  *Big Apple*, 783 F.3d at 790 (interpreting "engaged in the business" to mean, operating "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain.").

[8] The Commission asks that its MSJ arguments relating to Due Process be incorporated fully herein.  *See* DE 68 at 22-24.

[9] As this Court aptly stated in its August 2020 order denying his Due Process argument at the pleadings stage, Defendant "overlooks the express language of the Exchange Act, decisions from this circuit applying the definition of 'dealer,' and the SEC Guide itself, which sets forth instances in which a party can be deemed a dealer."  *See* DE 29 at 10-11.

*Apple*, 783 F.3d at 809 (applying the plain language of the statute and finding defendant was a dealer); *Eastside Church*., 391 F.2d at 362 (same); *Almagarby*, 479 F. Supp. 3d at 1268 (same). Second, because Defendant cannot seriously challenge the language of the statute or cite even one case holding that the language is vague or ambiguous, he claims that the statute must be unclear because the SEC issued the Guide and because the SEC's website "states that whether certain facts and circumstances meet the dealer definition is 'less clear." He further falsely asserts that the SEC's position in this case "*contradicts*" prior SEC guidance. *See* Def. MSJ at 24-25 (emphasis in original); DE 29 at 11. These claims fail to meet his burden.

As an initial matter, Defendant's argument that SEC guidance somehow renders the dealer registration statute ambiguous where, as here, courts have found the language to be clear, is nonsensical. *See Wyndham*, 799 F.3d at 251 ("The court not the agency is the ultimate arbiter of the statute's meaning"). In addition, whether it is "less clear" if some unidentified, hypothetical set of facts and circumstances meet the dealer definition, is not a serious argument—and does not mean that the dealer registration statute or the Eleventh Circuit law interpreting it is not clear.

Defendant further contends that no SEC dealer guidance specifically mentions convertible notes or the discounts in them, Def. MSJ at 24, but fails to acknowledge that this is of no moment. *See Wyndham*, 799 F.3d at 255 (holding that a person "is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute"). Defendant also claims that he must not be a dealer because "prior [SEC] guidance [states] that 'individuals who buy and sell securities for themselves generally are considered traders and not dealers.'" Def. MSJ at 24-25. Defendant must selectively quote the Guide—excising out of his quote the

critical phrase "engages in the business of buying and selling securities," which unambiguously applies to Defendant's conduct and is emphasized in the controlling precedent.

Defendant insists that because the Guide does not mention convertible notes, the SEC somehow changed its interpretation of the statute through this enforcement action.  As discussed in the SEC's MSJ, even if it had not previously brought an enforcement action under a similar theory (which, of course, it already has), it is not estopped from charging Defendant for his violations.[10]  "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant."  *Heckler v. Community Health Servs., Inc.,* 467 U.S. 51, 60 (1984).  Indeed, the affirmative defenses of estoppel and waiver should only be applied against the government "in the most serious of circumstances" "upon a showing of affirmative misconduct by the government."  *Rojas–Reyes v. INS,* 235 F.3d 115, 126 (2d Cir. 2000) (internal quotation marks omitted).  Defendant has not even attempted to make such a showing here. [11]

Finally, Defendant also alleges that his conduct was "consistent with industry practice, which further underscores that the SEC's current litigation position constitutes a due process violation."  Def. MSJ at 25.  But he does not even identify the "industry" in which he operates:

---

[10] *See also* Section 26 of the Exchange Act [15 U.S.C. § 78z] ("No action or failure to act by the Commission….shall be construed to mean that the particular authority has in any way passed upon the merits of or given approval to any security or any transaction….").

[11] Rather, Defendant attempts to rely upon a collection of inapposite cases in which agencies ignored their own regulations or policies and do not address enforcement of a federal statute.  Def. MSJ at 24-25; *see, e.g., FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012) (finding a due process violation when the agency abruptly changed its formal policy on indecency); *PHH Corp. v. CFPB,* 839 F.3d 1, 42 (D.C. Cir. 2016) (abrogated by *Seila Law LLC v. Consumer Financial Protection Bureau,* 140 S. Ct. 2183 (2020)) ("the CFPB has not adhered to [its] regulation"); *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 157 (2012) (refusing to defer to the Department of Labor's retroactive application of a changed interpretation of its own regulations); *Upton v. SEC,* 75 F.3d 92, 93, 98 (2d Cir. 1996) (focused on agency interpretation of regulation).

23

the business of buying convertible notes, converting them to newly issued shares of stock, and selling those shares into the public market.  Rather, Defendant attempts to liken himself to hedge funds, family offices, angel investors, and high frequency traders.  His argument is without merit because the Commission is not obligated to sue any other party before suing a Defendant even under the same theory.  But more fundamentally, Defendant presents no persuasive evidence that these other entities operated a convertible note business in the same manner as he did.

As if the plain language of the statute and the Eleventh Circuit law interpreting it were not enough, even after the SEC sued Defendant for not registering as a dealer while operating an expansive and highly lucrative convertible note business, and while his motion to dismiss was pending with the Court, he sold $13.76 million shares of stock converted from a note issued to him by Blink Charging Co.  DE 67 at ¶ 36.  And that was after telling SEC staff that "I have no interest in reentering that [convertible note] business whatsoever again."  *Id*. at ¶ 35.  There is arguably no greater notice that one is violating the dealer registration statute than being sued under Exchange Act Section 15(a)(1), and yet Defendant continued to reap millions of dollars from his convertible notes business.

### C.  Defendant's Disgorgement Arguments Are Both Premature And Without Merit

Defendant challenges the SEC's ability to seek disgorgement in this case on three grounds: "(1) there are no victims of Mr. Keener's investments [pursuant to *Liu v. SEC*, 140 S. Ct. 1936 (2020)]; (2) there is no causal connection between the alleged registration violation and any ill-gotten gains; and (3) Mr. Keener lost money on the transactions at issue."  Def. MSJ at 25-26.  These claims are premature and should be addressed after a decision on liability has been issued by the Court.

First, Defendant has now conceded that it is premature during the liability phase of the case for the Court to rule on disgorgement or any equitable remedies, including injunctive relief. DE 87 at 8. Following a finding of liability at summary judgment or trial, when "[t]he issue of remedies is . . . ripe for review," the SEC will move this Court for the entry of a final judgment and the imposition of remedies.[12] Thus, the Court should dispense with addressing the remedies issues now.

Second, Defendant's three arguments are simply wrong. His contention that the SEC must identify individual victims has no basis in law. The Supreme Court in *Liu* did not require the SEC to undertake the significant burden of identifying individual harmed investors or quantifying their losses ***before*** disgorgement is awarded or collected. "To be sure, [*Liu*] did not create a rule requiring all disgorged funds be returned to investors, or that a disgorgement award be limited to those funds that could be returned to investors." *SEC v. Blackburn*, Case No. 15-2451, 2020 WL 10787527 at *3 (E.D. La. Nov. 3, 2020). Rather, identifying the specific individuals and entities who may receive money in any disgorgement distribution must await entry of a judgment by this Court specifying the amount of disgorgement, as well as a determination of the amount that can be collected. Contrary to Defendant's first contention, there is no new requirement under *Liu* that the SEC identify any victims, let alone at this stage of the proceedings. *SEC v. Almagarby*, Case No. 17-62255-CIV-COOKE/HUNT, slip op. at 7 (S.D. Fla. Aug. 16, 2021) [DE 138] ("[T]he Supreme Court made no ruling, as Defendants suggest, that the SEC must identify specific victims to whom a disgorgement award should be

---

[12] *See SEC v. Ginsburg*, No. 99-8694-CV-RYSKAMP, 2002 WL 1835810, at *1 (S.D. Fla. July 8, 2002) (citing 15 U.S.C. § 78u-1); *see also Brice v. Haynes Invest., LLC*, Case No. 18-cv-01200-WHO, Case No. 19-cv-01481-WHO, 2021 WL 2936733, at *10 n.18 (N.D. Cal. July 13, 2021) ("The question of what, if any, equitable relief should be awarded to plaintiffs will be determined only after considering the jury verdict and the evidence at trial.").

distributed, or that all disgorged funds must be returned to investors, or that a disgorgement award should be limited to those funds that could be returned to investors.") (citing *Liu*, 140 S. Ct. at 1940).

Apart from being premature, Defendant's second claim—that the SEC cannot demonstrate a causal link between disgorgement and his dealer registration violation—is also wrong. The SEC seeks disgorgement of all profits Defendant obtained as a result of his commercial enterprise in which he purchased convertible notes, converted those notes to stock, and sold the stock into the public market. This practice is the basis for the SEC's unregistered dealer claim and, therefore, is linked to the disgorgement calculation.

Finally, Defendant's contention that the "SEC has not demonstrated that Mr. Keener generated any net profits" is also premature and wrong as a matter of undisputed fact. Def. MSJ at 28. The notion that Defendant lost money on his convertible notes business is simply fanciful. He spent almost $52 million buying convertible notes between July 2010 and April 2018. DE 67-11 at Ex. 4. And the record evidence demonstrates unambiguously that Defendant's convertible notes business was exceptionally profitable. Defendant's assertion that he lost money is based upon the fallacy created by his hired expert, who excluded a large portion of Defendant's income from convertible notes by counting only proceeds from selling stock converted from notes. Defendant's expert then, plainly misleadingly, applied an ***offset for every conceivable business expense Defendant experienced during the same period***. *See* Taveras Expert Report at ¶ 13. In taking 100 percent of the losses for JMJ Financial, the expert did not count proceeds from selling stock that Defendant received to settle outstanding convertible note debts, nor did he count proceeds from selling stock from warrants that were bundled with

26

convertible notes.  *Id*. at ¶ 12.  The Court should not rely on this obviously selective and misleading accounting in deciding any future disgorgement award.

### D.  Defendant's Challenge to Injunctive Relief Is Premature And Meritless

Defendant asks the Court to summarily reject the SEC's request for injunctive relief because the SEC purportedly could not meet the required elements.  *See* Def. MSJ at 29-30.  He asserts that: (1) no one was harmed by his conduct and thus there is "no risk of future harm"; (2) he did not act with scienter; and (3) he "stopped investing in new convertible notes in microcap companies four years ago."  *Id*.  Defendant now concedes that injunctive relief is appropriately determined only after a finding on liability.  DE 87 at 8.  Thus, the Court should dispense with this issue until after liability has been determined.

Nonetheless, the SEC has met the elements to obtain an injunction.  The standard in the Eleventh Circuit for injunctive relief in an SEC enforcement action focuses on the likelihood that the perpetrator will repeat the violations in the future: "[t]he SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated."  *See SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).  The SEC has demonstrated that Defendant has violated the unregistered dealer statute and is likely to repeat the violation as his convertible notes business was prolific and highly lucrative and he continued it during the pendency of this case.

### CONCLUSION

The Court should deny Defendant's MSJ because he meets the definition of dealer in the Exchange Act and did not register with the SEC as required by Section 15(a)(1).

DATE:   August 31, 2021          Respectfully submitted,

                    By:

                             /s/ Joshua E. Braunstein
                             Joshua E. Braunstein
                             Antony Richard Petrilla
                             Attorneys for Plaintiff
                             SECURITIES AND EXCHANGE COMMISSION
                             100 F Street NE
                             Washington, DC 20549
                             Telephone: (202) 551-8470
                             Braunsteinj@sec.gov

                             **ATTORNEYS FOR PLAINTIFF**
                             **SECURITIES AND EXCHANGE**
                             **COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2021, I filed Plaintiff Securities And Exchange Commission's Opposition to Defendant's Motion for Summary Judgment through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

<u>s/ Joshua E. Braunstein</u>
Joshua E. Braunstein
***Attorney for Plaintiff***
***Securities and Exchange***
***Commission***