UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-CV-21254-BLOOM/LOUIS

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

v.                                                          ORAL ARGUMENT REQUESTED

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

                            Defendant.

DEFENDANT JUSTIN W. KEENER'S OPPOSITION TO PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

I.     Introduction.....................................................................................................................1

II.    Factual Background.........................................................................................................4

   A.   Mr. Keener is a Private Investor and Does Not Have a Dealer Business ....................4

   B.   Mr. Keener Did Not "Hold Himself Out to the Public as Being in the Business of
      Buying and Selling Securities"....................................................................................5

   C.   Mr. Keener Did Not Profit from his Convertible Notes Investments ...........................5

   D.   The SEC's "Facts" Are Unsupported and Disputed ....................................................5

III.   Legal Standard .................................................................................................................6

IV.    Argument...........................................................................................................................7

   A.   The SEC's Statement of the Governing Law is Wrong ................................................7

   B.   The SEC Cites Only Disputed, Unsupported, or Immaterial Facts ...........................13

   C.   *Big Apple* and *Almagarby* Do Not Support the SEC's Position..............................20

   D.   Mr. Keener's Affirmative Defenses Present Disputed Facts for the Jury ................22

V.     Conclusion......................................................................................................................30


I.     Introduction ................................................................................................................... 1

II.    Factual background......................................................................................................... 4

   A.   Mr. Keener is a Private Investor and Does Not Have a Dealer Business ......................... 4

   B.   Mr. Keener Did Not "Hold Himself Out to the Public as Being in the Business of Buying
      and Selling Securities"................................................................................................... 5

   C.   Mr. Keener Did Not Profit from his Convertible Notes Investments ................................ 5

   D.   The SEC's "Facts" Are Unsupported and Disputed ........................................................ 5

III.   legal standard ................................................................................................................ 6

IV.    argument......................................................................................................................... 7

   A.   The SEC's Statement of the Governing Law is Wrong.................................................... 7

      1.    The SEC's Interpretation is Not Supported by the Language, Context, and History of
          the Exchange Act ................................................................................................... 7

      2.    The SEC Ignores the Dealer Factors While Also Conceding Mr. Keener Does Not
          Meet Them ........................................................................................................... 10

   B.   The SEC Cites Only Disputed, Unsupported, or Immaterial Facts ............................... 13

      1.    That Mr. Keener Incurred Investment Expenses is Irrelevant.................................... 13

      2.    Mr. Keener's Limited Social Media Presence and Conference Attendance is
          Irrelevant ............................................................................................................. 14

      3.    The Volume of Mr. Keener's Trading Activity is Irrelevant ...................................... 16

     4.      That the Stock was New to the Market Did Not Make Mr. Keener an Underwriter or Dealer .................................................................................................................................. 17

     5.      The Conversion Discount is Irrelevant ............................................................ 18

  C.    *Big Apple* and *Almagarby* Do Not Support the SEC's Position ...................................... 20

  D.    Mr. Keener's Affirmative Defenses Present Disputed Facts for the Jury ........................ 22

     1.      The SEC Is Not Entitled to Summary Judgment on Fair Notice ............................... 22

     2.      The SEC is Not Entitled to Summary Judgment on Statute of Limitations .............. 26

V.    conclusion ................................................................................................................................ 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................................................6

*Berman v. Blount Parrish & Co.*,
    525 F.3d 1057 (11th Cir. 2008) ..............................................................................................26

*Boneta v. Am. Med. Sys.*,
    No. 20-CIV-60409-RAR, 2021 WL 917871 (S.D. Fla. Mar. 10, 2021) ...............................30

*Chapel Invs., Inc. v. Cherubim Ints., Inc.*,
    177 F. Supp. 3d 981 (N.D. Tex. 2016) ..................................................................10

*Christian Coal. of Fla., Inc. v. United States*,
    662 F.3d 1182 (11th Cir. 2011) .........................................................................29

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) .............................................................................23, 24, 26

*Diebold Inc. v. Marshall*,
    585 F.2d 1327 (6th Cir. 1978) ...........................................................................26

*Donander Co. v. C.I.R.*,
    29 B.T.A. 312 (U.S. Bd. Tax Appeals, Nov. 8, 1933) .........................................7

*El Badrawi v. United States*,
    787 F. Supp. 2d 204 (D. Conn. 2011) ..............................................................10

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ...........................................................................................24

*Gabelli v. SEC*,
    568 U.S. 442 (2013) ...........................................................................................27

*Johnson v. Winslow*,
    279 N.Y.S. 147 (Sup. Ct. 1935) ...........................................................................8

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. 519 (2013) ...........................................................................................21

*Kokesh v. SEC*,
    137 S. Ct. 1635 (2017) .......................................................................................27

*KPMG, LLP v. SEC*,
    289 F.3d 109 (2002) ...........................................................................................25

*Maxwell v. Carnival Corp.*,
    No. 19-cv-23043-BLOOM/Louis, 2021 WL 1969967 (S.D. Fla. Mar. 18, 2021) ...........................7

*Mosley v. Progressive Am. Ins. Co.*,
    No. 14-cv-62850-BLOOM/Valle, 2018 WL 6171417 (S.D. Fla. Nov. 25, 2018) ...........................13

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972) ...........................................................................................25

*Rothenberg v. Daus*,
    481 F. App'x. 667 (2nd Cir. 2012) ....................................................................25

*SEC v. Almagarby,*
   479 F. Supp. 3d 1266 (S.D. Fla. 2020) ............................................................20, 21, 22, 25

*SEC v. Big Apple Consulting,*
   783 F.3d. 786 (11th Cir. 2015) ....................................................................19, 20, 21, 25

*SEC v. Federated All. Grp.,*
   No. 93-CV-0895E(F), 1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) ................................10

*SEC v. Feng,*
   935 F.3d 721 (9th Cir. 2019)................................................................................................12

*SEC v. Fiero,*
   No. 20-2104 (MAS) (DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020)........................22

*SEC v. Graham,*
   21 F. Supp. 3d 1300 (S.D. Fla. 2014) ............................................................................ 28, 29

*SEC v. Graham,*
   823 F.3d 1357 (11th Cir. 2016) ..........................................................................................28

*SEC v. Kovzan,*
   No. 11–2017–JWL, 2012 WL 4819011 (D. Kan. Oct. 10, 2012)......................................26

*SEC v. Kramer,*
   778 F. Supp. 2d 1320 (M.D. Fla. 2011)..............................................................................10

*SEC v. River North,*
   415 F. Supp. 3d 853 (N.D. Ill. 2019)..................................................................................22

*Seminole Tribe of Florida v. Florida,*
   517 U.S. 44 (1996)................................................................................................................21

*Skop v. City of Atlanta,*
   485 F.3d 1130 (11th Cir. 2007) ..........................................................................................15

*Summit Petroleum v. EPA,*
   690 F.3d 733 (6th Cir. 2012)..............................................................................................10

*Taggart v. Lorenzen,*
   139 S. Ct. 1795 (2019) ..........................................................................................................7

*United States v. Harra,*
   985 F.3d 196 (3d Cir. 2021)................................................................................................25

*Upton v. SEC,*
   75 F.3d 92 (2d Cir. 1996) ..........................................................................................23, 24, 25

**Statutes**

15 U.S.C. § 77b(a)(12) ....................................................................................................21

15 U.S.C. § 78c(a)(5) ...................................................................................................7, 21

28 U.S.C. § 2462 ...............................................................................................27, 28, 29

National Defense Authorization Act ("NDAA"), Pub. L. No. 116-283 (2021), §§
    6501 ...........................................................................................................................26

**Other Authorities**

17 C.F.R. § 230.144 ................................................................................................ 17, 18

Guide to Broker-Dealer Registration,
    http://www.sec.gov/divisions/marketreg/bdguide.htm .................................2, 11, 15, 20

H.R. Rep. No. 94-123, 94th Cong. 1st Sess., H.R. 4111 (1975) .........................................8

Guy P. Lander, *U.S. Securities Law for International Financial Transactions and Capital
    Markets* (Nov. 2020) ..................................................................................................16

*Many are Chasing the Stock Market By Day Trading in the Pandemic*, CNBC, Sept. 21, 2020
    (https://tinyurl.com/a2zu5kuh) ..................................................................................9

Mary Jo White, "Enhancing Our Equity Market Structure," (June 5, 2014)
    (https://tinyurl.com/4war8xjr) .....................................................................................16

Proposed Rule, SEC Release No. 34-46745, 2002 WL 31428622 (Oct. 30, 2002) ...............12

Revision of Holding Period Requirements in  Rules 144 and 145, SEC Release No.
    33-7390, 1997 WL 70606 (Feb. 28, 1997). ...................................................................18

SEC No-Action Letter, Fairfield Trading Corp., 1988 WL 233618 (Dec. 10, 1987)...............12

SEC Release No. 34-11742, 1975 WL 163406 (Oct. 15, 1975)...........................................10

SEC Release No. 34-40594, 63 Fed. Reg. 59362, 59370 n.61 (Nov. 3, 1998)  .....................10

SEC Release No. 34-47364, 68 Fed. Reg. 8686, 8689, n.26 (Feb. 24, 2003)  .......................10

SEC Release No. 34-63452, 75 Fed. Reg. 80,174 (Dec. 21, 2010)  ......................................10

## I.       INTRODUCTION

The SEC's brief reads as though the SEC has never said a word about the Exchange Act dealer registration requirements in the past 80 years, and has always maintained that the meaning of the statutory language is obvious.  The SEC never once reveals to the Court that it has advised the public on dozens of occasions in formal statements that the analysis of whether a person is a dealer is a complex, fact-intensive analysis that depends on whether up to a dozen factors are met.  Nor does it reveal what the factors are or that the SEC's own website has advised the public to examine those factors for the past fourteen years.  The reason for the SEC's omission is clear: Mr. Keener does not meet a single factor.  The factors all focus on whether a person interacts with and provides services to the investing public, or otherwise acts as a market maker by actively quoting buy and sell prices to the public.  Mr. Keener does not do any of these things.  He invests his own money, makes all of his own investment decisions, and does not interact with the investing public at all.  For this reason alone, the SEC's motion for summary judgment must be denied.

The SEC claims its argument is based on the "plain language" of the Exchange Act.  But in reality, it asks the Court to adopt an interpretation that is nowhere in the plain language.  The SEC's brief does not actually interpret the plain language—i.e., what it means to "engage in the business" of dealing.  Although at first glance, the SEC asks the Court to interpret "business" to encompass everyone who makes a living from buying and selling securities, it quickly walks away from this position—as the SEC itself must recognize, this interpretation would go too far and would sweep in millions of unregistered persons and firms.  Instead, the SEC asks this Court to read the statute to say Mr. Keener is a dealer because he "bought . . . convertible notes from penny stock companies, converted those notes into shares of stock . . . and sold those newly issued shares into the market."  Pl.'s Mot. for Summ. J. Br. ("Br.") at 1.  On its face, that is not an argument based on the actual

"plain language."  To the contrary, the SEC asks the Court to adopt new factors—ones not set forth

in any prior guidance—to single out convertible notes and the microcap industry for attack.

That the SEC asks the Court to ignore the existing factors and adopt new ones is

fundamentally unfair.  To this day, when market participants ask the SEC questions about whether

they have to register as securities dealers, the SEC advises them to look at the factors published in

the SEC's Guide to Broker-Dealer Registration (the "Guide") (https://tinyurl.com/88xycezk),

because these are the factors that "the courts consider when determining whether a person" is a

dealer:

> The staff of the Division of Trading and Markets has published some guidance on the
> Commission's website regarding the broker-dealer registration requirements here:
> http://www.sec.gov/divisions/marketreg/bdguide.htm.  This **Guide to Broker-Dealer
> Registration provides** some basic information regarding the definitions of 'broker' and
> 'dealer' and **the activities/factors the staff and the courts consider when determining
> whether a person fits that definition** . . . . This is a fact-specific assessment that involves
> consideration of a number of factors (which have been developed through SEC staff no
> action letters and case law)."

Def.'s Statement of Material Facts ISO Mot. for Summ. J. ("DSOF") Ex. 73 (SEC-JMJ-OIG-109)

ECF No. 73-24, at 1 (emphasis added).  That is, the SEC in its official correspondence with the

public acknowledges that courts conduct a "fact-specific assessment" based on the factors set forth

in the Guide.  Yet it asks this Court to be the exception.  The SEC's argument must fail.

Mr. Keener is entitled to a jury trial on whether his investment activity qualified as dealer

activity under the factors.  The record is replete with disputed facts, and all reasonable inferences at

this stage must be drawn in Mr. Keener's favor.  For instance:

- The SEC claims investments in convertible notes with a conversion discount is typical dealer
  activity; Mr. Keener's position is that convertible notes are extremely common and many
  investors not registered as dealers hold similar or identical convertible notes to Mr. Keener.

- The SEC claims Mr. Keener's use of social media demonstrated he was a dealer; Mr. Keener
  contends that 20 Tweets over a 3-year period do not suffice to demonstrate anything.

- The SEC claims Mr. Keener "distributed" newly issued stock and thus acted as an underwriter; Mr. Keener's position is that he did no such thing and has hundreds of attorney opinion letters confirming he did not act as an underwriter.

- The SEC claims Mr. Keener would "promptly resell" stock; Mr. Keener's position is that selling six months or more after his initial investment does not qualify as "promptly," especially when an SEC Rule (Rule 144) provides that a six-month holding period is long enough to demonstrate the stock is being held for investment purposes.

- The SEC claims Mr. Keener had $33 million in net income from sales of converted stock; Mr. Keener's position is he had net losses, not profits.

This is all the more so when the SEC seeks summary judgment by unsupported generalization and ambush. First, although the SEC alleges 200 or more convertible notes are at issue in the case, it refuses to identify the specific sales it believes required Mr. Keener to register and does not even explain the details of any one specific note or transaction. While it purports to explain how all of the sale transactions worked—claiming all the stock resulted from discounted conversions of convertible notes and was sold immediately upon receipt—that description does not even match the few transactions cited in the SEC's Complaint or summary judgment motion. For instance, Mr. Keener held his investment in Lithium Exploration Group (Compl. ¶ 15.a) for over three years, and many shares were not even obtained through a conversion discount. Def. Counterstatement of Disputed Facts in Response to Pl. SEC Statement of Material Facts ("CSOF") ¶ 18. The same is true for his investment in Blink Charging Co. *Id.* ¶¶ 12, 36. The SEC's other tactic is ambush: it revealed for the first time in its brief that it seeks to hold Mr. Keener liable based on an allegation that he made $33 million in "net income." The SEC cites a purported income analysis prepared by its own employee, an analysis the SEC previously refused to turn over, even at that employee's deposition during the last week of fact discovery. More importantly, the analysis is wrong, and excludes such basic information as the expenses that went into generating that income.

In sum, the SEC cannot win on summary judgment and overcome Mr. Keener's right to a jury trial based on unsupported and disputed facts it refused to provide in discovery and a wrong interpretation of the law. The SEC's summary judgment motion must be denied.

## II. FACTUAL BACKGROUND

### A. <u>Mr. Keener is a Private Investor and Does Not Have a Dealer Business</u>

Mr. Keener is an investor. For a brief, two-year period, he was an active investor. CSOF ¶ 11. At that time, he invested in a number of convertible notes—loans to companies that Mr. Keener could convert into stock in some circumstances. *Id* ¶¶ 14-15; Def. Additional Facts in Response to Pl. SEC Statement of Material Facts ("ASOF") ¶ 1. Mr. Keener referred to these notes as QuickLoans, because they were relatively small dollar value loans that Mr. Keener could fund quickly. CSOF ¶ 11; ASOF ¶ 1. He hired assistants to help him identify, execute, and account for these QuickLoan investments because they required a lot of work. CSOF ¶¶ 6, 20, 47. Before Mr. Keener could convert QuickLoans into stock, he would have to meet substantial compliance requirements imposed by the companies' transfer agents, as well as the broker-dealers and clearing firms that held his securities accounts. ASOF ¶¶ 16-21. Tracking and accounting for the investments was also complex because he held the investments for six months or more, and some of the companies had volatile performance and even went bankrupt while Mr. Keener was holding his investment. CSOF ¶ 18 (describing losses on ALLM and SFEG); ASOF ¶¶ 3-5.

Mr. Keener made all of his own investment decisions—including whether and how much money to invest in a company, whether to convert notes into stock, and whether to sell stock. ASOF ¶¶ 7, 10, 17. He did not have any customers. *Id.* ¶ 8. A customer is a person who "buys goods or services from a store or business." *See* Oxford English Dictionary (https://tinyurl.com/468fwtfu). He did not sell goods or services to anyone—all of his stock sales

were conducted by his brokerage firms, he never solicited any buyers or sellers from the investing public, and he never provided any services to any investors at all.  ASOF ¶¶ 9, 12-13, 16.

**B.**     **Mr. Keener Did Not "Hold Himself Out to the Public as Being in the Business of Buying and Selling Securities"**

Mr. Keener did take steps to establish credibility with companies as an investor and demonstrate that he had a track record of making successful investments.  For instance, he had a website that indicated he made investments in microcap companies, and he and his assistants attended a handful of investor conferences for networking and education.  CSOF ¶¶ 42-43, 51. Through these efforts, he repeatedly portrayed himself as a private investor in microcap companies. ASOF ¶ 1.  And he never held himself out to the public as being willing to buy and sell securities generally.  *Id.* ¶ 13; CSOF ¶.  In fact, neither his website nor any other marketing materials ever reference selling at all, let alone the sale of any of Mr. Keener's converted stock—Mr. Keener never advertised to or sought buyers for this stock.  CSOF ¶ 44.

**C.**     **Mr. Keener Did Not Profit from his Convertible Notes Investments**

These QuickLoan investments were risky.  He invested in many different convertible notes for this reason—many failed, and it was only by investing in a large volume that he could reasonably expect some to succeed.  ASOF ¶¶ 2-5.  He had to hold these investments for a long time.  *Id.*  They were also expensive, especially when considering the brokerage, compliance, and attorney fees, as well as the employee compensation expenses, he incurred in connection with each investment.  *Id.* ¶ 20; CSOF ¶ 7, 63.  In some years, he lost more money than he made.  ASOF ¶¶ 2-5; CSOF ¶ 18.  In July 2016, he laid off all but a few of his assistants once he realized that these labor-intensive investments were not paying off.   CSOF ¶¶ 6, 20, 47.

**D.**     **The SEC's "Facts" Are Unsupported and Disputed**

The SEC's Statement of Facts relies on gross generalizations about many different investments.  Some investments included conversion features, some did not.  *Id.* ¶ 22.  Some

included conversion rights only in the event of default, and others included conversion rights as a matter of course. *Id.* ¶ 12. Some investments were held for six months, some were held for 3 or more years. *Id.* ¶ 18; ASOF ¶ 3. Some included a market-adjustable conversion discount, some did not. *See* CSOF ¶¶ 14-15 (describing PBIO note, which had a fixed price). The SEC collapses all distinctions through a "summary" analysis prepared by an SEC economist that purports to opine on Mr. Keener's "net income." *See* Pl's Statement of Material Facts ("PSOF") Ex. 11 (Taveras Decl.) ECF No. 67-11 (only cite for Pl's SOF ¶¶ 8, 27, 28, 29, 30, 31, 32, 33). But this "analysis" is nothing more than a disputed expert report in disguise—and one that was not disclosed by the July 1, 2021 expert disclosure deadline. It is also an unreliable expert analysis and was based on two summary spreadsheets, neither of which properly differentiated between sources of income or identified the expenses that would need to be deducted from any "net income" calculation. *See* Taveras Decl. ¶¶ 4-6. The only comprehensive analysis of Mr. Keener's "net income" conducted in this case was prepared by Mr. Keener's expert, a former SEC accountant named Jason Flemmons, who tested numbers against underlying source documents and demonstrated that the SEC's numbers were overstated by tens of millions of dollars. *See* DSOF Ex. 70 (Flemmons Report) ECF No. 73-21 ¶¶ 26-47.

## III.   LEGAL STANDARD

The SEC is not entitled to summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The question at summary judgment is "whether there is a genuine issue for trial"—*i.e.*, whether there are any factual issues that "may reasonably be resolved in favor of either party." *Id.* at 249-50. In answering this question, the Court "views the facts in the light most favorable to the non-moving party, draws all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which are jury functions, not those of a judge."

*Maxwell v. Carnival Corp.*, No. 19-cv-23043-BLOOM/Louis, 2021 WL 1969967, at *2 (S.D. Fla. Mar. 18, 2021) (internal quotations omitted).

## IV.   ARGUMENT

The SEC's summary judgment motion must be denied because it misstates the law—it ignores the language, context, and history of the Exchange Act, and it ignores the factors-based analysis of the Exchange Act dealer definition that the SEC has promoted for decades and that courts have routinely adopted.  It also fails to apply the correct law to the factual record and all but concedes that Mr. Keener is not a dealer under the factors-based analysis.  Finally, the SEC's motion is also defeated by Mr. Keener's fair notice and statute of limitations defenses.  During the Relevant Period, Mr. Keener did not have notice of the interpretation of the dealer definition the SEC has adopted in this case.  And the SEC's request for penalties and disgorgement is also time-barred.

### A.   The SEC's Statement of the Governing Law is Wrong

#### 1.   The SEC's Interpretation is Not Supported by the Language, Context, and History of the Exchange Act

Section 3(a)(5) of the Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account."  However, it excludes a person who does not do so "as part of a regular business."  That is, it excludes persons not "engaged in the business of dealing."  15 U.S.C. § 78c(a)(5).  The key question for interpreting the statute then, is what does it mean to "engage in the business" of dealing?

This phrase is not defined in the statute.  It is a "longstanding interpretive principle" that when a statutory term "is obviously transplanted from another legal source . . . it brings the old soil with it."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (citation omitted).  The business of dealing is just such a term.  In 1934, the business of dealing meant the business of selling stocks to customers from the investing public and providing related dealer services; it did not mean buying and selling securities for investment purposes.  *See, e.g.*, *Donander Co. v. C.I.R.*, 29 B.T.A. 312, 314-15

(U.S. Bd. Tax Appeals, Nov. 8, 1933) (person is not "engaged" in the business of being a dealer when he "bought, sold or held securities for investment or speculation," and not for "resale to customers").  In fact, the term "dealer" itself was a known quantity at the time; a person "[whose] rights and duties have been before the courts for adjudication repeatedly," and who was characterized by "quot[ing] prices" to "his customers" who wished to buy the stocks in which he specialized. *Johnson v. Winslow*, 279 N.Y.S. 147, 156 (Sup. Ct. 1935) (internal citations omitted).

The original language of Section 15(a) of the Exchange Act underscores this meaning.  This statute authorized the regulation of persons who engaged in "making or creating . . . a market . . . for both the purchase and sale of any security."  Pub. L. No. 73-291, 48 Stat. 881 at 896 (June 5, 1934) (https://tinyurl.com/ndkm385e). That is, it focused explicitly and exclusively on market makers—persons who provide liquidity to the market by being willing to buy and sell securities to and from the investing public.[1]  *See* DSOF Ex.14 (Oldfield Report) ECF No. 72-16, at 15, Fig. 4.  Indeed, the purpose of the Exchange Act itself was "protecting investors" and thus the broker-dealer regulations were intended to reach market participants interacting with investors, and not investors themselves. Exchange Act § 2 n.1.

The SEC ignores anything about the context, purpose, or actual language of the Exchange Act, and instead demands an interpretation that is nowhere in the "plain language" of the statute. Although at first the SEC appears to argue that the Section 3(a)(5) dealer definition encompasses every person whose "livelihood" is based on "the purchase and sale of securities," this does not last. Br. at 13 (internal quotations omitted).  For obvious reasons:  otherwise, millions of unregistered investors would suddenly be covered, including all day traders—a population that increased

---

[1] This language was amended in 1975 but the focus on market makers did not change. The purpose of the amendment was to clarify a point not at issue here—specifically, to include dealers who were members of a national securities exchange, not only those involved in over-the-counter transactions. *See* H.R. Rep. No. 94-123, 94th Cong. 1st Sess., H.R. 4111, at 75 (1975).

exponentially during the Covid-19 pandemic[2]—and it would write the trader exception out of the statute.

To be specific, the SEC concedes that if most of the stock Mr. Keener sold had been purchased on the open market or had not been obtained directly from the issuer, it would not consider Mr. Keener to be a dealer.  For instance, the SEC refers four times to its allegation that most of Mr. Keener's stock was not purchased "in the open market."  Br. at 4, 8, 9, 18.  It refers *thirteen times* to its allegation that most of the stock was "newly issued."  Br. at 1, 4, 8, 9, 10, 13, 14, 17, 18 n. 11, 25.  But this just underscores that the SEC's argument is *not* based on the "plain language" of the statute.  Section 3(a)(5) *is silent as to the source of the stock*.  There is no support in the "plain language" for the artificial line the SEC seeks to draw between stock obtained on the open market or through any other source.

Instead, the SEC asks the Court to apply not the "plain language," but instead to adopt factors it invented for this litigation and now argues are characteristic of a dealer.  Before addressing the SEC's brand-new factors, we address the dealer factors that are actually set forth in dozens of SEC releases and publications and applied by courts, because the SEC's brief is silent on those factors that actually exist.[3]

---

[2] For instance, one article notes that "millions of unemployed Americans" have turned to day trading during the pandemic as a means to "replace [] lost income."  *Many are Chasing the Stock Market By Day Trading in the Pandemic*, CNBC, Sept. 21, 2020 (https://tinyurl.com/a2zu5kuh).

[3] Part of the reason the SEC employs a moving target is because it refuses to decide which of Mr. Keener's investments are actually at issue in the case.  For instance, the SEC concedes that stock purchased "on the open market" would not be at issue, or stock that wasn't sold "promptly" would not be at issue.  Br. at 18.  Yet the SEC repeatedly cites Mr. Keener's sales of Blink Charging Company, Br. at 9, when some of Mr. Keener's Blink shares were in fact purchased on the open market, and the majority of which Mr. Keener held for three or more years from the date of his original investment.  *See* CSOF ¶ 36.  The SEC's refusal to take a clear position underscores the extent to which it is seeking summary judgment on a disputed record.

2.      The SEC Ignores the Dealer Factors While Also Conceding Mr. Keener
        Does Not Meet Them

The SEC does not—and cannot—dispute that the dealer factors apply to this case.  *See* Br. at

21 (conceding that the Court already ruled the factors were relevant at the motion to dismiss stage);

Order, ECF 29, at 8 ("[The] factors are relevant for assessing and ultimately concluding whether a

party is a dealer").  The reason for this is clear—when the SEC or any other agency provides

guidance to the public on how the law should be interpreted, the public is entitled to rely on that

guidance in organizing their affairs.  *See, e.g.*, *El Badrawi v. United States*, 787 F. Supp. 2d 204, 225 (D.

Conn. 2011) (finding published agency guide "is entitled to significant weight in this analysis,

because it is published for the purpose of explaining the relevant regulation to the very people who

are put at risk by the government's proposed interpretation"); *Summit Petroleum v. EPA*, 690 F.3d

733, 746, 749 (6th Cir. 2012) (rejecting agency litigation position that contradicted prior guidance

memoranda).  Indeed, courts routinely apply a factors-based analysis, relying on the factors

described in extensive SEC guidance, to determine whether a person is a broker-dealer subject to the

registration requirements.  *See, e.g., Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990

(N.D. Tex. 2016); *SEC v. Federated All. Grp.*, No. 93-CV-0895E(F), 1996 WL 484036, at *4-5

(W.D.N.Y. Aug. 21, 1996); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011).[4]  The very

existence of the Guide demonstrates conclusively that the SEC concedes that the Exchange Act

dealer definition is not transparent, and instead requires a complex facts-and-circumstances analysis.

Yet the SEC's 30-page motion for summary judgment on a dealer registration claim

conspicuously and studiously avoids any mention of even one specific dealer factor.  The SEC

waited until page 19 to even mention that it has a website whose sole purpose is to offer guidance to

---

[4] Some of the SEC publications listing and analyzing the dealer factors are: SEC Release No. 34-
11742, 1975 WL 163406 (Oct. 15, 1975); SEC Release No. 34-40594, 63 Fed. Reg. 59362, 59370 n.
61 (Nov. 3, 1998); SEC Release No. 34-47364, 68 Fed. Reg. 8686, 8689, n. 26 (Feb. 24, 2003); SEC
Release No. 34-63452, 75 Fed. Reg. 80,174 (Dec. 21, 2010).

the public on the very question at issue: "Who is Required to Register."  Guide at § II.  It nevertheless hides the actual content of that website and argues the Court should ignore it instead. Br. at 20.  The SEC's silence speaks volumes.

It is obvious the SEC remained silent because even a cursory look at the factors will demolish the SEC's position in this case.  Let us look at how the SEC's case fares under the factors that have been posted on the SEC's website from 2008 to this day:

| | SEC Website Factor | Does Mr. Keener Meet It? |
|---|---|---|
| 1 | "a firm that advertises publicly that it makes a market in securities" | **NO.**  The SEC admits Mr. Keener never made a market in any securities.  (ASOF ¶ 11; DSOF Ex. 7 ECF No. 72-9, ¶ 15.) |
| 2 | "a person who holds himself our as being willing to buy and sell a particular security on a continuous basis" | **NO.**  There is no evidence that Mr. Keener ever held himself out as willing to sell any particular security, or to buy or sell any particular security on a continuous basis. (ASOF ¶ 13; *see, e.g.*, PSOF Ex. 9 ECF No. 67-9, screenshots of Mr. Keener's website.) |
| 3 | "a person who runs a matched book of repurchase agreements" | **NO.**  The SEC admits Mr. Keener never ran a book of repurchase agreements. (ASOF ¶ 15; DSOF Ex. 7 ECF No. 72-9, ¶ 29.) |
| 4 | "a person who issues or originates securities that he also buys and sells" | **NO.**  The person who issues or originates securities is the issuer company itself.  Mr. Keener is not an issuer.  (ASOF ¶ 14; DSOF Ex. 57 ECF No. 73-8, at -8413.) |
| 5 | "Do you advertise or otherwise let others know that you are in the business of buying and selling securities?" | **NO.**  The SEC has not cited any evidence that Mr. Keener ever advertised that he sold securities. |
| 6 | "Do you do business with the public (either retail or institutional)?" | **NO.**  The SEC has not cited any evidence that Mr. Keener did business with either the retail or institutional public.  (ASOF ¶¶ 13, 25; DSOF Ex. 56 ECF No. 73-7, Resp. to Nos. 14-15.) |
| 7 | "Do you make a market in, or quote prices for both purchases and sales of, one or more securities?" | **NO.**  The SEC admits that Mr. Keener never made a market or quoted a market in any securities.  (ASOF ¶ 11; DSOF Ex. 7 ECF No. 72-9 ¶¶ 15, 17.) |
| 8 | "Do you participate in a 'selling group' or otherwise underwrite securities?" | **NO.**  The SEC admits that Mr. Keener never participated in a selling group. (ASOF ¶ 11; DSOF Ex. 7 ECF No. 72-9, ¶ 18.)  And he complied with Rule 144, which |

| | SEC Website Factor | Does Mr. Keener Meet It? |
|---|---|---|
| | | confirms he did not act as an underwriter. *See* Sec. IV.B.4, *infra*. |
| 9 | "Do you provide services to investors, such as handling money and securities, extending credit, or giving investment advice?" | **NO.**  The SEC admits that Mr. Keener never provided services to investors. (ASOF ¶ 12; DSOF Ex. 7 ECF No. 72-9, ¶¶ 20, 21.)[5] |
| 10 | "Do you write derivatives contracts that are securities?" | **NO.**  The SEC admits that Mr. Keener never wrote derivatives contracts that are securities.  (ASOF ¶ 15; DSOF Ex. 7 ECF No. 72-9 ¶ 23.) |

There are yet more factors raised in other SEC statements.  Let us take a look at how Mr. Keener would fare under these factors:

| | Additional SEC Factor | Source | Does Mr. Keener Meet it? |
|---|---|---|---|
| 11 | "Carrying a dealer inventory" | SEC No-Action Letter, Fairfield Trading Corp., 1988 WL 233618, (Dec. 10, 1987) | **NO.**  A dealer inventory is a stable of stock positions that fluctuates in response to the demands of customers. (DSOF Ex. 14 ECF No. 72-16 ¶ 40.) Mr. Keener made all his own investment decisions and did not have any customers.  (DSOF Ex. 2 ECF No. 72-3, at 33:3-21, 225:16-19.) |
| 12 | "Lending securities in connection with securities transactions" | Proposed Rule, SEC Release No. 34-46745, 2002 WL 31428622 (Oct. 30, 2002) | **NO.**  The SEC admits Mr. Keener never lent securities. (ASOF ¶ DSOF Ex. 7 ECF No. 72-9, ¶ 31.) |

The factors analysis is based on the totality of all the relevant facts and circumstances.  *See, e.g.*, *SEC v. Feng*, 935 F.3d 721, 731-32 (9th Cir. 2019).  Mr. Keener answers "no" to every factor. The SEC does not and cannot deny this.  On this record, he by definition cannot qualify as a dealer under a totality of the circumstances.  At minimum, he is entitled to a jury trial on whether he meets

---

[5] The SEC now claims Mr. Keener provided "debt consolidation" "services to issuers."  Br. at 16 n.10.  That is both false and irrelevant.  There is no evidence that Mr. Keener ever provided "debt consolidation" services to issuers and in fact he never did so.  Moreover, no guidance suggests debt consolidation services "to issuers"—as opposed to services to investors—is relevant to the dealer analysis.

the factors.  *See, e.g., Mosley v. Progressive Am. Ins. Co.*, No. 14-cv-62850-BLOOM/Valle, 2018 WL

6171417, at *5 (S.D. Fla. Nov. 25, 2018) (denying summary judgment when "totality of the

circumstances" analysis showed existence of "[t]riable issues of material facts").

> **B.**     **The SEC Cites Only Disputed, Unsupported, or Immaterial Facts**

Because the SEC must concede Mr. Keener does not meet the dealer factors that have

existed for years, it has fabricated brand-new factors to bolster a novel litigation position—renting

office space, using social media, making investments directly with an issuer, and negotiating a

conversion discount.  These new factors are not mentioned at all in any SEC releases, publications,

or other guidance over the past 80 years.  Indeed, some of the new factors *contradict* the factors set

forth in prior SEC publications.  The Court should reject the SEC's invitation to apply brand new

factors and impose retroactive liability on Mr. Keener based on them.

> **1.**     That Mr. Keener Incurred Investment Expenses is Irrelevant

During the Relevant Period,[6] Mr. Keener had assistants and contractors to help him identify

investment opportunities and manage his investments.  CSOF ¶¶ 6, 20, 47.  He rented office space

so that he and his assistants would have a place to work.  *Id.* ¶ 5.  He developed software to help

him ensure that he conducted adequate due diligence before making an investment, and that he

accurately accounted for expenses and proceeds in order to prepare his taxes.  *Id.* ¶¶ 23-24.

The SEC claims these activities turned him into a dealer.  *See* Br. at 15 (arguing Mr. Keener

was a dealer because he "maintained a large office," had "employees and contractors," and created a

"computer system" to "find," "manage," and "account" for investments).  There is no basis in law

for this claim.  The Exchange Act does not say that having employees, researching investment

opportunities, or keeping good accounting records qualifies as dealer activity.  Neither the SEC's

---

[6] The SEC defines the Relevant Period as "January 2015 to January 2018."  PSOF ECF No. 67 at 3 n.1.

Guide to Broker Dealer Registration nor any other prior SEC Release, no-action letter, or other guidance identifies a single one of these facts as relevant to the dealer analysis. And the SEC does not cite any case law holding that these facts are relevant. At most, the SEC's argument is based on what its enforcement attorneys perceive to look like a "business." But this interpretation makes no sense when there are whole categories of market participants—angel investors, hedge funds, family offices, and high-frequency traders—who meet these same criteria, but are not registered as dealers. DSOF Ex. 14 ECF No. 72-16, ¶¶ 48-69. The SEC cannot impose retroactive liability based on facts that no prior law holds as relevant. At minimum, Mr. Keener is entitled to a jury trial on whether these facts qualify as dealer activity.

2. <u>Mr. Keener's Limited Social Media Presence and Conference Attendance is Irrelevant</u>

During the Relevant Period, Mr. Keener had a website, occasionally used social media, and attended a few conferences. CSOF ¶¶ 42, 46. These efforts were aimed at establishing Mr. Keener's credibility with companies as an investor, and none were directed at other investors because Mr. Keener did not solicit buyers. *Id.* ¶¶ 37, 64. The SEC claims these activities turned him into a dealer. *See* Br. at 15-16 (arguing Mr. Keener was a dealer because he "operated a website and a Twitter account" and "sponsored" or "attended[] conferences"). Again, the SEC cites no basis in law for alleging these facts are relevant. To the contrary, under the law, these facts affirmatively show Mr. Keener *was not* a dealer.

Prior SEC guidance and case law is unanimous: the only "advertising" efforts that could be relevant to the dealer analysis is advertising to the investing public that you are providing dealer services, such as market making services (*i.e.*, you stand ready to "buy *and* sell" securities in the hands of the public), or investment advisory services. Specifically, the SEC has repeatedly advised that only the following types of advertising are relevant to the dealer analysis:

14

- "A firm that advertises publicly that it makes a market in securities." Guide at Sec. II.B.

- Persons that "advertise or otherwise let others know that [they] are in the business of buying *and* selling securities." *Id.* (emphasis added)

- "[A]dvertising or listing as a dealer in professional publications such as Standard & Poor's *Blue List of Current Municipal Offerings*, the Bond Buyer's *Directory of Municipal Bond Dealers of the United States*, or Polk's *World Bank Directory*, or advertising in publications of general circulation as a dealer in municipal securities." SEC Release No. 34-11742 (emphasis added).

- "[O]therwise holding itself out *to other dealers or to investors* as a dealer in municipal securities." *Id.* (emphasis added).

Put simply, there is no law or guidance that even suggests that advertising directed at companies for the purpose of identifying investment opportunities could qualify.

This is particularly so given the trivial nature of the "advertising" efforts the SEC has made central to its case. His Twitter presence was limited to 22 tweets from a three-year period (2016 to 2018). PSOF Ex. 26 ECF No. 67-26. He had 75 followers. *Id.* There is no evidence that a single company contacted Mr. Keener after viewing his website or Twitter feed. The SEC cites a single, three-page e-mail "newsletter" that was not even opened by most recipients and had a whopping total of two individuals who engaged with it by clicking on a link. PSOF Exs. 32, 33 ECF No. 67-32, 67-33.

Nor does the SEC provide any explanation of why marketing efforts aimed at issuers, and that do nothing to solicit the investing public, could matter to dealer status. At minimum, Mr. Keener is entitled to a jury trial on whether these efforts qualified as "advertising" that Mr. Keener is "in the business of buying and selling securities," given that at this stage, all reasonable inferences must be drawn in his favor. *See, e.g.*, *Skop v. City of Atlanta*, 485 F.3d 1130, 1139-40 (11th Cir. 2007) (reversing grant of summary judgment when district court failed to draw critical inferences in non-movant's favor).

3.    The Volume of Mr. Keener's Trading Activity is Irrelevant

Mr. Keener's investments at issue in this case were in low-priced securities in the microcap space.  Some of the securities traded for pennies or less.  Consequently, even a small investment would result in a large number of shares.

The SEC's mantra is that Mr. Keener sold "billion[s]" of shares, arguing that this is conclusive proof of Mr. Keener's dealer status.  *See* Br. at 1, 8, 10, 17.  Not so.  Anyone who buys and sells microcap stocks even with small investments by definition will engage with hundreds of millions, if not billions of shares.  There is no law or guidance that singles out the microcap industry as being of any particular relevance to the dealer analysis.

Moreover, the SEC has issued substantial prior guidance advising that volume is actually *irrelevant* to the dealer analysis.  Specifically:

- Under "traditional concepts of what constitute dealer activities," a "bank which buys and sells municipal securities solely for investment for its own account . . . will not generally be classified as a dealer, *even though such purchases and sales are made with some frequency*."  SEC Release No. 34-11742 (emphasis added).

- "It would appear that the nature of a bank's activities, *rather than the volume of transactions or similar criteria*, are of greater relevance in determining [whether] a bank is a municipal securities dealer."  *Id.* (emphasis added).

Former SEC Chairwoman Mary Jo White also conceded that high frequency traders—who by definition trade substantial volumes, and account for a majority of all trading volume on any given day—do not fit within the dealer definition.  Mary Jo White, "Enhancing Our Equity Market Structure," (June 5, 2014) (https://tinyurl.com/4war8xjr); *see also* Guy P. Lander*, U.S. Securities Law for International Financial Transactions and Capital Markets* (Nov. 2020) § 13.23 (securities law treatise explaining that "the SEC has generally excluded investors from the definition of dealer, including those investors whose securities activity is sufficiently large and frequent to make them 'active traders'").  If volume was the key factor the SEC now claims, or even a relevant factor at all, Chairwoman's White's conclusion that high frequency traders are not dealers would be

incomprehensible.  Instead, Chairwoman White got it right, and the SEC's current litigation interpretation has no place.  In particular, when the SEC has admitted that no dollar or volume thresholds exist for identifying dealers, DSOF Ex. 7 (10.29.20 SEC Resp. to Def. Req. for Admis. (1st Set)) ECF No. 72-13 ¶ 44, Mr. Keener is at minimum entitled to a jury trial on whether his volume of activity turned him into a dealer.

4.   <u>That the Stock was New to the Market Did Not Make Mr. Keener an Underwriter or Dealer</u>

The SEC's argument that Mr. Keener is a dealer because some of the stock he sold was new to the market is also in no way based on the "plain language" of the Exchange Act.  At most, the SEC argues that Mr. Keener engaged in some kind of "distribution" of the new stock, and this turned him into an underwriter, which could be one type of dealer.  Br. at 9 (Mr. Keener "distributed [stock] to the public…").  This is not correct.  There is an entire body of securities law that concerns when a sale turns into a distribution, including a rule adopted by the SEC—Rule 144 under the Securities Act—that provides investors with a bright line safe harbor against being deemed an underwriter engaging in a distribution of securities.  (Incidentally, the SEC seeks to keep Rule 144 out of this case and cause confusion by accusing him of engaging in a "distribution" but eliminating his ability to respond, Pl's Mot. in Lim. ECF No. 64, at Sec. III.F.)  Specifically, the Commission "adopted Rule 144 to establish specific criteria for determining whether a person is not engaged in a distribution."  17 C.F.R. § 230.144 (Preliminary Note).  The Rule itself is titled "Persons deemed not to be engaged in a distribution."  Thus, "[i]f a sale of securities complies with" the conditions set forth in the Rule, the person who sells the securities "***will be deemed not to be engaged in a distribution***."  *Id.* (emphasis added).

Mr. Keener complied with Rule 144 in connection with every sale.  ASOF ¶¶ 22-23.  He obtained letters from attorneys, letters that were reviewed by his brokerage firms and by the issuers' transfer agents, that confirmed he complied with Rule 144.  *Id.*  That is, attorneys confirmed with

17

every sale that Mr. Keener was *not* engaging in a "distribution" and that instead he had held the stock for long enough to prove he had obtained the stock for investment purposes. *Id.* The SEC does not dispute that Mr. Keener complied with Rule 144, and does not dispute the accuracy of these attorney opinion letters. *Id.* ¶ 24. The SEC is not entitled to summary judgment by claiming Mr. Keener engaged in a distribution when the record evidence shows he did no such thing.

The SEC's claim that Mr. Keener sold the new stock "promptly" is also false. Br. at 18. The dictionary definition of "promptly" is "immediately." Oxford English Dictionary (https://tinyurl.com/3w9hvw3c). He never sold stock from convertible notes less than 6 months after his investment. ASOF ¶¶ 3, 22, 24. Mr. Keener held his investments for at least six months because that is the required holding period specified in Rule 144 to demonstrate the stock is being held for investment purposes. *See* 17 C.F.R. § 230.144(d)(1)(i). Nonetheless, to the extent the SEC argues the length of time between his investment and sale is relevant to the dealer analysis, this is yet another fact that cannot be resolved against Mr. Keener on summary judgment and is instead for the jury to determine.

5.      The Conversion Discount is Irrelevant

The SEC's final argument suffers the same fate. Some of the convertible note investments that Mr. Keener negotiated with issuers allowed Mr. Keener to convert unpaid loan balances to stock at a discount to the trading price. CSOF ¶¶ 9, 14-15. Such a conversion discount is a common feature in many convertible notes, especially when there is a long holding period before the investor can seek to convert the note and sell any stock. *See, e.g.*, DSOF Ex. 14 ECF No. 72-16 ¶¶ 52-53. That is because the investor takes substantial risk during the holding period. As the SEC itself previously acknowledged, discounts of "20-50%" are common in the types of investments that Mr. Keener made. Revision of Holding Period Requirements in Rules 144 and 145, SEC Release No. 33-7390, 1997 WL 70606 (Feb. 28, 1997).

Of course, the "plain language" of the Exchange Act contains no reference to discounts or convertible notes at all.  Nor are there any SEC Releases, publications, or other guidance that indicate that investing in a convertible note with a conversion discount might qualify as dealer activity.  The SEC concedes all of this.  Instead, the SEC's sole basis for asserting that it was clear that the conversion discount rendered Mr. Keener a dealer is the following one sentence from *SEC v. Big Apple Consulting* that concerned the definition of a dealer under the Securities Act of 1933, and not the Exchange Act of 1934, and did not have any citations to any supporting authority: "As further evidence of their dealer status, [defendants] purchased CyberKey stocks at deep discounts pursuant to its contractual agreement with CyberKey and then sold those stocks for profit."  783 F.3d. 786, 810 (11th Cir. 2015).[7]  The SEC does not—and cannot—cite any other source of authority from the eight decades of prior SEC interpretations and judicial decisions to support its position that the Exchange Act compels the court to find conversion discounts qualify as dealer activity.  Consequently, the SEC's argument must fail.

At most, the SEC's argument appears to be based on custom and practice—i.e., dealers typically make money "not from buying stock in the open market and reselling when prices increased" but by purchasing "discounted stock" directly from companies.  Br. at 18.  That is a question of fact for a jury—and a disputed one, because, as Mr. Keener's expert Dr. George Oldfield explains, dealers typically profit from a bid-ask spread, not a conversion discount.  DSOF Ex. 14 ECF No. 72-16 ¶ 39.  There is no evidence in the record, let alone enough evidence to allow the SEC to win on summary judgment, that this is a typical dealer practice.

---

[7] The facts of *Big Apple* are also distinguishable because the defendant did not acquire the stock for investment purposes, and did not comply with the Rule 144 holding period; instead, the defendant obtained stock from the issuer in exchange for promoting false information about the issuer's stock, and immediately sold it.  783 F.3d at 790-91

### C.     *Big Apple* and *Almagarby* Do Not Support the SEC's Position

At bottom, the SEC's argument hinges solely on its interpretation of *Big Apple* and *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020) (Judge Cooke).  But similar to its Section 3(a)(5) analysis, the SEC's interpretation of *Big Apple* and *Almagarby* is also a moving target that vanishes on closer inspection.  At first, the SEC asks the Court to interpret these cases to sweep into the dealer definition everyone who makes a living from buying and selling securities.  Br. at 13, 16.  But as with its Section 3(a)(5) analysis, it quickly backs away from this theory, recognizing its radical overbreadth.  If the SEC had actually embraced this interpretation, it would have taken down the Guide to Broker-Dealer Registration, because the dealer analysis would not require a single factor.  It did not do so.  Instead, the Guide continues to remain on the SEC's website to this day, and continues to advise the public that: "Individuals who buy and sell securities for themselves generally are considered traders and not dealers."  Guide Sec. II.B.

Moving away from this overbroad interpretation, as it must, the SEC then argues that the key to *Big Apple*'s dealer holding is that the defendant obtained "stock directly from the issuer, which it then sold in the public market."  Br. at 16 (citing *Big Apple*).  But *Big Apple* is silent as to this fact— the Eleventh Circuit never once opines on whether it is relevant that the stock was acquired "directly from the issuer."  Indeed, the defendant in *Almagarby did not* obtain convertible notes directly from the issuer, and instead purchased notes from third party debtholders.  479 F. Supp. 3d at 1268.

Finally, the SEC asks this Court to ignore that *Big Apple* concerned the dealer definition under the Securities Act, and instead collapse the Securities Act and Exchange Act dealer definitions because *Big Apple* in footnote 11 noted the two definitions "are very similar."  *See* Br. at 13 n.7.  As an initial matter, the two statutes are different.  The SEC's Guide to Broker-Dealer Registration only concerns the Exchange Act dealer definition and does not refer to the Securities Act at all.  The

20

same is true for all of the SEC Releases and no-action letters concerning the Exchange Act dealer

definition: not one of them opines that the same analysis would apply to the Securities Act.  An

inspection of the plain language of the statutes makes clear why:

> **Securities Act dealer definition**: "The term 'dealer' means any person who engages *either for all or part of his time*, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." 15 U.S.C. § 77b(a)(12) (emphasis added).

> **Exchange Act dealer definition**: "In general--The term 'dealer' means any person engaged in the business of buying and selling securities . . . for such person's own account . . . [but there is an] Exception for person not engaged in the business of dealing—The term 'dealer' does not include a person that buys or sells securities . . . for such person's own account . . . but not as part of a regular business." 15 U.S.C. § 78c(a)(5)

Significantly, the Securities Act definition is broader—there is no exception for persons "not

engaged in the business of dealing."  And only the Exchange Act definition triggers a registration

requirement.  More importantly, to the extent the two definitions should be interpreted the same

way, Mr. Keener obtained dozens of attorney opinion letters *that confirmed he was not acting as a dealer

under the Securities Act*.  ASOF ¶ 23.  By contrast, there is no evidence that either the defendants in *Big

Apple* or *Almagarby* had obtained such confirmation.

It is worth repeating that the SEC asks this Court to apply *Big Apple* to the Exchange Act

based on a footnote concerning a claim that was not briefed and was instead *abandoned* on appeal.

783 F.3d at 806 ("[A]ny claims raised by [defendants] as to their § 15(a) violations of the Exchange

Act failing to register with the SEC are deemed abandoned.")  Consequently, the passing reference

in *Big Apple* to the Exchange Act is by definition dicta.  *See, e.g., Seminole Tribe of Florida v. Florida*, 517

U.S. 44, 125 (1996) (Souter, J. dissent) (defining "dicta in the classic sense" as "sheer speculation"

about what would happen on issues "not before the court").  As the Supreme Court articulated: "Is

the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit

forever after?"  *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 548 (2013).  Of course, it is not so

bound.

The SEC's other cases are primarily district court cases decided in the last year that allow the SEC to rely on its interpretation of *Big Apple* for the motion to dismiss stage. *See, e.g.*, *SEC v. River North*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fiero*, No. 20-2104 (MAS) (DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020). *Almagarby* is the only case cited by the SEC that was decided at summary judgment.  In *Almagarby*, the court refused to consider or even name a single dealer factor on the sole basis that "There is nothing in any of the [SEC] releases . . . that impl[y] that the listed factors are an exclusive or exhaustive checklist that creates a burden of proof for the SEC."  479 F. Supp. 3d at 1273.

We respectfully submit that this was an incorrect statement of law, and one this Court already rejected at the motion to dismiss stage.  Order, ECF No. 29, at 8 (holding that the "factors are relevant for assessing and ultimately concluding whether a party is a dealer").  Indeed, the SEC specifically advised the public in routine written correspondence concerning dealer registration inquires that that the Guide contains the "**activities/factors [that] courts consider when determining whether a person fits [the dealer] definition.**"  DSOF Ex. 73 ECF No. 73-24, at 1. The SEC never told the public to ignore the factors and look at *Big Apple* instead.  If the SEC can tell the public to look at the factors, but then successfully persuade this Court to ignore every single one, it puts the public in the impossible position of not being able to rely on or trust anything the SEC says.  It would also give the SEC a free pass to create total confusion and uncertainty in the market.  This Court should not encourage or permit such behavior from a regulator.

### D.  Mr. Keener's Affirmative Defenses Present Disputed Facts for the Jury

#### 1.  The SEC Is Not Entitled to Summary Judgment on Fair Notice

The SEC's motion for summary judgment is premised on the assertion that the plain language of the Exchange Act definition of a "dealer," as interpreted in a dicta footnote in *Big Apple*, unambiguously applies to Mr. Keener.  As detailed above, this assertion is incorrect—the statutory

language is not transparent, which is why the SEC has issued so many interpretations of it over the years.  Instead, the determination of whether Mr. Keener is a dealer requires analyzing Mr. Keener's conduct with reference to the various interpretations the SEC has issued, including the dozen factors in the Guide.  As set forth above, the record shows that Mr. Keener did not engage in any of the factors set out in the Guide.  *See* Sec. IV.A.2, *supra*.  Therefore, at a minimum, the question of liability must be weighed by the jury, which can assess the totality of the circumstances to determine whether Mr. Keener is a dealer, and the SEC's motion must be denied.

But even if the Court does not agree and finds that the statutory language so clearly encompasses Mr. Keener's conduct that the jury can be sidelined, the SEC is still not entitled to summary judgment for an independent reason—Mr. Keener lacked fair notice that his conduct was unlawful.  To be clear, Mr. Keener's argument on this point is not, as the SEC suggests, that the statutory language is vague[8] or that the SEC failed to provide guidance to the market. Br. at 22-23.  Instead, the SEC did provide guidance to the market—lots of it, over many years.  *See* Sec. IV.A.2, *supra* (summarizing the dozens of Releases, no-action letters, and the SEC's Guide to Broker-Dealer Registration).  The problem is that the SEC's position in this litigation *directly contradicts* its prior guidance.

---

[8] The SEC argues that a "'fair notice' claim necessarily challenges the language of a statute on the basis of vagueness."  Br. at 22.  This is illogical and plainly incorrect.  A vague statute is one way, but certainly not the only way, in which a person can be deprived of fair notice of what the law requires.  For instance, the Supreme Court did not consider vagueness when it rejected an agency's new interpretation of its regulations as applied to conduct that took place before the new interpretation was announced, based on "the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal citations and quotations omitted); *see also Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (holding, without any consideration of vagueness, that "we cannot defer to the [SEC's] interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation").

The Supreme Court has made clear that a "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).  Thus, "[r]egulated parties should know what is required of them so they may act accordingly." *Id.*  "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *SmithKline Beecham Corp.*, 567 U.S. at 158-59.

These fundamental principles mean that the SEC cannot penalize someone based on "a substantial change in its enforcement policy that was not reasonably communicated to the public." *Upton*, 75 F.3d at 98.  Yet that is exactly what the SEC seeks to do to Mr. Keener.  There is no dispute that, for decades, the SEC advised market participants that whether someone is a "dealer" is a fact-intensive inquiry requiring consideration of up to a dozen factors—none of which describe Mr. Keener's conduct.  *See* Sec. IV.A.2, *supra*.  The SEC now says that those factors are irrelevant—suddenly replaced with new factors never before announced, such as the fact that Mr. Keener employed assistants to manage his affairs, that he used social media to promote himself, or that he negotiated for conversion discounts.  None of these factors have ever appeared in any of the SEC's dealer-related guidance over the years.

Mr. Keener reasonably relied on the guidance that the SEC had previously issued to determine that he was not a dealer.  Indeed, the SEC never seriously contests that if the factors set forth in the prior guidance were applied, Mr. Keener would be in the clear.  *See* Sec. IV.A.2, *supra*. By changing its position without warning, the SEC has deprived Mr. Keener of fair notice of what

the law requires. Not to mention that to this day it is still not clear what facts the SEC believes pushed Mr. Keener across the line—*e.g.*, would having four assistants be enough? Would several sales a day be enough? The Constitution demands clear lines, not "arbitrary and erratic" enforcement. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

The SEC's only response is that Mr. Keener should have known that the factors had changed based on *Big Apple*. This is both incorrect and extremely cynical. As explained above, *Big Apple* did not even interpret the relevant statute. It applied the definition of "dealer" in the Securities Act, which is different than the definition of "dealer" in the Exchange Act, and specifically noted that the appellants had "abandoned" the Exchange Act issue. *Big Apple Consulting USA, Inc.*, 783 F.3d at 806. Moreover, the entire analysis of the term "dealer" in *Big Apple* was three paragraphs in a lengthy opinion, and those three paragraphs did not even address the SEC's historical guidance.[9]

So the SEC's claim here is that those three paragraphs in a lengthy legal opinion, which interpreted a different statute, silently displaced decades of prior government guidance. This position is manifestly unfair and should be rejected out of hand by granting Mr. Keener's motion for summary judgment on lack of fair notice. *Upton*, 75 F.3d at 98 (rejecting SEC argument that a prior consent order was sufficient to put individuals on notice of change in enforcement policy); *KPMG, LLP v. SEC*, 289 F.3d 109, 116 (2002) (holding defendant denied fair notice when sanctioned based on a "novel" and "strained" reading of accounting industry rule).

At a minimum, however, the question whether Mr. Keener had fair notice of the new way in which the Exchange Act definition of "dealer" would be applied is a factual question that must be decided by the jury. *See, e.g.*, *United States v. Harra*, 985 F.3d 196, 215-16 (3d Cir. 2021) (finding that

---

[9] The other case on which the SEC relies, *SEC v. Almagarby*, cannot have provided Mr. Keener any notice because it was decided *after* this case was filed. 479 F. Supp. 3d 1266. *Big Apple* also was not decided until April 2015, several months after the start of the Relevant Period.

whether an individual had fair warning of government interpretation of regulation was a question for the jury); *Rothenberg v. Daus*, 481 F. App'x. 667, 670-71 (2nd Cir. 2012) (district court erred in granting summary judgment where a dispute exists as to fair warning).  In particular, one way in which Mr. Keener can demonstrate that he lacked fair notice that he could be a securities dealer subject to registration requirements is by pointing to the fact that his activities were consistent with a whole industry of unregistered investors who make a living from buying and selling securities.  *See, e.g.*, *SmithKline Beecham Corp.*, 567 U.S. at 157 (citing the pharmaceutical industry's "longstanding practice" that contradicted agency's current interpretation of the law as evidence of lack of notice); *Diebold Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978) (finding no fair notice when purported requirement was rarely fulfilled or enforced in the industry); *SEC v. Kovzan*, No. 11–2017–JWL, 2012 WL 4819011, at *5 (D. Kan. Oct. 10, 2012) (industry practice is relevant to a fair notice defense). Since the industry custom and practice around the dealer definition is a factual issue that the jury must address, the SEC is not entitled to summary judgment on Mr. Keener's fair notice defense.

2. <u>The SEC is Not Entitled to Summary Judgment on Statute of Limitations</u>

The SEC's motion for summary judgment also must be denied to the extent it seeks penalties or disgorgement because those claims are time-barred.  In its motion, the SEC notes that the statute of limitations for SEC disgorgement claims was amended by Section 6501(a) of the National Defense Authorization Act for Fiscal Year 2021 ("NDAA") and that the amendment applies to cases pending on the date the NDAA was enacted, which was January 1, 2021.  Br. at 27-28 (citing NDAA, Pub. L. No. 116-283 (2021), §§ 6501).  Thus, the SEC contends that the amended statute of limitations for disgorgement applies here.  Not so.

It is well-established that a change to a limitations period does not revive claims that had already expired pursuant to the previously-applicable statute of limitations.  *Berman v. Blount Parrish & Co.*, 525 F.3d 1057, 1058-59 (11th Cir. 2008) ("Appellants urge that because they filed their

complaint within five years of the May 1998 bond purchase, the Sarbanes-Oxley Act's statute of limitations revived their previously expired securities claims. This argument has been *soundly* rejected by every circuit court to have considered it. We now join our sister circuits and hold that the amended limitations period of Sarbanes-Oxley does not revive securities claims on which the previous statute of limitations had run.") (citations omitted) (emphasis in original). Therefore, the question is whether the SEC's claims had already expired before the SEC filed its Complaint on March 24, 2020.

At the time the Complaint was filed, before the enactment of the NDAA, the applicable statute of limitations for both penalties and disgorgement was set forth in 28 U.S.C. § 2462, which provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim **first accrued** if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added).[10]

The limitations period in the statute is "five years from the date when the claim first accrued." *Id.* By definition, a claim can only "first accrue" once, and the Supreme Court has held that occurs for purposes of § 2462 when the claim "comes into existence." *Gabelli v. SEC*, 568 U.S. 442, 448 (2013). "Thus the standard rule is that a claim accrues when the plaintiff has a *complete and present cause of action* . . . . This reading sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing the basic policies of all limitations provisions: repose,

---

[10] The statute applies to penalties by its plain terms. In 2017, the Supreme Court held that it also governs claims for disgorgement. *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017).

elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Id.* (emphasis added; citations and quotation marks omitted).

Here, the SEC's Complaint alleges that "[b]y engaging in a regular business of buying convertible notes and selling the resulting newly issued shares of microcap stock into the public market, Keener operated as an unregistered securities dealer." ECF No. 1, ¶ 2. So at what point did the SEC have a "complete and present cause of action" against Mr. Keener for operating as an unregistered securities dealer? The Complaint itself answers that question by referring to several transactions entered into by Mr. Keener throughout 2014 and early 2015—all more than five years before the Complaint was filed on March 24, 2020. *Id.* ¶ 15. The SEC's own Statement of Facts shows that there were many other such transactions. *See, e.g.*, CSOF ¶ 8 (citing transactions dating back to July 2010).

The SEC's claim that Mr. Keener operated as an unlicensed dealer first came into existence when he engaged in those transactions. There is no allegation that Mr. Keener did anything different after March 2015—he just engaged in more of the same types of transactions. Thus, if he is an unregistered securities dealer today, then he was also an unregistered securities dealer on March 23, 2015, more than five years before the Complaint was filed. And that means that the SEC's requests for penalties and disgorgement was time-barred when the Complaint was filed, and remains so even after enactment of the NDAA.

The SEC counters that its claim is still timely because the parties entered into a "tolling agreement" purporting to suspend the statute of limitations for one year. Thus, it contends that the limitations period is actually six years, meaning that its claim is timely if it first accrued after March 24, 2014 (rather than after March 24, 2015). Br. at 28. The SEC is wrong. Section 2462 is a

"jurisdictional" statute of limitations, which means that it cannot be altered by a tolling agreement or anything else.  *SEC v. Graham*, 21 F. Supp. 3d 1300, 1306-08 (S.D. Fla. 2014).[11]

In *Graham*, the SEC argued that its claim was timely despite being brought more than five years after the claim accrued due to the fraud "discovery rule."  The court held that it lacked jurisdiction to even consider whether the discovery rule applied, explaining that "just as it is true that federal courts possess only the statutory power to adjudicate a given case established by Congress, Congress may also act to limit the scope of that power, or remove it altogether."  *Id.* at 1306 (citing *John R. Sand & Gravel Co. v. U.S.*, 552 U.S. 130 (2008)).  The court reasoned that the plain language of Section 2462 did exactly that by dictating that claims "**shall not be entertained** unless commenced within five years from the date when the claim **first accrued**."  *Id.* at 1308 (emphasis added).  He explained that "[t]his statutory language is a congressional removal of a court's power to entertain—its adjudicatory authority and jurisdiction—cases not brought within five years of accrual.  Indeed, this language amounts to an '*unequivocal statutory command to federal courts not to entertain*' an untimely claim."  *Id.* (citing *Swain v. Pressley*, 430 U.S. 372 (1977)).

Further, it is significant that Section 2462 contains two exceptions to the five-year bar, for other statutes passed by Congress and for situations where the "offender or the property" is not within the United States such that proper service can be made.  28 U.S.C. § 2462.  By expressing those two exceptions in the statute, Congress implicitly foreclosed any others.  *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1193 (11th Cir. 2011) ("The principle of *expressio unius* simply says that when a legislature has enumerated a list or series of related items, the legislature intended to exclude similar items not specifically included in the list.").

---

[11] On appeal, the Eleventh Circuit affirmed in part and reversed in part, but did not reach the question whether Section 2462 creates a jurisdictional bar to claims more than five years old.  *SEC v. Graham*, 823 F.3d 1357, 1360 n.1 (11th Cir. 2016).  Thus, the district court's ruling on that question, while not binding on this Court, remains valid.

Moreover, even if this Court chooses to reject the reasoning in *Graham* and enforces the tolling agreement, the SEC's requests for disgorgement and penalties are still time-barred because the evidence shows that Mr. Keener began engaging in the transactions that the SEC says make him a dealer even before March 24, 2014.  *See* CSOF ¶ 8 (citing transactions back to July 2010).  At a minimum, the jury must decide whether the evidence of Mr. Keener's conduct prior to March 24, 2014 was sufficient to give the SEC a "complete and present cause of action."  *Boneta v. Am. Med. Sys.*, No. 20-CIV-60409-RAR, 2021 WL 917871, at *10 (S.D. Fla. Mar. 10, 2021) (denying motion for summary judgment based on statute of limitations because issue of when claim accrued is a jury question).[12]

## V.   CONCLUSION

The SEC asks the Court to adopt an interpretation of the Exchange Act that is both remarkably overbroad and extraordinarily particular, and upends decades of SEC guidance that establishes totally different factors for the identification of dealers.  The support for its interpretation is *Big Apple*'s passing discussion of a Section 15(a) claim that was not briefed and was instead abandoned on appeal.  When applying the actual dealer factors that have existed for decades, it is clear that Mr. Keener is not a dealer.  Given that all reasonable inferences must be drawn in his favor, he must be allowed to demonstrate to a jury that he does not meet any of the dealer factors.  The SEC's motion must be denied.

Dated: August 31, 2021                    Respectfully submitted,

                                          GREENBERG TRAURIG LLP

                                          *Benjamin G. Greenberg*
                                          **Benjamin G. Greenberg**
                                          Florida Bar No. 192732

---

[12] Mr. Keener is no longer asserting an estoppel or advice of counsel defense.  However, as described in Mr. Keener's Opposition to the SEC's Motion *in Limine*, evidence regarding the attorneys that were involved in reviewing and approving all of Mr. Keener's transactions is nevertheless relevant to this case.  ECF No. 87, at 12-15.

333 SE 2nd Avenue Suite 4400
Miami, FL 33131
Telephone: (305) 579-0850
Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing

Defendant Justin W. Keener's Opposition to Plaintiff Securities and Exchange Commission's

Motion for Summary Judgment to the following:

> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> 100 F Street NE
> Washington, DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov
>
> *Attorneys for Plaintiff*
> *Securities and Exchange Commission*

This, the 31st day of August, 2021

/s/ *Benjamin G. Greenberg*
Benjamin G. Greenberg