UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-CV-21254-BLOOM/LOUIS

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

v.

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

                              Defendant.

---

## DEFENDANT JUSTIN W. KEENER'S OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules, Defendant Justin W. Keener ("Mr. Keener") hereby submits his Opposition to Plaintiff Securities and Exchange Commission's ("SEC") Statement of Material Facts ECF No. 67 ("PSOF"). The SEC's Statement of Material Facts identifies 73 facts as "material" to its Motion for Summary Judgment ECF No. 68. *See* ECF No. 67. A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018) (internal citations omitted).

Mr. Keener notes that the SEC simply appended its exhibits to its motion, rather than to a declaration attesting to their authenticity as true and correct copies. For that reason alone, the SEC's assertions of fact should be rejected, and the SEC's Motion for Summary Judgment should be denied. *See, e.g., Saunders v. Emory Health., Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010) (upholding district court's decision to strike unauthenticated exhibits because "[t]o be admissible in support of

or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit"); *Goldman v. Summerfield*, 214 F.2d 858, 859 (D.C. Cir. 1954) (reversing grant of summary judgment when based on attached exhibits with no evidence of authenticity or completeness).

## COUNTERSTATEMENT OF DISPUTED FACTS

1.   Justin W. Keener was a resident of Miami, Florida from 2006 to 2018. Ex. 1 (Keener Tr. 25:18-20). Keener holds a bachelor's degree in finance from North Carolina State University. *Id.* at 16:9-11.

**RESPONSE:** Undisputed.

2.   Keener has never registered with the SEC as a securities dealer. *See* Dkt. #30, Defendant's Answer and Affirmative Defenses to the Securities and Exchange Commission's Complaint, ¶ 5 (hereinafter "Answer").

**RESPONSE:** Undisputed as phrased, but Mr. Keener maintains that he was not required to register with the SEC as a securities dealer.  *See, e.g.*, Def's Statement of Material Facts in Supp. of Mot. for Summ. J. ("DSOF") ECF No. 72 Ex. 7 (10.29.20 SEC Resp. to Def. Req. for Admis. (1st Set)) ECF No. 73-7, at 5-7. (failing to identify any currently registered dealer similar to Mr. Keener).

3.   Keener was associated with a registered broker-dealer leading up to his disbarment by the Financial Regulatory Authority ("FINRA") in 2012. *See* Ex. 1 (Keener Tr. 18:3-4 ("I was, in fact, disbarred from FINRA.")); Ex. 7, at 4589-91 (FINRA order suspending and then barring Keener from associating with any broker-dealer that is a member of FINRA). FINRA barred Keener from associating with any broker-dealer that is a member of FINRA because he failed to cooperate with a FINRA investigation. Ex. 7, at 4593

**RESPONSE:** Disputed as phrased.  Undisputed but immaterial that Mr. Keener was unintentionally associated with a registered broker-dealer "for five months, starting in April 2011," over three years before the start of the Complaint's Relevant Period, January 2015 to January 2018 Compl. ECF No. 1, ¶ 1; Ex. 1 (JMJ-LIT-001-004677) at -79, n.4 (July 2012 FINRA Hearing Panel Decision); *see also* Ex. 2 (JMJ-LIT-001-000001), at -1-2 (November 2011 letter to FINRA explaining Mr. Keener's refusal to produce information as "neither a member, person associated with a member or a person subject to FINRA's jurisdiction"); DSOF Ex. 51 (SEC-OCIE-E-0000039) ECF No. 73-2 , at -39 ("It appears that Mr. Keener wanted to make an investment in a FINRA member but did not want to be involved with that firm as a principal and did not know that this investment might subject him to the control of FINRA").  Undisputed but immaterial that Mr. Keener was automatically "suspended from association with any FINRA member" for "not completely respond[ing] to the Rule 8210 requests within three months after the date of" the hearing panel decision.  Ex. 1 (JMJ-LIT-001-004677) at 1; DSOF Ex. 51(SEC-OCIE-E-0000039) ECF No. 73-2, at -39.

4.    Keener does business under the "fictitious name" JMJ Financial ("JMJ"), which he registered in Florida in 2008. Answer, ¶ 5; Ex. 2 (one-page "fictitious name" application).

**RESPONSE:** Undisputed but immaterial.


5.    Keener has had offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico between January 2015 through January 2018. Ex. 1 (Keener Tr. 30:21 – 31:6). JMJ's San Diego office had 7,400 square feet and accommodated 15 to 20 "individual offices" and cubicles. Ex. 3 (Weisman Tr. 30:16 – 31:1).

**RESPONSE:** Undisputed but immaterial.

**6.**    Between January 2015 and January 2018, JMJ had as many as 25 employees at one time (Ex. 22 (Keener Dep. 47:13-18); Answer, ¶ 5) who each had employment contracts (Ex. 1 (Keener Tr. 54:10-12)), including the following: James Abbott (note finder), Dawn AuCoin (accountant), Peter Capernaros (loan servicing), John Casiano (note finder), Patrick Conniry (trader), Nhan Do (trader), Shawn Ellis (note finder), David Halfen (note finder), Jason Hightower (note finder), Liz Jankowski (marketing), Brandi Linn (Keener's assistant), Fran Martino (general counsel), Chris Mayo (note finder), Conrad Nagel (Chief Financial Officer), Eilon Natan (note finder), Maria Posadas (accounting), and Sandy Weisman (executive vice president). *See* Ex. 1 (Keener Tr. 43:10-14, 44:8-11, 45:16-22, 50:6-16, 52:3-4, 124:16-21, 174:9-12, 200:13-16); Ex. 4 (Nagel Tr. 15:17-25, 19:14-15, 22:25 – 23:5, 24:10-14, 35:14-17); Ex. 3 (Weisman Tr. 15:4-8, 79:16-21, 81:6-12); Ex. 5, at JMJ-SEC-010-5653 (Hightower identified 500 issuers for JMJ to contact). JMJ also employed two independent contractors for information technology services: Summer Piper and Alex Egg. Ex. 1 (Keener Tr. 52:12-16).

**RESPONSE:** Disputed as phrased.  Undisputed that Mr. Keener had assistants to help him administer convertible note investments and prepare related accounting and tax records, but in June 2016 most of these employees were laid off because Mr. Keener stopped engaging in these investments.   PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22, at 29:8-17, 30:10, 186:22-24; PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 43:10-15, 44:5-47:9, 55:2-3 ("Had to have employees to help administer them."); PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 23:11-16, 24:5-18; PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3, at 137:24-138:12.

**7.**    According to Keener's tax records, JMJ had employee payroll of $1,997,248 in 2014, $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017. See Ex. 6, at JMJ-SEC-022-64, 71, 77, 87 (Keener's tax returns for 2014-17); Ex. 1 (Keener Tr. 88:25 – 90:9).

4

**RESPONSE:** Undisputed but immaterial as to whether Mr. Keener was a securities dealer, and also immaterial to the extent the assertion is outside the Relevant Period.

8.   JMJ purchased securities known as convertible notes (hereinafter "the Convertible Notes") from penny stock issuers during the period July 2010 through April 2018. See Ex. 11, at ¶ 17 (Taveras Declaration). FOOTNOTE 1: The SEC's Complaint pleaded that the Relevant Period was January 2015 through January 2018, Complaint, ¶ 1, but Keener signed a one-year tolling agreement on March 27, 2019. *See* Ex. 8 (tolling agreement Keener). That agreement specified that the parties would not count the period of March 7, 2019 through March 6, 2020 in any calculation of a statute of limitations in this matter. *Id.* at ¶ 1.

**RESPONSE:** Disputed as the specific fact is unsupported by the cited document and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is a declaration the SEC never revealed to Mr. Keener during discovery, and instead revealed for the first time when it was attached to its summary judgment motion after the close of discovery.  It was prepared by the SEC's "summary" fact witness Carmen A. Taveras ("Dr. Taveras").  Def.'s Mot. to Exclude Rebuttal Expert Report Ex. 11 (7.19.21 SEC's Supp. Initial Discl.) ECF No. 66-, at 1.  Dr. Taveras' role as a summary fact witness is the subject of a motion in limine (ECF No. 69) and the Taveras Declaration will be addressed in the reply to that motion.  It is also addressed in Mr. Keener's Opposition to the SEC's Motion in Limine.  *See* ECF No. 87, at Sec. III.C.  In brief, the Court should not consider the Taveras Declaration because it has not been subject to any discovery process, was not even started when counsel for Mr. Keener took Dr. Taveras' deposition in late July, and improperly relies on hearsay summary data as evidence without establishing an appropriate foundation.  *See id.* (describing (1) chronology of Mr. Keener's efforts to obtain discovery regarding Dr. Taveras's analysis, (2) how the SEC refused to provide it, and (3) how her declaration is based upon two summary documents, neither of which contain accurate data distinguishing between

different investments). Undisputed that Mr. Keener purchased convertible notes during the Relevant Period, but disputed as to which notes and which stock sales are at issue. The Taveras declaration identifies many notes and transactions not at issue because they are outside the Relevant Period or because they do not concern the conversions of convertible notes. *Compare* PSOF Ex. 11 (Taveras Decl.) ECF No. 67-11, at Ex. 4 *with* DSOF Ex. 70 (7.1.21 Flemmons Report) ECF No. 73-21, at Exs. 3-4. With respect to the footnote, disputed as the tolling agreement does not extend the SEC's statute of limitations by one year. *See* Def. Resp. to Pl. Mot. for Summ. J. at Sec. IV.D.2.

9. Keener "negotiated the terms of the convertible notes and signed contracts to memorialize the investments he made into [the] issuers." Answer ¶ 9.

**RESPONSE:** Undisputed.

10. The Convertible Notes were contracts in which the issuer of the note promised to pay JMJ (the holder of the note) a designated sum of principal and potentially interest within a designated time frame (or be subject to financial penalties). *See, e.g.,* Ex. 12, at JMJ-SEC-010-6878 (convertible note issued by Bioenergy Plus, Inc. to JMJ).

**RESPONSE:** Undisputed as to the cited example, but otherwise disputed because many of Mr. Keener's investments had different features, and a citation to one example does not support the general proposition. There is also a dispute about which Convertible Notes are at issue, *compare* PSOF Ex. 11 (Taveras Decl.) ECF No. 67-11, at Ex. 4 to DSOF Ex. 70 (7.1.21 Flemmons Report) ECF No. 73-21, at Exs. 3-4., which further undermines any attempt to support a general proposition with one example.

11. JMJ's QuickLoan program generally sought to purchase Convertible Notes priced between $50,000 and $500,000. *See* Ex. 9, at 12 (JMJ website). JMJ's marketing of this program emphasized a streamlined approval process with reduced paperwork and quick funding for companies that needed

cash for working capital, to make payroll and to "keep the lights on." *See* Ex. 1 (Keener Tr. 69:16 –

70:20, 208:10-15). JMJ bought hundreds of Convertible Notes as part of the QuickLoan program.

*See id.* at 71:20-24 (Keener estimated that "100 to 200 issuers" sold JMJ convertible notes as part of

the QuickLoan program); Ex. 24, at 13 ("Quick Loan History … Over 225 QuickLoan recipients

with hundreds of follow-on transactions").

**RESPONSE:** Undisputed as to January 2015 through 2017, but otherwise disputed as the fact is

unsupported by the cited evidence.   PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1,at 54:17-

55:17, 56:21-57:15 (recalling only a "handful" of Convertible Notes in 2017); PSOF Ex. 22

(7.16.2021 Keener Tr.) ECF No. 67-22, at 30:10; *id.* at 186:22-24 (downsizing JMJ in 2016).


      **12.**     JMJ also sought to purchase larger notes that Keener called "bridge loans" that

frequently had an equity conversion feature essentially the same as a Convertible Note. *See* Ex. 1

(Keener Tr. 80:25 – 81:12, 98:8-12, 111:15-23); Ex. 3 (Weisman Tr. 34:14-19).

**RESPONSE:** Disputed.  The bridge loans were very different from the Convertible Notes.  Ex. 3

(JMJ-LIT-003-013095) at -013100-09,  -013114-20, -013124-29, -013227-34 (ACAR Security

Purchase Agreements ("SPA") and Note); Ex. 4 (JMJ-LIT-003-001714) at -001727-30, -001739,

-001777-95, -001798-99, -001802-12, -001842-54, -0001961) (BLSP SPA and Note); Ex. 5 (JMJ-LIT-

003-007205) at -007217-26, -007237-46, -007267-74, -007277-83, -007455-64, -007475-84, -007517-

62) (DUOT SPA and Note); Ex. 6 (JMJ-LIT-003-009109), at -009141-52, -009167-74, -009176-84)

(BLNK SPA and Note); Ex. 7 (JMJ-LIT-003-011968), at -011982-94, -011997-012009, -012018-40

(Connekt SPA and Note) (showing that bridge loans during the Relevant Period were different than

the convertible notes, including because they only had a limited convertible feature on default); *c.f.,*

DSOF Ex. 12 (JMJ-LIT-003-009357) ECF No. 72-14, at -9396-98 (convertible note with conversion

right as a matter of course); DSOF Ex. 13 (JMJ-SEC-009-000027) ECF No. 72-15, at -61-63 (same);

PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 80:25-81:12 (did not recall that any bridge loans

had a convertible feature); PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3, at 34:14-19 (describing bridge loans as "loans that often are designed to provide capital to a company during an interim period prior to some event, which then allows the company to repay the proceeds of that loan").

13.   As their name suggests, the Convertible Notes granted JMJ the option to demand that sums owed under the notes be paid in the form of the issuer's stock (hereinafter known as "converting the note"). The vast majority of issuers allowed Keener to convert the notes to stock rather than repay them in cash. See PSOF Ex. 4 (Nagel Tr.) at 102:22 – 103:3 (estimating only one out of every five issuers repaid notes without an equity conversion event occurring)).

**RESPONSE:** Disputed.  The SEC's only cited document for both assertions is limited testimony from Mr. Keener's accountant, Conrad Nagel ("Mr. Nagel"), who was not directly involved in helping him administer convertible note investments.  PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 15:22-25 (his responsibilities included "maintain[ing] the accounting records, administration, schedules, relationships with the landlord, parking garage, general administration and accounting and cash disbursements").  Here, Mr. Nagel testified "it's difficult for me to recall that" and "maybe" in response to the SEC asking how often Mr. Keener's investments in these notes were repaid in cash and whether it was "one out of five times." *Id.* at 102:22-103:3.

14.   The Convertible Notes allowed JMJ to convert the notes into stock at a typical discount of 30% to 40% against the lowest closing price of the stock during a specified number of trading days before each conversion (also known as the "look back period"). *See* Ex. 1 (Keener Tr. 61:25 – 62:2); Ex. 3 (Weisman Tr. 37:1-13); Ex. 4 (Nagel

**15.** Tr. 109:13-14 ("And that's why we made money on conversions, because generally speaking, there was that discount.")).[1]

**RESPONSE:** Disputed.  The Convertible Notes had many different terms.  *See, e.g.*, PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 61:13-62:2 (recalling that a typical discount for Convertible Notes held from 2014 to 2016 was generally a "10 percent discount to 40 or 50 percent discount, that range"); *id.* at 66:3-20 (explaining that a note with a 40 percent discount was maybe typical of Notes from 2013 and 2014, but not during the Relevant Period); PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3, at 37:1-24 (the look back period for the discount "would be a calendar period of time" normally "a period of time in the past" but "[t]here may have been instances where it was both future and past" and it would "measure a particular event," such as "an average stock price," "lowest price," or "highest price over a period of time"); PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 109:9-14 (describing how they would make money on a hypothetical conversion with a 40 percent discount in the note).  Undisputed that some of the Convertible Notes during the Relevant Period allowed Mr. Keener to convert the outstanding loan balance into shares at a ratio based on the loan balance and a specified discount to the trading price of the stock at the time of conversion, while other Convertibles Notes did not include a market-adjustable conversion discount. Ex. 8 (JMJ-SEC-009-002198), at -2240-2244 (ALLM #1 convertible note with 25 percent discount); Ex. 9 (JMJ-SEC-009-003430), at -3448-3450 (PBIO convertible note with a fixed price).  There is also a dispute about which Convertible Notes are at issue, which further undermines any attempt to generalize the features of the notes.  *See* Resp. to ¶ 8, *supra.*  Immaterial to the extent the cited testimony discusses Convertible Notes outside the Relevant Period.  PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22, at 61:13-62:2.

---

[1] The numbering of paragraphs 14 and 15 matches the SEC's Statement of Facts.  Counsel for Mr. Keener provides one response to both paragraphs as the separation appears to be a formatting error.

**16.** This discount meant that the conversion price fluctuated with the issuer's stock price. *See* Ex. 4 (Nagel Tr. 109:2-7 (describing how conversion price depended upon stock price during "lookback" period).

**RESPONSE:** Disputed.  The SEC only cites to testimony from Mr. Nagel, Mr. Keener's accountant, which is incomplete and taken out of context.  In the referenced testimony, Mr. Nagel gave a hypothetical example of how a discount would work and offered no testimony about how any conversion price actually fluctuated.  PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 108:21-109:7 ("Well, if the stock, <u>for instance</u>, had a market value within a certain period of time of the conversion, there <u>may</u> have been a look back period of 20 days, <u>something like that</u>, so it would be the lowest price within the previous 20 days or 30 days, a lookback period.") (emphasis added).  The Convertible Notes had different terms, and different types of discounts.  *See, e.g.*, PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3,  at 37:1-24 (the look back period for the discount "would be a calendar period of time" normally "a period of time in the past" but "[t]here may have been instances where it was both future and past" and it would "measure a particular event," such as "an average stock price," "lowest price," or "highest price over a period of time").

**17.** JMJ kept track of when notes were eligible to be converted and normally only converted a portion of the note to ensure that its stock holdings in that issuer did not exceed 4.99% at any point in time, which otherwise would have required making a public filing disclosing Keener's beneficial ownership of the issuer. *Id.* at 110:22-111:7; *see* Ex. 12, at JMJ-SEC-010-6878 (convertible note promissory note of Alliance Bioenergy Plus, Inc. limited JMJ to acquiring no more than 4.99% of the issuer's stock at one time from the note).

**RESPONSE:** Disputed as the fact is unsupported by the cited evidence—which consists of general testimony and only one example of a specific transaction.  There is also a dispute about which

Convertible Notes are at issue, which further undermines any attempt to generalize activity surrounding the Notes.  *See* Resp. to ¶ 8, *supra*.

   **18.**  Once stock from a note was eligible to be sold, JMJ converted the note into stock and sold it into the market. *See* Ex. 4 (Nagel Tr. 52:19-25 (Keener converted notes six months after buying them).

**<u>RESPONSE:</u>** Disputed as the fact is unsupported by the cited evidence—which is general testimony and does not concern specific transactions—and is not consistent with documents produced.  *See, e.g.*, PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 36:10-16 ("The company issues me a convertible note, and I take a long-term view of, you know, maybe six to twelve or twenty-four months. Sometimes a much longer term view of three to five years, which [] I've had actually more success with"); DSOF Ex. 27 (JMJ-LIT-016-005889) ECF No. 72-29, at -5889 (converting after holding for 2 years); DSOF Ex. 28 (JMJ-LIT-016-006219) ECF No. 72-30, at -6219 (converting after holding for 4 years); Ex. 10 (JMJ-SEC-009-003124), at -03133, -3127 (converting after holding LEXG note for 3 years); Ex. 11 (JMJ-LIT-007-000293) at -311 (same); DSOF Ex. 30 (JMJ-LIT-007-000201) ECF No. 72-32, at -218-19 (2015 Tax Return, Form 8949 reporting losses on 16 QuickLoan Convertible Notes, including -$74,900 on the BLUU note, -59,900 on the ABKI note, -$49,938 on the CRQE note, and -$49,900 on the SFEG note).

   **19.**  At that point, existing shareholders typically experienced price declines in the stock. Ex. 4 (Nagel Tr. 111:14-18 (general trend after JMJ started selling stock from the Convertible Notes was for the stock price to drop)). JMJ could make profits selling into a declining market because it acquired its shares at a substantial discount to the prevailing market price. Ex. 13 (Mayhew Dep. 67:19 – 68:3 ("Q. ... So Mr. Keener can sell into a declining market and still make profitable trades, *would you agree? A. Yes.")).

**RESPONSE:**  Disputed.  The general testimony provided by Mr. Keener's accountant does not support the proposition.  *See* PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 111:14-18 (simply agreeing to the SEC's representation about a "general trend").  There is also a dispute about which Convertible Notes are at issue, which further undermines any attempt to generalize activity surrounding the Notes.  *See* Resp. to ¶ 8, *supra*.  Undisputed but immaterial as to Dr. Stewart Mayhew's testimony that, hypothetically, Mr. Keener could sell into a declining market and still make a profitable trade.  PSOF Ex. 13 (7.30.21 Mayhew Tr.) ECF No. 67-13, at 67:19-68:3.

20. When JMJ evaluated issuers for its QuickLoan program, among the criteria Keener considered was the liquidity of an issuer's existing stock, the volume at which it traded in the market, and the amount of other outstanding convertible debt. *See* Ex. 14, at JMJ-SEC-017-3301 (Natan email describing JMJ criteria for QuickLoan Program); Ex. 15 (convertible note amount was generally equal to 10% of total dollar volume of issuer's stock traded over prior 60 days).

**RESPONSE:**  Undisputed that, before making a QuickLoan investment in a public company, Mr. Keener and/or his assistants conducted extensive due diligence.  PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3,) at 51:9-18 (looking at "the basic financial data" of a company such as the "assets, liabilities, revenue, profits, losses[, and] cash flow"); PSOF Ex. 17 (10.7.19 Natan Tr.) ECF No. 67-17, at 22:21-28:20 (trading volume is "just another one of our criteria among other things that we look at when we provide due diligence"); DSOF Ex. 9 (JMJ-LIT-003-000118) ECF No. 72-11, at -118 (due diligence reviews for red flags); DSOF Ex. 10 (JMJ-LIT-003-000303) ECF No. 72-12, at -303 (same).

21. Although each Convertible Note designated an amount of principal on its face, JMJ's practice was to pay the issuer a smaller amount at the note's inception and then pay additional amounts in the future. Ex. 16, at 26 (describing the QuickLoan program as having "Automatic

Follow-On Payments [from JMJ] Built In [to ensure] Only <u>one</u> closing ... The typical QuickLoan will receive the closing payment [and] typically several more payments through the life of the transaction ... Some have 10+ payments, so it keeps on paying the company") (emphasis in original). This approach allowed JMJ to add to its position in an issuer's convertible notes without having to negotiate and close on new contract language each time. *See id.*; Ex. 9, at 7 (JMJ's website).

**RESPONSE:**  Disputed as the fact is unsupported by the cited evidence—which consists of marketing materials rather than transaction documents.  There is also a dispute about which Convertible Notes are at issue, which further undermines any attempt to generalize activity surrounding the Notes.  *See* Resp. to ¶ 8, *supra*.  Undisputed that the cited marketing materials identified QuickLoans as having these options.

22. Some issuers sold JMJ warrants (convertible into common stock) at the same time that they sold JMJ convertible notes. *See* Ex. 4 (Nagel Tr. 71:3-11); Ex. 17 (Natan Tr. 38:6-8 ("a warrant is just another term that's added to a [convertible note] transaction.")).  No issuer sold JMJ warrants without a convertible note. Ex. 4 (Nagel Tr. 71:3-11).

**RESPONSE:**  Disputed as the fact is unsupported by the cited evidence—which is general testimony and does not concern specific transactions.  PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 71:3-11 (answering questions about whether a spreadsheet, JMJ-SEC-008-00380, included the sale of warrants); PSOF Ex. 17 at 38:6-8 ("every transaction has its own terms. So a warrant is just another term that's added to a transaction . . . it wasn't used all the time").  Mr. Keener invested in warrants separate from convertible notes.  *See, e,g.*, Ex. 12 (JMJ-SEC-009-002268) at -2268-2269, 2318-2337 (AMPE warrants with no convertible note).

**23.** To support, conduct, and develop its convertible notes business, JMJ "developed proprietary software" at a cost of more than $3 million. Ex. 3 (Weisman Tr. 24:23); Ex. 17 (Natan Tr. 61:23 – 62:15); Ex. 24, at 13 ("Over $3M in custom technology").

**RESPONSE:**  Undisputed that Mr. Keener developed software to assist him in conducting due diligence on potential investments and to account for his investments.  Disputed that that this software was exclusively intended for convertible note investments.

**24.** Customer management software, called "the mainframe," tracked "existing portfolio companies" and "potential companies and our interactions and relationships as we went through a relationship-building process." Ex. 3 (Weisman Tr. 25:22 – 26:17).

**RESPONSE:**  Undisputed that Mr. Keener had software called "the mainframe" and that it tracked his potential and ongoing investments.  Disputed that it was "customer management software"; instead, the software was intended to facilitate Mr. Keener's investment decisions.  PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3, at 25:20-25, 27:23-28:13 (the software tracked, among other things, company filings); PSOF Ex. 17 (10.7.19 Natan Tr.) ECF No. 67-17, at 58:5-59:19 (due diligence reviews for each investment opportunity tracked "on our mainframe, on our software, you know, proprietary software").

**25.** JMJ also had an accounting database to track the performance of JMJ's convertible notes. *See* Ex. 4 (Nagel Tr. 19:16 – 22:21); Ex. 3 (Weisman Tr. 25:20-21). The accounting database was "highly accurate." Ex. 4 (Nagel Tr. 67:8-9).

**RESPONSE:**  Undisputed that Mr. Keener had an accounting database that tracked the performance of Mr. Keener's investments in convertible notes.  Disputed that the accounting database only tracked convertible note investments.  DSOF Ex. 32 (6.28.2021 Aucoin Tr.) ECF No. 72-32, at 29:3-12.

14

**26.** JMJ experienced substantial competition from other companies that sought to purchase convertible notes from issuers. *See* Ex. 3 (Weisman Tr. 90:8-18 ("the marketplace became saturated with lenders doing similar types of loans")); Ex. 17 (Natan Tr. 33:22 – 34:8 (JMJ's convertible note business is part of a "competitive industry")). JMJ was nevertheless quite successful with, as Keener stated in a presentation in 2016, "over 50% market share." *See* Ex. 24, at 27 (JMJ "Broker and Finder Seminar" PowerPoint presentation).

**RESPONSE:**  Undisputed that other investors also sought to invest in convertible notes.  Disputed that Mr. Keener in fact had "over 50% market share" as the cited evidence is a marketing claim, not actual evidence related to market share.

**27.** Between July 2010 and April 2018, JMJ entered into at least 272 convertible notes with 201 different issuers. (fn. 2). Ex. 11 (Taveras Decl. at ¶¶ 17-18). FOOTNOTE 2: JMJ purchased other convertible notes during the period, but they are not included in this description because JMJ did not sell stock from those issuers during the relevant period for purposes of disgorgement (March 24, 2014 through January 31, 2018).

**RESPONSE:** Disputed as the specific fact is unsupported by the cited documents and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is the Taveras Declaration, which the Court should not consider for the reasons set forth above in the Response to Paragraph 8.  Undisputed that Keener purchased convertible notes during the Relevant Period, but there is a dispute as to which convertible notes are at issue.  *See* Resp. to ¶ 8, *supra*.

**28.** To purchase the notes, as well as warrant agreements bundled with the notes, JMJ made payments totaling approximately $52 million. *Id.* at ¶ 18.

**RESPONSE:**  Disputed as the specific fact is unsupported by the cited document and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is

the Taveras Declaration, which the Court should not consider for the reasons set forth above in the Response to Paragraph 8.  Moreover, the documents Dr. Taveras relied on to prepare her Declaration did not contain the information for her to differentiate between convertible notes and other investments, or to identify whether warrant agreements were "bundled" with notes.  DSOF Ex. 32 (6.28.2021 Aucoin Tr.) ECF No. 72-32, at 180:24-25 (the spreadsheet "doesn't include expenses. It's before expenses.").  Undisputed that Mr. Keener made payments to invest in convertible notes during the Relevant Period, but there is a dispute as to which convertible notes are at issue, and whether any warrant agreements or other investments are at issue.  *See* Resp. to ¶ 8, *supra*.

29. JMJ converted these notes and warrants on 2,414 occasions during the period and received more than 38 billion shares of newly issued stock directly from the issuers. *Id.*

**RESPONSE:** Disputed as the specific fact is unsupported by the cited document and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is the Taveras Declaration, which the Court should not consider for the reasons set forth above in the Response to Paragraph 8.  Undisputed that Keener converted notes during the Relevant Period, but warrants are not "converted."  *See, e.g.*, Ex. 12 (JMJ-SEC-009-002268) at -2268-2269, -2318-2337 (AMPE warrant).  Further, there is a dispute as to which convertible notes are at issue, and whether any warrant agreements or other investments are at issue.  *See* Resp. to ¶ 8, *supra*.

30. JMJ sold those shares into the market through more than 16,000 transactions during the period for gross proceeds of over $93 million. *Id.*

**RESPONSE:** Disputed as the specific fact is unsupported by the cited document and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is the Taveras Declaration, which the Court should not consider for the reasons set forth above in the

Response to Paragraph 8.  Undisputed that Mr. Keener sold shares received from note conversions during the Relevant Period, but there is a dispute as to which convertible notes and which sales are at issue.  *See* Resp. to ¶ 8, *supra*.

31.  During the period March 24, 2014 through January 31, 2018, JMJ sold a subset of the 38 billion shares of stock (which was approximately 33 billion shares) for net proceeds of approximately $34 million. *Id.* at ¶¶ 11, 12.

**RESPONSE:** Disputed as the specific fact is unsupported by the cited document and immaterial to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is the Taveras Declaration, which the Court should not consider for the reasons set forth above in the Response to Paragraph 8.  Undisputed that Mr. Keener sold shares received from note conversions during the Relevant Period, but there is a dispute as to which convertible notes and which sales are at issue.  *See* Resp. to ¶ 8, *supra*.  Moreover, Dr. Taveras is not an accountant, and thus is not appropriately qualified to offer any opinions about "net proceeds."  Furthermore, the documents she relied on to prepare the Declaration did not contain the information for her to do so because they did not contain any data about expenses.  DSOF Ex. 32 (6.28.2021 Aucoin Tr.) ECF No. 72-32, at 180:24-25 (the spreadsheet "doesn't include expenses. It's before expenses.").

32.  Sixty-two percent (62%) of these net proceeds were from selling stock converted from notes; 17% were from selling stock converted from warrants bundled with notes; 14% were from selling stock received from issuers settling the outstanding note balances without using the conversion mechanism; 6% were from selling stock from "bonuses" associated with notes; and 0.1% from penalties on the convertible note issuers. *Id.* at ¶ 14. Less than one percent of these net proceeds were from stock purchased in the open market. *Id.*

**RESPONSE:** Disputed as the specific fact is unsupported by the cited document and immaterial to

the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is the

Taveras Declaration, which the Court should not consider for the reasons set forth above in the

Response to Paragraph 8.  Moreover, Dr. Taveras is not an accountant, and thus is not appropriately

qualified to offer any opinions about "net proceeds."  Furthermore, the documents she relied on to

prepare the Declaration did not contain the information for her to do so because they did not

contain any data about expenses.  DSOF Ex. 32 (6.28.2021 Aucoin Tr.) ECF No. 72-32, at 180:24-

25 (the spreadsheet "doesn't include expenses. It's before expenses.").  Undisputed that Mr. Keener

generated revenue from selling shares received from note conversions during the Relevant Period,

but there is a dispute as to which convertible notes and which sales are at issue, and whether any

proceeds from transactions other than note conversions are at issue.  *See* Resp. to ¶ 8, *supra*.

    **33.** JMJ had net income of approximately $33 million after accounting for proceeds from

original issue discounts, interest, and penalties (of $6.3 million) as well as write-offs and other losses

(of $7.2 million). *Id.* at Taveras Ex. 1.

**RESPONSE:**  Disputed as the specific fact is unsupported by the cited document and immaterial

to the extent the assertion is outside the Relevant Period.  The only document cited by the SEC is

the Taveras Declaration, which the Court should not consider for the reasons set forth above in the

Response to Paragraph 8.  Moreover, Dr. Taveras is not an accountant, and thus is not appropriately

qualified to offer any opinions about "net income."  Furthermore, the documents she relied on to

prepare the Declaration did not contain the information for her to do so because they did not

contain any data about expenses.  DSOF Ex. 32 (6.28.2021 Aucoin Tr.) ECF No. 72-32, at 180:24-

25 (the spreadsheet "doesn't include expenses. It's before expenses.").  Undisputed that Mr. Keener

generated revenue from selling shares received from note conversions during the Relevant Period,

but there is a dispute as to which sales are at issue, and which expenses should be deducted to

calculate net income.  PSOF Ex. 11 (Taveras Decl.) ECF No. 67-11 (which does not discuss

expenses) to DSOF Ex. 70 (Flemmons Report) ECF No. 73-21, at Ex. 5 (listing expenses).

**34.**  Keener stated that "50 to 100 percent would be a reasonable ... estimate" of JMJ's profit

margin on convertible notes (*i.e.*, the ratio of JMJ's profit from a convertible note to its acquisition

cost). *See* Ex. 1 (Keener Tr. 246:14-20).

**RESPONSE:**  Undisputed that the cited testimony is accurately quoted but disputed as the fact is

unsupported as to the actual profit margin and because there is a dispute about which convertible

notes are at issue.  *See* Resp. to ¶ 8, *supra*.

**35.**  Keener testified in June 2019 that he had "essentially no interest" in the convertible note

business going forward and "I have no interest in reentering that business whatsoever again." *Id.* at

56:18-23, 57:12-13.

**RESPONSE:**  Disputed as phrased, because it suggests Mr. Keener only decided in June 2019 that

he had no interest in the convertible note business, when he actually made this decision several years

earlier.  The quoted testimony is incomplete and taken out of context.  Undisputed that Mr. Keener

stopped investing in convertible notes after entering into only a "handful" of new convertible notes

in 2017 and investing in one existing convertible note in 2018.

> I think -- I think last year, I did one new one in maybe February or March for $50,000
> because it was a company I had already invested in didn't have money to make its SEC
> filings. So throwing good money after bad, you know? That company, I believe, declared
> bankruptcy this or last year. But, you know, the year before that, it was a handful. . . .
>
> I have essentially no interest in it . . . [I]t's a very difficult investment to administer.  I believe
> because the borrower has little incentive to honor the investment, the contract.  It's not like
> a mortgage where the person who borrows the mortgage has the incentive of I don't want to
> lose my home, so I'm going to honor our agreement, I'm going to pay.   Most of these –
> these were unsecured. . . . So the borrower had little interest in honoring a contract. . . even
> if you [] sue them, they still don't care. . . . So it just became a hassle . . . I have no interest in
> reentering that business whatsoever again.

PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 54:17-55:7, 56:21-57:15; *see also* PSOF Ex. 22

(7.16.2021 Keener Tr.) ECF No. 67-22, at 29:14-17, 30:10.

**36.** In June and July 2020, JMJ sold the stock of Blink Charging Co. f/k/a Car Charging Group

Inc. ("BLNK") that JMJ obtained from a Convertible Note that it purchased in October 2016. *See*

Ex. 19, at 1-13 ("BlueSheet" transaction records showing sales of BLNK stock by Keener and JMJ

Financial); Ex. 20 (BLNK convertible note issued to JMJ Financial signed by Keener on October 13,

2016); Ex. 18 (warrant purchase agreement between BLNK and JMJ Financial dated October 13,

2016). JMJ's total proceeds from these sales exceeded $13.76 million. Ex. 19, at 13.

**RESPONSE:**  Disputed.  This fact is inconsistent with the BLNK's public filings.  Mr. Keener did

not acquire the BLNK shares sold in June and July 2020 through a Convertible Note purchased in

October 2016; he acquired them through a common stock purchase from the CEO in April 2018 as

well as other agreements with the company that were not convertible notes.  *See* Ex. 13 (BLNK 2019

10-K) at 36-37; Ex. 14 (BLNK Schedule 13G) at 2-4.  This fact is also disputed because the SEC has

also cited to inadmissible evidence.  The first document cited by the SEC is PSOF Ex. 19, which is

inadmissible because it is an unauthenticated, nonpublic document that was never produced during

discovery.  This fact is also immaterial because it is outside the Relevant Period.

**37.** Keener and his employees solicited issuers and conducted securities transactions using the

means and instruments of communication in interstate commerce and of the mails. *See, e.g.,* Answer,

¶ 13 (Keener "admits that he used the telephone or internet to liquidate shares"); Ex. 9 (JMJ website

soliciting issuers); Ex. 26, at 1-3 (JMJ Twitter account soliciting issuers); Ex. 23, at 1-10 (JMJ press

releases issued on its website); Ex. 33, at 1-2 ("Campaign Report" analyzing distribution of JMJ

newsletter by email); Ex. 34, at JMJ-SEC-016-11520 (Keener email to issuer); Ex. 35, at JMJ-SEC-

105-25820 ("all phone calls must be made" to qualify for bonuses).

**RESPONSE:** Disputed as to the characterization that Mr. Keener "solicited" issuers.  Mr. Keener

had a website in order to establish credibility as an investor.  PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF

No. 67-1,  at 103:7-18; PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22, at 73:6-10 (purpose of

the website is to show companies that Mr. Keener is "a real guy," a "real investor," and to "give

[him]self some credibility so that [he] can . . . hopefully have a better pool of [] companies to invest

in.").  And he would reach out to issuers to discuss whether they had any funding needs.  PSOF Ex.

1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 46:5-8, 161:19-24 (emailing or calling companies he

wanted to invest in).

**38.** Issuers satisfied JMJ's conversion demands by directing their transfer agents to issue new

stock, i.e., stock that had not previously traded in the market. *See* Ex. 1 (Keener Tr. 120:15 – 121:8).

Keener knew that stock converted from notes was not publicly traded until he "introduce[d] it to the

market." *Id.*

**RESPONSE:**  Disputed as the fact is unsupported by the cited material— which is general

testimony, does not concern specific transactions, and does not mention transfer agents.  There is

also a dispute about which convertible notes and conversions are at issue, which also undermines

any attempt to generalize activities around any conversions.  *See* Resp. to ¶ 8, *supra.*

**39.** It was JMJ's practice when purchasing a convertible note to have the issuer execute a letter

to its transfer agent reserving a certain amount of new shares that later could be issued to JMJ upon

conversion of the note. (fn. 3). *See* Ex. 12, at JMJ-SEC-010-6881 - 83 (transfer agent letter for

Alliance Bioenergy Plus, Inc. dated April 22, 2016). Many of these letters stated that the transfer

agent should reserve "such number of shares that has a market value equal to at least five times" the

outstanding balance on the note. *Id.* FOOTNOTE 3: A transfer agent is the institutional market

participant hired by issuers to record, track, and effectuate corporate issuances of new stock to purchasers.

**RESPONSE:**  Undisputed as to the cited example involving Alliance Bioenergy Plus, Inc., but otherwise disputed as the fact is unsupported by the cited evidence—which is only one example of a transaction.  There is also a dispute about which convertible notes are at issue, which also undermines any attempt to generalize activities around the notes.  *See* Resp. to ¶ 8, *supra*.  This fact is also immaterial.

**40.**  JMJ monitored the trading of the issuers' stock to determine when to increase the reservation of shares (*i.e.*, if the price drops, JMJ may need more shares when it converts the note). *See* Ex. 36, at JMJ-SEC-014-11523 - 26 ("T[ransfer] A[gent] Reset Report" tracks when to request additional shares to be reserved at the issuers' transfer agents).

**RESPONSE:**  Disputed as the fact is unsupported by the cited material—which is a spreadsheet to "establish guidelines for company contact and tracking."  PSOF Ex. 36 (JMJ-SEC-014-011482) ECF No. 67-36, at -11522.  There is also a dispute about which convertible notes are at issue, which also undermines any attempt to generalize activities around the notes.  *See* Resp. to ¶ 8, *supra*.

**41.**  JMJ employed a marketing manager named Liz Jankowski. *See* Ex. 1 (Keener Tr. 159:24 – 160:10); Ex. 17 (Natan Tr. 73:11-13).

**RESPONSE:** Undisputed that Mr. Keener employed a marketing manager named Elizabeth ("Liz") Jankowski until June 2016.  PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 23:11-16, 24:5-18 (many employees were laid off June 2016, including Liz Jankowski).

**42.**  Internal JMJ marketing documents show that JMJ employed a comprehensive marketing strategy to solicit issuers to sell JMJ convertible notes, including: operating a website (JMJfn.com); attending and sponsoring industry conferences to reach issuers; sponsoring JMJ's own conferences;

using email campaigns to solicit issuers; developing a "firm brochure"; and issuing press releases

about JMJ to the internet. *See* Ex. 21, at JMJ-SEC-007-2625 - 2627 (JMJ "Marketing Initiatives for

2016"); Ex. 22 (Keener Dep. 71:7-9); Ex. 23 (JMJ press releases).

**RESPONSE:**  Disputed as phrased.  Undisputed and immaterial that Mr. Keener had a website

(JMJfn.com), attended and sponsored conferences, sent out one newsletter, and published press

releases, but otherwise disputed as to the characterization that this was a "comprehensive marketing

strategy" and disputed that the "Marketing Initiatives for 2016" were ever implemented as described.

PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 162:16-163:6, 165:2-20, 178:2-20; PSOF Ex. 3

(9.25.19 Weisman Tr.) ECF No. 67-3, at 110:5-111:14.


**43.** The SEC downloaded JMJ's website on April 16, 2019. Ex. 10, ¶ 4 (Castillo Declaration

regarding capture of JMJfn.com); Ex. 9, at 1-18 (JMJ website capture); *see also* Answer, ¶ 10

("Defendant further admits to operating a website for JMJ Financial").

**RESPONSE:**  Undisputed but immaterial.


**44.** The website advertised JMJ's QuickLoan program in which JMJ purchased convertible notes

priced between $50,000 and $250,000 from publicly-traded issuers. *See* Ex. 9, at 7. The website

advertised JMJ's interest in offering bridge loans and engaging in "convertible debentures" and

"registered equity financings" with publicly-traded companies. *Id.* at 4 (website page on bridge

loans). The website stated that "JMJ has placed over $60 million in the last five years, closing

transaction with over 70 public companies in 2015 alone." *Id.*

**RESPONSE:**  Undisputed but immaterial that the website contained the quoted text, but otherwise

disputed as to the characterization that this was "advertising" for the reasons set forth above in

response to Paragraph 37.  Also disputed that Mr. Keener made all the types of investments listed.

**45.** The website included press releases that Keener and one of his employees drafted that were intended to establish JMJ's credibility with convertible note issuers. Ex. 1 (Keener Tr. 113:16 – 114:14); *see* Ex. 23 (JMJ press releases); Ex. 3 (Weisman Tr. 105:1-14).

**RESPONSE:**  Undisputed but immaterial.

**46.** JMJ maintained a Twitter account (@JMJ Financial) that advertised JMJ's willingness to purchase convertible notes. *See* Ex. 27, ¶ 3 (Castillo Declaration regarding capture of Twitter posts for @JMJ Financial); Ex. 26, at 1-3 (JMJ's Twitter posts as of Nov. 9, 2020).

**RESPONSE:**   Undisputed and immaterial that Mr. Keener had a Twitter account (@JMJ Financial) during the Relevant Period, but otherwise disputed as to the characterization that it "advertised" anything for the same reasons set forth above in response to Paragraph 37.

**47.** JMJ hired employees to solicit potential issuer clients to sell JMJ convertible notes. *See* Ex. 1 (Keener Tr. 166:6-22, 169:3-19 (Keener drafted scripts for employees soliciting issuers to use)); Ex. 36, at JMJ-SEC-014-11491 - 98 (sample scripts); Ex. 17 (Natan Tr. 13:11 – 14:9).

**RESPONSE:**   Disputed that any employees "solicit[ed] potential issuer clients" as the fact is unsupported by the cited materials.  Undisputed but immaterial that Mr. Keener had assistants to help identify convertible note investment opportunities by calling companies directly to inquire about their funding needs from January 2015 until June 2016 when most of Mr. Keener's employees were laid off.  PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1,  at 186:22-24 (JMJ downsized in 2016); PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3,  at 137:24-138:12 (same); PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4,  at 23:11-16, 24:5-18 (same).

**48.** These employees included James Abbott, John Casiano, Shawn Ellis, David Halfen, Chris Mayo, and Eilon Natan. *See, e.g.,* Ex. 17 (Natan Tr. 13:7-10).

**RESPONSE:** Disputed as the fact is unsupported by the cited testimony, which only describes Mr. Natan's general responsibilities. PSOF Ex. 17 (10.7.19 Natan Tr.) ECF No. 67-17, at 13:7-10 ("Q Okay. And what are your responsibilities? A I go out there and find companies, conduct due diligence on companies that would be a good fit for JMJ to provide capital to."). Most of these employees were laid off by June 2016. *See* PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22, at 29:8-17, 30:10, 186:22-24; PSOF Ex. 3 (9.25.19 Weisman Tr.) ECF No. 67-3, at 137:24-138:12 (reducing staff in June 2016); PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 23:11-16, 24:5-18 (by the end of June 2016, Shawn Ellis, James Abbott, and Chris Mayo were no longer employed by Mr. Keener).

49. JMJ paid them commissions and bonuses tied to the number and size of convertible notes they obtained for JMJ. *See, e.g.,* Ex. 35, at JMJ-SEC-015-25820 (email describing 2014 Bonus Structure for JMJ employees); Ex. 28, at JMJ-SEC-010-5680, 5682-83 ("2016 Comp Plan" setting forth bonus requirements); Ex. 25, at 1-2 (Natan received commissions of $114,500 in 2016 and $68,252 in 2017)); *see also* Ex. 1 (Keener Tr. 183:3-12 (describing bonus structure for note finder employees)).

**RESPONSE:** Disputed as the fact is unsupported by the cited materials—the only specific payment identified is to Mr. Natan, and the SEC has not cited any evidence related to the actual reason for Natan's commissions nor that any bonus or commissions were actually paid to the other employees. This fact is also immaterial.

50. A piece of "lead generation software" known internally at JMJ as "the screener" helped its employees "screen public filings ... to identify potential borrowers." Ex. 3 (Weisman Tr. 25:10-14). The screener had the capability to track every company in the SEC's EDGAR database "and then

[JMJ] could decide if it made sense to contact those companies to see if they had any capital needs."
*Id.* at 27:23 – 28:13. JMJ contacted hundreds of those companies. *Id.* at 28:14-23.

**RESPONSE:**  Undisputed but immaterial.

51.  Keener sponsored, and he and his employees attended, microcap industry conferences
(Answer, ¶ 9) at which they solicited issuers to sell JMJ convertible notes. *See, e.g.,* Ex. 3 (Weisman
Tr. 93:12 – 94:24). For example, in 2016, Keener and his employees had the following conference
schedule:

| Date | Name | Location | Sponsor? | Sponsorship Cost | JMJ Attendees |
|------|------|----------|----------|------------------|---------------|
| 1/11/2016 | SeeThruEquity - Microcap Healthcare Investor Conference | Fairmont, San Francisco, CA | Yes | $4,000 - Gold Sponsor | Jankowski, Natan, and Weisman |
| 1/11-13/2016 | Biotech Showcase 2016 | Parc 55, San Francisco, | No | N/A | Jankowski, Natan, and |
| 2/8-9/2016 | Bio CEO & Investor Conference | Waldorf Astoria, New | No | N/A | Keener, Jankowski, Natan, and |
| 2/10-11/2016 | Nat'l Investment Banking | Margaritaville Beach Resort, | Yes | Unknown | Ellis, Halfen, Linn, Natan, and Weisman |
| 2/22/2016 | Innovations 2016 - SeeThruEquity & Brewer | Ritz-Carlton, Miami Beach, Florida | Yes | Fee Waived | Halfen, Jankowski, Natan, and Weisman |
| 3/13-16/2016 | Roth Conference | Ritz-Carlton, Dana Point | Yes | $10,500 - Silver Sponsor | Caparneros, Ellis, Jankowski, Natan, and |
| 5/3-5/2016 | Growth Capital Expo | Caesars Palace, Las Vegas | Yes | $7,500 - Gold Sponsor | Ellis, Jankowski, Natan, and |
| 6/1-2/2016 | Marcum Microcap Conference | New York | Yes | $13,500 - Gold Sponsor | Not Known |
| 6/7-9/2016 | LD Micro | Los Angeles | No | N/A | Not Known |

*See* Ex. 29 (one-page 2016 conference schedule as of June 15, 2016).

**RESPONSE:**  Disputed as to the characterization, but undisputed that Mr. Keener or his assistants attended approximately 10 conferences in 2016 to "network[]" and "meet "companies who are seeking investors, other vendors, maybe attorneys and accountants" as well as for "education." DSOF Ex. 80 (JMJ-SEC-007-001638) ECF No. 73-31, at -1638 (2016 conference schedule as of June 15, 2016); PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 125:11-18.  This fact is also immaterial.

52. Keener has served as a speaker at industry conferences. *See* Ex. 1 (Keener Tr. 128:2-4).

**RESPONSE:** Undisputed but immaterial.

53. JMJ touted conference sponsorships on Twitter by posting pictures of its booths and otherwise advertising its interest in convertible notes. *See* Ex. 26, at 1-3 (JMJ's Twitter posts).

**RESPONSE:**  Disputed as to the characterization, but undisputed that a few times in 2016, pictures from conferences were posted on JMJ's Twitter account (@JMJ Financial).  This fact is also immaterial.

54. JMJ issued at least eight press releases to publicize conference sponsorships. *See* Ex. 23 (press releases). The press releases made statements such as:

    a.     "[JMJ] commits $20 Million in unsecured investment to emerging public companies in 2015." Id., at JMJ-SEC-007-002759.

    b.     "Keener and JMJ Financial have committed $20,000,000 to unsecured investments in 2016." Id., at JMJ-SEC-007-000137.

    c.     "JMJ Financial's primary investment vehicle, the QuickLoan, allows small publicly-traded companies the ability to access up to $500,000 utilizing a simple two-page promissory note." Id., at JMJ-SEC-007-000179.

    d.     "With a portfolio of over 200 companies and many years of operating experience, JMJ Financial is one of the most active, stable and reliable investors focused on the smallcap segment." Id., at JMJ-SEC-007-002755.

**RESPONSE:**  Undisputed but immaterial.

**55.** JMJ referred to non-employees who helped to identify issuers willing to sell convertible notes as "brokers and finders," and it used the term "partners" for service providers, such as law firms or accounting firms, that steered issuers to JMJ. *See* Ex. 1 (Keener Tr. 138:9-15, 139:425); Ex. 4 (Nagel Tr. 79:14-20); Ex. 3 (Weisman Tr. 101:14-25).

**RESPONSE:** Disputed as phrased—no service providers "steered" issuers to Mr. Keener.  On occasion, service providers identified companies that may be in need of funding for Mr. Keener to consider investing in.  PSOF Ex. 4 (9.11.19 Nagel Tr.) ECF No. 67-4, at 79:14-20 (brokers and finders provided leads on potential investments); PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22, at 69:6-10 (describing finders as "people who g[a]ve us leads from time to time"); PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 125:11-24 (attending conferences for "networking" and "education," and meeting "companies who are seeking investors, other vendors, maybe attorneys and accountants;" did not recall finding investments through an attorney).  This fact is also immaterial.

**56.** JMJ hosted a dinner at Nobu Restaurant in Las Vegas for 24 "brokers and finders" on April 13, 2015. Ex. 30, at JMJ-SEC-015-2383 (guest list for Nobu dinner); *see also* Ex. 1 (Keener Tr. 156:7-17 (Keener remembered buying securities such as a convertible note with the assistance of at least one attendee at the Nobu dinner)).

**RESPONSE:** Disputed that Mr. Keener "remembered buying securities such as a convertible note with the assistance of at least one attendee at the Nobu dinner"; that misstates the testimony.  PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 156:7-17 (discussing a specific attendee at the Nobu dinner but could not recall "what issuer" and then clarified that "it may have been that I was invested in an issuer that he provided some sort of services to").  Undisputed but immaterial that

Mr. Keener hosted a dinner at Nobu Restaurant in Las Vegas for 24 "brokers and finders" on April 13, 2015.

**57.** JMJ paid commissions to brokers and finders who helped it find convertible notes to purchase. *See* Ex. 4 (Nagel Tr. 85:16 – 86:17, 87:18 – 88:10 (JMJ paid a portion of the convertible note purchase price to brokers and finders)).

**RESPONSE:**  Disputed as the fact is unsupported by the cited material—which is general and hypothetical testimony not concerning specific transactions—and is inconsistent with documents produced, which indicate that Mr. Keener made such payments not at his own discretion, but at the request of issuers.  *See, e.g.,* Ex. 15 (JMJ-LIT-003-005108), at -005150 (issuer directing Mr. Keener to send some of his payment of consideration for the NVIC #1 Note directly to a broker); Ex. 16 (JMJ-LIT-003-008136), at -8159-60 (same, for the GDSI Note); Ex. 17 (JMJ-LIT-003-014656), at -014683-85 (same, for the NXGA Note).  This fact is also immaterial.

**58.** JMJ held a "Partner Seminar" on August 14, 2015 at the Wynn Hotel in Las Vegas. *See* Ex. 16, at 1 (PowerPoint presentation titled "Partner Seminar August 14, 2015").

**RESPONSE:** Undisputed but immaterial.

**59.** JMJ held a "Broker and Finder Seminar" (also called the "JMJ Financial Small Cap Summit") on April 8, 2016 at the Wynn Hotel where JMJ covered all expenses for attendees, including the cost of accommodations and airfare for participants. *See* Ex. 24, at 1 (PowerPoint presentation titled "Broker and Finder Seminar April 8, 2016"); Ex. 4 (Nagel Tr. 79:1-9); Ex. 23, at JMJ-SEC-007-98 (press release: "Justin Keener and JMJ Financial Host Small Cap Dealmaker Summit in Las Vegas").

**RESPONSE:**  Undisputed but immaterial.

**60.** At both events, Keener made a presentation to the participants urging them to send JMJ referrals of issuers that were looking to sell convertible notes. *See* Ex. 16; Ex. 24. Keener's presentations included a notarized affidavit of JMJ's CFO (Conrad Nagel) stating that JMJ had "in excess of $20,000,000 in liquid cash and cash equivalents that is immediately available for investment into small cap emerging companies." Ex. 16, at 20, 23 ("Committed to invest additional $20M this year."); Ex. 24, at 31 (same).

**RESPONSE:** Undisputed but immaterial.

**61.** JMJ posted information on Twitter about the Las Vegas seminars that it held. *See* Ex. 26, at 2 (JMJ's Twitter posts).

**RESPONSE:** Undisputed that on a few occasions in 2016, Mr. Keener posted information on Twitter about seminars in Las Vegas, but this fact is immaterial.

**62.** A JMJ press release about the April 8, 2016 event quoted Keener as follows:

"The individuals we invited to Vegas have been responsible for arranging billions of dollars of investment in hundreds of small and micro-cap companies," said Justin Keener[,] Founder and Portfolio Manager of JMJ Financial. "The JMJ Financial Small Cap Summit is unique in the industry, using an invitation-only, all expenses paid format to bring key dealmakers together to share and brainstorm. Underwriting the entire cost of this annual event, travel and lodging underscores our commitment to providing unsecured investment capital to small cap issuers."

Ex. 23, at JMJ-SEC-007-98.

**RESPONSE:** Undisputed but immaterial.

**63.** Keener took business deductions of $103,399, $101,701 and $67,407 on his 2014, 2015, and 2016 federal tax returns for the costs of sponsoring and sending JMJ employees to industry

conferences as well as sponsoring JMJ-branded conferences. *See* Ex. 6, at JMJ-SEC-022-64, 71, 77

(tax returns); Ex. 4 (Nagel Tr. 82:22 – 83:9 (the federal tax return line items for "Conference and

Summits – fees" covered all costs of attending and sponsoring both industry and JMJ conferences)).

**RESPONSE:** Undisputed but immaterial.

**64.** JMJ sent emails to potential issuer clients soliciting them to sell JMJ convertible notes. *See,*

*e.g.,* Ex. 31, at JMJ-SEC-015-23789 (Keener solicitation email to issuer).

**RESPONSE:** Disputed as phrased—Mr. Keener did not "solicit[]" potential "issuer clients."

Undisputed but immaterial that Mr. Keener and/or his assistants identified convertible note

investment opportunities by calling or emailing companies directly to inquire about their funding

needs.  PSOF Ex. 1 (6.6.2019 Keener Tr.) ECF No. 67-1, at 46:5-8 ("[I]f I liked the company, I'd say

call these guys, you know, to see if they're interested. Do they need money? If they do, you know,

can we maybe figure out an investment?"), 161:19-24 ("I did one-on[]-one communications, always

have. If I see a -- a company I wanted to invest in, I'll write them a letter, write them an email, call

them. That would include mail.").

**65.** JMJ distributed via email an "e-Newsletter" (which it also promoted on Twitter) to issuers to

solicit them to sell JMJ convertible notes. *See, e.g.,* Ex. 32, at JMJ-SEC-012-5822 - 24 (JMJ April 2016

Newsletter); *see also* Ex. 1 (Keener Tr. 162:22). JMJ employee Peter Capernaros used software to

track which issuers opened the e-Newsletter emails. Ex. 33, at 1-2. JMJ touted the e-Newsletter on

Twitter. *See* Ex. 26, at 1 (JMJ's Twitter posts).

**RESPONSE:** Disputed as phrased—Mr. Keener did not "solicit" issuers "to sell" him convertible

notes.  Otherwise undisputed but immaterial that Mr. Keener distributed via email the one cited e-

Newsletter.

**66.** JMJ sent potential issuer clients gifts, such as jelly beans and mugs branded with "JMJ Financial." Ex. 22 (Keener Dep. 64:1-6).

**RESPONSE:** Disputed as phrased—"potential issuers" were not "clients"—but undisputed that Mr. Keener would sometimes send companies jellybeans or mugs with the words "JMJ Financial."

**67.** JMJ directly paid auditors who were working to audit the financial statements for certain issuers that had sold convertible notes to JMJ. Ex. 1 (Keener Tr. 190:21 – 191:3); Ex. 4 (Nagel Tr. 89:13-14); *see also* Ex. 34, at JMJ-SEC-016-11520 (email exchange regarding JMJ paying for audit expenses of an issuer)); Ex. 17 (Natan Tr. 87:15-17 ("In some cases ... a portion of the proceeds [of a convertible note] would go directly to the accounting firms to make sure that they do their work.")).

**RESPONSE:**  Disputed as the fact is unsupported by the cited materials—which consists of general testimony and one email communication but no specific transaction records—and is inconsistent with documents produced. Ex. 18 (JMJ-LIT-003-006822), at -006846-47 (issuer directing Mr. Keener to send some of his payment of consideration for the DIDG Note directly to an accountant or attorney); Ex. 19 (JMJ-SEC-009-002433), at -2494-2496 (same, for the JAMN Note).  This fact is also immaterial.

**68.** JMJ directly paid attorneys working on such issuers' periodic filings. *See* Ex. 1 (Keener Tr. 191:2-3); Ex. 4 (Nagel Tr. 89:13-14); Ex. 17 (Natan Tr. 87:2-25).

**RESPONSE:** Disputed as the fact is unsupported by the cited materials—which consists of general testimony and does not concern specific transactions— and is inconsistent with documents produced.  Ex. 18 (JMJ-LIT-003-006822), at -6846-47; Ex. 19 (JMJ-SEC-009-002433), at -2494-2495.

**69.** JMJ provided custom financing options to issuers, described on its website as a "bridge loan": "As each situation is unique, we'll tailor the structure, timeline and details of your bridge loan to your specific needs. As we invest the personal capital of our portfolio manager, with no investors or underwriters, we can be uniquely creative and responsive." *See* Ex. 9, at 4 (website page on bridge loans).

**RESPONSE:** Undisputed that Mr. Keener's website contained the quoted text.

**70.** JMJ provided "Debt Consolidation/Refinance" consulting services to issuers on how to structure convertible notes and other financial instruments where the issuer has sold convertible notes to multiple holders. *Id.* at 6.

**RESPONSE:** Disputed as the fact is unsupported by the cited document, which is Mr. Keener's website. Although Mr. Keener's website contains the phrase "Debt Consolidation/Refinance," there is no evidence that he ever provided "Debt Consolidation/Refinance" "consulting services" to any issuers.

**71.** Keener testified at his deposition that he never sought advice of counsel about whether to register as a securities dealer:

> **Q.** Other than – I don't want you to talk about your current counsel. Other than with them – other than with them, you've never sought advice as to whether you needed to register as a dealer, is that right?
> **A.** That's right.

Ex. 22 (Keener Dep. 246:18-23).

**RESPONSE:** Undisputed but immaterial.

**72.** Keener testified at his deposition that he never received advice of counsel about whether to register as a securities dealer:

> **Q.** ... Do you have a letter or advice from an attorney that says you don't have to register as a dealer other than in a Rule 144 letter?

33

**A.** That specifically states that, no.

*Id.* at 237:8-11.

**RESPONSE:** Undisputed as to the testimony provided but disputed as the fact is unsupported by the cited exhibit.[2]

**73.** Keener never contacted the SEC to seek guidance about Section 15(a)(1) of the Securities Exchange Act of 1934. Ex. 22 (Keener Dep. 254:23 – 255:5).

**RESPONSE:** Undisputed but immaterial.

---

[2] The SEC cited page 237 of Mr. Keener's July 16, 2021 Deposition Transcript, but did not include that page in PSOF Ex. 22 (7.16.2021 Keener Tr.) ECF No. 67-22.  Instead, that page can be accessed at DSOF Ex. 1 (7.16.2021 Keener Tr.) ECF No. 72-2.

## ADDITIONAL FACTS

1.   Mr. Keener is "an investor" with a "long-term view" of his investments.  DSOF Ex. 2 ECF
No. 72-3, at  36:5-7;  DSOF Ex. 1 ECF No. 72-2, at 92:2-3, 201:9-14; DSOF Ex. 5 ECF No. 72-7, at
-2753 (describing JMJ Financial as an "investor"); DSOF Ex. 6 ECF No. 72-8, at -1256 (as a
"private investor").  One type of investment Mr. Keener made from January 2015 through 2017 was
in convertible notes, sometimes referred to as "QuickLoans."  DSOF Ex. 1 ECF No. 72-2, at 25:1-
26:2, 29:14-17, 30:10; DSOF Ex. 2 ECF No. 72-3, at 35:21-36:16, 69:25-70:20.

2.   Mr. Keener's investment strategy was to hold a large number of similar investments with
the knowledge that some would fail, and with the hope that some would succeed.   DSOF Ex. 2
ECF No. 72-3, at 55:2-3, 71:1-3, 209:6-14; DSOF Ex. 8 ECF No. 72-10, at 66:12-15, 79:13-14.

3.   Mr. Keener never sold any converted stock without waiting at least six months from the
date of the initial convertible note investment.  DSOF Ex. 2 ECF No. 72-3, at 36:10-16 ("The
company issues me a convertible note, and I take a long-term view of, you know, maybe six to
twelve or twenty-four months. Sometimes a much longer term view of three to five years, which []
I've had actually more success with").  He held some of the notes for two to five years before
converting into stock.  *Id.*; *see also* DSOF Ex. 27  ECF No. 72-29, at -5889 (2 years); DSOF Ex. 28
ECF No. 72-30, at -6219 (4 years).

4.   In some cases, either the stock price of these companies declined while Mr. Keener was
holding the convertible note, or he lost his entire investment because companies went bankrupt or
out of business during that time.  DSOF Ex. 2 ECF No. 72-3, at 37:2-5, 55:11-12, 226:15-25,
227:23-25; DSOF Ex. 15 (ECF No. 72-17 ¶¶ 22, 31-33; DSOF Ex. 24 ECF No. 72-26, at 219:7-21.
In other cases, the companies refused to honor the terms of the convertible notes.  DSOF Ex. 2
ECF No. 72-3, at 56:18-57:15 (because the notes were unsecured, "the borrower has little incentive

35

to honor the investment, the contract"); *see, e.g.*, DSOF Ex. 31 ECF No. 72-33, at -19831-19836 (settlement negotiations).

5.   Mr. Keener testified as follows about his losses on convertible notes:

> [I]t just turned out to be not a good way to make money. . . . [W]ith investing in convertible notes, it's a pain.  Had to have employees to help administer them.  You deal with defaults, companies that stop making the filings, there's companies that won't pay you.  And it became very burdensome and was not worth my continuing to move forward in those type of investments. . . .
>
> [I]t's a very difficult investment to administer.  I believe because the borrower has little incentive to honor the investment, the contract.  It's not like a mortgage where the person who borrows the mortgage has the incentive of I don't want to lose my home, so I'm going to honor our agreement, I'm going to pay.  Most of these – these were unsecured. . . . So the borrower had little interest in honoring a contract. . . even if you [] sue them, they still don't care. . . . So it just became a hassle . . . I have no interest in reentering that business whatsoever again.

DSOF Ex. 2 ECF No. 72-3, at 54:17-55:7, 56:21-57:15.

6.   The convertible note contracts typically identified Mr. Keener as either a "Lender" or an "Investor."  *See, e.g.,* DSOF Ex. 18 ECF No. 72-20, at -1430 ("Lender" in EPAZ note); DSOF Ex. 19 ECF No. 72-21, at -775 (same in CEGX note); DSOF Ex. 12 ECF No. 72-14, at -9396-9398 ("Investor" in CATV note); DSOF Ex. 13 ECF No. 72-15, at -61-63 (same in ACNV note).

7.   Mr. Keener alone decides when and how to invest his money.  DSOF Ex. 2  ECF No. 72-3 at 33:16-21; DSOF Ex. 8 ECF No. 72-10, at 53:17-18, 22-23.

8.   Mr. Keener does not have any customers to whom he sells securities.  DSOF Ex. 2  ECF No. 72-3, at 225:16-19 ("No customers, no clients"); DSOF Ex. 1 ECF No. 72-2, at 12:3-7, 15-21 (Mr. Keener does not "interact with customers").

9.   All of his sales of securities have been executed through registered broker-dealers.  DSOF Ex. 2 ECF No. 72-3, at 228:1-4; *see, e.g.,* DSOF Ex. 76 ECF No. 73-27, at -14005 (trade confirmation); DSOF Ex. 77 ECF No. 73-28, at -1 (same).

10.   Mr. Keener alone decides when to sell any securities.  DSOF Ex. 2 ECF No. 72-3, at 33:3-21.

11.   Mr. Keener does not make a market in any securities.  DSOF Ex. 7 ECF No. 72-9 ¶ 15. Mr. Keener does not quote a market in securities.  *Id.* ¶ 17.  Mr. Keener does not quote prices for securities.  DSOF Ex. 2 ECF No. 72-3, at 225:1-4.  Mr. Keener has never participated in a selling group.  DSOF Ex. 7 ECF No. 72-9 ¶ 18; DSOF Ex. 2 ECF No. 72-3, at 228:5-7.

12.  Mr. Keener does not provide any services to investors.  DSOF Ex. 7 ECF No. 72-9 ¶ 20. He does not extend credit to any other investors.  *Id.* ¶ 21.  He does not offer any investment advice to other investors.  *Id.*

13.   Mr. Keener does not buy securities from, or sell securities to, retail investors.  DSOF Ex. 56 ECF No. 73-7, at Resp. to No. 14 (unable to cite any evidence that Mr. Keener interacted with "retail public").  Mr. Keener does not buy securities from, or sell securities to, institutional investors. *Id.* at Resp. to No. 15 (no evidence that Mr. Keener interacted with the "institutional public").

14.   Mr. Keener does not issue or originate securities.  DSOF Ex. 28 ECF No. 72-30, at -6222 (Mr. Keener is not "an issuer, underwriter or dealer"); DSOF Ex. 79 ECF No. 73-30, at -6241 (same); DSOF Ex. 57 ECF No. 73-8, at -8413 (same).  Mr. Keener does not underwrite securities. DSOF Ex 28 ECF No. 72-30, at -6220; DSOF Ex. 57 ECF No. 73-8, at -8415.

15.   Mr. Keener does not run a matched book of repurchase agreements or a book of repurchase and reverse purchase agreements.  DSOF Ex 7 ECF No. 72-9 ¶¶ 6, 29.  Mr. Keener does not write derivatives contracts.  *Id.* ¶ 23.

16.   Mr. Keener is a retail customer of the brokerage firms that execute his trades.  DSOF Ex. 65 ECF No. 73-16, at 82:17-83:8; *see, e.g.,* DSOF Ex. 78 ECF No. 73-29, at -15681 (application to open a brokerage account with Alpine).

17.   When seeking to convert, Mr. Keener would first place a request with a company's transfer Agent.  *See*, e.g., DSOF Ex. 33 ECF No.72-35, at -1772; DSOF Ex. 34 ECF No. 72-36, at -26.   At the time he made each conversion request, Mr. Keener typically provided the transfer agent with the

following information for the transfer agent to review and approve the request: DSOF Ex. 33 ECF No. 72-35, at -1779-80 (note documents); *id.* at -1778 (wire transfer activity); *id.* at -1773-74 (conversion notice); DSOF Ex. 34 ECF No. 72-36, at -41 (prior conversion requests); DSOF Ex. 33 ECF No. 72-35, at 1774 to -1775 (compliance questionnaires); *id.* at -1781-85 (share reservation information); *id.* at -1786 (confirmation brokerage firm would seek to sell stock once deposited into his brokerage account); and *id.* at -1787-89 (Rule 144 attorney opinion letters).

**18.** Once the transfer agent approved the conversion, Mr. Keener would place a request with His brokerage firm to deposit the stock into his account. *See, e.g.,* DSOF Ex. 36  ECF No. 72-38, at -1940.  Each brokerage firm partnered with a clearing firm to hold Mr. Keener's securities.  *See, e.g.,* DSOF Ex. 44 ECF No. 72-46, at -656-668 (broker facilitating communications between its clearing firm and Mr. Keener and/or his assistants).

**19.** At the time Mr. Keener requested that converted shares be deposited into his brokerage account, Mr. Keener typically provided his brokerage and clearing firms with the same information about each note conversion as the transfer agent (*see* ¶ 17, *supra*), in order for those firms to review and approve his deposit request.  *See, e.g.,* DSOF Ex. 46 ECF No. 72-48, at -7941-44, 7932-38, -7945-48, -7950-53, -7393.

**20.** The firms often charged Mr. Keener a "review fee" or "legal review fee" for this process. *See, e.g.,* DSOF Ex. 47 ECF No. 72-49, at -4422 (legal fee $895); DSOF Ex. 48 ECF No. 72-50, at -91049 ($1,000 deposit review fee).

**21.** Mr. Keener's stock would not be deposited into his brokerage account unless the transfer agent, the brokerage firm, and the clearing firm all approved the transaction.  *See, e.g.,* DSOF Ex. 47 ECF No. 72-49, at -4422 (Alpine); DSOF Ex. 52 ECF No. 73-3, at -3788 (BMA/COR ); DSOF Ex. 53 ECF No. 73-4, at -852-856 (Key West); DSOF Ex. 36 ECF No. 72-38, at -1940-1943  (VStock Transfer/BMA/COR ).

22. In connection with each conversion request, Mr. Keener obtained opinion letters from attorneys that confirmed that the conversion complied with SEC Rule 144, 17 C.F.R. § 230.144, and that Mr. Keener could sell the securities "free of restriction." *See, e.g.,* DSOF Ex. 54 ECF No. 73-5, at -8314 (concluding, after a "review of documents presented to us by the Issuer and JMJ Financial and such other corporate documents we have deemed necessary," that the "shares may be issued free of any restrictions, and may be sold free of restriction in the manner provided by Rule 144."); DSOF Ex. 55 ECF No. 73-6, at -9088 (concluding, following a review of documents, that "the above listed shares meet the criteria under Rule 144, and that all of the shares listed above may be transferred").

23. Mr. Keener also obtained opinion letters from attorneys that confirmed that he was not acting as an "underwriter," was not engaging in a "distribution" of securities, and was "not engaged in the business of dealing." DSOF Ex. 57 ECF No. 73-8, at -8415 (finding that JMJ Financial "is not engaged in the business of . . . dealing," "has not acted as a dealer," did not purchase shares to "engage in a 'distribution,'" and "should not be deemed an underwriter."); DSOF Ex. 28 ECF No. 72-30, at -6220 (finding that JMJ Financial "is not a dealer" and did not acquire the shares "with a view to distribution").

24. The SEC has not disputed that Mr. Keener complied with Rule 144 and has not disputed the accuracy of any of the opinion letters Mr. Keener obtained from attorneys in connection with his conversions and sales. *See* DSOF Ex. 56 ECF No. 73-7, at Resp. to No. 11-13 (failing to cite any evidence of a dispute regarding Rule 144 compliance and regarding the attorney opinion letters).

25. Mr. Keener had no knowledge of whether his brokerage firm acquired the stock for its own account, or sold it to an institutional investor, retail investor, or other third party. DSOF Ex. 65 ECF No. 73-16, at 83:19-86:12. If his brokerage firm sold the stock to a third party, Mr. Keener has no knowledge of what price that third party paid. *Id.* at 111:24-114:21.

Dated: August 31, 2021

Respectfully submitted,

**GREENBERG TRAURIG LLP**

*Benjamin G. Greenberg*
**Benjamin G. Greenberg**
Florida Bar No. 192732
333 SE 2nd Avenue Suite 4400
Miami, FL 33131
Telephone: (305) 579-0850
Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing

Defendant Justin W. Keener's Opposition to Plaintiff Securities and Exchange Commission's

Statement of Material Facts to the following:

> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> 100 F Street NE
> Washington, DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov
>
> *Attorneys for Plaintiff*
> *Securities and Exchange Commission*

This, the 31st day of August, 2021

/s/ *Benjamin G. Greenberg*
Benjamin G. Greenberg