UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-CV-21254-BLOOM/LOUIS

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

v.

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

            Defendant.

**DEFENDANT JUSTIN W. KEENER'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Mr. Keener respectfully submits this Reply in support of his Motion for Summary Judgment (ECF No. 71, "Mot."), filed August 13, 2021. Plaintiff Securities and Exchange Commission ("SEC") filed its Opposition (ECF No. 89, "Opp.") on August 31, 2021.

## I. INTRODUCTION

The question for the Court is clear. Can the SEC pursue a dealer registration enforcement action against a defendant for investing activity that (1) complies with decades of SEC rulemaking releases and the SEC's own directives to the public interpreting the dealer definition; (2) is consistent with an entire industry of professional investors; and (3) benefited companies and caused no harm to anyone? As a matter of law—and as a matter of fundamental fairness—it cannot.

The SEC does not dispute that its rulemaking releases, website, and no-action letters direct the public to interpret the dealer definition in the Exchange Act, 15 U.S.C. § 78c(a)(5), by taking into account all of the facts and circumstances, and analyzing them against many factors that hinge on whether a person has customers and offers services to the investing public. Yet it tells this Court that a dealer is nothing more than a person who buys and sells securities for a living. It does not try to reconcile these statements, because it cannot. They are in direct contradiction.

This Court should reject the interpretation of the dealer definition the SEC advances in this case because it would silently abrogate the trader exception in the statute and render millions of unregistered ordinary investors and financial firms in violation of the law. The SEC attempts to avoid this problem by arguing that Mr. Keener is different from other traders because he invested in convertible notes in the microcap industry and converted and sold shares from those notes. But the SEC never explains why this fact matters—why someone who invests in convertible notes should be deemed a dealer rather than a trader, especially since Mr. Keener always held these investments for six months or more.

1

For purposes of the dealer/trader distinction, the type of stock Mr. Keener invested in is irrelevant. Instead, what is relevant is that Mr. Keener invested his own money and did not provide services to anyone. This shows he is a trader, not a dealer. The SEC has never identified any registered dealer who fits that description. To the contrary, Mr. Keener has shown that all registered dealers have customers and interact with the investing public. Nor has the SEC identified any aspect of Mr. Keener's activities that would have been different had he been registered or any person that has been harmed by Mr. Keener's investments. Nothing the SEC has put forward changes the clear and common-sense result that Mr. Keener is not a dealer. Mr. Keener's Motion should be granted.

II.     **ARGUMENT**

    A.     **The SEC Misstates the Law.**

The SEC demands that the Court ignore every word the SEC has previously said about the Exchange Act's dealer definition. *See, e.g.*, Opp. at 1, 8, 9, 11, 14. The SEC asks the Court to ignore the SEC's Guide to Broker-Dealer Registration and all of its prior no-action letters addressing dealer registration questions not because they misstate the law (they do not), but rather because the Court is not "bound" by them. *Id.* at 9. This Court should reject the SEC's cynical attempt to win this case by ignoring its own past statements to the public. It cannot be the law that the SEC is free to direct the public to consider the exact same factors that it demands this Court ignore.

Moreover, the SEC's brief does not address its rulemaking releases that are directly on point—refusing to make explicit its implicit position that its own releases are not to be trusted. In the SEC's own words from its rulemaking releases, here are the activities that turn a person into a dealer under the Exchange Act:

- **1975**: "A bank which buys and sells municipal securities solely for investment for its own account . . . will not generally be classified as a dealer, even though such purchases and sales are made with some frequency. . . . The Commission believes that **it was not the intent of Congress that every bank engaged in such investment-type activity register as a dealer.** In the view of the Commission, activities which may subject a bank to the registration requirements of the Act

applicable to municipal securities dealers . . . are as follows: (1) underwriting, which includes participation [in] a syndicate or joint account for the purchase of municipal securities; (2) maintaining a trading account in municipal securities; (3) advertising or listing as a dealer in professional publications such as Standard & Poor's *Blue List of Current Municipal Offerings*, the Bond Buyer's *Directory of Municipal Bond Dealers of the United States*, or Polk's *World Bank Directory*, or advertising in publications of general circulation as a dealer in municipal securities; or (4) otherwise holding itself out to other dealers or to investors as a dealer in municipal securities." SEC Release No. 34-11742, 1975 WL 163406, at *3 (Oct. 15, 1975) (emphasis added).[1]

- **1998**: Activities that "cause [a person] to be a 'dealer' as defined in Section 3(a)(5) of the Exchange Act" include "(1) purchasing or selling securities as principal from or to customers; (2) carrying a dealer inventory in securities . . . (3) quoting a market in or publishing quotes for securities . . . (4) holding itself out as a dealer or market-maker or as otherwise willing to buy or sell one or more securities on a continuous basis; (5) engaging in trading in securities for the benefit of others . . . (6) providing incidental investment advice with respect to securities; (7) participating in a selling group or underwriting with respect to securities; or (8) engaging in purchases or sales of securities from or to an affiliated broker-dealer except at prevailing market prices." SEC Release No. 34-40594, 1998 WL 745950, at *15 n.61 (Oct. 23, 1998).

- **2002:** "As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), **and generally transact a substantial portion of their business with investors** . . . . In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities." SEC Release No. 34-46745, 2002 WL 31428622, at *6 (Oct. 30, 2002) (emphasis added).

- **2012**: Dealers "normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of inventory (or participate in the sale or distribution of new issues, such as by acting as an underwriter), and generally provide liquidity services in transactions with investors." Other factors "that are relevant for distinguishing between dealers and non-dealers can include receipt of customer property and the furnishing of incidental advice in connection with transactions." SEC Release No. 34-66868, 2012 WL 1453850, at *6 n.31 (Apr. 27, 2012).

All of these releases interpret the dealer definition as requiring a totality of the facts and circumstances analysis that depends on up to a dozen factors. Not one of these releases

---

[1] The Release concerns the definition of a "municipal securities dealer," which "incorporates language found in the definition of a 'dealer' in section 3(a)(5) of the [Exchange] Act and thus traditional concepts of what constitute dealer activities." *Id.*

3

characterizes a dealer as simply a person who buys or sells a lot of securities to make a living, as the SEC proposes now.[2]

Indeed, that is why in virtually all of the cases the SEC cites, the analysis was based on the dealer factors. For instance, in *Sodorff*, the Commission found the defendant was a dealer because he "solicited investors and handled their money and securities, rendered investment advice, and sent subscription agreements to investors for their review and signature, all of which are characteristics of dealer activity. These factors distinguish the activities of a dealer from those of a private investor or trader." *In re Gordon Wesley Sodorff, Jr.*, 1992 WL 224082, at *4, n.27 (Sept. 2, 1992). Mr. Keener did not do any of these things—he did not solicit investors, handle their money or securities, render investment advice, or send anyone subscription agreements. *See* Def.'s Statement of Facts ("DSOF") ECF No. 72, ¶¶ 8, 77, 79; Def.'s Opp. to Pl.'s Statement of Facts ("Counterstatement" or "CSOF") ECF No. 91, ¶ 37. Accordingly, *Sodorff* supports Mr. Keener, not the SEC.

The district court in *Big Apple* also applied dealer factors. The court held that the SEC "has promulgated guidelines to help determine whether someone is acting as a dealer or not. These guidelines provide, among other things, that a business may need to register as a dealer if it holds itself out as being willing to buy and sell a particular security on a continuous basis. . . . Big Apple and MJMM undoubtedly *held themselves out as being willing to buy and sell CyberKey stock on a regular basis.*" *SEC v. Big Apple Consulting*, 2011 WL 3753581, at *9 (M.D. Fla. Aug. 25, 2011) (emphasis added). By contrast, Mr. Keener did not hold himself out as willing to buy and sell the stock of any particular issuer on a continuous basis. CSOF ECF No. 91, at Additional Facts ¶ 11.

---

[2] These Releases are also consistent with the dealer definition in the 1934 Exchange Act and the contemporaneous understanding of dealers. *See* Def.'s Opp. to Pl.'s Mot. for Summ. J. ECF No. 90, at 7-8. The SEC does not dispute that in 1934, dealers were understood as market makers and firms that provided financial services to customers. Instead, the SEC argues the Exchange Act rejected that understanding, but it cites no authority to support this illogical interpretation. Opp. at 8-9.

The SEC's final case, *Eastside Church*, is a 1968 case about church bonds that does not apply the dealer factors, but is inapposite because it predates all of the SEC rulemaking releases and other guidance on the dealer definition. In *Eastside Church*, a middleman had stolen church money, promising to promote church bonds to investors but instead kept the money for himself. *Eastside Church of Christ v. Nat'l Plan*, 391 F.2d 357, 360 (5th Cir. 1968). The court held that the churches could recover the stolen money under a theory that the middleman was an unregistered broker-dealer, with a cursory, one-sentence analysis of the dealer definition. *Id.* at 361. The SEC argues Mr. Keener is a dealer based on the bare-bones analysis in *Eastside Church* because he purchased securities for his own account and sold some of them. Opp. at 7. But that interpretation is undermined by decades of SEC statements that post-date this case and demonstrate that this is trader activity. Not to mention *Eastside Church* is fundamentally different because it involved fraud, which is not at issue here.

### B.   The SEC's Immaterial Facts Do Not Defeat Summary Judgment.

The SEC has admitted that Mr. Keener does not meet the factors that it has, for decades, said are key to determining whether someone is a dealer. It has admitted that Mr. Keener is not a market maker and does not provide services to investors. DSOF ECF No. 72, ¶¶ 73-74, 77. It has admitted the only "retail" or "institutional" public Mr. Keener "does business with" are the brokerage firms that hold his own accounts. *Id.* ¶¶ 80-81. And it has admitted he never participated in a selling group, ran a matched book of repurchase agreements, lent securities to anyone, or engaged in any of the other activities that by the SEC's own guidance turn an ordinary investor into a dealer. CSOF ECF No. 91, at Additional Facts ¶¶ 11-15.

Instead, the SEC's case focuses on volume. *See* Opp. at 2, 6, 7, 14, 17 (repeatedly referring to the number of companies Mr. Keener invested in or the number of shares he sold). But volume is irrelevant, as the SEC itself has said on many occasions. Def.'s Opp. to Pl.'s Mot. for Summ. J.,

5

ECF No. 90 at 16-17. Bolding and italicizing the number of investments Mr. Keener made or the number of shares he sold does not make those facts relevant. If volume was relevant, the Guide would mention it. It does not. Nor should the Court grant the SEC's request to adopt a new, ill-defined "volume" factor as relevant to the dealer analysis. What is the volume threshold that must be crossed to turn an ordinary investor into a securities dealer? The SEC never says. Not to mention the SEC's volume figures are based on an analysis the SEC directed its in-house economist to prepare but refused to turn over in discovery. *See* Def.'s Reply in Supp. of *Daubert* Mot., ECF No. 94, at 9-10. That analysis is riddled with flaws and should be excluded in its entirety. *Id.*

The SEC's second claim is that because Mr. Keener sold newly issued stock, he became an underwriter, and thus became a dealer. Opp. at 2, 7, 14, 16, 17, 19, 24. Not so. First, the word "underwriter" does not appear in the Exchange Act dealer definition. *See* 15 U.S.C. § 78c(a)(5). Instead, the SEC asks the Court to apply the one dealer factor that refers to underwriting but ignore all others. This request is improper and the Court should instead apply all the dealer factors in their totality. Moreover, Mr. Keener is not an underwriter as a matter of law. SEC Rule 144 sets forth conditions that, if met, mean that someone is not an underwriter. 17 C.F.R. § 230.144; *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 757 (S.D.N.Y. 2018) ("In connection with the status of underwriter, the SEC has provided a safe harbor. If a seller of securities demonstrates compliance with SEC Rule 144, then that seller is not deemed an underwriter with respect to those securities."). The SEC concedes that Mr. Keener complied with Rule 144, and that he therefore qualified for the safe harbor. DSOF ECF No. 72, ¶ 48; CSOF ECF No. 91, at Additional Facts ¶ 24.[3]

The SEC's third tactic is to fundamentally alter the purpose of the dealer registration requirements from that of **protecting customers and investors**, to that of **protecting companies**.

---

[3] Unlike Mr. Keener, the defendants in *Big Apple* had not complied with Rule 144 and were deemed underwriters. *SEC v. Big Apple Consulting*, 783 F.3d. 786, 807-809 (11th Cir. 2015).

The SEC refuses to read the dealer factors in its own guidance as written and as intended—to address advertising to investors, quoting prices to investors, and otherwise interacting with investors. *See, e.g.*, *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (purpose of registration is "to protect prospective **purchasers** of securities . . . . [and] ensure that securities are only sold by a salesman who understands and appreciates . . . his responsibilities **to the investor to whom he sells**") (emphasis added). Instead, the SEC asks this Court to interpret those factors to encompass communications **with companies** that were not directed to investors at all, even though there is no case law or guidance suggesting such communications could be relevant. Opp. at 15 (failing to cite a single authority for any of these points). Not to mention, the companies benefited from Mr. Keener's investments, and used his money to fund their operations, while Mr. Keener assumed the risk that he might not generate any return.

Similarly, the SEC argues the companies Mr. Keener invested in were his "clients" and that this basically means the same thing as "customers," so Mr. Keener had "customers." Opp. at 4, 8-10, and n.3. That is false. A "customer" is one "who purchases . . . a good or service." *BNY Mellon Capital Markets, LLC v. Paone*, 2019 WL 8362167, at *2-3 (S.D. Fla. Dec. 26, 2019) (explaining FINRA customer definition). But the companies Mr. Keener invests in do not purchase anything from him. The SEC's own Guide makes the distinction between customers and clients clear. The word "customer" appears in it **89 times** because there are extensive regulations governing broker-dealer interactions with their "customers," for instance requirements that broker-dealers "execute orders promptly," "disclose . . . information the customer would consider important as an investor," and "charge prices reasonably related to the prevailing market." Guide § V.A.1. None of these requirements could apply to Mr. Keener's interactions with companies. By contrast, the word "client" appears only once in the Guide, to describe the activities of a "finder." *Id.* § II.A.

7

The SEC also contorts other factors to fit the facts—claiming that because Mr. Keener tweeted a few times about his QuickLoan investments, that demonstrated his willingness "to buy and sell [a] particular security on a continuous basis." Opp. at 15. But the SEC's own case undermines that interpretation—the question is not whether he ever told anyone about his willingness to make a particular type of investment; it is whether he advertised his willingness to buy and sell the securities *of a particular issuer on a continuous basis* and thus make a market in that security. *See, e.g., Big Apple*, 2011 WL 3753581, at *9-10 (finding defendants met this factor because they "held themselves out as being willing to buy and sell CyberKey stock on a regular basis"). The record is clear Mr. Keener never did any such thing. *See* DSOF ECF No. 72, ¶¶ 73-74.

Grasping at straws, the SEC's final stratagem is to invent a brand-new allegation in hopes of creating a purported dispute of fact. Mr. Keener is a dealer, the SEC now claims, because he "provid[ed] liquidity" to companies. Opp. at 13. In plain English, that is exactly what every investor does—provide funding to companies in hopes of generating a return. It is not a "service" to an issuer (Opp. at 13) that is relevant to the dealer analysis.

### C. The SEC's Claims are Barred by a Lack of Fair Notice.

There is no dispute that the SEC's current litigation position contradicts decades of SEC guidance (which is why it argues the Court should ignore that guidance). The SEC argues Mr. Keener nevertheless had fair notice because of one line in *Big Apple* that interpreted the phrase "'business of' buying and selling securities" from the Securities Act of 1933, to include everyone whose "occupation or employment" involves buying and selling securities. *Big Apple*, 783 F.3d at 809. Thus, the SEC claims, Mr. Keener should have known that he fit within the Exchange Act dealer definition because he buys and sells securities for a living. Opp. at 2, 21, n.7.

*Big Apple*'s interpretation of "business" could not have given Mr. Keener fair notice of the Exchange Act dealer definition because it (1) is an interpretation of the Securities Act; and (2) is

8

directly at odds with all SEC guidance and case law on the Exchange Act dealer definition. If it was the law that everyone who buys and sells securities for a living is a dealer, the SEC would have taken down the Guide because not a single dealer factor would be necessary to the analysis. Further still, this interpretation is at odds with the understanding of the "business of dealing" that existed at the time the statute was enacted, namely the business of buying and selling stocks to customers from the investing public. *See* Def.'s Opp. to Pl.'s Mot. for Summ. J. ECF No. 90 at 7-8. There is a reason why millions of day traders and other professional investors are not registered securities dealers, even though they would fit within *Big Apple*'s interpretation of "business."[4]

### D. The SEC's Disgorgement and Injunctive Relief Requests Should be Dismissed as a Matter of Law.

There is no genuine dispute that Mr. Keener's transactions caused no harm to anyone. To the contrary, his investments benefited companies in need of funding. *See* Mot. at 25-28. And he sold stock to sophisticated market makers and broker dealers. *Id.* There is no evidence that any market participant lost money as a result of Mr. Keener's investments. *Id.* Nor is there any allegation that a single aspect of Mr. Keener's activities, including any proceeds he obtained, would have been different had he been registered. *Id.*

The SEC claims that none of this matters to its demands for $20 million or more in disgorgement and injunctive relief. The SEC argues it is entitled to disgorgement even if not a single person was harmed by Mr. Keener's stock sales. Opp. at 25. But the U.S. Supreme Court has rejected this argument. *Liu v. SEC*, 140 S. Ct. 1936, 1940, 1948 (2020) (holding "disgorgement

---

[4] The SEC's citation to *FTC v. Wyndham* does not help its case. Opp. at 22. In that case, the defendant asked the court to *ignore* all prior agency statements about the governing law and find a statute unconstitutionally vague *despite* many agency statements about its interpretation, including an agency guidebook that specifically directed the defendant to take actions it failed to take. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255-57 (3d Cir. 2015) (finding fair notice when FTC guidebook "counsel[ed] against many of the specific practices alleged here"). Here, by contrast, the SEC is the one asking the court to ignore its own prior guidance.

award" permissible equitable relief under the Exchange Act if it "is awarded for victims" and finding "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large"); *see also* Def.'s Reply in Supp. of Mot. *in Limine* ECF No. 95, at 2-5 (showing that courts since *Liu* have upheld disgorgement only where the SEC demonstrated an ability to return disgorged funds to harmed investors). Because it has not identified any harm caused to anyone, the SEC's request for disgorgement must fail. The same is true for the SEC's request for injunctive relief—the SEC concedes it has not demonstrated harm to anyone, and thus this remedy is unavailable as a matter of law. *See, e.g.*, *SEC v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019) ("[T]he most basic rule of preventive injunctive relief [is] that the plaintiff must show a cognizable risk of future harm.").

### III. CONCLUSION

Mr. Keener respectfully submits that the dealer factors apply, and that this Court has already decided as much. The question for the Court now is whether the SEC can distort the factors and the factual record to defeat summary judgment. As a matter of law, it cannot. Mr. Keener has no customers and does not interact with the investing public. There are many investors like him, including those who invest in convertible notes, convert those notes into shares, and sell those shares in the public market, who are not registered as dealers. And of the more than 3,000 currently registered dealers, none bear any resemblance to Mr. Keener—none trade solely for their own account without providing any services to customers. Mr. Keener respectfully requests that his Motion be granted and the SEC's case dismissed.

Dated: September 7, 2021               Respectfully submitted,

                                       **GREENBERG TRAURIG LLP**

                                       */s/ Benjamin G. Greenberg*
                                       **Benjamin G. Greenberg**
                                       Florida Bar No. 192732
                                       333 SE 2nd Avenue Suite 4400
                                       Miami, FL 33131
                                       Telephone: (305) 579-0850

Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

11

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing Defendant Justin W. Keener's Reply in Support of His Motion for Summary Judgment to the following:

Joshua E. Braunstein (Special Bar No. A5502640)
Antony Richard Petrilla (Special Bar No. A5502641)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov
Petrillaa@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*

This, the 7th day of September, 2021

*/s/ Benjamin G. Greenberg*
Benjamin G. Greenberg