IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JUSTIN W. KEENER D/B/A JMJ FINANCIAL, | ) ) | No. 20-cv-21254 |
| Defendant. | ) ) ) | Hon. Beth Bloom |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY TO
<u>DEFENDANT'S OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT</u>**

# **INTRODUCTION**

Defendant claimed in his Motion for Summary Judgment that he is not a dealer and that "there is no genuine dispute as to any material fact" as to that issue. DE 71 at 8. Now, after the SEC has established in its Motion for Summary Judgment, that the undisputed facts show he is operating as an unregistered dealer, Defendant completely changes course and asserts that the *very same* "record is replete with disputed facts." DE 90 at 2. According to the plain language of the statute and the controlling case law, the undisputed facts establish that Defendant operated JMJ Financial as a commercial enterprise, the sole purpose of which was to generate profits from selling stock converted from the numerous convertible notes he and his employees bought from more than a hundred penny stock issuers. Defendant is, as a matter of law, an unregistered dealer.

Defendant's repeated and reworked Due Process arguments have not improved over time. He now admits that the statute is not vague or ambiguous. This alone substantially undermines his claim. He also reiterates his unpersuasive argument that in suing him, the SEC has somehow contradicted prior guidance. This is more of an impermissible estoppel claim than a serious fair notice argument. Moreover, the Guide to Broker-Dealer Registration ("Guide") states on its face that it is not a source of law and that the law controls.

Defendant finally asserts that the statute of limitations had expired when the SEC filed its complaint because it had a "complete and present cause of action" as early as 2010—an argument that the *Almagarby* court expressly rejected. *See SEC v. Almagarby,* 479 F. Supp.3d 1266, 1270-71 (S.D.Fl. 2020). The statute of limitations offers no protection for continuing violations of the law. *Id.* Where, as here, Defendant continued his dealer operations during the limitations period, the SEC's action is timely under both 28 U.S.C. § 2462 and Section 21(d)(8) of the Exchange Act (and as extended by the one-year tolling agreement Defendant signed). (The parties agree that, for purposes of determining *liability*, the Relevant Period is "from at least January 2015 through January

2018. *See* DE 30 at ¶¶ 2, 8 (hereinafter "Answer").)

The Court should grant the SEC's motion for summary judgment as Defendant operated an established and prolific convertible notes business through which he purchased convertible notes and sold newly issued securities into the public market, he was not registered as a dealer, and, as a matter of law, he violated Section 15(a) of the Exchange Act.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the parties have filed cross-motions for summary judgment and do not actually disagree as to the facts, summary judgment should be entered in favor of the party that establishes, as a matter of law, that Defendant was an unregistered dealer in violation of Section 15(a). *See Almagarby,* 479 F.Supp.3d at 1270 *(citing Clark v. Coates & Clark Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). To the extent Defendant now has changed his position and asserts that material facts are in dispute, he must "set forth specific facts showing that there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Defendant has failed to meet his burden.

## UNDISPUTED FACTS

Defendant does not dispute *any* of the following facts: He does business under the "fictitious name" JMJ Financial (registered in Florida in 2008). DE 88 at ¶ 4 (Defendant's Opposition Statement of Facts ("DSMF")). He had offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico. *Id.* at ¶ 5. Defendant spent $1,997,248 in 2014, $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017 on employee payroll. *Id.* at ¶ 7.

Defendant has never registered with the SEC as a securities dealer. *Id.* at ¶ 2. He bought securities in the form of convertible notes from issuers from at least January 2015 through January 2018. Answer at ¶¶ 2, 8. He personally negotiated the terms for these convertible notes and signed

2

the contracts. DSMF ¶ 9. He converted the notes to stock of the issuer. Answer ¶ 2 ("Defendant further admits that he converted more than 100 such notes from more than 100 different microcap issuers during the Relevant Period."); *id.* at ¶ 8; DSMF ¶ 29. He received stock from these conversions at a discount to the prevailing market price. DSMF ¶ 15 (Keener stated convertible notes from 2014 to 2016 generally had a "10 percent discount to 40 or 50 percent discount"). The converted stock was newly issued. DE 71 at 22 (Def. MSJ) ("Convertible notes are, by definition, a way for new stock to come into the market."). He sold "billions" of shares of that converted stock in the market. Answer ¶¶ 1, 2, 8, 18; *see also* DSMF ¶¶ 30-33.

Defendant advertised his interest in buying convertible notes. From at least 2015 through 2017, he operated a website that described a type of convertible note that he was willing to purchase called a "QuickLoan." DSMF ¶¶ 11, 44. He issued press releases that made statements such as "JMJ Financial's primary investment vehicle, the QuickLoan, allows small publicly-traded companies the ability to access up to $500,000 utilizing a simple two-page promissory note" and "Keener and JMJ Financial have committed $20,000,000 to unsecured investments in 2016." *Id.* at ¶ 54. He had employees who contacted "hundreds" of companies to inquire whether they could sell him convertible notes. *Id.* at ¶¶ 50, 64.

Defendant sponsored and, with his employees, attended approximately 10 industry conferences in 2016 to "network[]" and meet "companies who are seeking investors." *Id.* at ¶ 51, 53. He hosted a dinner at Nobu Restaurant in Las Vegas for 24 "brokers and finders" on April 13, 2015. *Id.* at ¶ 56. He held a "Partner Seminar" at the Wynn Hotel in Las Vegas on August 14, 2015. *Id.* at ¶ 58. He held a "Broker and Finder Seminar" at the Wynn Hotel on April 8, 2016, where he covered all expenses for attendees, including the cost of accommodations and airfare. *Id.* at ¶ 59. At both Wynn Hotel events, he made a presentation that included a notarized affidavit of his CFO Conrad Nagel stating that JMJ Financial had "in excess of $20,000,000 in liquid cash and cash

3

equivalents that is immediately available for investment into small cap emerging companies." *Id.* at ¶ 60. He took business deductions of $103,399, $101,701, and $67,407 on his 2014, 2015 and 2016 federal tax returns for the costs of sponsoring and sending his employees to industry conferences as well as sponsoring JMJ-branded conferences. *Id.* at ¶ 63. He also sent issuers branded "JMJ Financial" coffee mugs and jelly beans. *Id.* at ¶ 66.

## ARGUMENT

### A.    The Undisputed Facts Show That The SEC Is Entitled To Summary Judgment

Despite arguing in his Motion for Summary Judgment that "there is no genuine dispute as to any material fact" (DE 71 at 8), Defendant now asserts *at least a dozen times* that, *the same factual record*, is replete with disputed facts. (DE 90 at 2, 4, 12, 14, 15, 17-19, 22-23, 25-26, 30). Contrary to Defendant's change in position, the undisputed material facts set forth above, are more than sufficient to demonstrate that he violated Section 15(a)(1) of the Exchange Act by not registering with the SEC as a dealer. The Court should apply the plain language of the statute and the controlling precedent in the Eleventh Circuit, *Big Apple* and *Eastside Church*.[1] The result would be the same even if the Court were to apply only factors from SEC Guide, as Defendant urges it to do. *See* SEC Opp. Def. MSJ, DE 89 at 14-20.

Defendant continues to insist that the factors contained in the Guide are the law[2] and claims that the SEC "ignores the content, purpose, or actual language of the statute." DE 70 at 7-8. To

---

[1] *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809-10 (11th Cir. 2015); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 361-63 (5th Cir. 1968).

[2] In asserting that the factors supplant the plain language of the statute and the controlling case law interpreting it, Defendant continues to rely, erroneously, on cases that defer to an agency's interpretation of its own *regulations*. DE 90 at 10 (citing *El Badrawi v. U.S.*, 787 F.Supp. 2d 204 (D.Conn. 2011); *Summit Petroleum v. EPA*, 690 F.3d 793 (6th Cir. 2012). These two additional cases are inapposite. Where, as here, a court is interpreting a federal statute, and not an agency regulation, the plain language controls, *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990). The Court not the agency is the ultimate arbiter of the statutory language. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251 (3d Cir. 2015) (citing *Skidmore v. Swift & Co.* 323 U.S. 134, 140 (1944).

the contrary, the SEC has consistently applied the plain language of the statute that defines a dealer as "any person **engaged in the business** of buying and selling securities … for such person's own account through a broker or otherwise." 15 U.S.C. §78o(a)(1). The Eleventh Circuit defines the operative phase "engaged in the business" as a "commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*." *Big Apple*, 783 F.3d at 809 (emphasis in original). A dealer is one whose "*entire* business model was predicated on the purchase and sale of securities," "where they bought 'stocks at deep discounts' by contractual agreement" and "then resold those stocks for profit." DE 29 at 9-10 (order denying motion to dismiss) (quoting *Big Apple*, 783 F.3d at 809-10) (emphasis in original).

It is undisputed that Defendant bought numerous convertible notes, converted them into stock, and sold the shares in the market to earn profits. Answer ¶¶ 1, 2, 8, 18; DSMF ¶¶ 29-33. In his own words, he "converted more than 100 [convertible] notes from more than 100 different microcap issuers" over a three year period and sold "billions" of the resulting shares into the market. Answer ¶¶ 1, 2, 8, 18; *see also* DSMF ¶¶ 30-33. Defendant acquired stock directly from the issuers at a substantial discount to the prevailing market price pursuant to the contract terms of the convertible notes. DSMF ¶ 15 (discounts ranged up to 50%).³ These facts make clear that Defendant operated a commercial enterprise through which he purchased and sold securities for livelihood or gain, and at no point in this case has he even *suggested* otherwise. Except for operating a *much larger* securities business, he is no different than the dealer-defendant in *Almagarby*. *See* 479 F.

---

³ Defendant erroneously claims that there is no authority, *other* than *Big Apple*, for the proposition that obtaining discounted stock from the issuer is indicative of dealer activity. DE 90 at 19. The SEC has consistently cited *In the Matter of Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *4-5 (Sept. 2, 1992), in which the court considered discounts in finding the defendant was a dealer t*wenty-nine years ago, see* 1992 WL 224082, at *5. Other courts have done so more recently as well. *See SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 858-59 (N.D. Ill. 2019) (finding it "particularly significant" that defendant purchased stock directly from the issuers at a discounted price); *Almagarby*, 479 F. Supp. 3d at 1272 (same).

5

Supp. 3d at 1268 (MEG, Almagarby's company, "simultaneously obtained convertible debentures or convertible notes … from the Issuers whose debt MEG had agreed to purchase, which gave MEG the right to convert the convertible debentures, or any portion of them, into discounted shares of the Issuer").

Defendant alleges that none of the facts that the SEC relies upon to show that he meets the operative language of the statute—"engaged in the business" —are relevant. DE 90 at 13-16. Rather than dispute these facts, Defendant claims "there is no basis in the law" for even considering that he "rented office space" in three separate locations; "had employees and contractors;" advertised his services on the internet and at conferences; engaged in a significant volume of transactions; and "created a computer system to find, manage, and account for investments." *Id.* Similarly, Defendant insists that whether these activities make him a dealer is an issue for the jury. *Id.* He is incorrect. The plain language of the statute, "engage in the business," makes these undisputed facts and others relevant and allows the Court to determine that Defendant, as a matter of law, was operating as an unregistered dealer. The strict application of the law to the undisputed facts is appropriate for summary judgment. *See Almagarby*, 479 F.Supp.3d at 1279.

Separately, Defendant challenges whether the distribution of newly issued securities into the market is relevant to the inquiry. DE 90 at 17. Defendant does not dispute that the stock he sold from convertible notes was newly issued. DE 71 at 22 (Def. MSJ). As he put it, "[c]onvertible notes are, by definition, a way for new stock to come into the market." *Id.* Courts and the SEC have found this practice to be relevant. *See, e.g., River North*, 415 F. Supp. 3d at 858 (finding it "particularly significant" that…like an underwriter, River North purchased stocks at a discounted price directly from numerous issuers…(instead of purchasing stocks already in the marketplace, like a trader)" and "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price") (citing *Sodorff,* 1992 WL 224082, at *5 ("Unlike an investor

or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid.")).

Defendant attempts to confuse the Securities Act and the Exchange Act by claiming that he was not an underwriter by virtue of his compliance with Rule 144, which is a "safe harbor" against underwriter status for the purpose of reselling unregistered securities in the market. DE 90 at 17. While the Rule freed him from having to file a registration statement before selling stock from notes, it did not change the fact that he still participated in the "sale or distribution of new issues."[4]

Defendant attempts to distinguish *Big Apple* on two grounds: (1) that the case is "silent . . . on whether it is relevant that the stock was acquired 'directly from the issuer'"; and (2) that *Big Apple* interpreted the definition of dealer under the Securities Act of 1933 and not the Exchange Act, so its holding is mere *dicta*. DE 90 at 20-21. First, *Big Apple* was far from silent about the relevance of acquiring stock directly from the issuer: The court stated, "As further evidence of their dealer status, Big Apple and MJMM **purchased CyberKey stocks** at deep discounts **pursuant to its contractual agreement with CyberKey** and then sold those stocks for profit." 783 F.3d at 809-10 (emphasis added). Second, this Court has already dispensed with the argument that *Big Apple*'s treatment of the definition of "dealer" does not concern the Exchange Act. *See* DE 29 at 10 n. 2. Defendant's effort to distinguish *Almagarby*—on the ground that the defendant there "did not obtain convertible notes directly from the issuer" (DE 90 at 20)—is equally unavailing, and rests on an incorrect reading of the case. *See Almagarby*, 479 F. Supp. 3d at 1268 (Almagarby's company "obtained convertible debentures or convertible notes … from the Issuers").

Defendant erroneously claims that the SEC's motion should be denied because it cannot

---

[4] *See* Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, SEC Rel. No. 34-47364, 2003 WL 328058, at *4 (Feb. 13, 2003) (emphasis added). Indeed, the Commission stated explicitly that having an exemption from registration, such as that under Rule 144, would not necessarily change its view of the seller's status as an underwriter and thus a dealer. *Id.* at n. 21.

7

meet the factors in the Guide. DE 90 at 10-11. Even if the Court were to apply *only* the factors set forth in the Guide, in lieu of the plain language of the statute, he would fare no better. As this Court has observed, the Guide indicates that a person may need to register as a dealer if they meet even one factor. *See* DE 29 at 7.[5] As the Court noted, Defendant held himself out to the public as being willing to buy convertible notes at a regular place of business. *See* DE 29 at 9.

Defendant asserts that this factor required him to advertise not only that he bought securities, but that he also *sold* them. DE 90 at 11. This is an overly narrow reading of the factor, not to mention the statute.[6] Still, he made clear his intent to sell in at least two ways. First, his website stated that he would work with issuers on "Registered Financings," through "registration statements filed by the issuer." DE 67-9 at 13; *see* DSMF ¶ 43. The purpose of a "registration statement" is to sell securities to the public. *See* 17 C.F.R. § 239.11 (registration statement on Form S-1). Second, and more compelling still, Defendant promised "[g]entle conversions and equity sales over time" to reassure issuers that he would not convert all the notes to equity and sell all the shares at once.[7] *See* DE 72 at 133:23-135:8 (Keener Dep.).

Defendant is a dealer, as a matter of law, whether the Court applies the plain language of the statute, the controlling precedent, or one or more factors set forth in SEC staff guidance.

**B.     Defendant's Due Process Argument Fails**

Defendant continues to insist that he lacked fair notice of the law, but no longer even

---

[5] *See also River North*, 415 F. Supp. 3d at 858 (the factors are "neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion").

[6] Of course, advertising that one is interested in buying convertible notes effectively advertises that one will sell the stock that results from them after conversion. *See* DE 72-26 at 104:10-17 (Defense expert stated that Defendant plays a role in distributing shares of issuers he deals with to the public).

[7] "Gentle conversions" was a major selling point for Defendant that appeared in his PowerPoint presentations to finders (DE 72-2 at 386, 396, 402, 406), as well as in the form letters and scripts in his Loan Servicing Manual, which included the references that JMJ would "endeavor to be very graceful and gentle in our stock liquidations." DE 72-2 at 486; *see also id.* at 484.

implies that the statutory language is vague or ambiguous. DE 90 at 23. Defendant accordingly makes no attempt to meet the requirements of challenging the clarity of any statute. *See City of South Miami v. DeSantis*, 408 F. Supp. 3d 1266, 1303 (S.D. Fla. 2019) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.7 (1982). Thus, his claim must fail.

Instead, Defendant returns to his original, and seriously flawed, Due Process fair notice argument that in suing him, the SEC has somehow abandoned and now "*directly contradicts* its prior guidance." DE 90 at 23. The SEC has fully responded to this argument and asks that the Court incorporate its prior arguments here, including from its opposition to Defendant's motion for summary judgment. DE 89 at 20-24; *see also* DE 97 at 2-5. At bottom, Defendant's quarrel with this case turns, not on the objective notice requirement, but on Defendant's mistaken belief that he has been singled out. In other words, this is no more than an impermissible, estoppel argument masquerading in due process garb. *See* DE 89 at 23.

**C.      The Statute of Limitations Does Not Bar The SEC's Complaint**

Defendant claims that penalties and disgorgement are time-barred under 28 U.S.C. § 2462 because the new limitations periods specified in the National Defense Authorization Act for Fiscal Year 2021 ("NDAA") do not apply to this case and the tolling agreement that he signed is ineffective because Section 2462 is jurisdictional and cannot be waived. DE 90 at 26-27; *see* NDAA, Pub. L. No. 116-283 (2021). He also asserts that under *Gabelli v. SEC*, 568 U.S.C. 442, 448 (2013), the statute began to run as early as July 2010, when the SEC had a "complete and present cause of action." *Id.* at 27. Defendant is mistaken.

Even assuming that the NDAA and Defendant's tolling agreement do not apply—and they do—the SEC's action was timely filed. The SEC filed its Complaint on March 24, 2020. Under Section 2462, the SEC is entitled to relief for conduct that occurred on or after March 24, 2015. The SEC's complaint charges conduct from "at least January 2015 through January 2018" and,

9

therefore, is not time barred. DE 1 at 1. Defendant claims that the statute of limitations began to run "more than five years before the Complaint was filed" because he was conducting operations as early as July 2010. DE 90 at 29. The *Almagarby* court addressed the same "first accrual" argument and soundly rejected it, reasoning that so long as "at least some [of] the violative conduct occurred within the limitations period," Section 2462 does not preclude relief. 479 F.Supp.3d at 1271. Defendant admits that he engaged in his convertible note business as late as January 2018, which was 26 months before the SEC filed its Complaint. *See* Answer ¶¶ 2, 8. The SEC's cause of action thus had not expired when it filed the Complaint.

Defendant erroneously insists that because his action was time barred at the time the Complaint was filed—and it was not—the NDAA cannot revive the claim. Because the SEC's claim was timely at the time the Complaint was filed, *Berman v. Blount Parrish & Co.*, 525 F.3d 1057, 1058-59 (11th Cir. 2008) does not apply, and the limitations periods in the NDAA apply to this case. *See* DE 68 at 27-28 (SEC MSJ listing the applicable statute of limitations under the NDAA).

Finally, Defendant contends that his signed tolling agreement does not preserve an extra year of violative conduct—from March 24, 2014 to March 24, 2015—because Section 2462 is a jurisdictional statute. DE 90 at 20 (citing *SEC v. Graham*, 21 F. Supp. 3d 1300, 1308-11 (S.D. Fla. 2014)). Undermining this position, the Eleventh Circuit declined to adopt the district court's conclusion in *Graham* that Section 2462 is jurisdictional. *SEC v. Graham*, 823 F.3d 1357, 1360 n.1 (11th Cir. 2016). Further, the *Graham* district court held that the Court could not enlarge the statute of limitations based upon the "discovery rule"; not that the parties could not agree to toll the statute of limitations. 21 F. Supp. 3d at 1308-11; *see also SEC v. Fowler*, 6 F.4th 260, n.5 (2d Cir. 2021) (finding Section 2462 not jurisdictional and tolling agreement valid).

## CONCLUSION

For the foregoing reasons, the Court should grant the SEC's Motion for Summary Judgment.

DATE:   September 7, 2021               Respectfully submitted,


By:

 /s/Joshua E. Braunstein
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2021, I filed Plaintiff Securities And Exchange Commission's Reply to Defendant's Opposition to Motion for Summary Judgement through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

    /s/Joshua E. Braunstein
Joshua E. Braunstein

**ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**