**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JUSTIN W. KEENER D/B/A JMJ FINANCIAL, | ) ) | No. 20-cv-21254 |
| Defendant. | ) ) ) | Hon. Beth Bloom |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES AGAINST DEFENDANT JUSTIN W. KEENER D/B/A JMJ FINANCIAL AND SUPPORTING MEMORANDUM OF LAW**

## TABLE OF CONTENTS

BACKGROUND .................................................................................................................................1

LEGAL STANDARD........................................................................................................................3

ARGUMENT .....................................................................................................................................3

      A.      Injunction .............................................................................................................3

      B.      Penny Stock Bar.................................................................................................6

      C.      Disgorgement....................................................................................................7

      D,      Prejudgment Interest .........................................................................................9

      E.      Civil Penalty...................................................................................................10

      F,      Fair Fund .........................................................................................................13

      G.      Surrender and Cancellation of Remaining Shares and Conversion Rights............14

CONCLUSION................................................................................................................................15

## TABLE OF AUTHORITIES

**CASES**

*Liu v. SEC,*
　　140 S. Ct. 1936 (2020) .................................................................................................3, 8

*Regional Props. v. Financial & Real Estate Consulting, Co.*,
　　678 F.2d 552 (5th Cir. 1982) ..............................................................................................4

*SEC v. Almagarby*,
　　479 F. Supp. 3d 1266 (S.D. Fla. 2020) ...........................................................................12

*SEC v. Almagarby,*
　　No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4459439 (S.D. Fla. 2021)..................5, 13

*SEC v. Aura Financial Services, Inc.*,
　　No. 09-21592-Civ., 2010 WL 3419200 (S.D. Fla. July 14, 2010) ..................................10

*SEC v. Benger*,
　　697 F. Supp. 2d 932 (N.D. Ill. 2010) ..................................................................................4

*SEC v. BIH Corp.*,
　　No. 2:10-cv-577-FtM-29DNF, 2014 WL 7499053 (M.D. Fla. Dec. 12, 2014)..................6

*SEC v. Big Apple Consulting USA, Inc.,*
　　No. 6:09-cv-1963-Orl-28GJK, 2013 WL 1352166 (M.D. Fla. Mar. 29, 2013)...........10, 11

*SEC v. Calvo*,
　　378 F.3d 1211 (11th Cir. 2004) .............................................................................3, 5, 7

*SEC v. Collyard*,
　　154 F. Supp. 3d 781 (D. Minn. 2015)..................................................................................6

*SEC v. Enviro Board Corp.*,
　　No. CV 16-6427-R, 2017 WL 4586335 (C.D. Cal. May 9, 2017) ....................................7

*SEC v.. Fierro,*
　　No. 20-2104 (MAS) (DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020) ........................12

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ............................................................................3

*SEC v. First Pacific Bancorp*,
    142 F.3d 1186 (9th Cir. 1998) .........................................................................3

*SEC v. Friendly Power*,
    49 F. Supp. 2d 1363 (S.D. Fla. 1999) .........................................................7, 12

*SEC v. Gibraltar Global Securities, Inc.*,
    No. 13 Civ. 2575 (GBD)(JCF), 2016 WL 153090 (S.D.N.Y. Jan. 12, 2016) ....................8

*SEC v. Graham*,
    823 F.3d 1357 (11th Cir. 2016) .........................................................................4

*SEC v. Hall*,
    759 Fed. Appx. 877 (11th Cir. 2019) ..................................................................7

*SEC v. Kahlon*,
    No. 4:12-CV-517, 2016 WL 5661642 (E.D. Tex. Sep. 30, 2016) .....................................12

*SEC v. Keener*,
    No. 20-cv-21254-BLOOM, 2022 WL 196283 (S.D. Fla. Jan. 21, 2022) ...................1, 4, 6

*SEC v. Koenig*,
    532 F. Supp. 2d 987 (N.D. Ill. 2007) ..................................................................13

*SEC v. Lefkowitz*,
    No. 8:12-cv-1210-T35-MAP, 2013 WL 12170296 (M.D. Fla. Sep. 6, 2013) ...................12

*SEC v. Merchant Capital*,
    397 Fed. Appx. 593 (11th Cir. 2010) ..................................................................7

*SEC v. Miller*,
    744 F. Supp. 2d 1325 (N.D. Ga. 2010) ...............................................................4

*SEC v. Offill*,
    No. 3:07-CV-1643-D, 2012 WL 1138622 (N.D. Tex. Apr. 5, 2012) ...........................6, 12

*SEC v. Radius Capital Corp.*,
    No. 2:11-cv-116-FtM-29DNF, 2015 WL 1781567 (M.D. Fla. Apr. 20, 2015) ................10

*SEC v. River North Equity, LLC*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ............................................................................12

*SEC v. Save the World Air, Inc.*,
    No. 01 Civ. 11586 (GBD) FM, 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) ...............14

*SEC v. Sky Way Global*,
    No. 8:09-cv-455-T-23TBM , 2010 WL 3025033 (M.D. Fla. July 29, 2010) ....................5

*SEC v. Sky Way Global*, *LLC*,
    No. 8:09-cv-455-T-23TBM, 2013 WL 12156317 (M.D. Fla. Mar. 1, 2013) ...................11

*SEC v. Yun*,
    148 F. Supp. 2d 1287 (M.D. Fla. 2001) ...........................................................................9

**STATUTES**

15 U.S.C. § 78u(1) ..............................................................................................................3

15 U.S.C. § 78u(d)(3) .......................................................................................................10

15 U.S.C. § 78u(d)(3)(B)(i) .............................................................................................10

15 U.S.C. § 78u(d)(5) .....................................................................................................8, 14

15 U.S.C. § 78u(d)(6) .........................................................................................................6

15 U.S.C. § 78u(d)(6)(A) ...................................................................................................6

15 U.S.C. § 78u(d)(6)(B) ...................................................................................................6

15 U.S.C. § 78u(d)(8)(A)(ii) ..............................................................................................1

15 U.S.C. § 78u(d)(8)(B) ...................................................................................................4

15 U.S.C. § 7246 ...............................................................................................................13

28 U.S.C. § 2462 .................................................................................................................1

**RULES**

17 C.F.R. § 240.3a51-1 ..............................................................................................................6

**OTHER AUTHORITY**

*IBC Funds, LLC,*
    Exch. Act Rel. No. 77195, 2016 WL 683557 (Feb. 19, 2016) .........................................13

*Ironridge Global Partners, LLC,*
    Exch. Act Rel. No. 81443, 2017 WL 3588037 (Aug. 21, 2017) ......................................13

*SEC v. Fife*, SEC Release No. 24886, 2020 WL 5291429 (Sept. 30, 2020)................................12

Securities Law Enforcement Remedies Act of 1990,
    H.R. Rep. 101-616, 1990 WL 25646 (July 23, 1990)...........................................11, 12, 13

*SEC v. Tasty Fries, Inc.*,
    SEC Release No. 20194, 2007 WL 2011040 (July 12, 2007) ..........................................12

*SEC v. U.S. Wind Farming, Inc.*,
    SEC Release No. 19886, 2006 WL 3039783 (Oct. 25, 2006) ..........................................14

On January 21, 2022, the Court granted the SEC's motion for summary judgment and held that Defendant Justin W. Keener d/b/a JMJ Financial violated the dealer registration requirements of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"). The SEC now moves the Court to impose remedies for this violation, including an injunction, a penny stock bar, disgorgement of net profits of $17,557,840, prejudgment interest of $5,141,461, and a civil penalty of $1,750,000. The Court should also order Defendant to surrender for cancellation shares of stock from, and conversion rights under, convertible notes that issuers[1] sold to him.

## BACKGROUND

As the Court held in its order granting the SEC's motion for summary judgment, Defendant operated as an unregistered dealer from at least January 2015 through January 2018. *SEC v. Keener*, No. 20-cv-21254-BLOOM, 2022 WL 196283, at *3-4 (S.D. Fla. Jan. 21, 2022). He did this primarily by buying convertible notes, converting them to stock of the issuers at a discount to the prevailing market price, and selling the stock into the public market. *Id.* The Court found that Defendant admitted that he converted more than 100 notes from more than 100 different microcap issuers and subsequently liquidated billions of shares of stock. *Id.* at *4.

Although the statute of limitations for civil penalties and disgorgement for non-scienter based charges is five years, 15 U.S.C. § 78u(d)(8)(A)(ii); 28 U.S.C. § 2462, the parties signed a one-year tolling agreement.[2] *See* DE 67 at ¶ 8 n.1 (tolling agreement). Thus, the relevant period for purposes of disgorgement and civil penalties began on March 24, 2014, six years before the

---

[1] The issuers are listed in Exhibit 1 (attached). *See* DE 122-1.

[2] Defendant challenged the tolling agreement in response to the SEC's motion for summary judgment on his statute of limitations affirmative defense. *Keener*, 2022 WL 196283, at *15 ("Defendant further argues that the parties' tolling agreement cannot suspend the statute of limitations because Section 2462 is jurisdictional."). Although it did not expressly address the validity of the tolling agreement, the Court rejected Defendant's statute of limitations defense in granting the SEC's motion. *See id.*

SEC filed its complaint.  *See* DE 68 at 28 (SEC's explanation of the relevant period); DE 1 (complaint filed on March 24, 2020).

The SEC's motion for summary judgment explained that the stock Defendant received and sold resulted from his convertible notes business.  Defendant received most of the stock he sold during the relevant period from converting notes he bought from penny stock companies.  Defendant also received substantial proceeds when he sold: (1) $5.76 million in stock that he received from exercising his rights under warrant agreements he had bundled[3] with the convertible notes at issue in this case, DE 68 at 4, 8, and (2) $4.78 million in lump-sum blocks of stock he received from issuers to pay off convertible notes (so-called "settlements"), rather than converting the notes to shares of stock piecemeal.  *Id*. at 8.

In a summary declaration (attached as Exhibit 3), Dr. Carmen Taveras summarized Defendant's relevant trading data.  *See* DE 122-3 (hereinafter "Summary Remedies Declaration").  Using Defendant's own records, the declaration demonstrates that, for the period March 24, 2014 through January 31, 2018, Defendant had net income (as Defendant's accountants defined it) from his convertible notes business of $32,971,128.  *Id*. at ¶ 13 & n. 1.  The declaration then subtracts from this amount Defendant's business expenses.  *Id*. at ¶ 19.  The SEC accepted the business expenses for 2015, 2016, 2017 and January 2018 that Defendant claimed through his expert accounting witness, Jason Flemmons.  *See id.* at ¶¶ 14-16; DE 73-21 at Ex. 5 (admitting that Defendant's business expenses for January 2015 through January 2018 were $12,377,974).  For 2014, Dr. Taveras's declaration uses the business expenses that

---

[3] Defendant sold stock from 12 warrant agreements during the relevant period, and 11 of them "had a convertible note around the same time, or sometimes on the very same day that the warrant agreement was signed."  *See* Exhibit 2 (attached), DE 122-2 at 32:24 – 33:2 (March 4, 2022 deposition of Dr. Taveras in her role as a summary witness).  For eight of the 12 warrant agreements, "JMJ paid zero cost for those warrants, as they came with a convertible note," but they produced $4.6 million in proceeds.  *Id*. at 33:7-10.

Defendant deducted on his 2014 federal tax return, prorated for the partial year (resulting in a figure of $3,053,314). Summary Remedies Declaration at ¶ 17 & n. 10. Accordingly, Defendant's total business expenses under *Liu v. SEC* are $15,413,288.[4] *Id*. at ¶ 18. Defendant therefore had net profits under *Liu* of $17,557,840 (net income from notes of $32,971,128 minus total business expenses of $15,413,288). *Id*. at ¶ 19.

## LEGAL STANDARD

"Once [a] district court has found federal securities law violations, it has broad . . . power to fashion appropriate remedies." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998) (noting a "district court has broad . . . powers to fashion appropriate relief for violations of the federal securities laws").

## ARGUMENT

**A.   Injunction**

The Court should enjoin Defendant from committing further violations of Exchange Act Section 15(a)(1). *See* 15 U.S.C. § 78(u)(1) (authority for a federal district court to enter an injunction in SEC enforcement proceedings under the Exchange Act). The SEC is entitled to injunctive relief when it establishes: (1) a prima facie case of previous violations of the federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). Indicia that a wrong will be repeated include: (1) the egregiousness of the defendant's violations, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the

---

[4] Specifically, the Supreme Court held that this Court may order disgorgement that does not exceed Defendant's net profits after "deducting legitimate expenses." *See Liu v. SEC*, 140 S. Ct. 1936, 1946-1948 (2020).

likelihood that the defendant's occupation will present opportunities for future violations.  *Id*. at 1216.  The SEC need not prove every factor in order to obtain permanent injunctive relief.  *Id.*

Here, the Court has already found that Defendant violated the dealer registration requirements under Section 15(a) of the Exchange Act for several years.[5]  *Keener*, 2022 WL 196283, at *11-13.  The dealer registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the Commission "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records."  *SEC v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (quoting *Celsion Corp. v. Stearns Mgmt. Corp*., 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001)); *Regional Props. v. Financial & Real Estate Consulting, Co.*, 678 F.2d 552, 562 (5th Cir. 1982). Defendant's conduct thus was sufficiently egregious to warrant an injunction.

The Court found that Defendant disregarded these requirements during a three year period, *Keener*, 2022 WL 196283, at *3, entering into *more than* 100 convertible notes with more than 100 different issuers.  *Id*. at *4.  The SEC also presented evidence that during the period July 2010 through April 2018, Defendant entered at least 272 convertible notes, made 692 payments totaling approximately $52 million to 201 issuers, and sold more than 38 billion shares of stock for gross proceeds exceeding $93 million.[6]  DE 67-11 at ¶ 17-18 & Ex. 4 (Taveras Summary Declaration).  Defendant's conduct was plainly recurrent.

---

[5] The SEC meets the *Calvo* requirement to show "a prima facie case of previous violations" because this Court has found that Defendant violated Exchange Act Section 15(a)(1). *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1336 (N.D. Ga. 2010); *SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) (quoting *Miller* for the proposition: "[N]umerous courts have found no requirement that a defendant must have committed violations before the ones at issue.  Indeed, the 'previous' violations relied upon by federal courts as a basis for injunctive relief are frequently the same ones just proven in the liability portion of those cases.").

[6] For purposes of injunctive relief, the statute of limitations is 10 years, and Defendant also entered a one-year tolling agreement.  15 U.S.C. § 78u(d)(8)(B); DE 67 at ¶ 8 n. 1.  The

Defendant has offered no assurances against future violations of Exchange Act Section 15(a)(1).  Nor has he recognized the wrongful nature of his conduct.  Indeed, while this Court was considering his motion to dismiss, he sold millions of dollars in stock that he obtained from convertible notes he had bought from Blink Charging Co.  *See* DE 101 at ¶ 36 & Exs. 1, 2 (SEC's reply statement of facts providing account statements for sales of Blink Charging Co.).

There is also a strong likelihood that Defendant's occupation, as a self-employed participant in the financial markets, will present him with further opportunities to violate Exchange Act Section 15(a)(1).  *See* DE 72 at ¶ 7 (Defendant admitted that he "invests his own money in many different instruments, including in 'stocks, bonds, mutual funds, CDs, T-Bills, private placements, public offerings, initial public offerings.  Term loans, bridge loans, pretty much all of it through the years.'").  Unless enjoined, he will have the ability to resume his unregistered dealer business with minimal effort.[7]  Given his background and ready access to capital, it would be easy for him to buy a new series of convertible notes.  *See* DE 72-3 at 144:23 – 146:3 (Keener testified that his net worth in 2015 was "$50 to $100 million, I really don't know").

While scienter is an important factor in this analysis, "it is not a prerequisite to injunctive relief."  *See Calvo*, 378 F.3d at 1216.  Courts have frequently found injunctions to be appropriate for non-scienter based broker-dealer registration violations.  *See, e.g., SEC v Almagarby,* No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4459439, at *1 (permanently enjoining unregistered dealers); *SEC v. Sky Way Global*, No. 8:09-cv-455-T-23TBM, 2010 WL 3025033, at *2 (M.D.

___

Court may consider conduct dating back to March 24, 2009 in deciding whether to impose an injunction.

[7] Although FINRA barred Defendant from associating with any FINRA member, he would not need to do so to resume his unregistered dealer business. *See* DE 67 at ¶ 3.  Only injunctive relief would preclude him from violating Exchange Act Section 15(a)(1) again.

5

Fla. July 29, 2010) (in default order, court found injunction against broker-dealer registration violations to be appropriate); *SEC v. Collyard*, 154 F. Supp. 3d 781, 793 (D. Minn. 2015), *aff'd in part and vac'd on other grounds*, 861 F.3d 760 (8th Cir. 2017); *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *4-5 (N.D. Tex. Apr. 5, 2012).  This Court should reach the same conclusion.

**B.**      **Penny Stock Bar**

Courts may enter a penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock[.]"  *See* 15 U.S.C. § 78u(d)(6)(A).  A "penny stock" includes an equity security bearing a price of less than five dollars, except as provided in 17 C.F.R. § 240.3a51-1.  The Court may enter a penny stock bar "permanently or for such period of time as the court shall determine."  *See* 15 U.S.C. § 78u(d)(6).  In this case, "Defendant … admits that during the Relevant Period, he 'converted more than 100 [convertible] notes from more than 100 different microcap issuers' [*i.e.*, penny stock companies] and 'liquidated billions of shares of common stock[.]'"  *Keener*, 2022 WL 196283, at *4.  Thus, "at the time of the alleged misconduct," Defendant was "participating in . . . an offering of penny stock[.]"  *See* 15 U.S.C. § 78u(d)(6)(B) (defining "person participating in an offering of penny stock" to include "any person engaging in activities with a[n] . . . issuer for purposes of issuing, . . . or inducing or attempting to induce the purchase or sale of, any penny stock").

In deciding whether to impose a penny stock bar, "the court examines the nature of the defendant's conduct and the likelihood that his occupation and experience will present further opportunities to violate the securities laws."  *SEC v. BIH Corp*., No. 2:10-cv-577-FtM-29DNF,

2014 WL 7499053, at * 6 (M.D. Fla. Dec. 12, 2014) (citation omitted).  For the reasons that an injunction is appropriate, as discussed in Section A, *supra*, a penny stock bar is also appropriate.[8]

## C.     Disgorgement

The Court should order Defendant to disgorge the net profits from his unregistered dealer business, which Dr. Taveras's Summary Remedies Declaration shows were $17,557,840.  *See id*. at ¶ 19 & Ex. A.  "The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."  *Calvo*, 378 F.3d at 1217.  "Exactitude is not a requirement; so long as the measurement of disgorgement is reasonable, and risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Id*.; *see also SEC v. Hall*, 759 Fed. Appx. 877, 882 (11th Cir. 2019).  Once the SEC provides a reasonable approximation of disgorgement, "the burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation."  *Calvo*, 378 F.3d at 1217; *Hall*, 759 Fed. Appx. at 883.

The fact that Defendant committed a non-scienter based violation of the securities laws does not diminish his obligation to pay disgorgement.  "Disgorgement is not dependent on scienter, but is tied instead to the idea of unjust enrichment: the broad idea is that persons not profit from breaking the securities laws."  *SEC v. Merchant Capital*, 397 Fed. Appx. 593, 595 (11th Cir. 2010).  Thus, courts have not hesitated to order disgorgement where, as here, the violations do not require a finding of scienter.  *See SEC v. Friendly Power*, 49 F. Supp. 2d 1363, 1372-73 (S.D. Fla. 1999) (ordering disgorgement for securities registration violations); *SEC v. Enviro Board Corp*., No. CV 16-6427-R, 2017 WL 4586335, at *4 (C.D. Cal. May 9, 2017) (ordering disgorgement for securities and broker-dealer registration violations); *SEC v. Gibraltar*

---

[8] Defendant's FINRA bar (against associating with FINRA members) would not preclude him from participating in the offering of a penny stock.  *See* DE 67 at ¶ 3.

*Global Securities, Inc*., No. 13 Civ. 2575 (GBD) (JCF), 2016 WL 153090, at *1 (S.D.N.Y. Jan. 12, 2016) (default judgment ordering disgorgement for broker-dealer registration violations).

In *Liu*, the Supreme Court upheld the authority of lower courts to order disgorgement pursuant to Section 21(d)(5) of the Exchange Act.  140 S.Ct. at 1940 (holding "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5) [Exchange Act Section 21(d)(5)]").  That statute provides that "the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  *Liu* identified two important features of equitable disgorgement.  Courts "must deduct legitimate expenses before ordering disgorgement," which is defined as a defendant's "net profits from the wrongdoing."  *Liu*, 140 S.Ct. at 1946.  *Liu* also held that "[t]he equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit," but did not rule out the possibility that an order directing disgorged funds to the Treasury could be "for the benefit of investors" and "consistent with equitable principles."  *See id*. at 1948, 1949.

Consistent with these principles, the SEC determined that Defendant's net profits under *Liu* were $17,557,840, based on his sales of stock (which he received from convertible notes and warrants that were bundled with convertible notes) between March 24, 2014 and January 31, 2018.  Exhibit A to Dr. Taveras's Summary Remedies Declaration shows the steps that lead to this figure.  Defendant's net proceeds from selling all stock were $34,008,376.  *Id*. at Ex. A.  He gained an additional $6,322,524 from selling stock that issuers paid him to satisfy the Original Issue Discount, interest, and penalties owed under convertible notes, but he lost $7,177,463 from notes that had to be written off.  *Id*.  Netting these figures against each other produces net income from all stock of $33,153,437.  *Id*.  Dr. Tavaras then subtracted $182,309 in proceeds from sales

8

of stock that Defendant acquired in the open market or through syndicated offerings (*i.e.*, not from convertible notes) to arrive at net income from notes of $32,971,128. *Id.*

Next, Dr. Taveras credits Defendant for his business expenses under *Liu*. The SEC has adopted the $12,377,974 in *Liu* expenses Defendant's expert accounting witness (Flemmons) proposed, *see* DE 73-21 at Ex. 5, and added another $3,035,314 to account for the period between March and December 2014. *See* Summary Remedies Declaration at ¶¶ 14-17, n. 10. Defendant originally deducted all of these expenses on his federal tax returns. *Id.* at ¶ 14. Defendant's total business expenses for the relevant period were $15,413, 288. *Id.* at ¶ 18 & Ex. A. Offsetting this amount against Defendant's net income from notes ($32,971,128) produces net profits under *Liu* of $17,557,840, which the Court should order Defendant to disgorge. *Id.* at ¶ 19 & Ex. A.

The Commission intends to distribute any disgorgement it collects from Defendant to harmed investors. Specifically, the most directly harmed investors are the counterparties who purchased the shares that Defendant sold in the market. The distribution plan would target investors who lost money holding stock that they purchased from Defendant. Given Dr. Taveras's conclusion that 93% of issuers experienced stock price declines between Defendant's first and last sales, there should be no shortage of eligible recipients for the distribution. *See* DE 66-2 at ¶ 29 (Taveras Expert Rebuttal Report).

**D.    Prejudgment Interest**

The Court should order Defendant to pay prejudgment interest on the amount of disgorgement it orders. The purpose of prejudgment interest is "to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain." *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001), *aff'd in part and vac'd on other grounds*, 327 F.3d 1263 (11th Cir. 2001). Courts routinely use the IRS underpayment rate when calculating

prejudgment interest in SEC enforcement actions because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. Radius Capital Corp.*, No. 2:11-cv-116-FtM-29DNF, 2015 WL 1781567, at *7 (M.D. Fla. Apr. 20, 2015) (citations and quotations omitted). Using the IRS underpayment rate, and calculating prejudgment interest on the proposed disgorgement figure of $17,557,840, results in prejudgment interest of $5,141,461. *See* Summary Remedies Declaration at ¶¶ 20-22 (explaining the prejudgment interest calculation). The Court should order Defendant to pay both amounts for a total of $22,699,301.

**E.    Civil Penalty**

The Court should order Defendant to pay a civil penalty of $1,750,000, equivalent to approximately 10% of the SEC's proposed disgorgement figure.

Section 21(d)(3) of the Exchange Act authorizes the Court to order penalties for violations of the federal securities laws, providing three tiers of escalating penalty amounts. 15 U.S.C. § 78u(d)(3). Even under the lowest tier for non-scienter based violations, courts may impose a penalty up to the amount of a defendant's gross pecuniary gain, which here totaled nearly $33 million from the sale of stock related to notes. *See* 15 U.S.C. § 78u(d)(3)(B)(i).

The decision whether to impose a penalty and in what amount falls within the Court's discretion. *SEC v. Aura Financial Services, Inc.*, No. 09-21592-Civ., 2010 WL 3419200, at *3 (S.D. Fla. July 14, 2010). Courts look to a number of factors, including: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Big Apple Consulting USA, Inc.*, No. 6:09-cv-1963-Orl-28GJK, 2013 WL 1352166, at *3 (M.D. Fla. Mar.

29, 2013), *aff'd*, 783 F.2d 786 (11th Cir. 2015).  However, these factors are not a rigid checklist that must be satisfied in every case.  *Id*. (while "these factors are helpful in characterizing a particular defendant's actions, . . . each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed'") (citation and quotation omitted).

These factors weigh in favor of ordering Defendant to pay a substantial penalty.  The violations were recurrent rather than isolated, involving thousands of transactions between 2010 and 2018.  *See* DE 67-11 at ¶ 17-18 & Ex. 4.  Given the drop in share price that routinely accompanied Defendant's trading as he flooded the market with newly issued shares of stock, *see* DE 66-2 at ¶ 29 (93% of issuers experienced stock price declines between Defendant's first and last sales), the conduct created substantial losses or the risk of substantial losses to other investors while Defendant obtained outsized gains.  The importance of the dealer registration requirements, as previously noted, means his conduct was sufficiently egregious to warrant a penalty.  Finally, Defendant's demonstrated current and future financial condition is no impediment to a substantial penalty as he has a net worth in the millions of dollars.  *See* DE 72-3 at 144:23 – 146:3 (in SEC investigative testimony, Defendant estimated his net worth in 2015 to be between $50 million and $100 million).

Another factor that this Court should consider in deciding whether a penalty is appropriate is "the need to deter repetitive conduct from the defendant and others."  *See SEC v. Sky Way Global, LLC*, No. 8:09-cv-455-T-23TBM, 2013 WL 12156317, at *2 (M.D. Fla. Mar. 1, 2013).  Indeed, in promulgating Section 21(d)(3) of the Exchange Act, Congress recognized the need to "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws, as opposed to engaging in affirmative conduct to defraud investors."  Securities Law Enforcement Remedies Act of 1990, H.R. Rep. 101-616, 1990 WL 25646, at *1384 (July 23, 1990) (hereinafter "Remedies Act").  The House Report

11

further noted that "[a] broker-dealer . . . may fail to comply with regulatory requirements simply because it is unwilling to devote the resources necessary to comply with these statutory objectives.…To the extent that such violations are motivated by a desire to maximize profits by reducing costs, the prospect of civil money penalties will improve compliance with the law and have a significant remedial effect." *Id*.

For violations that do not involve scienter, courts have found penalties to be appropriate where, as here, the violations encompassed numerous transactions that inundated the market with large amounts of stock. *Friendly Power*, 49 F. Supp. 2d at 1373 (ordering $100,000 penalty for violation of securities registration requirements); *SEC v. Lefkowitz*, No. 8:12-cv-1210-T35-MAP, 2013 WL 12170296, at *6 (M.D. Fla. Sep. 6, 2013) (in default motion, court imposed civil penalty equaling defendant's gross pecuniary gain based on violations of securities registration requirements); *Offill*, 2012 WL 1138622, at *4 (imposing penalty for section 5 violations because "defendants' violations involved multiple transactions in which millions of unregistered shares were sold resulting in millions of dollars of profit to them. Additionally, defendants' violations were committed, if not intentionally, at least with reckless disregard for the legality of the transactions."); *SEC v. Kahlon*, No. 4:12-CV-517, 2016 WL 5661642, at *6 (E.D. Tex. Sep. 30, 2016).

Here, there is a substantial need to deter Defendant and others from this type of conduct. Over the last several years, the SEC has filed a number of cases involving the same or a substantially similar business model as that used by Defendant in this case. *See, e.g.*, *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Fife*, SEC Release No. 24886, 2020 WL 5291429, at *1 (Sept. 30, 2020) (SEC announcement of lawsuit filed); *SEC v. Fierro,* No. 20-2104 (MAS) (DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River North Equity, LLC,* 415 F. Supp. 3d 853 (N.D. Ill. 2019); *Ironridge Global Partners, LLC,* Exch. Act Rel. No.

81443, 2017 WL 3588037 (Aug. 21, 2017) (settled order); *IBC Funds, LLC,* Exch. Act Rel. No. 77195, 2016 WL 683557 (Feb. 19, 2016) (settled order).  These actions, all of which involved substantially similar conduct resulting in similarly outsized gains, demonstrate the pervasiveness of Defendant's business model.  A meaningful penalty in this case would deter others from engaging in this type of misconduct.  *See* Remedies Act, 1990 WL 256464, at *1384 (the "authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator."); *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007) ("Disgorgement and injunctive relief are not sufficient to deter [defendant] and others from committing future securities violations….Without civil penalties, the only financial risk to violators is forfeiture of their ill-gotten gains.").

For all of these reasons, the Commission recommends that the Court order Defendant to pay a civil penalty of $1,750,000.  This figure represents approximately 10% of the SEC's proposed disgorgement figure.  The proposed penalty is proportionally comparable to the penalty in *Almagarby*, which was approximately 9% of the disgorgement figure there.  *See Almagarby,* 2021 WL 4459439, at *1 ($80,000 civil penalty versus disgorgement of $885,000).

**F.    Fair Fund**

Section 308(a) of the Sarbanes Oxley Act of 2002 [15 U.S.C. § 7246] provides that, if the SEC obtains a penalty in any litigation for violation of the federal securities laws, "the amount of such penalty shall, on the motion . . . of the Commission, be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation."  As mentioned previously, the SEC intends to distribute any disgorgement and prejudgment interest collected to investors.  This Court should include in any final judgment a provision allowing the SEC to establish a Fair Fund for whatever penalty amount the Court orders in this case.

13

**G.      Surrender and Cancellation of Remaining Shares and Conversion Rights**

The SEC requests that the Court order Defendant to surrender for cancellation any remaining shares of stock of, and conversion rights under convertible notes issued by, the issuers identified in Exhibit 1 (attached).[9]  *See* DE 122-1.  In addition to preventing Defendant from profiting further from his violative conduct, these surrender actions will benefit shareholders by eliminating the prospect of further shareholder dilution caused by Defendant's sales of additional stock or his exercise of conversion rights.

Section 21(d)(5) of the Exchange Act permits a federal court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5). Orders for the cancellation or return of shares are within the Court's equitable powers.  *See, e.g., Almagarby*, 2021 WL 4459439, at *2 (ordering unregistered dealer to surrender shares for cancellation); *SEC v. Save the World Air, Inc.*, No. 01 Civ. 11586 (GBD) FM, 2005 WL 3077514, at *20 (S.D.N.Y. Nov. 15, 2005) (on summary judgment, ordering CEO to disgorge stock in company for cancellation in addition to $7.5 million in disgorgement and officer and director bar); *see also SEC v. Tasty Fries, Inc.*, SEC Release No. 20194, 2007 WL 2011040, at *2 (July 12, 2007) (settled case in which principal of company ordered to return all stock to company for cancellation as equitable remedy, in addition to injunction, officer and director bar, and disgorgement); *SEC v. U.S. Wind Farming, Inc.*, SEC Release No. 19886, 2006 WL 3039783, at *1 (Oct. 25, 2006) (settled case that included order to return all stock to company for cancellation, in addition to injunction, disgorgement, and penny stock bar).  Such an order is

---

[9] Under the terms the SEC is proposing, Defendant may continue to collect money he is owed under convertible notes, even if he surrenders his conversion rights, so long as repayment occurs in cash and not stock.

appropriate and necessary for the benefit of investors, as it will ensure that Defendant ceases his illegal conduct.

## **CONCLUSION**

For the foregoing reasons, the Court should enter an order imposing the remedies the SEC has requested: an injunction, a penny stock bar, cancellation of shares and conversion rights, disgorgement of net profits of $17,557,840, prejudgment interest of $5,141,461, and a civil penalty of $1,750,000.  A proposed Final Judgment incorporating the remedies and terms the SEC has requested in this Motion is attached as Exhibit 4.  *See* DE 122-4.


DATE:   March 18, 2022          Respectfully submitted,


By:    /s/Joshua E. Braunstein

Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, I filed Plaintiff Securities and Exchange Commission's Motion For Remedies Against Defendant Justin W. Keener d/b/a JMJ Financial and Supporting Memorandum of Law through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

/s/Joshua E. Braunstein
Joshua E. Braunstein

**ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**