UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

v.                                                    CASE NO. 1:20-CV-21254-
                                                           BLOOM/LOUIS

JUSTIN W. KEENER D/B/A JMJ
FINANCIAL,

                              Defendant.

DEFENDANT JUSTIN W. KEENER'S OPPOSITION TO PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT .........................................................................................................3

   A.   Disgorgement Is Not Warranted ...................................................................3

     1.  Disgorgement Is Barred Because There Is No Causal Connection Between the Alleged Violation and Any Profits.................................................................................................3

     2.  Disgorgement Is Barred Under *Liu* Because the SEC Cannot Identify Any Victims.............5

   B.   The SEC's Disgorgement Calculation Is Not a Reasonable Approximation of Net Profits ....................................................................................................... 10

   C.   Prejudgment Interest Is Not Warranted..................................................... 12

   D.   Injunctive Relief Is Not Warranted ........................................................... 13

   E.   A Penny Stock Bar Is Not Warranted ....................................................... 17

   F.   A Civil Penalty Is Not Warranted ............................................................. 17

   G.   Mr. Keener Is Willing to Surrender and Cancel His Remaining Shares ....................20

III.    CONCLUSION ....................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980)................................................................................................16

*Beaubrun v. Geico Gen. Ins. Co.,*
    2017 WL 3025852 (S.D. Fla. July 17, 2017) .........................................................9

*CFTC v. Sidoti,*
    178 F.3d 1132 (11th Cir. 1999) ..................................................................... 1, 3, 4

*CFTC v. Southern Trust Metals, Inc.,*
    894 F.3d 1313 (11th Cir. 2018) ..................................................................... 4, 5, 8

*In re David B. Havanich Jr.,*
    SEC Release No. 935, 2016, 2016 WL 25746 (Jan. 4, 2016) ....................... 15, 16

*Glob. Digit. Sols., Inc. v. Grupo Rontan Electro Metalurgica,*
    2020 WL 8816214 (S.D. Fla. Dec. 1, 2020)...........................................................9

*Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC,*
    2017 WL 9939048 (M.D. Fla. Aug. 22, 2017) .....................................................12

*Guevara v. NCL (Bahamas) Ltd.,*
    920 F.3d 710 (11th Cir. 2019) ...............................................................................9

*Hanna Yachts, LLC v. Caribbean Breeze Marine A.C., X, LLC,*
    2013 WL 12141336 (S.D. Fla. Mar. 19, 2013)....................................................12

*Hinds v. Am. Sec. Ins. Co.,*
    2016 WL 8677901 (S.D. Fla. Dec. 7, 2016) ..........................................................9

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH,*
    141 F.3d 1434 (11th Cir. 1998) ............................................................................12

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) ...................................................................................passim

*SEC v. Aerokinetic Energy Corp.,*
    2010 WL 5174514 (M.D. Fla. Sept. 10, 2010)....................................................20

*SEC v. Almagarby,*
    2021 WL 4461831 (S.D. Fla. Aug. 16, 2021).................................................passim

*SEC v. Bevil,*
    2020 WL 7048263 (D. Nev. Nov. 30, 2020) ..........................................................6

*SEC v. Big Apple,*
   2013 WL 1352166 (M.D. Fla. Mar. 29, 2013) ..................................................................17

*SEC v. BIH Corp.,*
   2014 WL 7499053 (M.D. Fla. Dec. 12, 2014) ..................................................................17

*SEC v. Blackburn,*
   15 F.4th 676 (5th Cir. 2021) ..............................................................................................5

*SEC v. Blatt,*
   583 F.2d 1325 (5th Cir. 1978) ........................................................................................13

*SEC v. Calmes,*
   2011 WL 13174658 (S.D. Fla. Nov. 10, 2011) ................................................................19

*SEC v. Calvo,*
   378 F.3d 1211 (11th Cir. 2004) .............................................................................10, 13, 14

*SEC v. Carrillo,*
   325 F.3d 1268 (11th Cir. 2003) ........................................................................................13

*SEC v. Collyard,*
   154 F. Supp. 3d 781 (D. Minn. 2015) ..............................................................................15

*SEC v. Cope,*
   2021 WL 653088 (S.D.N.Y. Feb. 19, 2021) ....................................................................10

*SEC v. Dang,*
   2021 WL 1550593 (D. Conn. Apr. 19, 2021) ....................................................................5

*SEC v. E-Smart Techs., Inc.,*
   2016 WL 183503 (D.D.C. Jan. 14, 2016) ........................................................................13

*SEC v. ETS Payphones, Inc.,*
   408 F.3d 727 (11th Cir. 2005) ............................................................................................3

*SEC v. Friendly Power Co.,*
   49 F. Supp. 2d 1363 (S.D. Fla. 1999) ..............................................................................19

*SEC v. Gane,*
   2005 WL 90154 (S.D. Fla. Jan. 4, 2005) ..........................................................4, 15, 18, 19

*SEC v. Graham,*
   823 F.3d 1357 (11th Cir. 2016) ........................................................................................16

*SEC v. Huff,*
   2010 WL 148232 (S.D. Fla. Jan. 12, 2010) ......................................................................19

*SEC v. Ingoldsby,*
    1990 WL 120731 (D. Mass. May 15, 1990) ............................................................... 14, 16

*SEC v. J.W. Korth & Co.,*
    991 F. Supp. 1468 (S.D. Fla. 1998) ........................................................................... 18

*SEC v. Janus Spectrum LLC,*
    811 Fed. App'x 432 (9th Cir. 2020) ............................................................................ 6

*SEC v. Kahlon,*
    2016 WL 5661642 (E.D. Tex. Sept. 30, 2016) .......................................................... 19

*SEC v. Lefkowitz,*
    2013 WL 12170296 (M.D. Fla. Sept. 6, 2013) .......................................................... 19

*SEC v. Miller,*
    744 F. Supp. 2d 1325 (N.D. Ga. 2010) ..................................................................... 19

*SEC v. Monterosso,*
    2012 WL 12950028 (S.D. Fla. Feb 16, 2012) ........................................................... 12

*SEC v. Offill,*
    2012 WL 1138622 (N.D. Tex. Apr. 5, 2012) ......................................................... 15, 19

*SEC v. Perez,*
    2011 WL 5597331 (S.D. Fla. Nov. 17, 2011) ............................................................ 15

*SEC v. Pros Int'l Inc.,*
    994 F.2d 767 (10th Cir. 1993) .................................................................................. 15

*SEC v. Razmilovic,*
    738 F.3d 14 (2d Cir. 2013) ......................................................................................... 3

*SEC v. Sky Way Glob.,*
    2010 WL 3025033 (M.D. Fla. July 29, 2010) ............................................................ 15

*SEC v. Smyth,*
    420 F.3d 1225 (11th Cir. 2005) ................................................................................ 16

*SEC v. Steadman,*
    967 F.2d 636 (D.C. Cir. 1992) .................................................................................. 14

*SEC v. US Pension Tr. Corp.,*
    2010 WL 3894082 (S.D. Fla. Sept. 30, 2010) ........................................................... 18

*SEC v. Wyly,*
    56 F. Supp. 3d 394 (S.D.N.Y. 2014) ........................................................................ 4, 5

*In re Spring Hill Cap. Mkts.*,
    SEC Release No. 919, 2015 WL 7730856 (Nov. 30, 2015) ...............................................15

*Steadman v. SEC*,
    603 F.2d 1126 (5th Cir. 1979) ..................................................................... 14, 17

*Validsa, Inc. v. PDVSA Servs., Inc.*,
    424 Fed. Appx. 862 (11th Cir. 2011)..............................................................13

*Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000)...................................................................................2, 19

**Statutes**

15 U.S.C. § 78u(d) ...................................................................................*passim*

**Other Authorities**

17 C.F.R. § 201.1001 .....................................................................................19

Fed. R. Civ. P. 37(c)(1) ...................................................................................9

Rule 144 Holding Period, 86 Fed. Reg. 5063, 5074 (proposed Jan. 19, 2021).........................................6

SEC Release No. 34-94524, (Mar. 28, 2022).................................................. 2, 5, 19

## I.      INTRODUCTION

The remedies the SEC demands against Mr. Keener are neither consistent with the law nor proportional to the violation in this case.  Mr. Keener invested in microcap issuers who needed financing.  He invested through a variety of instruments, including convertible notes that he later converted to stock.  The issuers publicly disclosed the terms of his investments in SEC filings.  He sold all stock through his registered brokerage firms, after confirming with attorneys that the sales complied with applicable securities laws.  The Court found that after considering the volume of sales of stock he obtained through note conversions, he became subject to dealer registration requirements. *See* Omnibus Order, ECF No. 118 at 21-22.  But there is no evidence that his unlicensed status had anything to do with any proceeds he generated or that his counterparties—likely market makers and other sophisticated actors—suffered any losses.  The SEC's demand to disgorge $22.7 million with prejudgment interest thus fails as a matter of law.  Nor do the SEC's numbers bear any relation to Mr. Keener's actual net profits, when he lost millions of dollars on his investments.

The SEC's disgorgement demand fails first because the SEC does not attempt to and cannot show that any of Mr. Keener's proceeds were generated *because of* the registration violation.  The Court lacks jurisdiction to disgorge profits not causally connected to the violation.  *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999).  Yet the SEC does not even mention this requirement let alone try to meet it, because it cannot.  The SEC has offered no evidence that a single fact about Mr. Keener's transactions or proceeds—from the terms of his investments to the price at which he sold—would have been different had he registered.

Second, the SEC's disgorgement demand contravenes the plain language of the authorizing statute and Supreme Court precedent.  The SEC must demonstrate that the disgorgement is "appropriate or necessary for the benefit of investors," *see* 15 U.S.C. § 78u(d)(5), and specifically that the disgorgement amounts would be "awarded for victims," *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). The SEC does not and cannot make such a showing.  There are no "victims."  There is no evidence that any counterparty who acquired stock from Mr. Keener was a retail investor who lost money, and in fact, his counterparties had many opportunities to make a profit.  Nor is there any evidence that Mr. Keener's unlicensed status impacted his counterparties in any way.

Third, the SEC's demand is also not a reasonable approximation of net profits.  The transactions at issue are Mr. Keener's "Quick Loan" convertible note investments, which Mr. Keener stopped making in 2017 because they were no longer profitable.  His other investments—*e.g.*, bridge loans and stock and warrants obtained through syndicates and public offerings—bore no resemblance

to the Quick Loan investments and did not involve note conversions at all. The SEC arrives at its $22.7 million demand by improperly including proceeds from all of these other investments. Nonetheless, even considering all of his investments together since 2014, Mr. Keener has **lost** more than $5 million. He took substantial risk and incurred major expenses. The SEC cannot be allowed to cherry-pick wins and ignore losses. Its disgorgement demand cannot stand.

At bottom, remedies are about fairness. Mr. Keener always acted in good faith, and through multiple gatekeepers (*i.e.*, registered broker-dealers, clearing firms, securities attorneys, and stock transfer agents). Attorneys specifically advised him that he was not a securities dealer. Many persons who engaged in the exact same activity as Mr. Keener (*i.e.*, trading a large volume of securities for their own account) are not registered. The Court found a single Section 15(a) registration violation. But when considering culpability and fairness—which are highly relevant to the remedies analysis—the SEC's demands are unjustified.

A brand-new rule proposal issued by the Commission on March 28, 2022 highlights the injustice of the SEC's position in this case. In the rule proposal, the Commission purports to "further define" the statutory phrase "as part of a regular business" to clarify that some of the largest, most sophisticated investment funds have always had to register as dealers. *See* SEC Release No. 34-94524 (Mar. 28, 2022), https://tinyurl.com/2ekh8s7j, at 4. Instead of seeking to bankrupt these firms in a retroactive enforcement action—as the SEC tries to do to Mr. Keener here—the Commission is giving *these* firms (politically connected hedge funds) notice and a full year to register. *Id.* at 34.

Mr. Keener was never given that notice. Instead, he was hit with a lawsuit in which the SEC demands $24.5 million in disgorgement, prejudgment interest, and penalties. In a statement issued in connection with the rule proposal, SEC Commissioner Hester Peirce commented on this exact disparity:

> I particularly appreciate the use of the rulemaking process to clarify the scope of the term "dealer." Using the notice-and-comment rulemaking process to solicit public input to inform the Commission's response to market and technological evolution, ***in lieu of extending ambiguous provisions of the law through enforcement actions against unsuspecting market participants***, demonstrates a commitment to transparency and good government that should be the hallmark of all our work at the Commission.

Peirce, Statement on Proposal (Mar. 28, 2022), https://tinyurl.com/2p8msfv2, at 1 (emphasis added). The Commission's singling out of Mr. Keener runs headlong into the equal protection component of the Fifth Amendment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). There is no basis to

punish Mr. Keener to the extent the SEC seeks. Mr. Keener respectfully requests that the SEC's Motion be denied.

## II.      ARGUMENT

### A.      <u>Disgorgement Is Not Warranted</u>

There are two separate reasons why the SEC's disgorgement demand fails as a matter of law: (1) it is not limited to profits obtained as a result of the violation; and (2) it will not be "awarded for victims" as required by *Liu*. These points are addressed in Sections II.A.1 and II.A.2 below.

#### 1.      <u>Disgorgement Is Barred Because There Is No Causal Connection Between the Alleged Violation and Any Profits</u>

The Court should not award disgorgement because Mr. Keener did not generate any proceeds *as a result of* the registration violation. Disgorgement must be limited to "property causally related to the wrongdoing"; it cannot extend to profits "obtained without the aid of any wrongdoing." *Sidoti*, 178 F.3d at 1138; *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) ("[T]he power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment."); *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (SEC "must distinguish between the legally and illegally derived profits" and identify those profits "causally connected to the violation").

*Sidoti* is directly on point. That case concerned an individual, Sidoti, who provided capital for a brokerage house in exchange for 90% of the profits. *Sidoti*, 178 F.3d at 1134. The Commodity Futures Trading Commission charged Sidoti with failing to register as a principal of that brokerage house and sought to disgorge all profits he obtained from the brokerage house. *Id.* at 1135. The district court granted the CFTC's disgorgement request, but the Eleventh Circuit reversed. The CFTC argued that Sidoti's failure to register "provides the nexus for deeming illegal all profits received by him," but the Eleventh Circuit rejected that argument, and instead held as follows:

> Sidoti's **failure to register, by itself, is not causally related to [any] ill-gotten profits**. Indeed, the CFTC has not cited and we are not aware of any case in which a court has disgorged profits from a defendant whom it finds liable solely for failure to register as a principal. A district court may not disgorge profits, unless there is record evidence the defendant is liable (either directly or indirectly) for fraud.

*Id.* at 1138 (emphasis added).[1]

---

[1] The Eleventh Circuit's ruling that disgorgement is improper when "there [is] no record evidence of fraud" is yet another reason why the SEC's disgorgement demand is unwarranted. *Sidoti*, 178 F.3d at

It is the SEC's burden to demonstrate a causal connection. *SEC v. Gane*, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005). In other words, the SEC must show that, "but for" the registration violation, Mr. Keener would not have generated the profits. *SEC. v. Wyly*, 56 F. Supp. 3d 394, 405 (S.D.N.Y. 2014). Yet **the SEC skips this step entirely** and does not attempt to show Mr. Keener's unregistered status caused any profits. In fact, there is no relationship between the two. There is no evidence that any specific transactions would have been different had Mr. Keener registered. Nor is there any evidence that he was able to obtain better terms on his convertible note investments or sell converted stock at a higher price *because of* his unregistered status. There is no evidence that the public or FINRA would have reacted differently to Mr. Keener's convertible note investments had he registered. The details about Mr. Keener's investments were already disclosed to the public in issuer filings. *See* Def.'s Statement of Facts in Supp. of Mot. for Summ. J. ("DSOF"), ECF No. 72, ¶ 26. The brokerage firms that executed his transactions were registered, and they disclosed his transaction details to FINRA in real time, and FINRA never objected to those transactions. *Id.* at ¶ 53. In short, there is no evidence that Mr. Keener's lack of registration had anything to do with any of the profits he generated, let alone caused them. In fact, as discussed below, there were no net profits at all. *See* Sec. II.B, *infra.* In such circumstances, disgorgement is not warranted. *See, e.g., Gane*, 2005 WL 90154, at *19 (denying disgorgement when "there is no record evidence of any causal connection at all").[2]

Compare this scenario to the scenario of the unlicensed lawyer considered in *CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1330-31 (11th Cir. 2018). As the Court concluded, whether or not the lawyer was licensed would have no causal relationship to the fees he generated or the outcome in his client's cases, which could depend on a variety of factors. *Id.* ("[A] client might well prevail in court despite the lawyer's unlicensed status. Or, if there is a loss, the loss might flow from . . . unfavorable precedent, judicial error, or a jury's caprice."). Also consider the scenario of a ride-share driver who failed to or could not obtain a driver's license. All the profits this driver generated from chauffeuring passengers around town would not be "ill-gotten" gains subject to disgorgement by the state just because the driver was not licensed. In both scenarios, the unlicensed status did not *cause* any profits generated. The same is true for Mr. Keener—the fact that he was not registered as a

---

1138. It is undisputed that Mr. Keener's registration violation was a non-scienter Section 15(a) registration violation, and there was no fraud.

[2] The court in *Almagarby* stated that the profits the defendant generated "are connected to" the registration violation. *SEC v. Almagarby*, 2021 WL 4461831, at *3 (S.D. Fla. Aug. 16, 2021). But the court did not explain how the profits were *causally* connected to the violation or address *Sidoti*.

securities dealer had nothing to do with the profits he generated (to the extent such profits even exist). There is no evidence that his unlicensed status resulted in "any market distortion, price impact, or profit," and thus disgorgement is unwarranted. *Wyly*, 56 F. Supp. 3d at 269.

At most, the SEC conflates correlation with causation—claiming that because Mr. Keener generated proceeds and because he was unregistered, the latter must have caused the former. But the Eleventh Circuit has already rejected that argument. *Southern Trust Metals*, 894 F.3d at 1330 (vacating restitution award that "conflate[d] correlation with causation"). And although he was barred from becoming a principal of a FINRA member firm (*see* DSOF Ex. 51, ECF No. 73-2), there is still no evidence that the transactions would have been different if carried out by a registered person. Indeed, the only fact that would have been different had Mr. Keener registered is he would have incurred the specific expenses associated with registration. According to SEC, the cost would have been approximately $520,000 for the initial registration plus annual fees. *See* SEC Release No. 34-94524 at 135 n.268. As the SEC itself highlighted, the purpose behind disgorgement is to ensure individuals "incur the cost of full compliance with the securities laws." Pl.'s Mot. for Remedies ("Mot."), ECF No. 122, at 11 (quoting Congressional history). Here, the cost of full compliance is orders of magnitude less than the disgorgement the SEC seeks.

## 2. Disgorgement Is Barred Under *Liu* Because the SEC Cannot Identify Any Victims

Moreover, the Court should not award disgorgement because the SEC's demand does not comply with the Supreme Court's holding in *Liu*. Under *Liu*, a disgorgement award must be "awarded for victims" to be proper equitable relief rather than an unlawful penalty. *Liu*, 140 S.Ct. at 1940. The Court specifically rejected the SEC's argument that the purpose of disgorgement was to take away "ill-gotten gains," and held that a disgorgement award must do "more than depriv[e] a [defendant] of his net profits alone," and instead must be "'appropriate or necessary for the benefit of investors.'" *Id.* at 1948 (quoting 15 U.S.C. § 78u(d)(5)). Otherwise, the direction in 15 U.S.C. § 78u(d)(5) that equitable relief must be "appropriate or necessary for the benefit of investors" would be meaningless. *Id.* The Court further held that in order to satisfy this direction, the disgorgement award "must do more than simply benefit the public at large" and instead must be "for the benefit" of specific "investors." *Id.* at 1948.

Accordingly, after *Liu*, courts only authorize disgorgement awards after the SEC has identified a discrete set of specific victims. *See, e.g., SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021) (affirming disgorgement award "[b]ecause the SEC has already identified the defrauded [] investors"); *SEC v.*

*Dang*, 2021 WL 1550593, at \*7 (D. Conn. Apr. 19, 2021) (SEC identified two investor victims).  Indeed, in those cases where the SEC failed to demonstrate that the disgorgement award would benefit a specific set of victims, the court refused to award disgorgement.  *SEC v. Bevil*, 2020 WL 7048263, at \*2 (D. Nev. Nov. 30, 2020) (denying disgorgement because of the SEC's "failure to identify whether the disgorgement award is for the benefit of investors"); *SEC v. Janus Spectrum LLC*, 811 Fed. App'x 432, 434 (9th Cir. 2020) (remanding disgorgement award for the same reason).[3]

The SEC's disgorgement demand should be rejected because the SEC has not identified, and cannot identify, specific victims as required by *Liu*.  There are no victims here.  Mr. Keener made convertible note and other investments in companies that were struggling to find financing.  *See, e.g.*, Rule 144 Holding Period, 86 Fed. Reg. 5063, 5074 (proposed Jan. 19, 2021) (these issuers "have limited options to raise capital" and rely on convertible notes).  His investments benefited the companies' employees and existing shareholders.  For instance, Mr. Keener invested several million dollars in Advanced Cell Technology ("ACTC"), which develops treatments for eye diseases; ACTC was thereafter able to uplist from the Over-the-Counter ("OTC") market to NASDAQ, and was subsequently acquired by a global pharmaceutical company for nearly $400 million.  DSOF Ex. 29, ECF No. 72-31, at -468; *see also* Pl.'s Statement of Material Facts ("PSOF") Ex. 9, ECF No. 67-9, at 18 (CEO describing how company "was able to expand its operations and subsequently launch a wider range of product offerings" because of Mr. Keener's investment).  Without his investments, some of these companies may have gone out of business, wiping out shareholders.  Indeed, as the SEC itself recently recognized, without these kinds of investments, issuers would face "**an increase in the cost of financing and a decrease in total access to financing**."  86 Fed. Reg. at 5074 (emphasis added).  The SEC ignores the benefits that Mr. Keener's investments provided to shareholders.

Nor is there evidence that any of Mr. Keener's counterparties, *i.e.*, the persons who purchased the stock that he sold, experienced losses.  His counterparties were likely the registered brokerage firms where he held accounts or other sophisticated market participants.  *See, e.g.*, OTC Markets,

---

[3] *Almagarby* is the exception.  That court held that disgorgement can be awarded under *Liu* even if the SEC does not "identify specific victims," or "return [disgorged funds] to investors," and that no analysis of how the award would benefit victims is necessary.  *Almagarby*, 2021 WL 4461831, at \*3.  Respectfully, that contradicts the central holding of *Liu*: a disgorgement award must be "for victims" and "must do more than simply benefit the public at large."  *Liu*, 140 S.Ct. at 1940, 1948.  As described above, it also contradicts all the other cases following *Liu*, where the SEC was required to demonstrate how disgorgement would benefit victims.

*Trading*, otcmarkets.com/learn/market-101/trading (describing typical broker-dealer practice after receiving investor sale order as "execut[ing] the trade internally" or "attempt[ing] to execute the trade with another broker-dealer").[4]   And Mr. Keener's brokerage firms were fully aware of the details of his convertible note investments because they conducted extensive due diligence before accepting a sale order from Mr. Keener.  DSOF ¶¶ 39-47.  Moreover, the market generally was aware of the terms of his convertible note investments before he sold any stock, including the amount invested and the conversion price, because issuers were obligated to disclose this information in their public filings. *See, e.g.*, DSOF Ex. 25, ECF No. 72-27, (excerpted public filings disclosing notes); Ex. E (excerpt from ACTC Form S-1 filing disclosing number of Mr. Keener's shares) at 3-4; Ex. K (list of hundreds of SEC filings describing Mr. Keener's investments) at App'x C.  Indeed, the SEC actively reviewed issuer disclosures about Mr. Keener's investments and has been aware of those investments for years. *See, e.g.*, Ex. J (sample SEC letter reviewing disclosure about Mr. Keener's investment) at 1.

Mr. Keener's counterparties would also have made money when the stock price of the companies he invested in went up after his sales.  For instance, the trading price of biotechnology company Advaxis, Inc. ("ADXS") more than doubled during the time of Mr. Keener's sales within the relevant period, and then almost doubled again two weeks after his last sale.  Ex. C at 3.  **Ninety-nine percent** of his counterparties in ADXS sales had an opportunity to make a profit.  Ex. A (Mayhew Decl.) at Ex. 1.  The SEC nevertheless seeks to disgorge nearly $4.8 million in ADXS sale proceeds.  The same is true for Northwest Biotherapeutics, Inc. ("NWBO")—the SEC seeks to disgorge $4 million in NWBO sales, but **ninety-nine percent** of his counterparties here too had a profit opportunity.  *Id.*; DSOF Ex. 2, ECF No. 72-4, at 120 (showing net proceeds for ADXS and NWBO).  In fact, the NWBO trading price increased during Mr. Keener's sales and a few months after his last sale, the price was up 50%.  Ex. C at 1.

The SEC claims it has complied with *Liu* through the conclusory assertion that "there should be no shortage" of victims because "93% of issuers experienced stock price declines between Defendant's first and last sales."  Mot. at 9.  Not so.  The length of time between Mr. Keener's first and last sales was hundreds of days and in many cases more than a thousand days.  Ex. A at Ex. 1.  But the average microcap investor holds for less than a month—not for the hundreds or even

---

[4] The SEC assumes Mr. Keener's counterparties were retail "investors" rather than broker-dealers and market makers.  Mot. at 9.  But the SEC provides no basis for this assumption and has refused to identify any specific counterparties in this case.

thousands of days between Mr. Keener's first and last sales—thus, the SEC's statistic is meaningless. Ex. A ¶ 5.  The date of the counterparty's actual purchase and sale (which the SEC has refused to determine) matters.  In fact, the SEC's own analysis demonstrates that if that counterparty purchased on the day of Mr. Keener's last sale, and sold a week later, then it is more likely that the counterparty did not lose money and may even have *made money*.  Ex. A at Ex. 4 (chart summarizing SEC's "Week After Last Sale" analysis).  Indeed, a comprehensive analysis of the trading price of these issuers demonstrates how important it is to identify the counterparty's actual purchase and sale date:  in the vast majority of cases, the issuer's stock price increased on certain dates following Mr. Keener's sales; and if his counterparty sold on those dates, *that counterparty would have made money*.  Ex. A at Ex. 1. Specifically, on average, **ninety percent** of his counterparties had an opportunity to avoid a loss and make a profit.  *Id.*

Moreover, even assuming that some counterparties lost money—and it is only an assumption because the SEC has not identified any counterparty that actually lost money—there are no "victims" of Mr. Keener's unregistered status because that status did not cause any losses.  *See, e.g., Southern Trust Metals,* 894 F.3d at 1331 (11th Cir. 2018) (vacating restitution award when the defendant did not cause investor losses).  The SEC already conceded that there was no causal relationship between Mr. Keener's conduct and any particular losses.  *See* Taveras Dep. (July 27, 2021), ECF No. 66-13, at 161:5-7 ("I don't show causation. . . . As I sit here today, I think it would be hard, or impossible, perhaps.").[5] There are dozens of factors that would have impacted the stock price of any particular company, from the company's business performance to industry trends to world events.  Nor would the dollar amount of any investor loss have any relationship, causal or otherwise, to the dollar amount of Mr. Keener's proceeds.  Simply put, there is no basis to find that if any particular counterparty lost money, that loss had anything to do with Mr. Keener or the fact that he was not registered.

Because it cannot identify any victims, the SEC seeks to postpone its obligation to identify victims until some indeterminate point in the future when Mr. Keener no longer has the opportunity to challenge its analysis.  Mot. at 9 (planning to later identify "investors who lost money holding stock that they purchased" from Mr. Keener).  The SEC's approach not only contravenes *Liu* and subsequent caselaw; it also violates the Federal Rules of Civil Procedure and the Due Process Clause.

---

[5] Indeed, in some cases, the company's stock price **did not** fluctuate during Mr. Keener sales, and only fluctuated during long periods in which Mr. Keener held the stock, which shows there was no causal connection.  *See* Ex. C.

Litigants are required to timely disclose the evidence they intend to rely on and allow the adversary a chance to challenge that evidence. *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 719 (11th Cir. 2019) (compliance with disclosure rules is required and "is not merely aspirational"). If a party fails to timely disclose evidence, fundamental fairness and the Federal Rules bar it from later using that evidence. *See* Fed. R. Civ. P. 37(c)(1).

The SEC has not complied with its disclosure obligations—it has not identified any alleged victims, any specific losses allegedly suffered by those victims, or any causal connection between those losses and Mr. Keener's unregistered status. The one witness the SEC listed regarding counterparties (Robert Nesbitt) has not identified a single counterparty and indeed cannot determine whether they suffered any losses. *See* SEC's Rule 26(a) 2d Supp. Discl., ECF No. 69-13, at 4 (Nesbitt's role is "to identify counterparties"); DSOF Ex. 65, ECF No. 73-16, (Nesbitt Tr.) at 103:23-104:22 ("I typically do not get involved in [] issues [relating to harm]"). Nor did the SEC produce any of the data that would be required to do this analysis. *Id.* at 107:19-108:5.

The SEC's conduct is neither substantially justified nor harmless; instead, it is highly prejudicial because it deprives Mr. Keener of the ability to challenge the SEC's analysis that any particular counterparties were victims and show the counterparties did not suffer losses or that losses were caused by other market forces. *See, e.g.*, *Beaubrun v. Geico Gen. Ins. Co.*, 2017 WL 3025852, at *3 (S.D. Fla. July 17, 2017) (finding late disclosure of evidence harmful and prejudicial to defendants). The appropriate sanction is that the SEC be barred from later identifying alleged victims. *See, e.g.*, *Hinds v. Am. Sec. Ins. Co.*, 2016 WL 8677901, at *3 (S.D. Fla. Dec. 7, 2016) (excluding evidence when defendant was "deprived of the opportunity to investigate" and challenge it); *Glob. Digit. Sols., Inc. v. Grupo Rontan Electro Metalurgica*, 2020 WL 8816214, at *3-4 (S.D. Fla. Dec. 1, 2020) (same when late disclosure "deprived [party] of a meaningful opportunity to conduct discovery" regarding the evidence).

Finally, it is clear that the SEC will ultimately ask for "an order directing disgorged funds to the Treasury" rather than to any individual investors, because it will never be able to identify any specific wronged investors. Mot. at 8. The SEC claims that *Liu* "did not rule out [this] possibility," and by implication the Court can order the same here. *Id.* The SEC is wrong. The Supreme Court specifically held that prior disgorgement orders that "deposit[ed] disgorgement proceeds] in Treasury funds instead of disbursing them to victims" were problematic and "test[ed] the bounds of equity." *Liu*, 140 S.Ct. at 1946. The only question the Court left open was whether in those instances where "it is infeasible to distribute the collected funds to investors" as a practical matter, for instance if the investors are deceased or cannot be located, the disgorgement award could be deposited with the

Treasury. *Id.* at 1948. The SEC offers no reason why distribution to individual victims—if any exist—would be "infeasible." It cites no logistical impediment to such distribution. Instead, the SEC seeks an escape hatch because it knows finding any victims is impossible—Mr. Keener's activity did not cause any losses suffered by any individual investor. *Liu* does not allow this. "[L]ower courts should view requests for disgorgement skeptically where the SEC intends to deposit disgorgement funds with the United States Treasury." *SEC v. Cope*, 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021).

### B. The SEC's Disgorgement Calculation Is Not a Reasonable Approximation of Net Profits

If the Court finds that disgorgement is warranted, the Court should nevertheless reject the SEC's amount because the $17.6 million in disgorgement the SEC demands grossly exceeds any net profits Mr. Keener made from his convertible note investments. In order to obtain disgorgement, the SEC must "produc[e] a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). Under *Liu*, that amount must be limited to "net profits" and must deduct "legitimate expenses." *Liu*, 140 S. Ct. at 1940, 1950.

The SEC's numbers are not a reasonable approximation. Instead, the SEC draws every factor in its own favor to artificially exceed by leaps and bounds any reasonable approximation of Mr. Keener's actual net profits. First, the SEC's calculation includes transactions beyond those that allegedly turned him into a securities dealer. The SEC previously cited only those convertible note investments where he was able to convert at a "deep discount[] . . . from the prevailing market price" and quickly resell to "lock in his profits." Compl. ¶¶ 2, 8, 13. That is why this Court also focused on his convertible notes and the conversion discount in finding he was a dealer. ECF No. 118 at 21-25 (dealer activity was "convert[ing] more than 100 convertible notes" into stock at a "discount to the trading price" and selling that stock). Yet, the SEC now seeks to disgorge the proceeds of the sale of every single share of microcap stock regardless of the terms of his investments and whether they bore any resemblance to the convertible notes. This is improper because the other investments were different. For instance, the two largest investments (ADXS and NWBO) were bridge loans where Mr. Keener was to be repaid in cash out of the proceeds of a larger stock offering; although he later obtained stock, it was at the companies' request (as opposed to a conversion at his election) and he held that stock for years. *See* Exs. C and D (NWBO and ADXS agreements and stock sale dates); *see also* Def's Opp. to PSOF, ECF No. 91, ¶ 12. The SEC has never attempted to justify disgorging these bridge loan proceeds, which account for $8.8 million of the net proceeds. *See* ECF No. 72-4 at 120.

The SEC also has errors in its numbers. For instance, the SEC agreed that proceeds obtained through open market purchases or syndicated offerings should be excluded. *See* Mot. Ex. 3 ¶ 3.d. Yet the SEC improperly included more than $600,000 in proceeds from warrants that were obtained through syndicated offerings or open market purchases. Ex. B (Flemmons Decl.) ¶ 10. Moreover, the SEC also improperly included $3 million in cash repayments in its entry for "OID, Interest and Penalties," which were not proceeds from stock sales at all. *Id* ¶ 9. Thus, by the SEC's own terms, its disgorgement calculation must be reduced by millions of dollars.

Furthermore, the SEC manipulates the date range in its favor. The SEC previously identified the relevant period as January 2015 through January 2018. *See* Ex. F (Pl.'s 1st Reqs. for Admis.) at 4 (defining "Relevant Period" as "from January 2015 through January 2018") and (Pl.'s 1st Interrogs.) at 6 ("The term 'Relevant Period' means January 2015 through January 2018."). But now the SEC seeks to extend the time period back to March 24, 2014, which by its own calculation more than doubles its disgorgement demand from $8.7 million to $17.6 million. The SEC's tactics are particularly unfair when most of Mr. Keener's proceeds from 2014 were from sales of ADXS and NWBO, which were bridge loan investments and his counterparties likely made substantial profits because the stock price increased after his sales. *See* Sec. II.A.2, *supra*.

Mr. Keener's accounting expert (Jason Flemmons, the former Deputy Chief Accountant at the SEC's Division of Enforcement) properly calculated Mr. Keener's net profits based on the SEC's allegations in the Complaint—that is, based on proceeds from sales of converted stock obtained at a discount during the 2015 to 2018 time period. He concluded that Mr. Keener generated approximately $10 million in gross proceeds, and at the same time incurred approximately $12.4 million in expenses. DSOF Ex. 70, ECF No. 73-21, (Flemmons Report) ¶¶ 35-36, 46. Accordingly, Mr. Keener suffered a net loss of almost $2.5 million based on the activity singled out in the Complaint. Virtually all of Mr. Keener's expenses were tied to the labor-intensive convertible note investments. *See* DSOF ¶¶ 55, 59, 65. Yet even with the expenses prorated to the percentage of overall revenue related to converted stock, Mr. Keener's net profits from this time period were only $3 million. *See* Ex. B (Flemmons Decl.) at Ex. 2.

Nor is there any basis for the SEC's end date of January 31, 2018, which also results in an inflated disgorgement figure. Mr. Keener suffered substantial losses in 2018 and 2019 from earlier investments—notably, he lost more than $17 million dollars from a failed bridge loan in a company called Connekt Media Inc. ("Connekt"). *See* DSOF Ex. 1, ECF 72-2, at 183:14-186:4; Ex. G (showing $17.2 million investment) at 3; Ex. H (2019 tax return) at 3, 9-10 (showing losses). Thus, even

11

assuming the relevant period began on March 24, 2014, and disgorgement is expanded beyond convertible notes, Mr. Keener lost money and there are no profits to disgorge.[6]  If the Court believes it is appropriate to award disgorgement, the amount should take into account Mr. Keener's substantial losses after January 2018, which includes losses for investments in earlier years in both bridge loans and convertible notes.  Ex. B at Ex. 1.  Mr. Flemmons' summary of Mr. Keener's investment activity from 2014 to 2019 demonstrates clearly that his securities investments were not profitable and his net losses since 2014 were more than $5 million.  *Id.*

### C.    Prejudgment Interest Is Not Warranted

Nor is the additional $5.1 million in prejudgment interest demanded by the SEC equitable in this case.  First, prejudgment interest is calculated based on disgorgement, and disgorgement is unwarranted here.  *See* Sec. II.A, *supra*.  Yet even if the Court awards disgorgement, it should still decline to impose prejudgment interest.  The Court has wide discretion to determine whether to impose prejudgment interest.  *See, e.g., Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1446-47 (11th Cir. 1998).  The purpose of awarding prejudgment interest is *not* to penalize the defendant or to disgorge ill-gotten gains; instead, the purpose is to "compensate[] the plaintiff for the use of funds that were rightfully his."  *Id.*; *see also Hanna Yachts, LLC v. Caribbean Breeze Marine A.C., X, LLC*, 2013 WL 12141336, at *4 (S.D. Fla. Mar. 19, 2013) (the "purpose of awarding prejudgment interest is compensatory").

Courts consider several factors in determining whether to impose prejudgment interest: "(1) the need to fully compensate the wronged party for actual damages suffered, (2) considerations of fairness and the relative equities of the award, (3) the remedial purpose of the statute involved and/or (4) such other general principles as are deemed relevant by the court."  *SEC v. Monterosso*, 2012 WL 12950028, at *7 (S.D. Fla. Feb 16, 2012).

The SEC neither identifies nor applies these factors, which weigh in Mr. Keener's favor.  First, as described above, there is no "wronged party" or "actual damages suffered."  The SEC has not identified any victims or harm suffered, let alone harm that would not be "fully compensate[d]" by the disgorgement award.  *See, e.g., Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*, 2017 WL 9939048, at

---

[6] Deducting the Connekt loss is proper under *Liu*.  The SEC has conceded that it is appropriate to deduct losses.  *See* Mot. Ex. 3 ¶ 3.c.  As the Supreme Court held: "Courts may not enter disgorgement awards that exceed the gains made upon any business or investment, *when both the receipts and payments are taken into the account*."  *Liu*, 140 S. Ct. at 1949-50 (emphasis added).  The purpose of disgorgement is to "restore[] the status quo," not to punish the defendant.  *Id.* at 1943.

*2 (M.D. Fla. Aug. 22, 2017) (denying prejudgment interest when it would give plaintiff—who was "adequately compensate[d]" by the damages award—a windfall); *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 Fed. Appx. 862, 878-79 (11th Cir. 2011) (same).

Second, considerations of fairness and the relative equities also weigh in Mr. Keener's favor. He stopped investing in convertible notes five years ago, and he made those investments after attorneys confirmed the transactions complied with applicable securities laws. *See* Sec. II.D, *infra*. Moreover, he invested virtually all of his proceeds earned between 2014 and 2018 into Connekt but lost his full investment when Connekt went out of business. *See* Sec. II.B, *supra*. Accordingly, he did not obtain any benefit at all from these proceeds. And courts "routinely refuse[] to award prejudgment interest when defendants are unable to use or secure a benefit from" the disgorged profits. *SEC v. E-Smart Techs., Inc.*, 2016 WL 183503, at *8 (D.D.C. Jan. 14, 2016).[7]

Even if the Court believes prejudgment interest is warranted, the amount calculated by the SEC is unjustifiably large. This Court has wide discretion to determine both the rate and the time period for accrual. *See, e.g.*, *SEC v. Carrillo*, 325 F.3d 1268, 1273 (11th Cir. 2003). If prejudgment interest is imposed, the time period for accrual should begin no earlier than the end of the relevant period for disgorgement, as the court adopted in *Almagarby* (at the SEC's request). *Almagarby*, 2021 WL 4461831, at *3. The SEC instead demands here that the court calculate prejudgment interest separately for each year during the relevant period. But the SEC's choice to deviate from *Almagarby* is unjustified and improperly increases the prejudgment interest by millions of dollars.

## D.      Injunctive Relief Is Not Warranted

The permanent injunction the SEC seeks against Mr. Keener is also unwarranted. The SEC can only obtain injunctive relief when it demonstrates that a "person is engaged or is about to engage in" a violation of the securities laws. 15 U.S.C. § 78u(d)(1). Accordingly, the SEC must show not only a prior violation, but also a reasonable likelihood that the wrong will be repeated. *Calvo*, 378 F.3d at 1216. That is, the SEC "must offer positive proof of the likelihood that the wrongdoing will recur." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978).

---

[7] Nor does the third factor (the "remedial purpose of the statute") justify the SEC's demand. As the SEC itself highlighted, the purpose of imposing remedies for dealer registration violations is to "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance." Mot. at 11. And as discussed above, the cost of "full compliance" was far less than the SEC demands. *See* Sec. II.A.1, *supra*.

There is no possibility of a recurrent violation, let alone the "cognizable danger" of an imminent violation that the SEC must show. *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992); *see also SEC v. Ingoldsby*, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) (injunctive relief requires showing that "recurring violations are a relatively imminent threat"). Mr. Keener is out of the convertible note business. His last investment in a new convertible note was in 2017, one year before the SEC began investigating him and three years before it filed this lawsuit. DSOF ¶ 56. He stopped investing in convertible notes because they were not profitable, after considering the substantial expenses associated with those investments. DSOF ¶ 65 ("[I]t just turned out to be not a good way to make money. . . . I have no interest in reentering that business whatsoever again."). Mr. Keener is willing to surrender any remaining conversion rights and converted stock. *See* Sec. II.G, *infra*. Thus, there is no chance that the conduct that forms the basis of the SEC's lawsuit will recur.

The other factors courts consider in assessing the likelihood of a future violation also weigh against injunctive relief. Those factors are (1) the degree of scienter involved; (2) the egregiousness of the conduct; (3) the isolated or recurrent nature of the infraction; (4) the sincerity of defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct; and (6) the likelihood that the defendant's occupation will present opportunities for a future violation. *Calvo*, 378 F.3d at 1216.

First, it is undisputed that Mr. Keener did not act with scienter. *See* Order, ECF No. 45 at 2 ("SEC does not allege scienter."). He did not overlook the dealer registration requirements knowingly or even recklessly. To the contrary, he routinely confirmed with attorneys that his transactions complied with applicable securities laws. DSOF ¶¶ 48, 49. During the relevant time period, three separate attorneys told him that he was not a securities dealer. *Id.* (citing letters from counsel stating that Mr. Keener "has not acted as a dealer" and "is not a dealer"). Moreover, his investing activity was similar to that of many other participants in the securities industry who were not registered dealers, including hedge funds, family offices, and high frequency traders. DSOF ¶¶ 91-95. At most, he was engaged in a "technical violation," not one deserving of injunctive relief. *Steadman*, 967 F.2d at 648 (denying injunctive relief when violation was not "flagrant or deliberate" but was "merely technical in nature" and defendant had relied on "advice of counsel" in good faith).[8]

---

[8] While scienter is not an absolute prerequisite to imposing injunctive relief, it is "highly relevant" to the analysis. *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) ("[W]hile scienter is not required

14

For the same reason, there was no "egregious" misconduct warranting injunctive relief. *SEC v. Perez*, 2011 WL 5597331, at *3 (S.D. Fla. Nov. 17, 2011) (egregious conduct requires "flagrant" rather than "merely technical" violation); *see also Gane*, 2005 WL 90154, at *18 (denying injunctive relief in light of "mere technical violations"). The SEC argues Mr. Keener's conduct was "egregious" because the dealer registration requirements are "importan[t]." Mot. at 4. Yet the SEC finds no support in the case law for its argument that a violation of an "important" law makes the conduct "egregious." Indeed, if this was the correct standard, then every securities violation would automatically be egregious—surely, there are no "unimportant" securities laws. To the contrary, conduct is egregious only if it is "flagrant," if it constituted a "breach of fiduciary duty," if it "caused others to suffer significant financial loss," or if it "arose out of a complex scheme to defraud." *Perez*, 2011 WL 5597331, at * 2. Not one of those circumstances is present here.

Regarding the third factor, whether the conduct was isolated or recurrent, there was only one registration violation. *See, e.g., In re David B. Havanich, Jr.*, SEC Release No. 935, 2016 WL 25746, at *11 (Jan. 4, 2016) ("The events at issue will be considered as one course of action—Respondents' operations as an unregistered broker-dealer from 2010 to 2012."); *In re Spring Hill Cap. Mkts.*, SEC Release No. 919, 2015 WL 7730856, at *19 (Nov. 30, 2015) (finding that "SHCP's operations as an unregistered broker-dealer" was one violation). The SEC argues the conduct was "recurrent" based solely on the number of investments Mr. Keener made, as though each purchase or sale of a security was a separate violation. Mot. at 4. Not so—there was only one violation. *See also* Sec. II.F, *infra*.[9]

Regarding the fourth factor, Mr. Keener's assurances against future violations—as noted above, he is out of the convertible note business. And as to recognizing the wrongful nature of the

---

to make out violations of several of the statutory sections involved here, the respondent's **state of mind is highly relevant** in determining the remedy to impose. It would be a gross abuse of discretion to bar an investment adviser from the industry on the basis of isolated negligent violations.") (emphasis added); *see also SEC v. Pros Int'l Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) ("Although no single factor is determinative . . . the degree of scienter bears heavily on the decision.") (citing *SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir. 1981)). In the SEC's own cases, the courts only granted injunctive relief **after finding defendant acted with scienter**. *See SEC v. Sky Way Glob.*, 2010 WL 3025033, at *1 (M.D. Fla. July 29, 2010) (defendant "demonstrates a high degree of scienter"); *SEC v. Collyard*, 154 F. Supp. 3d 781, 791 (D. Minn. 2015) (defendant's conduct "was at least reckless"); *SEC v. Offill*, 2012 WL 1138622, at *5 (N.D. Tex. Apr. 5, 2012) (defendant acted "at least with reckless disregard . . . if not intentionally").

[9] Although *Almagarby* imposed an injunction against the defendant for a registration violation, that was because the defendant had multiple active companies with no apparent purpose other than to engage in alleged dealer activity, which is not the case here. *Almagarby*, 2021 WL 4461831, at *2.

conduct, although he chose to litigate against the SEC, this fact is irrelevant.  *See, e.g.*, *Ingoldsby*, 1990 WL 120731, at *3 ("While the defendant has not publicly acknowledged the wrongfulness of his conduct, I find that this is not evidence of a propensity . . . to commit future violations. . . [T]he defendant should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet its proper evidentiary burden.").  The SEC claims that because Mr. Keener sold the stock of a company named Blink Charging last year, he "has [not] recognized the wrongful nature of his conduct."  Mot. at 5.  The SEC is mistaken.  In fact, Mr. Keener obtained that Blink Charging stock after he made a simple loan in 2018 with no conversion rights that the company later requested to repay in stock— not through the Quick Loans at issue in this case.  *See* Ex. I (Jan. 24, 2018 email confirming loan and Feb. 1, 2018 request from company to repay out of public offering); *see also* Def's Opp. to PSOF ¶ 36 (describing different investments in Blink Charging).

As to the final factor, whether the occupation presents opportunities for future violations, Mr. Keener has shifted entirely to other types of investments.  He has invested in blue chip stocks and "retirement type investments."  DSOF ¶ 66.  Last year, he acquired a reference and education website. *Id.*  The SEC claims because he is "self-employed" and has "access to capital," it would be "easy for him to buy a new series of convertible notes."  Mot. at 5.  But he made a conscious decision years ago to stop investing in convertible notes because it was not profitable.  There is no basis to conclude he is now going to change his mind.  Ultimately, "an injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against" someone like Mr. Keener who was "acting in good faith."  *Aaron v. SEC*, 446 U.S. 680, 703 (1980) (concurring opinion); *see also In re Havanich,* 2016 WL 25746, at *11 ("No Commission opinion in a litigated administrative proceeding has imposed a bar on a respondent solely for operating as an unregistered broker-dealer.").

Finally, the injunction requested by the SEC is also improper because it is an "obey the law" injunction that merely parrots the language of the Exchange Act.  The Eleventh Circuit has clearly and repeatedly struck down "obey the law" injunctions:

> Repeatedly we have said that, in the context of SEC enforcement actions and otherwise, 'obey the law' injunctions are unenforceable. . . . In particular, an injunction which merely tracks the language of the securities statutes and regulations . . . will not clearly and specifically describe permissible and impermissible conduct as required by Federal Rule of Civil Procedure 65(d). . . . We condemn these injunctions because they lack specificity and deprive defendants of the procedural protections that would ordinarily accompany a future charge of a violation of the securities laws.

*SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016); *see also SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (directing district court to find obey the law injunction that "track[ed] the

provisions of the statute" unenforceable). The SEC's proposed injunction does nothing more than recite Sections 3(a)(5) and 15(a)(1) of the Exchange Act. *See* Mot. Ex. 4 at 1. It gives Mr. Keener no specificity as to what conduct would constitute a violation and is unwarranted for this additional reason.[10]

E.      **A Penny Stock Bar Is Not Warranted**

The SEC also seeks a permanent bar preventing Mr. Keener from "participating in an offering of penny stock." Mot. Ex. 4 at 2. In assessing the propriety of a penny stock bar, courts examine (1) the "nature of the defendant's conduct" and (2) "the likelihood that his occupation and experience will present further opportunities to violate the securities laws." *SEC v. BIH Corp.*, 2014 WL 7499053, at *6 (M.D. Fla. Dec. 12, 2014). Neither factor weighs in favor of a bar.

With regards to the nature of the conduct, as described above, the SEC has alleged a technical, non-scienter violation. *See* Sec. II.D, *supra*. This technical violation is far from the examples of conduct warranting a penny stock bar described in prior cases—namely conduct that is so egregious that it indicates the defendant "*cannot ever operate in compliance* with the law," and he must be made an example of to serve as a "deterrent to others." *BIH Corp.*, 2014 WL 7499053, at *6 (emphasis added). The SEC does not even attempt such a showing.

With regards to whether Mr. Keener has "opportunities" for further violations, as described above, Mr. Keener has left the convertible notes business and has no interest in returning. *See* Sec. II.D, *supra*. The SEC does not and cannot demonstrate otherwise. To obtain a permanent penny stock bar, the SEC must "specifically articulate[] compelling reasons for such a sanction." *Steadman*, 603 F.2d at 1140. The SEC has not met its burden.

F.      **A Civil Penalty Is Not Warranted**

Nor is a penalty warranted in this case. The Court may only impose a penalty "upon a proper showing" that one is warranted. 15 U.S.C. § 78u(d)(3)(A)(i). In assessing whether a penalty is warranted, courts look at (1) the degree of scienter; (2) the egregiousness of the conduct; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Big Apple*, 2013 WL 1352166, at *3 (M.D. Fla. Mar. 29, 2013). None of these factors support the SEC's request.

---

[10] For instance, it does not specify whether he is allowed to purchase stock on the open market, to hire accountants to administer any investments, or to attend investment conferences.

First, it is undisputed that Mr. Keener did not act with scienter.  *See* Sec. II.D, *supra*.  Nor was his failure to register "egregious."  *See, e.g.*, *Gane*, 2005 WL 90154, at *17 (defendant's conduct was not egregious when he "had continuously been consulting counsel").  Indeed, every sale was only executed after being approved by an attorney, transfer agent, clearing firm, and broker-dealer, and none of those third-party intermediaries ever raised concerns that he might be subject to the dealer registration requirements.  DSOF ¶¶ 36-47.  Mr. Keener's conduct—investing in microcap companies in need of financing and selling stock after the sales were approved by multiple gatekeepers—does not come close to the conduct that other courts have found "egregious."  *See, e.g.*, *SEC v. US Pension Tr. Corp.*, 2010 WL 3894082, at *25 (S.D. Fla. Sept. 30, 2010) (defining "egregious" conduct as conduct similar to "ponzi schemes").  Not to mention, his unregistered status was consistent with thousands of other market participants who buy and sell securities in tremendous volumes yet are unregistered.  DSOF ¶¶ 91-95.

Moreover, there is no evidence that Mr. Keener's unregistered status created substantial losses or the risk of such losses.  As described above, there is no evidence of specific losses, let alone evidence Mr. Keener's unregistered status caused those losses.  *See* Sec. II.A.2, *supra; see also* Taveras Dep. (July 27, 2021) at 161:5-7 (SEC conceding it doesn't "show causation. . . . As I sit here today, I think it would be hard, or impossible, perhaps.").  To the contrary, Mr. Keener's counterparties had many opportunities to generate a profit.  Ex. A at Ex. 1.

The SEC's main argument is that Mr. Keener should be punished because the "violations were recurrent rather than isolated" if each stock sale is treated as a separate violation.  Mot. at 11.  The SEC does not support this argument with a citation to any case law.  To the contrary, the case law is clear that the failure to register is one violation.  *See* Sec. II.D, *supra*; *SEC v. J.W. Korth & Co.*, 991 F. Supp. 1468, 1473 (S.D. Fla. 1998) (rejecting the "SEC's assessment regarding the number of violations" and finding only one technical violation).

The SEC claims a penalty is needed "to deter Defendant and others from this type of conduct."  Mot. at 12.  But there is no need to "deter" Mr. Keener because he has not invested in a convertible note in five years.  *See* Sec. II.D, *supra*.  And the SEC's reference to "others" (Mot. at 12-13) only highlights the unfairness of the SEC's approach.  Every firm in the convertible lending industry engaged in the same conduct as Mr. Keener, which is evidence of the reasonable, widespread belief that Mr. Keener's conduct was lawful.  Moreover, the SEC's desire to punish Mr. Keener and make an example of him stands in stark contrast to the SEC's approach to certain principal trading firms.  As described above, the Commission recently issued a new rule proposal to clarify that some

of the largest, most sophisticated investment firms have actually been "dealers" under the existing statutory framework all along. SEC Release No. 34-94524. Yet the SEC is not seeking to investigate them; it is not seeking to file enforcement actions against them; it is not seeking to disgorge all of their profits; and it is not seeking to punish them in any way. There is no "rational basis for [this] difference in treatment." *Olech*, 528 U.S. at 564.

If the Court believes a penalty is warranted here, the facts and circumstances do not justify the $1.75 million penalty the SEC seeks. 15 U.S.C. § 78u(d)(3)(B)(i) (penalty amount "shall be determined by the court in light of the facts and circumstances"). The Exchange Act authorizes three tiers of penalties in increasing severity, but only the first and lowest tier applies here because the SEC only alleges one non-scienter violation against Mr. Keener. For a non-scienter violation against an individual, the first tier provides for an inflation-adjusted penalty of $10,360. *Id.*; 17 C.F.R. § 201.1001.[11] Courts within the Eleventh Circuit routinely award this tier of penalty for violations like Mr. Keener's failure to register. *See, e.g.*, *Gane*, 2005 WL 90154, at * 20 (tier one penalty for "technical violations"); *SEC v. Calmes*, 2011 WL 13174658, at *5 (S.D. Fla. Nov. 10, 2011) (tier one penalty for registration violations). The SEC provides no reason to deviate from this statutory framework. Indeed, the SEC advocated for, and the court adopted, the statutory tier-one penalty in *Almagarby*. *See Almagarby*, 2021 WL 4461831, at *4. None of the SEC's cases justify deviating so dramatically from the inflation-adjusted statutory penalties.[12]

The statute allows in the alternative that the penalty can go up to "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78u(d)(3)(B)(i). For the Court to award a penalty under this provision, the SEC "must demonstrate" that the "financial gain that the defendant enjoyed" was "*because of the violation* that the penalizing court found him to have committed." *SEC v. Huff*, 2010 WL 148232, at *3 (S.D. Fla. Jan. 12, 2010) (emphasis added). But for the reasons set forth above, the SEC has not met this burden—it has not identified any way in which Mr. Keener's unregistered status caused his pecuniary gain. *See* Sec. II.A.1, *supra*. The SEC claims Mr.

---

[11] The Exchange Act authorizes the tier one penalty "for each violation," *see* 15 U.S.C. § 78u(d)(3)(B), and there was only one violation here—the failure to register as a securities dealer under Section 15(a). *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1345 (N.D. Ga. 2010) (number of violations depends on "the number of statutes the defendant violated").

[12] *See Offill*, 2012 WL 1138622, at *3-4 ($120,000 penalty); *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1373 (S.D. Fla. 1999) ($100,000 penalty); *SEC v. Kahlon*, 2016 WL 5661642, at *5 (E.D. Tex. Sept. 30, 2016) ($200,000 penalty); *SEC v. Lefkowitz*, 2013 WL 12170296, at *4 (M.D. Fla. Sept. 6, 2013) (default judgment over an alleged scheme to evade the securities laws by recidivist violator).

Keener made "outsized gains," *see* Mot. at 11, but that does not mean any of his gains were caused by his unregistered status. Not to mention Mr. Keener did not generate outsized gains, and instead lost money overall. Regardless, the SEC ignores this statutory causation requirement and does not show that any gain was caused by his unregistered status.

Finally, the specific penalty amount demanded by the SEC—"approximately 10% of the SEC's proposed disgorgement figure" (Mot. at 13)—is arbitrary, and thus improper. *See, e.g.*, *SEC v. Aerokinetic Energy Corp.*, 2010 WL 5174514, at *7-8 (M.D. Fla. Sept. 10, 2010) (cutting SEC's penalty demand in half when it failed to "articulate[ ] any cogent basis for" the specific amount).

### G.   Mr. Keener Is Willing to Surrender and Cancel His Remaining Shares

Mr. Keener is willing to surrender any remaining shares in the hundreds of companies listed in Exhibit 1 to the SEC's Motion, and to stipulate that he will not convert any convertible note of those companies. Mr. Keener stopped investing in convertible notes years ago because these investments were not profitable, and he has no interest in returning to them. *See* Sec. II.D, *supra*. However, the SEC's proposed order also requires Mr. Keener to provide "copies of correspondence evidencing the surrender," which is not possible. Mot. Ex. 4 at 5. Many of the companies have gone out of business, and there are no persons to "correspond" with to demonstrate the surrender.

## III.   CONCLUSION

The remedies the SEC seeks are unwarranted, unfair, and all out of proportion to the license violation at issue here. There is no basis to force Mr. Keener to pay more than $24 million, when the failure to register did not cause harm to others or cause Mr. Keener to earn profits he would not otherwise have made. Nor is it justified when his unregistered status was consistent with an entire industry of thousands of persons buying and selling securities for a living. Mr. Keener made convertible note investments for a few years and has now moved on. No further sanctions—and certainly not of the level the SEC seeks—are justifiable here. For these reasons, and all the others set forth herein, Mr. Keener respectfully requests that the SEC's Motion be denied.

Dated: April 15, 2022                    Respectfully submitted,

**GREENBERG TRAURIG LLP**

*Benjamin G. Greenberg*
**Benjamin G. Greenberg**
Florida Bar No. 192732
333 SE 2nd Avenue Suite 4400
Miami, FL 33131

Telephone: (305) 579-0850
Facsimile: (305) 579-0717
greenbergb@gtlaw.com

**BUCKLEY LLP**

**Christopher F. Regan (*pro hac vice*)**
**Veena Viswanatha (*pro hac vice*)**
**Adam Miller (*pro hac vice*)**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
cregan@buckleyfirm.com
vviswanatha@buckleyfirm.com
amiller@buckleyfirm.com

*Counsel for Defendant Justin W. Keener*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served via ECF a true and correct copy of the foregoing

Defendant Justin W. Keener's Opposition to Plaintiff Securities and Exchange Commission's

Motion for Remedies to the following:

> Joshua E. Braunstein (Special Bar No. A5502640)
> Antony Richard Petrilla (Special Bar No. A5502641)
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> 100 F Street NE
> Washington, DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov
> Petrillaa@sec.gov
>
> *Attorneys for Plaintiff*
> *Securities and Exchange Commission*

This, 15th day of April, 2022

/s/ *Benjamin G. Greenberg*
Benjamin G. Greenberg