IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JUSTIN W. KEENER D/B/A JMJ FINANCIAL, | ) |
| | ) No. 20-cv-21254 |
| Defendant. | ) |
| | ) Hon. Beth Bloom |
| | ) |
| | ) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY TO
DEFENDANT'S OPPOSITION TO THE SEC'S MOTION FOR REMEDIES**

## TABLE OF CONTENTS

I. Introduction ..................................................................................................................................1

II. Defendant's Disgorgement Arguments Misapply the Law and the Facts ..................................2

    a. Defendant's regular business of buying and selling securities without registering caused his unjust enrichment. ...........................................................................................2

    b. The SEC's request for disgorgement complies with *Liu*. ................................................3

    c. The SEC has met its burden to provide a reasonable approximation of disgorgement. ......................................................................................................................4

III. The SEC Is Entitled to Prejudgment Interest..............................................................................7

IV. The Court Should Grant Injunctive Relief..................................................................................7

V. The Court Should Enter a Penny Stock Bar ................................................................................9

VI. The Court Should Require Defendant to Pay a Civil Penalty of $1,750,000 .............................9

# TABLE OF AUTHORITIES

**CASES**

*CFTC v. Sidoti*,
  178 F.3d 1132 (11th Cir. 1999) .......................................................................................... 2

*CFTC v. Southern Trust Metals, Inc.*,
  894 F.3d 1313 (11th Cir. 2018) .......................................................................................... 3

*Hays v. Adam*,
  512 F. Supp. 2d 1330 (N.D. Ga. 2007) ............................................................................. 3

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) ........................................................................................................ 1

*SEC v. Almagarby*,
  477 F. Supp. 3d 1266 (S.D. Fla. 2020) ............................................................................. 8

*SEC v. Almagarby*,
  No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831 (S.D. Fla Aug. 16, 2021) ............ 2, 3

*SEC v. Almagarby*,
  No. 17-62255-CIV-COOKE/HUNT, 2022 WL 832279 (S.D. Fla. Feb. 15, 2022) .............. 3, 9

*SEC v. Bevil*,
  No. 2:19-cv-0590-RFB-DJA, 2020 WL 7048263 (D. Nev. Nov. 30, 2020) ...................... 3, 4

*SEC v. Blackburn*,
  15 F.4th 676 (5th Cir. 2021) .............................................................................................. 4

*SEC v. Calvo*,
  378 F.3d 1211 (11th Cir. 2004) ................................................................................. 5, 6, 7

*SEC v. Dang*,
  No. 3:20-cv-01353, 2021 WL 1550593 (D. Conn. Apr. 19, 2021) ................................... 4

*SEC v. Goble*,
  682 F.3d 934 (11th Cir. 2012) ........................................................................................... 9

*SEC v. Huff*,
  No. 08—60315—CIV, 2010 WL 148232 (S.D. Fla. Jan. 10, 2010) ............................... 3, 10

*SEC v. Janus Spectrum LLC,*
      811 Fed. App'x 432 (9th Cir. 2020) ...................................................................................3, 4

*SEC v. Keener,*
      No. 1:20-cv-21254-BLOOM/Louis, 2020 WL 4736205 (S.D. Fla. Aug. 13, 2020) ...................7

*SEC v. Keener,*
      No. 1:20-cv-21254-BLOOM/Louis , 2022 WL 196283 (S.D. Fla. Jan. 21, 2022) ......................8

*SEC v. McGinn, Smith & Co.,*
      98 F. Supp. 3d 506 (S.D.N.Y. 2015) ........................................................................................3

*SEC v. Monterosso,*
      756 F.3d 1326 (11th Cir. 2014) ..............................................................................................10

**STATUTES**

15 U.S.C. § 78u(d)(3)(A)(ii) ............................................................................................... 2, 3, 4

15 U.S.C. § 78u(d)(3)(B)(i) ..................................................................................................... 10

15 U.S.C. § 78u(d)(7) ................................................................................................................3

I. **Introduction**

Defendant's remedies opposition brief contends that virtually *no remedies* are appropriate. *See* DE 124 (Opposition to Plaintiff's Motion for Remedies) (hereinafter "Opp."). But Defendant repeatedly misstates the law and the established facts of this case, which instead support the SEC's Motion for Remedies. *See* DE 122. For example:

- To determine disgorgement, the Court must look at net profits that are causally related to the violation, *not* investor losses as Defendant repeatedly asserts. (Opp. at 1, 8, 10)
- The SEC's request for disgorgement fully complies with the Supreme Court's holding in *Liu v. SEC*, 140 S.Ct. 1936 (2020). Under *Liu*, the SEC is not required to identify specific victims to obtain disgorgement as Defendant asserts here. (Opp. at 5-10). Moreover, Defendant's opposition brief fails to address Congressional amendments enacted in 2021 to the Securities Exchange Act of 1934 ("Exchange Act") that contain no "for the benefit of investors" language for disgorgement.
- Likewise, the SEC met its burden to provide a "reasonable approximation" of Defendant's ill-gotten gains. His claim that he *lost* money, and does not owe disgorgement, is based on several ***false premises***: (1) he only counts profits from his Quick Loans product and not from *convertible* "bridge loans" or warrants bundled with convertible notes, (2) he treats the tolling agreement *he signed* as invalid, (3) he subtracts from disgorgement $17 million in losses on loans he made to his ***own*** private company, Connekt Media Inc., which had nothing to do with his convertible note business, and (4) he refused to disclose the contents of foreign accounts during discovery.
- Defendant fails to rebut the SEC's arguments for an injunction to prevent similar conduct in the future.
- Defendant's request for a mere $10,000 penalty is insufficient for either general or specific deterrence purposes. The facts of this case justify a substantial penalty.

In short, the Court should grant the SEC's Motion for Remedies and enter its proposed final judgment.[1]

---

[1] The SEC has attached a corrected proposed final judgment hereto as Exhibit A, which inserts the words "and warrants" in the sentence on page 5 that now states "surrender for cancellation his remaining shares of stock and warrants of the issuers listed in Exhibit 1 of the SEC's motion for remedies in this case [DE 122-1] and surrender his remaining conversion rights under the convertible securities issued by them."

1

## II. Defendant's Disgorgement Arguments Misapply the Law and the Facts

### a. Defendant's regular business of buying and selling securities without registering caused his unjust enrichment.

Defendant incorrectly claims that there is no causal connection between his violation of Section 15(a)(1) and the profits he reaped from operating his convertible note business. Opp. at 3. He contends that "the SEC must show that, 'but-for' the registration violation, Mr. Keener would **not** have generated the profits." *Id.* at 4 (emphasis added).

The "but-for" standard is appropriate to determine causation,[2] but Defendant misapplies it.[3] The proper framing is straightforward: Did Defendant profit from his illegal conduct? Defendant's conduct that violated Section 15(a)(1) was engaging in a regular business of buying and selling securities without registering as a dealer. It is not just that he failed to register—he failed to register while buying and selling securities as part of a regular business. And had Defendant not committed *all* of these acts, he would not have made the profits that the SEC seeks to disgorge. Defendant must disgorge the net profits he made from this unregistered dealer activity.[4]

Defendant misinterprets *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999), to support two false propositions: (1) the "failure to register, by itself, is not causally related to [any] ill-gotten profits," and (2) "disgorgement is improper when 'there [is] no record evidence of fraud.'" *See* Opp. at 3 & n. 1. First, the Eleventh Circuit held that a person who did not participate in or know of a firm's fraudulent conduct did not cause the firm to acquire fraudulent proceeds subject to disgorgement merely because he failed to register as a principal of the firm. *Id.* at 1138. *Sidoti* does not help Defendant because here he *personally* engaged in the conduct that caused him to generate the profits that are subject to disgorgement. *See Sidoti*, 178 F.3d at 1134, 1138. Second, Defendant's

---

[2] Section 21(d)(3)(A)(ii) of the Exchange Act effectively incorporates a "but-for" standard of causation when it states that: "the court shall have jurisdiction to … require disgorgement under [Section 21(d)(7)] of any unjust enrichment by the person who received such unjust enrichment *as a result of such violation*." 15 U.S.C. § 78u(d)(3)(A)(ii) (emphasis added).

[3] *See SEC v. Almagarby*, Case No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831 at *3 (S.D. Fla. Aug. 16, 2021), *affirmed and adopted*, 2022 WL 832279 (S.D. Fla. Feb. 15, 2022) ("Defendants' violation was engaging in the business of regularly acquiring securities from issuers and reselling those securities into the market without registering as a 'dealer.' Thus, the profits generated from these transactions are connected to Defendants' violation.").

[4] Defendant argues that: "And although he was barred from becoming a principal of a FINRA member firm [],there is still no evidence that the transactions would have been different if carried out by a registered person." Opp. at 5. Of course a registered dealer could have engaged in Defendant's convertible note business, but that is irrelevant to whether Defendant's actions in operating the business in violation of the law caused him to obtain ill-gotten gains.

2

argument about *Sidoti* is a further "misreading of the case," because "[n]owhere did the Eleventh Circuit hold that a court could not order disgorgement unless there was evidence of fraud." *Hays v. Adam*, 512 F. Supp. 2d 1330, 1345 (N.D. Ga. 2007).

Defendant also relies in error on *CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018) to argue that courts cannot award disgorgement for the failure to register as a dealer. But that case addressed the appropriateness of *restitution*, not disgorgement, finding that there were no investor losses flowing from the violation. *Id.* at 1331 ("we vacate the restitution award"). Unlike restitution, disgorgement is measured by a defendant's profits, *not* investor losses.[5] Simply put, *Southern Trust Metals* is irrelevant to the legal standard here.

In sum, there is no question that Defendant obtained unjust enrichment "as a result" of buying and selling securities as part of a regular business without registering as a dealer. *See* 15 U.S.C. § 78u(d)(3)(A)(ii).

### b. The SEC's request for disgorgement complies with *Liu*.

Defendant asserts that *Liu* bars disgorgement because the SEC cannot identify any "specific victims." Opp. at 5. Defendant cites no case holding that the SEC must identify harmed investors *by name* for the Court to determine that disgorgement would be "for the benefit of investors" under *Liu*.[6] As the *Almagarby* court found: "*the Supreme Court made no ruling … that the SEC must identify specific victims* to whom a disgorgement award should be distributed, or that all disgorged funds must be returned to investors, or that a disgorgement award should be limited to those funds that could be returned to investors." 2021 WL 4461831 at *3 (emphasis added).

Moreover, after *Liu* was decided, Congress added Section 21(d)(7) to the Exchange Act to specifically authorize the Court to award disgorgement. *See* 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission

---

[5] *See, e.g., SEC v. Huff*, No. 08—60315—CIV, 2010 WL 148232 at *5 (S.D. Fla. Jan. 10, 2010) ("the [disgorgement] inquiry focuses on a defendant's gain, not investors' losses."); *SEC v. McGinn, Smith & Co.*, 98 F. Supp. 3d 506, 521 (S.D.N.Y. 2015) ("The court agrees that [the return of disgorged profits to defrauded investors] is the appropriate course of action, even though *the measure of disgorgement is distinct from restitution*, and need not be tied to investor losses.")(emphasis added).

[6] The *Bevil* and *Janus* cases that Defendant cites simply do not stand for the proposition that the SEC must identify "specific victims." *See* Opp. at 6; *SEC v. Bevil*, No. 2:19-cv-0590-RFB-DJA, 2020 WL 7048263, at *2 (D. Nev. Nov. 30, 2020) (denying SEC's request for disgorgement in default judgment "at this time" because SEC failed to contend it was "for the benefit of investors"); *SEC v. Janus Spectrum LLC*, 811 Fed. App'x 432, 434 (9th Cir. 2020) (remanding because district court *did not address* whether such award would be for "the benefit of investors").

may seek, and any Federal court may order, disgorgement.").[7] This new provision does not contain the "for the benefit of investors" language in Section 21(d)(5) that was at issue in *Liu* and thus provides courts greater flexibility to use their equitable authority to remedy unjust enrichment.

Defendant does not address Section 21(d)(7) and cites only cases that either pre-date it[8] or did not analyze it. For example, the *Blackburn* and *Dang* courts did not need to consider Section 21(d)(7) because they found the SEC had met the "for the benefit of investors" standard under *Liu*.[9]

In any event, the SEC intends to make a good faith effort to distribute disgorgement to harmed investors. *See* DE 122 at 9 (Motion for Remedies). After Defendant pays disgorgement, the Commission will file a plan with the Court that describes how the money should be distributed to harmed investors.[10] Under his theory that *Liu* limits disgorgement to the amount of money counterparties lost, Defendant seeks to cast doubt upon whether any of them actually suffered losses.[11] *See* Opp. at 9 & Ex. A at 1 (Mayhew declaration). Dr. Taveras demonstrates that Mayhew's conclusions are unavailing. Ex. B at ¶¶ 28-37 (attached) (Declaration of Carmen A. Taveras, Phd. In Support of Plaintiff's Reply to Justin W. Keener's Opposition to Plaintiff's Motion for Remedies) ("Taveras Decl."). Defendant also ignores Section 21(d)(3)(A)(ii) of the Exchange Act, which states that disgorgement is measured by Defendant's "unjust enrichment," not by investor harm. *See* 15 U.S.C. § 78u(d)(3)(A)(ii). Nevertheless, the SEC intends to distribute disgorgement to those who did suffer losses and, if it is unable to distribute all of the money, it will seek this Court's guidance.

    c. **The SEC has met its burden to provide a reasonable approximation of disgorgement.**

When the SEC provided a "reasonable approximation" of the ill-gotten gains resulting from

---

[7] New Section 21(d)(7) of the Exchange Act was part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, PL 116-283, 134 Stat. 3388, which became law on January 1, 2021.

[8] *Bevil* and *Janus* are 2020 cases that predate new Section 21(d)(7). *See Bevil*, 2020 WL 7048263; *Janus*, 811 Fed. App'x 432.

[9] *See SEC v. Blackburn*, 15 F.4th 676, n. 4 (5th Cir. 2021) (the SEC prevailed on Section 21(d)(5) and thus the court stated that it did not need to address Section 21(d)(7)); *SEC v. Dang*, No. 3:20-cv-01353, 2021 WL 1550593 (D. Conn. Apr. 19, 2021) (court entered default judgment providing for disgorgement because the SEC met the *Liu* standard under Section 21(d)(5)).

[10] Robert Nesbitt, an SEC market professional, testified that it is feasible to identify Defendant's counterparties. DE 73-16 at 51:14-23, 54:6 – 55:12, 73:6-8, 74:2 – 79:12, 81:13 – 83:4.

[11] Defendant's expert Dr. Mayhew asserts that his "analysis of market data … for the periods following Mr. Keener's trades shows that his counterparties commonly had potential profit opportunities or opportunities to avoid losses after acquiring shares from Mr. Keener." Opp., Ex. A, at 1. It is unreasonable to deny disgorgement to a counterparty who lost money merely because a backward-looking analysis can identify "periods" when he or she *could have sold* the stock at a profit.

Defendant's violation of the securities laws in its remedies motion, the burden shifted to Defendant to show that the SEC's approximation is not reasonable. *See SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). Defendant has not met his burden in any respect.

Defendant makes two primary arguments: (1) the SEC has counted proceeds from selling stock from instruments that "bore no resemblance" to his Quick Loan program and "did not involve note conversions at all," and (2) his convertible note business lost money and thus there were no profits to disgorge. Opp. at 1-2, 10-12. Defendant's first argument is contradicted by the exhibits to his own brief. For example, the bridge loans for Advaxis, Inc. ("ADXS") and Northwest Biotherapeutics, Inc. ("NWBO") *both contain conversion features* and are thus "convertible notes." *See* Opp., Ex. D, at JMJ-SEC-001989 – 1994, JMJ-LIT-003-008597. And the ADXS document even expressly states on its face that Defendant engaged in an "accelerated conversion" of the note. *See id.* at JMJ-LIT-003-008597 (ECF page 20). Even if Defendant received stock from the NWBO note without technically converting it, *see* Opp. at 10, his argument puts form over substance. Defendant unquestionably entered a convertible note with NWBO and received stock to satisfy the note. His profits from selling that stock were thus attributable to his unregistered convertible note business.[12]

Defendant's assertion that his convertible notes business actually *lost* millions of dollars is also unquestionably false, as Dr. Taveras details in her attached declaration. *See* Taveras Decl. at ¶¶ 6-27. In arguing that he has no profits to disgorge, Defendant cites his 2019 federal tax return—which he filed seven months after the SEC filed the Complaint in this matter—in which he reported losing "more than $17 million dollars [sic] from a failed bridge loan in a company called Connekt Media Inc."[13] *See* Opp. at 11, Ex. H at JMJ-LIT-018-000003 (Schedule C to 2019 federal tax return dated October 28, 2020). There are several problems with this argument.

First, *crucially*, Defendant fails to disclose that he *owned* Connekt. *See* DE 72-3 at 23:2-3 (Defendant testified on June 6, 2019 that "I own a technology company called Connekt."); DE 72-2 at 184:4-23 (Defendant testified he was a "quasi-owner" and controlling shareholder of Connekt). Second, if anything "bore no resemblance" to a convertible note, it was Defendant's note with Connekt, which *had no convertible feature because Connekt was a private company*. *See* DE 72-2 at 184:16-18, 187:14-16 (Connekt was private and Defendant could not recall purchasing any convertible notes

---

[12] The SEC's motion for remedies previously addressed Defendant's objections to including profits from warrants in the reasonable approximation of disgorgement. *See* DE 122 at n. 3.

[13] Defendant's brief states the Connekt loss was $17.2 million, Opp. at 11 & Ex. G, but Flemmons uses $13.6 million, as Dr. Taveras explains. *See id.*, Ex. B at ¶ 18; Taveras Decl. at n. 13.

5

from it).  This alleged loss was plainly not part of Defendant's convertible notes business.[14]

Second, there is no way to evaluate a self-dealing transaction like the Connekt loan because of Defendant's use of foreign accounts, the contents of which he concealed from the SEC.  *See* DE 72-3 at 24:14-15 (Defendant testified: "my foreign accounts are in the names of three international corporations"); DE 72-2 at 285:23-24 (Defendant confirmed he owned foreign accounts as of July 2021); Ex. C (attached) at JMJ-LIT-018-000009 (Defendant's 2019 federal tax return stated that he had no "financial interest in or signature authority over a financial account … located in a foreign country").  Defendant refused to testify about the amount of money in the accounts or where they are located.[15]  DE 72-2 at 294:20 – 295:8.  The only account records that he agreed to produce are so highly redacted that it is impossible to even tell who owns them, s*ee id.* at 300:17 – 303:2, or the amount and source of funds in them.  *See id.*, at ECF Page Nos. 514-563 (heavily redacted account statements).  In light of Defendant's secret foreign accounts, and his testimony that he had a profit margin of "50 to 100 percent," there is no way for the Court to find that he lost the money he claims—even if it *had* come from his convertible notes business.  *See* DE 67 at ¶ 34 (profit margin estimate).  He cannot carry his burden of showing that the SEC's approximation of disgorgement is unreasonable—whether by citing ostensibly failed loans to himself or other purported losses.  As *Calvo* held, the "risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  378 F.3d at 1217.

Finally, Defendant's attempt to reduce the disgorgement calculation amount by millions of dollars because the SEC supposedly "manipulates the date range in its favor" makes no sense.  The parties have briefed extensively that Defendant *himself* agreed to toll the statute of limitations, and the Court subsequently rejected his affirmative defense based on the statute of limitations, key facts that he ignores in contending that holding him to his bargain is unfair.[16]  *See* Opp. at 11; DE 68 at 28

---

[14] This all assumes that Defendant has even demonstrated that he in fact suffered a loss from Connekt.  The documents he attaches to his brief do no such thing.  *See* Opp. at 11, Exs. G & H.  Even assuming the wholly unauthenticated (or explained) spreadsheet in Exhibit G "show[s a] $17.2 million investment" (which it does not), Exhibit H (excerpts from Keener's 2019 federal tax return) nowhere shows a $17.2 million loss in Connekt.  *See id.*, Exs. G & H.  The only mention of Connekt is for a $3.6 million long term capital loss for "worthless" shares.  *Id.*, Ex. H at JMJ-LIT-018-000019.  None of this purported evidence is sufficient to carry Defendant's burden.

[15] Defendant's counsel instructed him not to answer certain questions about the foreign accounts in part ostensibly because of a possible IRS investigation.  *See* DE 72-2 at 286:2-19.

[16] Flemmons's first report treated the relevant period as starting on March 24, 2014, almost certainly because of the tolling agreement and the fact that the Complaint stated that the period was "[f]rom *at least*" January 2015.  *See* DE 73-21 at Ex. 3; DE 1 at ¶ 1 (emphasis added).

6

(SEC's MSJ); *SEC v. Keener*, 2020 WL 4736205 at *15 (S.D. Fla. Aug. 13, 2020).  This is pure gamesmanship.[17]

### III.    The SEC Is Entitled to Prejudgment Interest

Rather than challenge the SEC's prejudgment interest calculation, Defendant instead urges the Court not to order prejudgment interest at all based upon his other failed arguments and because he "invested virtually all of his proceeds earned between 2014 and 2018" into his failed venture Connekt, a company he owned.  *See* Opp. at 13.  It is beyond self-serving for him to then say that "he did not obtain any benefit at all" from money that he deployed as an investment.  *See id.*  The Court should order the full amount of PJI the SEC requested.

### IV.    The Court Should Grant Injunctive Relief

Injunctive relief is proper under *Calvo,* 378 F.3d at 1216-17.  Defendant does not contest that he committed a previous violation of the securities laws.  He instead focuses on the likelihood that the wrong will be repeated, arguing that the SEC has not met the *Calvo* factors.  *See id.* at 1216.

None of Defendant's arguments undermine this Court's analysis at the pleading stage that:

> Plaintiff has pled sufficient facts to obtain injunctive relief. Defendant was previously barred by FINRA from associating with any FINRA member in any capacity after 2012, his alleged instant securities violations spanned three years and involved selling over 17.5 billion shares, he employed twenty people working on commission at one point, sponsored conferences and gave presentations as part of his business, and he dealt with over 100 different microcap issuers.

*SEC v. Keener*, 2020 WL 4736205 at *6 (S.D. Fla. 2020).  The Court found that these features together "permit an inference" that Defendant would repeat his misconduct without an injunction. *Id.*  These facts are now established and, fully support the SEC's request for injunctive relief.

If anything, the SEC's argument is even stronger now that Defendant will repeat his wrong given the fact that he engaged in dealer conduct *while* the Court was drafting the above-quoted order. He sold $14.8 million in stock from convertible notes and bundled warrant agreements with Blink Charging Co. ("BLNK") during June and July 2020.  *See* Taveras Decl. at n. 15 (noting that full year proceeds for BLNK in 2020 were $14.8 million compared to $13.76 million for June and July 2020); DE 67-18 (BLNK warrant agreement); DE 67-20 (BLNK convertible note); DE 101 at ECF page

---

[17] Defendant also argues that the SEC's reasonable approximation is overstated by about $3 million because it includes profits from OID and interest that issuers paid in cash.  Opp., Ex. B, at ¶ 9.  As Dr. Taveras explains, there is no reason not to count profits received in cash when Defendant is simultaneously deducting expenses that he also paid in cash.  Taveras Decl. at ¶ 17.

7

numbers 30-31, 96-100, 106-18, 127-28, 153-56 (account statements showing sales of BLNK stock for all of 2020). Defendant's representation to the Court—that he "obtained that Blink Charging stock after he made a simple loan in 2018 with no conversion rights that the company later requested to repay in stock"—is false. *See* Opp. at 16. The vast majority of the BLNK stock Defendant sold resulted not from the "simple" loan in 2018, but rather from BLNK's repayment in February 2018 of the convertible securities he purchased in October 2016.[18]

Notwithstanding that acting with scienter it is not a "prerequisite" for an injunction, *Calvo*, 378 F.3d at 1216, it is difficult to square Defendant's claims that he "did not act with scienter" with his massive sales of BLNK stock *after* the SEC sued him for being an unregistered dealer. *See* Opp. at 14. At a minimum, Defendant's conduct is enough to establish that without an injunction there is a risk that he will once again engage in this type of conduct.

Because the Court has found that Defendant abandoned his advice of counsel defense, *Keener*, 2022 WL 196283 at *13, he cannot now rely on it, without factual or legal support, to show he acted in good faith to avoid appropriate remedies.[19] *See* Opp. at 14.

Defendant objects that his conduct was not "recurrent" under *Calvo* because it constituted only a single violation. Opp. at 15. Without legal support, he asserts that there must be multiple violations for the Court to find that his conduct was recurrent. *See id.* He does not explain, however, why a course of conduct that occurred from at least 2010 through 2018 and that encompassed thousands of transactions was somehow singular for purposes of injunctive relief.[20]

Defendant attacks the SEC's proposed injunction as a prohibited "'obey the law' injunction that merely parrots the language of the Exchange Act." Opp. at 16. He is mistaken about the

---

[18] BLNK's Form 10-K for 2018 explained that it provided more than 3.8 million shares of stock to Defendant pursuant to a convertible note and bundled warrant agreement originally signed in October 2016. *See* DE 91-14 at 36-37. Defendant sold 2,424,000 of these shares in June and July 2020. DE 101 at ECF page numbers 30-31, 153-56 (Defendant's account statements showing his sales of BLNK stock in June and July 2020). BLNK's Form 10-K clarified that the $250,000 loan from Defendant in January 2018 was "unrelated" to the convertible note and the company repaid it with only 73,529 shares of stock and 147,058 warrants. DE 91-14 at 37.

[19] He withdrew that affirmative defense when the SEC's moved for summary judgment on it (*see* DE 68 at 28-29; DE 90 at n. 12), likely because he could not meet the requisite elements.

[20] Defendant insists that "he is out of the convertible note business" as an assurance against future violations. Opp. at 15. He, of course, told the SEC the very same thing in 2019, the year before he sold more than $14 million worth of BLNK stock. *See* DE 72-3 at 57:12-13 ("I have no interest in reentering that business whatsoever again."). Even if his assurances were credible, the *Almagarby* court rejected the argument that voluntarily ceasing misconduct eliminates the need for an injunction. 479 F. Supp. 3d 1266, 1273-74 (S.D. Fla. 2020).

8

standard for regulatory injunctions in the Eleventh Circuit, which permits using language from the relevant statute so long as "the district court [] craft[s] terms that provide the defendant fair notice of what conduct risks contempt and clearly inform the defendant of what he is ordered to do." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012). Here, the proposed injunction forbids Defendant from taking actions "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … while engaged in and pursuant to the regular business of buying and selling securities … for their own account through a broker or otherwise unless the Defendant is registered as a dealer" with the SEC. *See* DE 122-4. This wording comes from "the plain language of the Exchange Act and controlling judicial precedent" that the Court relied upon in granting the SEC summary judgment on both its dealer claim and Defendant's affirmative fair notice defense. *See Keener*, 2022 WL 196283 at *11, 14; *see also Almagarby*, 2022 WL 832279 at *1 (ordering injunction that tracks Section 15(a)(1) language). There is no question that the proposed injunction properly details what conduct would constitute impermissible dealer activity.

### V. The Court Should Enter a Penny Stock Bar

Defendant opposes a penny stock bar for largely the same reasons that he contests injunctive relief in general: that he is charged with a "technical, non-scienter violation" and that he has exited the business (and thus has no opportunity for further violations).[21] *See* Opp. at 17.

Defendant states that the "SEC does not and cannot demonstrate otherwise" when it comes to whether he "has left the convertible notes business and has no interest in returning." Opp. at 17. The future may be difficult to predict, but if past is prologue, Defendant's commitment may prove to be hollow once more. In 2019, he professed to have no interest in the convertible note business and then sold more than $14 million worth of BLNK stock a year later. *See* DE 72-3 at 57:12-13 ("I have no interest in reentering that business whatsoever again."). There is no way to know whether his current commitment is genuine. Only a penny stock bar (and an injunction) will ensure that it is.

### VI. The Court Should Require Defendant to Pay a Civil Penalty of $1,750,000

Defendant challenges the SEC's penalty analysis on the grounds that he lacked the proper

---

[21] Defendant's view that his dealer violation was merely "technical" may explain why he was willing to engage in it by trading millions of shares of BLNK while the Court was ruling on his motion to dismiss. For just one stock, he generated more than fifteen times the amount of disgorgement that Almagarby paid for his so-called "technical" violation of the dealer provisions of the Exchange Act. *See Almagarby*, 2022 WL 832279 at *1. Almagarby, of course, also received a penny stock bar. *Id.* at *2. Defendant does not attempt to explain why he has a better case for avoiding a bar when Almagarby had been in the dealer business for only three years and had far fewer transactions, proceeds, and profits.

9

degree of scienter, his unregistered status did not create substantial losses or the risk of such losses, his conduct was not recurrent, and there is no need to deter him or others from engaging in the conduct in the future.  Opp. at 18-19.

The SEC's arguments on scienter and recurrence, *supra* at p. 8, apply equally here. Defendant contends that the SEC must prove that he caused investors to suffer substantial losses, invoking a theory of proximate causation.  *See* Opp. at 18.  But as the *Huff* court noted: "A court may enter [even] third-tier penalties … when it finds that a defendant has committed a violation that has merely 'created a significant risk of substantial losses to other persons,' although no person has actually incurred a loss." *Huff*, 2010 WL 148232 at *4.  Defendant's preferred standard of causation is not the law for a penalty analysis.  Dr. Taveras's testimony that 93% of issuers saw price declines between Defendant's first and last sales is adequate to show a significant risk of substantial losses. *See* DE 66-2 at ¶ 29.  Whether Dr. Mayhew is correct that Defendant's "counterparties had many opportunities to generate a profit" is beside the point.  *See* Opp. at 18.

Defendant's contention that "there is no need to 'deter' [him] because he has not invested in a convertible note in five years" is especially unavailing.  *See* Opp. at 18.  It is unremarkable that he mostly ceased his misconduct when the SEC investigated him.

In that vein, Defendant's suggestion that the Court impose only a first-tier penalty of $10,360 fails to take into account the gravity of his actions.  *See id.* at 19.  A penalty that small would fail to provide general deterrence, and it also would not provide the specific deterrence that is so clearly needed here.  *See SEC v. Monterosso,* 756 F.3d 1326, 1338 (11th Cir. 2014) ("Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations.").  The Court can and should set a much higher penalty using the flexibility provided in the Exchange Act to impose *up to* Defendant's "gross amount of pecuniary gain." *See* 15 U.S.C. § 78u(d)(3)(B)(i).  The SEC has recommended a $1,750,000 civil money penalty, which takes into account Defendant's gross pecuniary gain and makes a substantial downward adjustment to provide appropriate deterrence for this misconduct.  DE 122 at 13.

Defendant has opposed this amount by arguing that his "unregistered status" did not cause his "pecuniary gain."  *See* Opp. at 19.  In its discussion of disgorgement in Section II.a, above, the SEC demonstrated that Defendant's conduct in buying and selling securities as part of a regular business did in fact cause him to reap profits of approximately ten times this amount.

Based on the facts and circumstances of this case, a civil money penalty of $1,750,000 is appropriate.

10

DATE:    April 29, 2022					Respectfully submitted,


						By:

						  /s/Joshua E. Braunstein
						 Joshua E. Braunstein
						 Antony Richard Petrilla
						 Attorneys for Plaintiff
						 SECURITIES AND EXCHANGE COMMISSION
						 100 F Street NE
						 Washington, DC 20549
						 Telephone: (202) 551-8470
						 Braunsteinj@sec.gov

						 **ATTORNEYS FOR PLAINTIFF**
						 **SECURITIES AND EXCHANGE**
						 **COMMISSION**

## CERTIFICATE OF SERVICE

   I hereby certify that on April 29, 2022, I filed Plaintiff Securities and Exchange Commission's Reply to Defendant's Opposition to the SEC's Motion for Remedies through the Court's CM/ECF system, which automatically sends notices to counsel of record in this case.

               /s/Joshua E. Braunstein
               Joshua E. Braunstein

               **ATTORNEY FOR PLAINTIFF**
               **SECURITIES AND EXCHANGE**
               **COMMISSION**