# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CV-21254-BLOOM

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

vs.

JUSTIN W. KEENER, *d/b/a/ JMJ Financial*,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** comes before the Court upon Plaintiff Securities and Exchange Commission's Motion for Remedies ("Motion").  (ECF No. 122).  Defendant Justin W. Keener d/b/a/ JMJ Financial filed a Response (ECF No. 124), to which Plaintiff filed a Reply (ECF No. 129).  Defendant then filed a Sur-Reply (ECF No. 133), and Plaintiff filed a Sur-Sur-Reply (ECF No. 137).  This matter was referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(A) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, by the Honorable Beth Bloom, United States District Judge, for a Report and Recommendation. (ECF No. 130)  Upon consideration of the Motion, Response, and Replies, the undersigned recommends that the Motion be **GRANTED, in part, and DENIED, in part,** as follows.

## I.    BACKGROUND

On January 21, 2022, the Court entered summary judgment in favor of Plaintiff, Securities and Exchange Commission ("SEC"), against Defendant, finding Defendant liable for violating Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1).

(ECF No. 118).  Between January 2015 and January 2018 (hereinafter, the "Relevant Period"), Defendant bought and sold shares of microcap securities (i.e. penny stocks) and, by the calculations of Defendant's own expert, generated millions of dollars of profits from those sales. (ECF No. 84-5).  However, Defendant failed to comply with dealer registration requirements under the Exchange Act.  (ECF No. 118 at 22).

Defendant bought convertible notes from penny stock issuers, holding the notes for at least six months, converting the notes into newly issued shares of stock at a deep discount to the prevailing market price, and then selling those shares into the public market for a significant profit. (*Id.*).  Defendant purchased or converted more than 100 notes from more than 100 different microcap issuers and liquidated billions of shares of common stock during the Relevant Period. (ECF No. 118 at 8).

The Parties moved for summary judgment and the Court granted summary judgment in the SEC's favor, holding that Defendant was liable for violating the dealer registration requirements of Section 15(a)(1) of the Exchange Act.  The Court reserved a ruling on Defendant's remaining affirmative defenses regarding the SEC's ability to seek remedies, noting that the Parties agreed that it was premature to address issues of Plaintiff's requested relief until a decision as to liability was issued.  (ECF No. 118 at 32).

Following the Court's ruling on summary judgment, the Parties filed a Joint Proposed Briefing Schedule for the resolution of the SEC's request for remedies.  (ECF No. 120).  Defendant sought to limit the Parties' presentation of evidence to that on which they had relied at the summary judgment phase.  (*Id.*).  The SEC opposed this stipulation.  Neither party requested a hearing on the briefing, either in the Joint Proposed Briefing Schedule or in their briefings on the remedies. The Court subsequently approved and adopted the Parties' proposed Briefing Schedule.

The SEC now asks the Court to impose the following remedies: (i) a permanent injunction prohibiting Defendant from committing further violations of Exchange Act Section 15(a)(1); (ii) an injunction barring Defendant from participating in the offering of any penny stock; (iii) ordering Defendant to disgorge, with prejudgment interest, all ill-gotten gains derived from the activities set forth in the Complaint; and (iv) ordering Defendant to pay a civil penalty.  The SEC also seeks an order requiring Defendant to surrender for cancellation all shares of stock and conversion rights from convertible notes that issuers sold to him.

Both Parties engaged experts who submitted declarations and both Parties briefed the issues, submitting documentation in support.  The Motion is now ripe for review.

## II.    ANALYSIS

The SEC argues that Defendant's conduct as an unregistered dealer during the Relevant Period warrants remedies, including an injunction, a penny stock bar, disgorgement of net profits of $17,557,840.00, prejudgment interest of $5,141,461.00, and a civil penalty of $1,750,000.00. Defendant contends that the remedies sought by the SEC are neither consistent with the law nor proportional to the violation in this case because there is no evidence that Defendant's unregistered dealer status was related to the profits generated.  The Court addresses each requested remedy in turn.

### a.  Injunctive Relief

The SEC seeks to permanently enjoin Defendant from committing further violations of Section 15(a)(1) of the Exchange Act.  "The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated."  *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). Factors that indicate a wrong will be repeated include: "(1) the egregiousness of the defendant's

3

actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Solow*, 554 F. Supp. 2d 1356, 1361 (S.D. Fla. 2008) (citing *SEC v. Carriba Air*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

The SEC argues that it established a prima facie case of previous violations of federal securities law because the Court found Defendant liable for violating Section 15(a)(1) of the Exchange Act by failing to register as a securities dealer. The SEC argues that courts have found no requirement that a defendant must have committed violations before the ones at issue because the violations relied upon as a basis for injunctive relief are frequently the same ones just proven in the liability portion of those cases. (ECF No. 122 at 10 n.5). Based upon the instant violation and the finding of liability, the Court finds that the SEC has established a prima facie case.

The Court turns to the six aforementioned factors to determine a reasonable likelihood the harm will be repeated. As to the first factor, the SEC cited the Court's Summary Judgment Order finding that Defendant violated the dealer registration requirements, thus the SEC contends the conduct was egregious. (ECF Nos. 122 at 10; 118 at 30). According to the SEC, the dealer registration requirement is crucial in enforcing the Exchange Act because it enables the SEC to exercise discipline over those involved in securities and also establishes industry-wide standards. (*Id.*). In response, Defendant avers that there was no egregious misconduct warranting injunctive relief. (ECF No. 124 at 15). Defendant asserts that the SEC cites no caselaw that supports the proposition that violating an "important law" makes the conduct inherently egregious. (*Id.*). Defendant argues that such a standard would mean that "every securities violation would automatically be egregious" because there are no "unimportant" securities laws. (*Id.*). Defendant

asserts that conduct is egregious only if it is flagrant, if it constituted a breach of fiduciary duty, if it caused others to suffer significant financial loss, or if it arose out of a complex scheme to defraud. (*Id.*) (citing *SEC v. Perez*, No. 09-CV-21977, 2011 WL 5597331, at *2 (S.D. Fla. Nov. 17, 2011)).

As to the second factor, the SEC advances the argument that Defendant's conduct was recurrent because the Court found that Defendant disregarded the dealer registration requirements during the Relevant Period and entered over 100 convertible notes with more than 100 issuers. (ECF Nos. 118 at 21–22; 122. at 10).  In response, Defendant argues that there is no possibility of a recurrent violation because he is "out of the convertible note business" and that he is willing to surrender "any remaining conversion rights and converted stock."  (ECF No. 124 at 20).

As to the third factor, the SEC avers that scienter may be an important factor in this analysis, but it is not a prerequisite to injunctive relief.  *Calvo*, 378 F.3d at 1216.  In support, the SEC cites cases where courts have entered injunctions for non-scienter based broker-dealer registration violations.  Defendant argues that he did not act with scienter because he did not overlook the dealer registration requirements knowingly or even recklessly.  (ECF No. 124 at 20). Instead, Defendant advances evidence, including emails with attorneys, indicating that he confirmed with attorneys that his transactions complied with securities laws, and that three separate attorneys told him he was not a securities dealer.  (ECF Nos. 72 ¶ 48; 73-5).  Defendant argues that, at most, he was engaged in a "technical violation" based on a reliance on the advice of counsel, and not one that was flagrant or deliberate.  (*Id.*).

As for factors four and five, the SEC asserts that Defendant has offered "no assurances" against future violations of the Exchange Act, and that he has not recognized the wrongful nature of his conduct.  (ECF No. 122 at 11).  In support, the SEC advances evidence to show that while the Court was considering Defendant's Motion to Dismiss (ECF No. 15), Defendant "sold millions

of dollars in stock that he obtained from convertible notes he had bought from Blink Charging Co." (ECF No. 101 ¶ 36, Exhibits 1, 2). In response, Defendant contends that he is out of the convertible note business. Defendant pushes back against the SEC's argument that Defendant has not recognized the wrongful nature of his conduct. Defendant asserts that he chose to litigate against the SEC and, citing *SEC v. Ingoldsby*, Defendant argues that he should not be prejudiced for not publicly acknowledging the wrongfulness of his conduct when presenting a vigorous defense in this ongoing action. (*Id.* at 4–5) (citing *SEC v. Ingoldsby*, 1990 WL 120731, at *2 (D. Mass. May 15, 1990)).

Moreover, Defendant argues that he obtained the Blink Charging Co. stock after he made a loan in 2018 and because the company later requested to repay Defendant in stock which did not involve the QuickLoans at issue in this case.[1] (*Id.*).

As to the sixth factor, the SEC argues that there is a strong likelihood that Defendant's occupation as a self-employed participant in the financial markets will present him with further opportunities to violate Section 15(a)(1) of the Exchange Act. (*Id.*). Unless enjoined, the SEC asserts that Defendant will have the ability to "resume his unregistered dealer businesses," and given his background and access to capital, Defendant could easily buy a new series of convertible notes. (ECF No. 72-3 at 144:23–146:3). Defendant argues that his occupation's focus has "shifted entirely to other types of investments," including blue chip stocks and retirement-type investments. Defendant argues that just because he has access to capital does not mean it would be easy for him

---

[1] The QuickLoan program consisted of Defendant purchasing convertible notes from microcap companies (issuers) in need of "quick" cash. (ECF No. 67-9 at 13); (ECF No. 67-24 at 9); (ECF No. 67-1 at 208:8-15); (ECF No. 72-2 at 25:1-22). The convertible notes were contracts in which the issuer of the note promised to pay JMJ a designated sum of principal and potentially interest within a designated time frame. The convertible notes also gave JMJ the option to demand that sums owed under the notes be paid in the form of the issuer's stock at a discount to the market price. *see* (ECF No. 67-3 at 36:7-37:13); (ECF No. 67-4 at 108:21-109:22).

to purchase convertible notes.  Defendant avers that he also decided to stop investing in convertible notes because it was not profitable.

Considering all six factors, the Court agrees that injunctive relief is warranted.  The Court does not find that Defendant's failure to register an example of an egregious violation.  Defendant engaged in conduct that was unfavorable and illegal, spanning three years and involving millions of dollars.  However, the SEC is unable to show how the failure to register, on its own merits, was egregious.

"Egregious" is defined by Oxford University Dictionary as "outstandingly bad; shocking." *See SEC v. City of Miami*, No. 13-22600-CIV, 2016 WL 11783322, at *2 (S.D. Fla. Dec. 5, 2016) (citing Oxford English and Spanish Dictionary, Synonyms, and Spanish to English Translator, available at https://www.lexico.com/en/definition/egregious).  In finding a securities violation egregious, a court in one case described the conduct as "pervasive, premeditated" and causing others "to sustain millions of dollars in damages."  *SEC v. K.W. Brown and Co.*, 555 F. Supp. 2d 1275, 1311 (S.D. Fla. 2007).  In *SEC. v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004), the Eleventh Circuit found that a CEO breached his fiduciary duty to his company and shareholders for the financial gain of his family; "[d]eliberately tipping material nonpublic information for family members' financial gain is a bad thing, and doing it twice in a year is doubly so."  *Id.* at 1304 (alteration added).

The fact that Defendant violated securities laws by failing to register does not automatically make his conduct or the violation "outstandingly bad" or "shocking."  *City of Miami*, 2016 WL 11783322, at *2 (declining to enter injunctive relief without tangible evidence that the defendant's conduct rose to the level of "outstandingly bad; shocking").  Unlike cases of insider trading or conduct that involved scienter and not mere technical violations, the SEC can show no such

conduct here nor cite cases in support. *SEC v. Megalli*, No. 1:13-CV-3783-AT, 2015 WL 13021472, at *3 (N.D. Ga. Dec. 15, 2015) (the very nature of insider trading tends to render it economically dangerous, because "insider trading is a flagrant, deliberate, and serious violation of the federal securities laws; in no sense is it merely technical.")

Defendant's conduct was recurrent over the course of the three-year period. As the SEC noted, Defendant disregarded the dealer registration requirements over three years and entered over 100 convertible notes with more than 100 issuers. The Court's Dismissal Order noted that Defendant's conduct, although not dispositive on the issue, "permit[s] an inference that Defendant's alleged misconduct will be repeated if not enjoined." (ECF No. 29 at 12). Thus, this factor weighs in favor of injunctive relief.

Although there has been no finding as to scienter, the Court notes that scienter is not a prerequisite to injunctive relief. *See Calvo*, 378 F.3d at 1216. Moreover, Defendant has failed to proffer any evidence to assure the Court that he will not commit future violations. Following the initiation of this litigation, and while Defendant's Motion to Dismiss was pending, Defendant sold Blink Charging Co. stock, which is the type of stock the SEC qualifies as relevant in this litigation. (ECF No. 67-18); (ECF No. 67-20).

Defendant's prior interaction with the Financial Industry Regulatory Authority ("FINRA") also indicates his unwillingness to provide assurances to a regulatory body. In 2012, Defendant was barred from FINRA after he failed and refused to appear for an interview or provide documents and information regarding the sales of unregistered securities. (ECF No. 67-7); *see* (ECF No. 67-1) (18:5-23). Defendant claimed that he was not subject to FINRA's jurisdiction. (*Id.*). Defendant has also not recognized the wrongful nature of his conduct, even after the Court granted summary judgment in the SEC's favor. *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D.

Fla. 2001) ("[W]here litigants do not publicly acknowledge the wrongfulness of their conduct due to a decision to contest SEC enforcement, such actions should not prejudice those litigants since a full and vigorous defense is a 'right under our system of justice.'" (alteration added) (citation omitted)).  Lastly, Defendant's occupation remains rooted in the financial markets.  Although he claims to have no more involvement in the convertible note business, Defendant has access to capital and resources to engage in prohibited conduct with ease.

In the totality, these factors weigh in favor of enjoining Defendant in order to prevent additional violations of the Exchange Act.

Citing primarily Federal Rule of Civil Procedure 65(d)(1) and *SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016), Defendant also argues that the Eleventh Circuit prohibits the sort of broad "obey the law" injunction sought by the SEC that merely recites the language of the Exchange Act.  In response, the SEC argues that the language from the statute can be used so long as the Court provides Defendant fair notice of what conduct risks contempt, and the proposed injunction clearly informs Defendant of what he is ordered to do.

Here, the injunction sought by the SEC is sufficiently specific under Rule 65(d)(1).  The injunction does more than require Defendant to obey the federal securities laws:

> IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") by, directly or indirectly, making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security pursuant to 17 C.F.R. § 240.15a-2 or commercial paper, bankers' acceptances, or commercial bills) while engaged in and pursuant to the regular business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for their own account through a broker or otherwise unless the Defendant is registered as a dealer with the Securities and Exchange Commission as provided in Section 15(b) of the Exchange Act, or unless Defendant is associated with a broker-dealer that was so registered.

(ECF No. 123); *see also* 15 U.S.C. § 78o(a).  The injunction tracks the statutory language of Section 15(a)(1), specifies the conduct enjoined, and "clearly let[s] defendant know what he is ordered to do or not to do."  *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *SEC v. Almagarby*, No. 17-62255-CIV, 2021 WL 4461831 at *2–3 (S.D. Fla. Aug. 16, 2021), *report and recommendation adopted*, No. 17-62255-CIV, 2021 WL 4459439 (S.D. Fla. Sept. 29, 2021), *and report and recommendation adopted*, No. 17-62255-CIV, 2022 WL 832279 (S.D. Fla. Feb. 15, 2022); *see Solow*, 554 F. Supp. 2d, at 1362  (finding it permissible for a requested injunction to track the statutory language of the sections that the defendant violated); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) (stating that "[t]here can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated").  The proposed injunction contains specific commands, and a defendant restrained from violating these commands would be able to determine what conduct the injunction addressed.

While injunctions such as the above may encompass a broad scope, the Eleventh Circuit has found the entry of such injunctions, like the proposed injunction, appropriate.  *See Goble*, 682 F.3d at 950.  Permitting injunctions of some breadth in the context of civil enforcement actions brought by the SEC is warranted, and where the public interest is involved, the court's equitable power has a "broader and more flexible character."  *Id.*  (citing *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008)).

Having considered the necessary factors, the undersigned recommends that Defendant be permanently enjoined from committing further violations of Exchange Act Section 15(a)(1).

### b.  Penny Stock Bar

The SEC also seeks a penny stock bar against Defendant.  Under the Exchange Act, a court may prohibit any person who, at the time of the alleged misconduct, was participating in any

offering of penny stock, from participating in any future offering of penny stock. 15 U.S.C. § 77t(g); 15 U.S.C. § 78u(d)(6). Penny stocks include any equity security with a price of less than $5.00, except as exempted under Rule 3a51-1 under the Exchange Act. *SEC v. McNamee*, 481 F.3d 451, 453 (7th Cir. 2007) (citing 17 C.F.R. § 240.3a51-1). Before a court may enter a penny stock bar, the SEC must demonstrate that the stock at issue in the violations under review is, in fact, a penny stock. *SEC v. Huff*, 758 F. Supp. 2d 1288, 1357–58 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012) (citations omitted).

Here, the stock at issue is a penny stock. Defendant has already admitted to converting convertible notes for microcap issuers—also known as penny stock companies—during the Relevant Period. *SEC v. Keener*, No. 20-CV-21254, 2022 WL 196283, at *1 (S.D. Fla. Jan. 21, 2022).

When evaluating the need for a penny stock bar, a court examines the nature of the defendant's conduct and the likelihood that his occupation and experience will present further opportunities to violate the securities laws. *SEC v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2014 WL 7499053, at *6 (M.D. Fla. Dec. 12, 2014). The SEC argues a penny stock bar is appropriate for the same reasons an injunction is appropriate. (ECF No. 122 at 12–13). Defendant argues that the nature of the conduct is a technical, non-scienter violation, thus, a penny stock bar is not warranted. Here, the Court still finds, as it did in relation to injunctive relief, that Defendant's conduct was not egregious, but that a valid concern exists that Defendant may violate securities laws in the future, especially because Defendant chiefly conducted business with microcap issuers, buying and selling penny stocks. Thus, the concern is even greater that Defendant could easily reengage in conduct involving penny stock companies and recommit the same violation this action

is based upon.  Accordingly, the undersigned recommends that a penny stock bar be imposed against Defendant.

### c.  Disgorgement

The SEC seeks disgorgement of the net profits, in the amount of $17,557,840.00, associated with the sale of convertible notes while Defendant was unregistered.  Defendant contends that disgorgement is unwarranted because he did not generate any profits as a result of the registration violation, in fact, Defendant argues that he experienced financial losses.  As explained below, the Court finds that Defendant's violation of securities laws warrants disgorgement by: (1) examining the equitable principles underlying Section 15(a) of the Exchange Act, and (2) finding that a causal connection exists.

Congress enacted the Securities Act and the Exchange Act in the wake of the stock market crash of 1929 to ensure the integrity of capital markets and capital formation activities.  The purpose of these federal securities laws and those later enacted is to protect investors through regulation of transactions upon national securities exchanges and in over-the-counter markets against manipulation of share prices.  *SEC v. Benger*, 934 F. Supp. 2d 1008, 1013 (N.D. Ill. 2013); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011).

As part of regulating the markets, Section 15(a) of the Exchange Act is utilized as a means of ensuring dealers are trained, knowledgeable, and bound by the same rules as others.  In order to enforce Section 15(a), the Government relies upon principles of equity to ensure that registration requirements are not violated.  Notwithstanding, registration is just one component of the Exchange Act's broader statutory scheme and exists to achieve the overarching purpose of the Act.

*See Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 561–62

(5th Cir. 1982); *accord*, *Kramer*, 778 F. Supp. 2d at1334; *Eastside Church of Christ v. Nat'l Plan,*

*Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).  The importance of enforcing securities laws often involves

the process of registration.

> [Section 15(a)(1)'s registration requirement] is of the utmost importance in
> effecting the purposes of the Act. It is through the broker registration requirement
> that some discipline may be exercised over those who may engage in the securities
> business and by which necessary standards may be established with respect to
> training, experience, and records.

*Id.*  In order to enforce these laws, the SEC employs a panoply of tools and remedies; one, in

particular, being disgorgement.  Caselaw has established that "[t]he effective enforcement of the

federal securities laws requires that the SEC be able to make violations unprofitable.  The deterrent

effect of an SEC enforcement action would be greatly undermined if securities law violators were

not required to disgorge illicit profits."  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104

(2d Cir. 1972).  "The purpose of disgorgement is . . . to deprive the wrongdoer of his ill-gotten

gain." *See SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) (quoting *SEC v. Commonwealth*

*Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978).  "It would severely defeat the purposes

of the Act if a violator of [securities laws] were allowed to retain the profits from his violation."

*SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971).

Because disgorgement is an equitable remedy, it serves to prevent unjust enrichment and

to allow the Court to exercise its equitable power over the property causally related to the

wrongdoing.  *See CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999); *see SEC v. Wyly*, 71 F.

Supp. 3d 399, 405 (S.D.N.Y. 2014).  Accordingly, the SEC bears the burden of producing a

reasonable approximation of the defendant's "ill-gotten gain[s]."  *Calvo*, 378 F.3d at 1217.

However, the SEC's burden "is light."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir.

2005) (citations omitted).  Upon such a showing, the burden shifts to the defendant to show that the approximation is not reasonable.  *Id.*

Additionally, the SEC must establish a causal relationship between Defendant's unregistered status and the ill-gotten gains.  Courts broadly construe the phrase "causally connected" to accomplish the goals of equity and disgorgement.  *See Huff*, 758 F. Supp. 2d at 1359.  The rationale behind the equitable remedy of disgorgement allows for broad consideration of all of a defendant's wrongful conduct in connection with the violation of the securities laws.  *Id.* A court can also look at whether a defendant gained some form of advantage in the market and/or over others as indicia of a causal connection.  *Wyly*, 71 F. Supp. 3d at 414.

Defendant asserts that the SEC fails to demonstrate a causal connection between Defendant's unregistered status and the net proceeds by arguing that there is no evidence that any transactions would have had a different outcome if he were registered as a dealer.  Defendant proffers caselaw drawing parallels between unlicensed lawyers generating fees and unlicensed ride-share drivers also generating profits to support the proposition that his unlicensed status did not cause any profits generated because the profits would have been generated with or without the license.  Defendant argues that the SEC conflates correlation with causation.  In its Reply, the SEC argues that the issue is not limited to whether Defendant failed to register, but that he failed to register while buying and selling securities.  The SEC distinguishes Defendant's proffered cases on the basis that in each of those cases, there was an absence of evidence that the defendant there personally did anything fraudulent or illegal and by contrast, the Court has here found Mr. Keener himself liable for conducting himself as an unlicensed dealer.

A review of each of the cases is necessary to discern who has the better argument on causation.  Defendant relies heavily on *Sidoti*.  Sidoti was found liable for failing to register as a

principal of a firm ("Trinity") that subsequently engaged in fraudulent conduct.  The Eleventh Circuit affirmed the decision on liability, agreeing that the evidence of his influence and control over the business qualified him as a principal. "Pursuant to Sections 4f and 8a(1) of the Act, the CFTC promulgated CFTC Rule 3.10, which requires all principals of an introducing broker (IB) to register." *Id.* at 1137. Yet when Trinity applied for registration, neither Sidoti nor Trinity identified Sidoti as a principle.  "[B]y concealing his status as a principal and by failing to file the required statements, Trinity and Sidoti made a 'false and misleading statement of material fact in [a] registration application,' in violation of Sections 4f, 6(c) and 8a(1) of the Act and CFTC Rules 3.10 and 3.31." *Id.*

Despite affirming the court's decision on liability, the Eleventh Circuit reversed the order of disgorgement as to Sidoti because the CFTC "did not allege Sidoti knew of, much less participated in, any of the fraudulent conduct [that occurred at the firm]."  178 F.3d at 1138. "Sidoti's failure to register, by itself, is not causally related to Trinity's ill-gotten profits." In this respect, the Eleventh Circuit distinguished Sidoti's role from that of his co-defendants, who the appellate court agreed could be the subject of an award of disgorgement.

Defendant urges the same result is here required.  Like *Sidoti*, Defendant here admits the failure to register but defends the conduct on the basis that he reasonably believed that his activity did not qualify him as a dealer.  And like *Sidoti*, Defendant contends that his failure to register, by itself, is not causally related to his realization of income in those transactions.

SEC relies heavily on *Almagarby*.  In *Almagarby*, a court in this district entered a disgorgement award after finding the defendants liable for violating Section 15(a) of the Exchange Act by acting as unregistered dealers.  Defendants there similarly argued that in the absence of evidence that investors were harmed, there was no causal connection between the failure to register

as a dealer and the disgorgement sought by the SEC.  The court disagreed, reasoning that "Defendants' violation was engaging in the business of regularly acquiring securities from issuers and reselling those securities into the market without registering as a 'dealer.'  Thus, the profits generated from these transactions are connected to Defendants' violation."  *Almagarby*, 2021 WL 4461831, at *3.  In sum, the court there recognized a causal connection between the defendants' engaging in a regular business of acquiring securities while failing to register as a dealer, and not limiting its consideration to the status of the defendants as registered or unregistered.

Defendant correctly notes that the *Almagarby* opinion does not consider *Sidoti* and suggests that the two decisions cannot be reconciled.  However, the SEC offers to distinguish *Sidoti* on the ground that Defendant here, as in *Almagarby*, was "personally involved" in the conduct; by contrast, the CFTC had not even alleged in *Sidoti* that the defendant knew of or participated in the fraudulent conduct.  (ECF No. 129 at 6).  Further examination of Defendant's remaining cases suggest that this distinction is valid and supports *Almagarby*'s focus on the defendants' conduct, as opposed to their status.

Defendant advances *Wyly* to support his contention that absent evidence that his unregistered status impacted the market or caused any harm, the SEC cannot prove the required causal connection.  After a jury found defendants liable for failing to make various disclosures required by securities laws, the court in *Wyly* considered and rejected the SEC's demand for disgorgement of all profits realized over a seven-year period.  The court explained its basis for finding the causal connection not proven, despite the fact that the "jury found that the Wylys engaged in a scheme to hide their beneficial ownership of a large block of securities in companies they controlled. The jury did not find that the trading itself was unlawful and could not have reasonably done so. There is no authority in any statute or case law that forbids insiders from

trading, unless they do so while in possession of material, non-public information, or in other limited circumstances not applicable here." *SEC v. Wyly,* 56 F. Supp. 3d 260, 269–70 (S.D.N.Y. 2014) (emphasis added). Meaningful to the court's causation analysis was the fact that the defendants' transactions as conducted did not violate the law. This stands in contrast to the present case.

The SEC, in this case, provided evidence, and the Court found, that Defendant failed to register, and, while unregistered, bought and sold convertible notes from which he profited significantly. (ECF No. 118 at 21). Notably, Defendant does not genuinely dispute that he sought to make a profit from selling the converted stock. *See* (ECF No. 84-5). The SEC adduced that Defendant's net proceeds relating to buying and selling convertible notes over the Relevant Period were $33 million, whereas Defendant's expert interpreted the evidence to indicate Defendant made $10 million in net proceeds. The SEC's evidence shows that in 2015 the net proceeds from selling all stock amounted to $11,658,270.00, and convertible stock is nearly 95% of those net proceeds, or $11,081,874.00. (ECF No. 122-3 at 10). In the same year, Defendant calculated net profits of $4,688,403.00. In both Parties' calculations, it is undisputed that Defendant made significant net profits which would not be allowed to occur if his unregistered status was realized earlier.

As the Court found, there is no genuine dispute of fact that Defendant marketed himself as willing to buy and sell securities on a continuous basis. (ECF No. 118 at 25). Defendant entered into over 100 convertible notes with over 100 issuers as an unregistered dealer and reaped the benefits of a registered securities dealer by garnering proceeds from these transactions. (*Id.* at 21). As the Court found, Defendant also engaged in other "dealer' conduct by acquiring newly issued stock from the aforementioned microcap issuers at a discount and then reselling them to the public. (*Id.* at 24). Thus, Defendant's profits did not result from an appreciation in the value of the notes,

rather, his profits were derived from the profits he gained converting and then selling the convertible notes, all while he was unregistered.  (*Id.*).

### i.  Disgorgement Is Not Barred Under *Liu*

Defendant also raises the argument that *Liu* bars disgorgement because a disgorgement award must be awarded to victims, must do more than simply benefit the public at large, and that disgorgement should awarded be for the benefit of specific investors.  (ECF No. 124 at 11).  As a result, Defendant argues that the Court should reject the SEC's request for disgorgement because the SEC failed to identify victims.  Defendant also argues that the Court in *Liu* held that prior disgorgement orders that deposited disgorgement proceeds in Treasury funds, instead of distributing them to victims, were problematic.  *Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020).  Defendant argues that the SEC seeks to deposit funds with the treasury as an "escape hatch" because the SEC cannot identify any victims; this is not allowed under *Liu*.

In its Reply, Plaintiff argues that Defendant's assertion that *Liu* bars disgorgement because the SEC cannot identify specific victims without support is wrong.  Plaintiff argues that the Supreme Court made no ruling that identifying victims is a prerequisite to disgorgement.  Plaintiff also presented a new argument that the recently enacted Section 21(d)(7) of the Exchange Act specifically authorized the Court to award disgorgement.  *See* 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.").

Because the SEC raised this new argument in its Reply, the Court granted Defendant leave to file a Sur-Reply (ECF No. 133).  Defendant asserts that the SEC argues incorrectly that Section 21(d)(7) overruled the Supreme Court's decision in *Liu* because Section 21(d)(7) simply states that "the Commission may seek, and any Federal court may order, disgorgement."   15 U.S.C. §

78u(d)(7).  According to Defendant, no court in the country has interpreted Section 21(d)(7) to impact the interpretation of *Liu*.

Defendant also argues that the statute only authorizes disgorgement of "unjust enrichment" under 15 U.S.C. § 78u(d)(3), which is an equitable remedy that must be considered in tandem with the "for the benefit of investors" language in Section 21(d)(5) that was at issue in *Liu*.  (ECF No. 133 at 1–2); *see* 15 U.S.C. § 78u(d)(3).  Thus, Defendant argues, the language defining equitable remedies in Section 21(d)(5) should govern and the SEC must be able to identify the "victims" or investors harmed.  Defendant argues that Plaintiff's interpretation retroactively imposes a punitive form of disgorgement, which would be unconstitutional.

The SEC, in a Sur-Sur-Reply argues that it never suggested that Section 21(d)(7) overruled *Liu*.  Instead, the SEC asserts that its Reply merely notes that Section 21(d)(7) omits the "for the benefit of investors" language, thus, providing the Court with more flexibility in determining how to distribute disgorgement.  15 U.S.C. § 78u(d)(7).  The SEC contends that it does not intend for the Court to send disgorged funds to the Treasury, rather, it will attempt to make distributions to investors.  (ECF No. 137 at 2).  The SEC addresses Defendant's argument regarding retroactivity by arguing that the omission of the language in question does not transform disgorgement into penal legislation.  The SEC also contends that, similar to the cases Defendant cites which satisfied *Liu*'s interpretation of Section 21(d)(5), the disgorgement award sought here conforms with both *Liu* and Section 21(d)(7).

In *Liu*, the SEC brought a civil action against petitioners, alleging that they violated the terms of the offering documents by misappropriating millions of dollars that were supposed to fund the construction of a cancer-treatment center.  The SEC in that case argued that the primary function of the disgorgement award they sought as an equitable remedy under § 78u(d)(5) was to

deprive wrongdoers of their ill-gotten gains, not to return the funds to victims.  140 S. Ct. at 1948.

The SEC maintained that the mere fact that it conducted an enforcement action satisfied the

requirement that it was "appropriate or necessary for the benefit of investors."  *Id.*  The Supreme

Court disagreed.

The Court held that the SEC's equitable, profits-based remedy must do more than simply

deprive the wrongdoer of their ill-gotten profits.  *Id.*  Rather than holding that it "must" award

victims, the Court stopped one step short stating, "we do not address [that] issue here."  *Id.  Liu*

also left open the question as to whether depositing disgorgement funds with the Treasury satisfied

principles of equity.  *Id.*  The Court directed lower courts to evaluate whether a disgorgement order

would indeed be "for the benefit of investors" under § 78u(d)(5) and "consistent with equitable

principles."  *Id.* at 1949.

The Court agrees with the SEC that *Liu* does not bar disgorgement simply because victims

have not been identified.  The SEC has proffered that it intends to make a distribution to investors,

which is "for the benefit of the investors" and consistent with the equitable principles enunciated

in *Liu*.  *See* (ECF Nos. 122 at 15; 129 at 8; 137 at 2–3).  Finally, the SEC suggests that Section

21(d)(7) of the Exchange Act omits any language requiring an award of disgorgement that is

specifically "for the benefits of investors," thus affording courts "greater flexibility" to use their

equitable authority.  Yet the SEC contends that in this case, it intends in fact to distribute any

disgorgement award to "harmed investors," (ECF No. 129 at 8), and thus this Court need not decide

whether and to what extent Section 21(d)(7) expands its equitable powers.[2]

---

[2] To the extent the SEC urges the Court to interpret the New Section as expanding its equitable powers, I submit that the Supreme Court's analysis of the origin and bounds of equity suggests otherwise.  In examining what Congress meant by its use of the term "disgorgement," the Court recognized that statutes "did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity."  *Liu*, 140 S. Ct. at 1947.  Application of the New Section, like any statute providing for "equitable relief," depends on whether the remedy falls into one of "those categories of relief that were *typically* available in equity," something the court discerns "by

ii.   The SEC's Approximation of Defendant's Ill-Gotten Gains

The SEC bears the burden of producing a reasonable approximation of the defendant's ill-gotten gains.  *Calvo*, 378 F.3d at 1217.  The burden then shifts to the defendant to show that the approximation is not reasonable.  *Id.*  (citation omitted).  The Court does not need to calculate the precise amount so long as the disgorgement measured is reasonable.  *Huff*, 758 F. Supp. 2d at 1358.

Defendant argues that if the Court finds disgorgement warranted, it should reject the SEC's calculation because the roughly $17.5 million requested exceeds any net profits Defendant made from his convertible note investments.  Under *Liu*, Defendant argues that the amount must be limited to net profits minus legitimate expenses.

Following summary judgment and a determination of Defendant's liability for violating securities laws, the Parties' expert accountants submitted declarations providing updated disgorgement calculations for the remedies phase of this action, based upon the proceeds from stock sales derived from convertible notes.  *See* (ECF Nos. 122-3; 124-2).  For the SEC, Dr. Carmen Taveras submitted an additional Remedies Summary Declaration to calculate net profits exclusively from convertible notes by using Defendant's Income Statement-Notes, (ECF No. 66-15), and calculating the Defendant's net proceeds from all stock sales while then subtracting applicable costs, interest, OID, penalties, proceeds from open market transactions and syndicated offerings, and business expenses.  Exhibit A of Dr. Taveras' Remedies Declaration titled "JMJ Net Profits from Notes and Prejudgment Interest" indicates that the Declaration pulls from the Defendant's Income Statement-Notes to combine the stock proceeds, cost of stock, and income of stock, as a foundation.  Of the $34 million of net proceeds, Dr. Taveras calculates the total stock

consulting works on equity jurisprudence."  *Id.* at 1942 (emphasis in original).  The SEC's proffered interpretation, to the extent it would purport to expand beyond relief typically available in equity, would be inconsistent with *Lui.*

21

sales from convertible notes to equal 83% or $28 million by combining and categorizing the sales as conversions, bonuses, payments of note balances, and penalties. *See* (ECF No. 67-11 at 11); (ECF No. 66-15); (ECF No. 122-3). Dr. Taveras then subtracted the aforementioned expenses, thus resulting in $17,557,840.00.

Dr. Taveras' calculations relied upon a timeline beginning March 24, 2014 and extending through to January 31, 2018. In the Court's Summary Judgment Order, (ECF No. 118), the Court explicitly recognized the Complaint as "defining the relevant period as January 2015 through January 2018." (*Id.* at 30). In rejecting Defendant's statute of limitations affirmative defense, the Court found that the SEC was entitled to relief for conduct that "occurred on or after March 24, 2015." (*Id.*) As Defendant notes, the inclusion of 2014 into the disgorgement calculation accounts for $14.6 million of the $34 million sought.

The Court finds the SEC approximation unreasonable in the following respects. First, the SEC relies on a period time that is not the Relevant Period determined by the Court. The Court explicitly defined the relevant period as beginning in January 2015 and extending through January 2018. (ECF No. 118 at 30). However, the SEC's approximation includes March 24, 2014, through December 31, 2014. Plaintiff contends that the one-year tolling agreement entered by the parties is controlling, thus the Relevant Period began on March 24, 2014. (ECF No. 67-8). The Court disposed of the Statute of Limitations affirmative defense on summary judgment and also stated in the Order, "Plaintiff is entitled to relief for conduct that occurred on or after March 24, 2015." (ECF No. 118 at 30). By disposing of the affirmative defense at that stage, the Court effectively precluded consideration of this agreement and defined the Relevant Period as beginning on March 24, 2015. Thus, the Court recommends removing 2014 from the approximation, thus removing $11,6898,657 in profits from the total disgorgement amount.

The Court also recognizes that January 1, 2015 through March 23, 2015 is outside the Relevant Period for which the SEC is entitled to relief as defined by the Court. (ECF No. 118 at 30). This period of time accounts for approximately 23% of 2015, thus the Court calculates this to equate to $1,497,332.89 in net proceeds that should be subtracted from the total disgorgement amount as well.

Referencing Exhibit A of Dr. Taveras' Remedies Declaration during the correct Relevant Period, the Court combines the Defendant's net income from notes for the years 2015, 2016, 2017, and January 1, 2018, through January 31, 2018. (ECF No. 122-3 at 10). The resulting amount of Defendant's net income from notes is $21,203,241.00, which is then subtracted by the business expenses for the same Relevant Period, which is $12,377,974..00. Subtracting Defendant's business expenses from the net income from notes results in profits of $8,725,267.00. *See* (*Id.*). Accounting for the portion of 2015 that is not included in the Relevant Period, the Court subtracts $1,497,332.89, thus the final amount of net proceeds between March 24, 2015 and January 31, 2018 is $7,227,934.11. The Court finds that this amount is reasonably calculated using the information provided by the SEC and analysis by Defendant. Again, the Court notes that exactitude is not a requirement, just that the approximation be reasonable. *Calvo*, 378 F.3d at 1217. Any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.

The burden now shifts to Defendant, whose expert prepared a final report in which the total net proceeds were calculated for the correct Relevant Period (January 2015 – January 2018) to be $9,973,633. (ECF No. 66-10 at 54). Defendant also concluded the amount of business expenses to be $12,377,94.09. (*Id.* at 55). Similar to the Court's calculations for the SEC's approximation regarding the period of January 1, 2015 through March 23, 2015, the Court finds that subtracting

the amount from this period of time ($1,078332.69) results in $8,895,300.31 in net proceeds for the period beginning March 24, 2015 through January 31, 2018. Defendant argues that the SEC's calculations are wrong and that the ADXS and NWBO bridge loans should not be included in the calculations as convertible notes even if Defendant received stock from the NWBO note without technically converting it. *See* (*Id.* at 16).

Defendant also argues that the January 31, 2018 end date results in an inflated disgorgement figure because it excludes a $17 million loss associated with Defendant's investment in Connekt Media Inc. ("Connekt"). (*Id.* at 17). Calculating Defendant's losses is appropriate, he argues, because it shows that Defendant also lost money for which no profits could be disgorged. (*Id.*).

As to Defendant's argument that he actually lost millions of dollars, the SEC argues this claim to be false. The SEC contends that the $17 million Defendant lost from his investment in Connekt bore no resemblance to a convertible note because Defendant owned the company, and Connekt was also private. Even if Connekt were considered in the calculation, the SEC argues that it is impossible to evaluate a self-dealing transaction like the Connekt loan because Defendant utilizes foreign accounts, concealed from the SEC. (ECF No. 124 at 10); *see also* (ECF No. 72-3 at 24:14–15) (Defendant's testimony: "my foreign accounts are in the names of three international corporations"). The SEC argues that between the highly redacted account records and his vague testimony, Defendant cannot establish his burden of showing that the SEC's approximation is unreasonable.

The disgorgement amount should not exceed Defendant's net profits from the wrongdoing. Disgorgement is measured by Defendant's profits and not investor losses, thus, it need not consider whether Defendant's investment in Connekt is included in the approximation. *SEC v. U.S. Pension*

*Tr. Corp.*, No. 07-22570-CIV, 2010 WL 3894082, at *23 (S.D. Fla. Sept. 30, 2010), *aff'd sub nom. SEC v. U.S. Pension Tr. Corp.*, 444 F. App'x 435 (11th Cir. 2011).  In this case, the disgorgement amount should be $7,227,934.00.[3]  The Court views the SEC's calculations during the relevant period to be reasonable by following the principles outlined in *Liu*, which instruct courts to deduct legitimate expenses before arriving at the final approximation.  *Liu*, 140 S.Ct. at 1946.  Exhibit A of Dr. Taveras' Remedies Declaration demonstrates the sources upon which the approximation was based.  (ECF Nos. 122-3 at 10; 67-11).  The Court notes minor errors in the SEC's calculations;[4] however, "[e]xactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Calvo*, 378 F.3d at 1217.  Accordingly, the Court recommends disgorgement in the amount of $8,725,267.00.

### d.  Prejudgment Interest

The Court has the discretion to decide whether to award prejudgment interest and, if so, at what rate.  *See SEC v. Carrillo*, 325 F.3d 1268, 1273 (11th Cir. 2003).  Courts impose prejudgment interest to prevent those found liable under the securities laws from enjoying any benefit accrued from the use of the ill-gotten gains.  *Yun*, 148 F. Supp. 2d at 1293.  Courts routinely use the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."  *BIH Corp.*, 2014 WL 7499053, at *4 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).  The time frame for the imposition of prejudgment interest usually begins with the

---

[3] The final disgorgement amounts are rounded to the nearest dollar.
[4] For example, the Net Proceeds from Selling All Stock in 2017 is $4,242,637 in the JMJ Income Statement Notes, instead of $4,242,673.  *Compare* (ECF No. 66-15 at 3) with (ECF No. 122-3 at 10).  Also, Line 1 amounts to $34,008,377 when added—not $34,008,376.  However, these discrepancies are very minor and fail to affect the reasonableness of the calculation.

date of the unlawful gain and ends at the entry of judgment. *Yun*, 148 F. Supp. 2d, at 129 (citation omitted).

Here, the SEC proffers that Defendant should pay $5,141,461.00 in prejudgment interest. Using the IRS underpayment rates, Dr. Taveras calculated prejudgment interest for sales occurring within a given calendar year from the first day of the following year through February 1, 2022. Defendant argues prejudgment interest in the amount of $5.1 million is not equitable. Defendant argues that the Court should follow *Almagarby*, which calculated the accrual period to begin after all of the sales during the Relevant Period had occurred. *Almagarby*, 2021 WL 4461831, at *2. The Court observes that although there is no universal method for calculating prejudgment interest, many courts appear to calculate prejudgment interest on the final disgorgement amount sought, which is the realized amount of the unlawful gain. *See BIH Corp.*, 2014 WL 7499053, at *8; *Yun*, 148 F. Supp., at 1293; *Almagarby*, 2021 WL 4461831, at *2. The Court finds it reasonable to levy prejudgment interest on the amount realized at the end of the Relevant Period. Thus, the undersigned recommends that prejudgment interest be imposed on $7,227,934.00, from February 1, 2018, until January 21, 2022, which is the date the Court filed its Order on Summary Judgment (ECF No. 118).

### e. Civil Penalty

The SEC requests that the Court impose a civil penalty in the amount of $1,750,000.00. Section 21(d)(3) of the Exchange Act authorizes the Court to order penalties for violations of the federal securities laws, providing three tiers of escalating penalty amounts. 15 U.S.C. § 78u(d)(3). The decision of whether to impose a penalty and in what amount falls within the Court's discretion. *SEC v. Aura Financial Services, Inc.*, No. 09-21592-Civ., 2010 WL 3419200, at *3 (S.D. Fla. July 14, 2010). Courts look to a number of factors, including: (1) the egregiousness of the defendant's

conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Big Apple Consulting USA, Inc.*, No. 6:09-cv-1963-Orl-28GJK, 2013 WL 1352166, at *3 (M.D. Fla. Mar. 29, 2013), *aff'd*, 783 F.2d 786 (11th Cir. 2015).

Because civil penalties, like a permanent injunction, are imposed in part to deter the wrongdoer from similar conduct in the future, courts apply the same factors for determining injunctive relief in assessing civil penalties. The Court will not belabor the Court's prior findings by repeating that discussion here. As for the factors not discussed, the Court notes that Defendant's conduct routinely flooded the market with newly issued shares of stock, thus dropping share prices and resulting in, at a minimum, the risk of substantial losses for investors. (ECF No. 122 at 17). This conduct occurred while Defendant realized significant profits. As for Defendant's current and future financial condition, this factor warrants no reduction. In 2019, Defendant provided testimony estimating his net worth to be between $50 million and $100 million. *See* (ECF No. 72-3 at 144:23–146:3). Defendant remains involved in the financial markets and continues to operate JMJ. The factors militate in favor of imposing a penalty of more than a nominal amount.

Considering the totality of the factors, the Court agrees with the SEC insofar as Defendant's conduct warrants the imposition of a civil penalty.

The SEC also argues that a civil penalty is warranted to deter Defendant and others from engaging in repetitive conduct. Defendant adduces this argument to be without merit by proffering evidence that Defendant has not invested in a convertible note in five years. Defendant also puts forth evidence that fairness weighs in favor of a penalty by citing an SEC Release indicating the

27

proposition of a new rule that would expand the types of entities that are defined as dealers or government securities dealers.  *See* SEC Release No. 34-94524.  Defendant argues that the penalty unfairly targets Defendant because many other firms are engaged in the same conduct.  However, the SEC has advanced caselaw showing that Mr. Keener has not been the only individual or firm that the SEC has brought suit against for the same or a substantially similar business model.  (ECF No. 122 at 12–13).

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize three tiers of civil monetary penalties against violators of the Acts.  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d).  The first tier applies to any violation of the Exchange Act.  15 U.S.C. § 78u(d).  Here, the SEC seeks a tier-one penalty for which the amount of penalty shall not exceed the greater of $5,000 for a natural person or $50,000 for any other person, or the gross amount of pecuniary gain to such defendant as a result of the violation.  15 U.S.C. § 78u(d)(3)(B)(i).

The second tier applies to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id.*  The third tier applies to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id.*  The statutory language referring to "the gross amount of pecuniary gain to such defendant as a result of the violation" focuses not on any loss that an investor or other potential victim might have sustained, but rather, on the gain that a defendant enjoys as a result of a violation of the Exchange Act.  *Huff*, 758 F. Supp. 2d at 1365 (citing 15 U.S.C. 78u(d)(3)(B)).

As Defendant correctly noted, courts within this circuit routinely award tier one penalties for violations like Defendant's failure to register.  (ECF No. 124 at 25).  A tier-one penalty is appropriate here as well.

Even under tier one, the Court may impose a penalty up to the amount of a defendant's gross pecuniary gain.  *See* 15 U.S.C. § 78u(d)(3)(B)(i).  The SEC's proposed penalty equates to 10% of its proposed disgorgement figure.  In *Almagarby*, the court levied a penalty that was approximately 9% of the disgorgement figure.  2021 WL 4459439, at *1 ($80,000 civil penalty and disgorgement award of $885,000).  The SEC is requesting a civil penalty of $1.75 million.  The SEC rationalizes this percentage because "[t]he proposed penalty is proportionally comparable to the penalty in *Almagarby*."  (ECF No. 122 at 19).  Besides the arbitrary nature of the SEC's selection of 10%, the proposed penalty no longer bears that relationship to the disgorgement award recommended herein.

In Defendant's disgorgement argument, Defendant advanced evidence of the costs associated with becoming a dealer, including the SEC's registration costs and the costs of registering as a dealer, becoming a member of a national securities association, and complying with the association regulation.  Based on the evidence Defendant advanced, these costs would amount to approximately $545,000.00 for the initial registration and first-year fees and $240,000 every year thereafter.[5]  (ECF No. 124 at 11); *see* SEC Release No. 34-94524 at 135 n.268.

The Relevant Period spanned between March 2015 and January 2018, thus, Defendant should be required to pay a penalty of $545,000.00 for the initial registration, which includes year one (2015), in addition to $240,000.00 for years two (2016) and three (2017) for which he was not registered, totaling $1,025,000.  The Court also deems it appropriate to assess a fee for the actual violation in the amount of $5,000.  Accordingly, the undersigned recommends a civil penalty of $1,030,00.00.

---

[5] These amounts factor in the costs of inflation from March 2015 to January 2018, based approximately on the Consumer Price Index for All Urban Consumers (CPI-U) as recorded by the Bureau of Labor Statistics.  *See* Consumer Price Index, U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/data.htm.

The undersigned also recommends that a provision allowing the SEC to establish a Fair Fund for the final penalty amount the Court orders should be included in the final judgment. Defendant did not raise any objection.

### f.   Surrender and Cancellation of Remaining Shares and Conversion Rights

The SEC seeks to require Defendant to surrender for cancellation his remaining shares of stock and conversion rights under convertible notes issued by the issuers identified in Exhibit 1. (ECF No. 122-1).  Defendant states that he is willing to surrender any remaining shares in the companies listed in Exhibit 1 to the Motion.  Thus, there is no dispute on this issue.

However, Defendant contends that the proposed order should omit language requiring Defendant to provide copies of correspondence evidencing the surrender because it is not possible. (ECF No. 123 at 5).  He argues that such a task may be onerous and many companies may have gone out of business, making it more difficult to communicate with them.  However, that does not prevent Defendant from attempting to correspond with these companies.  Accordingly, the undersigned recommends that Defendant should be required to surrender his remaining shares for cancellation, and at a minimum, attempt to correspond with the issuers.

## III.   RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that the SEC's Motion for Remedies be **GRANTED, in part, and DENIED, in part**.  The undersigned specifically recommends the following:

> a.   Defendant should be permanently enjoined from committing further violations of Exchange Act Section 15(a)(1), as set forth in Exhibit A § I;

    b.   Defendant should be ordered to disgorge the amount of $7,227,934.00, plus prejudgment interest on the disgorged amount between February 1, 2018 and January 21, 2022, to be entered in Exhibit A § III;

    c.   A tier-one civil penalty in the amount of $1,030,00.00 should be imposed against Defendant, as set forth in Exhibit A § III;

    d.   A penny stock bar should be imposed against Defendant, as set forth in Exhibit A § II; and

    e.   Defendant should be required to surrender for cancellation all shares of stock and conversion rights from convertible notes that issuers sold to him and attempt to contact the issuers as listed in Exhibit 1 of Plaintiff's Motion, (ECF No. 122-1), and provide copies of correspondence to the Court, as set forth in Exhibit A § IV.

Pursuant to Local Magistrate Rule 4(b), the Parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to timely file objections shall bar the Parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**RESPECTFULLY SUBMITTED** in Chambers on this 8th day of August, 2022.

_____
LAUREN F. LOUIS
**UNITED STATES MAGISTRATE JUDGE**