# Exhibit A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.                          Case No. 8:19-cv-448-VMC-CPT

SPARTAN SECURITIES GROUP, LTD,
ISLAND CAPITAL MANAGEMENT,
CARL DILLEY, and MICAH ELDRED,

     Defendants.

_____/

**ORDER**

     Before the Court is the Motion for Remedies filed by Plaintiff Securities and Exchange Commission ("SEC") on April 13, 2022. (Doc. # 270). Defendants Spartan Securities Group, Ltd., Island Capital Management, Carl E. Dilley, and Micah J. Eldred (collectively, "Defendants") filed a response in opposition on May 23, 2022. (Doc. # 273). The SEC filed a reply on July 12, 2022. (Doc. # 284). The Court thereafter held an evidentiary hearing and oral argument on this matter, and it solicited supplemental materials from the parties. Following careful consideration, and for the reasons that follow, the Motion is granted in part and denied in part.

**I.  Background**

     Following a 12-day trial in July 2021, a jury handed down a verdict in Defendants' favor on 13 of the 14 counts brought by the SEC. (Doc. # 250). However, the jury rendered a verdict in favor

1

of the SEC as to Count Six of the complaint, finding that Spartan, Island, Dilley, and Eldred made materially misleading statements or omissions in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act. (Id.). Defendants filed a renewed motion for judgment as a matter of law, which this Court denied. (Doc. # 263).

The SEC now seeks certain remedies against Defendants, including an injunction, penny stock bars, and monetary relief consisting of disgorgement and civil penalties. (Doc. # 270). Defendants have responded, and the Motion is ripe for review.

## II.  **Legal Standard**

Congress has authorized the SEC to enforce the Securities Act of 1933 and the Securities Exchange Act of 1934 and to punish securities fraud through administrative and civil proceedings. Liu v. SEC, 140 S. Ct. 1936, 1940 (2020). Once a court determines that a federal securities law violation has occurred, it has broad equitable powers to fashion appropriate remedies. SEC v. Lorin, 76 F.3d 458, 461-62 (2d Cir. 1996).

## III. **Discussion**

### A.   **Injunctive Relief**

The Exchange Act authorizes the SEC to seek an injunction "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter." 15 U.S.C. § 78u(d)(1).

2

"The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." SEC v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004).

The jury's verdict against Defendants sufficiently meets the requirement of a previous violation, leaving the issue of whether there is a "reasonable likelihood that the wrong will be repeated." The SEC bears the burden of proving that a recurrent violation is reasonably likely to occur and, in the Eleventh Circuit, the "mere fact of past violations" is insufficient to establish the propriety of an injunction. SEC v. Yun, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001) (citing SEC v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978)). In determining whether to grant injunctive relief, factors to consider are: "[1] [the] egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of the conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations." Calvo, 378 F.3d at 1216.

The SEC seeks permanent injunctive relief against all four Defendants. Defendants claim that, under the Calvo factors, an injunction is not warranted in this case. (Doc. # 273 at 3-8). The

Court must first, then, determine whether an injunction is appropriate.

First, as to the egregiousness of Defendant's actions, the SEC presented evidence at trial that Defendants submitted Form 211s to FINRA for multiple issuers containing information that Defendants knew or reasonably should have known was false, made materially false statements or omissions in connection with clearance from the Depository Trust Company, and/or processed bulk transfers in instances where shares were restricted or their actions were otherwise improper. In short, the Court agrees with the SEC that, taking the evidence in the light most favorable to the jury's verdict, the evidence demonstrated that Defendants abused their "gatekeeper" role by enabling the purchase and sale of securities on the public market that should have been barred or more carefully vetted by FINRA. This factor leans in favor of an injunction.

Second, as to the isolated or recurrent nature of the infraction, the SEC calls the Defendants' conduct "far-reaching," arguing that for more than five years, they played "critical roles in bringing at least 19 separate blank check companies public under false pretenses." Defendants argue that the SEC only presented evidence of 19 problematic securities offerings, out of the over 1,200-1,500 Form 211 applications Defendants filed , or about 1% of the applications filed during the relevant time. The Court

4

believes both parties make valid points, and this factor is neutral.

Third, as to the degree of scienter involved, based on the jury's verdict, Defendants had to make the material misrepresentations or omissions at issue with at least severe recklessness. Scienter weighs in favor of an injunction.

Fourth, as to the sincerity of Defendant's assurances against future violations and Defendants' recognition of the wrongful nature of their conduct, Defendants have not expressed any remorse for their actions. But they rightly point out that their right to defend themselves should not be held against them. While the Court respects Defendants' right to raise a vigorous defense, the fact remains that neither individual Defendant has provided the Court with specific assurances against future violations, has not admitted any wrongful conduct, and has not shown any remorse. This factor weighs in favor of an injunction.

Finally, the Court turns to the likelihood that Defendants' occupation(s) will present opportunities for future violations. The parties presented evidence on this point at the hearing. Mr. Eldred, who is 54 years old, testified that he is no longer registered as a securities broker with the SEC or FINRA. He voluntarily withdrew his licenses with the regulators in 2019. Mr. Eldred explained that FINRA requires brokers to have a "sponsoring organization," so that to reactivate his FINRA license, he would

need to first find an organization willing to sponsor him and then FINRA would need to re-grant his licensure. He believes that, based on his convictions in this case, the likelihood of this happening is very slim.

Currently, Mr. Eldred is the CEO and on the Board of Directors of Endurance Exploration Group, a shipwreck recovery and salvage company. He does not draw a salary from Endurance, although he could receive dividends or shares of the company's profits, should the company do well. Mr. Eldred also works as a non-lawyer partner in a small law firm, in which he provides business development services and "expertise," including securities expertise, to the firm's clients.

Mr. Eldred also elaborated on the current status of Spartan and Island. Island went out of business in 2020 and is not currently operating. He explained that it shut down due to this litigation – clients left, and the firm became unprofitable. Island is no longer registered with the relevant regulators and, to resume operations, it would have to re-register with the SEC and the DTC. Mr. Eldred testified that, upon closing, Island sold its book of business and Eldred has drawn continuing payments from that sale – he received approximately $100,000 in the past year, and there are three years left on the sales agreement.

Spartan is also no longer in operation. Mr. Eldred explained that, in June 2019, Spartan lost more than $15 million in one day

due to the actions of a rogue employee. Spartan initiated a FINRA arbitration action against the employee and received a $5.4 million judgment in its favor. However, under an agreement they made with another firm who paid their legal expenses, if the employee were to ever pay the judgment, the firm would be reimbursed first. The employee has thus far not paid any amount of the judgment, and Mr. Eldred does not believe he has the means to do so.

Pursuant to SEC regulations, Spartan was required to wind down and cannot operate because of its negative resources. Thus, to restart operations, Spartan would need to recover all of its lost capital and also receive regulatory approval from the SEC and FINRA. Mr. Eldred stated that he does not believe FINRA would allow Spartan to re-register. Mr. Eldred explained that, although he personally had no prior disciplinary history with securities regulators, FINRA had filed 10 actions against Spartan over the years, fining them close to $400,000. The Court finds Mr. Eldred's testimony credible with respect to Spartan and Island.

Mr. Dilley, who is 67 years old, concurred with Mr. Eldred's statements about what would be required for Island, Spartan, or himself as an individual broker to re-enter the securities business. Given these hurdles, he similarly believes it highly unlikely that Island or Spartan could resume operations. Mr. Dilley voluntarily gave up his securities licenses in 2014. Mr. Dilley retired from Island in January 2018 but remained a consultant for

the company. Mr. Dilley is also involved with Endurance, the shipwreck salvage company, as the COO and a member of the Board of Directors. He receives *de minimus* amounts for overseeing that company's accounting, but, like Mr. Eldred, could plausibly receive profit sharing or dividends from the company. Mr. Dilley receives income from Social Security, a Canadian pension, work from his repair shop, and "limited securities consulting." He also has a real estate license but testified that he has not yet earned any money in the real estate business. He is also the owner or part-owner of certain companies that do not generate much, if any, income.

1. Injunction against Spartan

The Court is persuaded that the economic, logistical, and regulatory impediments to Spartan resuming operations make it unlikely that it will ever re-enter the securities business. The Court is mindful that "[t]he purpose of injunctive relief is, after all, not to punish but to deter future violations." SEC v. Advance Growth Capital, Corp., 470 F.2d 40, 54 (7th Cir. 1972). The SEC argues that Spartan could plausibly resurrect operations in the securities realm, but the standard the SEC must show is a "*reasonable* likelihood that the wrong will be repeated." Calvo, 378 F.3d at 1216 (emphasis added). They have not met that standard here, and the Court will not issue an injunction against Spartan because that entity is basically defunct with little to no chance

of ever resuming operations. See SEC v. Scott, 565 F. Supp. 1513, 1537 (S.D.N.Y. 1983) (refusing to grant injunctive relief where, based on the record, the court was "unable to find a reasonable likelihood that, absent an injunction, [the defendant] would be likely to commit future violations of the securities laws"); see also SEC v. Blockvest, LLC, No. 18CV2287-GPB(BLM), 2018 WL 6181408, at *8 (S.D. Cal. Nov. 27, 2018), on reconsideration, No. 18CV2287-GPB(BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) (refusing to grant preliminary injunction where defendant agreed to stop his challenged actions and thus, SEC had not demonstrated a reasonable likelihood that the wrong will be repeated). Finally, the Court also notes that Spartan will be subject to a penny stock bar, as explained further below, which is appropriate because its business (and the misconduct at issue here) centered on penny stocks.

## 2. Injunction against Island

Testimony from the evidentiary hearing showed that Island, like Spartan, is no longer operational. However, there are two important differences between the companies. First, while Island may be de-registered with regulators, it does not face the same capitalization concerns that Spartan does if it wished to resume operations. Second, as a transfer agent, the SEC is not seeking a penny stock bar against Island, a measure that the Court believes to be adequate with respect to Spartan. For these reasons, the Court will issue an injunction against Island. Furthermore, as a

corporate defendant, the Court need not consider impacts upon livelihood or credibility like it does with individual defendants. The Court sees no reason why the injunctive relief granted here cannot be permanent. Furthermore, the Court finds the SEC's proposed injunctive language, as revised, is sufficiently specific, and the Court adopts it here:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:
>
> i.   whether an issuer is a shell or blank check company; or
> ii.  information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or
> iii. the designation of securities as free trading; or
> iv.  the issuance and transfer of securities, including by means of stock certificates without restrictive legends.

(Doc. # 296-1).

### 3. Injunctions against Mr. Dilley and Mr. Eldred

The Court will issue injunctions against Mr. Dilley and Mr. Eldred. Looking at the totality of the facts and circumstances, including the fact that both individuals still have at least

tangential contacts with the securities industry (Mr. Dilley with his "limited securities consulting" and Mr. Eldred in his advisory role at the law firm), there is a reasonable likelihood that the wrong could be repeated. Both men have been involved with the securities industry for most of their lives. Both are involved or have been involved in multiple businesses and are likely still well connected in the industry. Furthermore, while the Court does not penalize them for defending this case, neither man has given adequate assurances against future misconduct, beyond (credible) doubts regarding their ability to re-enter the industry. See, e.g., SEC v. Selden, 632 F. Supp. 2d 91, 99 (D. Mass. 2009) (imposing injunction where defendant worked at a non-public company, but "should it become [a public company], Selden would once again assume the ultimate responsibility of ensuring the accuracy of the company's public statements. His abuse of such authority in the past and his refusal to accept full responsibility in this case . . . demonstrates, at the very least, a lack of adequate assurance against future misconduct.").

Here, both Mr. Dilley and Mr. Eldred are serial entrepreneurs with years of experience offering services whereby private companies can access the public markets. The Court believes there to be a reasonable likelihood that both men could attempt to leverage their knowledge of the securities business and the penny stock market and possibly repeat the wrongs for which they were

convicted. See <u>SEC v. Miller</u>, 744 F. Supp. 2d 1325, 1341-42 (N.D. Ga. 2010) (holding that defendant's "background as an entrepreneur and his proven ability to start a private company and take it public weighs in favor of an injunction").

However, while the SEC seeks permanent lifetime injunctions against Mr. Dilley and Mr. Eldred, the Court is not persuaded that such a drastic remedy is necessary. These violations occurred many years ago and both men have voluntarily withdrawn their securities licenses. They are also advancing in age, being 54 and 67 years old. Thus, after careful consideration, the Court believes a five-year injunction to be appropriate against Mr. Dilley and Mr. Eldred. See <u>Miller</u>, 744 F. Supp. 2d at 1348 (imposing a five-year bar); <u>Selden</u>, 632 F. Supp. 2d at 99 (imposing a two-year bar)

Having determined that a five-year injunction is appropriate, the Court must fashion relief that is fair and legal. The SEC seeks an injunction against Mr. Dilley and Mr. Eldred that states as follows:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

12

the statements made, in the light of the circumstances
under which they were made, not misleading, regarding:

    i.   initiating a quoted market in an issuer's
security; or

    ii.  the listing and trading of an issuer's stock;
or

    iii. applications or submissions pursuant to
Exchange Act Rule 15c2-11; or

    iv.  whether an issuer is a shell or blank check
company; or

    v.   the identity of any consultants or persons in
control of an issuer; or

    vi.  the relationships or affiliations among an
issuer's shareholders and those in control of
the issuer; or

    vii. an issuer's plans for potential mergers or
acquisitions; or

    viii. an issuer's business purpose; or

    ix.  the nature and conduct of due diligence of an
issuer; or

    x.   the identity of the person or entity for whom
a security's quotation is being submitted,
when seeking to initiate or resume quotations
of an issuer's security; or

    xi.  whether material information, including
adverse material information, exists
regarding an issuer; or

    xii. information submitted to the Depository Trust
Company ("DTC") or its participants when
seeking DTC eligibility for an issuer; or

    xiii. information submitted to Financial Industry
Regulatory Authority ("FINRA" when seeking to
initiate or resume quotations of an issuer's
security; or

    xiv. the designation of securities as free trading;
or

    xv.  the issuance and transfer of securities,
including by means of stock certificates
without restrictive legends.

(Doc. ## 296-3, 296-4).

Defendants argue that injunctive relief is inappropriate
because the SEC seeks "obey the law" injunctions, which are not

13

permitted in this Circuit.[1] Another court within the Middle District of Florida has explained why "obey the law" injunctions are problematic:

> Articulating the standard of specificity that every injunction must satisfy, Rule 65(d), Federal Rules of Civil Procedure, states that "[e]very order granting an injunction . . . must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail — and not by referring to the complaint or other document — the act or acts sought to be restrained or required[.]" The specificity requirement "prevent[s] uncertainty and confusion on the part of those faced with injunctive orders and . . . avoid[s] the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974) (finding that because "an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."). Thus, every injunction must contain "an operative command capable of 'enforcement.'" "A person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." Accordingly, "appellate courts will not countenance injunctions that merely require someone to 'obey the law.'"

SEC v. Sky Way Glob., LLC, 710 F. Supp. 2d 1274, 1277–78 (M.D. Fla. 2010) (citations omitted or altered); see also SEC v. Smyth, 420 F.3d 1225, 1233 (11th Cir. 2005) (finding that proposed injunctions that tracked the provisions of the statute or regulation was a "quintessential 'obey-the-law' injunction").

---

[1] At oral argument, the Court indicated that it agreed with Defendants that the SEC's first set of proposed injunctions was inadequate. While the Defendants have not proffered this argument against the SEC's revised injunctive language, the Court will still discuss it.

The Court believes that the additional, revised language proposed by the SEC takes the proposed injunctive language outside the realm of an "obey the law" injunction because it describes specific conduct that is prohibited. Certain of the language, however, remains too broad or vague. For example, the prohibition on making any misrepresentation pertaining to "the listing and trading of an issuer's stock" is very broad and not directly linked to the misconduct at issue in this case. For this reason, the Court has adopted only those prohibitions on conduct that are sufficiently specific and tied to the misconduct at issue in this case.

Accordingly, the Court will enter injunctions against Mr. Dilley and Mr. Eldred as follows:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is restrained and enjoined, for a period of five years from the date of this judgment, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:

>> i.   initiating a quoted market in an issuer's security; or
>> ii.  applications or submissions pursuant to Exchange Act Rule 15c2-11; or
>> iii. whether an issuer is a shell or blank check company; or

|  | iv. | the identity of any consultants or persons in control of an issuer; or |
|---|---|---|
|  | v. | an issuer's plans for potential mergers or acquisitions; or |
|  | vi. | the identity of the person or entity for whom a security's quotation is being submitted, when seeking to initiate or resume quotations of an issuer's security; or |
|  | vii. | information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or |
|  | viii. | information submitted to Financial Industry Regulatory Authority ("FINRA") when seeking to initiate or resume quotations of an issuer's security. |

**B.    Penny Stock Bar**

Courts may enter a penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock[.]" 15 U.S.C. § 77t(g)(1); 15 U.S.C. § 78u(d)(6)(A). A "penny stock" generally includes an equity security bearing a price of less than five dollars. See SEC v. E-Smart Techs., Inc., 139 F. Supp. 3d 170, 182 (D.D.C. 2015). The Court may enter a penny stock bar "permanently or for such period of time as the court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6). Defendants do not dispute that the underlying scheme involved penny stocks. Nor do they dispute that they participated in an "offering of penny stock," which broadly encompasses "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting

to induce the purchase or sale of, any penny stock." 15 U.S.C §§
77t(g), 78u(d)(6).

The only question, then, is whether such a bar is warranted.
In deciding whether to impose a penny stock bar, "the court
examines the nature of the defendant's conduct and the likelihood
that his occupation and experience will present further
opportunities to violate the securities laws." <u>SEC v. BIH Corp.</u>,
No. 2:10-cv-577-JES-DNF, 2014 WL 7499053, * 6 (M.D. Fla. Dec. 12,
2014) (citation omitted).

Here, a penny stock bar against Mr. Dilley and Mr. Eldred is
warranted. The jury convicted them of securities fraud in
connection with the offering of penny stocks. There was testimony
at the evidentiary hearing that the vast majority of businesses
with which Mr. Eldred and Mr. Dilley involved themselves were penny
stocks. In other words, a penny stock bar would prohibit Mr. Dilley
and Mr. Eldred from engaging in precisely the sort of misconduct
that led to their instant convictions. Both men protest that such
a bar would have ramifications on innocent investors in Endurance,
the shipwreck salvage company with which they are both involved.
But the Court finds that the need to protect the investing public
as a whole outweighs the speculative possibility that 400 investors
within one company could suffer future harm.

The SEC requests a lifetime ban, but the statute permits the
Court to fashion a penny stock bar "for such period of time as the

court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6). Given the age of Mr. Dilley and Mr. Eldred, the Court determines that a 10-year penny stock bar is appropriate in this case. In declining to impose a lifetime bar, the Court is mindful of the guidance offered by the Fifth Circuit: "[W]hen the [SEC] chooses to order the most drastic remedies at its disposal, it has a greater burden to show with particularity the facts and policies that support those sanctions and why less severe action would not serve to protect investors." Steadman v. SEC, 603 F.2d 1126, 1137 (5th Cir. 1979).[2] The SEC has not explained why a lifetime bar is more appropriate than a lesser sanction. Given the Commission's failure to do so here, the Court will not impose the most drastic remedy, deciding that a temporally limited bar is sufficient on these facts.

The SEC also seeks a permanent penny stock bar against Spartan. Considering that Spartan dealt in penny stocks, the Court is persuaded that a permanent ban with respect to penny stocks is in order for Spartan.

C.  **Disgorgement**

The SEC originally sought disgorgement from Island in the amount of $147,508. (Doc. # 270 at 2). As the SEC explains it,

---

[2] Decisions of the Fifth Circuit rendered prior to October 1, 1981, are binding upon courts in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Island collected fees from 14 identified issuers as part of the scheme, and the Commission seeks to recover these "ill-gotten gains."

Currently, federal law provides for disgorgement in this way:

> (5) Equitable relief
> In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.
>
> . . .
>
> (7) Disgorgement
> In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

15 U.S.C. §§ 78u(d)(5), 78u(d)(7).

The first question this Court must address is whether it may order disgorgement at all. The key case in this area is the recent Supreme Court case of Liu v. SEC, 140 S. Ct. 1936 (2020). In that case, the Supreme Court held that the SEC could seek disgorgement through its power to award "equitable relief" under 15 U.S.C. § 78u(d)(5) so long as the award did not exceed the wrongdoer's net profits and was "awarded for victims." Id. at 1940. The Court wrote that while disgorgement was at heart an equitable remedy so long as it sought to restore ill-gotten gains from the wrongdoer to his victims, the SEC had been pushing the bounds of the equitable nature of the remedy in three ways: (1) "by ordering the proceeds

of fraud to be deposited in Treasury funds instead of dispersing them to victims"; (2) "imposing joint and several disgorgement liability"; and (3) "declining to deduct even legitimate expenses from the receipts of fraud." Id. at 1946.

As to the first problem, which centers on the importance of returning ill-gotten gains to defrauded victims, the Supreme Court stressed that "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless" the statute's language about the relief being "appropriate or necessary for the benefit of investors." Id. at 1948. This language "must mean something more than depriving a wrongdoer of his net profits alone, else the Court would violate the cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." Id. (quotation marks and citation omitted).

Importantly for this case, the Supreme Court specifically declined to address the question of whether, when it is impossible to identify defrauded victims, disgorged funds deposited into the Treasury could comply with the requirements of the statute, writing that:

> The Government additionally suggests that the SEC's practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors. It is an open question whether, and to what extent, that practice

20

nevertheless satisfies the SEC's obligation to award relief "for the benefit of investors" and is consistent with the limitations of § 78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles.

Id. at 1948-49.

After Liu, Congress amended the securities remedies statute as part of the National Defense Authorization Act of 2021 ("NDAA"). Specifically, the NDAA added subsection (7) above to expressly permit courts to "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, [] order [] disgorgement." 15 U.S.C. § 78u(d)(7). The NDAA also amended subsection (d)(3) to make it explicit that district courts have the power to impose both civil penalties and to "require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." Id. § 78u(d)(3). Thus, Sections 78u(d)(3) and (7), as added by the NDAA, do not contain the "for the benefit of investors" language that is still included in Section 78u(d)(5). The NDAA applies to "any action or proceeding that is pending on" January 1, 2021. NDAA, Section 6501(b). This action was pending on that date.

21

With this background in mind, the Court turns to the parties' arguments. The SEC concedes that "distribution of the disgorged funds to harmed investors is not feasible or practical in this case" and that while Defendants' conduct harmed the capital markets at large, "identifying specific investors who were harmed or the amount by which any particular investor was harmed is not possible." (Doc. # 270 at 14). The SEC's position is that "the only alternative that is consistent with equitable principles is to send the disgorged funds to the Treasury." (Id.). The parties have stipulated that a distribution to investors of the disgorgement amount requested would be infeasible. (Doc. # 287).

The SEC argues that the recent amendments under the NDAA "provide[] the courts with greater flexibility to determine where collected disgorged funds may be distributed, because the provision omits the phrase 'for the benefit of investors.'" (Doc. # 270 at 14 n.29). The Court takes the SEC's position to be that because the newly added provisions of the NDAA are silent on the question of whether funds must be returned to investors – i.e., because subsections (d)(3) and (7) do not contain the "for the benefit of investors" language that is included in subsection (d)(5) – the SEC need not show that disgorgement is for "the benefit of investors" and, thus, disgorgement to the Treasury is appropriate.

Again, the NDAA applies to the instant action because it was pending on January 1, 2021. NDAA, Section 6501(b). Thus, 15 U.S.C. § 78u(d)(7) explicitly provides this Court the ability to order disgorgement and does not require that such disgorgement be "for the benefit of investors." The Court holds that it may order disgorgement and direct that disgorged funds be sent to the Treasury under Section 78u(d)(7).

Alternatively, the Court holds that, even if it is (post-NDAA) still required to balance the equities under Liu, the equities here weigh in favor of disgorgement to the Treasury, rather than allowing Island to retain the money. Both parties, acknowledging that this case squarely presents the "open question" in Liu, have attempted to identify which traditional equitable principles should govern here. The SEC identifies two such principles. First, it argues that distribution to the Treasury serves the foundational principle that no person should benefit from his own wrongs and that, between Island and the Treasury, it is more equitable for the money to go to Treasury. (Doc. # 270 at 14). Second, it points to the legal doctrine of *cy pres*, arguing that where identifying victims is not feasible, the money should go to the nearest possible alternative. (Id. at 15). And Defendants also identify certain equitable principles: (1) that disgorgement here is inherently a penalty on Island and that equity never "lends its aid" to enforce a penalty; and (2) that the issuers who paid

the claimed money into Island were themselves fraudsters and the doctrine of unclean hands bars repayment of these funds. (Doc. # 273 at 11-12).

The Eleventh Circuit has yet to issue any guidance on this topic. The Court's independent research demonstrates that multiple district courts have, post-Liu, allowed disgorgement awards to be directed toward the Treasury. See SEC v. Bronson, No. 12-CV-6421 (KMK), 2022 WL 1287937, at *14 (S.D.N.Y. Apr. 29, 2022) (denying petitioner's challenge to disgorgement award in Rule 60 motion where the final judgment did not identify any identifiable harmed investors to whom the disgorged profits should be returned, concluding that the disgorgement award was consistent with Liu); SEC v. Almagarby, No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831, at *3 (S.D.N.Y. Aug. 16, 2021) (rejecting defendants' argument that disgorgement should be denied because the SEC had not identified any victims and there was no proximate causation between the defendants' securities law violation (failing to register as a dealer) and any losses from investors, writing that Supreme Court precedent does not require the SEC to "identify specific victims to whom a disgorgement award shall be distributed, or that all disgorged funds must be returned to investors, or that a disgorgement award should be limited to those funds that could be returned to investors"); SEC v. Laura, No. 18-CV-5075 (NGG)(VMS), 2020 WL 8772252, at *5 (E.D.N.Y. Dec. 30, 2020) (reasoning that

24

_Liu_ "does not require that a disgorgement award reflect every individually wronged investor's private agreements. If it did, a court would need to conduct a mini-trial as to each investor before it could order disgorgement. There is no reason to believe that _Liu_, which confirmed the breadth of the SEC's power to seek equitable awards, also stealthily erected such a substantial barrier to SEC recovery").

In sum, a balancing of the equities favors ordering disgorgement and allowing it to be sent to the Treasury. Between the money staying with Island, a key player in a scheme to put dubious equities on the market, or a fund at the Treasury, it is more equitable to order disgorgement.

Having determined that disgorgement is appropriate in this case, the Court must next calculate the amount of the disgorgement. The parties dispute the applicable statute of limitations. Once again, the NDAA comes into play here. The previous statute of limitations for disgorgement was five years. But in the NDAA, Congress mandated that the SEC may bring a disgorgement action under the newly added subparagraph (7) within 10 years of the latest violation of the securities laws for which scienter must be established, including section 10(b). 15 U.S.C. § 78u(d)(8)(A).

Defendants argue that the SEC did not amend its complaint to plead relief under the NDAA and, thus, it is more equitable for the five-year statute of limitations (in effect when the SEC first

filed this action) to apply. Moreover, Defendants call the NDAA's retroactivity provision constitutionally "dubious" because it violates the ex post facto clause and violates Island's due process rights. These arguments are unconvincing. This case was currently pending as of January 1, 2021, and thus the NDAA applies to it. One court has applied the NDAA even to cases where a judgment was entered under the old five-year statute of limitations but was still "pending" because the Second Circuit had not yet ruled on the parties' appeal. See SEC v. Ahmed, No. 3:15CV675 (JBA), 2021 WL 2471526, at *4 (D. Conn. June 16, 2021) (citing Landgraf v. USI Film Prod., 511 U.S. 244, 273-74 (1994) ("[A] court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit.")). What's more, Defendants fail to cite any authority in support of its due process and ex post facto arguments. Cf. SEC v. Gallison, No. 15 CIV. 5456 (GBD), 2022 WL 604258 (S.D.N.Y. Mar. 1, 2022) (holding that ex post facto clause did not preclude application of the NDAA's extended statute of limitations to disgorgement claims). Accordingly, the Court will apply a 10-year statute of limitations to the disgorgement award. As explained at the evidentiary hearing, taking into account certain tolling agreements, this allows the SEC to recover fees going back to 2008.

The SEC is entitled to disgorgement upon producing "a reasonable approximation" of a defendant's ill-gotten gains.

26

Calvo, 378 F.3 at 1217. "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. (citation and quotation marks omitted). Once the SEC has met its burden, the burden then shifts to the defendants to demonstrate that the SEC's estimate is not a reasonable approximation. Id. A defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008). Both parties seem to agree that the "reasonable approximation" standard has survived Liu. See SEC v. Tayeh, 848 F. App'x 827, 828 (11th Cir. 2021) (unpublished) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment from ill-gotten gains and must not be used punitively. The CFTC has the burden to produce a reasonable approximation of a defendant's ill-gotten gains to sustain a disgorgement amount." (citation omitted)); SEC v. Camarco, No. 19-1486, 2021 WL 5985058, at *15-16 (10th Cir. Dec. 16, 2021) (noting multiple courts across the country that continue to abide by the reasonable approximation standard).

The SEC here has compiled the amounts that Island received in fees from each of the 14 Mirman/Rose companies from the applicable statute of limitations date through the date of the issuer's bulk sale. In support, the SEC attached a declaration from Mark Dee, an

accountant with the SEC. He reviewed certain Island statements showing fees invoiced and paid by these 14 issuers. Dee then calculated a summary of the total fees paid by the issuers to Island during the relevant time frames. Dee's calculation shows the total fees collected as follows:

(1) Topaz Resources, Inc. f/k/a Kids Germ Defense Corp: $11,800
(2) MyGo Games Holding Co. f/k/a Obscene Jeans Corp.: $18,923
(3) On the Move Systems Corp.: $11,875
(4) Rainbow Coral Corp.: $13,975
(5) Angiosoma f/k/a First Titan: $8,375
(6) Neutra Corp.: $8,175
(7) Aristocrat Group Corp.: $11,208
(8) Rebel Group Inc. f/k/a Inception Technology Group Inc. f/k/a Moxian Group Holdings Inc. f/k/a First Social Networx: $10,674
(9) Global Group Enterprises Corp.: $9,779
(10) E-Waste Corp.: $9,474
(11) Codesmart Holdings Inc. f/k/a First Independence Corp.: $8,178
(12) Envoy Group: $7,500
(13) Changing Technologies Inc.: $9,400
(14) First Xeris Corp.: $8,172

**TOTAL:    $147,508**

See (Doc. # 270-1, Ex. 2).

The analysis is not yet complete because, under Liu, courts must deduct legitimate business expenses when fashioning disgorgement awards. See Liu, 140 S. Ct. at 1950 (explaining that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)" because "[a] rule to the contrary that makes no allowance for the cost and expense of conducting a business would be inconsistent with the ordinary principles and

practice of courts of chancery" (internal alterations and quotation marks omitted)).

Following the evidentiary hearing, both parties submitted documents identifying legitimate expenses incurred by Island prior to the bulk sale date for each company. The SEC tacitly agreed to most of these expenses, and to the extent it continues to argue that such expenses should not be deducted, that position is both unfair and inconsistent with Liu. The expenses identified by the parties include fees that Island paid to third parties for courier services, printing, and regulatory fees. The Court agrees that these expenses are appropriate to deduct, and they are supported by the statements provided by the SEC.

Defendants argue for further reductions, pointing out that the fees paid into Island do not account for the business's fixed costs and overhead. That may well be, but the only evidence that Island set forth in support of this argument were Island's audited annual financial statements for 2013 and 2014, along with the testimony of Mr. Eldred that Island's profit margins were typically between 10 and 25%. But this is insufficient to show that the SEC's estimate is not a reasonable approximation and, moreover, any risk of uncertainty necessarily falls on Island. See Calvo, 378 F.3 at 1217 (explaining that "[e]xactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of

uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty").

Accordingly, listed below are the total fees paid by each of the 14 issuers to Island up to the stipulated bulk sale dates; the legitimate business expenses incurred by Island prior to the bulk sale date; and the net fees for that account (that is, fees paid to Island less business expenses).

| Issuer | Fees Paid In | Expenses | Fees - Expenses |
|---|---|---|---|
| Angiosoma f/k/a First Titan | 8375 | 75 | 8,300 |
| Aristocrat Group Corp. | 11008[3] | 1136 | 9,872 |
| Changing Technologies | 9400 | 925 | 8,475 |
| E-Waste Corp. | 9474 | 274 | 9,200 |
| Global Group Enterprises | 9579[4] | 229 | 9,350 |
| MYGO Games f/k/a Obscene Jeans | 18923 | 8500 | 10,423 |
| On the Move Systems | 11675[5] | 3575 | 8,100 |
| Neutra Corp. | 8175 | 75 | 8,100 |
| Rainbow Coral Corp. | 13975 | 5075 | 8,900 |
| Topaz Resources f/k/a Kids Germ Defense Corp. | 11800 | 3500[6] | 8,300 |

[3] The Court excluded one $200 payment made after the bulk sale date.

[4] The Court excluded one $200 payment made after the bulk sale date.

[5] The Court excluded one $200 payment made after the bulk sale date.

[6] The SEC disputes whether this expense, marked on the statement as a $3,500 payment to the DTC (Depository Trust Company), should be included. While it is true that this was invoiced on April 6, 2010 (before the bulk sale date), and the next payment made was not until June 2010 (after the bulk sale date), as SEC witness

30

| Codesmart f/k/a First Independence Corp. | 8178 | 278 | 7,900 |
|---|---|---|---|
| Rebel Group f/k/a First Social Networx Corp. | 10674 | 974 | 9,700 |
| Envoy Group[7] | | | N/A |
| First Xeris Group[8] | 8172 | 272 | 7,900 |
| **TOTALS** | **$139,408** | **$24,888** | **$114,520** |

Accordingly, Island will be ordered to disgorge $114,520.00.

### D.    **Prejudgment Interest**

The SEC also seeks prejudgment interest on any disgorged amount, specifically, it seeks the IRS underpayment rate (what it would have cost to borrow money from the government). Courts in this Circuit regularly apply this rate in calculating prejudgment interest on disgorgement awards. See SEC v. Lauer, 478 F. App'x 550, 557–58 (11th Cir. 2012) (noting the widespread use of the IRS underpayment rate and holding that the district court did not abuse

---

Mark Dee testified, Topaz Resources had an odd payment history. It began with a $1,500 payment, prior to any invoice, and the issuer then made a $10,000 payment on February 23, 2010, even though there was only a $6,500 balance. The Court believes, on the whole, this DTC cost was in furtherance of setting up the issuer's account and is appropriately deducted as a legitimate business expense.

[7] The Court agrees with Defendants that because the SEC submitted only an invoice, not a statement, in support of the Envoy Group issuer, there is insufficient evidence to support a fee payment for Envoy Group.

[8] No bulk sale date.

its discretion in applying this "commonly used" rate). Because awards of prejudgment interest are compensatory, not punitive, the district court should make the interest decision through an "assessment of the equities." Id.

Defendants note that over $21,000 of the $51,000 requested in interest has accrued since the complaint was filed and they argue that the award would therefore unfairly penalize Island for exercising its right to defend itself. Defendants do not point to any case law in support of this proposition, and the Court does not find Defendants' argument persuasive.

Rather, the Court utilized the same framework employed by the SEC in calculating prejudgment interest – using the IRS underpayment rate, with interest compounded quarterly, and running from July 1, 2014 until February 28, 2022. But the Court utilized the disgorgement value calculated above: $114,520. The Court calculates that $39,874.05 is due in prejudgment interest. Thus, in total, Island owes $154,394.05. Regardless of the precise mathematical calculation, the Court believes this to be a fair and appropriate amount of disgorgement principal and interest.

**E. Civil Penalties**

Federal securities law authorizes a court to impose civil penalties for violation of the federal securities laws and provides three "tiers" of penalties in escalating amounts.

(1) First tier

For each violation, the amount of the penalty shall not
exceed the greater of (i) $5,000 for a natural person or
$50,000 for any other person, or (ii) the gross amount
of pecuniary gain to such defendant as a result of the
violation.

(2) Second tier
The amount of penalty for each such violation shall not
exceed the greater of (i) $50,000 for a natural person
or $250,000 for any other person, or (ii) the gross
amount of pecuniary gain to such defendant as a result
of the violation.

(3) Third tier
The amount of penalty for each such violation shall not
exceed the greater of (i) $100,000 for a natural person
or $500,000 for any other person, or (ii) the gross
amount of pecuniary gain to such defendant as a result
of the violation.

15 U.S.C. §§ 77t(d), 78u(d)(3).

These amounts are occasionally adjusted for inflation. Thus,
for the relevant period, Tier One penalties are $7,500/$80,000,
Tier Two penalties are $80,000/$400,000, and Tier Three penalties
are $160,000/$775,000. See (Doc. # 296-8).

The Court can determine the applicability of each tier only
"upon a proper showing" by the SEC. For a Tier Two penalty, the
Court must find that the violation "involved fraud, deceit,
manipulation, or deliberate or reckless disregard of a regulatory
requirement." 15 U.S.C. § 78u(d)(3). For a Tier Three penalty, the
Court must find that the violation "involved fraud, deceit,
manipulation, or deliberate or reckless disregard of a regulatory
requirement" **and** that the violation "directly or indirectly

33

resulted in substantial losses or created a significant risk of substantial losses to other persons." (Id.).

The amount of the civil penalty is determined by the district court judge "in light of the facts and circumstances" and is subject to the statutory maximums prescribed above. In evaluating the facts and circumstances of the case, the Court looks to factors such as: (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition. SEC v. Aerokinetic Energy Corp., No. 08-CV-1409, 2010 WL 5174509, at *5 (M.D. Fla. Dec. 15, 2010).

The SEC here argues for Third Tier penalties, arguing that at trial they presented evidence that (1) Defendants' violations involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (2) the violations created a significant risk of substantial losses. The Court agrees only in part.

First, the Court agrees with the SEC that Defendants' violations here involved fraud, deceit, manipulation, or

34

deliberate or reckless disregard of a regulatory requirement, which is sufficient to support Tier Two penalties. The jury here convicted Defendants of violating Section 10(b) and Rule 10b-5 of the Exchange Act, which requires that a material misrepresentation or omission be made with scienter. See FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (explaining that the elements of a claim under Section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss").

The Supreme Court has defined the level of scienter necessary to support a securities fraud claim as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). In order to adequately plead scienter in the Eleventh Circuit, a plaintiff must allege facts creating a "strong inference" that the defendant acted purposefully or with "severe recklessness." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010). Because the jury necessarily found that Defendants were at least severely reckless, this aligns with the penalty statute's requirement of "deliberate or reckless disregard of a regulatory requirement."

The trial evidence supports that Defendants acted with, at least, a reckless disregard for regulatory requirements and/or that their violations involved fraud, deceit, or manipulation. There were multiple instances where the FINRA Form 211s that Mr. Eldred or Mr. Dilley signed contained misrepresentations that Mr. Dilley or Mr. Eldred (and therefore Spartan and Island) should have known to be false. For example, some of the Forms 211s stated that Mr. Dilley had a phone call with the issuers when there was evidence that that was false.

The Court does not believe, however, that the SEC has demonstrated that the violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" sufficient to support Tier Three penalties. The SEC has not pointed to any evidence showing that the violations "resulted in substantial losses." And while the Court has reviewed the trial evidence that the SEC relies on to argue that the violations "created a significant risk of substantial losses to other persons," the most that can be said is that: (1) one of the fraudsters testified that the people who bought the shell companies wanted unrestricted stock so they would "be in a position" to engage in pump and dump schemes; and (2) the fraudster was "aware" that "one or two" of those companies later became pump and dumps, though he could not say which ones. (Doc. # 194 at 90-91).

36

This is insufficient. "Although all Section 10(b) or Rule 10b-5 frauds could be said to create some 'risk' of some 'harm' to investors, the Remedies Act reserves third-tier civil penalties for those frauds that create a significant risk of substantial losses." SEC v. Madsen, No. 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018). The SEC has not made that showing here.

Moving on, the SEC requests that the Court assess penalties for three "violations" against Mr. Dilley, two violations against Mr. Eldred, and a single violation against the corporate Defendants. (Doc. # 270 at 20). Defendants do not dispute this particular point of the civil-penalties analysis.

Turning now to the factors that the Court may look to in determining civil penalties, the Court has considered Defendants' roles in the overall scheme, the evidence admitted at trial tending to show that Defendants acted with a certain level of scienter in submitting Form 211s to FINRA containing false information, the fact that this information was originally provided by third parties (at the behest of Mirman and Rose), the fact that Defendants' actions facilitated the possibility of pump and dump schemes, the inability of the SEC to identify any harmed investors, the testimony given at the trial and the hearing on remedies, and all of the other pertinent facts and circumstances. Being so advised, the Court orders civil penalties in the amount of $150,000 each

37

against both Mr. Dilley and Mr. Eldred. The Court believes that these Defendants have equal culpability and should face equal civil penalties. The Court further orders that Spartan and Island each pay civil penalties in the amount of $250,000. The Court has determined that these amounts are fair and appropriate under all the facts and circumstances.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The Motion for Remedies filed by Plaintiff Securities and Exchange Commission (Doc. # 270) is **GRANTED in part and DENIED in part** as set forth herein.

(2) The Clerk is directed to enter judgments against the Defendants in accordance with this Order and thereafter **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>10th</u> day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE